IN THE

# United States Court of Appeals for the Fourth Circuit

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, ET AL.,

*Plaintiffs-Appellees*,

v.

SOCIAL SECURITY ADMINISTRATION, ET AL.,

*Defendants-Appellants.*

On Appeal from the U.S. District Court
for the District of Maryland
Case No. 1:25-cv-00596

## RESPONSE IN OPPOSITION TO
## MOTION FOR STAY PENDING APPEAL

Mark B. Samburg
DEMOCRACY FORWARD FOUNDATION
P.O. Box. 34553
(202) 448-9090
msamburg@democracyforward.org
*Counsel for Plaintiffs-Appellees*

*Additional counsel on signature page.*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT ......................................................................................................2

ARGUMENT .......................................................................................................5

I.     Plaintiffs are likely to succeed on the merits...................................5

     A.     Plaintiffs have standing. ........................................................5

     B.     Plaintiffs challenge a final agency action...........................11

     C.     Plaintiffs are likely to succeed on their Privacy Act and APA claims.................................................................................12

          1.     Privacy Act...............................................................12

               a.     Plaintiffs may proceed under the APA. ...............12

               b.     Defendants have violated the Privacy Act...........13

          2.     Arbitrary and capricious .........................................16

II.     Leaving the preliminary injunction in place will not injure Defendants, much less cause them irreparable harm.....................................18

III.     Staying the preliminary injunction would substantially harm Plaintiffs' members and be detrimental to the public interest........................19

     A.     Harm to Members ................................................................19

     B.     Detrimental to Public Interest .............................................20

CONCLUSION ...................................................................................................21

# INTRODUCTION

The Social Security Administration is the nation's largest benefits-paying agency, overseeing essential programs (including Old-Age, Survivors, and Disability Insurance and Supplemental Security Income) and helping administer those run by other agencies. To effectuate those programs, SSA houses vast amounts of highly sensitive, personally identifiable information ("PII"), including significant financial and medical information. From the agency's founding through the modern day, it has committed to keeping those records in the utmost confidence. That changed when SSA granted members of its Department of Government Efficiency ("DOGE") Team unfettered access to agency systems without a requisite need, in violation of the Privacy Act and in contravention of agency practice.

Defendants cast the preliminary injunction issued by the district court as inflicting harms of constitutional proportions. Their arguments rely on a stay decision issued by a panel of this Court on the basis of substantially different records and legal analysis. But Defendants fail to engage with the district court's fulsome analysis that, even considering the panel decision, Plaintiffs had demonstrated entitlement to a preliminary injunction. Nothing Defendants say calls that conclusion into question, and this Court should not stay the preliminary injunction on the basis of Defendants' unsupported and conclusory assertions.

**STATEMENT**

The Social Security Administration is the nation's largest benefit-paying agency and oversees essential programs (including Old-Age, Survivors, and Disability Insurance and Supplemental Security Income) while helping administer programs run by other agencies (including Medicare, Medicaid, and SNAP). ADD14. To effectuate those programs, SSA collects and stores a huge quantity of sensitive, personally identifiable information ("PII"). ADD 22. Much of this data is among the most sensitive information a person may have. SSA houses "medical and mental health records," including information that may carry a stigma, "financial and bank information," "tax records," "birth certificates," and "personal records concerning children." *See* ADD21–22, 68–69.

Ensuring the confidentiality of these records "has been a bedrock principle" of SSA since its inception. ADD10. The agency's first regulation required strict confidentiality for its records. ADD13. And it "has long communicated to the public its commitment to privacy," which has "informed the expectations of the American public that the information held by SSA is private and confidential." ADD151, ADD13.

