# SUPREME COURT OF THE UNITED STATES

―――――
No. 24A1063
―――――

## SOCIAL SECURITY ADMINISTRATION, ET AL. *v.* AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, ET AL.

ON APPLICATION FOR STAY

[June 6, 2025]

On January 20, 2025, the President signed an executive order "establish[ing] the Department of Government Efficiency" (DOGE) with the goal of "modernizing Federal technology and software to maximize governmental efficiency and productivity." Exec. Order No. 14158, 90 Fed. Reg. 8441. The executive order requires agency heads to establish "DOGE Team[s]" within their agencies and to "ensure [DOGE] has full and prompt access to all unclassified agency records, software systems, and IT systems" in a manner "consistent with applicable law." *Id.*, §§3(c), 4(b), 5(b). On April 17, the District Court preliminarily enjoined the Social Security Administration (SSA) from granting DOGE affiliates access to various SSA records, subject to certain exceptions. The en banc Fourth Circuit denied the Government's request to stay the preliminary injunction by a vote of nine to six. The Government now seeks a stay from this Court.

When considering whether to grant a stay, this Court looks to four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken* v. *Holder*, 556 U. S. 418, 434 (2009) (quoting *Hilton* v. *Braunskill*, 481

U. S. 770, 776 (1987)). After review, we determine that the application of these factors in this case warrants granting the requested stay. We conclude that, under the present circumstances, SSA may proceed to afford members of the SSA DOGE Team access to the agency records in question in order for those members to do their work.

The application for stay presented to THE CHIEF JUSTICE and by him referred to the Court is granted. The April 17, 2025, preliminary injunction entered by the United States District Court for the District of Maryland, case No. 1:25–cv–596, is stayed pending the disposition of the appeal in the United States Court of Appeals for the Fourth Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

JUSTICE KAGAN would deny the application.

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting from the grant of application for stay.

Today the Court grants "emergency" relief that allows the Social Security Administration (SSA) to hand DOGE staffers the highly sensitive data of millions of Americans. The Government wants to give DOGE unfettered access to this personal, non-anonymized information *right now*—before the courts have time to assess whether DOGE's access is lawful. So it asks this Court to stay a lower court's decision to place temporary and qualified limits on DOGE's data access while litigation challenging DOGE's authority to access the data is pending. But the Government fails to substantiate its stay request by showing that it or the public will suffer irreparable harm absent this Court's intervention. In essence, the "urgency" underlying the Government's stay application is the mere fact that it cannot be bothered to wait for the litigation process to play out before

proceeding as it wishes.

That sentiment has traditionally been insufficient to justify the kind of extraordinary intervention the Government seeks. But, once again, this Court dons its emergency-responder gear, rushes to the scene, and uses its equitable power to fan the flames rather than extinguish them. See, *e.g.*, *Noem* v. *Doe*, 605 U. S. \_\_\_, \_\_\_ (2025) (JACKSON, J., dissenting from grant of application for stay) (slip op., at 5) (explaining that, by granting a stay, the Court was allowing the Government to terminate the lawful parole status of half a million noncitizens before the courts could determine whether such agency action was lawful). Once again, respectfully, I dissent.

I

A

The SSA and the sensitive data it collects are well known to Americans who entrust their information to that government agency. Social Security numbers, birth dates, addresses, bank-account numbers, medical records—all of that, and more, is in the mix. Every person who has received a Social Security number appears in the SSA's data. And beyond the identification numbers and retirement benefits that bear the agency's name, the SSA also administers a host of other programs, such as Social Security Disability Insurance, which collects detailed medical histories (describing, for example, prescriptions, mental-health treatments, and testing results for sensitive health conditions like HIV) from applicants and beneficiaries. See App. to Application for Stay 98a–99a (App.). Since 1935, the SSA has been collecting, storing, and, perhaps most importantly, *protecting* the information that Americans provide.

Some of the most critical safeguards are established in a federal law called the Privacy Act of 1974, 5 U. S. C. §552a, which Congress enacted "to protect the privacy of individu-

4                   SSA *v.* AFSCME

JACKSON, J., dissenting

als identified in information systems maintained by Federal agencies." §2(a)(5), 88 Stat. 1896. In its findings supporting the Privacy Act, Congress focused on "the collection, maintenance, use, and dissemination of personal information by Federal agencies," specifically noting that those agency practices "directly affec[t]" individual privacy. §2(a)(1), *id.*, at 1896. Congress also recognized "the harm to individual privacy that can occur" from the Government's mishandling of Americans' sensitive information—harm that can relate to "employment, insurance, and credit," among other areas of life. §§2(a)(2)–(3), *ibid.*

To protect against the significant privacy risks that the Government's handling of Americans' sensitive information creates, the Privacy Act regulates federal agencies' "collection, maintenance, use, and dissemination of" such data. §2(a)(5), *ibid.* As relevant here, the Act prohibits agencies from disclosing covered data except in narrow circumstances, such as where agency employees "have a need for the record in the performance of their duties." 5 U. S. C. §552a(b)(1).