President Trump established DOGE via executive order on the day of his inauguration, requiring each federal agency to establish a "DOGE Team." Exec. Order 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025) ("EO"). SSA immediately provided the DOGE Team with access to a "massive amount" of information in the agency's

systems of record, including non-anonymized and "sensitive, confidential, and personally identifiable information," even though its members had not satisfied standard training and background requirements and some were not properly detailed or hired by the agency. ADD10–11.[1]

Plaintiffs represent millions of American workers and retirees. ADD20. Members of each are distressed about DOGE's unlawful records access at SSA, which one Plaintiff member described as "almost like someone breaking into my house and stealing stuff." ADD69–70, 84–89. Plaintiffs filed suit and moved for emergency relief, alleging, *inter alia*, violations of the Administrative Procedure Act, 5 U.S.C. § 706(2), and the Privacy Act, 5 U.S.C. § 552a. The district court entered a temporary restraining order on March 20, 2025, the duration of which was extended to April 17 by the parties' agreement. Defendants moved for a stay pending appeal of the TRO, which this Court dismissed for lack of jurisdiction. No. 25-1291, Dkt. 20.

Shortly after Plaintiffs moved for a preliminary injunction, a motions panel of this Court issued a non-precedential order in *Am. Fed'n of Tchrs., et al. v. Bessent, et al.*, No. 25-1282 (4th Cir. April 7, 2025) (hereinafter *Bessent*). The *Bessent* plaintiffs challenged the provision of Office of Personnel Management and

---

[1] DOGE Team members also requested the source code for SSA's complex systems. ADD11, 33.

Departments of Education and Treasury data to DOGE. They secured a preliminary injunction, which the panel stayed pending consideration on appeal.[2]

On April 17, the district court in this case granted a preliminary injunction, *see* ADD1–6, and issued a related memorandum opinion, concluding that Plaintiffs prevailed on all the *Nken* factors. Having closely examined the tort of intrusion upon seclusion and the differences between this case and *Bessent*, the court concluded that Plaintiffs had associational standing and had shown a likelihood of success on their claims that SSA's decision to grant blanket access to the DOGE Team—which the court concluded was final agency action—was arbitrary and capricious and violated the Privacy Act as pled through the APA.

The injunction allows DOGE Team members to access anonymized records after completing the training and background checks typically required of SSA employees whose duties involve access to PII. ADD2–3. DOGE Team members who meet those requirements and from whom SSA obtains explanations of need may access discrete, particularized, and personally identifiable information in the agency's systems. ADD1–3.

Defendants immediately appealed, moving for a stay in the district court hours after issuance of the injunction and, without waiting for a ruling, filing the motion now before this Court. ADD187. The district court subsequently denied their motion. ECF 154.

---

[2] By a vote of 8 to 7, the Court's active judges voted to deny initial hearing *en banc*.

# ARGUMENT

In assessing whether to grant a stay, this Court considers: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). A district court's decision on a preliminary injunction should be examined only for abuse of discretion, which is a "deferential standard." *Real Time Med. Sys. v. PointClickCare Techs.*, 131 F.4th 205, 224 (4th Cir. 2025). Here, Defendants are not entitled to a stay.

## I. Plaintiffs are likely to succeed on the merits.

### A. Plaintiffs have standing.

Plaintiffs sustain a concrete injury under Article III if, *inter alia*, their injury bears "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Defendants here challenge only that prong of the standing analysis, and their challenges are wrong. Plaintiffs adequately allege injury in fact by alleging (and providing evidence of) harm akin to that covered by the traditional common law tort of intrusion upon seclusion.

SSA's records contain the same information traditionally found in a home ("personal records concerning children," "tax records," "birth certificates"), a bank

or wallet ("financial and bank information"), a physician's office ("medical and mental health records," "hospitalization records"), or another secluded location ("work and earnings history"). ADD68–69. Both the nature of those records and the existence of the Privacy Act, applicable federal regulations, and SSA's own practices and public statements mean that Plaintiffs' members have an objectively reasonable expectation of privacy regarding the information collected and maintained by SSA.