It should come as no surprise, then, that the SSA has long followed a policy of restricting access to the personal records the agency maintains, consistent with the Privacy Act and similar laws. App. 24a, 116a–117a. For example, before granting its employees access to SSA data, the agency strictly enforces background checks, training requirements, and agreements outlining sanctions for misuse of data. *Id.*, at 114a–122a. It also limits employees' access to sensitive data to only what they need in order to perform their assigned job responsibilities. *Id.*, at 114a.

B

The SSA's established practices for handling Americans' data changed dramatically after January 20, 2025—the day the President issued an Executive Order creating the Department of Government Efficiency, or DOGE. Exec. Order

Cite as: 605 U. S. \_\_\_\_ (2025) 5

JACKSON, J., dissenting

No. 14158, 90 Fed. Reg. 8441. DOGE's stated purpose was to "modernize[e] Federal technology and software to maximize governmental efficiency and productivity." *Ibid.* According to the Government, the core of DOGE's work involves "'"identifying fraud, waste, and abuse."'" App. 41a. DOGE demanded immediate and unfettered access to the SSA's data and systems shortly after its creation. *Id.,* at 46a–48a. And though it encountered initial obstacles, DOGE soon obtained access to troves of sensitive information stored in the SSA's computer files. *Ibid.*

Record evidence reflects that DOGE received far broader data access than the SSA customarily affords for fraud, waste, and abuse reviews. A former Acting Chief of Staff at the SSA recounted that similar investigations typically "'start with access to high-level, anonymized data based on the least amount of data the analyst or auditor would need to know.'" *Id.,* at 48a. Only if suspicious entries appear would the reviewer then gain "'access [to] more granular, non-anonymized data [limited] to just that subset of files.'" *Ibid.*

In February 2025, respondents (two labor unions and a grassroots advocacy organization) filed a lawsuit in the District of Maryland, seeking to block DOGE from breaching the SSA's standard protocols. Respondents alleged that, by opening the SSA's data systems to unfettered access by DOGE personnel, the SSA and DOGE officials had run afoul of the Privacy Act and the Administrative Procedure Act (APA), 5 U. S. C. §706(2).

After assessing the relevant legal factors and evidence, the District Court entered a preliminary injunction that temporarily placed qualified limitations on DOGE staffers' access to SSA data. Its order was accompanied by a 145-page opinion laying out the court's legal reasoning and factual findings. The District Court found, specifically, that respondents were likely to succeed on the merits of their

claims that the SSA's and DOGE's actions violated the Privacy Act and the APA. App. 166a. It also found that, absent temporary injunctive relief, respondents' members would suffer irreparable injury from the disclosure of their personal information to DOGE staffers—harm that could not later be remedied with money damages. *Id.*, at 161a–162a.

The Government appealed and requested a stay of the District Court's order. The Court of Appeals for the Fourth Circuit, sitting en banc, declined to stay the preliminary injunction pending its resolution of the merits. *Id.*, at 2a. So, the Government now seeks a stay from us.

II

Just last week, I wrote about the requirements for granting stay applications and, in particular, how this Court's emergency-docket practices were decoupling from the traditional harm-reduction justification for equitable stays. See *Noem*, 605 U. S., at ___ (slip op., at 5). With today's decision, it seems as if the Court has truly lost its moorings. It interferes with the lower courts' informed and equitable assessment of how the SSA's data is best accessed during the course of this litigation, and it does so without any showing by the Government that it will actually suffer concrete or irreparable harm from having to comply with the District Court's order.

What the lower courts have done here is carefully craft interim relief tailored to the needs of the moment. To start, the District Court received sworn evidence about what DOGE wants to do and considered all of the interests at stake. Moreover, and importantly, the District Court repeatedly asked the critical question: *Why* does DOGE need immediate, unfettered, and unprecedented access to highly sensitive non-anonymized data to accomplish its objectives? The Government's answers were "imprecise, contradictory, and insufficient." App. 154a. And when the court requested further clarification, the Government passed. *Id.*, at 32a

(choosing instead to "'stand on the record in its current form'"). Ultimately, the court found, the Government "never made clear why . . . the DOGE Team requires unbridled access to the [personally identifiable information] of countless Americans in order to effectuate [its] responsibilities." *Id.*, at 154a.

Despite the Government's poor showing, the District Court still structured its injunction in a minimally burdensome manner from the Government's standpoint. The injunction allows the SSA to provide DOGE staffers with access to redacted or anonymized data and SSA records, so long as DOGE staffers meet the training, background-check, and other requirements that generally govern such access. *Id.*, at 170a–171a. The injunction also permits the SSA to grant DOGE staffers access to "discrete, particularized, and non-anonymized data" if DOGE gives the agency a written explanation of its specific need for the records. *Id.*, at 171a. And the injunction expressly leaves intact the SSA's "ordinary operations." *Id.*, at 172a. Thus, in the end, the District Court's order amounts to a short-term pause on giving DOGE unfettered and uniquely unprotected access to millions of Americans' sensitive, non-anonymized data, paired with reasonable conditions on data access in the interim.