Congress prohibited the disclosure[3] of agency records to employees without a specific need precisely because the government's use of computers and information technology "greatly magnified the harm to individual privacy that can occur." *See* 5 U.S.C. § 552a(b). And SSA's policy of protecting PII, even within the agency, is consistent with its regulations. *See, e.g.*, 20 C.F.R. Pt. 401, App. A(d)(1) (providing for disclosure within SSA only to employees with "a legitimate need to know the record" in the course of their official duties); ADD100–06 (quoting Administrative Record excerpts and unrefuted declarations regarding SSA's emphasis on "least privilege" data access, segregation of duties, and "zero-trust" principles). That Plaintiffs' members' information is in SSA's secure, statutorily protected systems— which are open to neither the public nor the overwhelming majority of the agency's

---

[3] SSA regulations define "disclosure" as "making a record about an individual available to . . . another party." 20 C.F.R. § 401.25. For that and other reasons, the district court properly found that "disclosure of a record includes access to the record." ADD120.

employees, *see* ADD107—does not render the harm associated with its unauthorized access distinct from that inflicted by accessing the same information from a home, doctor's office, or bank.

Nor did Plaintiffs have an "understanding" that unauthorized, unvetted personnel without a need for access to their PII would be given unfettered access to those records. *See* Mot. 10–11. Defendants' assertion otherwise runs headlong into the district court's findings of fact. ADD88–89, n.39; *see Piney Run Pres. Ass'n v. Carroll Cnty. Comm'rs*, 268 F.3d 255, 262 (4th Cir. 2001) ("In analyzing a decision on Article III standing, we review the district court's factual findings for clear error.").[4]

This kind of unauthorized access to or disclosure of private information causes a harm closely related to traditional examples of intrusion upon seclusion, even when the information is not stored in a specific physical location. *See Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921–23 (4th Cir. 2022) (plaintiffs had standing based on claim that defendants obtained their names and addresses from state motor vehicle records); Restatement (Second) of Torts (1977) § 652B (defining intrusion upon

---

[4] Nor does Plaintiffs' members' provision of their data to SSA in the first instance support the conclusion that they voluntarily disclosed their private information to all SSA workers (including DOGE Team members), or that they lost their reasonable expectation of privacy in the information. *See Carpenter v. United States*, 585 U.S. 296, 310–13 (2018) (in Fourth Amendment context, a "person does not surrender all . . . protection by venturing into the public sphere"). Here, Plaintiffs reasonably expected SSA would maintain the privacy of their data, even within the agency.

seclusion as involving "intentional[] intru[sion], *physically or otherwise*, upon the solitude or seclusion of another or his *private affairs or concerns*" (emphasis added)); David A. Elder, *Privacy Torts* §§ 2.6, 2:22 (providing examples where disclosure of medical or other confidential information amounted to intrusion on seclusion).

Defendants dispute analogies to that tort, asserting that Plaintiffs' alleged injury "in no way resembles" an "intrusion into private space." Mot. 10. Their assertion turns on an imagined distinction between unauthorized access to sensitive records, on the one hand, and physical intrusion into spaces such as homes or safe deposit boxes, on the other. Mot. 9–10. But as Judge Richardson explained, physical intrusion is not required. *Bessent* at 11 ("Prying eyes and probing fingers can be as disquieting when aimed at one's private affairs as when aimed at one's private bedroom."). And unauthorized access to private, highly sensitive information intended to be securely maintained by the government may be just as harmful as unauthorized access to private information maintained in a home. *See* ADD93 (comparing the harm associated with receiving a single unwanted text message to that caused by providing the DOGE Team with unauthorized access to vast quantities of personally identifiable medical records and sensitive financial information). Indeed, "both the common law and the literal understandings of privacy encompass the individual's control of *information* concerning his or her

person." *Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 763 (1989) (emphasis added).

Moreover, as Judge Richardson noted, intrusion upon seclusion guards "against the feeling of unease when and where one should ideally be at peace." *Bessent* at 10. Here, the record is replete with examples of that unease, ADD69–70 (quoting declarations); Defendants have conceded that the records at issue "are admittedly very private," ADD89 (quoting transcript); and SSA's grant of unrestricted access to PII to the DOGE Team would be highly offensive to an objectively reasonable person, ADD85–87 (citing cases and literature reflecting societal expectations).