Dissatisfied with even those minor limitations, the Government rushed to the Fourth Circuit and sought a stay of the District Court's injunction. That court then considered the matter en banc, and its judges, too, commented on the Government's poor performance. One highlighted "the government's inability to provide a convincing explanation of how it will be tangibly and irreparably harmed absent a stay." *Id.*, at 15a (Heytens, J., concurring in denial of stay). Another noted that, based on the record, "DOGE's work could be accomplished largely with anonymized and redacted data, along with discrete pieces of non-anonymized data in limited, appropriate circumstances—as has long

been typical at SSA for the type of technology upgrades and waste, abuse, and fraud detection that DOGE claims to be doing." *Id.*, at 7a (King, J., concurring in denial of stay).

The Fourth Circuit's evaluation led it to deny the Government's request for a stay. Still, that court committed to continue addressing this matter en banc, and it set a briefing schedule with respect to the Government's substantive appeal of the District Court's preliminary injunction. Briefing is scheduled to conclude next month, and the arguments presented will be considered and ruled upon by all the active judges on that court.

### III

Stepping back to take a birds-eye view of the stay request before us, the Government's failure to demonstrate harm should mean that the general equity balance tips decisively against granting a stay. See *Noem*, 605 U. S., at ___ (slip op., at 4). On the one hand, there is a repository of millions of Americans' legally protected, highly sensitive information that—if improperly handled or disseminated—risks causing significant harm, as Congress has already recognized. On the other, there is the Government's desire to ditch the usual protocols for accessing that data, before the courts have even determined whether DOGE's access is lawful. In the first bucket, there is also the state of federal law, which enshrines privacy protections, and the President's constitutional obligation to faithfully execute the laws Congress has passed. This makes it not at all clear that it is in the public's interest for the SSA to give DOGE staffers unfettered access to all Americans' non-anonymized data before its entitlement to such access has been established, especially when the SSA's own employees have long been subject to restrictions meant to protect the American people.

One more equitable consideration: Throughout the lower courts' thorough evaluations, the Government never

deigned to substantiate its purported need for unfettered access, much less demonstrate why it must have that degree of access *now*. And it produces nothing more on that score with respect to the "emergency" application this Court considers today. The lower courts repeatedly placed the Government on notice of its harm-related failures, yet the Government *still* offers us next to nothing to satisfy its burden.*

In my view, granting the Government a stay on this plainly deficient showing of harm is also systemically corrosive. We have *told* everyone that it is "critical" that an applicant justify its request for a stay from this Court by showing that it "'will be irreparably injured absent a stay.'" *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). So the idea that the Government actually need not satisfy the irreparable-harm burdens that other stay applicants have, nor wait for the courts to decide the merits of challenges to its allegedly unlawful conduct—as other litigants must—is not costless.

To accept this line of argument sends a troubling message: that this Court will allow departures from our stated legal standards and the basic norms of our judicial system (such as respect for lower court rulings and equal justice under law) for certain litigants. It says, in essence, that although *other* stay applicants must point to more than the annoyance of compliance with lower court orders they don't like, the Government can approach the courtroom bar with nothing more than that and obtain relief from this Court nevertheless. It is particularly startling to think that

---

\* In its reply brief, the Government glibly contends that it is harmed by the injunction's effect on the Government's work. Reply in Support of Application for Stay 13–14 (accusing the courts of "micromanaging" the Executive Branch and imposing "inefficient" restrictions). Those kinds of generalized complaints are mere descriptors of what it means to be constrained by law. As such, they are manifestly insufficient to demonstrate concrete harm.

grants of relief in these circumstances might be (unintentionally) conveying not only preferential treatment for the Government but also a willingness to undercut both our lower court colleagues' well-reasoned interim judgments and the well-established constraints of law that they are in the process of enforcing.

\* \* \*

The lower courts are hard at work, expeditiously assessing whether federal law permits the SSA to give DOGE staffers unfettered access to Americans' sensitive information. The only question before us today is what should happen to all of that data in the meantime. Two lower courts have said that DOGE staffers should have to comply with temporary safeguards on data access while the litigation is proceeding. Meanwhile, here, the Government has plainly failed to meet the moment, as it has not shown that it will suffer any concrete or irreparable harm unless this Court immediately intervenes.

But, today, the Court grants a stay permitting the Government to give unfettered data access to DOGE regardless—despite its failure to show any need or any interest in complying with existing privacy safeguards, and all before we know for sure whether federal law countenances such access. The Court is thereby, unfortunately, suggesting that what would be an extraordinary request for everyone else is nothing more than an ordinary day on the docket for this Administration. I would proceed without fear or favor to require DOGE and the Government to do what all other litigants must do to secure a stay from this Court: comply with lower court orders constraining their behavior unless and until they establish that irreparable harm will result such that equity requires a different course. The Court opts instead to relieve the Government of the standard obligations, jettisoning careful judicial decisionmaking and creat-

ing grave privacy risks for millions of Americans in the process.