Defendants also argue that Plaintiffs lack standing because the government's conduct does not resemble "opening of private mail or snooping in private accounts." Mot. 12. To begin, it should be self-evident that granting access to, *inter alia*, HIV treatment records to employees without a need for them is, at minimum, an intrusion similar in kind to someone rifling through their neighbor's mail. Second, this argument pulls from Judge Richardson's conclusion that the alleged harm in *Bessent* was "different in kind, not just in degree, from the harm inflicted by reporters, detectives, and paparazzi." *Bessent* at 12. But whatever the record in *Bessent*, here Defendants have admitted that DOGE Team members—charged only with "modernizing Federal technology and software to maximize governmental

efficiency and productivity," EO ¶ 1, are "working on individual cases and may be reaching out to individuals," ECF 62-1 ¶ 9.

Defendants further argue that a plaintiff suffers no harm absent individual targeting of their information. Defendants cite no precedential authority for support, and this Court's sister circuits have held that plaintiffs have standing even when a defendant gathers information programmatically. *See, e.g.*, *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1275 (9th Cir. 2019) (plaintiffs had standing to sue Facebook for using software that stored biometric data).

*Garey* also supports Plaintiffs' standing. There, the defendants "knowingly obtain[ed]" names and addresses from motor vehicle records. 35 F.4th at 922 (quoting complaint). In *Bessent*, Judge Agee posited that both obtainment and use of information are necessary to cause a cognizable injury. *Bessent* at 4–5. But in *Garey*, one plaintiff group sued *exclusively* on an "obtaining" theory of liability. *Garey*, 35 F.4th at 923. This Court nonetheless concluded that the group had standing to sue. *See id.*

Finally, while plaintiffs cannot establish a cognizable injury in fact merely by pleading a statutory violation, Congress can "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992)). In enacting the Privacy Act, Social Security

Act, and other statutes, Congress recognized that improper disclosure of PII, "even to government employees," "poses a harm to legitimate privacy interests." ADD17.

### B. Plaintiffs challenge a final agency action.

In providing unfettered access to the DOGE Team members, SSA has taken an action within the meaning of 5 U.S.C. § 704. As demonstrated by Plaintiffs' evidence and the Administrative Record, and as the district court concluded after detailed review, SSA's decision to provide the DOGE Team with expansive access to SSA record systems (without signed detail agreements, adequate training, completed background investigations, executive work forms, or actual need) is a "sea change" in agency practice, *see* ADD111, not discrete decisions as to individual employee relationships.[5]

SSA's decision here was likewise final. It was made by the agency's top official. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 151 (1967) (ruling of subordinate official evinces lack of finality). And it had the "immediate and practical impact," *City of New York v. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019), of determining the rights of Plaintiffs' members (whose information was being

---

[5] The record on this point differs from *Bessent. Bessent* at 13 (Richardson, J., concurring and noting "doubt" regarding a determination of final agency action based on the record).

accessed) and the obligations of the Defendants (with regard to that data), *see Bennett*, 520 U.S. at 177.

This case is on all fours with *Venetian Casino Resort, LLC v. EEOC*, in which the D.C. Circuit held an agency's decision to adopt a policy of disclosing confidential information without notice final for purposes of APA review. 530 F.3d 925 (D.C. Cir. 2008). Defendants' attempt to distinguish it by arguing that case applies only to policies of third-party disclosure, Mot. 19, something that the *Venetian* court never said nor implied, is unpersuasive.

### C. Plaintiffs are likely to succeed on their Privacy Act and APA claims.

#### 1. Privacy Act

##### a. *Plaintiffs may proceed under the APA.*

Contrary to Defendants' arguments, the relevant statutes do not require Plaintiffs' members and the hundreds of other millions of Americans who will imminently suffer Privacy Act violations to *wait* for that harm to befall them and subsequently sue for damages. Instead, as several courts, including this one, have recognized, the Privacy Act's provision of injunctive relief in specific, limited situations (requests to amend or produce specific, individual records) does not displace the availability of such injunctive relief under the APA in other contexts. *See Doe v. Chao*, 435 F.3d 492, 505 n. 17 (4th Cir. 2006) ("[I]njunctive relief for [Privacy Act] violation … [is] appropriate and authorized by the APA."); *All. for*

*Retired Ams. v. Bessent*, 2025 WL 740401 at *19 (D.D.C. Mar. 7, 2025) ("[T]he Privacy Act is not the kind of comprehensive and 'exclusive' remedial statute that impliedly displaces related remedies under other statutes.") (citing *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024)). Indeed, the Privacy Act's "inattention" to "standards of proof governing equitable relief that may be open to victims of adverse determinations or effects … may be … explained by the general provisions for equitable relief within the" APA. *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004).

Without an injunction, Plaintiffs' members know that their data will be accessed in a manner that violates their privacy and is contrary to SSA's longstanding approach. Most concerningly, the custodians of their data not only will not attempt to resolve that unlawful access, but instead actively facilitate it. The Privacy Act is "not addressed to the type of grievance which the plaintiff seeks to assert" here, meaning that "the statute cannot prevent an APA suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012) (citations omitted).

### b.     Defendants have violated the Privacy Act

Defendants pin their Privacy Act theory on the "need to know" exception, 5 U.S.C. § 552a(b)(1), which allows disclosure of records to "employees of the agency … who have a need for the record in the performance of their duties." But the district

court found, after a sweeping and thorough review of the record, that DOGE Team members at SSA do not have a need for the unprecedented and sweeping access they seek. ADD122–41. And while the district court asked SSA Acting Commissioner Dudek to appear at the preliminary injunction hearing because his testimony on this point would "be helpful," Defendants instead elected to stand on the record. ADD18–19.

Defendants attempt to establish need by relying on the EO. But the EO focuses on modernizing IT and maximizing governmental efficiency generally; it does not purport to establish a need specific to SSA, much less as to non-anonymized data in any particular SSA system of records, or for anyone to have unfettered access to *all data* at SSA. Nor does it make any mention of anti-fraud work, the nominal basis for much of the DOGE Team's access. *See* Mot. 23. Treating this EO as establishing a need in these circumstances would effectively eliminate the Act's protections, which were meant to limit executive branch access.[6] And an executive order cannot "license [Defendants] to violate the Privacy Act." *Parks v. IRS*, 618 F.2d 677, 681 (10th Cir. 1980).

---

[6] The Privacy Act was "designed to prevent the kind of illegal, unwise, overbroad, investigation and record surveillance of law-abiding citizens produced in recent years from actions of some over-zealous investigators, and *the curiosity of some government administrators*." S. Rep. No. 1183, 93d Cong., 2d Sess. (1974) (emphasis added).

To avail themselves of the "need to know" exception, Defendants would need to show that each grant of access was supported by a need: each time a DOGE Team member was given access to PII, he "must [have]… examined the record in connection with the performance of duties assigned to him and [must have] had to do so in order to perform those duties properly." *Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000). But, as the district court found, Defendants' justifications "are thin" and "[n]othing in the specific requests suggests that the DOGE Team members required unlimited access to PII to perform their work." ADD135. And while the district court asked SSA Acting Commissioner Dudek to appear at the preliminary injunction hearing because his testimony would be helpful on this point, Defendants elected to stand on the record. ADD18–19.

Defendants effectively concede this point, acknowledging that the DOGE Team could do its work with anonymized versions of data, albeit more slowly in some instances. *See* ADD135–36. Indeed, as Defendant Dudek himself explained, the DOGE Team could perform at least some of its work by first reviewing "anonymized, aggregated data" and then reviewing "individual data only when anomalies are identified." ADD138 (quoting Dudek Decl., ECF 74–1, ¶ 8).

*Second*, DOGE Team members are not employees of SSA for purposes of the Privacy Act. This eliminates the availability of the "need to know" exception, which applies only to intra-agency disclosures. 5 U.S.C. 552a(b)(1).

Determining which agency employs an individual is a "practical" assessment, in which it is appropriate to consider "all the circumstances," including assignments and supervisors. *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 131–32 (D.C. Cir. 2005) (quotation omitted). This practical assessment reveals that DOGE, not SSA, "employs" the DOGE Team. DOGE Team members are functionally supervised by DOGE, and by Defendants' own characterization, the DOGE Team "exists" to fulfill the DOGE agenda. Mot. 22. The EO requires DOGE Team members to "coordinate their work with" DOGE but requires only that the Team "advise" the Acting Administrator at SSA. EO § 3(c). Given that there are DOGE Teams across agencies, coordination must mean attention to the instructions and expectations of DOGE. And the record makes that clear. *See, e.g.*, Romig Decl., ECF 39–2, ¶¶ 2–4.

## 2. Arbitrary and capricious

Record evidence substantiates the district court's finding that SSA acted arbitrarily and capriciously, but Defendants fail to grapple with these facts.

*First*, in allowing this unprecedented scale of access in contravention of SSA's usual practices, *see* ADD100–06, Defendants neither disclosed nor acknowledged a change in position. *See Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018) ("At a minimum, an agency must 'display awareness that it is

changing position[s].'" (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)).

*Second*, Defendants never explained their choice of unrestricted access, instead of pursuing a more limited pathway (e.g., anonymized data, fewer systems of records, or maintaining prior training and vetting requirements). *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (internal quotation marks and citation omitted)); *Casa de Maryland*, 486 F. Supp. 3d at 963 ("failure to consider an important policy alternative" rendered agency action arbitrary and capricious (internal citations omitted)). SSA further failed to acknowledge the risks to the data it houses or the agency's own reputation— "important aspect[s] of the problem." *State Farm*, 436 U.S. at 43.

*Third*, SSA never acknowledged or considered the serious reliance interests that their privacy policies—conveyed through SSA regulations, the agency's website, and its communications with customers, *see* ADD88—engendered. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (requiring consideration of reliance interests to survive arbitrary and capricious review).

## II. Leaving the preliminary injunction in place will not injure Defendants, much less cause them irreparable harm.

Defendants will not suffer irreparable harm absent a stay. To start, Defendants' contention that the government's interests and those of the public "merge" when the government is seeking a stay is flatly incorrect. Mot. 24 (citing *Nken*, 556 U.S. at 435). The merger discussed in *Nken v. Holder* is the familiar principle that the third and fourth *Nken* factors (the balance of equities and the public interest) merge when the government is the *opposing* party, not whenever the government is a party. *See* 556 U.S. at 435.

Moreover, Defendants' assertions of harm as to the President's authority and his effort to "modernize fraud, waste, and abuse," Mot. 24–25, are conclusory and unconvincing. The preliminary injunction has no impact on non-DOGE fraud efforts at the agency and expressly permits the DOGE Team to pursue anti-fraud efforts by accessing anonymized data or examining discrete, particular, non-anonymized data, subject to certain baseline requirements. ADD2–3. This structure is in keeping with long-held agency practices. *See* ADD100–06.[7]

Defendants do not even attempt to explain why these nonexistent harms are irreparable. They are not. As Defendant Dudek told the district court, the DOGE

---

[7] As discussed above, Defendants have never explained why anonymization is impracticable.

Team's projects are "work [SSA has] never gotten around to as an agency." Emergency Tel. Conf. at 10 (Mar. 27, 2025), ECF 73. Any delay as this Court fully considers the case would thus have limited impact. And even if Defendants' anti-fraud efforts were temporarily halted, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough" to constitute irreparable harm. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

### III. Staying the preliminary injunction would substantially harm Plaintiffs' members and be detrimental to the public interest.

#### A. Harm to Members

A stay would "substantially injure" Plaintiffs' members, *see Nken*, 556 U.S. at 434, by allowing Defendants to proceed as they did before entry of the TRO—unlawfully and with disregard for both SSA's well-established practices and the privacy interests of millions. It would allow Defendants to violate the privacy of Plaintiffs' members and misuse sensitive personal information, potentially transmitting it to other agencies, running it through artificial intelligence, or otherwise using it in a manner to which Plaintiffs' members did not consent.

The other cases Defendants cite concerned different agencies' systems, which contain records of various sensitivity, and involved substantially different evidence and allegations of harm. Defendants make no effort to explain why those cases are analogous here.

Nor is Judge Richardson's *Bessent* concurrence dispositive. That concurrence stated that "without more," the *Bessent* plaintiffs could not prove irreparable injury. *Bessent* at 15. (Richardson, J., concurring). This case provides that "more." As explained above, the record here is factually distinct from that before the Court in *Bessent*. Plaintiffs have demonstrated injury in fact, and, unlike in *Bessent*, the district court concluded that SSA's action was likely arbitrary and capricious, the harms from which, statutorily, "cannot be fully rectified" by money damages after trial. *See Mountain Valley Pipeline, LLC v. Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks and citations omitted).

Further, Judge Richardson's concern that the DOGE Teams at the *Bessent* agencies had already accessed PII, *Bessent* at 15–16, does not alter the conclusion here, where the TRO and preliminary injunction both required DOGE Team members to disgorge and delete any data previously obtained. The injunction here does exactly what injunctions normally do: "forestall[] impending events that would be difficult to reverse." *Bessent* at 16.

### B.    Detrimental to Public Interest

Defendants' limited public interest argument appears to be that the injunction frustrates the President's ability to "effectuate policy priorities through lawful direction of the Executive Branch." Mot. 25. To be sure, "'Energy in the [E]xecutive' is much to be respected." *Abrego-Garcia v. Noem*, 25-1404 (4th Cir. April 17, 2025)

(Wilkinson, J.) (citations omitted). Plaintiffs do not contest that the President's "lawful direction" of the Executive Branch is in the public interest. *See* Mot. 25. But permitting an administration to flout the law while pursuing its goals is undoubtedly not. Indeed, as this Court's sister circuits have recognized, there is a strong public interest in "having governmental agencies abide by the laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *see Roe v. Dep't of Def.*, 947 F.3d 207, 230-31(4th Cir. 2020) (citing with approval the district court's statement that "the 'public undoubtedly has an interest in seeing its governmental institutions follow the law. . . .'"). That is especially true here, where privacy—a right protected since the country's founding, *see Carpenter*, 585 U.S. at 304–05, and embodied in the Constitution and laws, including the Privacy Act—is at stake and where millions have relied on SSA's commitments to keep their sensitive information private. The public interest in presidential policy priorities must be tempered by other, equally valuable interests, and would be better weighed and considered by this Court on full briefing.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' emergency motion for a stay of the district court's preliminary injunction.

Dated: April 23, 2025

Respectfully submitted,

*/s/ Mark B. Samburg*
Mark B. Samburg
Alethea Anne Swift
Emma R. Leibowitz
Robin F. Thurston
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
msamburg@democracyforward.org
aswift@democracyforward.org
eleibowitz@democracyforward.org
rthurston@democracyforward.org

Brian A. Sutherland
Anna-Rose Mathieson
COMPLEX APPELLATE LITIGATION GROUP LLP
96 Jessie Street
San Francisco, CA 94105
brian.sutherland@calg.com
annarose.mathieson@calg.com

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

This filing complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 4,760 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This filing also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Windows in 14-point Times New Roman.

April 23, 2025                                    */s/Mark B. Samburg*
                                                  Mark B. Samburg

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit via the CM/ECF system. Counsel for all parties are registered CM/ECF users, and service was completed by that system.


 */s/ Mark B. Samburg*
Mark B. Samburg