**No. 25-1411**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, et al.,

Plaintiffs-Appellees,

v.

SOCIAL SECURITY ADMINISTRATION, et al.,

Defendants-Appellants.

———————

On Appeal from the United States District Court
for the District of Maryland

———————

### JOINT APPENDIX – VOLUME I (JA1–JA533)

———————

ALETHEA ANNE SWIFT
MARK B. SAMBURG
EMMA R. LEIBOWITZ
ROBIN F. THURSTON
 *Democracy Forward Foundation*
 *P.O. Box 34553*
 *Washington, DC 20043*
 *(202) 448-9090*

ANNA-ROSE MATHIESON
BRIAN ADAIR SUTHERLAND
 *Complex Appellate Litigation*
  *Group LLP*
 *96 Jessie Street*
 *San Francisco, CA 94105*
 *(415) 649-6700*
*Counsel for Plaintiffs*

YAAKOV M. ROTH
 *Acting Assistant Attorney General*

ERIC D. MCARTHUR
 *Deputy Assistant Attorney General*

GERARD SINZDAK
JACK STARCHER
SIMON JEROME
JACOB CHRISTENSEN
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7525*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-5048*

*Counsel for Defendants*

# TABLE OF CONTENTS

## VOLUME I

Docket Report ...................................................................... JA1

Amended Complaint (Dkt. 17) .......................................... JA19

Declarations in Support of Plaintiffs' Motion for Temporary
    Restraining Order (Dkt. 22 to 22-10) ........................ JA51

Declarations in Support of Defendants' Opposition to Temporary
    Restraining Order (Dkt. 36-1 to 36-2) ..................... JA113

Declarations in Support of Plaintiffs' Motion for Temporary
    Restraining Order (Dkt. 39-1 to 39-2) ..................... JA125

Transcript of Hearing on Temporary Restraining Order
    (Dkt. 45) .................................................................... JA132

Temporary Restraining Order (Dkt. 48)........................ JA236

Memorandum Opinion (Dkt. 49)..................................... JA242

Letter to Counsel (Dkt. 51) ............................................ JA379

Letter to Counsel (Dkt. 52) ............................................ JA381

Defendants' Status Report and Certification (Dkt. 56 to 56-1)....... JA382

Notice of Compliance (Dkt. 62 to 62-2)........................... JA391

Letter to Counsel (Dkt. 64) ............................................ JA405

Letter to Counsel (Dkt. 65) ............................................ JA407

Joint Status Report (Dkt. 68)......................................... JA409

Order (Dkt. 69)................................................................. JA413

Transcript of Proceedings on March 27, 2025 (Dkt. 73) ................. JA415

Notice of Filing (Dkt. 74 to 74-1) ...................................................... JA450

Declaration of Leland Dudek (Dkt. 80-1) .......................................... JA457

CA4 Corrected Order Dismissing Appeal (Dkt. 83) ......................... JA461

Letter to Counsel (Dkt. 91) ............................................................... JA464

Memorandum and Order (Dkt. 95) .................................................... JA466

Certification of Administrative Record and Index
     (Dkt. 100-1 to 100-2) ................................................................... JA473

Declarations in Support of Plaintiffs' Motion for Preliminary
     Injunction (Dkt. 111-3 to 111-13) ............................................. JA477

Exhibit in Support of Defendants' Opposition to Motion for
     Preliminary Injunction (Dkt. 113-1) ........................................ JA516

Notice of Filing of Statements of Need (Dkt. 114 to 114-1)............. JA518

Notice Regarding Defendants' Statements of Need (Dkt. 120) ....... JA527

## VOLUME II

Administrative Record (Redacted):

     Notice of Filing of Redacted Administrative Record
          (Dkt. 121) ..................................................................................... JA534

     Certification of Administrative Record (Dkt. 121-1) .............. JA537

     Index to Administrative Record (Dkt. 121-2)........................... JA539

     Administrative Record (Redacted) (Dkt. 121-3 to 121-5) ....... JA542

     Supplement to the Administrative Record
          (Dkt. 112 to 112-1)................................................................... JA1157

## VOLUME III

Declaration in Support of Plaintiffs' Motion for Preliminary
    Injunction (Dkt. 126-1) ............................................................ JA1166

Letter to Counsel (Dkt. 127) ....................................................... JA1170

Plaintiffs' Notice of Supplemental Declaration
    (Dkt. 136 to 136-1) ................................................................ JA1173

Letter to Counsel (Dkt. 137) ....................................................... JA1179

Notice Regarding Hearing (Dkt. 138) ......................................... JA1182

Transcript of Hearing on Preliminary Injunction (Dkt. 143) ........ JA1185

Order Granting Preliminary Injunction (Dkt. 147) ...................... JA1293

Amended Memorandum Opinion (Dkt. 157) ................................. JA1299

Notice of Appeal (Dkt. 148) ........................................................ JA1447

## VOLUME IV – SEALED

Administrative Record (Unredacted) (Dkt. 86) ............................. JA1450

Notice of Filing of SSA DOGE Team List (Dkt. 118 to 118-1) ...... JA2062

APPEAL

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:25−cv−00596−ELH

American Federation of State, County and Municipal Employees, AFL−CIO et al v. Social Security Administration et al
Assigned to: Judge Ellen Lipton Hollander
Case in other court:  USCA, 25−01291
              USCA, 25−01411
Cause: 05:706 Judicial Review of Agency Action

Date Filed: 02/21/2025
Jury Demand: Plaintiff
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| **American Federation of State, County and Municipal Employees, AFL−CIO** | represented by | **Alethea Anne Swift** |

**Alethea Anne Swift**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202−899−9065
Fax: 202−701−1775
Email: aswift@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Carrie Y Flaxman**
Democracy Forward Foundation
District of Columbia
P.O. Box 34553
Washington, DC 20043
202−862−1394
Email: cflaxman@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma R. Leibowitz**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202−448−9090
Email: eleibowitz@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karianne Jones**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
2024489090
Email: kjones@democracyforward.org
*TERMINATED: 04/02/2025*
*PRO HAC VICE*

**Robin Frances Thurston**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202−701−1775
Email: rthurston@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark B Samburg**
Democracy Forward Foundation
PO Box 34553

JA1

Washington, DC 20043
202–448–9090
Email: msamburg@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alliance for Retired Americans**          represented by   **Alethea Anne Swift**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carrie Y Flaxman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma R. Leibowitz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karianne Jones**
(See above for address)
*TERMINATED: 04/02/2025*
*PRO HAC VICE*

**Robin Frances Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark B Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**American Federation of Teachers**          represented by   **Alethea Anne Swift**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carrie Y Flaxman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma R. Leibowitz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karianne Jones**
(See above for address)
*TERMINATED: 04/02/2025*
*PRO HAC VICE*

**Robin Frances Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark B Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Social Security Administration** | represented by | **Elizabeth J. Shapiro** |

DOJ–Civ
Poc Agostinho, Jean
1100 L St., N.W.
8142
Washington, DC 20530
202–307–0340
Email: elizabeth.shapiro@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin S. Kurland**
DOJ–Civ
Federal Programs branch
1100 L Street NW
Rm. 12202
Washington, DC 20005
202–598–7755
Email: ben.kurland@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Bradley Philip Humphreys**
United States Department of Justice
1100 L St. NW
Washington, DC 20005
2023050878
Fax: 2026168470
Email: bradley.humphreys@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Marianne F Kies**
DOJ–Civ
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street NW, Ste 12th Floor, #12102
Washington, DC 20005
202–353–1819
Email: marianne.f.kies@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Michael Jackman Wilson**
DOJ–USAO
36 S. Charles Street
4th Floor
Baltimore, MD 21201
410–209–4941
Email: michael.wilson4@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Samuel S. Holt**
DOJ–Civ
1100 L Street NW
Washington, DC 20005
202–674–9761
Email: samuel.holt2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Leland Dudek**<br>*in his official capacity as purported* | represented by | **Elizabeth J. Shapiro**<br>(See above for address) |

JA3

*Acting Commissioner, Social Security*
*Administration*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin S. Kurland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Philip Humphreys**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marianne F Kies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Jackman Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel S. Holt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Mike Russo**
*in his official capacity as Chief*
*Information Officer, Social Security*
*Administration*

represented by **Elizabeth J. Shapiro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin S. Kurland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Philip Humphreys**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marianne F Kies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Jackman Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel S. Holt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Elon Musk**
*in his official capacity as Senior Advisor*
*to the President and de facto head of*
*DOGE*

represented by **Elizabeth J. Shapiro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin S. Kurland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Philip Humphreys**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marianne F Kies**

JA4

(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Jackman Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel S. Holt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Doge Service**    represented by    **Elizabeth J. Shapiro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin S. Kurland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Philip Humphreys**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marianne F Kies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Jackman Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel S. Holt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Doge Service Temporary**    represented by    **Elizabeth J. Shapiro**
**Organization**                                    (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin S. Kurland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Philip Humphreys**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marianne F Kies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Jackman Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel S. Holt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | |
|---|---|
| **Amy Gleason**<br>*in her official capacity as DOGE Acting Administrator* | represented by **Elizabeth J. Shapiro**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Benjamin S. Kurland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Philip Humphreys**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marianne F Kies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Jackman Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel S. Holt**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/21/2025 | 1 | COMPLAINT against Leland Dudek, Social Security Administration, United States DOGE Service, United States DOGE Service Temporary Organization ( Filing fee $ 405 receipt number AMDDC−11799774.), filed by American Federation of State, County and Municipal Employees, AFL−CIO, American Federation of Teachers, Alliance for Retired Americans. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons)(Samburg, Mark) (Additional attachment(s) added on 2/25/2025: # 8 Flattened Summons) (hmls). (Entered: 02/21/2025) |
| 02/21/2025 | 2 | NOTICE of Appearance by Mark B Samburg on behalf of Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL−CIO, American Federation of Teachers (Samburg, Mark) (Entered: 02/21/2025) |
| 02/21/2025 | 3 | MOTION to Appear Pro Hac Vice for Karianne Jones (Filing fee $100, receipt number BMDDC−11799789.) by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL−CIO, American Federation of Teachers(Samburg, Mark) (Entered: 02/21/2025) |
| 02/21/2025 | 4 | MOTION to Appear Pro Hac Vice for Emma R. Leibowitz (Filing fee $100, receipt number AMDDC−11799794.) by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL−CIO, American Federation of Teachers(Samburg, Mark) (Entered: 02/21/2025) |
| 02/21/2025 | 5 | MOTION to Appear Pro Hac Vice for Robin F. Thurston (Filing fee $100, receipt number AMDDC−11799797.) by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL−CIO, American Federation of Teachers(Samburg, Mark) (Entered: 02/21/2025) |
| 02/23/2025 | 6 | Local Rule 103.3 Disclosure Statement by American Federation of State, County and Municipal Employees, AFL−CIO (Samburg, Mark) (Entered: 02/23/2025) |
| 02/23/2025 | 7 | Local Rule 103.3 Disclosure Statement by American Federation of Teachers (Samburg, Mark) (Entered: 02/23/2025) |
| 02/23/2025 | 8 | Local Rule 103.3 Disclosure Statement by Alliance for Retired Americans (Samburg, Mark) (Entered: 02/23/2025) |

| 02/24/2025 | 9 | PAPERLESS ORDER granting 4 Motion to Appear Pro Hac Vice on behalf of Emma R. Leibowitz. Directing attorney Emma R. Leibowitz to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/24/2025. (mh4s, Deputy Clerk) (Entered: 02/24/2025) |
| --- | --- | --- |
| 02/24/2025 | 10 | PAPERLESS ORDER granting 5 Motion to Appear Pro Hac Vice on behalf of Robin Frances Thurston. Directing attorney Robin Frances Thurston to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/24/2025. (mh4s, Deputy Clerk) (Entered: 02/24/2025) |
| 02/24/2025 | 11 | PAPERLESS ORDER granting 3 Motion to Appear Pro Hac Vice on behalf of Karianne Jones. Directing attorney Karianne Jones to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/24/2025. (mh4s, Deputy Clerk) (Entered: 02/24/2025) |
| 02/24/2025 | | Case Reassigned to District Judge Ellen Lipton Hollander. Magistrate Judge J. Mark Coulson no longer assigned to the case. (kns, Deputy Clerk) (Entered: 02/24/2025) |
| 02/25/2025 | 12 | QC NOTICE: 1 Complaint filed by American Federation of Teachers, American Federation of State, County and Municipal Employees, AFL–CIO, Alliance for Retired Americans was filed incorrectly.<br>**Not all pdf documents (Summons) were flattened prior to filing. All pdf's uploaded to CM/ECF MUST BE FLATTENED for all future filings. Failure to comply may result in rejected filings and delays in case processing.*<br>***This filing has been corrected by court staff and no further corrective action is required.* (hmls, Deputy Clerk) (Entered: 02/25/2025) |
| 02/25/2025 | 13 | Summons Issued 60 days as to Leland Dudek, Social Security Administration, U.S. Digital Service, U.S. Doge Service Temporary Organization, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons) (hmls, Deputy Clerk) (Entered: 02/25/2025) |
| 03/03/2025 | 14 | SUMMONS Returned Executed by American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers, Alliance for Retired Americans. Leland Dudek served on 2/27/2025, answer due 3/20/2025; Social Security Administration served on 2/27/2025, answer due 3/20/2025; U.S. Digital Service served on 2/27/2025, answer due 3/20/2025; U.S. Doge Service Temporary Organization served on 2/27/2025, answer due 3/20/2025.(Samburg, Mark) (Entered: 03/03/2025) |
| 03/03/2025 | 15 | AFFIDAVIT of Service for Complaint, Civil Cover Sheet, and Summonses served on Phil Selden, U.S. Attorney for the District of Maryland and Pam Bondi, Attorney General of the U.S. on 2/27/2025, filed by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers.(Samburg, Mark) (Entered: 03/03/2025) |
| 03/03/2025 | 16 | NOTICE of Appearance by Alethea Anne Swift on behalf of Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Swift, Alethea) (Entered: 03/03/2025) |
| 03/07/2025 | 17 | AMENDED COMPLAINT against All Defendants, filed by American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers, Alliance for Retired Americans. (Attachments: # 1 Redline Against Original Complaint)(Swift, Alethea) (Entered: 03/07/2025) |
| 03/07/2025 | 18 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers *for the Clerk to issue summons (Amy Gleason)* (Swift, Alethea) (Entered: 03/07/2025) |
| 03/07/2025 | 19 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers *for the Clerk to issue summons (Musk)* (Swift, Alethea) (Entered: 03/07/2025) |

| 03/07/2025 | 20 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers *for the Clerk to issue summons (Russo)* (Swift, Alethea) (Entered: 03/07/2025) |
| --- | --- | --- |
| 03/07/2025 | 21 | MOTION for Temporary Restraining Order *, Preliminary Injunction, and/or Stay* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Index to Declarations)(Swift, Alethea) (Entered: 03/07/2025) |
| 03/07/2025 | 22 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers re 21 MOTION for Temporary Restraining Order *, Preliminary Injunction, and/or Stay* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J)(Swift, Alethea) (Entered: 03/07/2025) |
| 03/10/2025 | 23 | ORDER re 21 MOTION for Temporary Restraining Order. Signed by District Judge Ellen Lipton Hollander on 3/10/2025. (c/ad hoc:AUSA Corcoran) (hmls, Deputy Clerk) (Entered: 03/10/2025) |
| 03/10/2025 | 24 | NOTICE by Social Security Administration (Wilson, Michael) (Entered: 03/10/2025) |
| 03/10/2025 | 25 | ORDER SCHEDULING telephone conference at 4:30 p.m. on March 10, 2025; DIRECTING Counsel for plaintiffs shall ensure that Assistant United States Attorney Michael J. Wilson has been notified as to the conference call details. Signed by District Judge Ellen Lipton Hollander on 3/10/2025. (hmls, Deputy Clerk) (Entered: 03/10/2025) |
| 03/10/2025 | 26 | ORDER re: Court Proceedings. Signed by District Judge Ellen Lipton Hollander on 3/10/2025. (hmls, Deputy Clerk) (Entered: 03/10/2025) |
| 03/10/2025 | 27 | NOTICE of Appearance by Elizabeth J. Shapiro on behalf of All Defendants (Shapiro, Elizabeth) (Entered: 03/10/2025) |
| 03/10/2025 | 28 | QC NOTICE: 18 , 19 , and 20 Notice/Summons for Amy Gleason, Elon Musk, and Mike Russo filed by American Federation of Teachers, American Federation of State, County and Municipal Employees, AFL–CIO, Alliance for Retired Americans was filed missing information.<br>\*\**Please provide service on summons for the US Attorney for Maryland and the US Attorney General as required when suing the Federal Government using the event Notice (Other) and link Summons to 18 , 19 , and 20 Notice.* (hmls, Deputy Clerk) (Entered: 03/10/2025) |
| 03/10/2025 | 29 | NOTICE of Appearance by Bradley Philip Humphreys on behalf of All Defendants (Humphreys, Bradley) (Entered: 03/10/2025) |
| 03/10/2025 | 30 | ORDER setting briefing schedule and hearing re 21 MOTION for Temporary Restraining Order *, Preliminary Injunction, and/or Stay* filed by American Federation of Teachers, American Federation of State, County and Municipal Employees, AFL–CIO, Alliance for Retired Americans; hearing scheduled for 3/14/2025 at 1:00 p.m. Signed by District Judge Ellen Lipton Hollander on 3/10/2025. (kns, Deputy Clerk) (Entered: 03/10/2025) |
| 03/10/2025 | 31 | Telephone Conference held on 3/10/2025 before District Judge Ellen Lipton Hollander.(Court Reporter: Trish Mitchell) (km13, Deputy Clerk) (Entered: 03/11/2025) |
| 03/12/2025 | 32 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers 19 Notice (Other), 18 Notice (Other), 20 Notice (Other) (Swift, Alethea) (Entered: 03/12/2025) |
| 03/12/2025 | 33 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers re 19 Notice (Other), 18 Notice (Other), 20 Notice (Other) (Swift, Alethea) (Entered: 03/12/2025) |
| 03/12/2025 | 34 | NOTICE of Appearance by Benjamin S. Kurland on behalf of All Defendants (Kurland, Benjamin) (Entered: 03/12/2025) |

| 03/12/2025 | 35 | Summons Issued 60 days as to Amy Gleason, Elon Musk, Mike Russo, U.S. Attorney and U.S. Attorney General. (Attachments: # 1 Summons Russo, # 2 Summons Musk, # 3 Summons USAG, # 4 Summons USA) (hmls, Deputy Clerk) (Entered: 03/12/2025) |
| 03/12/2025 | 36 | RESPONSE in Opposition re 21 MOTION for Temporary Restraining Order , *Preliminary Injunction, and/or Stay* filed by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization. (Attachments: # 1 Affidavit, # 2 Affidavit, # 3 Text of Proposed Order)(Humphreys, Bradley) (Entered: 03/12/2025) |
| 03/12/2025 | 37 | MOTION for Extension of Time to File Response/Reply as to 21 MOTION for Temporary Restraining Order , *Preliminary Injunction, and/or Stay Nunc Pro Tunc (Unopposed)* by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 03/12/2025) |
| 03/12/2025 | 38 | ORDER GRANTING 37 Motion for Nunc Pro Tunc Extension of Time to File Response/Reply. Signed by District Judge Ellen Lipton Hollander on 3/12/2025. (hmls, Deputy Clerk) (Entered: 03/13/2025) |
| 03/13/2025 | 39 | REPLY to Response to Motion re 21 MOTION for Temporary Restraining Order , *Preliminary Injunction, and/or Stay* filed by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers. (Attachments: # 1 Affidavit Ex. K, Flick Supp. Decl., # 2 Affidavit Ex. L, Romig Decl.)(Swift, Alethea) (Entered: 03/13/2025) |
| 03/13/2025 | 40 | MOTION to Appear Pro Hac Vice for Carrie Y. Flaxman (Filing fee $100, receipt number AMDDC–11840725.) by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers(Swift, Alethea) (Entered: 03/13/2025) |
| 03/14/2025 | 41 | NOTICE of Appearance by Michael Jackman Wilson on behalf of All Defendants (Wilson, Michael) (Entered: 03/14/2025) |
| 03/14/2025 | 42 | NOTICE of Appearance by Marianne F Kies on behalf of All Defendants (Kies, Marianne) (Entered: 03/14/2025) |
| 03/14/2025 | 43 | Motion Hearing held on 3/14/2025 re 21 MOTION for Temporary Restraining Order , *Preliminary Injunction, and/or Stay* filed by American Federation of Teachers, American Federation of State, County and Municipal Employees, AFL–CIO, Alliance for Retired Americans before District Judge Ellen Lipton Hollander.(Court Reporter: Patricia Mitchell) (jh2s, Deputy Clerk) (Entered: 03/14/2025) |
| 03/17/2025 | 44 | PAPERLESS ORDER granting 40 Motion to Appear Pro Hac Vice on behalf of Carrie Y Flaxman. Directing attorney Carrie Y Flaxman to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/17/2025. (mh4s, Deputy Clerk) (Entered: 03/17/2025) |
| 03/18/2025 | 45 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, Motions Hearing held on 3/14/2025, before Judge Ellen L. Hollander. Court Reporter Patricia G. Mitchell, trish_mitchell@mdd.uscourts.gov. Total number of pages filed: 120. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 4/8/2025. Redacted Transcript Deadline set for 4/18/2025. Release of Transcript Restriction set for 6/16/2025. (Entered: 03/18/2025) |
| 03/18/2025 | 46 | SUMMONS Returned Executed by American Federation of Teachers, Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO. Amy Gleason served on 3/14/2025, answer due 4/4/2025; Elon Musk served on 3/14/2025, answer due 4/4/2025; Mike Russo served on 3/14/2025, answer due 4/4/2025.(Swift, Alethea) (Entered: 03/18/2025) |
| 03/18/2025 | 47 | AFFIDAVIT of Service for Summons, Amended Complaint, Motion for TRO, Plaintiffs Reply, and Supporting Documents served on U.S. Attorney for the District of Maryland, Attorney General of the U.S. on 3/14/2025, filed by Alliance for Retired |

| | | Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers.(Swift, Alethea) (Entered: 03/18/2025) |
|---|---|---|
| 03/20/2025 | 48 | TEMPORARY RESTRAINING ORDER. Signed by District Judge Ellen Lipton Hollander on 3/20/2025. (hmls, Deputy Clerk) (Entered: 03/20/2025) |
| 03/20/2025 | 49 | MEMORANDUM OPINION. Signed by District Judge Ellen Lipton Hollander on 3/20/2025. (hmls, Deputy Clerk) (Entered: 03/20/2025) |
| 03/21/2025 | 50 | Letter ORDER re 48 Temporary Restraining Order. Signed by District Judge Ellen Lipton Hollander on 3/21/2025. (hmls, Deputy Clerk) (Entered: 03/21/2025) |
| 03/21/2025 | 51 | Letter ORDER re 48 Temporary Restraining Order. Signed by District Judge Ellen Lipton Hollander on 3/21/2025. (hmls, Deputy Clerk) (Entered: 03/21/2025) |
| 03/21/2025 | 52 | LETTER TO COUNSEL re Temporary Restraining Order. Signed by District Judge Ellen Lipton Hollander on 3/21/2025. (kns, Deputy Clerk) . (Entered: 03/21/2025) |
| 03/24/2025 | 53 | Check Received on 3/24/2025 from Capitol Process Services, Inc. for American Federation of Teachers. Check Number: 1588. Amount: $250.00. (dass, Deputy Clerk) Modified to correct ECF document # on 3/24/2025 (dass). (Entered: 03/24/2025) |
| 03/24/2025 | 54 | Check Received on 3/24/2025 from Capitol Process Services, Inc. for American Federation of State, County and Municipal Employees, AFL–CIO. Check Number: 1586. Amount: $250.00. (dass, Deputy Clerk) Modified to correct ECF document # on 3/24/2025 (dass). (Entered: 03/24/2025) |
| 03/24/2025 | 55 | Check Received on 3/24/2025 from Capitol Process Services, Inc. for Alliance for Retired Americans. Check Number: 1587. Amount: $250.00. (dass, Deputy Clerk) Modified to correct ECF document # on 3/24/2025 (dass). (Entered: 03/24/2025) |
| 03/24/2025 | 56 | RESPONSE re 48 Temporary Restraining Order *Declaration of Compliance* filed by Leland Dudek, Mike Russo, Social Security Administration. (Attachments: # 1 Affidavit)(Shapiro, Elizabeth) (Entered: 03/24/2025) |
| 03/24/2025 | 57 | NOTICE OF APPEAL by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization. (Shapiro, Elizabeth) (Entered: 03/24/2025) |
| 03/25/2025 | 58 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 57 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(kns, Deputy Clerk) (Entered: 03/25/2025) |
| 03/25/2025 | 59 | USCA Case Number 25–1291 for 57 Notice of Appeal filed by Elon Musk, Mike Russo, U.S. Doge Service Temporary Organization, Leland Dudek, Social Security Administration, U.S. Doge Service, Amy Gleason. Case Manager – Emily Borneisen (av4s, Deputy Clerk) (Entered: 03/25/2025) |
| 03/26/2025 | 60 | MOTION to Stay re 48 Temporary Restraining Order, 49 Memorandum Opinion, 52 Memorandum to Parties, 50 Order, 51 Order *Pending Appeal* by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization (Attachments: # 1 Affidavit Declaration of Leland Dudek)(Kies, Marianne) (Entered: 03/26/2025) |
| 03/26/2025 | 61 | Letter ORDER re 60 MOTION for Stay Pending Appeal. Signed by District Judge Ellen Lipton Hollander on 3/26/2025. (hmls, Deputy Clerk) (Entered: 03/26/2025) |
| 03/27/2025 | 62 | NOTICE by Leland Dudek, Amy Gleason, Mike Russo, Social Security Administration *of Compliance with Paragraphs 2–3* (Attachments: # 1 Affidavit Exhibit 1, # 2 Affidavit Exhibit 2)(Shapiro, Elizabeth) (Entered: 03/27/2025) |
| 03/27/2025 | 63 | PAPERLESS ORDER. In response to the government's filing this morning of ECF 62, the Court will hold a telephone conference with counsel at 12:15 p.m. on March 27, 2025. The government is directed to provide conference call information. A public access line will be provided. In order to assure adequate responses to the Court's questions, the government may wish to include Acting Commissioner Dudek as a participant in the conference. Signed by District Judge Ellen Lipton Hollander on |

| | | 3/27/2025. (kws, Chambers) (Entered: 03/27/2025) |
|---|---|---|
| 03/27/2025 | 64 | Letter ORDER confirming the results of the Emergency Telephone Conference held today. Signed by District Judge Ellen Lipton Hollander on 3/27/2025. (hmls, Deputy Clerk) (Entered: 03/27/2025) |
| 03/27/2025 | 65 | LETTER to Counsel re 60 Motion for Stay. Signed by District Judge Ellen Lipton Hollander on 3/27/2025. (c/em:4th Circuit COA) (hmls, Deputy Clerk) (Entered: 03/27/2025) |
| 03/27/2025 | 66 | Correspondence re: Court's March 26, 2025 Letter Order (ECF 61) (Kies, Marianne) (Entered: 03/27/2025) |
| 03/27/2025 | 67 | Emergency Telephone Conference re 62 held on 3/27/2025 before District Judge Ellen Lipton Hollander. (Court Reporter: Nadine Bachmann) (Rebecca Maldeis, Deputy Clerk – Courtroom 5B) (Entered: 03/27/2025) |
| 03/27/2025 | 68 | STATUS REPORT *(Joint)* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers(Swift, Alethea) (Entered: 03/27/2025) |
| 03/27/2025 | 69 | Order setting briefing deadlines; Extending the Temporary Restraining Order through April 17, 2025. Signed by District Judge Ellen Lipton Hollander on 3/27/2025. (jf3s, Deputy Clerk) (Entered: 03/27/2025) |
| 03/28/2025 | 70 | Correspondence re: Court's March 26 Order (Swift, Alethea) (Entered: 03/28/2025) |
| 03/28/2025 | 71 | RESPONSE re 60 MOTION to Stay re 48 Temporary Restraining Order, 49 Memorandum Opinion, 52 Memorandum to Parties, 50 Order, 51 Order *Pending Appeal* filed by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers.(Swift, Alethea) (Entered: 03/28/2025) |
| 03/28/2025 | 72 | NOTICE of Appearance by Samuel S. Holt on behalf of All Defendants (Holt, Samuel) (Entered: 03/28/2025) |
| 03/28/2025 | 73 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 03/27/2025, before Judge Hollander. Court Reporter Nadine Bachmann, Telephone number 410–962–4753 nadine_bachmann@mdd.uscourts.gov. Total number of pages filed: 42. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 4/18/2025. Redacted Transcript Deadline set for 4/28/2025. Release of Transcript Restriction set for 6/26/2025.(nb, Court Reporter) (Entered: 03/28/2025) |
| 03/28/2025 | 74 | NOTICE by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization *of Supplemental Declaration of Acting Commissioner Leland Dudek* (Attachments: # 1 Affidavit)(Humphreys, Bradley) (Entered: 03/28/2025) |
| 03/28/2025 | 75 | MOTION for Extension of Time *Nunc Pro Tunc* by Leland Dudek, Mike Russo, Social Security Administration (Attachments: # 1 Text of Proposed Order)(Shapiro, Elizabeth) (Entered: 03/28/2025) |
| 03/28/2025 | 76 | ORDER GRANTING 75 Motion for Extension of Time Nunc Pro Tunc. Signed by Judge Ellen Lipton Hollander on 3/28/2025. (hmls, Deputy Clerk) (Entered: 03/31/2025) |
| 03/31/2025 | 77 | RESPONSE re 62 Notice (Other), 74 Notice (Other), filed by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers. (Attachments: # 1 Ex. A (Doe Decl.), # 2 Ex. B (Lewis Decl.))(Swift, Alethea) (Entered: 03/31/2025) |
| 03/31/2025 | 78 | MEMORANDUM. Signed by Judge Ellen Lipton Hollander on 3/31/2025. (chs, Deputy Clerk) (Entered: 03/31/2025) |
| 03/31/2025 | 79 | ORDER denying 60 Motion to Stay. Signed by Judge Ellen Lipton Hollander on 3/31/2025. (chs, Deputy Clerk) (Entered: 03/31/2025) |

| 04/01/2025 | 80 | Correspondence re: Notice of Compliance (Reply to Plaintiffs' Response) (Attachments: # 1 Affidavit)(Humphreys, Bradley) (Entered: 04/01/2025) |
| 04/01/2025 | 81 | ORDER of USCA Dismissing this appeal lack of jurisdiction as to 57 Notice of Appeal filed by Elon Musk, Mike Russo, U.S. Doge Service Temporary Organization, Leland Dudek, Social Security Administration, U.S. Doge Service and Amy Gleason. (slss, Deputy Clerk) (Entered: 04/01/2025) |
| 04/01/2025 | 82 | JUDGMENT of USCA (certified copy) Dismissing this appeal as to 57 Notice of Appeal filed by Elon Musk, Mike Russo, U.S. Doge Service Temporary Organization, Leland Dudek, Social Security Administration, U.S. Doge Service, Amy Gleason. (Attachments: # 1 Notice of Judgment)(slss, Deputy Clerk) (Entered: 04/01/2025) |
| 04/01/2025 | 83 | CORRECTED ORDER of USCA Dismissing this appeal for lack jurisdiction as to 57 Notice of Appeal filed by Elon Musk, Mike Russo, U.S. Doge Service Temporary Organization, Leland Dudek, Social Security Administration, U.S. Doge Service and Amy Gleason. (slss, Deputy Clerk) (Entered: 04/02/2025) |
| 04/02/2025 | 84 | MOTION for Protective Order by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 04/02/2025) |
| 04/02/2025 | 85 | MOTION to Seal *Administrative Record* by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 04/02/2025) |
| 04/02/2025 | 86 | –SEALED – NOTICE of Filing Under Seal Administrative Record by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization (Attachments: # 1 Exhibit Certification, # 2 Exhibit AR Part 1, # 3 Exhibit AR Part 2, # 4 Exhibit AR Part 3, # 5 Exhibit AR Part 4, # 6 Exhibit AR Part 5)(Humphreys, Bradley) (Entered: 04/02/2025) |
| 04/02/2025 | 87 | (FILED IN ERROR PER COUNSEL – WRONG ATTACHMENT) MOTION for Extension of Time *and Notice Regarding Defendants Motions* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers(Swift, Alethea) Modified on 4/2/2025 (hmls). (Entered: 04/02/2025) |
| 04/02/2025 | 88 | ORDER GRANTING 85 Motion to Seal Administrative Record. Signed by Judge Ellen Lipton Hollander on 4/2/2025. (hmls, Deputy Clerk) (Entered: 04/02/2025) |
| 04/02/2025 | 89 | MOTION for Extension of Time *and Notice re Motion for Protective Order* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers(Swift, Alethea) (Entered: 04/02/2025) |
| 04/02/2025 | 90 | Correspondence to the Court by defendants. (hmls, Deputy Clerk) (Entered: 04/02/2025) |
| 04/02/2025 | 91 | Letter ORDER to Counsel re 84 MOTION for Protective Order filed by Elon Musk, Mike Russo, U.S. Doge Service Temporary Organization, Leland Dudek, Social Security Administration, U.S. Doge Service, Amy Gleason. Signed by Judge Ellen Lipton Hollander on 4/2/2025. (hmls, Deputy Clerk) (Entered: 04/02/2025) |
| 04/02/2025 | 92 | MOTION to Withdraw as Attorney by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Text of Proposed Order)(Jones, Karianne) (Entered: 04/02/2025) |
| 04/02/2025 | 93 | Due to the compressed schedule in this case, the government shall provide the court with a courtesy copy of the Administrative Record by noon on April 3, 2025. Paperless ORDER Signed by Judge Ellen Lipton Hollander on 4/2/2025. (Hollander, Ellen) (Entered: 04/02/2025) |
| 04/02/2025 | 95 | MEMORANDUM AND ORDER re: 62 Notice of Compliance filed by Mike Russo, Leland Dudek, Social Security Administration, Amy Gleason. Signed by Judge Ellen Lipton Hollander on 4/2/2025. (hmls, Deputy Clerk) (Entered: 04/03/2025) |

JA12

| 04/02/2025 | 97 | ORDER GRANTING 92 Motion to Withdraw as Attorney. Attorney Karianne Jones terminated. Signed by Judge Ellen Lipton Hollander on 4/2/2025. (hmls, Deputy Clerk) (Entered: 04/03/2025) |
| 04/03/2025 | 94 | RESPONSE in Opposition re 84 MOTION for Protective Order filed by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers.(Samburg, Mark) (Entered: 04/03/2025) |
| 04/03/2025 | 96 | MOTION for Discovery *Supplementation of the Administrative Record, or, in the Alternative, Limited Discovery* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Samburg, Mark) (Entered: 04/03/2025) |
| 04/03/2025 | 98 | MOTION for Extension of Time *Nunc Pro Tunc* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers(Samburg, Mark) (Entered: 04/03/2025) |
| 04/03/2025 | 99 | Marginal ORDER GRANTING 98 Motion for Extension of Time Nunc Pro Tunc; REMINDING Plaintiffs to include a proposed order with every motion. Signed by Judge Ellen Lipton Hollander on 4/3/2025. (hmls, Deputy Clerk) (Entered: 04/03/2025) |
| 04/03/2025 | 100 | NOTICE by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization *of Filing of Administriative Record Certification and Index* (Attachments: # 1 Exhibit AR Certification, # 2 Exhibit AR Index)(Humphreys, Bradley) (Entered: 04/03/2025) |
| 04/03/2025 | 101 | Letter ORDER to Counsel SCHEDULING a Hearing for April 4, 2025, at 10:00 a.m., in lieu of a telephone hearing. Signed by Judge Ellen Lipton Hollander on 4/3/2025. (hmls, Deputy Clerk) (Entered: 04/03/2025) |
| 04/03/2025 | 102 | REPLY to Response to Motion re 84 MOTION for Protective Order filed by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization.(Humphreys, Bradley) (Entered: 04/03/2025) |
| 04/03/2025 | 103 | Consent MOTION for Extension of Time *to File Motion for Preliminary Injunction and response thereto* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Text of Proposed Order)(Swift, Alethea) (Entered: 04/03/2025) |
| 04/03/2025 | 104 | ORDER GRANTING IN PART 103 Consent Motion for Extension of Time. Signed by Judge Ellen Lipton Hollander on 4/3/2025. (hmls, Deputy Clerk) (Entered: 04/03/2025) |
| 04/03/2025 | 105 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers re 96 MOTION for Discovery *Supplementation of the Administrative Record, or, in the Alternative, Limited Discovery* (Swift, Alethea) (Entered: 04/03/2025) |
| 04/03/2025 | 106 | Consent MOTION to Amend/Correct 96 MOTION for Discovery *Supplementation of the Administrative Record, or, in the Alternative, Limited Discovery* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Text of Proposed Order, # 2 Attachment Proposed Amended Motion, # 3 Attachment Proposed Amended Memorandum in Support of Proposed Amended Motion, # 4 Attachment Proposed Amended Order, # 5 Attachment Redline of Motions, # 6 Attachment Redline of Memoranda in Support, # 7 Attachment Redline of Proposed Orders)(Samburg, Mark) (Entered: 04/03/2025) |
| 04/04/2025 | 107 | Consent MOTION to Seal *Motion for Preliminary Injunction and Accompanying Documents* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Text of Proposed Order)(Samburg, Mark) (Entered: 04/04/2025) |
| 04/04/2025 | 108 | Motion Hearing held on 4/4/2025 re 84 MOTION for Protective Order filed by Elon Musk, Mike Russo, U.S. Doge Service Temporary Organization, Leland Dudek, Social |

| | | |
|---|---|---|
| | | Security Administration, U.S. Doge Service, Amy Gleason, 96 MOTION for Discovery *Supplementation of the Administrative Record, or, in the Alternative, Limited Discovery* filed by American Federation of Teachers, American Federation of State, County and Municipal Employees, AFL–CIO, Alliance for Retired Americans, 85 MOTION to Seal *Administrative Record* filed by Elon Musk, Mike Russo, U.S. Doge Service Temporary Organization, Leland Dudek, Social Security Administration, U.S. Doge Service, Amy Gleason before Judge Ellen Lipton Hollander.(Court Reporter: Nadine Bachmann) (dg4s, Deputy Clerk) (Entered: 04/04/2025) |
| 04/04/2025 | 109 | ORDER GRANTING 107 Motion to Seal Motion for Preliminary Injunction. Signed by Judge Ellen Lipton Hollander on 4/4/2025. (hmls, Deputy Clerk) (Entered: 04/04/2025) |
| 04/04/2025 | 110 | –SEALED– MOTION for Preliminary Injunction , MOTION to Stay by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Ex. A (Widger), # 4 Ex. B (Conard), # 5 Ex. C (Fiesta), # 6 Ex. D (Somo), # 7 Ex. E (Aguirre), # 8 Ex. F (Gray), # 9 Ex. G (Meyer), # 10 Ex. H (Escobar–Alava), # 11 Ex. I (Flick), # 12 Ex. J (Brady), # 13 Index of Exhibits)(Swift, Alethea) (Entered: 04/04/2025) |
| 04/04/2025 | 111 | MOTION for Preliminary Injunction *(Redacted)*, MOTION to Stay *(Redacted)* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Ex. A (Widger), # 4 Ex. B (Conard), # 5 Ex. C (Fiesta), # 6 Ex. D (Somo), # 7 Ex. E (Aguirre), # 8 Ex. F (Gray), # 9 Ex. G (Meyer), # 10 Ex. H (Escobar–Alava), # 11 Ex. I (Flick), # 12 Ex. J (Brady), # 13 Index of Exhibits)(Swift, Alethea) (Entered: 04/04/2025) |
| 04/07/2025 | 112 | NOTICE by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization *of Filing of Supplement to the Administrative Record* (Attachments: # 1 Exhibit)(Humphreys, Bradley) (Entered: 04/07/2025) |
| 04/07/2025 | 113 | RESPONSE in Opposition re 110 Motion for Preliminary Injunction MOTION to Stay filed by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization. (Attachments: # 1 Exhibit A (Table))(Kies, Marianne) (Entered: 04/07/2025) |
| 04/07/2025 | 114 | NOTICE by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization re 95 Memorandum and Order *of Statements of Need* (Attachments: # 1 Exhibit A)(Holt, Samuel) (Entered: 04/07/2025) |
| 04/07/2025 | 115 | [Filed in Error} NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 04–04–2025, before Judge Hollander. Court Reporter N. Bachmann, Telephone number 410–962–4753 nadine_bachmann@mdd.uscourts.gov. Total number of pages filed: 85. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 4/28/2025. Redacted Transcript Deadline set for 5/8/2025. Release of Transcript Restriction set for 7/7/2025.(nb, Court Reporter) Modified on 4/10/2025 (nb). (Entered: 04/07/2025) |
| 04/07/2025 | 116 | Letter ORDER addressing concerns. Signed by Judge Ellen Lipton Hollander on 4/7/2025. (hmls, Deputy Clerk) (Entered: 04/07/2025) |
| 04/07/2025 | 117 | NOTICE by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration *and Request for Reconsideration* (Attachments: # 1 Attachment)(Shapiro, Elizabeth) (Entered: 04/07/2025) |
| 04/08/2025 | 118 | –SEALED – NOTICE of Filing Under Seal Employee List by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization re 116 Order (Attachments: # 1 Exhibit A)(Holt, Samuel) (Entered: 04/08/2025) |

| 04/08/2025 | 119 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers re 116 Order *for Supplemental Briefing* (Swift, Alethea) (Entered: 04/08/2025) |
| 04/08/2025 | 120 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers re 114 Notice (Other), *of Defendants' Statements of Need* (Swift, Alethea) (Entered: 04/08/2025) |
| 04/09/2025 | 121 | NOTICE of filing Administrative Record by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization (Attachments: # 1 Exhibit Certification, # 2 Exhibit Index, # 3 Exhibit AR–000001 throug AR–000205, # 4 Exhibit AR–000206 through AR–000410, # 5 Exhibit AR–000411 through AR–000615)(Humphreys, Bradley) (Entered: 04/09/2025) |
| 04/10/2025 | 122 | –SEALED–REPLY to Response to Motion re 111 MOTION for Preliminary Injunction *(Redacted)* MOTION to Stay *(Redacted)* filed by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers. (Attachments: # 1 Ex. A (Supp. Meyer Decl.))(Swift, Alethea) (Entered: 04/10/2025) |
| 04/10/2025 | 123 | Consent MOTION to Seal *Reply in Support of Motion for Preliminary Injunction* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Text of Proposed Order)(Samburg, Mark) (Entered: 04/10/2025) |
| 04/10/2025 | 124 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 04–04–2025, before Judge Hollander. Court Reporter N. Bachmann, Telephone number 410–962–4753 nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 5/1/2025. Redacted Transcript Deadline set for 5/12/2025. Release of Transcript Restriction set for 7/9/2025.(ng, Court Reporter) (Entered: 04/10/2025) |
| 04/10/2025 | 125 | ORDER GRANTING 123 Motion to Seal Reply in Support of Motion for Preliminary Injunction. Signed by Judge Ellen Lipton Hollander on 4/10/2025. (hmls, Deputy Clerk) (Entered: 04/10/2025) |
| 04/11/2025 | 126 | REDACTED DOCUMENT to 122 Reply to Response to Motion, by Alliance for Retired Americans, American Federation of State and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Ex. A (Supp. Meyer Decl.))(Swift, Alethea) (Entered: 04/11/2025) |
| 04/11/2025 | 127 | Letter ORDER DENYING 117 Notice and Request for Reconsideration. Signed by Judge Ellen Lipton Hollander on 4/11/2025. (hmls, Deputy Clerk) (Entered: 04/11/2025) |
| 04/11/2025 | 128 | MOTION to Seal *Motion to Expand Hearing Scope and File Supplemental Declarations* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Text of Proposed Order)(Samburg, Mark) (Entered: 04/11/2025) |
| 04/11/2025 | 129 | –SEALED– MOTION for Other Relief *(Motion to Expand Hearing Scope and for Leave to File Supplemental Declarations)* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Text of Proposed Order)(Swift, Alethea) (Entered: 04/11/2025) |
| 04/11/2025 | 130 | REDACTED DOCUMENT to 129 MOTION for Other Relief *(Motion to Expand Hearing Scope and for Leave to File Supplemental Declarations)* by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers (Attachments: # 1 Text of Proposed Order)(Swift, Alethea) (Entered: 04/11/2025) |
| 04/11/2025 | 131 | ORDER granting in part 129 Motion by Plaintiffs to Expand Hearing Scope and to File Supplemental Declarations. Signed by Judge Ellen Lipton Hollander on 4/11/2025.(cs3s, Clerk) (Entered: 04/11/2025) |

| 04/14/2025 | 132 | RESPONSE in Opposition re 129 MOTION for Other Relief *(Motion to Expand Hearing Scope and for Leave to File Supplemental Declarations)* filed by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization.(Humphreys, Bradley) (Entered: 04/14/2025) |
| --- | --- | --- |
| 04/14/2025 | 133 | ORDER GRANTING 128 Motion to Seal Motion to Expand Hearing Scope and File Supplemental Declarations. Signed by Judge Ellen Lipton Hollander on 4/11/2025. (hmls, Deputy Clerk) (Entered: 04/14/2025) |
| 04/14/2025 | 134 | MOTION for Other Relief *to Protect Employee Identities during the PI Hearing* by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization (Attachments: # 1 Text of Proposed Order)(Holt, Samuel) (Entered: 04/14/2025) |
| 04/14/2025 | 135 | ORDER GRANTING 134 Motion to Protect Employee Identities during the PI Hearing. Signed by Judge Ellen Lipton Hollander on 4/14/2025. (hmls, Deputy Clerk) (Entered: 04/14/2025) |
| 04/14/2025 | 136 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL−CIO, American Federation of Teachers *re: Filing of Supplemental Declaration* (Attachments: # 1 Attachment Third Supplemental Declaration of Tiffany Flick)(Samburg, Mark) (Entered: 04/14/2025) |
| 04/14/2025 | 137 | Letter ORDER re: Scope of PI Hearing; DENYING Plaintiffs' Motion to Expand the Scope of the P.I. Hearing; GRANTING Plaintiffs' Request to Submit the Flick Declaration; DIRECTING the government may file a written submission or an additional declaration in response to the Flick Declaration, due by 9:00 a.m. on April 15, 2025. Signed by Judge Ellen Lipton Hollander on 4/14/2025. (hmls, Deputy Clerk) Modified on 4/14/2025 (hmls). (Entered: 04/14/2025) |
| 04/14/2025 | 138 | NOTICE by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization *Regarding April 15, 2025 Hearing on Plaintiffs' Preliminary Injunction Motion* (Humphreys, Bradley) (Entered: 04/14/2025) |
| 04/15/2025 | 139 | Preliminary Injunction Hearing held on 4/15/2025 before Judge Ellen Lipton Hollander.(Court Reporter: Nadine Bachmann) (dg4s, Deputy Clerk) (Entered: 04/15/2025) |
| 04/15/2025 | 140 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL−CIO, American Federation of Teachers *of Supplemental Authority* (Attachments: # 1 Supplement)(Samburg, Mark) (Entered: 04/15/2025) |
| 04/15/2025 | 141 | ORDER GRANTING 106 Motion to Amend Motion for Supplementation of the Administrative Record or, in the Alternative, Limited Discovery; Plaintiffs' prior motion, ECF No. 96, is AMENDED and replaced by Plaintiffs' proposed amended motion, ECF 106 along with the proposed amended memorandum in support and proposed amended proposed order. Signed by Judge Ellen Lipton Hollander on 4/15/2025. (hmls, Deputy Clerk) (Entered: 04/15/2025) |
| 04/16/2025 | 142 | NOTICE by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization *re Parties' Proposed Protective Order (Portion Agreed Upon) and Addenda Regarding Dispute for Court Resolution* (Attachments: # 1 Exhibit Protective Order, with Addenda Regarding Dispute)(Kies, Marianne) (Entered: 04/16/2025) |
| 04/16/2025 | 143 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 04−15−2025, before Judge Hollander. Court Reporter N. Bachmann, Telephone number 410−962−4753 nadine_bachmann@mdd.uscourts.gov. Total number of pages filed: 128. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 5/7/2025. Redacted Transcript Deadline set for 5/19/2025. Release of Transcript Restriction set for 7/15/2025.(ng, Court Reporter) (Entered: 04/16/2025) |

| 04/16/2025 | 144 | NOTICE by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers *of Supplemental Authority* (Attachments: # 1 Ex. A)(Swift, Alethea) (Entered: 04/16/2025) |
| 04/17/2025 | 145 | ORDER. Signed by Judge Ellen Lipton Hollander on 4/17/2025. (bas, Deputy Clerk) (Entered: 04/17/2025) |
| 04/17/2025 | 146 | MEMORANDUM OPINION. Signed by Judge Ellen Lipton Hollander on 4/17/2025. (jf3s, Deputy Clerk) (Entered: 04/17/2025) |
| 04/17/2025 | 147 | ORDER granting 110 Plaintiffs' Motion for Preliminary Injunction; on or before 5:00 p.m. on April 23, 2025, Defendants shall file a Status Report; denying as moot 62 request to provide access to DOGE Team members; vacating as superseded by this order 69 Order; Counsel shall file a joint status report by 5:00 p.m. on April 29, 2025.. Signed by Judge Ellen Lipton Hollander on 4/17/2025. (jf3s, Deputy Clerk) (Entered: 04/17/2025) |
| 04/17/2025 | 148 | NOTICE OF APPEAL as to 146 Memorandum Opinion, 147 Order on Motion for Preliminary Injunction,, Order on Motion to Stay,,,,, by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization. (Humphreys, Bradley) (Entered: 04/17/2025) |
| 04/17/2025 | 149 | MOTION to Stay re 146 Memorandum Opinion, 147 Order on Motion for Preliminary Injunction,, Order on Motion to Stay,,,,, *Pending Appeal* by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 04/17/2025) |
| 04/18/2025 | 150 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 148 Notice of Appeal,. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(kns, Deputy Clerk) (Entered: 04/18/2025) |
| 04/18/2025 | 152 | PROTECTIVE ORDER. Signed by Judge Ellen Lipton Hollander on 4/18/2025. (hmls, Deputy Clerk) (Entered: 04/21/2025) |
| 04/18/2025 | 153 | USCA Case Number 25–1411 for 148 Notice of Appeal, filed by Elon Musk, Mike Russo, U.S. Doge Service Temporary Organization, Leland Dudek, Social Security Administration, U.S. Doge Service, Amy Gleason. Case Manager – Rachel Phillips (kns, Deputy Clerk) (Entered: 04/22/2025) |
| 04/19/2025 | 151 | RESPONSE in Opposition re 149 MOTION to Stay re 146 Memorandum Opinion, 147 Order on Motion for Preliminary Injunction,, Order on Motion to Stay,,,,, *Pending Appeal* filed by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers.(Samburg, Mark) (Entered: 04/19/2025) |
| 04/22/2025 | 154 | MEMORANDUM AND ORDER denying 149 MOTION to Stay re 146 Memorandum Opinion, 147 Order on Motion for Preliminary Injunction. Signed by Judge Ellen Lipton Hollander on 4/22/2025. (jf3s, Deputy Clerk) (Entered: 04/22/2025) |
| 04/23/2025 | 155 | STATUS REPORT *and Certification* by Leland Dudek, Mike Russo, Social Security Administration (Attachments: # 1 Exhibit)(Humphreys, Bradley) (Entered: 04/23/2025) |
| 04/24/2025 | 156 | MEMORANDUM to Counsel re: Westlaw. Signed by Judge Ellen Lipton Hollander on 4/24/2025. (hmls, Deputy Clerk) (Entered: 04/24/2025) |
| 04/24/2025 | 157 | AMENDED MEMORANDUM OPINION. Signed by Judge Ellen Lipton Hollander on 4/17/2025. (c/em:4th Circuit) (hmls, Deputy Clerk) (Entered: 04/24/2025) |
| 04/30/2025 | 158 | ORDER of USCA Granting initial hearing en banc as to 148 Notice of Appeal, filed by Elon Musk, Mike Russo, U.S. Doge Service Temporary Organization, Leland Dudek, Social Security Administration, U.S. Doge Service and Amy Gleason. (slss, Deputy Clerk) (Entered: 05/01/2025) |

| 05/05/2025 | 159 | MOTION for Extension of Time to File Answer re 17 Amended Complaint, *or to Otherwise Respond (Nunc Pro Tunc)* by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 05/05/2025) |
| --- | --- | --- |
| 05/05/2025 | 160 | Marginal ORDER re 159 MOTION for Extension of Time to File Answer re 17 Amended Complaint, *or to Otherwise Respond (Nunc Pro Tunc)* filed by Elon Musk, Mike Russo, U.S. Doge Service Temporary Organization, Leland Dudek, Social Security Administration, U.S. Doge Service, Amy Gleason. Signed by Judge Ellen Lipton Hollander on 5/5/2025. (hmls, Deputy Clerk) (Entered: 05/05/2025) |
| 05/07/2025 | 161 | RESPONSE in Opposition re 159 MOTION for Extension of Time to File Answer re 17 Amended Complaint, *or to Otherwise Respond (Nunc Pro Tunc)* filed by Alliance for Retired Americans, American Federation of State, County and Municipal Employees, AFL–CIO, American Federation of Teachers.(Swift, Alethea) (Entered: 05/07/2025) |
| 05/08/2025 | 162 | REPLY to Response to Motion re 159 MOTION for Extension of Time to File Answer re 17 Amended Complaint, *or to Otherwise Respond (Nunc Pro Tunc)* filed by Leland Dudek, Amy Gleason, Elon Musk, Mike Russo, Social Security Administration, U.S. Doge Service, U.S. Doge Service Temporary Organization.(Humphreys, Bradley) (Entered: 05/08/2025) |
| 05/09/2025 | 163 | MEMORANDUM AND ORDER re: 159 Nunc Pro Tunc Motion for Extension of Time to File Answer by defendants; EXTENDING the deadline through fourteen days after the Supreme Court rules on defendants' application for stay. In the event that the Supreme Court denies the stay request, the government may seek a further extension of time to respond to the Amended Complaint. Signed by Judge Ellen Lipton Hollander on 5/9/2025. (hmls, Deputy Clerk) (Entered: 05/09/2025) |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# NORTHERN DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, 1625 L Street NW, Washington, D.C. 20036, ALLIANCE FOR RETIRED AMERICANS, 815 16th Street NW, Washington, D.C. 20006, and AMERICAN FEDERATION OF TEACHERS, 555 New Jersey Avenue NW, Washington, D.C. 20001, *Plaintiffs*, *vs.* SOCIAL SECURITY ADMINISTRATION, 6401 Security Blvd., Baltimore, MD 21235 (Baltimore County), LELAND DUDEK, *in his official capacity as purported Acting Commissioner, Social Security Administration*, 6401 Security Blvd., Baltimore, MD 21235 (Baltimore County), MIKE RUSSO, *in his official capacity as Chief Information Officer, Social Security Administration*, 6401 Security Blvd., Baltimore, MD 21235 (Baltimore County), ELON MUSK, *in his official capacity as Senior Advisor to the President and de facto head of DOGE*, 1600 Pennsylvania Ave. NW, Washington, DC 20500, U.S. DOGE SERVICE, 736 Jackson Pl. NW, Washington, DC 20503, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, 736 Jackson Pl. NW, Washington, DC 20503, and AMY GLEASON, *in her official capacity as DOGE Acting Administrator*, 736 Jackson Pl. NW, Washington, DC 20503, *Defendants*. | Case No. 1:25-cv-00596 **Jury Trial Requested** |

## PLAINTIFFS' FIRST AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Since its founding, the Social Security Administration ("SSA")—charged with administering the nation's retirement, disability, and survivor benefits—has committed itself to maintaining the privacy of the data it collects from Americans, including eligible noncitizens. Numerous laws and regulations require the agency to keep that data secure, with good reason. SSA maintains data including the Social Security numbers, employment and wage information, medical histories, tax return information, and personal addresses—among other things—of hundreds of millions of people. The data is, to put it mildly, highly sensitive, personal, and private.

2.     But over the last six weeks, SSA has abandoned its commitment to maintaining the privacy of personal data. SSA and its acting officials have opened its data systems to unauthorized personnel from the "Department of Government Efficiency" (or "DOGE") in violation of applicable laws and with disregard fo the privacy interest of the millions of Americans that SSA serves. DOGE's access has already harmed Plaintiffs and their members, and every day DOGE retains access, the risk of additional injury increases.

3.     SSA is not the first agency that DOGE has infiltrated. Since President Trump's inauguration, DOGE and "senior advisor" Elon Musk have unilaterally and unlawfully accessed highly sensitive information systems across multiple federal agencies.

4.     DOGE has attempted to seize control of carefully protected information systems at the Treasury Department (including the Internal Revenue Service); the Consumer Financial Protection Bureau; the General Services Administration; the United States Agency for International Development ("USAID"); Office of Personnel Management ("OPM"); the Department of Housing and Urban Development; the National Oceanic and Atmospheric Administration; and the Departments of Education, Labor, and Health and Human Services.  At

1

USAID, DOGE has obtained "God mode" access—full, unrestricted admission to the agency's digital infrastructure.[1]

5.      DOGE and its government-wide commandeering of sensitive information have wreaked havoc on the American system of government and caused incredible concern for the privacy of the American public. Because DOGE has unlawfully mined data from multiple agencies, it is able to cross-reference and potentially cross-contaminate information from different, previously secure and segregated sources. That only compounds the harm (and ongoing risk of future harm) to the American people.

6.      It hasn't helped that the Executive Branch has been unable or unwilling to explain exactly what DOGE is, what its activities are, or the authority under which it is operating.

7.      Courts have taken notice. Two judges, including in this Circuit, have granted emergency relief to safeguard information systems at the Department of Education[2] and the Department of Treasury.[3] Another acknowledged that "DOGE's unpredictable actions have resulted in considerable uncertainty and confusion," highlighting the concerning nature of "the unchecked authority" being wielded by "an unelected individual and an entity that was not created by Congress."[4] And another expressed "serious concerns" about the privacy of the data of millions and rejected the government's argument that DOGE is a "goldilocks" entity that can wield massive authority with minimal oversight."[5]

---

[1] Charlie Warzel et al., *DOGE has 'God Mode' Access to Government Data*, The Atlantic (Feb. 19, 2025), https://perma.cc/9QXM-NKK5.
[2] *See Am. Fed'n of Teachers v. Bessent*, No. 8:25-cv-00430, 2025 WL 582063 (D. Md. Feb. 24, 2025).
[3] *See New York v. Trump*, No. 25 CIV. 1144, 2025 WL 435411 (S.D.N.Y. Feb. 8, 2025), *modified on clarification*, No. 25-CV-01144 (JAV), 2025 WL 455406 (S.D.N.Y. Feb. 11, 2025).
[4] *New Mexico v. Musk*, No. 25-cv-429, 2025 WL 520583, at *4 (D.D.C. Feb. 18, 2025).
[5] *Am. Fed'n of Lab. & Cong. of Indus. Orgs. et al. v. Dep't of Lab. et al.*, No. CV 25-0339, 2025 WL 542825, at *3 (D.D.C. Feb. 14, 2025).

2

8.    Only once before has a presidential administration sought access to such sensitive, personally identifiable information. Congress met those notorious attempts by President Nixon with the Privacy Act of 1974 and the Tax Reform Act of 1976, which implemented broad and decisive protections meant to prevent presidential misuse of sensitive, personal information maintained in government systems.

9.    Today, the American public again faces Executive Branch overreach threatening the privacy of hundreds of millions of people's personal data. In attempting to seize and maintain access to agency systems, including SSA's, the Trump administration is violating the many protections that Congress and the Executive Branch have erected against exactly this type of data mining and misuse.

10.    Even against the backdrop of the Nixon administration, these unlawful attempts are without equal. Never before has a group of unelected, unappointed, and unvetted individuals— contradictorily described as White House employees, employees of either existing or putative agencies (multiple and many), and undefined "advisors"—sought or gained access to such sensitive information from across the federal government.

11.    Never before has an industry mogul with countless conflicts of interest—not to mention an undefined role in the administration—sought and gained access to protected, private data on nearly every person in the country.

12.    And never before has a White House demonstrated such a breathtaking disregard for the legal protections Congress and the Executive Branch implemented to protect data belonging or pertaining to individual Americans.

13.    This lawsuit seeks to protect Plaintiffs and their members against the ongoing (and ever increasing) harm caused by DOGE and certain SSA executives' unlawful seizure of personal,

3

private, and sensitive data from SSA systems. The seizure and unauthorized use of that data is prohibited by the Privacy Act, the Social Security Act, the Internal Revenue Code, the Federal Information Systems Modernization Act, and the Administrative Procedure Act.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically the Privacy Act, 5 U.S.C. § 552a; the Social Security Act, 42 U.S.C. § 1306; the Tax Reform Act, 26 U.S.C. §§ 6103, 7213A; the Federal Information Security Modernization Act of 2014 ("FISMA"), 44 U.S.C. §§ 3551-58, and the Administrative Procedure Act, 5 U.S.C. § 701.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendant SSA is an agency of the United States headquartered in Baltimore, Maryland, where a substantial part of the events or omissions giving rise to Plaintiffs' claims.

## PARTIES

16.     Plaintiff the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and membership association headquartered in Washington, D.C. AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils, and affiliates located throughout 46 states, the District of Columbia, and Puerto Rico. Of AFSCME's members, approximately 200,000 are retired public service workers who continue to remain members of AFSCME, participate in its governance, and advocate for fairness, equality, and income security for retired Americans. AFSCME's retiree membership is organized into local and state chapters that are chartered by AFSCME. They elect local and state leadership and, together, organize under a national Retiree Council. AFSCME's Retiree Council elects

chairpersons who, by virtue of their position, are representatives to and attend meetings of AFSCME's International Executive Board. Retiree Chapters also elect delegates who participate in AFSCME's biennial constitutional convention, at which the union's policy, agenda, and goals are established by the Convention Delegates through the adoption of resolutions.

17.     Plaintiff Alliance for Retired Americans ("ARA" or the "Alliance") is a grassroots advocacy organization with 4.4 million members headquartered in Washington, D.C. Founded by the AFL-CIO Executive Council in 2001, the Alliance has 40 state alliances and members in every state. The Alliance's retiree members are from all walks of life. They are former teachers, industrial workers, state and federal government workers, construction workers, and community leaders, all united in the belief that every American deserves a secure and dignified retirement after a lifetime of hard work.

18.     Plaintiff American Federation of Teachers ("AFT") is a national labor organization headquartered in Washington, D.C., representing over 1.8 million members who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. Approximately 490,000 of AFT's members are retired, and most benefit from programs administered by SSA. AFT's purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and the communities AFT's members serve. AFT does so by ensuring its members receive fair pay and benefits for their critical work and by fighting for safe working conditions that also benefit students, patients. and all those who use public services. Economic and retirement security is at the core of AFT's mission.

19.    Defendant Social Security Administration ("SSA") is an independent federal agency established to administer the Old-Age, Survivors, and Disability Insurance programs and the Supplemental Security Income program.

20.    Defendant Leland Dudek is the purported Acting Commissioner of SSA. He is sued in his official capacity.

21.    Defendant Mike Russo is the Chief Information Officer of SSA. He is sued in his official capacity.

22.    Collectively, Defendants SSA, Dudek, and Russo are referred to herein as "SSA Defendants."

23.    Defendant Elon Musk is a Senior Advisor to the President and the de facto Head of DOGE. He is sued in his official capacity.

24.    Defendant U.S. DOGE Service (previously the U.S. Digital Service) was established by Executive Order 14158, which reorganized and renamed the United States Digital Service as the United States DOGE Service, established in the Executive Office of the President. Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025).

25.    Defendant U.S. DOGE Service Temporary Organization is a temporary organization also created by Executive Order 14158 and headed by the U.S. DOGE Service Administrator. *Id.*

26.    Defendant Amy Gleason is the Acting Administrator of the U.S. DOGE Service and the U.S. DOGE Service Temporary Organization. She is sued in her official capacity.

27.    Collectively, Defendants U.S. DOGE Service, U.S. DOGE Service Temporary Organization, Musk, and Gleason are referred to herein as "DOGE Defendants."

## FACTS

### I.     <u>The Social Security Administration</u>

28.     The Social Security Administration is the nation's principal benefit-paying agency. Founded in 1935 in the depths of the Great Depression, the agency was intended to "give some measure of protection to the average citizen," particularly those facing "poverty-ridden old age."[6]

29.     SSA issues Social Security numbers ("SSN") to U.S. citizens, permanent residents, and other eligible noncitizens. Over 450 million SSNs have been issued thus far.

30.     SSA also manages and administers some of the largest federal benefit programs, including Old-Age, Survivors, and Disability Insurance ("OASDI") and Supplemental Security Income ("SSI").

31.     Although most Social Security beneficiaries are retired, others receive benefits because they have a qualifying disability; are the spouse (or former spouse) or child of someone who receives or is eligible for Social Security; or are the spouse (or former spouse), child, or dependent parent of a deceased worker.[7] In fact, SSA pays more benefits to children than any other federal program.[8]

32.     Collectively, SSA pays over $1.5 trillion to seventy million people—more than one in five Americans—each year.[9] Those benefits lift 22 million people, including over 16 million adults aged sixty-five and over, out of poverty.[10] They reduce the depth of poverty for millions

---

[6] Soc. Sec. Admin., *Presidential Statement on Signing the Social Security Act* (August 14, 1935), https://perma.cc/7RDU-EDWD.
[7] Soc. Sec. Admin., *Understanding the Benefits* (2025) 2, https://perma.cc/V2MH-VANX.
[8] *Id.*
[9] Soc. Sec. Admin., *Fact Sheet*, https://perma.cc/595S-B36F.
[10] Kathleen Romig, *Social Security Lifts More People Above the Poverty Line Than Any Other Program*, Ctr. on Budget & Pol'y Priorities (Jan. 21, 2025), https://perma.cc/6U8X-7U9A.

more.[11] These benefits are funded primarily through payroll taxes that employees and employers pay over the course of their working lives.[12]

33.     SSA also helps administer other federal programs and laws, including Medicare, Medicaid, SNAP, eVerify, and the Help America Vote Act.

34.     To facilitate its work on behalf of the American public, SSA collects and houses some of the most sensitive, personally identifiable information (including personal health information) of millions of seniors, working-age adults, and children. Form SS-5, which applicants must submit to SSA to receive a Social Security number, provides a small sample of the type of data SSA collects. It requires applicants to provide their name (including prior names or other names used), place and date of birth, citizenship, ethnicity, race, sex, phone number, and mailing address, as well as their parents' names and Social Security numbers.

35.     SSA also collects driver's license and identification card information, bank and credit card information, birth and marriage certificates, pension information, home and work addresses, school records, immigration and/or naturalization records, health care providers' contact information, family court records, employment and employer records, psychological or psychiatric health records, hospitalization records, addiction treatment records, and tests for, or records about, HIV and AIDS.

36.     And it collects tax information. Each year, employers send SSA a W-3 form showing the total earnings, Social Security wages, Medicare wages, and withholdings for all employees for the previous year.

---

[11] *Id.*
[12] Soc. Sec. Admin., Press Office, *How Is Social Security Financed?*, https://perma.cc/6AKF-DC7Z.

## II.    Laws and Regulations Governing Privacy and Security of SSA Data

37.    Since its founding, SSA (originally called the Social Security Board) has been legally obligated to protect the sensitive data it obtains and has made public commitments to protect the data with which it is entrusted. For example, the agency's first regulation, adopted in 1937, prohibited SSA and its employees from producing or disclosing the agency's records and files.[13]

38.    Because of the breadth and sensitivity of the confidential information SSA maintains, the agency's information systems are subject to even more stringent privacy protection than those of other agencies.

39.    Among the panoply of laws governing SSA's information systems are the Privacy Act, Social Security Act, Tax Reform Act, Taxpayer Browsing Protection Act, and the Federal Information Systems Modernization Act. SSA's data systems and the security thereof are also governed by standards developed by the National Institute of Standards and Technology.

40.    Compliance with those laws and regulations requires both stringent protection of the sensitive personal data SSA maintains and public disclosures about the agency's management of that data.

41.    As but one example, the Privacy Act requires that when an agency establishes or revises a system of records, it must issue a System of Records Notice ("SORN") disclosing information about the records contained in the system, the manner(s) in which those records may be used, and related storage and access policies. 5 U.S.C. § 552a(e)(4).

42.    SORNs must be made publicly available on the issuing agency's website and published as notices in the Federal Register. The agency must solicit comments from the public

---

[13] Soc. Sec. Admin., *Regulation No. 1,* https://perma.cc/JNV8-QG9G.

and must update the Federal Register any time an agency changes its system of record policies

change. No SORN, for any SSA records system, authorizes the disclosure of information to DOGE

or its personnel.

43.     For example, the Master Beneficiary Record contains information about every

person who has applied for OASDI benefits. The Master Beneficiary Record SORN permits the

disclosure of certain of that data for "routine uses," such as disclosures made to the Department of

Treasury for use when collecting Social Security taxes, 71 Fed. Reg. 1826 (Jan. 11, 2006), or

disclosures to federal, state, and local agencies after a data breach, 72 Fed. Reg. 69723 (Dec. 10,

2007).

44.     It permits disclosure to the Office of the President in only one circumstance: "for

the purpose of responding" to an inquiry made by "an individual or from a third party on [the

individual's] behalf." 71 Fed. Reg. at 1827. The same is true of the SORN for the Supplemental

Security Income database, 71 Fed. Reg. at 1831, which contains sensitive personal information

about SSI eligibility, citizenship, residency, Medicaid eligibility, addiction history, income, SSN,

and date of birth, among other things.

45.     SSA regulations regarding data maintenance and disclosure also require that the

agency weigh, among other things, whether disclosure would "result in a clearly unwarranted

invasion of personal privacy," the "sensitivity of the information (e.g., whether individuals would

suffer harm or embarrassment as a result of the disclosure)," "[t]he rights and expectations of

individuals to have their personal information kept confidential," and "[t]he public's interest in

maintaining general standards of confidentiality of personal information." 20 C.F.R. § 401.140.

This regulation reflects the sensitivity of this information and the inherent risks of it being made

public, as recognized by other laws such as the Freedom of Information Act. *See id.* ("When no

law specifically requiring or prohibiting disclosure applies to a question of whether to disclose information, we follow FOIA principles."); *see also* 5 U.S.C. § 552(b)(6) (exempting from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy").

46.    This web of privacy protections reflects the sensitivity of the personal data SSA maintains and, among other things, is responsive to the widespread attempts to scam everyday Americans into disclosing their Social Security information to unauthorized sources.[14] Those risks are particularly acute for senior citizens, who are among the most vulnerable targets of fraud, particularly fraud aimed at seeking access to Social Security and financial information.[15]

### III.    Creation of the Department of Government Efficiency

47.    On November 12, 2024, President-Elect Trump announced his intent to create a "Department of Government Efficiency" to "provide advice and guidance from outside of Government" to "the White House and Office of Management & Budget" and to help "pave the way" for the Trump-Vance Administration to "dismantle," "slash," and "restructure" federal programs and services.[16]

48.    Upon taking the oath of office, he did just that via Executive Order 14158, titled "Establishing and Implementing the President's 'Department of Government Efficiency'" (the

---

[14] Soc. Sec. Admin., *Social Security and Scam Awareness* (Nov. 16, 2023), https://perma.cc/EFL8-V2TL.

[15] *See* Dep't of Just., Elder Just. Initiative Home, *Senior Scam Alert*, https://perma.cc/TH4Q-8CAR.

[16] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 12, 2024, 7:46 PM ET), https://perma.cc/K75N-RTC7.

"E.O."). The E.O. reorganized and renamed the United States Digital Service as the United States DOGE Service and established the department in the Executive Office of the President.[17]

49.　　The E.O. created a new role, U.S. DOGE Service Administrator, housed within the Executive Office of the President and reporting to the White House Chief of Staff.[18]

50.　　The E.O. further established within U.S. DOGE Service a temporary organization known as "the U.S. DOGE Service Temporary Organization," headed by the U.S. DOGE Service Administrator and tasked with advancing "the President's 18-month DOGE agenda."[19]

51.　　The E.O. required each agency head to establish a "DOGE Team" to "coordinate their work with [U.S. DOGE Service]" and advise each team's head-of-agency on "implementing the President's DOGE Agenda."[20]

52.　　The E.O. also directed agency heads across the government to take "all necessary steps" to "ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems."[21] It did so without any reference to applicable legal restraints on such activity, directing only that DOGE adhere to undefined "rigorous data protection standards."[22]

53.　　DOGE officials have made clear their view that DOGE is "subject to [the] Presidential Records [Act]."[23] That Act applies, in relevant part, to EOP individuals and units

> whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

---

[17] Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025).

[18] *Id.* § 3(b).

[19] *Id.*

[20] *Id.* § 3(c).

[21] *Id.* § 4(b).

[22] *Id.*

[23] Minho Kim, *Trump's Declaration Allows Musk's Efficiency Team to Skirt Open Records Laws*, N.Y. Times (Feb. 10, 2025), https://perma.cc/3KCP-GFVV; *see also* Katie Miller (@katierosemiller), X (Feb. 5, 2025, 8:26 PM), https://perma.cc/VQB6-447P (contending that the E.O. made DOGE "subject to Presidential Records [Act]").

12

44 U.S.C. § 2201.

54.    DOGE is being "headed by Elon Musk."[24]

55.    DOGE reportedly has more than fifty employees.[25]

56.    DOGE has been executing a cross-agency infiltration campaign: personnel swoop in to agencies, demand access to sensitive data systems, and take adverse employment action against employees who resist. The ultimate goal is to re-work entire agencies to DOGE's will.

57.    Since Inauguration Day, DOGE personnel have sought and in most instances obtained unprecedented access to information systems across numerous federal agencies, including the Department of Treasury[26] (including the Internal Revenue Service[27]), the Consumer

---

[24] *Full Transcript of President Trump's Speech to Congress,* N.Y. Times (March 4, 2025), https://perma.cc/AT4N-WRDY ("I have created the brand new Department of Government Efficiency. DOGE . . . . [w]hich is headed by Elon Musk."); Joe Hernandez, *Trump hired Musk as a 'special government employee.' Here's what that means*, NPR (Feb. 13, 2025), https://perma.cc/6XTG-UHEC. Josh Marshall (@joshtpm.bsky.social), X (Mar. 6, 2025, 1:01 AM), https://perma.cc/7Y5N-95BE.

[25] *See* Avi Asher-Shapiro et al., *Elon Musk's Demolition Crew*, ProPublica (updated Feb. 20, 2025), https://perma.cc/5Z9Z-F2EP. *The People Carrying Out Musk's Plans at DOGE*, N.Y. Times (updated March 4, 2025), https://perma.cc/DD2M-C8FR.

[26] Katelyn Polantz et al., *How an arcane Treasury Department office became ground zero in the war over federal spending*, CNN (Feb. 1, 2025), https://perma.cc/U5VF-RWE7; Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payment System*, N.Y. Times (Feb. 1, 2025), https://perma.cc/YGR9-2J65; Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, Wired (Feb. 4, 2025), https://perma.cc/6U6Z-3CK4.

[27] Jeff Stein et al., *Musk's DOGE seeks access to personal taxpayer data, raising alarm at IRS*, Wash. Post (Feb. 9, 2025), https://perma.cc/GJ38-S2M2.

Financial Protection Bureau,[28] the General Services Administration,[29] USAID,[30] OPM,[31] the Department of Housing and Urban Development,[32] the National Oceanic and Atmospheric Administration,[33] and the Departments of Education,[34] Labor,[35] and Health and Human Services.[36]

58. Some DOGE staffers are mining data from and working within multiple agencies at the same time.[37] That unauthorized cross-agency access allows DOGE to collect sensitive

---

[28] Makena Kelly, *DOGE Is Now Inside the Consumer Financial Protection Bureau*, Wired (Feb. 7, 2025), https://perma.cc/9YP7-EA57; Jason Leopold, *DOGE-Backed Halt at CFPB Comes Amid Musk's Plans for 'X' Digital Wallet*, Bloomberg Law (Feb. 10, 2025), https://perma.cc/9356-2UFN.

[29] Emily Davies & Faiz Siddiqui, *GSA engineering lead resigns over DOGE ally's request for access,* Wash. Post (Feb. 18, 2025), https://perma.cc/E2X9-3VST.

[30] Charlie Warzel et al., *DOGE has 'God Mode' Access to Government Data*, *supra* ("DOGE has acquired God-mode access across the entire digital system [at USAID].").

[31] Davies, *supra* note 29.

[32] Jesse Coburn, *DOGE Gains Access to Confidential Records on Housing Discrimination, Medical Details — Even Domestic Violence*, ProPublica (Feb 26, 2025), https://perma.cc/E33L-2ACL.

[33] Michael Sainato, *Doge staffers enter NOAA headquarters and incite reports of cuts and threats*, The Guardian (Feb. 4, 2025), https://perma.cc/W4WP-MHRV; Eric Katz, *DOGE enters NOAA, accesses IT systems and removes the top HR official*, Gov't Exec. (Feb. 5, 2025), https://perma.cc/5DFK-NUTU.

[34] *See* Laura Meckler et al., *Trump Preps Order to Dismantle Education Dept. as DOGE Probes Data*, Wash. Post (Feb. 3, 2025), https://perma.cc/PP8N-NCD7 ("At least some DOGE staffers have gained access to multiple sensitive internal systems, the people said, including a financial aid dataset that contains the personal information for millions of students enrolled in the federal student aid program.").

[35] Ex. F, Decl. of Rushab Sanghvi ¶ 9, *Am. Fed'n of Lab. & Cong. of Indus. Orgs. et al. v. Dep't of Lab. et al.,* No. CV 25-0339 (JDB) (D.D.C. Feb. 12, 2025), ECF No. 29-8.

[36] Chelsea Cirruzzo and Kelly Hooper, *How HHS gets DOGE'd*, Politico (Feb. 10, 2025), https://perma.cc/N772-EKFF; Dan Diamond et al., *DOGE broadens sweep of federal agencies, gains access to health payment systems*, Wash. Post (Feb. 5, 2025), https://perma.cc/398V-QY7Y.

[37] *See*, *e.g.*, Tim Marchman & Matt Giles, *This DOGE Engineer Has Access to the National Oceanic and Atmospheric Administration*, Wired (Feb. 5, 2025), https://perma.cc/4PNG-XF55; Vittoria Elliott et al., *The US Treasury Claimed DOGE Technologist Didn't Have 'Write Access' When He Actually Did*, Wired (Feb. 6, 2025), https://perma.cc/U9V8-GBB8; Asher-Schapiro, *supra* note 25; Ella Nilsen & Sean Lyngaas, *Trump Energy Secretary Allowed 23-Year-Old Doge Rep To Access It Systems Over Objections From General Counsel*, CNN (Feb. 7, 2025),

information from multiple agency systems. DOGE personnel are then able to combine and cross-reference data in ways never contemplated by each agency's security policies and/or safeguards.

59.    DOGE has not merely accessed sensitive and protected information. On the contrary: it is publicly disclosing it. For example, DOGE has posted classified information, including classified personnel information, from the National Reconnaissance Office on its website,[38] and has posted sensitive SSA system code GitHub, an open platform that allows developers to create, store, manage and share code through which sensitive information about the structure of government information systems could be revealed. At some agencies, DOGE staffers have even been *accidentally* granted edit access to sensitive data systems.[39]

## IV.    President Trump, Elon Musk, and DOGE Take Aim at Social Security and Medicare

60.    President Trump, Elon Musk, and other administration officials have had their sights set on Social Security for the past year, even as President Trump has claimed that "Social Security will not be touched."[40]

61.    On March 11, 2024, then-candidate Trump implied that he would be amenable to cutting Social Security and Medicare if he won the presidency, stating during an interview on

---

[38] Jennifer Bendery, *Elon Musk's DOGE Posts Classified Data On Its New Website*, HuffPost (Feb 14, 2025), https://perma.cc/9KSL-KLUT; Will Steakin et al., *DOGE Data Release Criticized By Intel Community; Trump Admin Says It's Public Data*, ABC News (Feb. 16, 2025), https://perma.cc/HZ72-W9M8.

[39] Beatrice Nolan, *A 25-year-old staffer with Elon Musk's DOGE was accidentally given permission to edit a sensitive Treasury payments system*, Fortune (Feb. 13, 2025), https://perma.cc/P928-YZY2.

[40] Eli Hager, *Anxiety Mounts Among Social Security Recipients as DOGE Troops Settle In*, ProPublica (Feb. 22, 2025), https://perma.cc/K8X2-3KZW.

https://perma.cc/Y7XW-HL6M (DOGE staffer Luke Farritor working at HHS and Department of Energy); Evan Weinberger, *Musk's DOGE Descends on CFPB With Eyes on Shutting It Down*, Bloomberg Law (Feb. 7, 2025), https://perma.cc/GKQ4-NAZB; Makena Kelly & Zoe Schiffer, *Elon Musk's Friends Have Infiltrated Another Government Agency*, Wired (Jan. 31, 2025), https://perma.cc/RZG8-XDP2; Laura Barrón-López (@lbarronlopez), X (Feb. 3, 2025, 2:05 PM), https://perma.cc/GNM2-DXM2.

CNBC: "There is a lot you can do in terms of entitlements, in terms of cutting and in terms of also the theft and the bad management of entitlements."[41]

62.    Elon Musk stated during the presidential campaign that if Trump were re-elected, his administration would likely cause "temporary hardship" for American citizens because of the ensuing budget cuts.[42]

63.    Elon Musk also expressed a desire to slash the federal budget by at least $2 trillion, a figure that amounts to more than what the federal government spent in the last fiscal year on "defense, education, veterans' health and other discretionary items" combined.[43]

64.    On December 2, 2024, Musk implied that he was amenable to overhauling Social Security, quote tweeting an "X" thread by Senator Mike Lee that called Social Security an "outdated, mismanaged system."[44]

65.    Since Donald Trump has taken office, both he and Elon Musk have repeatedly suggested that there is widespread fraud within Social Security, as well as other entitlements.

66.    On February 11, 2025, Musk wrote on "X": "At this point, I am 100% certain that the magnitude of the fraud in federal entitlements (Social Security, Medicare, Medicaid, Welfare, Disability, etc.) exceeds the combined sum of every private scam you've ever heard by FAR. It's not even close."[45]

---

[41] Kate Sullivan & Tami Luhby, *Trump suggests he's open to cuts to Medicare and Social Security after attacking primary rivals over the issue*, CNN (Mar. 11, 2024), https://perma.cc/83AG-2QZ3.
[42] Rob Wile & Lora Kolodny, *Elon Musk asks voters to brace for economic 'hardship,' deep spending cuts in potential Trump Cabinet role*, CNN (Nov. 1, 2024), https://perma.cc/3F5T-LQHG.
[43] Tami Luhby et al., *Trump wants Elon Musk to overhaul the government. Here's what could be on the chopping block*, CNN (Nov. 14, 2024), https://perma.cc/5ULP-QL7H.
[44] Elon Musk (@elonmusk), X (Dec. 2, 2024, 9:47 PM ET), https://perma.cc/MX85-XK7K.
[45] Elon Musk (@elonmusk), X (Feb. 11, 2025, 1:23 AM ET), https://perma.cc/R6YD-5KY9.

67.     On February 17, 2025, Musk falsely claimed on "X": "Yes, there are FAR more 'eligible' Social Security numbers than there are citizens in the USA. This might be the biggest fraud in history."[46]

68.     On February 17, 2025, White House Press Secretary Karoline Leavitt stated on Fox News that President Trump "has directed Elon Musk and the DOGE team to identify fraud at the Social Security Administration."[47] Leavitt also stated on Fox News: "They haven't dug into the books yet, but they suspect that there are tens of millions of deceased people who are receiving fraudulent Social Security payments."[48]

69.     On February 19, 2025, Commerce Secretary Howard Lutnick stated on Fox News:

> Back in October … I flew down to Texas, got Elon Musk to [set up DOGE], and here was our agreement: that Elon was gonna cut a trillion dollars of waste fraud and abuse….We have almost $4 trillion of entitlements, and no one's ever looked at it before. You know Social Security is wrong, you know Medicaid and Medicare are wrong….[49]

70.     On February 19, 2025, purported Acting SSA Commissioner Leland Dudek issued a press release endorsing DOGE and stating that DOGE "is a critical part of President Trump's commitment to identifying fraud, waste, and abuse."[50]

---

[46] Elon Musk (@elonmusk), X (Feb. 17, 2025, 12:17 AM ET), https://perma.cc/UU68-7ZHY.

[47] Yamiche Alcindor & Raquel Coronell, *Top Social Security official steps down after disagreement with DOGE over sensitive data*, CNN (Feb. 17, 2025), https://perma.cc/9ZLL-VLFH.

[48] Zachary B. Wolf, *Trump and Musk set their sights on Social Security by spreading rumors*, CNN (Feb. 19, 2025), https://perma.cc/YY7H-8XPA.

[49] Acyn (@Acyn), X (Feb. 19, 2025, 8:16 PM ET), https://perma.cc/T4RA-6BXL.

[50] Soc. Sec. Admin., Press Release, *Statement from Lee Dudek, Acting Commissioner, about Commitment to Agency Transparency and Protecting Benefits and Information* (Feb. 19, 2025), https://perma.cc/W33R-QKEZ.

71.    On February 22, 2025, President Trump reiterated his administration's claims that tens of millions of Americans are improperly receiving Social Security benefits,[51] calling Social Security "the biggest Ponzi scheme of all time … It's all a scam, the whole thing is a scam."[52]

72.    On February 28, 2025, Elon Musk went on "The Joe Rogan Experience"—a widely listened to podcast—and proclaimed that "a basic search of the Social Security database" indicated "20 million dead people [were] marked as alive" and that "Social Security is the biggest Ponzi scheme of all time."[53] That claim is false.[54]

73.    On March 4, 2025, in his first speech before a joint session of Congress, President Trump claimed there to be "shocking levels of incompetence and probable fraud in the Social Security Program."[55]

74.    At the same time, SSA leadership has sought to wholly rework the agency.

75.    On February 21, 2025, SSA announced an "organizational realignment" of its Office of Analytics, Review, and Oversight, which was responsible for addressing recommendations from external monitoring authorities and overseeing fraud detection.[56]

---

[51] The Express Tribune, *Trump Reveals Shocking Social Security Records & Payments*, YouTube (Feb. 20, 2025), https://perma.cc/4ZC6-EL8M; Justin Glawe, *Lies, Cuts, Closures: Trump and Musk Ravage Social Security Administration*, Rolling Stone (Feb. 28, 2025), https://perma.cc/Y76Q-AJAZ.

[52] Mandy Taheri, *Donald Trump Riffs on Social Security—'It's All a Scam,'* Newsweek (Feb. 23, 2025), https://perma.cc/THX8-3ZS4.

[53] HappyScribe, *#2281 – Elon Musk,* The Joe Rogan Experience (Feb. 28, 2025), https://perma.cc/RJ9A-7K6Q.

[54] Soc. Sec. Admin., Off. of Inspector Gen., *IG Reports: Nearly $72 Billion Improperly Paid; Recommended Improvements Go Unimplemented* (Aug. 19, 2024), https://perma.cc/WR7T-3KZA.

[55] *Full Transcript of President Trump's Speech to Congress, supra* note 24.

[56] Soc. Sec. Admin., Press Release, *Social Security Announces Change to Improve Agency Operations and Strengthen Protections* (Feb. 21, 2025), https://perma.cc/3EC7-KARR.

18

76.    On February 24, 2025, SSA announced it was closing the agency's Office of Transformation,[57] which was dedicated to the digital modernization of SSA programs and services, including improving the agency's website. A day later, SSA shuttered its Office of Civil Rights and Equal Opportunity,[58] which had been tasked with overseeing the agency's civil rights, equal employment, harassment prevention, accommodations, and disability services.

77.    On February 27, 2025, SSA announced that it was implementing an "agency-wide organizational restructuring that will include significant workforce reductions"[59] and began offering buyouts to agency employees.[60]

78.    On February 28, 2025, SSA announced it was reducing the agency's workforce by 7,000 and reducing the number of regional SSA offices from ten to four.[61] The agency had already been at a fifty-year staffing low.[62]

79.    That same day, over twenty senior SSA leaders announced their resignations.[63]

80.    During this time, DOGE has also been examining SSA's contracting and other systems, posting various cuts to agency contracts on its "wall of receipts."[64]

---

[57] Soc. Sec. Admin., Press Release, *Social Security Eliminates Wasteful Department* (Feb. 24, 2025), https://perma.cc/WMY9-T2WN.

[58] Soc. Sec. Admin., Press Release, *Social Security Dissolves Duplicative Office* (Feb. 25, 2025), https://perma.cc/CMG2-JBCJ.

[59] Soc. Sec. Admin., Press Release, *Social Security Announces Options to its Workforce* (Feb. 27, 2025), https://perma.cc/J64C-SX3T.

[60] Aaron Navarro, *Social Security Administration offering voluntary buyouts ahead of "significant workforce reductions*," CBS News (Feb. 27, 2025), https://perma.cc/3XYQ-HHQJ.

[61] Soc. Sec. Admin., Press Release, *Social Security Announces Options to its Workforce* (Feb. 27, 2025), https://perma.cc/J64C-SX3T.

[62] Natalie Alms, *Social Security shutters its civil rights and transformation offices*, Gov't Exec. (Feb. 26, 2025), https://perma.cc/VY6T-K9FZ.

[63] Gregory Korte and Emily Birnbaum, *Social Security Revamp Sees at Least Two Dozen Leaders Exit*, Bloomberg Law (Feb. 28, 2025), https://perma.cc/K7HL-S43F.

[64] *The people voted for major reform*, Dep't of Gov't Efficiency, https://perma.cc/G6VS-NR2J (Last visited Mar. 6, 2025); Aliss Higham, *DOGE Reveals Social Security Administration Cuts*, Newsweek (Feb. 20, 2025), https://perma.cc/3R6K-BZEC.

81.     The purported Acting Commissioner has confirmed: DOGE personnel—or, as he called them, "outsiders who are unfamiliar with nuances of SSA programs"—are calling the shots.[65]

## V.     DOGE Seeks Access to Protected Information at SSA

82.     DOGE has also sought access to SSA data systems containing highly sensitive information.

83.     On the morning of January 30, 2025, Tiffany Flick—then-Acting Chief of Staff to the Acting SSA Commissioner—received a phone call from Leland Dudek—who was at the time serving as a mid-level manager in the Office of Program Integrity, where he worked on anti-fraud measures.[66] Mr. Dudek told Ms. Flick that some members of DOGE requested to be on-site immediately and wanted to come to SSA headquarters that day. Over the following two weeks, DOGE, working with Mr. Dudek, ransacked the agency, installing DOGE associates without proper vetting or training, threatening career employees, and demanding access to some of the agency's most sensitive data systems.

84.     Then-Acting Commissioner Michelle King and other career employees did their best to hold DOGE at bay, understanding the harm that would ensue should DOGE gain unfettered access to SSA's data systems.

85.     In the end, DOGE won. The President installed Mr. Dudek as the purported Acting Commissioner, and Commissioner King and Ms. Flick retired from government service.

86.     Commissioner Dudek then gave DOGE access to numerous data systems, including at least the following:

---

[65] Lisa Rein et al., *DOGE is driving Social Security cuts and will make mistakes, acting head says privately*, Wash. Post (Mar. 6, 2025), https://perma.cc/FYY3-QGRR.
[66] Marisa Kabas, *The Curious Case of Leland Dudek*, The Handbasket (Feb. 20, 2025), https://perma.cc/HND5-AHVQ.

a.    The Enterprise Data Warehouse, which houses SSA's master files and includes extensive information about anyone with a Social Security number, including names, names of spouses and dependents, work history, financial and banking information, immigration or citizenship status, and marital status;

b.    The NUMIDENT file, which contains information about the assigning of Social Security numbers;

c.    The Master Beneficiary Record and Supplemental Security Record files, which contain detailed information, including medical information, about anyone who applies for or receives Social Security or Supplemental Security benefits.

87.    Now, reporting suggests that SSA is now pushing to get DOGE access to additional data systems, including the Federal Parent Locator Service and the National Directory of New Hires database—both of which contain additional sensitive information about working Americans, including quarterly wage data from state workforce agencies, unemployment insurance claims, employer history and information, information about child support cases and child support orders.[67]

## HARMS TO PLAINTIFFS

88.    Plaintiffs have been engaged in, advocating for, and ensuring the availability of Social Security benefits for decades, as a central piece of their missions. Plaintiffs ASCME and AFT have active members in the workforce who participate in and contribute to the Old Age, Survivors, and Disability Insurance ("OASDI") program managed by SSA. AFSCME, AFT, and ARA also have retired members—most of whom receive OASDI payments or are otherwise

---

[67] Jeff Stein and Dan Diamond, *DOGE targets child support database full of income data*, Wash. Post (Mar. 6, 2025), https://perma.cc/D9DX-WVGU.

eligible for OASDI. Many AFSCME members also have children who receive disability benefits administered by SSA of whom receive survivor benefits.

89.    SSA has collected and stored extensive personal and financial information about Plaintiffs' members, including their Social Security numbers, names and addresses, taxable income, and contributions to Social Security.

90.    Many of Plaintiffs' members also have highly sensitive medical information on file with SSA, including members whose medical records may contain information that carries stigma.

91.    Plaintiffs' members have understood the information they submit to SSA to be private barring a few specific exceptions. Their trust in SSA is engendered by their understanding of the privacy laws the agency is subject to and the agency's own public commitments to data privacy, both in its official communications (for example, on its website) and in the statements made by agency employees during the course of conducting SSA business.

92.    SSA Defendants are required by law to protect the sensitive personal and financial information that they collect and maintain about individuals from unnecessary and unlawful disclosure.

93.    Plaintiffs' members have not—and do not—consent to the release of their sensitive information to DOGE personnel.

94.    The decision to grant DOGE personnel access to the extensive records that SSA maintains—and any future decisions to do so—without obtaining or even requesting the consent of affected individuals like Plaintiffs' members, violates those requirements and upends the reliance these members had on their data being secure.

95.    Plaintiffs' members—senior citizens—are also among the most targeted for and vulnerable to scams seeking or using their sensitive financial and medical information.

96.    Plaintiffs' members rely on the programs that President Trump, Elon Musk, the White House, and DOGE are targeting to live.

97.    Defendants' actions have thus harmed Plaintiffs' members by depriving them of privacy protections guaranteed by federal law and by making their information available for, and subject to, investigation by DOGE and scammers. This harm is exacerbated by the attendant risk that this information, still being improperly disclosed, is more easily accessed and abused by malicious actors.

## CLAIMS FOR RELIEF

### Count I
### Violation of the APA: Unlawful, Arbitrary and Capricious Agency Action, 5 U.S.C. § 706
### (Privacy Act, 5 U.S.C. § 552a)

98.    Plaintiffs assert and incorporate by reference the foregoing paragraphs.

99.    The Privacy Act prohibits agencies from "disclos[ing] any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b).

100.    The Privacy Act authorizes agencies to enter into agreements to share data, including via computer matching agreements, only if they adhere to strict processes. 5 U.S.C. § 552a(o).

101.    SSA Defendants have disclosed and continue to disclose personal records contained in systems of records under their control. Those disclosures are neither pursuant to a written request from Plaintiffs' members nor made with their prior written consent. 5 U.S.C. § 552a(b).

102.   SSA Defendants have also entered inter-agency data sharing agreements without abiding the process prescribed by law, 5 U.S.C. § 552a(o).

103.   SSA Defendants' conduct constitutes final agency action under 5 U.S.C. § 704.

104.   SSA Defendants have thereby engaged in conduct that is contrary to law, in excess of statutory authority, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2).

## <u>Count II</u>
## Violation of the Privacy Act, 5 U.S.C. § 552a

105.   Plaintiffs assert and incorporate by reference the foregoing paragraphs.

106.   The Privacy Act prohibits agencies from "disclos[ing] any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b).

107.   The Privacy Act authorizes agencies to enter into agreements to share data, including via computer matching agreements, only if they adhere to strict processes. 5 U.S.C. § 552a(o).

108.   SSA Defendants have disclosed and continue to disclose personal records contained in systems of records under their control. Those disclosures are neither pursuant to a written request from Plaintiffs' members nor made with their prior written consent. 5 U.S.C. § 552a(b).

109.   SSA Defendants have also entered inter-agency data sharing agreements without abiding the process prescribed by law, 5 U.S.C. § 552a(o).

110.    Accordingly, and alternatively to Count I, Plaintiffs are entitled to civil remedies under 5 U.S.C. § 552a(g).

### Count III
**Violation of the APA: Unlawful, Arbitrary and Capricious Agency Action, 5 U.S.C. § 706 (Internal Revenue Code, 26 U.S.C. §§ 6103, 7213; Social Security Act, 42 U.S.C. § 1306)**

111.    Plaintiffs assert and incorporate by reference the foregoing paragraphs.

112.    The Internal Revenue Code makes clear that "[r]etrns and return information shall be confidential" and prohibits, and the Social Security Act prohibits "disclosure of any return or portion of return." 26 U.S.C. § 6103; 42 U.S.C. § 1306.

113.    "Return information" includes "the nature, source, or amount" of a taxpayer's income and any other data gathered or collected by the Secretary of the Treasury.

114.    SSA Defendants unlawfully permitted DOGE Defendants to access and inspect tax return information protected by the Internal Revenue Code, 26 U.S.C. §§ 6103, 7213A, and the Social Security Act, 42 U.S.C. § 1306.

115.    Defendants' conduct constitutes final agency action under 5 U.S.C. § 704.

116.    Defendants have thereby engaged in conduct that is contrary to law, in excess of statutory authority, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2).

## Count IV

### Violation of the APA: Unlawful, Arbitrary and Capricious Agency Action, 5 U.S.C. § 706 (FISMA, 44 U.S.C. §§ 3554)

117.    Plaintiffs assert and incorporate by reference the foregoing paragraphs.

118.    SSA Defendants have administered systems containing vast quantities of sensitive personal information without complying with statutorily required security protections under FISMA. 44 U.S.C. §§ 3554(a)(1)–(2).

119.    Defendants' conduct constitutes final agency action under 5 U.S.C. § 704.

120.    Defendants have thereby engaged in conduct that is contrary to law, in excess of statutory authority, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2).

## Count V

### Violation of the APA: Unlawful, Arbitrary and Capricious Agency Action, 5 U.S.C. § 706

121.    Plaintiffs assert and incorporate by reference the foregoing paragraphs.

122.    SSA Defendants have disclosed an unfathomable amount of sensitive, personally identifying information about the American public without acknowledging that SSA was changing its policies, identifying the source of its authority to do so, or providing any analysis whatsoever of why its decision is not arbitrary and capricious, and without considering the consequences, including to the reliance interests of Plaintiffs and their members.

123.    Defendants' conduct constitutes final agency action under 5 U.S.C. § 704.

124.    Defendants have thereby engaged in conduct that is contrary to law, in excess of statutory authority, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2).

## Count VI
### Actions *Ultra Vires*

125.    Plaintiffs assert and incorporate by reference the foregoing paragraphs.

126.    In directing and controlling the use and administration of Defendant SSA's systems, DOGE Defendants have breached secure government systems and caused the unlawful disclosure of the personal data of hundreds of millions of people.

127.    DOGE Defendants may not take actions which are not authorized by law.

128.    No law or other authority authorizes or permits DOGE Defendants to access or administer these systems.

129.    Through such conduct, DOGE Defendants have engaged (and continue to engage) in *ultra vires* actions that injure Plaintiffs' members by exposing their sensitive, private, and personally identifiable information and increasing the risk of further disclosure and misuse thereof.

## Count VII
### Violation of the Appointments Clause, U.S. Const. Art. II, § 2, cl.2, 42 U.S.C. § 902

130.    Plaintiffs assert and incorporate by reference the foregoing paragraphs.

131.    The Appointments Clause of the U.S. Constitution provides that officers of the United States may be appointed by the President "by and with the advice of the Senate" unless Congress has "by Law" authorized the appointment of an inferior officer by the President, the courts, or a department head. U.S. Const. Art. II, § 2, cl.2.

132.    As purported Acting Commissioner, Defendant Dudek is exercising significant authority and discretion. He therefore was purporting to act as an officer for purposes of the Appointments Clause when he unlawfully gave DOGE access to systems. The same is true today.

133.    Despite serving in a presidentially appointed and Senate-confirmed position, Defendant Dudek was neither nominated by the President nor confirmed by the Senate. Nor has Congress enacted any law authorizing him to perform the functions and duties of the Commissioner without Senate confirmation.

134.    Mr. Dudek is therefore acting in violation of 42 USC § 902.

135.    Plaintiffs filed suit to challenge the access granted to SSA systems within a reasonable amount of time after it occurred, and Defendants had reasonable notice of the defect in Mr. Dudek's appointment. The grant of initial and continued access to SSA systems is thus unlawful and must be invalidated.

## REQUESTED RELIEF

Plaintiffs therefore request that this Court:

1.    Declare unlawful and fully enjoin DOGE Defendants' access, inspection, disclosure, or use of any information, including but not limited to return information, personally identifiable information, or non-anonymized information, that is contained in or obtained, derived, copied, or exported from SSA information systems or systems of record;

2.    Declare unlawful and fully enjoin all Defendants' access, inspection, disclosure, or use of any SSA information system or system of record, or data contained in or obtained, derived, copied, or exported therefrom, for any purpose other than those permitted by the Privacy Act, a published System of Records Notice, the Internal Revenue Code, and the Federal Information Security Modernization Act.

3.    Declare unlawful and fully enjoin DOGE Defendants' or purported Acting Commissioner Dudek's direction or control of access, inspection, disclosure, or use of any SSA

information system or system of record, or data contained in or obtained, derived, copied, or exported therefrom, including but not limited to return information, personally identifiable information, and non-anonymized information;

4.      Direct all Defendants to file, within 24 hours of issuance of any grant of injunctive relief, a notice confirming that DOGE Defendants no longer have access to SSA information systems or systems of record or any data contained in or obtained, derived, copied, or exported therefrom;

5.      Order DOGE Defendants to disgorge or delete all unlawfully obtained, disclosed, or accessed data, including but not limited to return information, personally identifiable information, or non-anonymized data, from any SSA information system or system of record they could not lawfully access prior to January 20, 2025;

6.      Prohibit DOGE Defendants from installing any software on SSA devices, information systems, or systems of record and order that any software previously installed be removed;

7.      Prohibit DOGE Defendants from accessing, altering, or disclosing any SSA computer or software code;

8.      Award costs and reasonable attorneys' fees incurred in this action; and

9.      Grant such other relief as the Court may deem just and proper.

Plaintiffs request a trial by jury on all issues so triable.

Dated: March 7, 2025

Respectfully Submitted,

*Alethea Anne Swift*

Alethea Anne Swift (Bar No. 30829)
Mark B. Samburg (Bar No. 31090)
Karianne M. Jones*+
Emma R. Leibowitz*+
Robin F. Thurston+
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
aswift@democracyforward.org
msamburg@democracyforward.org
kjones@democracyforward.org
eleibowitz@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

* Admission to this Court *pending*
+ Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that I filed this document through the CM-ECF system and sent it via email to counsel for Defendants in the Federal Programs Branch at the Department of Justice, Civil Division. I additionally certify that summons were submitted for Defendants Russo, Musk, and Gleason.

Dated: March 7, 2025                    */s/ Alethea Anne Swift*
                                        Counsel for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, | |
| *Plaintiffs*, | |
| *vs.* | Civil Action No. 1:25-cv-00596 |
| SOCIAL SECURITY ADMINISTRATION, *et al.*, | |
| *Defendants*. | |

## NOTICE OF FILING

Plaintiffs hereby file the declarations submitted in support of their Motion for a Temporary Restraining Order, Preliminary Injunction, and/or 5 U.S.C. § 705 Stay.

Dated: March 7, 2025                Respectfully submitted,

*Alethea Anne Swift*
Alethea Anne Swift (Bar No. 30829)
Mark B. Samburg (Bar No. 31090)
Karianne M. Jones*+
Robin F. Thurston*+
Emma R. Leibowitz*+
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
aswift@democracyforward.org
msamburg@democracyforward.org
kjones@democracyforward.org
rthurston@democracyforward.org
eleibowitz@democracyforward.org

*Counsel for Plaintiffs*

* Admission to this Court pending
+ Admitted *pro hac vice*

JA51

**<u>CERTIFICATE OF SERVICE</u>**

I, Alethea Anne Swift, certify that I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Maryland, Northern Division, by using the CM/ECF system, which sent a notice of such filing to all registered CM/ECF users who have appeared in this case. I also emailed a copy of the motion and all its attachments to counsel at the Department of Justice.

/s/ Alethea Anne Swift
*Counsel for Plaintiffs*

# EXHIBIT A

PLFS-001

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND NO
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

    *Plaintiffs*,

    *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

    *Defendants*.

Case No. 1:25-cv-00596

---

## DECLARATION OF ANN WIDGER

I, Ann Widger, declare as follows:

1. My name is Ann Widger. I am the Director of Retirees at the American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME). I submit this declaration in support of Plaintiffs' application for a temporary restraining order, or, in the alternative, a preliminary injunction. The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me in the course of my duties at AFSCME.

2. As Director of Retirees, I am responsible for directing the AFSCME department for Retirees, including providing guidance and leadership to the leaders and members of AFSCME's 44 Retiree Chapters and their more than 200 subchapters across the United States. I advise and support the leaders, members, chapters, and subchapters with organizing, growth, advocacy, communications, data, and leadership development. This work includes identifying supports and resources for retirees and their families, such as assisting them with identifying the state and federal benefit programs they are eligible for and working to ensure that they are able to access

**PLFS-002**

JA54

all the benefits to which they are entitled to their full extent. I have held this position for over twelve years.

3. AFSCME is a labor organization and unincorporated association headquartered in Washington, D.C.

4. AFSCME is the largest trade union of public employees in the United States, with 1.4 million members organized into approximately 3,400 local unions, 58 councils, and 250 state and local chapters and subchapters of retiree members across 46 states, the District of Columbia, and Puerto Rico.

5. Of AFSCME's membership, approximately 200,000 are retired public service workers who continue to remain members of AFSCME, participate in its governance, and advocate for fairness, equality, and income security for retired Americans.

6. Most of AFSCME's active membership of working Americans participate in and contribute to the federal Old-Age, Survivors and Disability Insurance (OASDI) program managed by the Social Security Administration (SSA). The majority of AFSCME's retiree membership, of which the average age is 76, are OAI eligible (and younger retiree members are generally DI eligible). Many AFSCME members have children who receive disability benefits administered by SSA or who receive survivor benefits.

7. AFSCME's retiree membership is organized into local and state chapters and subchapters that are chartered by AFSCME. They elect local and state leadership and, together, are organized under a national Retiree Council. AFSCME's Retiree Council elects a chairperson who, by virtue of that position, is a representative to, and attends, AFSCME's International Executive Board. Retirees Chapters also elect delegates who participate in AFSCME's biennial constitutional

PLFS-003

JA55

convention, at which the union's policy, agenda, and goals are established by the Convention Delegates through the adoption of resolutions. A few examples include:

- Resolution No. 33, adopted at AFSCME's 42nd International Convention in 2016, titled "Strengthening Social Security," resolved that AFSCME was to lobby and advocate for reforms to strengthen the Social Security System.

- Resolution No. 74, adopted at AFSCME's 36th International Convention in 2004, titled "Preserving Social Security for Future Generations of Workers," directed the union to make efforts at every level of the political and legislative spectrum to improve and protect the social security system.

- Resolution No. 97, adopted at AFSCME's 33rd International Convention in 1998, titled "Social Security Privatization," called for the opposition of policies and politicians that advocate for the privatization of social security.

- Resolution No. 32, adopted at AFSCME's 28th International Convention in 1988, titled "Social Security and the Federal Deficit," advocated for fair funding of Social Security.

8. AFSCME's mission has long included work to ensure that its members have access to Social Security benefits, now and in the future. Indeed, member polling shows that such work is a high priority to AFSCME's members. In a recent member poll, 91% of AFSCME's working members believed that protecting Social Security was a "very important" issue for them.

9. SSA has in its systems significant personal information of AFSCME members, including but not limited to names, addresses, social security numbers, and tax and bank account information.

10. SSA also has in its systems the private medical information of AFSCME members who are applying for or have applied for disability insurance benefits, including about medical

PLFS-004

conditions that may carry with them a social stigma. Medical records for one individual can exceed 1,000 pages. During required, periodic subsequent reviews for disability insurance benefits eligibility, members must submit additional medical evidence. A member applying for disability insurance must file an Adult Disability Report (Form SSA-3368-BK) with SSA. This filing requires the submission of extensive personal information, including information about a person's education, training and work history, along with detailed medical information.

11. Required medical information includes all prescription and non-prescription medicines the person is currently taking; all health care providers from whom the individual has sought treatment (doctor, hospital, clinic, psychiatrist, nurse practitioner, therapist, physical therapist or other medical professional) and the medical conditions that were treated and evaluated; all medical tests performed by the listed providers (with the enumerated list including HIV and psychological/IQ tests); and other personal health information.

12. Information, for example, for a mental health disability claim could include notes from psychotherapists and counseling sessions. For these applicants, exposure of their private information in and of itself can cause great psychological harm. Information disclosed concerning health conditions like HIV or other STDs can result in stigma, social isolation, job loss, housing loss, and other harms.

13. AFSCME members share this information with SSA because they are required to do so to obtain benefits, and they expect the agency to follow the law and keep that data safe and secure.

14. SSA data is highly sensitive. AFSCME members were injured by the release of their data to DOGE personnel as soon as those personnel gained access to it. That injury continues and will persist until DOGE access is halted.

PLFS-005

JA57

15. The continuing injury to AFSCME members by the release of sensitive data to DOGE is compounded by the related increase in risk that this information will be stolen or misused by outside parties who can now gain access to less-protected data. As soon as uncredentialed DOGE personnel accessed this data, it was compromised, making AFSCME members more apt targets for identity theft and other scams.

16. If DOGE is accessing this data for the purpose of "rooting out fraud," it may also mean that AFSCME members have essential benefits slashed incorrectly or inadvertently, as DOGE personnel are not equipped to understand the complex SSA systems. DOGE's head, Elon Musk, has publicly claimed that SSA is providing benefits to 150-year-olds. But reporting has made clear that this is false.

17. Since DOGE  was granted access to SSA systems, AFSCME retiree members have been contacting the AFSCME Retirees Department with questions and concerns about the safety of their data and the security of their social security and other retirement benefits. AFSCME has received thousands of phone calls, emails and other communications from affected retirees who are fearful that their private information will be compromised and/or that they will lose their benefits.

18. This flood of communications has required our department to quickly divert resources and staff to respond, which seems unabating and likely to continue for as long as DOGE has access to SSA information.

19. The volume of communications and the level of fear within those communications leads us to believe that a significant number of retirees, or soon-to-be retirees, who are members of AFSCME will be chilled from applying for much needed benefits out of fear of their data being compromised.

PLFS-006

20. My department has been in frequent communication with retiree members, leaders, and state and local affiliates about DOGE access to their personal data at SSA. We have held numerous tele- and video-conference calls, sent emails, and made social media posts educating members with updates and advice. I have seen three to four times more engagement with our social media posts since DOGE was granted access and our email traffic has doubled.

21.  We have increased our communications educating members about taking protective measures against fraud and abuse, including reminders to not share their social security numbers and other personally identifiable information to third parties, especially over the phone.

22. And now we must also help these AFSCME members understand how to protect themselves from additional data breaches (from data within the agency tasked with and publicly committed to safeguarding their information and benefits).

23.  Social Security must be paid by direct deposit or direct express card from the Treasury Department—the vast majority of AFSCME retirees use direct deposit. Our members are concerned that their bank account information may be compromised along with their Social Security number and other personal information. Retirees are concerned that personal banking information and income could be at risk.

24. Many AFSCME Retiree members live on limited incomes of Social Security, personal savings, and a modest pension. Many of our retirees are dependent on their direct deposits to get by in a month. If something were to happen with their data and those payments were compromised, it could mean the difference between being able to afford groceries or going without. We are advising our retiree members to run regular credit reports and to keep a close eye on their bank account activity.

25. Additionally, in December of 2024, Congress passed the Social Security Fairness Act, which fully repealed the Government Pension Offset and Windfall Elimination Provision. The repeal now allows more than 3.2 million retired public service workers and their spouses to receive additional Social Security Benefits. AFSCME advocated extensively for this repeal and has communicated with our retiree members about it on many occasions.

26. Many of our members are currently in the process of working with SSA either over the phone or in field offices to get these benefits. These retirees are concerned about DOGE's access at SSA. Our retiree members will have to file new paperwork and submit their work history, pension information, and other personal financial information. They are hesitant to provide new information to SSA now to access these crucial benefits. They are also concerned that DOGE's access to and misunderstanding of SSA's data could further delay these benefits.

27. AFSCME Retiree members have personally told us they are particularly anxious and stressed because, while outside entities have attempted to steal their identities in the past, they must now worry about threats from inside the SSA itself due to DOGE access. They are worried about whether they can trust SSA with their work history, income history, pension information, bank account information, and health care data.

28. AFSCME Retirees are anxious and distressed about the disclosure of their health data too. For example, an 80-year-old retiree member who worked for thirty-nine years as a public information officer with the state youth corrections programs and the state highway patrol contacted me in great distress about DOGE now having access to his entire work history and medical records. This retiree is frightened about who now has access to their medical records and whether those persons will have influence over approval or denial of necessary medicines.

PLFS-008

29. Another Retiree contacted me who was forced to retire due to an injury sustained while working for their state motor vehicles department. This retiree participates in the Social Security Disability program (SSDI) and is frightened about her medical information being accessible by those who are targeting SSDI for cuts.

30. AFSCME Retirees are also frightened over the now-heightened risk of data breaches, which will leave them open to fraud. AFSCME Retirees are already flooded with phone calls and texts from scammers seeking to take advantage of their age and health conditions like diabetes and knee replacements with sales pitches for treatments and devices not prescribed or recommended by their doctors. They have contacted AFSCME to convey their fear that DOGE access to their data will only exacerbate their exposure to fraud and identity theft.

31. AFSCME Retirees are also fearful of retaliation and reprisals based on their roles as union advocates for protecting Social Security and robust retirement benefits. One retiree who has served in leadership roles within their AFSCME Retiree Chapter and has testified numerous times before elected officials and at public hearings in favor of public pensions. This retiree member has also served as a delegate to the Democratic National Convention several times. DOGE and its principals have frequently made public statements denigrating the value of public employees, the need for retirement benefits, and the Democratic party, and have used their millions of followers on social media to attack and harass those with whom they disagree. This retiree has contacted me to express his concern. They and others are frightened at the prospect of their most sensitive, personal data being exposed in this way because of their expression of their political views.

32. AFSCME retirees depend on Social Security to provide for themselves and their families. The benefits they receive allow them to stay in their homes, buy groceries, and remain

financially independent. Social Security allows them to age with dignity. They are experiencing great distress over the possibility of their private data being used to put the program at risk of substantial cuts. They are worried about DOGE using their personal data to make the case for significant cuts to the program or to train their AI models for personal profit.

33. AFSCME retirees are aware that personal identifying information is a lucrative commodity for criminal enterprises and that social security numbers, medical records and financial information are often sold through criminal channels.

34. The harms to AFSCME and its members began as soon as DOGE personnel gained access to the sensitive SSA data systems and will continue until DOGE is stopped from accessing this information at SSA.

I declare under penalty of perjury as prescribed in 28 U.S.C.§ 1746 that the foregoing is true and correct.

Executed on March 5, 2025, in Washington, D.C.

Ann Widger

# EXHIBIT B

PLFS-011

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

     *Plaintiffs,*

    *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

    *Defendants.*

Case No. 1:25-cv-00596

---

### DECLARATION OF SUE CONARD

I, Sue Conard, declare as follows:

1. My name is Sue Conard. I am a retiree member of the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME"). I submit this declaration in support of Plaintiffs' application for a temporary restraining order or, in the alternative, a preliminary injunction. The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me pursuant to my experience as a retiree member of AFSCME.

2. I am a resident of La Crosse, Wisconsin, and I am seventy-four years of age.

3. I have been an enrollee in various programs run by the Social Security Administration ("SSA") for much of my life, including survivor and retirement benefits.

4. My father passed away when I was three years old. For fifteen years, Social Security survivor benefits allowed my family to survive and allowed me to stay in school and pursue a career as a public health nurse.

PLFS-012

5.  When I was forty-nine years old, my husband unexpectedly passed away. Again, Social Security Survivor benefits allowed me to make ends meet, stay in my home, purchase groceries, and raise my children.

6.  Now, in retirement, Social Security retirement benefits allow me to age with dignity.  I receive those benefits as a result of my years of employment as a public health nurse. When I turned 65, I also applied for and began receiving Medicare.

7.  I am worried about the access by DOGE of my most sensitive personal data, which SSA stores and which I have submitted to SSA and continue to update on an ongoing basis. These concerns are heightened by Elon Musk's public statements calling for cuts to Social Security, a program that has helped me survive for much of my life.

8.  It is very important to me that my data remain private. I always tell my fellow AFSCME Retiree members to never give out their Social Security numbers to anyone. Now, we are all being forced to give our numbers and other sensitive information to DOGE without our consent, which opens up that information to bad actors outside of government. These are major risks— just like the ones I warn my fellow AFSCME members about.

9.  I fear that now malicious individuals who lack expertise or experience in providing the Social Security benefits I receive will be in charge of determining my eligibility for benefits and safeguarding my private information. I worry greatly that DOGE will use my personal data to train their AI models and profit off my information, which I absolutely do not consent to them doing.

10. I always expected that the personal data I have submitted, and continue to submit when required, to SSA would remain private and used only to determine whether I was eligible for benefits, and not to be used for any other purpose. I have never consented for DOGE, Elon Musk

PLFS-013

JA65

or any other third party to have access to my personal employment data or other confidential

information.

I declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on March 5th, 2025, in La Crosse, Wisconsin.

_Sue A Conard_

Sue Conard

PLFS-014

# EXHIBIT C

PLFS-015

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*,<br><br>        *Plaintiffs*,<br><br>     *vs.*<br><br>SOCIAL SECURITY ADMINISTRATION, *et al.*,<br><br>        *Defendants*. | Case No. 1:25-cv-00596 |

**<u>DECLARATION OF JOHN DOE</u>**

I, John Doe, declare as follows:

1. My name is John Doe. I am a retiree member of the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME"). I submit this declaration in support of Plaintiffs' application for a temporary restraining order or, in the alternative, a preliminary injunction. The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me pursuant to my experience as a retiree member of AFSCME.

2. I am a resident of Tallahassee, Florida, and I am eighty years of age. Throughout my retirement I have been an active member of my retiree chapter, including serving as its President and have been a vocal advocate for protecting Social Security and all Americans' retirement security.

3. Before I retired, I was a public servant employed directly by the states of Florida and Ohio as a public information officer for youth corrections and the department of highway safety.

PLFS-016

4.  I receive Social Security retirement benefits as a result of my work history, including as a public servant, and I am on Medicare.

5.  The SSA has sixty-five years of my employment records, from my time as a clerk at a five and dime store where I was paid $.60 per hour through my retirement from service with the State of Florida in 2011.

6.  I always expected that data to remain private and to be used only to determine whether I was eligible for benefits. I have never consented for DOGE, Elon Musk, or any third party to have access to my data or information.

7.  I am distressed by and anxious about the access by DOGE to the personal information about my that I have submitted to, and is in the possession of, the Social Security Administration ("SSA"), including my current bank account information and my entire work and income history.

8.  I am particularly concerned about my data getting in the hands of corporate operators who are looking to profit off of seniors. My spouse and I are already deluged with calls and text messages from scammers and fraudsters on a daily basis; they attempt to persuade us to purchase medical treatments and devices I do not need and that have not been prescribed to me by my doctor or sign me up for insurance I do not need. I fear that allowing DOGE access to data will risk the disclosure of my personal information to more third parties that will attempt to harass and defraud me and my family.

9.  I have also been elected as a delegate to the last three Democratic Party National Conventions. Elon Musk and others associated with DOGE have been known to leverage their massive social media followings to level personal attacks and harassment against those who disagree with them. I am fearful that DOGE access to my most personal data and financial information, in light of my past political activity, would put me at risk of those attacks and

PLFS-017

harassment.

10. I depend on Social Security to make ends meet for myself and my family. Social Security and Medicare allow me to age with dignity. I am experiencing great distress over the possibility of my private data being accessed, shared, or used in some manner that may put me at risk of harm or my benefits in danger.

I declare under penalty of perjury as prescribed in 28 U.S.C.§ 1746 that the foregoing is true and correct.

Executed on March 5, 2025, in Tallahassee, Florida.

_____
*/s/*
John Doe*

*Out of fear of retaliation and harassment, John Doe submits this declaration under pseudonym. Counsel hereby certifies that she has an unaltered signed copy of the foregoing document available for inspection by the Court.

PLFS-018

# EXHIBIT D

**PLFS-019**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

        *Plaintiffs*,

        *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

        *Defendants*.

Case No. 1:25-cv-00596

## DECLARATION OF TAMARA IMPERIALE

    I, Tamara Imperiale, declare as follows:

1.  My name is Tamara Imperiale. I am a retiree member of the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME").  I submit this declaration in support of Plaintiffs' application for a temporary restraining order or, in the alternative, a preliminary injunction. The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me pursuant to my experience as a retiree member of AFSCME.

2.  I am a resident of Greensboro, North Carolina. I am sixty years old.

3.  I was forced to retire earlier than I would have wanted to due to an injury I sustained while working for the New York Department of Motor Vehicles. After a snowstorm and on my way into work, I slipped and fell in a parking lot that had not been plowed.

4.  I currently participate in the Social Security Disability ("SSDI") program. I am now anxious and distressed about the access of my private data by DOGE, which the Social Security Administration ("SSA") stores and which I have submitted to SSA and continue to submit and

PLFS-020

update to receive SSDI benefits. Elon Musk's public statements calling for cuts to SSDI has only added to my concern about DOGE accessing my confidential information.

5.  As a retiree with a disability, it is very important to me that my data remain private. I have been the target of many scammers trying to sell me snake oil and unneeded medical devices.

6.  I am worried that unfettered access to my data by DOGE and Elon Musk will put my benefits at risk and subject me to further attempts at fraud. I also fear that individuals who lack expertise or experience in providing the Social Security benefits I receive will be in charge of determining my eligibility for those benefits and for safeguarding my private information used to determine that eligibility.

7.  It was my expectation that the personal information I submitted and continue to submit to SSA—including private health information about my disability—would be used only to determine whether I was eligible for benefits, and not disclosed for any other purpose. I have never consented for DOGE, Elon Musk, or any other third party to have access to my personal employment, health, or other confidential data or information.

8.  I depend on SSDI to live. These benefits have allowed me to retire with dignity. I am experiencing great distress over the possibility of my private data being accessed by DOGE and potentially by other individuals, in a way that puts a target on my back for fraudsters.

I declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on March 5th, 2025, in Greensboro, North Carolina.

Tamara Imperiale

PLFS-021

# EXHIBIT E

PLFS-022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

       *Plaintiffs,*

       *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

       Case No. 1:25-cv-00596

       *Defendants.*

### DECLARATION OF CHARLES "CK" WILLIAMS

I, Charles "CK" Williams, declare as follows:

1. My name is Charles "CK" Williams. I am a retiree member of the American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME). I submit this declaration in support of Plaintiffs' application for a temporary restraining order or, in the alternative, a motion for a preliminary injunction. The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me pursuant to my experience as a retiree member of AFSCME.

2. I am a resident of Dayton, Ohio, and I am seventy-seven years old.

3. Before I retired, I served in the United States Air Force as a federal employee and then worked for eighteen years as a non-federal public servant employed by the State of Ohio as part of a program to assist veterans transitioning back into civilian life. My job was to help returning troops find jobs and to assist those with disabilities to get the care they needed.

4. I receive Social Security retirement benefits, and I am on Medicare. Because of the Government Pension Offset (GPO), my Social Security benefit was reduced due to my public

service pension. Thankfully, at the beginning of the year, the Social Security Fairness Act (SSFA) was signed into law, which will allow me to collect my full Social Security benefit moving forward. In addition, the law requires the Social Security Administration (SSA) to pay me those full Social Security benefits retroactively for 2024. Because of this new law, I may be required to provide SSA with updated information about my work history, income, and pension to ensure that my new benefits are calculated correctly.

5.   While SSA has said they are planning on expediting these new benefits provided by the SSFA to retirees like me who were previously impacted by these Social Security provisions, I am concerned that DOGE access to this data may delay or jeopardize receipt of these additional Social Security benefits. I fear that now individuals who lack expertise or experience in providing the Social Security benefits I receive (and those that I am newly entitled to) will be in charge of determining my eligibility for those benefits and of safeguarding my private information used to determine that eligibility.

6.   I always expected the personal data I have submitted, and continue to submit, to SSA would remain private and be used only to determine whether I was eligible for benefits, and not to be disclosed for any other purpose. I have never consented for DOGE, Elon Musk or any other third party to have access to my personal employment data or other confidential information.

7.   I am hesitant to provide additional information I may need to submit to SSA under the SSFA. I am anxious and distressed about the access by DOGE to that data, which I may be required to submit in the future to continue receiving my benefits. And I am anxious and distressed about their having access to the data about me already in SSA systems.

**PLFS-024**

8.  I depend on Social Security to provide for myself and my family to make ends meet.

Social Security allows me to age with dignity. I am experiencing great distress over the

possibility of my private data being used to put the program at risk of substantial cuts.


I declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the foregoing is

true and correct.

Executed on March 5, 2025, in Dayton, Ohio.

Charles Williams

PLFS-025

# EXHIBIT F

PLFS-026

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

      *Plaintiffs*,

      *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

      *Defendants*.

Case No. 1:25-cv-00596

---

## DECLARATION OF RICHARD J. FIESTA

I, Richard Fiesta, declare as follows:

1. My name is Richard J. Fiesta. I am the Executive Director of the Alliance for Retired Americans ("ARA" or the "Alliance"). The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me in the course of my duties at the Alliance.

2. The Alliance is a grassroots organization with 4.4 million members. Founded by the AFL-CIO Executive Council in 2001, ARA has 40 state alliances and members across the country, in every state.

3. ARA's members are from all walks of life. We are former teachers, industrial workers, state and federal government workers, construction workers, and community leaders—all united in the belief that every American deserves a secure and dignified retirement after a lifetime of hard work.

4. ARA's work includes educating the public and policymakers about critical issues facing older Americans and working families, such as retirement security, health care, housing,

transportation, and consumer protection. We work closely with leaders at the federal, state, and local levels to ensure that seniors' issues like retirement security and prescription drug prices get the attention they deserve.

5.  Members join ARA in a few ways, including through retiree programs sponsored by national unions, through similar programs run by union locals that work with ARA state chapters, and as individuals who pay dues directly to ARA.

6.  ARA members are older and among the Americans most vulnerable to exploitation.

7.  Each year, millions of elderly Americans are the target of financial fraud and other scams. Elderly Americans are particularly attractive targets for scammers: they are often trusting and polite; may be less technologically adept; and are more likely to have financial savings, own a home, and have good credit. As one recent FBI report found, scams targeting individuals sixty and older led to at least $3.4 billion in losses in 2023.

8.  ARA has members who receive Old-Age, Survivors, and Disability Insurance benefits from the Social Security Administration ("SSA") and from other programs that require SSA to collect or verify data, such as Medicare.

9.  I understand that SSA, to facilitate these programs, collects and maintains databases with sensitive personal and financial data about ARA's members. This data includes information such as names, Social Security numbers, medical histories, dates and places of birth, home addresses, contact information, and bank account and financial information, including tax information.

10. ARA members share this data with SSA because they understand that the agency is committed and legally bound to protect the security of their information.

PLFS-028

11. It is my understanding that SSA has given access to sensitive databases to members of the Department of Government Efficiency ("DOGE"), led by Elon Musk. These databases include the sensitive data of Alliance members.

12. Our members did not consent to have their sensitive personal and financial data shared with DOGE, DOGE personnel (including Elon Musk), or any other unauthorized third parties or government "departments." They only consented to have their data used for the purposes disclosed by SSA, and the procedures governing the protection of that data, in the agency's System of Record Notices.

13. Granting DOGE unfettered access to this data immediately increased the risk that our members' sensitive information will be stolen or misused, whether by DOGE personnel or criminal enterprises that gain access to the now unprotected data. For example, ARA members–already among the most vulnerable to fraud–are afraid that SSA's failure to protect their sensitive information will enable bad actors to access and use their Social Security numbers to fraudulently file for unemployment benefits or to file a false tax return. They are also alarmed by the risk, significantly heightened by SSA and DOGE's actions, that they will be targets of other forms of identity theft and fraudulent financial activities and subjected to further improper disclosures of their sensitive data.

14. These risks will continue until DOGE personnel are restricted from accessing SSA systems, prohibited from using the sensitive data already obtained, and prevented from receiving information.

15. Our members also fear that if DOGE personnel are granted more access to SSA's systems, it may cause the interruption of timely payments, which our members rely on to live.

PLFS-029

16. DOGE personnel's access to SSA data has made and will make ARA members more fearful of submitting information to SSA. It will also alter the way that at least some ARA members interact with SSA, making their receipt of government benefits more cumbersome. For example, some members will be less likely to submit sensitive information online out of fear that such information will be compromised, and will, in turn, be required to travel to local Social Security offices to deal with routine issues—a task that is being made even more burdensome as SSA continues to shutter such offices, requiring members to travel even further than before.

17. We have thousands of members who have just become eligible for Social Security benefits under the Social Security Fairness Act, which President Biden signed on January 5, 2025. To get benefits, these members will now have to apply and submit personal and confidential information about themselves and their spouses to SSA. In light of the news that SSA has given DOGE access to personal and sensitive information, our newly eligible members will have to weigh that risk when deciding whether to apply. Some may choose not to. But even if they do apply, they will now be saddled with the fear and anxiety that they have subjected themselves to an increased risk of fraud or could become the target of a government investigation.

18. ARA also has members who have submitted sensitive medical information to SSA to receive disability benefits, including health records and doctors' evaluations for physical and mental conditions. This information is both highly personal and, if made public, could cause harm to members whose medical conditions may carry stigma (for example, treatment for mental health issues or HIV/AIDS). It is my understanding that SSA employees who deal with this health information undergo extensive training to ensure they properly handle it. Access to this information by DOGE personnel carries with it many risks for ARA members who have submitted this data to SSA.

PLFS-030

JA82

19. ARA members have contacted our national office and state chapters to express these concerns about DOGE personnel having access to their sensitive information at SSA and to ask what they can and should do to protect their data.

20. To address these concerns, ARA has told and will continue to tell members through our weekly newsletter and other communications to make sure their financial information is as secure as possible and to continuously check their bank accounts and other financial assets (including through credit monitoring services) to screen for changes.

21. These injuries will continue until DOGE personnel and other third parties are no longer able to access the sensitive personal financial and medical data of ARA members.


I declare under penalty of perjury as prescribed in 28 U.S.C.§ 1746 that the foregoing is true and correct.

Executed on March 5, 2025, in Washington, D.C.

_Richard J. Fiesta_

_____
                    Richard J. Fiesta

PLFS-031

# EXHIBIT G

PLFS-032

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

          *Plaintiffs*,

      *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

          *Defendants*.

Case No. 1:25-cv-00596

---

### <u>DECLARATION OF LINDA SOMO</u>

I, Linda Somo, declare as follows:

1. My name is Linda Somo, I live in Arizona and am a retired teacher and guidance counselor. Before I retired, I taught English to students in grades 7-12 for nine years and served as a guidance counselor in junior high schools for the rest of my 32 years of service in public schools across the Phoenix metro area. I retired in 2000.

2. I have been a member of the Alliance for Retired Americans (ARA) for about twenty years. I became a member after joining the retired group of the public school educators union in my state, Arizona Education Association (AEA). Before retiring, I was an active AEA member, and since retiring I have served in leadership roles with AEA Retired. I have also been heavily involved with the National Education Association, the national union for teachers and educators.

3. I have served in different leadership roles in the Arizona State Alliance of the ARA throughout my tenure as a member of the organization. I have been a Board Member, Treasurer, and Secretary, and now serve as President, a position I have been in for about a year and a half.

PLFS-033

4.   ARA does important work on key issues for the senior citizens, including on Social Security, Medicare, and Voting Rights. As a retiree and part of the baby boomer generation, I joined ARA because I quickly realized that people like me needed an advocate on our side—to speak up for the elderly and for low-income people (a group many senior citizens are a part of). When I saw the type of work ARA was doing, I knew I had to be a part of it.

5.   Both my husband and I receive Social Security benefits from the Social Security Administration (SSA) and are both enrolled in Medicare programs for which we had to submit information to SSA.

6.   These programs make up half of our monthly income. Without them, we would not be able to live independently; we would be a burden not only on our families but also on our community. These programs allow us to be economically independent and to contribute to our economy and our society.

7.   To receive Social Security and Medicare, my husband and I have both submitted extensive information to SSA. Put simply: SSA knows basically everything about us. They know our names. They know our birthdays. They know our finances, including our bank account information. They know where we live. They know our Social Security numbers. They know anything that a scammer would want to know, to do just about anything a scammer would want to do.

8.   As someone over the age of seventy-five, I am constantly the target of scams. I get emails, text messages, and other communications regularly that are scams. Sometimes, for example, I get what looks like legitimate messages from banks. Most of these are from banks where I know we do not keep our money, so I ignore them. But occasionally, I get fake messages from the bank where I do my business, and it gives me pause. Often, I will try to call the bank to

PLFS-034

confirm. But if these messages included more of my personal information, I'm not sure that I would be able to tell that they are fake, and I'm not sure that I would think twice about them.

9.   When I shared my sensitive information with SSA, it was with the understanding that it would be used for the calculation and receipt of government benefits and remain private.

10. I am aware that members of the Department of Government Efficiency (DOGE) have been granted access to troves of sensitive information at SSA. I certainly did not consent to this access to data, by untrained personnel, and in insecure manners. And I fail to understand why a so-called Department—one that has not even been created or approved of by Congress—is accessing vital information about individuals that they are not authorized to see. Individuals like myself and my husband will pay the price.

11. I am very scared that untrained people (both in and out of the government) will gain access to this information and use it for nefarious purposes. That is particularly so for third parties that will be more easily able to access data once it is in DOGE's hands. Scammers are more technologically adept than I am, and I fear what will happen to my information (and to me) if and when my information gets into the wrong hands. These fears will not subside until I know my information will be protected, as I've always understood it to have been.

12. Because of DOGE's access to SSA databases, I am going to have to think more carefully about submitting my information to SSA. But at the end of the day, what choice do I have? My ability to live is dependent on supplying information to the government, but I am deeply distressed about the threats I face from the breach of my sensitive information. I am in a Catch-22.

13. My fears are shared by many of my fellow Arizona ARA members. In recent weeks, the Arizona ARA has heard from a high volume of our members concerned about DOGE access to

PLFS-035

their sensitive information, including Social Security information. Like myself, these members are worried about access to SSA databases by DOGE personnel and, in turn, vulnerability to third-party access. They fear, as I do, that the more that information is shared with DOGE, the higher the risk that it will be accessed by bad actors.

14. The Arizona ARA is considering ways to help our members in light of these concerns. We send a weekly e-newsletter to members (in addition to the weekly update ARA National sends) and have been—and plan to continue–keeping our members well-apprised about what is going on with DOGE, what they can do about it, and how they can protect themselves from threats.

15. I am a proud American citizen and have always felt secure sharing confidential, sensitive information with government agencies. Not once did I feel scared that my data would be threatened or stolen. For the first time in my life, I feel like I cannot trust my government. Not only am I worried about my security, I am sad for my country.


I declare under penalty of perjury as prescribed in 28 U.S.C.§ 1746 that the foregoing is true and correct.

Executed on March 5, 2025, in Fountain Hills, Arizona.

_____
/s/*
Linda Somo


*A copy of the signature page bearing an original signature is attached hereto.

**PLFS-036**

their sensitive information, including Social Security information. Like myself, these members are worried about access to SSA databases by DOGE personnel and, in turn, vulnerability to third-party access. They fear, as I do, that the more that information is shared with DOGE, the higher the risk that it will be accessed by bad actors.

14. The Arizona ARA is considering ways to help our members in light of these concerns. We send a weekly e-newsletter to members (in addition to the weekly update ARA National sends) and have been—and plan to continue–keeping our members well-apprised about what is going on with DOGE, what they can do about it, and how they can protect themselves from threats.

15. I am a proud American citizen and have always felt secure sharing confidential, sensitive information with government agencies. Not once did I feel scared that my data would be threatened or stolen. For the first time in my life, I feel like I cannot trust my government. Not only am I worried about my security, I am sad for my country.

I declare under penalty of perjury as prescribed in 28 U.S.C.§ 174o that the foregoing is true and correct.

Executed on March 5, 2025, in ~~Fountain Hills~~ Arizona.

<br>

*Linda Somo*
Linda Somo

PLFS-037

# EXHIBIT H

PLFS-038

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

        *Plaintiffs*,

        *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

        *Defendants*.

Case No. 1:25-cv-00596

## DECLARATION OF BERNADETTE AGUIRRE

I, Bernadette Aguirre, declare as follows:

1. My name is Bernadette Aguirre. I am the Director of the Retiree Division of the American Federation of Teachers (the "AFT"). I submit this declaration in support of Plaintiffs' application for a temporary restraining order or, in the alternative, a preliminary injunction. The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me in the course of my duties at the AFT.

2. The AFT is a national labor organization and unincorporated association headquartered in Washington, D.C., and which represents over 1.8 million members who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education professional staff and faculty; federal, state, and local government employees; and nurses and other healthcare professionals.

3. The AFT's purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and

PLFS-039

communities their members serve. The AFT does so by ensuring its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients and all those who use public services. Economic and retirement security is at the core of the AFT's mission.

4.    The AFT has approximately 490,000 members who are retired. Active members are members of the AFT retiree division as soon as their local union changes their status from "working" to "retired, active" in their reports to the AFT. Retirees are organized in more than 100 chartered AFT retiree chapters nationwide. Each chapter is able to send a delegate to the biennial AFT Convention where delegates from all AFT locals debate and vote on resolutions that set the policies and priorities of the AFT.

5.    The AFT has long worked to improve the lives of its retired members, including to strengthen programs such as Social Security and Medicare. The AFT has passed resolutions, for example, expressing the AFT's commitment to improving the financing and benefits of the Social Security system, addressing Social Security's long-term solvency, opposing privatization of retirement assistance, and to expanding social safety programs more broadly. For example:

- Delegates to the 2024 AFT Convention passed "Protecting Seniors," committing the AFT to "seek federal legislation to maintain Medicare and expand Social Security benefits for seniors as well as to ensure that these benefits will never be diminished and that any future contemplated changes should act only to enhance these benefits, which have been earned after decades of employee and employer participation into the Medicare and Social Security systems and need to be preserved into the foreseeable future."

PLFS-040

- Delegates to the 2022 AFT Convention passed "Changing Social Security to Provide Full Access and Equity For All Educational Employees," which committed the AFT to supporting and advocating for the Social Security Fairness Act of 2021.

- Delegates to the 2018 AFT Convention passed "Lift the Cap on Social Security," which committed the AFT to supporting the elimination of the cap on wages taxed by Social Security to ensure the long-term sustainability of the Social Security Trust Fund.

- And delegates to the 2008 AFT Convention passed "Strengthening Social Security," which committed the AFT to opposing any attempts to privatize social security and advocating for improvements in the financing and benefits of the current Social Security System.

6. In addition, the AFT maintains a Retiree Program and Policy Council that I support. The Retiree Program and Policy Council is a committee of retirees tasked with organizing retiree members to protect, support, and strengthen Social Security, among other focuses.

7. I am aware of and have identified individual AFT members who participate in Social Security Administration (SSA) programs (such as Old-Age, Survivors, and Disability Insurance) and other programs for which SSA collects or verifies data (such as Medicare, CHIP, and SNAP).

8. I am aware that the sensitive information of these and other AFT members is contained in the SSA record systems, including Social Security numbers, bank account numbers, details of personal finances, and personnel information.

9. AFT members share this information with SSA based on their understanding that the agency is legally obligated—and committed—to keeping their data secure.

**PLFS-041**

10. I am aware that personnel from the Department of Government Efficiency (DOGE) have accessed sensitive information at SSA, and that the acting SSA Commissioner was previously suspended from his role at the agency for sharing data with DOGE personnel before this administration took office.

11. I am not aware of any AFT member who has requested or authorized DOGE or its representatives to access their personal data or who has consented to the use of this data for any reason other than for the purposes and through the procedures previously disclosed by SSA in its System of Record Notices.

12. I have personally heard from retiree members who send data to SSA that they are concerned about DOGE's access to the private personal and financial information they have provided to SSA.

13. The improper disclosure of this information to DOGE immediately increased the risk of access by external actors, doxxing, identity theft, invasion of personal privacy, and financial crimes against AFT members. That risk deepens every day that DOGE has access to AFT members' data. And feeding members' data into unauthorized or unprotected programs running artificial intelligence—as DOGE has done with data seized from other agencies—enhances these risks.

14. These risks began as soon as DOGE had access to SSA data and will continue until DOGE personnel are prohibited from accessing SSA record systems and using or distributing any data they have already seized.

15. AFT and its members are also deeply concerned about the possibility that DOGE, if able to further interfere with SSA data systems, may purposefully or even inadvertently disrupt the

PLFS-042

timely payment of SSA benefits. Many of our members rely on those benefits to survive, and even one missed check would upend their lives.


I declare under penalty of perjury as prescribed in 28 U.S.C.§ 1746 that the foregoing is true and correct.

Executed on March 6, 2025, in Washington, D.C.

Bernadette Aguirre

PLFS-043

# EXHIBIT I

PLFS-044

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, <br> *Plaintiffs*, <br><br> *vs.* <br><br> SOCIAL SECURITY ADMINISTRATION, *et al.*, <br> *Defendants*. | Case No. 1:25-cv-00596 |

**DECLARATION OF DAVID GRAY**

I, David Gray, declare as follows:

1.  My name is David Gray. I live in Oklahoma City, Oklahoma. I am a retired member of the American Federation of Teachers (AFT) and have been with the union for nearly forty years. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order or a preliminary injunction. The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me pursuant to my experience as a retired member of AFT.

2.  My background is in building and construction. I joined AFT when I worked in a maintenance department. Before I was a member of AFT, I was a member of other unions. I come from a union family and have been in unions for most of my life.

3.  I was voted president of my AFT local in 1988 and served in that role until 2024. I also served as a national vice president of AFT from 1992 until 2024. In these roles, I helped members file complaints and organize against harms in their workplaces. I also chaired a few

**PLFS-045**

AFT committees, including the Constitutional Convention Committee and the Members' Trust Committee.

4.  I am enrolled in Social Security and Medicare.

5.  To apply for these programs—and to receive benefits from them—I have shared various types of personal information with the Social Security Administration (SSA), including my name, bank account information, birth date, and Social Security number.

6.  When I applied for these programs, I provided this information to an intake person at my local social security office. I was told that it was going to be extremely confidential—that only specific, qualified people at SSA would have access to it. I shared this information to receive the benefits that I worked so hard for and expected my information to remain private.

7.  I understand that people from the Department of Government Efficiency (DOGE) have accessed information at SSA and are attempting to access more. I do not want these people to have access to my data. It's personal and private. They should not have access to this information unless I provide it to them. I have not.

8.  I am most concerned that these people—intentionally or not—will manipulate the data I have on file at SSA. I worry that they will mess with my monthly benefits, which I rely on to live. These people know nothing about the SSA systems and have not been trained on how to use them. I cannot be sure that they will not mess the systems up.  I cannot be sure DOGE people have accessed or will access the data I have on file with SSA in a secure way that will prevent third-party scammers from getting it.

9.  Because of the breach of data at SSA, I will be checking on my finances more frequently. Normally, I check my credit score once a month; I will now be doing that more often. I will also be checking my bank account out of concern.

**PLFS-046**

10. My anxiety is at an all-time high because of the threats to my personal information and my benefits that come from DOGE access to sensitive information like my Social Security information. I will remain anxious until people from DOGE are stopped.

I declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on March 5, 2025, in Oklahoma City, Oklahoma

David Gray

PLFS-047

# EXHIBIT J

PLFS-048

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

        *Plaintiffs*,

    *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

        *Defendants*.

Case No. 1:25-cv-00596

---

## DECLARATION OF TIFFANY FLICK

I, Tiffany Flick, declare as follows:

1.     My name is Tiffany Flick. I recently retired from the Social Security Administration ("SSA") after working at the agency for almost 30 years.

2.     I began my career at the agency in 1995, when I joined as a social insurance specialist in a local Social Security office providing direct service to the public. I then took a promotion to a position in the Office of Budget at SSA Headquarters, where I held a variety of positions, including the Acting Associate Commissioner for Budget. I have also held a variety of roles in the Office of the Commissioner for multiple Commissioners, including Senior Advisor to Chief of Staff, Senior Advisor to the Deputy Commissioner, Executive Secretary, and Deputy Chief of Staff.  Before becoming Acting Chief of Staff to Acting SSA Commissioner Michelle King on January 20, 2025, I served as the Associate Commissioner for Budget, Facilities and Security in the Office of Hearings Operations.

3.     The Social Security Administration oversees Social Security Retirement, Survivor, and Disability benefits, and Supplemental Security Income payments for nearly 72 million people.

**PLFS-049**

Providing those benefits requires the agency to maintain sensitive and personal information on nearly every person in the United States. In addition to Social Security numbers, that data include individuals' citizenship status, age, income, bank account numbers, medical history, and federal tax information.

4.      It has been a priority throughout my career to protect the extremely personal information that SSA collects and maintains. Throughout its existence, SSA has emphasized to the public that any personal data or information shared with the agency will be protected. The importance of privacy is engrained into every SSA employee from day one. Along with accurate and timely payment of benefits, attention to privacy is one of SSA's most fundamental duties. In 1937, the first regulation adopted by the Social Security Board outlined the rules regarding privacy and the disclosure of Social Security records.  Through the years, other regulations and the Privacy Act have further defined the agency's responsibilities to ensure the confidentiality of the information the agency collects and holds.

5.      SSA's collection and maintenance of sensitive data is governed by numerous laws and policies, including the Privacy Act and Systems of Record Notices issued under the Privacy Act, the Social Security Act, federal tax laws, and internal SSA regulations and policies.

6.      In addition, every employee is required to sign two documents on a yearly basis. The first outlines our Systems Sanctions Policy, which explains the specific sanctions for any unauthorized access or disclosure of SSA data. The second document is an annual reminder about every employee's duty to protect personally identifiable information, including when SSA employees need to, as a part of their job, communicate with constituents outside the agency. In addition, annual information security training is required for all employees.

PLFS-050

7.      Part of SSA's annual Financial Statement, Federal Information Security Management Act ("FISMA"), and internal controls audits examine the agency's privacy protections and data systems to help ensure that all information security policies and processes are being followed.

8.      SSA also has a detailed process for entering agreements with other agencies when there is a need to share data between agencies, such as computer matching agreements. This process generally takes months and involves multiple levels of review, including review by the General Counsel's office to ensure the sharing of information accords with all applicable privacy laws and policies of both SSA and the partner agency.

9.      On the morning of January 30, 2025, I got a call from Leland Dudek. At the time, Mr. Dudek was serving as a senior advisor in the Office of Program Integrity, where he worked on anti-fraud measures. Mr. Dudek told me that some members of DOGE requested to be on-site immediately and wanted to come to our Headquarters that day. He informed me that two DOGE associates, Michael Russo and Scott Coulter, would be working at SSA.

10.     Since Mr. Dudek was only a mid-level employee, I asked him why he was communicating with anyone from DOGE. Mr. Dudek told me that DOGE had reached out to him. I then told him to stand down and not have further contact with anyone from DOGE. I told Mr. Dudek that we would handle the issue through the Commissioner's Office. I immediately reported this call to Acting Commissioner King. We began to prepare to onboard Mike Russo, but Scott Coulter had not come to the agency prior to February 16, 2025.

11.     On January 31, 2025, Mike Russo came onsite to begin his onboarding process, and he officially joined the agency as Chief Information Officer (CIO) on February 3. He introduced himself as a DOGE representative to multiple employees on multiple occasions.

**PLFS-051**

12.      That day, he also met with two senior executives and asked whether they planned to take the deferred resignation offer, commonly known as the "Fork in the Road" offer, and suggested that they should take the offer.

13.      As soon as Mr. Russo joined SSA, he requested to bring in a software engineer named Akash Bobba, who was already assisting DOGE in multiple agencies. However, there were challenges with Mr. Bobba's background check that took a few days to resolve.

14.      On February 10, the Commissioner's Office and the Office of Human Resources started to receive phone calls and emails from Mr. Russo, DOGE manager Steve Davis, and people who said they were associated with the White House's Presidential Personnel Office ("PPO") but who were working out of the Office of Personnel Management ("OPM"). All of those contacts were about onboarding and giving Mr. Bobba the equipment and credentials he needed to access SSA data before midnight on February 10.

15.      I worked for multiple SSA commissioners across multiple administrations, and that request was unprecedented. I did not understand the apparent urgency with which Mr. Bobba needed to be onboarded and given access to SSA's systems and data, which are highly sensitive.

16.      Mr. Russo and Mr. Davis grew increasingly impatient over the course of the evening on February 10. We managed to swear Mr. Bobba in over the phone, contrary to standard practice, around 9 p.m. ET that evening.  However, the credentialing process necessary for access to the systems would take longer.

17.      On the same day, February 10, Mr. Russo contacted several people, including Mr. Dudek, and put together his own internal team to answer questions from DOGE. Because Mr. Russo did not share many details of the questions or his conversations, I had only limited information on what the team he assembled was doing.

PLFS-052

18.    Mr. Russo never fully disclosed to the Commissioner's office the details on what information DOGE wanted and issues it needed to address, but my understanding is that it was related to fraud. The information DOGE sought seemed to fall into three categories: (1) untrue allegations regarding benefit payments to deceased people of advanced age; (2) concern regarding single Social Security numbers receiving multiple benefits (which is normal when multiple family members receive benefits through one wage-earner); and (3) payments made to people without a Social Security number.

19.    I considered each of these concerns to be invalid and based on an inaccurate understanding of SSA's data and programs. As to the first, SSA's benefits' file contradicts any claim that payments are made to deceased people as old as 150 years. As to the second issue, DOGE seemed to misunderstand the fact that benefits payments to spouses and dependents will be based on the Social Security number of a single worker. As to the third, we were simply never given enough information to understand the source of the concern but had never encountered anything to suggest that inappropriate benefit payments were being made to people without a Social Security number.

20.    As soon as Mr. Russo started, the Commissioner's Office tried to assist him in the areas related to potential fraud to help him understand how the programs work, what measures the agency currently takes, and areas that need specific focus, as we would do for any new political appointee.  We proposed briefings to help Mr. Russo and Mr. Bobba understand the many measures the agency takes to help ensure the accuracy of benefit payments, including those measures that help ensure we are not paying benefits to deceased individuals.  However, Mr. Russo seemed completely focused on questions from DOGE officials based on the general myth of supposed widespread Social Security fraud, rather than facts.

PLFS-053

21.     In addition, during this time, Mr. Russo was also having conversations with other agencies about data sharing, including the Department of Treasury, Department of Education, and Department of Homeland Security. While data sharing with these agencies is normal, Mr. Russo's lack of transparency with the Acting Commissioner about those conversations is not.

22.     Throughout this time, Acting Commissioner King requested that Mr. Russo report to her, as the CIO normally would, but he consistently gave evasive answers about his work. It appeared to me that he was actually reporting to DOGE.

23.     During the week of February 10, with daily pressure from Mr. Russo, the CIO's office tried to rapidly train Mr. Bobba to get him access to SSA data systems so he could work on a special project for Mr. Russo at DOGE's request and so that he could "audit" any of the work of SSA experts.

24.     We worked to provide Mr. Bobba with the necessary information and information security training but had to do so in a truncated manner and outside normal processes.

25.     Given that, I do not believe Mr. Bobba had a sufficient understanding of the sensitive nature of SSA data or the ways to ensure such data's confidentiality. These are complicated systems with complex policies governing very large programs, and it simply is not possible to become proficient within a matter of a few days.

26.     Based on my conversations with experts in the CIO's office, I determined that Mr. Bobba could have access to anonymized and read-only Numident data using a standard "sandbox" approach so that he wouldn't have access to other data. That access was sufficient to allow Mr. Bobba to answer DOGE's numident-related questions about fraud as I understood them, but didn't expose personally identifiable information. This approach was similar to how we would handle any request to review SSA's records for potential fraud, waste, and abuse by oversight agencies

PLFS-054

like OIG, GAO, or auditors conducting financial statement and FISMA audits.  For auditors, we would only provide the data they were requesting for the scope of their review, which they would outline in detail. SSA would provide anonymized or sanitized data needed for the type of review being conducted. If problems were identified, then the individual cases would be located and addressed.

27.     Unfortunately, due to the speed with which we were demanded to work, the anonymized file had technical glitches that created problems with the data in the file.

28.     Mr. Bobba reported that there were problems with the sandboxed, anonymized Numident file on Saturday, February 15. I understood that Mr. Bobba was working off-site at OPM while he was analyzing the SSA data.  I also understood that other, non-SSA people were with him and may have also had access to this protected information. My understanding is that Mr. Russo approved a telework agreement for Mr. Bobba (while at the same time directing CIO management to work onsite full-time) to allow him to work out of OPM. But our standard telework agreements state that employees need to work in a private location and should be careful to protect systems and data from unauthorized access. Mr. Bobba's work didn't seem to align with those requirements.

29.      I also understood that a DOGE employee asked why it was taking so long to get Mr. Bobba access to SSA's data and why SSA was more difficult than other agencies.

30.     Mr. Russo and other DOGE officials demanded that Mr. Bobba be given immediate, full access to SSA data in the Enterprise Data Warehouse ("EDW"), which included Numident files, the Master Beneficiary Record ("MBR") files, and the Supplemental Security Record ("SSR") files.

PLFS-055

31.     The mater files in the EDW, including the Numident, MBR and SSR files, includes extensive information about anyone with a social security number, including names, names of spouses and dependents, work history, financial and banking information, immigration or citizenship status, and marital status.

32.     The Numident file contains information necessary for assigning and maintaining social security numbers.

33.     The MBR and SSR files contain detailed information about anyone who applies for, or receives, Title II or Title XVI benefits.

34.     Full access to the EDW would provide "read" access to most of SSA's data. Read access does not allow a user to change data but does permit a user to copy and paste, export, and screenshot that data or otherwise compile it for analysis.

35.     Full access to other SSA data systems might also include "write" access, which would allow for the changing of data in the system.

36.     It was never entirely clear what systems Mr. Russo wanted Mr. Bobba to have access to, but Mr. Russo repeatedly stated that Mr. Bobba needed access to "everything, including source code."

37.     Generally, we would not provide full access all data systems even to our most skilled and highly trained experts. The scope of each official's access is job-dependent and follows separation of duties to keep individuals from making inadvertent or unauthorized changes to systems.

38.     We tried to determine why Mr. Bobba needed full access to the EDW. But Mr. Russo was evasive and never provided the kind of detail that SSA typically requires to justify this level of access.

PLFS-056

39.     Instead of giving us time to resolve the technical issues with Mr. Bobba's sandbox, on February 15, Mr. Russo went to the federal Chief Information Officer, a Presidential appointee housed within the Office of Management and Budget, and got an opinion saying he could give Mr. Bobba access to all SSA data.

40.     Meanwhile, I received phone calls from SSA staff that Mr. Russo requested they provide full access to the EDW for Mr. Bobba. I told our CIO's office not to provide Mr. Bobba with that access and informed them that Mr. Russo needed to speak with Acting Commissioner King, because we needed to understand why this level of access was necessary to address the specific questions or issues they were looking at.

41.     Also on February 14, Mr. Dudek was placed on administrative leave while an administrative investigation was conducted regarding allegations of multiple inappropriate actions. The public reporting of this incident is largely correct.

42.     All of this led to the escalation of tensions over the weekend of February 15 and 16, 2025, because we did not promptly provide full access to SSA's data and because Mr. Dudek was placed on administrative leave.

43.     But the request to give Mr. Bobba full access to these databases without justifying the "need to know" this information was contrary to SSA's long-standing privacy protection policies and regulations, and none of these individuals could articulate why Mr. Bobba needed such expansive access. I also understood that Mr. Bobba would not view the data in a secure environment because he was living and working at the Office of Personnel Management around other DOGE, White House, and/or OPM employees.

PLFS-057

44.    Acting Commissioner King requested more details from Mr. Russo on why this level of access was necessary for the work Mr. Bobba was conducting before authorizing any additional access. She did not get an answer.

45.    Instead, on February 16, 2025, Commissioner King received an email from the White House noting that the President had named Mr. Dudek as the Acting Commissioner. At the time this email was sent, I understood Mr. Dudek to still be on administrative leave because, according to normal agency procedure, it would be his immediate supervisor that would have had to lift his leave—which had not happened.

46.    Shortly after Commissioner King informed me of Mr. Dudek's elevation to Acting Commissioner, I retired.

47.    I understand that, upon my leaving, then-Acting Commissioner Dudek gave Mr. Bobba and the DOGE team access to at least the EDW and possibly other databases.

48.    I am deeply concerned about DOGE's access to SSA systems and the potential to inappropriately and inaccurately disclose this information, especially given the rushed nature in which we were required to onboard and train Mr. Russo and Mr. Bobba.

49.    I am not confident that DOGE associates have the requisite knowledge and training to prevent sensitive information from being inadvertently transferred to bad actors. That concern is elevated, given that I understand Mr. Bobba to be working, and thus accessing SSA systems, from OPM offices—surrounded by employees and officials of other agencies and White House components who have, to my knowledge, never been vetted by SSA or trained on SSA data, systems, or programs. Given that non-secure off-site access, the protections built into SSA's data systems may not work. Others could take pictures of the data, transfer it to other locations, and

PLFS-058

even feed it into AI programs. In such a chaotic environment, the risk of data leaking into the wrong hands is significant.

50.    Access to the EDW alone would not affect benefit payment systems. However, I witnessed a disregard for critical processes—like providing the "least privileged" access based on a "need to know"—and lack of interest in understanding our systems and programs. That combined with the significant loss of expertise as more and more agency personnel leave, have me seriously concerned that SSA programs will continue to function and operate without disruption. SSA information technology is made up of an incredibly complex web of systems that are extremely reliable in making Social Security and Supplemental Security Income payments. Some of the system operate based on old programming languages that require specialized knowledge. Such systems are vulnerable to being broken by inadvertent user error if SSA's longstanding development, separation of duties, and information security policies and procedures are not followed. That could result in benefits payments not being paid out or delays in payments. I understand that DOGE associates have been seeking access to the "source code" to SSA systems. If granted, I am not confident that such associates have the requisite understanding of SSA to avoid critical errors that could upend SSA systems.

51.    Additionally, even with only read access DOGE can, and has already, used SSA data to spread mis/disinformation about the amount of fraud in Social Security benefit programs. The agency can always do more to ensure accurate and timely benefits payments, and it continues to pursue improvements. However, fraud is rare, and the agency has numerous measures in place to detect and correct fraud.

PLFS-059

52.     SSA serves practically every American in this country. And the agency administers more than $1.5 trillion dollars of the American economy. And we understand the seriousness of our responsibility to the people of this country.

53.     A disregard for our careful privacy systems and processes now threatens the security the data SSA houses about millions of Americans. The stakes are high.

54.     It is because of these very real concerns that I submit this declaration today.

I declare under penalty of perjury, as prescribed in 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on March 6, 2025, in Valparaiso, Indiana.

Tiffany Flick

PLFS-060

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, | |
| *Plaintiffs*, *vs.* | Civil Action No. 1:25-cv-00596 |
| SOCIAL SECURITY ADMINISTRATION, *et al.*, | |
| *Defendants*. | |

## DECLARATION OF MICHAEL L. RUSSO

I, Michael L. Russo, hereby declare upon penalty of perjury:

1.  I am the Chief Information Officer of the Office of the Chief Information Officer (OCIO) at the Social Security Administration (SSA), in Woodlawn, Maryland, and I have served in this role since February 3, 2025.  I am a Non-Career Senior Executive reporting directly to SSA's Acting Commissioner, Leland Dudek.

2.  In my role as Chief Information Officer, I am responsible and accountable for the effective implementation of information technology (IT) management responsibilities, such as developing, maintaining, and facilitating the implementation of a sound, secure, and integrated information technology architecture for SSA.  As part of my information resources management duties, I am responsible for oversight of grants of permissions to access SSA systems.

3.  I provide this declaration in support of the Defendants' opposition to the Motion for a Temporary Restraining Order, Preliminary Injunction, and/or 5 U.S.C. § 705 Stay in the above-captioned case.  This declaration provides information underlying the decision to

1

grant data access to the members of SSA's DOGE Team.  These statements are made with my personal knowledge, discussion with SSA staff, and review of documents and information furnished to me in the court of my official duties.

4. Pursuant to Executive Order 14,158 ("Establishing and Implementing the President's 'Department of Government Efficiency'"), there exists within SSA a "DOGE team" responsible for "implementing the President's DOGE agenda."  *Id.* § 3(c).  The SSA DOGE Team currently consists of ten SSA employees:  four SSA special government employees (Employees 1, 4, 6, and 9) and six detailees to SSA from other government agencies and offices (Employees 2, 3, 5, 7, 8, and 10).  To protect the privacy of these individuals, and to avoid exposing them to threats and harassment, I have not listed their names in this declaration.

5. The overall goal of the work performed by SSA's DOGE Team is to detect fraud, waste and abuse in SSA programs and to provide recommendations for action to the Acting Commissioner of SSA, the SSA Office of the Inspector General, and the Executive Office of the President.

6. In the case of DOGE team data access, data access to the DOGE team was first approved by SSA's Acting Commissioner.

7. Employee 1, an SSA special government employee, was granted access to, a production copy with read-only access and no update ability, the following information on the following dates:

  a. On February 12, 2025, access was granted to anonymized data (i.e., data that had personal identifiers removed) from SSA's Master Beneficiary Record (MBR) (System of Records Notice 60-0090), Supplemental Security Record (SSR)

(System of Records Notice 60-0103), the Master File of Social Security Number

Holders and SSN Applications (also known as the Numident, System of Records

Notice 60-0058), and Treasury Payment Files Showing SSA Payments

(containing information from Social Security Online Accounting and Reporting

System, System of Records (SSOARS) Notice 60-0231).

b.  On February 20, 2025, access was granted to personally identifiable information

from copies of SSA's MBR, SSR, Numident, and Treasury Payment Files

Showing SSA Payments from SSOARS.

c.  SSA MBR and SSR may contain limited fields containing information sourced

from federal tax information that SSA uses in benefits eligibility calculations and

determinations.

d.  Employee 1 needs access to the personally identifiable information and limited

tax return information in the data that he was granted access to because he could

not complete the work he is tasked with using anonymized versions of the data, as

the analysis tasked requires an examination of individual-level benefits data,

payments data, and Numident records.

e.  Employee 1 needs access to the limited federal tax information in the MBR and

SSR, which is comingled with SSA's benefits records, because it is part of the

benefits payment-related data.  For instance, SSA uses federal tax information in

calculations of earnings (often with other non-tax earnings data in SSA records) in

determining benefits eligibility.  Employee 1 was not granted access to SSA's

separate repository of federal tax information, which is SSA's Master Earnings

File (Privacy Act System of Records 60-0059).

8. On February 21, 2025, Employee 3, an SSA detailee, was granted access to, a production copy with read-only access and no update ability, personally identifiable information from SSA's MBR, SSR, Numident, and Treasury Payment Files Showing SSA Payments from SSOARS. His need for the data access granted is the same as Employee 1 (see paragraph 7.d-e).

9. On February 21, 2025, Employee 5, an SSA detailee, was granted access to, a production copy with read-only access and no update ability, personally identifiable information from SSA's MBR, SSR, Numident, and Treasury Payment Files Showing SSA Payments from SSOARS. He was granted systems access to several other databases but never accessed the data in them. His need for the data access granted is the same as Employee 1 (see paragraph 7.d-e).

10. On February 22, 2025, Employee 10, an SSA detailee, was granted access to, a production copy with read-only access and no update ability, personally identifiable information from SSA's MBR, SSR, Numident, and Treasury Payment Files Showing SSA Payments from SSOARS. His need for the data access granted is the same as Employee 1 (see paragraph 7.d-e).

11. On March 4, 2025, Employee 9, an SSA special government employee, was granted access to, a production copy with read-only access and no update ability, personally identifiable information from SSA's MBR, SSR, Numident, and Treasury Payment Files Showing SSA Payments from SSOARS. His need for the data access granted is the same as Employee 1 (see paragraph 7.d-e).

12. On March 6, 2025, Employee 8, an SSA detailee, was granted access to, a production copy with read-only access and no update ability, personally identifiable information

from SSA's MBR, SSR, Numident, and Treasury Payment Files Showing SSA Payments from SSOARS.  His need for the data access granted is the same as Employee 1 (see paragraph 7.d-e).

13. Employee 2, an SSA detailee, has not received access to any SSA programmatic data or systems.  He has only accessed limited personnel data about SSA workforce, provided by Human Resources.  The data was used to provide some detail about the number of people affected and their respective titles by category to the Office of Personnel Management (OPM), which was conveyed in an SSA memo to OPM.  This employee is acting as SSA's DOGE Team lead and as part of his duties is responsible for consulting on the agency's workforce plans, including but not limited to reorganization and hiring.  These duties necessitated the need for this limited workforce data.

14. On March 11, 2025, Employee 7, an SSA detailee, was granted access to SSA systems but he has only accessed data from SSA's Numident.  All other access initially granted has since been revoked pending review of further data access needs.  He required access to the files because his work involves analysis of improper payments relating to death records maintained in the Numident.

15. Not on behalf of SSA, but as Health and Human Services/Office of Child Support Services (OCSS) authorized users, Employee 7 and Employee 3 were granted access as a National Directory of New Hire Data.  This file is maintained on SSA's network for OCSS; we have a Service Level Agreement with OCSS describing how SSA will grant users to OCSS authorized users upon receipt of OCSS permissions.  OCSS permissions were obtained prior to granting Employee 7 and Employee 3 access.

16. No SSA data or personally identifiable information access, or access to systems containing such information, has been granted to Employee 6 and Employee 4.

17. To the best of my knowledge, the data and systems listed in paragraphs 7 through 14 above contain a complete listing of all SSA data accessed by the listed SSA employees working with the DOGE Team, as of the date of this declaration.

18. There are five other individuals whose services were authorized under our interagency agreements with U.S. DOGE Service, previously U.S. Digital Service. Some of these individuals predated the creation of U.S. DOGE Service. However, the agency has determined it does not need these individuals services, these individuals were never working with the SSA DOGE Team or granted access to sensitive agency data or personally identifiable information, and SSA is in the process of terminating their arrangements with SSA.

19. In each case of data access being granted above, the agency has provided read-only access to copies of production data which does not allow modification or deletion of the underlying data. This level of access provides no access to SSA production automation, code, or configuration files, and provides no avenues to alter the function of SSA production systems. This level of access ensures these employees can review records needed to detect fraud but does not allow them the ability to make any changes to beneficiary data or payment files.

20. The data sets provided were obtained from SSA's Enterprise Data Warehouse (EDW). The EDW is an integrated source of data created to service Management Information, Business Intelligence, and predictive analytics across SSA. EDW data sets are copies of production data like those provided to the individuals identified above, are routinely used

JA118

for analytics purposes by employees performing analysis on agency data within job duties, such as anti-fraud analysis or research. SSA's Office of Financial Policy and Program Integrity confirmed the level of access granted to the DOGE team to perform analysis has similarly been granted to 30-40 SSA employees in their component.

21. The individuals above who have been granted access have all received SSA training on topics including ethics, the Privacy Act, and information security. They also have acknowledged and signed the Systems Sanctions Access Policy and Annual Reminders on Safeguarding PII. This is the same level of training that we provide our other SSA employees.

22. SSA has IT safeguards to ensure no private or commercial servers have been integrated with SSA systems. SSA performs continuous network monitoring that includes identifying unauthorized devices. The agency further has extensive security layers in place ensuring access to all systems and records are controlled and tracked with appropriate profiling (e.g., employee, contractor, supervisor) of the user.

I declare the foregoing to be true and correct, upon penalty of perjury.

Date: _____    Signed: **Michael L. Russo** _____

Digitally signed by Michael L. Russo
Date: 2025.03.12 15:38:37 -04'00'

Michael L. Russo
Chief Information Officer
Office of the Chief Information Officer
Social Security Administration

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

     *Plaintiffs*,
     *vs.*

     Civil Action No. 1:25-cv-00596

SOCIAL SECURITY ADMINISTRATION,
*et al.*,
     *Defendants*.

---

## DECLARATION OF FLORENCE FELIX-LAWSON

I, Florence Felix-Lawson, hereby declare upon penalty of perjury:

1. I am the Deputy Commissioner of Human Resources at the Social Security Administration (SSA), in Woodlawn, Maryland, and I have served in this role since November 17, 2024. I am a Career Senior Executive reporting directly to SSA's Acting Commissioner, Leland Dudek.

2. In my role as Deputy Commissioner of Human Resources, I am responsible for leading and overseeing human resource services to the agency, including but not limited to appointing and onboarding new personnel, including regular and special government employees and detailees.

3. I provide this declaration in support of the Defendants' opposition to the Motion for a Temporary Restraining Order, Preliminary Injunction, and/or 5 U.S.C. § 705 Stay in the above-captioned case. This declaration outlines how each individual associated with SSA's DOGE team has been onboarded with SSA. These statements are made with my

1

personal knowledge and review of documents and information furnished to me in the course of my official duties.

4. Pursuant to Executive Order 14,158 ("Establishing and Implementing the President's 'Department of Government Efficiency'"), there exists within SSA a "DOGE team" responsible for "implementing the President's DOGE agenda." *Id.* § 3(c). The SSA DOGE Team currently consists of ten SSA employees: four SSA special government employees (Employees 1, 4, 6, and 9) and six detailees to SSA from other government agencies and offices (Employees 2, 3, 5, 7, 8, and 10). To protect the privacy of these individuals, and to avoid exposing them to threats and harassment, I have not listed their names in this declaration.

5. On February 13, 2025, Employee 1, a software engineer, was appointed as an expert, special government employee under 5 U.S.C. § 3109 and 5 C.F.R. Part 304. 42 U.S.C. § 904(a)(2) further supports his appointment and states that the Commissioner of Social Security "may procure services of experts and consultants in accordance with the provisions of section 3109 of title 5." His duties currently relate to improper payments and SSA's Death Master File (records maintained by SSA on deceased individuals). SSA is currently working with the Small Business Administration (SBA) to effectuate an interagency agreement for Employee 1 to be detailed temporarily to SBA.

6. On February 18, 2025, we began onboarding and training Employee 3, a Schedule C Policy Advisor, detailed from the Department of Labor to SSA. The agreement finalizing his onboarding is dated February 22, 2025. His duties currently relate to improper payments and SSA's Death Master File (containing information about decedents from SSA records).

JA121

7. On February 18, 2025, we began onboarding and training Employee 5, an engineer, detailed from the United States DOGE Service to SSA. The agreement finalizing his onboarding is an Interagency Agreement with U.S. Digital Service (now U.S. DOGE Service) covering Fiscal Year 2025, which was amended February 20, 2025 to recognize the change to U.S. DOGE Service; extend the duration to uly 4, 2026; and modify and supplement certain terms in the original agreement. The agreement authorizes work to include, but does not limit work to, increasing efficiency and the modernization of SSA IT infrastructure and systems, detecting waste, fraud, and abuse.

8. On February 18, 2025, we began onboarding and training Employee 2, Senior Advisor (Program Specialist AD-0301-00). He is in the process of being detailed from National Aeronautics and Space Administration (NASA) to SSA. The agency is waiting on final signature on the interagency detail agreement from NASA. His duties currently include serving as the DOGE lead at SSA.

9. On February 19, 2025, Employee 10, a software engineer, was detailed from the Office of the Administrator at the General Services Administration to SSA. His duties currently include supporting the leadership team with the assessment and enhancement of internal processes and operational procedures, specifically, focusing on identifying inefficiencies and areas for improvement and ensuring that the administrative and programmatic functions align with the best practices for effectiveness and accountability.

10. On February 26, 2025, Employee 8, an engineer, was detailed from Office of Personnel Management to SSA. His duties currently relate to improper payments and death data.

11. On February 27, 2025, Employees 4, 6, and 9 were each appointed as an expert, special government employee under 5 U.S.C. § 3109 and 5 C.F.R. Part 304. 42 U.S.C. §

3

904(a)(2) further supports their appointment and states that the Commissioner of Social Security "may procure services of experts and consultants in accordance with the provisions of section 3109 of title 5." All three of these individuals' duties currently relate to improper payments and death data.

12. On March 5, 2025, the agency began onboarding Employee 7, as a detailee from Department of Labor (DOL) to SSA.  The agency is waiting on final signatures on the interagency detail agreement from DOL.  His duties currently relate to improper payments.

13. Each of the special government employees and detailees listed above completed the following training and onboarding actions, in addition to any component specific training:

    a. Attended Privacy Training (either in-person or via MS Teams), which covered privacy laws applicable to agency data and penalties for improper use

    b. Attended Ethics Training (either in-person or via MS Teams), which covered ethics laws applicable to agency employees.

    c. Signed Acknowledgement of SSA Information Security and Privacy Awareness Training, which covers requirements for compliance with information security and privacy policies of SSA.

14. Each of the detailee agreements contained terms clarifying that detailee must not make unauthorized disclosures of SSA information and that detailee must follow SSA rules and policies while working for SSA.

JA123

15. For employees 3, 5, 8 and 10, the Executive Office of the President informed SSA that these individuals had favorable background investigations adjudicated.  For the remaining employees, background investigations are still pending.

16. Under the U.S. DOGE Service interagency agreement described above (formerly with U.S. Digital Service), there are five additional individuals who have been onboarded. These include individuals onboarded in 2024, prior to creation of the U.S. DOGE Service.  However, the agency has determined it does not need their services and is taking action to remove them from this agreement.

17. My office has worked to expedite onboarding of the above individuals and is working to ensure all onboarding requirements are met.

I declare the foregoing to be true and correct, upon penalty of perjury.

Date: March 12, 2025          Signed:  *Florence Felix-Lawson /s/*

Florence Felix-Lawson
Deputy Commissioner
Human Resources
Social Security Administration

# EXHIBIT K

PLFS-061

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

     *Plaintiffs*,

     *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

     *Defendants*.

Civil Action No. 1:25-cv-00596

### SUPPLEMENTAL DECLARATION OF TIFFANY FLICK

I, Tiffany Flick, declare as follows:

1.     My name is Tiffany Flick. I previously submitted a declaration in this case based on my nearly 30 years of experience working at the Social Security Administration ("SSA") prior to my recent retirement.

2.     I have read the declarations submitted by Michael Russo and Florence Felix-Lawson in this case. I submit this supplemental declaration to clarify a few points.

3.     First, the declarations of Mr. Russo and Ms. Felix-Lawson make clear that several DOGE associates are accessing SSA data systems, including those containing personally identifiable information, as detailees but without signed and finalized detail agreements. That is not in keeping with agency practice because the agency does not consider a detailee to be an employee of SSA until a detail agreement is signed and finalized.

4.     Mr. Russo states that members of the DOGE Team at SSA are unable to do their work with anonymized data. Normally when analysts or auditors review agency data for possible payment issues, including for fraud, the review process would start with access to high-level,

1

PLFS-062

anonymized data based on the least amount of data the analyst or auditor would need to know. If a subset of records within that data are flagged as suspicious, the analyst or auditor would access more granular, non-anonymized data to just that subset of files. In my experience, the type of full, non-anonymized access of individual data on every person who has a social security number or receives benefit from Social Security is unnecessary at the outset of any anti-fraud or other auditing project. While agency anti-fraud experts would have access to the types of data that Mr. Russo describes, they also have significant training and expertise in agency programs and how to read and understand the data from agency systems.

5.      Second, Mr. Russo asserts that members of the DOGE Team have a sufficient "need to know" reason for the full and non-anonymized access to SSA data systems. But the "need to know" reasons he describes are, based on my experience, far from sufficiently detailed to justify granting the level of access the DOGE Team now has. In fact, Mr. Russo states that one member of the DOGE Team was granted access to "several other databases but never accessed the data in them." That assertion cuts against the suggestion that all members of the DOGE Team have a "need to know" reason for accessing these data systems. If this employee didn't need to access the data, they didn't "need to know" it and thus should never have had access to it.

6.      Third, Mr. Russo asserts that the MBR and SSR data systems "contain limited fields containing information from sources from federal tax information." In accordance with the law, whether a system has one piece of federal tax information or one hundred doesn't impact how SSA treats that system's data. It cannot be shared with non-SSA employees.

7.      Fourth, Mr. Russo states that 30-40 SSA employees have similar levels of access to data systems as the DOGE Team. That may be true, but SSA is an agency of roughly 57,000 employees. Moreover, these 30-40 SSA employees, as I noted in my original declaration, are

highly skilled and highly trained. In my experience at SSA, new employees would receive more

training on SSA's complex programs and systems before receiving such access.  In addition, they

would have a specific "need to know." As I explained in my initial declaration, I did not observe

any DOGE personnel receiving the "same level of training" as other SSA employees.

8.    I continue to be concerned by the DOGE Team's access to SSA data systems for

the reasons discussed in my original declaration.


I declare under penalty of perjury, as prescribed in 28 U.S.C. § 1746, that the foregoing is true and
correct.

Executed on March 13, 2025, in Valparaiso, Indiana

_Tiffany Flick_
Tiffany Flick

PLFS-064

# EXHIBIT L

PLFS-065

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

   *Plaintiffs*,

    *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

   *Defendants*.

Civil Action No. 1:25-cv-00596

## DECLARATION OF KATHLEEN ROMIG

I, Kathleen Romig, declare as follows:

1. My name is Kathleen Romig. I am the Director of Social Security and Disability Policy at the Center on Budget and Policy Priorities. I work on Social Security, Supplemental Security Income and other budget issues.

2. On March 4, 2025, I attended a meeting held by the Social Security Administration ("SSA"), at which Leland Dudek, the acting commissioner of SSA addressed a group of senior staff and advocates.

3. On March 12, 2025, the news outlet ProPublica published an article describing what was said at that meeting. Eli Hager, *"The President Wanted It and I Did It": Recording Reveals Head of Social Security's Thoughts on DOGE and Trump*, ProPublica (Mar. 12, 2025), https://perma.cc/ZQ2Q-RUB9.

4. I have reviewed that article and can attest, based on my firsthand knowledge, that it is an accurate representation of that meeting.

1

PLFS-066

I declare under penalty of perjury, as prescribed in 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on March 13, 2025, in Washington, D.C.

/s/Kathleen Romig[*]

Kathleen Romig

---

[*]Counsel hereby certifies that she has a signed copy of the foregoing document available for inspection at any time by the court or a party to this action.

**PLFS-067**

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3   AMERICAN FEDERATION OF STATE,    )
     COUNTY and MUNICIPAL EMPLOYEES,  )
 4   AFL-CIO, et al.,                 )
                                      )
 5            Plaintiffs,             )
          vs.                         )
 6                                    ) CIVIL NO.:
     SOCIAL SECURITY ADMINISTRATION,  ) 1:25-cv-00596-ELH
 7   et al.,                          )
                                      )
 8            Defendants.             )
     _____)
 9                                      Baltimore, Maryland
                                        March 14, 2025
10                                      1:00 p.m.

11                  TRANSCRIPT OF PROCEEDINGS
                         MOTIONS HEARING
12          BEFORE THE HONORABLE ELLEN L. HOLLANDER

13   For the Plaintiffs:

14        ALETHEA ANNE SWIFT, Esquire
          KARIANNE JONES, Esquire
15        EMMA R. LEIBOWITZ, Esquire
          CARRIE Y. FLAXMAN, Esquire
16          Democracy Forward
            1445 New York Ave. NW
17          Washington, DC 20005

18   For the Defendants:

19        BRADLEY P. HUMPHREYS, Esquire
          ELIZABETH J. SHAPIRO, Esquire
20        MARIANNE F. KIES, Esquire
            U.S. Department of Justice, Civil Division
21          1100 L Street NW
            Washington, DC 20005
22
          MICHAEL J. WILSON, Esquire
23          Office of the United States Attorney
            36 South Charles Street, 4th Floor
24          Baltimore, MD 21201

25    Also Present:  Jessica Vollmer, SSA Office of General Counsel
```

*Patricia G. Mitchell, RMR, CRR  Federal Official Court Reporter*
*101 W. Lombard St., Fourth Floor*
*Baltimore, MD 21201*

JA132

1    (Computer-aided transcription of stenotype notes)

2                    P R O C E E D I N G S

3    (12:59 p.m.)

4         THE COURT:  Good afternoon, everyone.  Madam Clerk,

5    please call the case.

6         THE CLERK:  Yes, Your Honor.  The matter now pending

7    before this court is Civil Docket Number ELH-25-cv-596,

8    American Federation of State, County and Municipal Employees,

9    AFL-CIO, et al. versus Social Security Administration, et al.

10   This matter now comes before the Court for the purpose of a

11   motions hearing.

12        Counsel for the plaintiffs, followed by counsel for the

13   defendants, will you introduce yourselves for the record.

14        THE COURT:  And our visitors can have a seat, thank

15   you.  Counsel.

16        MS. SWIFT:  Good afternoon, Your Honor.  My name is

17   Anne Swift.  I'm joined by my colleagues Karianne Jones, Emma

18   Leibowitz and Carrie Flaxman.

19        THE COURT:  All right, thank you.  You can have a

20   seat.  Counsel.

21        MR. HUMPHREYS:  Good afternoon, Your Honor.  This is

22   Brad Humphreys from the Department of Justice on behalf of

23   defendants.  I have with me Elizabeth Shapiro from the

24   Department of Justice; Jessica Vollmer, the Social Security

25   Administration; Marianne Kies of DOJ; and Mike Wilson of DOJ

1  also.

2         THE COURT:  All right, thank you.  You-all can have a

3  seat.

4      Counsel, what I thought might be the most efficient way to

5  proceed would be to invite you to begin with each side making

6  some type of introductory presentation laying out what issues

7  you think are crucial for purposes of the motion that's now

8  pending, and then I thought we would go topic by topic with my

9  inviting you to answer questions that I might have.  Or if you

10  would like to speak to a particular topic first, followed by

11  questions, we can take that route as well.

12      So if anybody has a better idea, I'm certainly amenable to

13  hearing it but if you don't, I think that might be the most

14  efficient way to proceed.  Is that satisfactory?

15         MS. SWIFT:  Yes, Your Honor.

16         MR. HUMPHREYS:  Yes, Your Honor.

17         THE COURT:  Okay.  So why don't we start with the

18  movants.  I don't know who is going to be doing the arguing.

19         MS. SWIFT:  That will be me, Your Honor.  Would you

20  prefer me to speak from the podium?

21         THE COURT:  Sure.

22         MS. SWIFT:  Good afternoon, Your Honor.  This is not

23  a case of first impression in this court.  Just a few weeks

24  ago, Your Honor's colleague, Judge Boardman, issued an

25  injunction in a case about the exact same kind of unauthorized

1    and unlawful access by DOGE officials to similarly private

2    information held by OPM, the Department of Education and the

3    Treasury Department.

4              THE COURT:  That's this court, but there are judges

5    in other courts who have ruled differently so we'll come back

6    to that, I'm sure.

7              MS. SWIFT:  Of course, Your Honor.  Like the

8    information protected in the case I just referenced, Social

9    Security record systems maintain some of the most personal,

10   private and individualized information about Americans,

11   including plaintiffs' members.  The public submits this

12   information to the agency with the expectation that it will

13   remain protected by the complex and comprehensive scheme of

14   statutes, regulations and agency policies meant to do just

15   that.  But defendants are now acting without regard for those

16   legally binding protections, and plaintiffs' members, along

17   with other Americans, are being harmed.

18        Your Honor, I know that you expressed interest in standing

19   at our status conference and so I'll address that here.

20             THE COURT:  We can come back to that.  I wanted you

21   to have a chance to give me an overview, so I don't want to

22   hone in on any particular issue yet.  There's a lot to discuss

23   on standing.

24             MS. SWIFT:  Of course.  In terms of an overview, I

25   think it's important to make clear from the outset that this is

1   an unprecedented intrusion into the violation of

2   Americans' private data.  It violates not just the Privacy Act

3   but also the Tax Reform Act, the Internal Revenue Code and SSA

4   regulations.

5           THE COURT:  I don't remember you citing any SSA

6   regulations.

7           MS. SWIFT:  Of course, Your Honor.  We cite -- I

8   believe it's 20 CFR 140.410 which is an SSA regulation

9   directing how the agency should make decisions regarding the

10  disclosure of data which says basically that it should do so in

11  line with the principles established in FOIA.

12          THE COURT:  I'm sorry, go ahead.

13          MS. SWIFT:  Not at all.  But I think the Privacy Act

14  is the right place to start.  The Privacy Act --

15          THE COURT:  Now do you agree with the defense that in

16  order to pursue a Privacy Act claim, there needs to be an

17  individual plaintiff and here we have no individual plaintiffs?

18          MS. SWIFT:  I absolutely do not agree, Your Honor.

19          THE COURT:  You don't agree.

20          MS. SWIFT:  No.  The Privacy Act was enacted in the

21  wake of Watergate and it was not designed to, nor can it,

22  accommodate the kinds of harms at issue in this case.  I'd note

23  that we think that we have an independent Privacy Act claim,

24  but if defendants' position is that we do not, then we

25  certainly have a claim rooted in the Privacy Act that is

1    actionable under the Administrative Procedure Act.

2              THE COURT:  For arbitrary and capricious action?

3              MS. SWIFT:  Yes, Your Honor.

4              THE COURT:  Can we go to the complaint for a minute,

5    just sort of a housekeeping question.  I'm looking at ECF 17.

6    For ECF 17, that's where you start the particular counts.  It's

7    difficult to really tell which defendants are named in which

8    count.

9              MS. SWIFT:  I apologize for that confusion, and I'd

10   certainly like to clear it up.

11             THE COURT:  Maybe you could just tell me what you

12   think you said.

13             MS. SWIFT:  Yes, of course, Your Honor.

14             THE COURT:  Count 1 looks like it's SSA defendants

15   and only SSA defendants.

16             MS. SWIFT:  Correct.  All of the claims other than

17   the ultra vires claim and the appointment clause claim are

18   against SSA defendants.  The appointments clause claim refers

19   to defendant Dudek and the ultra vires claim refers to the DOGE

20   defendants.

21             THE COURT:  So is the ultra vires claim the only one

22   that's for the DOGE defendants?

23             MS. SWIFT:  It's the only claim that we allege

24   directly against the DOGE defendants.  Given the Federal Rule

25   of Civil Procedure 65, while the other claims are directed

1   towards the SSA defendants, they also incorporate anyone who is

2   operating at the direction of or in concert with the SSA

3   defendants, so our position is that while the counts themselves

4   are against the SSA defendants, it would be well within this

5   Court's purview to issue an injunction on those claims that

6   would incorporate actions not just by the SSA defendants but

7   also by the DOGE defendants.

8        THE COURT:  You've hit the nail on the head as to

9   what my concern is.  They don't appear to be named in your

10  other counts so if you were to prevail on your request, why

11  would I be enjoining people who aren't named in a count?

12       MS. SWIFT:  If we were to prevail on our request, we

13  would be directing -- we would have the Court direct the SSA

14  defendants to return to the status quo.  In order to do that,

15  they have to retrieve information that they have unlawfully

16  given to the DOGE defendants and ensure that the DOGE

17  defendants are no longer able to unlawfully use that

18  information.  So in the request that we seek with the TRO, we

19  explain the various ways in which we believe SSA defendants

20  would need to be enjoined in order to accomplish that goal.

21       THE COURT:  Okay.  So I read it the way I think you

22  wrote it is what you're telling me.

23       MS. SWIFT:  Yes, Your Honor.

24       THE COURT:  Okay.  If you don't have a sort of

25  overview to add, you don't need to keep going.  I'll get into

1   the other issues when --

2          MS. SWIFT:  I appreciate that, Your Honor.  I would

3   just note at the outset that this really is an unprecedented

4   situation.  We can sit here and talk about the minutia of the

5   hiring decisions, et cetera, the defendants raise in their

6   brief, but it is disingenuous for defendants to suggest, as

7   they do, that this is just some sort of ordinary change in

8   policy, change in procedure associated with new priorities of

9   the government.  This is, in fact, a sea change in the way that

10  the agency housing some of the most sensitive, personally

11  identifiable, private, and comprehensive information of the

12  American public protects that data.  It's in violation of law,

13  it's in violation of SSA's regulations, and it's arbitrary and

14  capricious so we'd ask the Court to enjoin on that basis.

15         THE COURT:  Thank you.  Let me see if the defense

16  would like to make a short presentation of an overview.

17         MR. HUMPHREYS:  Thank you very much, Your Honor.  I

18  don't have much of an overview either.  I would respond to a

19  few of plaintiffs' counsel's points.  Obviously we're aware of

20  the American Federation of Teachers case.  We respectfully

21  disagree with Judge Boardman for reasons we're happy to get

22  into as we go through the various issues.  As Your Honor noted,

23  there are other cases which have taken a different position,

24  and we think that those decisions are more -- a different

25  position, and we think that those decisions are more

1    persuasive.

2           Also this is not unprecedented at all.  There's no

3    unlawful access here.  This is the Social Security

4    Administration giving access to data systems to its own

5    employees --

6                THE COURT:  Let's save that because I'm not sure I'm

7    on your page.

8                MR. HUMPHREYS:  Yes, Your Honor.  We don't think it's

9    unprecedented, Your Honor.

10               THE COURT:  You don't think it's unprecedented?

11               MR. HUMPHREYS:  That's correct.  We don't think it's

12   unprecedented as plaintiffs' counsel contend.

13          As Mr. Russo states in his declaration, there are 30 to 40

14   other individuals at the Social Security Administration who

15   have similar access --

16               THE COURT:  57,000 employees in the Social Security

17   Administration approximately -- I'm not sure for how much

18   longer -- but as of the time the affidavit was submitted, and

19   you're telling me that it's not unprecedented because 30 or 40

20   people out of 57,000, just in that agency, have access to this

21   information?

22               MR. HUMPHREYS:  I agree -- we do not think it's

23   unprecedented, Your Honor.

24               THE COURT:  Is your point that it's not unprecedented

25   because somewhere in the neighborhood of 40 out of 57,000

USCA4 Appeal: 25-1411      Doc: 33-1        Filed: 06/09/2025      Pg: 144 of 538

1   employees also have access to this information?  I just want to

2   make sure I understood your argument.

3            MR. HUMPHREYS:  My point, Your Honor, is that the

4   Social Security Administration is a huge data agency.

5   Employees are given, in the regular course, access to its

6   databases all the time when --

7            THE COURT:  Are you telling me that in the regular

8   course of work for the Social Security Administration that

9   employees are given -- I'm going to call it -- unfettered

10  access, at least read only, to all of the systems?

11           MR. HUMPHREYS:  I'm not sure how many have access

12  across the entire agency, Your Honor, but my understanding is

13  this is not uncommon.

14           THE COURT:  I don't think there's anything in

15  Mr. Russo's affidavit that says that.  Okay, I think we can

16  talk about that.

17           MR. HUMPHREYS:  Sure.

18           THE COURT:  I wanted to get into a discussion of the

19  Privacy Act and the terminology which addresses need, so I

20  think this topic might fall under that category.  It might be

21  easier to --

22           MR. HUMPHREYS:  Certainly, Your Honor.

23           THE COURT:  -- get into a little more detail about

24  it.  But, again, not to rush you.  If you don't have an

25  overview, I was certainly welcoming any initial presentation

1    you-all might have had in mind before we delved in.

2                MR. HUMPHREYS:  I will say, Your Honor, the

3    plaintiffs' motion should be denied for several independent

4    reasons: lack of standing, lack of jurisdiction because there's

5    no final agency action, and also because their claims fail on

6    the merits --

7                THE COURT:  I'm sorry -- because why?

8                MR. HUMPHREYS:  Also because they failed to establish

9    irreparable harm which is required for emergency injunctive

10   relief, and because plaintiffs are not likely to succeed on the

11   merits.

12               THE COURT:  Okay, thank you so much.

13               MR. HUMPHREYS:  Thank you.

14               THE COURT:  I don't want it to feel like a game of

15   Ping-Pong but there's so many topics to cover, and I personally

16   thought perhaps going issue by issue -- there is going to be

17   overlap so I know when you talk about one where it's going to

18   be unavoidable maybe to start to seep into another.  I'm not

19   trying to constrain you in any way.

20      I don't know -- it's the movant's burden but I have

21   different questions.  I guess while you were standing counsel,

22   I could have asked you this.  I'm sorry, let me ask you now.  I

23   don't think you've argued that SSA is not an agency.  I think

24   the Government has taken that position in other cases growing

25   out of executive order matters.  The plaintiff argues that on

1  this topic in the reply, I think really, but you haven't made

2  that argument here.  So I just want to verify are you conceding

3  that, at least for the purpose of the case before me, that the

4  Social Security Administration -- that DOGE would qualify as an

5  agency?

6         MR. HUMPHREYS:  Thank you, Your Honor.  We have not

7  had an opportunity, as you note, to respond to plaintiffs'

8  reply brief arguments which were raised for the first time

9  there --

10        THE COURT:  Right, but normally when you've advanced

11 it -- I don't mean you personally but the government in some of

12 these cases around the country have argued that DOGE isn't an

13 agency.  The argument has been rejected by several judges,

14 Judge Bates, Judge Cooper, to name two.  I didn't see the

15 argument even being advanced here, so I simply wanted to

16 clarify that I don't have that issue.

17        MR. HUMPHREYS:  Correct, Your Honor.  I think

18 plaintiffs tried to insert it into their argument, but our

19 position is the USDS is not an agency.

20        THE COURT:  You're still taking that position?

21        MR. HUMPHREYS:  Yes, Your Honor.  That's our

22 position.

23        THE COURT:  You didn't argue that here.

24        MR. HUMPHREYS:  We didn't have an opportunity to.  It

25 only came up --

1    THE COURT:  I'm not sure that I agree with that

2  because the way the arguments have been presented in other

3  cases is it's advanced in opposition to a motion by the

4  Government that the USDS or DOGE, whichever acronym you want to

5  use, is not an agency.  That's how it's emerged as an issue in

6  the first place.  You didn't argue that here so I didn't even

7  think it was on the table.  When the plaintiff raised it, I was

8  surprised.

9    MR. HUMPHREYS:  It's only on the table to the degree

10 it is at all because plaintiffs argue that for one of the ten

11 employees that, in plaintiffs' view, there was not authority

12 under the Economy Act to detail that employee to the Social

13 Security Administration.  That's the context in which it came

14 up which is in plaintiffs' opposition -- reply brief.  I don't

15 think it's central to the issues in this case, Your Honor.

16   THE COURT:  What's the bottom line?  Are you taking

17 the position that USDS is or is not an agency for the purpose

18 of this case?

19   MR. HUMPHREYS:  Not an agency, Your Honor.

20   THE COURT:  Not an agency.  What would be your

21 authority?  What should I look to?  You didn't even address

22 this in anything you gave me.

23   MR. HUMPHREYS:  I don't have authorities.  These

24 issues, again, are not presented in this case.  We didn't have

25 an opportunity to -- it only was inserted for the first time in

1  plaintiffs' opposition -- excuse me -- reply.

2          THE COURT:  But that's sort of meaningless because

3  the place I would have expected it is in your opposition.  It's

4  their motion and you would be opposing it, which you did, and

5  one of the reasons you would oppose it would be an argument

6  that DOGE or USDS isn't an agency.

7          MR. HUMPHREYS:  As you pointed out the topic, Your

8  Honor, the claims in this case, the amended complaint, are

9  really -- except for the ultra vires claims -- against the

10 agency itself.  So DOGE's status as an agency or not --

11         THE COURT:  They're a named defendant though.

12         MR. HUMPHREYS:  That's true, but the issue here is

13 whether or not under the Privacy Act the employees at SSA have

14 lawful access to the data systems.  Our position is

15 emphatically that they do because they were appointed --

16 employed by the Social Security Administration or detailed

17 there which --

18         THE COURT:  Let's -- while you're up, let's talk

19 about that.  I'd like to get some clarification and because you

20 represent Social Security, you might be the one to give me this

21 information.  In general, in reading your submission, I found

22 that I really didn't have any clarity about exactly what is in

23 some of these data systems.  I know what they're called.  I

24 know what you say is in them, but it's really vague.

25         And that matters because one thing that I think undergirds

1    the arguments today from your perspective one way, and the

2    plaintiffs have a different view, is that the Privacy Act

3    provides that in the first instance, looking at 552a,

4    5 U.S.C. -- and I'm looking in particular at (b) Conditions of

5    Disclosure -- it says:  "No agency shall disclose any

6    record" -- we know Social Security is an agency -- "which is

7    contained in a system of records by any means of communication

8    to any person, or to another agency, except pursuant to a

9    written request by, or with the prior written consent of, the

10   individual to whom the record pertains, unless disclosure of

11   the record would be, one, to those officers and employees of

12   the agency" -- so of the agency meaning Social Security

13   Administration -- "which maintains the record" -- that's not

14   the end of it -- "who have a need for the record in the

15   performance of their duties."

16        And I really didn't see much discussion on the need part

17   of this equation, so I thought maybe you could help me

18   understand how the disclosure -- it seems to me you've conceded

19   the disclosures remain.  I mean, that doesn't seem to be an

20   issue.  These records -- when I say disclosures, I mean the

21   records that are the subject of this case were, in fact,

22   revealed.

23            MR. HUMPHREYS:  Not necessarily, Your Honor.  They

24   have access to the system, I think, with respect to any

25   particular plaintiff which we do think would be -- should

1    properly be before the Court in order to pursue a Privacy Act

2    claim.  So it's not established in the record; plaintiffs have

3    not established that any particular plaintiff's record has been

4    disclosed within the meaning of the Privacy Act.

5         However, as we have indicated, the ten employees do have

6    access to the system.  So I think it's a separate question --

7              THE COURT:  I'm not trying to be difficult at all,

8    but I feel like that's a little bit disingenuous because if

9    they have access, do you know, maybe they didn't look yesterday

10   but they're looking today?  They have access and that's really

11   the critical part, right?

12             MR. HUMPHREYS:  I think --

13             THE COURT:  I don't have access but they do.  So

14   whether today is the day they exercise their access or some

15   other day, the bottom line is they couldn't do anything without

16   access.  The first step is access and they got it.

17             MR. HUMPHREYS:  I think there's a distinction between

18   access and disclosure which is why a Privacy Act case would

19   normally play out if a person's records were disclosed, and

20   they were harmed by it and had standing --

21             THE COURT:  You can't disclose without access.

22             MR. HUMPHREYS:  I think that's fair, Your Honor,

23   yes.

24             THE COURT:  I mean, how many records are we talking

25   about?

1        MR. HUMPHREYS:  It's a massive amount.

2        THE COURT:  A massive amount, okay.  So let's go

3   through this because -- we'll come back to standing.  I think

4   that is certainly a very important issue; I didn't mean to

5   sidestep it in any way.  But the affidavits that were presented

6   or the declarations that were presented to me from the

7   government make clear that there are a number of employees, to

8   use that term, and whether they are SSA employees is a little

9   less clear to me, but they were provided access.  And they're

10  not named, unlike in other cases where we actually know who the

11  people are.  For some reason apparently, the government thought

12  it shouldn't disclose identities of these people.

13       But let's go with Employee 1 and this is from the

14  Felix-Lawson declaration.  This person was appointed as a

15  special government employee.  I don't know if it's a he or she.

16  The duties relate to improper payments, or shall we say alleged

17  improper payments, and SSA's Death Master File.  And this

18  person is currently working with the Small Business

19  Administration to be detailed -- the background investigation

20  is pending, and this person has access to -- and it lists

21  anonymized data from the Master Beneficiary Record,

22  Supplemental Security record, Numident, Treasury payment files

23  which show SSA payments, personal identifiable information --

24  which nobody has really defined for me which is another issue,

25  I think, here.  And that's from copies of various files.

1          So one concern would be this person was given access

2     before the background investigation was even completed, and it

3     seems to have -- he or she has access to a very broad array of

4     records, some of which are anonymized, but it doesn't appear

5     that they're all anonymized.  This person hasn't, it sounds

6     like -- they're working on the detailing.

7          So when I read that, my concern was how is that person an

8     SSA employee?  Because the Privacy Act applies to employees of

9     the agency who have a need.

10               MR. HUMPHREYS:  A couple of responses, Your Honor.

11               THE COURT:  Sure, and we can keep going because

12     there's ten of them.

13               MR. HUMPHREYS:  I think my question -- my response

14     may apply to all, if not most, of them.

15               THE COURT:  Okay, sure.

16               MR. HUMPHREYS:  First on the definition of PII which

17     the Court asked about --

18               THE COURT:  Is there a statutory definition

19     somewhere?

20               MR. HUMPHREYS:  There's something in the Office of

21     Management and Budget Circular A-130, it's published in the

22     Federal Register.  It has been for quite a while.  On page 33,

23     it says that "personally identifiable information means

24     information that can be used to distinguish or trace an

25     individual's identity either alone or when combined with other

1    information that is linked or linkable to specific individual."

2         And I think that gets to the anonymization point, Your

3    Honor.  It's not as if you can just redact the name or redact

4    the Social Security number to make this information easily

5    anonymized.  If there's any information the employee is looking

6    at that can be linked up and traced back to any individual,

7    then that would qualify as PII as SSA sees it.  So it's

8    actually a very broad definition.

9         When the administration does anonymize something, it's

10   incredibly difficult and takes a lot of time.  So it's, again,

11   not just as if redacting the name or redacting the Social

12   Security number; much more complicated than that.

13        If on the point on whether or not Employee 1 or others is

14   an employee, yes, the person has been detailed there.  The

15   background investigation is not complete, as Your Honor noted.

16   However, that's not uncommon for employees to start working

17   when there's a detail --

18             THE COURT:  There's a difference between working and

19   looking at confidential information before you've gotten a

20   background check, isn't there?

21             MR. HUMPHREYS:  I understand that point, Your Honor,

22   but these people, as Mr. Russo's declaration states, have gone

23   through the requisite privacy and security arrangements and are

24   subject to the same limitations as any other SSA employee with

25   respect to --

1    THE COURT:  Why bother with the background

2  investigation?

3    MR. HUMPHREYS:  The background investigation is not

4  complete for that person, but I don't believe that's

5  necessarily a requirement, as long as the other trainings have

6  been completed.

7    THE COURT:  Is it a requirement of the Social

8  Security Administration that before someone has access to data

9  of this magnitude that they pass a background investigation?

10    MR. HUMPHREYS:  I'm not sure specifically, Your

11  Honor.  I think as long as the other trainings are complete,

12  then they can get access.

13    THE COURT:  Well, was the detail agreement

14  effectuated before the access was provided?  It didn't seem to

15  say that in the declaration.

16    MR. HUMPHREYS:  All of the detail arrangements are

17  complete, Your Honor, is my understanding --

18    THE COURT:  But were they when the disclosures were

19  first made or access provided?

20    MR. HUMPHREYS:  I believe they were.

21    THE COURT:  That's not what the affidavit says, I

22  don't think.

23    MR. HUMPHREYS:  You know, we can follow up on that,

24  Your Honor.  We put this together in very short time frame.  If

25  there are other details on that, we can follow up.  But, again,

1  these are the same requirements that other SSA employees meet,

2  and if the Court were to conclude with this level of

3  granularity that there isn't need to know, of course, a

4  particular employee for a particular system, I think that would

5  have far-reaching, unworkable consequences for the agency

6  because 552a(b)(1) is the exemption of the Privacy Act that

7  agencies across the government rely on routinely to allow their

8  employees access so they can perform their job duties.

9          THE COURT:  Where in your submissions do you address

10  the issue of need?

11          MR. HUMPHREYS:  Yes, Your Honor.

12          THE COURT:  That is never explained, I might add, at

13  least I don't think you've touched it.  What would be the need?

14  I looked at the Executive Order.  There's an overarching desire

15  to effectuate modernization, et cetera, efficiencies.  I'm not

16  understanding anything about how the scope of this kind of

17  disclosure serves that purpose.

18          MR. HUMPHREYS:  Well, Your Honor --

19          THE COURT:  Like, what is the goal here?  What are we

20  looking for?

21          MR. HUMPHREYS:  The goal is to review records to

22  identify potentially --

23          THE COURT:  The people who are 150 years old and

24  still getting their benefits?

25          MR. HUMPHREYS:  I think more broadly, the Social

1   Security Administration's records to see if there are improper

2   or fraudulent payments.  Naturally if one is looking for

3   improper or fraudulent payments, one looks at the data to see

4   if any such payments are made --

5           THE COURT:  This is like hitting a fly with a sledge

6   hammer?  Why do you need all of every single thing that Social

7   Security Administration has by way of records?  What about a

8   more refined and narrow search that would address what that

9   concern is about?

10          MR. HUMPHREYS:  I don't think that it is all that

11  unusual for SSA employees to have this sort of access; as we

12  described, particularly those who are looking for waste and

13  abuse, looking for fraud, this is the data that they would need

14  to look at in order to identify --

15          THE COURT:  I would have expected to see that in

16  Mr. Russo's declaration, that "We have done this before.  We

17  have audits and we make everything available to everybody, come

18  on in, take a look."  He never says anything like that.

19          MR. HUMPHREYS:  Can I cite, Your Honor, on the

20  employee point?

21          THE COURT:  Sure.

22          MR. HUMPHREYS:  As an alternative argument -- not

23  really alternative argument.  As an alternative basis, there's

24  also the Systems of Record Notice which allows nonemployees to

25  access the same data if they similarly have a need to do so --

1    THE COURT:  But that's what you don't address.  I'm

2  still lost.  I'm not following your contention which is barely

3  addressed that -- what was the mission and what was the need?

4  What was the purpose in providing access to all of this

5  information?  Some of which is highly personal.  For example --

6  and correct me if I am wrong because I only know what you-all

7  tell me -- to get some of the kinds of benefits that people

8  apply for to Social Security -- disability, for example -- they

9  provide some really personal health records.  So I'm not

10 understanding what that disclosure or access, what bearing that

11 would have.

12    Is somebody suggesting somebody who claimed, for example,

13 that they have a psychiatric disorder that prevents them from

14 working really doesn't have a psychiatric disorder?

15    MR. HUMPHREYS:  I'm not sure if that specific

16 information is in these records, Your Honor.  But on the need,

17 if one, as I tried to explain -- if one is looking for

18 fraudulent or improper payments that may or may not be going

19 out by the Social Security Administration, one would need to

20 look at the records, the beneficiary data, the payment data in

21 order to do an assessment of that and to recommend potential

22 changes.

23    THE COURT:  I'm sorry, I want to make sure I didn't

24 misunderstand you.  Payment data, is that what you said?

25    MR. HUMPHREYS:  It's included, sure.  Yes, payment

1  data.

2         THE COURT:  Okay.  So payment data and then that

3  would have to do with payment files, if that's how they're

4  maintained.  The Supplemental Security record, what's in there?

5         MR. HUMPHREYS:  Just a moment, Your Honor.  I think

6  it's similar information as in the other files except that it

7  covers information about those applying for Social Security

8  income and Special Veterans Benefits.

9         THE COURT:  Okay, what does that mean?  Does that

10 mean detailed health information?

11        MR. HUMPHREYS:  I don't know the answer to that, Your

12 Honor.

13        THE COURT:  Don't you need to know the answer to that

14 to understand whether there's any justification for the

15 disclosure of this kind of information?

16        MR. HUMPHREYS:  No, I disagree, Your Honor.  I think

17 the need is very clear.  I think --

18        THE COURT:  How can you tell me the need is clear if

19 you don't know why they would need it?

20        MR. HUMPHREYS:  I can tell you that they are looking

21 for instances of improper or fraudulent payments and that it is

22 natural that one would look at the data in that system to see

23 if they've been substantiated, your request for payments --

24        THE COURT:  By fraudulent payments, let's see if we

25 can at least be sure I understand what you mean by that.  By

1    fraudulent payments, you mean paying someone -- sending

2    benefits to somebody on behalf of someone who's deceased; that

3    would be an obvious one.  I assume you mean that.  What other

4    things do you mean?

5            MR. HUMPHREYS:  I think the distinction is probably

6    between improper being it could be an accident or just not

7    entitled to it when there was a good faith belief that the

8    person seeking the benefits had that he was entitled to it.

9    Fraudulent implies some intent, Your Honor.

10           THE COURT:  Fraudulent such as somebody claimed for a

11   child, a parent died and the parent didn't really die,

12   something like that?

13           MR. HUMPHREYS:  I think that would be a fraudulent

14   payment, yes, Your Honor.

15           THE COURT:  Anything else?  So what do the Numident

16   records have to do with that?

17           MR. HUMPHREYS:  Just a moment, Your Honor.

18           THE COURT:  Those are the Social Security numbers --

19           MR. HUMPHREYS:  My understanding, Your Honor, is that

20   is the large database that links up the Social Security number

21   of all Americans essentially with the payment systems.  Again,

22   one would need information -- that information to determine if

23   improper payments were going out.  Just as the other employees

24   in the Office of Financial Policy that Mr. Russo describes in

25   his declaration have access to these data in order to advise

1   policymakers, the ten employees here do the same, just as any

2   other SSA employee would in their position.  I do --

3           THE COURT:  So -- go ahead.

4           MR. HUMPHREYS:  Your Honor, these questions about the

5   specific record that may be involved I think really go to show

6   why this is not all that well suited as an APA case.  The

7   Privacy Act provides for monetary damages, provides for

8   injunctive relief in some cases.  If there were any person who

9   showed their data was misused and they were harmed by it, they

10  could come into court and seek monetary damages for that.

11          THE COURT:  I want to ask you about that because it's

12  clear that -- maybe we'll get to standing this way.  I have my

13  share of questions for plaintiff too.  But it's clear that an

14  intangible harm can be a concrete harm.  I guess my question

15  would be this.  What you just said, if a person knows that

16  their data -- I don't want to misquote you but the gist of it

17  was, I think, to the effect that if it was disclosed.  Is that

18  what you were saying?

19          MR. HUMPHREYS:  If there was an unlawful disclosure,

20  which there has not been here, but if there were and the person

21  were injured such that he or she had Article III standing, that

22  person could sue in federal court and adjudicate a Privacy Act

23  claim on an individual basis.

24          THE COURT:  Let me go back for a moment before I

25  switch gears.  You said if there were an unlawful disclosure

which you then said didn't happen, I want to just ask you in

your opposition to the motion, these may not be all of them but

I wrote down the number of times that you said DOGE had access.

I saw it on -- this is ECF 36.  I use electronic pagination,

not the pages that are imprinted on your submissions.

MR. HUMPHREYS:  Thank you, Your Honor.

THE COURT:  So ECF 36 at 12, 13, 13 note 3, 14, 21

and 25, where you or whoever authored this say that

"defendants' actions in allowing certain USDS employees to

access those records," that's page 12.  Page 13, "a handful of

USDS employees" is the reference.  "Because USDS's mere access

to SSDA data is not a physical, monetary or cognizable harm, it

cannot establish injury-in-fact..."

So I took this to mean -- if this isn't what you mean, I

invite you to tell me -- but I took it to mean that there's no

question that this information has indeed been provided to

DOGE.

MR. HUMPHREYS:  That's incorrect, Your Honor.  I'm

sorry if we created that misimpression.  I think DOGE, the

people who are at the agency, employees fulfilling the DOGE

mission, but no, none of them -- the USDS service has not

received any data from SSA.  The employees themselves do.  They

are, you know, in some sense DOGE affiliated in that they're

there carrying out the Executive Order.  But no, SSA does not

transmit information to USDS.

1  THE COURT:  So is your position that the people from

2  USDS who are at SSA are wearing the hat of SSA and not USDS

3  when they're there?

4  MR. HUMPHREYS:  That's correct, Your Honor.

5  THE COURT:  And, therefore, whatever has been

6  provided has been within the confines of the agency?

7  MR. HUMPHREYS:  That's correct, pursuant to

8  552a(b)(1), and we would also have the authority to do so under

9  (b)(3) under the Systems of Record Notice.

10  THE COURT:  Under the what?

11  MR. HUMPHREYS:  Systems of Record Notices.  I can

12  call them SORNs.

13  THE COURT:  Yes, I saw that in your submission.  What

14  do they say?

15  MR. HUMPHREYS:  They effectively boil down to a need

16  to know also, but the distinction is one does not have to be an

17  employee for the SORN to apply.  So the disclosure, if there

18  was one, can be appropriate under the SORN even for

19  nonemployees.

20  THE COURT:  Okay.  So back to the issue --

21  MR. HUMPHREYS:  May I correct myself for one moment

22  there, Your Honor?

23  THE COURT:  Yeah.

24  MR. HUMPHREYS:  Specifically, that's under the

25  routine use that is published in the SORN, but 552a(b)(3) talks

1  about routine uses, and those are published in the Systems of

2  Record Notices.

3           THE COURT:  Why don't you elaborate -- that's one of

4  the questions I had.  I thought the discussion of routine use

5  was not helpful.  Sorry.

6           MR. HUMPHREYS:  Yes, Your Honor.

7           THE COURT:  Explain how that applies here.

8           MR. HUMPHREYS:  Yes, Your Honor.  The Privacy Act,

9  you read the intro, I believe, to § 552a(b) and then (b)(1)

10 includes an exemption from the Privacy Act for any employees or

11 officials of an agency who have a need to know.  That's (b)(1).

12 A(b)(3) -- I'll read it to you if you'll give me a moment,

13 please -- creates a separate exemption "for a routine use as

14 defined in subsection (a)(7) of this section and described

15 under subsection (e)(4)(B)" --

16           THE COURT:  (E)(4)(D).

17           MR. HUMPHREYS:  (E)(4)(D), thank you very much.  So

18 routine uses are required to be published in something called a

19 Systems of Record Notice in the Federal Register, and the

20 agencies in those SORNs set out and explain the routine uses

21 that they will allow disclosures of the information pursuant to

22 the --

23           THE COURT:  It was difficult for me to understand

24 because (a)(7) defines routine use as "the use of such record

25 for a purpose which is compatible for the purpose which it was

1    collected."  So understanding why it was being reviewed, it

2    seemed to be at odds with that definition.  This didn't seem

3    anything remotely like a routine use.

4              MR. HUMPHREYS:  Well, it is a routine use to give

5    nonemployees, but who need access to the information, access to

6    the data.  So it could be volunteers in some sense, in many

7    cases.

8              THE COURT:  That's in the SORN --

9              MR. HUMPHREYS:  It's in the SORN.  I believe

10   volunteers is in --

11             THE COURT:  I remember that.  It didn't -- I was

12   trying to reconcile these.  It didn't seem -- I felt like I was

13   trying to put a square peg in a round hole.

14             MR. HUMPHREYS:  Compatibility is a separate

15   requirement, Your Honor.  We think the use here is absolutely

16   compatible with the reason for which the data was collected,

17   which is to administer, make sure that the payments made by the

18   Social Security Administration are consistent with the Social

19   Security Act and not improper.  I think it should be

20   uncontroversial.  I hope that helps, Your Honor.

21             THE COURT:  Not really, but thank you for trying.

22   It's a little confusing.

23        So let's go back to the issue of whether the alleged

24   injuries here satisfy the standard for standing and looking

25   at -- you mentioned about that if somebody's health records

1  have been disclosed, they may have the ability to recover

2  monetary damages.  Did I misunderstand that?

3             MR. HUMPHREYS:  No, that's correct.  On an

4  individualized basis someone finds out that their record was

5  given to someone improperly, they can show harm sufficient for

6  Article III standing.  Then, yes, that person can bring a

7  claim --

8             THE COURT:  Does that preclude -- that doesn't mean

9  it's not a concrete injury though?  You're talking about

10 whether it's irreparable harm as opposed -- I was really

11 focusing on is the provision of access in and of itself of such

12 personal information a harm, an intangible but concrete harm.

13            MR. HUMPHREYS:  I don't think -- not always, Your

14 Honor.  I think it could be in certain circumstances if the

15 agency were to improperly disclose a record about one person

16 and we knew that it had done that outside of the agency, I

17 think that could be a harm for Article III purposes, but in

18 general, no.  Just the mere access is not.

19            THE COURT:  And there are -- some of the decisions of

20 other judges have drawn that line essentially, even suggesting

21 that there were mistakes made, basically concluding but they

22 didn't go outside the agency so there's no ground for an

23 injunction of any sort.

24       But my question would be this:  If the information that

25 has been disclosed seems to include people's personal health

1    information, don't we have a culture that basically respects

2    the privacy of information of that nature?  This isn't a HIPAA

3    case, I understand that, but the reason HIPAA came into

4    existence, for example, is that doctors and health institutions

5    are obligated to protect people's private information.  That

6    just spoke to an overarching, I think, view that we don't just

7    lightly let people have information of that kind.

8         So that's a long-winded way of my asking the mere fact

9    that some of this information would fall into the hands of

10   people who had no need for it, wouldn't that be a concrete

11   injury?  Let's assume -- and you think there was a need, so

12   let's just assume for the sake of discussion there isn't a need

13   that meets the requirement to obtain somebody's health

14   conditions that even today, some of these conditions are a

15   stigma.  It could be a stigma to have HIV.  It could be a

16   stigma to have some sexual orientation issues.  There's all

17   sorts of things that are possible.  Somebody has a psychiatric

18   condition that's disabling and doesn't want somebody to know

19   that.  They have a job of -- maybe it's not disabling if they

20   have a job, but just, in general, if there ever was a time when

21   they were disabled from it.  Isn't something that private, just

22   by virtue of it being disclosed, a harm?

23            MR. HUMPHREYS:  A couple of responses, Your Honor.

24   One, SSA does not take privacy interest lightly either which is

25   why these employees have gone through the same requirements of

1    privacy training, et cetera, as other employees who see the

2    same data within the Social Security Administration.

3        Also that -- so if there were Article III injury here, it

4    would also mean essentially a plaintiff could sue an agency

5    because he or she does not like the agency employee who is

6    working at the agency which is basically what here; plaintiffs

7    do not like the ten DOGE officials or don't trust them and

8    therefore are saying they're injured by it.

9        But the case law for informational injuries requires

10   something more.  It requires concrete harm.  As the Supreme

11   Court in *TransUnion* said:  No concrete injury, no standing.  In

12   *TransUnion*, the plaintiffs in that case had actually been

13   designated as terrorists or potential drug traffickers, and it

14   was only by happenstance that third parties hadn't received

15   that information because they hadn't requested it.  The Court

16   still said no standing and it required a concrete injury that

17   we think -- that's determinative, Your Honor.  *TransUnion* just

18   means no standing.

19       I'm happy to talk about the intrusion into seclusion tort

20   now.  We don't think that applies.

21           THE COURT:  Even Judge Kollar-Kotelly, who found no

22   irreparable harm, found standing.  You cite that case to me and

23   offer it as an example of why I should rule in your favor.  If

24   you read carefully -- of course, I know you did -- Judge

25   Kollar-Kotelly's very well-written opinion, she concludes there

1    was standing on facts similar to this.

2          MR. HUMPHREYS:  So, yes, obviously we acknowledge

3    Judge Kollar-Kotelly did find standing.  We disagree for

4    reasons that I think are very persuasive.  Let me try to

5    explain, please, Your Honor.

6          I believe Judge Kollar-Kotelly replied on the intrusion

7    upon seclusion common law analog that's discussed in the

8    *TransUnion* case.  A couple points about that.  One is I think

9    it's helpful to look at *TransUnion,* what the case it actually

10   cited there discussed.  That's *Gadelhak v. AT&T Services*.  It

11   was a then Judge Barrett decision.  In *Gadelhak* the Seventh

12   Circuit addressed unwanted text messages the plaintiff had

13   received, and the court said the text messages, just like

14   repeated phone calls to your house would be, could meet the

15   definition of an intrusion upon seclusion which is the common

16   law tort.

17         That, of course, is very different than this situation

18   here where it is accessed by agency employees to data already

19   housed within the agency.

20         I would also point Your Honor to the *O'Leary v. TrustedID*

21   decision which is a Fourth Circuit case, so not binding on

22   Judge Kollar-Kotelly, and there the court drew the same

23   distinction that the *Gadelhak* -- or discussed *TransUnion* and

24   its citation to *Gadelhak* to say, no, in *TrustedID* the

25   allegations here are not actually an intrusion into the home in

1    the same way that text messages or phone calls would be.

2        Also under the intrusion upon seclusion tort, the conduct

3    has to be highly objectionable.  I forget the language, but --

4        THE COURT:  Wouldn't that be so if somebody is

5    reading your information about your personal health issues?

6        MR. HUMPHREYS:  Not for SSA employees who have

7    properly been given access to the data.  That's also the case

8    for other agency employees --

9        THE COURT:  But they don't have a need for it.  You

10   still haven't really answered that question.

11       MR. HUMPHREYS:  I think the need is the same as any

12   IT professional who would go into one of these systems and who

13   would look to see if there are pervasive problems or if the

14   inspector general or policymakers who are looking at the

15   information to make sure that the agency is carrying out its

16   duties as required by the Social Security Act.  That's the

17   need, to make sure we're protecting the public fisc.

18       THE COURT:  So I just wanted to ask you about the

19   case of *Havemann v. Astrue*, the plaintiff cites it.  Nobody

20   really talks about it.  It happened to be my case and it was a

21   while ago but -- more than a decade ago.  It was a FOIA case

22   brought by a news reporter against the Social Security

23   Administration for disclosure of private data.  It wasn't a

24   reported decision.  The Fourth Circuit did affirm.  And there

25   were some interesting things about it that I remembered and

went back and read the case.

Of course, Social Security Administration did not want to release these copious records.  It had released quite a lot of records to the news reporter but it drew a line at some point, opposed any further production and this FOIA case was instituted, and I ruled in favor of the Social Security Administration.  I quoted, for example, the Supreme Court saying that -- it wasn't a direct quote from the case, but that "The public availability, for example, of employee names and addresses doesn't mean that the employees don't have a significant interest in controlling information related to their identities," and the Supreme Court had said, "This interest is enhanced when the information is compiled through the power of the state such that individuals have little choice or control over the initial disclosure and subsequent use of the data."  That's the FLRA case, and that was 510 U.S. at 490.  Actually it was the *Favish* case, 541 U.S. 157 at 170 and through 172.

And then there was a discussion in the case that I thought was interesting.  "Individuals who apply for or receive Social Security benefits are required by law to provide personal identifying information and data on income, family status, and medical records as well as names, addresses and other identifying information."  And I based that on a declaration of someone from the Social Security Administration.  "And to

1  protect the confidentiality of this information," I wrote, "SSA

2  maintains the requested records and databases subject to the

3  Privacy Act of 1974 from which the records cannot normally be

4  released without the individual's written consent," citing also

5  the statute and the declaration of the SSA employee.

6       "Accordingly, there is a significant privacy interest in

7  the control of private information maintained in SSA's

8  databases," and I cite the *Favish* case in the Supreme Court.

9  There the Court had said, "There is special reason to give

10 protection to intimate personal data to which the public does

11 not have a general right of access in the ordinary course."  Of

12 course I understand your argument this wasn't the general

13 public.  But their argument is just wait, it will be available

14 to the general public.

15      I thought it was interesting because there's Social

16 Security arguing for these reasons, it shouldn't have to give

17 information that the reporter sought.

18           MR. HUMPHREYS:  Well, absolutely, Your Honor.  This

19 is not a FOIA case.  FOIA requires disclosure to the public.  A

20 disclosure to one is a disclosure to all under the case law.

21 Social Security Administration --

22           THE COURT:  You said redaction was difficult but

23 there would be redaction tools.

24           MR. HUMPHREYS:  But this is giving the information to

25 SSA employees.  Just as any other employee gets that data which

1   is very different from the FOIA context.

2            THE COURT:  If they weren't an employee at the time

3   it was disclosed, where do we go from there?  That's another

4   question.  We just spoke about Employee 1, and I don't know

5   that Employee 1 was really an employee at the time access was

6   first provided, if the detail agreement and the background

7   check aren't completed.  The same was true of Employee 2,

8   background investigation pending.  That's Mr. Felix-Lawson's

9   declaration -- I think it's Ms. Felix-Lawson, ECF 36-2,

10  paragraph 15.  And the same applies to some of the other

11  people.

12           MR. HUMPHREYS:  Your Honor, those people, in our

13  view, were employees for the purposes of 552a(b)(1).  However,

14  even if the Court disagrees, plaintiffs still are not likely to

15  prevail on their claims because of the routine use which is

16  published in the SORNs which allows the agency to give

17  information to nonemployees if it is in the need of the

18  performance of their duties.  So our case does not rise and

19  fall on whether or not those individuals are employees.  We

20  believe they were, but the routine use provides an alternate

21  reason why it was permissible for SSA to provide that

22  information.

23           THE COURT:  So was this done pursuant to the

24  Executive Order of January 20 that established DOGE?  When you

25  say that there was a need, is that to fulfill that agenda?

1    MR. HUMPHREYS:  In part.  These particular people are

2  working at the agency in order to carry out the sort of broad

3  policy prescription contained in the Executive Order.  They are

4  also looking at improper payments and potential waste or --

5  improper or fraudulent payments, and then as the Russo

6  declaration explains, in some cases providing policy

7  recommendations to senior leadership.

8    THE COURT:  Okay, well, thank you.  Let me see what

9  plaintiffs want to tell me and maybe we'll have another

10  round.

11    MR. HUMPHREYS:  May I say one more thing, Your Honor?

12    THE COURT:  Sure.

13    MR. HUMPHREYS:  I just don't want to miss it.  I hope

14  I have an opportunity to come back and talk about final agency

15  action.  We think there is absolutely no final agency action

16  here.

17    THE COURT:  I do plan to ask that question of

18  plaintiffs.

19    MR. HUMPHREYS:  Okay.  On standing is my only point.

20  We think the risk of further dissemination has to be something

21  that's imminent.  Even cases, as in the Fourth Circuit in *Beck,*

22  have said something that even seems reasonably likely is not

23  enough for standing; there has to be something much more than

24  what plaintiffs allege here which is, again, really a

25  disagreement, a dislike or distrust of specific agency

1   employees.  Thank you, Your Honor.

2            THE COURT:  Okay, thank you.  Counsel.

3       So you didn't really spend any time on standing in your

4   opening brief and then addressed it in the reply.  You give a

5   few reasons for why you think there's standing.  Let me hear

6   what they are.

7            MS. SWIFT:  Of course, Your Honor.  I would like to

8   clarify because defendants expressed some confusion that

9   plaintiffs are alleging associational standing, not

10  organizational standing.

11           THE COURT:  You're alleging associational.

12           MS. SWIFT:  Correct.  I can walk through the

13  different particularities of standing, I'm happy to do that,

14  but I think at the outset, the bulk of the disagreement between

15  plaintiffs and defendants rests on defendants'

16  mischaracterization or perhaps misunderstanding of the injuries

17  in fact that plaintiffs alleged and have demonstrated.

18           THE COURT:  How are they not speculative which is,

19  therefore, not cognizable for standing purposes?  When you talk

20  about your concern being a potential problem involving identity

21  theft or something equivalent to that?  Hasn't that been

22  completely debunked in recent case law?

23           MS. SWIFT:  I disagree with that.  I think part of it

24  has to do with both the harm that we are alleging and with the

25  scope of defendants' actions.  I think the speculative argument

1    is most applicable in theory --

2            THE COURT:  I didn't give you a chance to tell me.

3    You offered three grounds in your brief of why there's

4    standing, so why don't you just make sure I know what those

5    three are.

6            MS. SWIFT:  Thank you, Your Honor.  We do allege

7    three different concrete cognizable injuries:

8        The first of those is an invasion of privacy akin to

9    intrusion upon seclusion; the second is exposure to an

10   increased and nonspeculative risk of identity theft; and the

11   third is an increased likelihood of direct disruption in

12   benefit payments.

13           THE COURT:  If you start with the last one, I know

14   that there's been some news articles, which Judge Cooper had a

15   comment about this in his opinion about relying on news

16   articles as a source of any information, and there's been some

17   indication that there's been some crashes of IT-type incidents

18   at Social Security, but that one strikes me as so completely

19   speculative as to be on its face -- no disrespect is meant --

20   but clearly not an injury in fact, not concrete.  Totally

21   speculative and certainly nothing to do with anything that this

22   case is about.  How do you tie that to what's happened here?  I

23   don't know.

24           MS. SWIFT:  We --

25           THE COURT:  You only need one.

1          MS. SWIFT:  Yes, Your Honor.

2          THE COURT:  I don't think that's your best.

3          MS. SWIFT:  Okay.  I can provide more context for

4     that claim if it would be helpful to the Court.

5          THE COURT:  Okay.

6          MS. SWIFT:  It's tied to our claims here because it

7     is caused by the same activity.  Defendants have given DOGE

8     employees, allegedly, who are unvetted and untrained -- I can

9     go into the details of that later -- access, basically

10    unfettered access to these systems.  And the first declaration

11    from Tiffany Flick who was acting chief of staff to former

12    Acting Commissioner Michelle King, a 30-year employee at SSA,

13    makes clear that from the first day, DOGE personnel and the

14    acting leadership at SSA is trying to get even more access to

15    the source code.  But the access that they have, read access, I

16    suppose it's not technically a misnomer, but I certainly think

17    it hides the ball.

18         Read access does mean that these individuals cannot go in

19    and change the code.  It doesn't mean that all they can do is

20    read the access.  If someone has read access to these systems

21    of records, they can plug in a USB drive and take them out.

22    They can export them.  They can take pictures.  And defendants

23    say in their brief that SSA systems and equipment have

24    firewalls to guard against that kind of behavior, but Ms. Flick

25    attests in her declaration that from the very beginning, these

1    DOGE personnel were accessing SSA data offsite at OPM in the

2    presence of DOGE or OPM personnel who had no even alleged

3    relationship to SSA.

4         To get back to the alleged harm, I agree that news

5    reporting cannot be the foundation for claims in federal court,

6    including at this stage, and I would note to Your Honor that

7    the article in which most of those assertions appear is the

8    *ProPublica* article that was published on March 11, I believe,

9    day before yesterday, and plaintiffs included a declaration

10   from someone else who was at the meeting described in the

11   *ProPublica* article, affirming that that article is an accurate

12   representation of what was said at that meeting.

13             THE COURT:  By Mr. Dudek.

14             MS. SWIFT:  Exactly.  So that's where we get to

15   breach -- excuse me, to interruption in payments.  And I know

16   that Your Honor doesn't find that particularly persuasive so I

17   don't want to spend too much time on it.  But I would also note

18   because I do think this issue can get muddled that, sure, some

19   plaintiffs have concerns about whether or not this new

20   administration is going to, you know, cut off their access to

21   plaintiffs to which they and we would think that they're

22   statutorily entitled.  That's not what this claim is about.

23        This claim is about disrupting SSA systems to the extent

24   that we are seeing delays in payment to beneficiaries who, as

25   is evidenced in our record, rely on these payments to live.

1    Even one missed payment --

2              THE COURT:  I don't remember reading anything that

3    you gave me that somebody has received a delayed payment.

4              MS. SWIFT:  None of plaintiffs' members have yet,

5    Your Honor.

6              THE COURT:  Right so that's so theoretical.  They had

7    the news reported not that long ago there was a risk of some

8    giant meteor hitting the earth, and luckily they avoided it.

9    Maybe that wasn't speculative.  But what you're talking about,

10   I hope it never happens, but there's absolutely not a place I

11   could hang my hat to say that this would provide standing.

12   It's so theoretical.

13        Let's talk about the data breach possibility and identity

14   theft.  How do you get around *Beck v. McDonald* in which the

15   Fourth Circuit concluded that their personal information was

16   compromised in the data breach, and the Court found no

17   Article III injury based on an alleged increased risk of future

18   identity theft?  And even measures taken to protect against

19   misuse of information which the plaintiffs there had done.  So

20   they actually had to protect themselves and the Fourth Circuit

21   said no Article III injury in fact.

22             MS. SWIFT:  Yes, Your Honor.  I do think that *Beck* is

23   instructive here.  I don't think it is the firm bar that the

24   Court is concerned about.  The harm that plaintiffs are

25   alleging is an exposure to increased and nonspeculative risk of

1    identity theft.  I think the way we can distinguish this from
2    *Beck* is with respect to the scope of the data at issue.
3        Social Security Administration data is among the most
4    comprehensive system of data about Americans in the world.  As
5    Your Honor mentioned in *Havemann*, I think this was discussed
6    extensively, while -- so the Social Security number itself is
7    scammers' most sought-out information.  The other information
8    contained in SSA systems, especially when combined, compiled by
9    the Government and not anonymized, is a treasure trove for
10   scammers.
11       So here, as Your Honor's colleague explained in the AFT
12   case, we're dealing with something completely different.  This
13   is not a data breach at a private organization.  This is the
14   most comprehensive set of personally identifiable private
15   information out there that the Fourth Circuit has acknowledged
16   previously gives scammers everything they would ever need, both
17   in general I should say -- and this is my commentary -- but
18   especially with respect to plaintiffs' members who are hundreds
19   of thousands of retirees.  Plaintiffs' members are among the
20   most targeted individuals in America for these types of scams
21   already.
22              THE COURT:  The cases where there really were data
23   breaches but somebody was compromised in a data breach, even
24   that wasn't enough.  And here what you're saying is based on
25   what took place, there could be a data breach.  Isn't that what

1   these cases would say is speculative and, therefore, not an

2   injury in fact and, therefore, not sufficient for Article III

3   standing?

4           MS. SWIFT:  One moment, Your Honor.

5       I'd refer the Court to the Office of Personnel Management

6   case.  I know it's in the D.C. Circuit from 2019 which talked

7   about --

8           THE COURT:  Do you have a cite --

9           MS. SWIFT:  -- a nonspeculative risk of identity

10  theft.  *O'Leary* actually, which the plaintiffs cite, refer to

11  this case, I believe, and the OPM cases that specifically an

12  agency, which, again, is not what was at issue in *Beck* or the

13  other data breach cases, that an agency's failure to adequately

14  secure its databases creates exactly the sort of --

15          THE COURT:  Is that the *Jefferies* case?  Is that what

16  you're talking about?

17          MS. SWIFT:  I believe it's *In re U.S. Office of*

18  *Personnel Management Data Security Breach Litigation.*

19          THE COURT:  So what's the cite?

20          MS. SWIFT:  928 F.3d 42, 54 to 55.  It's from the

21  D.C. Circuit 2019.

22          THE COURT:  Okay, go ahead.

23          MS. SWIFT:  I'd also refer Your Honor, and I suspect

24  we may talk more about this case, to the recent decision in the

25  Southern District of New York.  In that case --

1    THE COURT:  Judge Vargas's decision?

2    MS. SWIFT:  That's correct, Your Honor.  There are

3  some distinctions between our case and that, but in that case,

4  Judge Vargas cited a collection of cases and found that courts

5  routinely find standing for equitable relief where it's the

6  inadequate cybersecurity measures that are creating this

7  heightened risk.

8    So in the traditional data breach cases, the harm is the

9  data breach.  The harm that we are alleging that Judge Vargas

10  addressed, that Judge Broadman [sic] addressed, is inadequate

11  protection measures -- quite frankly, obviously inadequate

12  because they're contrary to law -- that increased dramatically,

13  substantially, and nonspeculatively the risk to plaintiffs.

14    THE COURT:  So by inadequate protection measures, I'm

15  not sure I know what you mean.  You're saying they don't have

16  any protections in place that's governing the review of this

17  material?

18    MS. SWIFT:  The Social Security Administration, like

19  all other federal agencies, has a series of complex and

20  comprehensive protections in place.  The problem in this case

21  is that defendants aren't complying with them.  So --

22    THE COURT:  Where is that in the record before me?

23    MS. SWIFT:  That defendants aren't complying with

24  them?

25    THE COURT:  Yeah, you mean just by virtue of looking

1   and getting the material or something else that you're talking

2   about?

3          MS. SWIFT:  Sure.  I think it relates to the Privacy

4   Act claim, to the APA claim --

5          THE COURT:  No, but my question is are you saying --

6   I'm asking you, where in the record of information before me

7   would I see that?

8          MS. SWIFT:  I'd refer, Your Honor, to Ms. Dudek's

9   declaration, both the first and second, I believe it's

10  Exhibit J -- I'm sorry --

11         THE COURT:  Flick?

12         MS. SWIFT:  Ms. Flick's declaration, thank you.  Like

13  I said earlier, Ms. Flick has been in senior leadership at SSA

14  for decades.  She served across different administrations.

15  This is certainly not, as defendants suggest, political for her

16  or for plaintiffs.  But Ms. Dudek -- Ms. Flick explains in

17  great detail how defendants are not complying with applicable

18  laws, regulations and policies.  Perhaps it would be

19  instructive for me to talk a little bit about the need-to-know

20  aspect of this as an example.

21         THE COURT:  Okay.  We can do that.  I just wanted to

22  go to the third ground that you had for standing which would

23  be --

24         MS. SWIFT:  Invasion of privacy akin to an intrusion

25  upon seclusion in the common law tort.

1          THE COURT:  Do you want to speak to that?

2          MS. SWIFT:  Yes, Your Honor.

3      I believe defendants said earlier, my colleague said that

4  *TransUnion* is the end of this inquiry.  Obviously, plaintiffs

5  disagree and would note that *TransUnion* itself cites the tort

6  of intentional intrusion upon seclusion as a cognizable, if

7  intangible, harm.

8      Defendants are correct that several of the cases sounding

9  in this tort relate to physical intrusions into the house in

10  the form of text messages or calls.  They don't all.  I'd refer

11  the Court actually to the second *Restatement of Torts*.  That's

12  § 652B, comment B.  It talks there about this tort, and it

13  explains that these sorts of invasions might occur when a

14  defendant opens a plaintiff's personal and private mail,

15  searches his safe or his wallet or -- and I think this is

16  crucial -- examines his private bank account.

17      So certainly physical intrusions into the home whether by

18  a person or via technology are covered by this tort, but

19  they're certainly not the harms exclusively covered by this

20  tort.

21          THE COURT:  Well, in *O'Leary*, it says in a footnote,

22  the court cites the definition as "a common law cause of action

23  against defendants who invade the private solitude of another."

24  I wasn't sure really what that meant because if your personal

25  information is accessed, I don't know if you have any solitude.

1   I wasn't sure if that was another way of saying it has to be

2   the home, or is there some other way in which your solitude is

3   disrupted?

4          MS. SWIFT:  I'd say the latter, Your Honor, and I'd

5   refer the Court to *Neal v. United States* from this district --

6          THE COURT:  This Court, this judge.

7          MS. SWIFT:  Exactly, thank you for the correction.

8          THE COURT:  Yes.  Have to read those cases more

9   carefully.

10         MS. SWIFT:  Yes, Your Honor.  I think *Neal* addressed

11  this dead-on when Your Honor said that "a legitimate

12  expectation of privacy is the touchstone of this tort."

13  *O'Leary* itself bears that out.

14      I think that defendants misstate perhaps both *O'Leary*'s

15  findings and its applicability to this case.  Some of that is

16  based on their overall misunderstanding of the tort that

17  plaintiffs allege.  *O'Leary* was very careful to distinguish

18  between the tort of public disclosure of private information

19  and the tort that we are alleging here which is, as you know,

20  intrusion upon seclusion.

21         THE COURT:  Well, if there is -- I guess I would put

22  it this way.  If, in fact, this notion of the tort is viable, I

23  would say that I think your affidavits would cover the

24  requirements, if you will, at least insofar as expectation of

25  privacy is concerned because several of your affiants speak to

1  the fact that they are very -- it's very disconcerting to them

2  to have had their health information looked at and troubling

3  and frightening --

4              MS. SWIFT:  Yes, Your Honor.

5              THE COURT:  -- and stressful and unexpected which is

6  somewhat what I think *Havemann* was talking about too, that

7  people provide this -- you have to when you want to get the

8  benefit, but when you do, there's sort of this understanding

9  that Social Security protects the information, not obviously

10 from people within the agency that need it but to do a job.

11             MS. SWIFT:  Exactly, Your Honor.  With respect to

12 *O'Leary* in the chance it might be helpful to the Court,

13 defendants say in their brief that the Court rejected the

14 analogy between the disclosure of the last six digits of a

15 Social Security number to intrusion upon seclusion because

16 there was no unwanted intrusion into the home.  That's not what

17 the *O'Leary* court said.

18     The *O'Leary* court said that the plaintiff did not actually

19 allege an increased risk of identity theft, and he --

20             THE COURT:  What page are you on?

21             MS. SWIFT:  Of *O'Leary*, Your Honor?

22             THE COURT:  Yes.

23             MS. SWIFT:  I believe it's page 245 and it's page 10

24 of defendants' brief.  So the *O'Leary* court said, one, there's

25 no allegations about increased risk of identity theft and, two,

1  the plaintiff appeared to just rely on some sort of abstract

2  privacy information interest in his Social Security number

3  itself.  Obviously, that's not the case here as, again, we've

4  demonstrated both by reference to other cases and by record

5  affidavits.

6          THE COURT:  So I'm not sure I see what you're saying

7  on this page.

8          MS. SWIFT:  Well, I apologize for that.

9          THE COURT:  I mean, the court calls it an abstract

10 privacy interest in his Social Security number itself.

11         MS. SWIFT:  If I might, Your Honor, I would be happy

12 to look up the exact language for the Court.  I certainly don't

13 want to misrepresent the case.  I'd be happy to pull the exact

14 language and discuss it in more detail.  I just unfortunately

15 don't have it in front of me at this moment.

16         THE COURT:  Okay.  They do say it's the unwanted

17 intrusion into the home that marks intrusion upon seclusion.

18 Judge Kollar-Kotelly was not that literal, but she's not in

19 this circuit.

20         MS. SWIFT:  I do think her analysis is instructive.

21         THE COURT:  Yes.  But this is a very recent case,

22 *O'Leary*.

23         MS. SWIFT:  Yes, Your Honor.

24         THE COURT:  Okay.  So your argument would be that the

25 disclosure of these records is tantamount to the tort of

1  invasion of privacy of the variety known as intrusion on
2  seclusion.
3          MS. SWIFT:  Yes, unauthorized, unexpected, unlawful
4  disclosure of information.
5          THE COURT:  Okay.
6      So what would be your authority to say that it was an
7  unauthorized disclosure?  Because the government takes the
8  position that all of these people to whom access was provided
9  are employees of the Social Security Administration and that
10 the Privacy Act therefore, subject to need, allows the
11 disclosure to have been made.
12         MS. SWIFT:  As Your Honor might suspect, I think
13 there's two key steps there.  The first is whether or not these
14 individuals were, in fact, employees of the agency.  And the
15 second is whether or not defendants have established an
16 appropriate need to know.
17     Plaintiffs dispute both of those facts.
18         THE COURT:  I'm sorry, what was the last thing you
19 said?
20         MS. SWIFT:  Plaintiffs dispute both of those points.
21 Your Honor, helpfully I think, earlier in argument went through
22 the Russo declaration and the declaration of the SSA HR
23 professional with respect to the, again, unnamed employees that
24 defendants have now identified as being on the DOGE team within
25 Social Security.

Again, there are several discrepancies there that I think all suggest that several of these individuals are not actually employees.  As you noted, Employee 1 had a start date of February 13, I believe, but he got access to these systems on February 12.  Employees 2 and 5 still don't have finalized detail agreements from their alleged agencies, despite the fact that employee 5 got access to this information on February 21.  And there are similar issues with respect to Employee 7.

That is, of course, setting aside the issue that several of the employees with access to personally identifiable information have not passed background checks.

THE COURT:  Just while you're on this point, I'm trying to think of what an injunction would look like.  Would it be:  You, SSA, cannot give information to people who are not actually SSA employees?  And so -- not sure what that does for you.  Because somebody who -- Employee number 1 got access one day before they were allegedly an employee.  I mean, I would have a hard time saying there was irreparable harm from one day, wouldn't I?

MS. SWIFT:  I don't think so, Your Honor.

THE COURT:  What would be the remedy?

MS. SWIFT:  I think the remedy here is to disgorge the data and require --

THE COURT:  But it may be that they should not have had it on the 12th, but if they should have had it or were

1    allowed to have it on the 13th, what would an injunction do?

2    What would it even look like?  Give back what you learned on

3    the 12th but you were entitled to it on the 13th?

4              MS. SWIFT:  Your Honor, what plaintiffs are asking

5    the Court to do is to restore the status quo, to require the

6    Social Security defendants and the DOGE defendants to comply

7    with the law.  As Your Honor referenced, there are several

8    elements of the law.  One, sure, is whether or not they are an

9    employee, but another, and I think perhaps the most crucial for

10   this case, is whether or not they have a need to know.  And for

11   reasons that I would be happy to discuss, defendants have come

12   far from making that showing here.

13        So in terms of the specifics of a preliminary injunction,

14   I think, as we say in our proposed order and in our motion,

15   there are --

16             THE COURT:  Is this a TRO or PI?  We left that

17   unsettled on Monday.

18             MS. SWIFT:  We did, Your Honor.  Especially given

19   events between Monday and today, plaintiffs' position is this

20   should be a TRO.  The facts of this case are changing on the

21   ground every day.  I think defendants' brief points to a good

22   example of this.  It seems that one of the DOGE employees that

23   they list, Employees 1 through 10, I think started on March 11,

24   and plaintiffs can only assume that that is why there are

25   discrepancies between the HR executive's declaration and

1   plaintiffs' briefs in terms of how many employees have done

2   these privacy trainings, nine versus ten, how many are

3   detailees, et cetera.  We've all made typos in briefs -- I'm

4   sure you'll find one in ours; I apologize in advance -- but I

5   think that this particular substantive misstatement is

6   indicative of what's happening at the agency and the struggle

7   that the plaintiffs and defendants have in fully briefing this

8   issue before the Court.

9        So our position is that a TRO would be necessary and

10  advisable because defendants would have time to access more

11  information about these employees.  We'll see if any more start

12  in the next few weeks.  And plaintiffs would have the

13  opportunity to seek discovery generally to give the Court, you

14  know, more information about the facts on the ground in order

15  to address this obviously very important issue.

16           THE COURT:  Okay.  Well, that was that, but I think I

17  interrupted you.  You were saying -- I was asking you, you were

18  talking about the employees, and my main concern at the moment

19  is what makes these people not employees of SSA?  The

20  government takes the position they are.  We have the need issue

21  but before I get to that issue, the question is are they SSA

22  employees?  The government says they are.

23       The government says also even if they aren't, it doesn't

24  matter because under the routine use exception and SORN

25  notices, they can get in anyway.  But you might want to answer

 1    both of those.

 2              MS. SWIFT:  I would love to.  I was surprised, as I

 3    think Your Honor was, to hear defendants say today that DOGE is

 4    not an agency.  If DOGE is not an agency, it is not permitted

 5    under the Economy Act to detail employees to any other

 6    agency.

 7         There is some creative briefing around this in defendants'

 8    opposition and in the declarations with respect to whether

 9    these employees are detailees from, for example, NASA or the

10    Department of Labor.  I think it's clear in the record but

11    certainly in public recording that DOGE employees are often

12    detailed to multiple agencies at once.  I believe we cite in

13    our brief to some declarations in the UCLA case where one week

14    a DOGE employee alleged that he was -- stated that he was

15    detailed to one agency, agency one, and about a week and a half

16    later, I believe, testified to the Court that he was, in fact,

17    detailed to an entirely different agency and had been on the

18    ground there for several weeks.

19         So with respect to whether or not they're employees, I

20    think there are a couple key points.  One, again, is if DOGE is

21    not an agency, it can't detail and --

22              THE COURT:  What would be the source of that?

23              MS. SWIFT:  For the Economy Act?

24              THE COURT:  The Economy Act.

25              MS. SWIFT:  I don't have the cite directly in front

1    of me, Your Honor, but I will make sure I do the next time I

2    stand up.  So that's the first point --

3              THE COURT:  But I think just as an aside, I'm not

4    ruling, I don't even know if the issue was really presented

5    because it was never argued by the government.  That's why I

6    thought they weren't making the argument because they've lost

7    on this point in other courts, so I didn't think they were

8    pursuing it.

9              MS. SWIFT:  We feel the same.

10             THE COURT:  But I think there's been some very

11   well-reasoned opinions that have concluded that it is an

12   agency.

13             MS. SWIFT:  I agree --

14             THE COURT:  In which case, let's assume arguendo it's

15   an agency so now they can detail.  So why aren't the people

16   working there employees for purposes of within the Social

17   Security Administration?

18             MS. SWIFT:  Three of them are not because they don't

19   have final detailee agreements signed.

20             THE COURT:  So what would that mean?  That would

21   mean, even if that's true, do you throw the baby out with the

22   bath water?  Let me restate it.  It doesn't advance your

23   position because other people would qualify as employees, so

24   what difference would it make?

25             MS. SWIFT:  Respectfully, Your Honor, I would

1    disagree.

2            THE COURT:  In other words, I guess what I'm saying

3    is, assume that some aren't and some who are.  The larger

4    question of whether the disclosure or access that was provided

5    is somehow improper, that wouldn't carry the ball for you with

6    respect to people who were qualified as employees of SSA.

7            MS. SWIFT:  I think there's more to say --

8            THE COURT:  So just to keep going, what would an

9    injunction look like then?  An injunction would look like

10   Social Security Administration is enjoined from allowing anyone

11   who's not an employee access to these documents.

12           MS. SWIFT:  No, Your Honor, respectfully.  An

13   injunction would look like an order enjoining defendants from

14   acting contrary to law.  So there's a lot to be said about

15   whether or not these individuals are or not employees, but as

16   Your Honor discussed earlier, whether or not they have a need

17   to know and are thus legally able to access and/or disclose the

18   information under the Privacy Act or the SORN or the Internal

19   Revenue Code is an entirely different issue, and it's a bar

20   that they can meet.

21           THE COURT:  Right, but I'm trying to go one step at a

22   time.  I'm up to the are they employees or aren't they?  And if

23   some are and some aren't, it would seem like this isn't a very

24   likely ground for you to succeed on the merits because, okay,

25   they had ten people.  Some were employees and some weren't.  So

1    if some people could get it and some couldn't, at the end of

2    the day, they were allowed to arguably give information, at

3    least to the people who were employees, subject to it being

4    satisfied on the standard of need.  All I'm saying is it seems

5    to me like this doesn't get you very far.

6            MS. SWIFT:  I'm sorry if I wasn't clear earlier, and

7    I appreciate you pressing me on it.  The fact that there are,

8    let's say, three nonemployees accessing the data is not

9    remediated by the fact that there are seven employees accessing

10   the data because the harm here, the final agency action, not to

11   muddle the different merits claims, is a policy of ignoring

12   applicable laws and regulations and permitting regularly, if

13   not encouraging, the unauthorized disclosure of data to

14   individuals who may or may not be employees but who certainly

15   do not have a need to know and whose access is not otherwise --

16           THE COURT:  Let's get to that before I forget.  What

17   is the final agency action?

18           MS. SWIFT:  The final agency action is the

19   defendant's decision to allow access to SSA data and record

20   systems without respect to whether or not that access and

21   disclosure is permitted by law.

22           THE COURT:  And is that just by sort of because your

23   claim is it happened, that that would be the final agency

24   action?  What makes it a final agency action?

25           MS. SWIFT:  It's a final agency action for two

1    different reasons, Your Honor.  The first is that it grants

2    rights.  The final agency action at issue here grants the

3    defendants, and especially the DOGE defendants, rights to

4    access data that they certainly would not otherwise have.  So

5    there's the grant and then there's also that this is the

6    culmination of agency decision-making.

7         The decision itself was made by now Acting Commissioner

8    Leland Dudek.  There's no one above him.  It's hard to say that

9    this is not the culmination of the agency's decision-making

10   process because it comes from the head of the agency.

11        And I'd note that while defendants state in their brief

12   that this is not a final agency action, they then spend four

13   pages talking about it as though it were.  And I think that's

14   reflective of the facts on the ground.

15             THE COURT:  Okay.

16             MS. SWIFT:  If it would be helpful, we could turn to

17   defendant's alleged need to know.

18             THE COURT:  Yes.

19             MS. SWIFT:  As Your Honor well knows at this point,

20   the Privacy Act limits disclosures -- and this is certainly a

21   disclosure -- to situations in which an individual has a

22   need-to-know reason to access particular data.  I want to level

23   set a little bit.  The Social Security Administration is not a

24   stranger to fraud investigations or to audits.  It has

25   procedures in place for just this type of inquiry, and none of

those procedures necessitate ten individuals who, as I do hope

we can discuss, are actually not -- have not received the

standard training to access the individualized data files of

hundreds of millions of persons.

    As Ms. Dudek details in her declaration --

            THE COURT:  No, Ms. Flick.

            MS. SWIFT:  Correct, Your Honor.  I apologize, and I

hope we remedy that going forward.

    As Ms. Flick explains in her declaration, this is part of

SSA's ongoing operations, and they have established ways to

pursue that without violating the laws at issue and

Americans' privacy interests.

    What typically happens -- and actually happened last year

because these are routine -- is that an auditor comes in, will

say, for example, as a hypothetical that they're looking for

fraud related to death records.  The auditor is given access to

an anonymized tranche of let's say 100,000 records.  If that

auditor reviewing anonymized data identifies a subset, let's

say 500 records, that they think are potentially related to

death record fraud, at that point they would explain their need

to know to the inspector general and other leadership in SSA,

and then they would be granted more specific information.

    As Your Honor discussed, defendants' alleged needs to know

are cursory at best, and even if they weren't, they are wholly

untethered to the scope of access they are seeking.  President

1    Trump certainly has the authority to direct fraud

2    investigations at the Social Security Administration and other

3    agencies for that matter, but that doesn't mean that DOGE

4    employees suddenly are able to access, again, hundreds of

5    millions of pieces of personally identifiable information.

6         I hope that sort of running through the facts again can

7    elucidate this point.  We're not talking about redactions.  SSA

8    systems are complex data systems as has been, I think, detailed

9    extensively today, and they allow auditors, DOGE personnel,

10   whoever it may be -- again, with a need to know -- to access

11   different data in a number of different ways.  So, again, as a

12   hypothetical, someone might go in and say let's use even very

13   specific demographic data and say, "I want to look at white

14   women in Austin, Texas who have been reimbursed for knee

15   replacement surgery."  They can do that and they can do it

16   without accessing the unanonymized data.  This isn't just a

17   matter of whether or not there's a name attached to something.

18   There's a name, a date of birth, there's a personal address.

19   And all of that comprehensively is the most sensitive

20   information out there about a person.

21        So it may be that in certain circumstances, a DOGE

22   individual would need to access a very, very, very small number

23   of personalized data entries.  We are so far from that

24   situation that I don't think it even has explanatory value

25   here.

```
1        What they are saying -- and, again, Your Honor addressed
2   that -- is that because they have alleged an extremely broad
3   need to know, that suddenly their personnel can access every
4   piece of information the agency has about Americans and others
5   who are entitled to its benefits --
6           THE COURT:  Are there any cases that you have found
7   that address this?  Because I have not found any.
8           MS. SWIFT:  Your Honor, your colleague, I believe it
9   was Judge Boardman, it may have been Judge Vargas, addressed
10  just this point.
11          THE COURT:  The point that there isn't anything
12  really discussing it.
13          MS. SWIFT:  That there is nothing discussing facts
14  analogous to this and that's because it has never happened
15  before.  It is so contrary to law, to the decades of protection
16  that Congress, the courts, and the agencies have used to
17  sequester this data, that we've just never seen anything like
18  it.
19       I do think -- I know you did this before so feel free to
20  point me in a direction that's more useful to you -- but
21  defendants directed the Court to the routine use exception,
22  which is a separate exception, again, from need to know under
23  the Privacy Act, as one of the enumerated exceptions that are
24  relevant here allegedly.  Our understanding is that the routine
25  use exception has two components, as Your Honor inquired about.
```

1    One is that a use of a record has to be for a purpose

2    compatible with the purpose for which it was collected.

3         The second is the routine use identified in the SORN.  For

4    every system of record that defendants allege they are entitled

5    to access, the routine use detailed in the SORN -- I do think

6    it's helpful here to read if the Court would indulge me --

7              THE COURT:  Sure.

8              MS. SWIFT:  Is that, again, for a purpose which is

9    compatible with the purpose for which it was collected allows

10   "student volunteers, individuals working under a personal

11   services contract, and other workers who technically do not

12   have the status of federal employees, when they are performing

13   work for the Social Security Administration, as authorized by

14   law, and they need access to personally identifiable

15   information and SSA records in order to perform their assigned

16   Agency functions."

17        I think it strains credulity, frankly, to argue that the

18   unfettered access that defendants think DOGE personnel is

19   entitled to have here is akin to a student volunteer who may

20   have a need to access, for example, anonymized data sets to

21   assist in a retrogressive research analysis.

22             THE COURT:  So the statute says "have a need for the

23   record in the performance of their duties."  And the judges who

24   have previously considered similar issues with other agencies,

25   as I understand it, there doesn't seem to be any case law that

1   anybody has brought to my attention to interpret that.

2          MS. SWIFT:  I could only direct Your Honor to the

3   most recent case law from the past couple weeks.

4          THE COURT:  Saying there isn't any.

5          MS. SWIFT:  Correct.

6          THE COURT:  So need, of course, in the basically

7   principles of statutory construction, we would say we give it

8   its plain meaning.  If there's a broad scope, at least I've

9   understood this was brought about by the Executive Order

10  creating the DOGE structure, and it says the purpose is to

11  "modernize federal technology and software to maximize

12  governmental efficiency and productivity."  That's Section 1.

13      Does that mean in order to be conduct pursuant to this

14  Executive Order, it has to be limited to trying to modernize

15  technology, and fraud investigation would be totally unrelated

16  to the purpose of DOGE?

17         MS. SWIFT:  There are a couple of different sections

18  of the Executive Order, of course.  But --

19         THE COURT:  That's the first one that says what the

20  purpose is.

21         MS. SWIFT:  Correct, Your Honor.  It does say that

22  they should -- I'm reading from the last part of that

23  provision -- "work with agency heads to promote

24  interoperability between agency network and systems, ensure

25  data integrity, and facilitate data collection."

1      My understanding is that defendants hang their hat on

2   "ensure data integrity" which I do think is attenuated from

3   modernizing federal technology.  But if we take them at their

4   word, it still certainly doesn't --

5           THE COURT:  And which section is that?

6           MS. SWIFT:  That's Section 4, Your Honor.

7           THE COURT:  So that's under the heading modernizing

8   federal technology and software to maximize efficiency and

9   productivity.

10          MS. SWIFT:  Correct, Your Honor.

11          THE COURT:  As I construed that, it's part of

12  software modernization, not fraud investigation.

13          MS. SWIFT:  That is plaintiffs' understanding as

14  well.

15          THE COURT:  It does say ensure data integrity, but

16  what I took that to mean in the context of this provision and

17  facilitate responsible data collection and synchronization,

18  that it had to do with making sure the data was protected.

19          MS. SWIFT:  I agree.

20          THE COURT:  I raise that because I'm trying to

21  understand how need -- I understood this Executive Order to be

22  the origin of the placement of these DOGE-related people at the

23  agency who then undertook this pursuit of access to the

24  millions of pieces of data, but it doesn't sound like -- that

25  it had -- what I think even the Government has said is it's

 1    part of a fraud investigation.  What Mr. Musk has said, that

 2    he's sure that the agency is paying 150-year-old dead people.

 3        I mean, that's in the news.  That's why I brought up -- he

 4    is a named defendant.  You don't make much of anything about

 5    Mr. Musk other than naming him, but there are news articles

 6    attributing to him the fact that his concern about Social

 7    Security, among other things, is that he's positive the agency

 8    is paying dead people.

 9        Ms. Flick, I think, refutes that.  Maybe there are people

10    who are dead whose families are getting checks.  I've had a few

11    prosecutions over the years, not many, but a few.

12            MS. SWIFT:  There are always outliers, Your Honor.

13            THE COURT:  Well, I don't know what to make of that.

14    I was thinking about that because that just means they find the

15    fraud.  I mean, they may not find all the fraud, but they don't

16    overlook it when we've had prosecutions of people who were

17    collecting Social Security benefits to which they were not

18    entitled.  I haven't had one in a while but I have had them.

19            MS. SWIFT:  Certainly.  And I think that is

20    illuminative of what's going on here --

21            THE COURT:  They weren't 150 years old, but what

22    happened is somebody in the family died and the people were

23    still getting the checks, and Social Security somehow didn't

24    know the person had died and the family member was happily

25    cashing the checks until, lo and behold, it was discovered and

1    then they were prosecuted.

2            MS. SWIFT:  Exactly.  In that circumstance, I'm glad

3    to hear it wasn't someone who was 357 years old which I think

4    has also been erroneously reported; it is exactly what's

5    supposed to happen which is that SSA complies with the law,

6    protects all of this data exactly the way it is supposed to.

7    Within the bounds of that law, it detects fraud.  There was

8    actually a fulsome report from the inspector general's office

9    last year detailing this issue and the very small amount of

10   fraud that it found.  But it's in the agency's interest to

11   detect that fraud and it does so.  It just is very easy for it

12   to do it without trampling on the privacy rights of hundreds of

13   millions of Americans.

14           THE COURT:  Well, I was just trying to understand,

15   looking at the Executive Order and what it says is the purpose

16   of creating DOGE and what the Government has said is the reason

17   that this DOGE team was seeking access to all the records, how

18   is that -- on the issue of need, how does it comport with this

19   Executive Order's mandate?  Which seem much more to be about

20   modernization.

21           MS. SWIFT:  I don't think it does, Your Honor.

22           THE COURT:  So I guess that brings me back to the

23   issue of need because if the government's argument -- and this,

24   of course, I'll be delighted to hear from the government again

25   on this point.  But if the issue is that these employees, to go

1    for a moment with the way the government characterizes the

2    individuals, had a need for it in light of this Executive

3    Order, the Executive Order doesn't really speak to this issue

4    which just makes me more confused.

5            MS. SWIFT:  I share the Court's confusion and I would

6    respectfully suggest -- and I don't want to lean too heavily on

7    evidence that is not in the record -- but Defendant Musk has

8    been widely quoted as saying that he wants to take a wood

9    chipper to the federal government.

10           THE COURT:  He wants to what?

11           MS. SWIFT:  Take a wood chipper to the federal

12   government.  I think that this is the Executive Order that they

13   are using as the umbrella for that.  That is certainly not a

14   need to know within the scope of the Privacy Act.

15           THE COURT:  Okay.  I'm trying to make sure I asked

16   you everything I wanted to cover.  I think the standing is

17   definitely a serious issue.  Tell me about irreparable harm.

18           MS. SWIFT:  Of course, Your Honor.  In this circuit,

19   to show irreparable harm, a party has to clearly show that it's

20   suffering actual imminent harm that can't be fully rectified by

21   a final judgment after trial.  That is, of course, in some ways

22   distinct from the irreparable harm standard in the D.C. Circuit

23   which precluded some of these claims in a recent case.

24       I'd submit that plaintiffs have, in fact, met that burden

25   and they've met it well.  We'll take, for example, intrusion

1   upon seclusion, although I'd certainly be happy to discuss our

2   other claims -- I'm sorry, not intrusion upon seclusion but the

3   Privacy Act.

4        As I believe Your Honor noted in *Havemann*, there is an

5   obvious privacy interest in the type of data that SSA contains,

6   and the unauthorized disclosure of that is, at the time it

7   happens, an injury.

8             THE COURT:  I'm sorry to interrupt, but I did want to

9   follow up with that point.  In the case of *Garey v. Farrin*

10  which Judge Motz authored for the Fourth Circuit, that's the

11  case you'll recall where the defendants were lawyers who were

12  sued for obtaining car accident reports and then those reports

13  contained personally identifiable information, and they used

14  them to disseminate solicitations, including to some of the

15  plaintiffs.  There's more than one analysis in the case of

16  different issues, so I'm only speaking on a limited basis.

17       The lawyers for the plaintiff basically narrowed their

18  claim to unlawful obtaining of the information.  And that was

19  fatal really for standing because Judge Motz said they didn't

20  complain about using.  They talked about obtaining.  To quote

21  her, it was a fait accompli.  So at that point, that would be

22  enough, she said, for retrospective monetary relief, but it

23  wouldn't establish an ongoing or imminent injury because it had

24  already happened.

25       So is that our situation here?  These disclosures took

1    place, it's too late.

2         MS. SWIFT:  Absolutely not, Your Honor.  Every day

3    that DOGE personnel retain unauthorized, unlawful access to

4    plaintiffs' information, it perpetuates the privacy harm that

5    plaintiffs' members experience, and it increases again the

6    nonspeculative risk of identity theft, and I'll put aside for

7    now disruption in benefits.

8       That is especially true because, as the record indicates,

9    defendants continue to act with what I suppose I describe as a

10   chaotic purpose and so, sure, they might come into court

11   tomorrow and say that the three people who are nonemployees are

12   no longer given access to the data.  But there's no reason to

13   think there wouldn't be three new nonemployees.  And access, of

14   course, I think is disclosure but I want to be clear,

15   incorporates a lot of different types of activity.  And the

16   situation that Ms. Flick described in her declaration, I think,

17   is helpful for the Court.

18        THE COURT:  I will say -- and I know somebody is here

19   for Social Security -- whether or not the right to access the

20   material is lawful is one thing.  Even if it is, what you're

21   saying is disturbing because it's a very -- it reflects -- if

22   anybody looks at the information before they were vetted or

23   trained or detailed, the devil is in the details.  We are

24   supposed to follow the rules.  And to be that cavalier with the

25   information of other people that's inherently private and let

1   anyone look at it before the I's were dotted and T's are

2   crossed, it's a separate legal issue.  It's not even the issue

3   before me perhaps, but what you're raising is extremely

4   worrisome and surprising, that an agency steeped in a history

5   of exercising extreme care with this kind of information would

6   bend the rules and let anybody look before they were qualified

7   to see what it is they were looking at.

8       So I don't understand how that happened under any

9   circumstance.  It's not necessarily the issue before me, but

10  it's there and it's very troubling, and I think that message

11  needs to go somewhere, back to Social Security.

12      Because I could rule that there's no irreparable harm, I

13  could rule there's no standing, but I still will be very

14  troubled by what looks really sloppy to me, letting people have

15  access whose detail assignments haven't been completed or

16  haven't had their background checks completed; what's the

17  excuse for that?  Or the justification.

18          MS. SWIFT:  I agree.

19          THE COURT:  I guess I have to ask the government to

20  answer that one.

21          MS. SWIFT:  Sure --

22          THE COURT:  But you were touching on it and it

23  basically has been gnawing at me.

24          MS. SWIFT:  It's been gnawing at me as well, Your

25  Honor.  I don't want to get off field, I know you'd like to

1   move through issues sequentially, but I think that your comment

2   reflects why plaintiffs' members are also bringing an arbitrary

3   and capricious claim.

4        Again, the injury here, just to backtrack for a moment, is

5   not that one nonemployee looked at the data.  The injury that

6   causes the ongoing irreparable harm is defendants' decision to

7   adopt a policy of allowing access to this data when that's not

8   authorized by law.  That decision is impacting and injuring

9   plaintiffs' members every day that it is allowed to stand.

10       Obviously we have a great deal of faith in our arguments

11   under the Privacy Act, the Tax Reform Act, et cetera, but I

12   don't want to sit down without bringing in our claim that this

13   is arbitrary and capricious behavior.

14            THE COURT:  So what you're saying is what I was

15   referencing would at least flow under the umbrella of arbitrary

16   and capricious.

17            MS. SWIFT:  Absolutely, Your Honor.

18            THE COURT:  A complete disregard of what the

19   requirements are.

20            MS. SWIFT:  Absolutely.  As we made clear in our

21   briefings -- and it sounds like you're familiar with our

22   declaration so I won't belabor that with cites -- but

23   plaintiffs' members and Americans generally have long-standing

24   reliance interests related to how SSA protects their data.

25   Defendants didn't acknowledge those.

1    Defendants also didn't announce that they were making a

2    policy change, whether it be a SORN or elsewhere.  And they

3    didn't even attempt to explain the rationale for that change.

4        So with respect to the Privacy and Tax Reform Act, I think

5    that irreparable harm is clear, but even putting all of that

6    aside, this is the definition of arbitrary and capricious

7    behavior and it should be enjoined.

8                THE COURT:  Okay, thank you.

9                MS. SWIFT:  Thank you, Your Honor.

10               THE COURT:  A little unorthodox because it's your

11   motion, you usually would have rebuttal and there may be an

12   opportunity for that, but I owe the government another

13   chance.

14               MS. SWIFT:  Of course.  And we would certainly value

15   the opportunity in the future if it makes sense for the

16   Court.

17               THE COURT:  Thank you.

18               MR. HUMPHREYS:  Thank you very much, Your Honor.  I

19   do have a few points I want to cover.

20               THE COURT:  Sure.

21               MR. HUMPHREYS:  At the start, I think there may be

22   some misconception about how limited access to this data may

23   be.  It's not just the 30 or 40 people in the declaration,

24   although we mention in the declaration, that's true.  But all

25   claims adjudicators and auditors have access to this data the

1    same way that these employees do.

2              THE COURT:  Let's stop there for a minute.  You're

3    saying claims adjudicators and auditors.  By claims

4    adjudicators, what do you mean?

5              MR. HUMPHREYS:  Employees of the agency of which

6    there are many -- I don't have a number but I think a lot --

7    who work in the business of reviewing materials provided by

8    applicants for benefits, look at those benefits --

9              THE COURT:  I don't know how you can talk about that

10   in the same breath.  That's like one person at a time.  Someone

11   who makes a claim and then you're going to review it, and you

12   need the information.  It doesn't have to do with millions of

13   Americans and their records.

14             MR. HUMPHREYS:  My understanding is those individuals

15   do have the ability to submit queries across the database.  It

16   is the same access to the same files.  Obviously, they're not

17   going to do that --

18             THE COURT:  That sounds ludicrous, to be honest.

19   They only have a right to seek information they need and they

20   don't need -- if you apply for a claim, they don't need my

21   information.  So that doesn't make any sense if we're talking

22   about a claim.

23        Auditors, I don't know what they're auditing.  There's all

24   kinds of audits.

25             MR. HUMPHREYS:  There are all kinds of audits, Your

1    Honor.

2           THE COURT:  Can you tell me?  It's not in Mr. Russo's

3    affidavit that this -- you tried to paint a picture that this

4    isn't uncommon, and you said there were maybe 40 people out of

5    the 57,000 employees of the Social Security Administration who

6    have access to all this material.  That's not a very big

7    percentage.

8           MR. HUMPHREYS:  I would note that that is limited to

9    only the Office of the Financial Bureau; I may have that office

10   name incorrect.  But that's one office.  There are many more

11   people who have access to these same systems, including

12   auditors.  And the same rationale or need would apply here,

13   just as in a real sense, the ten employees we're talking about

14   are auditing data.  The same need applies to them.  If you

15   don't think there would be a need in that sense, I think it

16   would require the court to provide a searching inquiry of each

17   auditor who gets access to new systems.

18       I think that goes to final agency action.  But really what

19   the analysis plaintiffs are asking the Court to do is to become

20   the chief information officer for federal agencies.  Plaintiffs

21   say that there is no announcement of a policy or rule making.

22   That's because there was no policy.  This happens in the

23   ordinary course when a new person gets access to systems,

24   happens all the time and there would be no policy description

25   of that.

1      On compatibility --

2              THE COURT:  What part do you think happens all the

3      time?  I must have missed that.

4              MR. HUMPHREYS:  Employees at an agency getting access

5      to a new system within their agency.  Email system, or here a

6      data system of which many people have access.  That is not a

7      final agency action as contemplated by the APA --

8              THE COURT:  Let me ask you this.  I've been trying to

9      sort of reflect on what would be a final agency action and

10     understanding what the plaintiff position is.  The way

11     Ms. Flick lays out events that took place before she resigned

12     after the termination of the Acting Commissioner Michelle King,

13     who was replaced by Mr. Dudek who is a GS-15 employee, as I

14     understand it.  The way I understood it is that what led to

15     that actually was -- these may not be the best descriptors --

16     but essentially a clash over who -- really sounded like it

17     started with Mr. Bobba and giving him access to information

18     that he wasn't authorized to receive.  And there was a lot of

19     pressure placed on giving him access and he was from the DOGE

20     team and things escalated, and Ms. King -- I don't know, of

21     course I wasn't there; I'm only going by what Ms. Flick either

22     said or implied.

23         But it appeared that there was push-back and ultimately

24     the naysayer was kicked out, and then the information was

25     provided.  That's a decision, isn't it?

1      MR. HUMPHREYS:  No, Your Honor -- it's a decision but

2  I don't think it's a decision that is agency action for the

3  purposes of the APA.

4      THE COURT:  What would it be?

5      MR. HUMPHREYS:  A workaday decision about whether or

6  not an individual employee gets access to a system.  I mean

7  that --

8      THE COURT:  But it isn't just any employee.  It's an

9  employee who was imported from DOGE which is new and who didn't

10 yet have -- meet the criteria for access, so a decision is made

11 to allow access.  Isn't that a decision that would qualify then

12 as a final agency action, letting someone look at information

13 when arguably he didn't fit the criteria of eligibility?

14     MR. HUMPHREYS:  No, Your Honor, for a couple of

15 reasons.  First, I would direct the Court to the decision in

16 *Norton v. SUWA* by the Supreme Court which cautioned courts not

17 to get into the sort of administerial running of day-to-day

18 activities of an agency which I think is exactly what this is.

19 It was in the news where there was disagreement, maybe even

20 strong disagreement within the agency -- I don't know

21 personally -- but that doesn't turn it into an APA claim.  The

22 APA is designed to provide programmatic review.

23    If, again, a theme here is if plaintiffs are ever injured

24 and their data is actually disclosed, they would not have the

25 final agency action limitation on the jurisdiction of this

1    court.  They could bring in a claim under the Privacy Act and

2    seek monetary damages, another reason why there's no

3    irreparable harm here.  The APA provides certain limitations

4    that only final agency action may be reviewed, and these sort

5    of email access --

6              THE COURT:  It's sort of a sea change in policy,

7    wasn't it?  If up until then the policy had been that you can't

8    see or gain access to this kind of information unless you met

9    certain criteria, you had to be trained, had to sign those

10   documents, the sanctions document was one of them.  He hadn't

11   even signed that document yet, right?

12             MR. HUMPHREYS:  I don't recall specifically, but I

13   think it goes to the point of for plaintiffs to prevail on

14   their burden of having a temporary injunction here, they have

15   to meet all of the various factors under --

16             THE COURT:  I'm back to -- I'm a little slow, sorry.

17   I'm on the final agency action question.

18             MR. HUMPHREYS:  You're quicker than I am, Judge.

19             THE COURT:  If you are saying that's not a final

20   agency action, I was trying to ask you why it isn't if it's a

21   change in the way the agency had been operating.  Where

22   previously you wouldn't be allowed to see this material until

23   you had signed -- and I can't remember, but I think he had, I

24   think Ms. Flick said he hadn't signed that document yet, that

25   sanctioned document and -- I could be wrong about that.  I can

1   look at the affidavit.  But that's one thing, he hadn't had the

2   training.  And he hadn't -- I'm not even sure the detailing had

3   taken place.

4        If all of that were true and they make a decision to let

5   someone see something that no one else has been able to see

6   until those details were met, isn't that a decision?  And in

7   this case, not only is it a decision -- and I'm playing devil's

8   advocate -- but isn't it a decision of incredible consequence?

9   Because that decision allowed someone access, unfettered access

10  to an enormous, massive quantity of records -- I think

11  everybody agrees these qualify as records -- belonging to

12  millions of Americans.  So how would that not qualify as a

13  final agency action?

14             MR. HUMPHREYS:  The policy is that employees need to

15  be trained.  Need to be trained, need to sign the appropriate

16  paperwork.  I don't know that -- if there was or wasn't, but

17  let's assume for the sake of argument that the paperwork was

18  not inked beforehand.  That would be potentially an error on

19  the part of or something that may need to be corrected, but

20  that is not really within even the zone of interest of, you

21  know, that plaintiffs are able to bring in court.  There's no

22  policy change.

23        And I think it also goes to what would the injunction look

24  like here, Your Honor?  That if someone missed signing the

25  paperwork, which I think is probably unfortunately more common

1    than you might think, particularly in a transition period when

2    a lot of new personnel are coming on.  But let's say the

3    paperwork wasn't signed -- that's unfortunate -- the injunction

4    would only be, I think, sign the paperwork before you proceed

5    with access which is otherwise authorized by the Privacy Act.

6         On the compatibility argument, Your Honor, that

7    compatibility requirement applies across the agency.  That

8    would mean that if the Court found that the records were

9    incompatible with looking for waste or fraud, et cetera, then

10   that would also apply to auditors.  That would have a huge

11   impact on the agency's ability to conduct its day-to-day

12   business.

13        I think for need, there are few cases on this because it's

14   not a proper APA challenge, as we've been discussing.  These

15   cases addressed an issue where there was a disclosure of a

16   single record, and then you can look:  Did someone improperly

17   go and look for whether or not another employee's divorce

18   details or something untoward, and that's how the need comes up

19   in the case law.  We just don't have cases on this because

20   courts have not conducted a searching inquiry --

21        THE COURT:  Another reason could be there's been

22   nothing like this before.

23        MR. HUMPHREYS:  I think what the "this" is that an

24   agency is giving its own employees access to data systems which

25   is authorized by the Privacy Act.  So it's not --

1          THE COURT:  That's sort of circular and begs the

2    question because it's only authorized if there's a need.  And

3    what is the need?  And does the need have to tie in with the

4    Executive Order?  And where in the Executive Order does it

5    contemplate this?  Because I read the Executive Order to be

6    about modernization and updating and integrity of systems, but

7    you said this was about fraud investigation.

8          MR. HUMPHREYS:  Well, first, (b)(1) is very broad,

9    need to know in the performance of duties.  So you look at what

10   is the person doing.  The people here are being supervised

11   within the agency, by the agency head.  So there is independent

12   authority to direct these ten people as they're detailed -- as

13   they are organic employees of the Social Security

14   Administration or detailed there from another agency, they are

15   under the control of SSA.  So if they have a need based on what

16   the Social Security Administration directs them to do, that is

17   sufficient for the purposes of (b)(1).  You don't need an

18   executive order that says you have to do this thing, you have

19   to establish the need.  The agency itself can provide the

20   need --

21         THE COURT:  Right, but I guess I'm trying to

22   understand what the need is and you told me it was to conduct

23   an investigation into fraud.  I thought they only were assigned

24   there in the first place because of the creation of DOGE and

25   they were part of the DOGE team; the Executive Order

1   contemplates at least four people in different roles going to

2   an agency.  And then the Executive Order speaks of

3   modernization of software and technology and all of that, data

4   integrity.  So if that was the reason the team is assigned

5   there, I thought.

6           MR. HUMPHREYS:  Well, the team does, as you point

7   out -- the Executive Order, as you point out, establishes the

8   DOGE teams, but those teams are within the agencies and under

9   the supervision of the agency's leadership like the acting

10  commissioner and Mr. Russo.  Their -- it's not like they have,

11  the only things they can do at their job are things that are

12  specifically, you know, outlined in the Executive Order.  That

13  would be unworkable.  It would be sort of an intrusion into how

14  agencies direct their own employees.  I don't think that's --

15  there can't be a need for a presidential executive order to

16  direct exactly what each agency employee is able or able not to

17  do.

18          THE COURT:  I guess one question I have, though, is I

19  don't see anywhere where the government has explained the need

20  for all of those records.  I'm still struggling to understand

21  what the answer is to that question.  It is broad maybe just

22  like you said and there's -- the agency has prerogative to set

23  its needs, but what are the needs?  Nobody has told me.

24          MR. HUMPHREYS:  I've tried to, Your Honor.  I

25  apologize if it hasn't been clear.  The purpose is to look for

1    and root out --

2              THE COURT:  I understand that but what does that have

3    to do with these records?  What is it in these records that

4    will answer those questions?  Isn't that really what is at the

5    heart of this?  Why does the DOGE team need millions of pieces

6    of data belonging to scores and scores and scores of Americans,

7    information that is inherently private?

8              MR. HUMPHREYS:  Just as in the case you discussed,

9    Your Honor, with a false claim for benefits, if you wanted to

10   decide whether or not that was improper or not, you would want

11   to look at the records to see if the payment was properly made

12   or if it was fraudulent.  In order to evaluate claims of fraud,

13   you have to be able to look at the underlying materials.

14             THE COURT:  Well, why not just get claims requests?

15             MR. HUMPHREYS:  I don't know why that limitation

16   should be imposed.

17             THE COURT:  Because the whole point is you're not

18   supposed to get more than you need.

19             MR. HUMPHREYS:  I think that -- again, (b)(1) is very

20   broad and need in the performance of duties.  I think it is for

21   the executive branch agencies who are directing these employees

22   to figure out what their duties are and what their need is.

23             THE COURT:  And they never have to tell anybody.

24             MR. HUMPHREYS:  Well, there are other reasons why --

25             THE COURT:  I mean, an objection was lodged

1    essentially through this case, and there's never been an

2    explanation really offered, certainly not by anyone at the

3    agency, explaining the need to do this job, you have to look at

4    the Numident files, for example.  Nobody has readily made that

5    clear.  What's in those files besides Social Security numbers?

6    I don't know, what is that for?

7              MR. HUMPHREYS:  I think Numident is the database that

8    links up Social Security numbers with individual

9    beneficiaries --

10             THE COURT:  People.

11             MR. HUMPHREYS:  That's right, Your Honor.  Just in

12   the same way the agency is not required to provide a public

13   release when it gives a new political appointee access to a

14   system whose job it is to properly oversee the agency.  The

15   agency didn't do so here because it's not a final agency

16   action.  It doesn't require rule making.  To get final agency

17   action -- again, it doesn't create rights, the activity here,

18   the granting of access to a particular system, doesn't

19   implicate the rights of any plaintiff.  It just is an

20   administerial access decision within the -- to the department's

21   own files.

22             THE COURT:  So Ms. Flick asserts that Mr. Bobba, I

23   think it is, was taking the material back to -- was working

24   offsite.  While everybody was being told they had to come to

25   work at the office, he was being allowed to work somewhere

1   else.  And she makes that assertion, but her point in that

2   assertion was that this is very confidential information and it

3   wasn't being handled properly.  Is that a concern?

4           MR. HUMPHREYS:  I mean --

5           THE COURT:  In other words, the need is -- to the

6   arbitrary and capricious point, I think, is why that allegation

7   is probably there.  But the way in which the information was

8   provided.

9           MR. HUMPHREYS:  A couple of responses.  First I don't

10  have any reason to believe that that was, in fact, true.  My

11  understanding is that SSA does restrict -- it certainly imposes

12  the same Privacy Act for training, Privacy Act trainings and

13  security requirements on the ten employees here as it does for

14  other employees.  My understanding is that they were required

15  to work on site.  I think though I would say it is also

16  inherently a risk any time data access is given to any system,

17  that there could potentially be carelessness or misuse.  It's

18  impossible to root out but --

19          THE COURT:  Especially if you haven't been trained.

20          MR. HUMPHREYS:  That's fair, Your Honor, and SSA has

21  trained these individuals.

22          THE COURT:  Okay.  What else did you want to tell me?

23          MR. HUMPHREYS:  I touched on it very briefly but

24  there's no irreparable harm here because plaintiffs could seek

25  money damages if, in fact, there is ever an actual disclosure

1  that's unlawful or if they suffer any harm and under the case

2  that you mentioned, *Garey,* that's an independent basis for

3  there being no irreparable harm.

4       SSA is following the rules.  It is only giving access to

5  its employees we think were authorized to do so under

6  552a(b)(1) or, alternatively, 552a(b)(3).  It's plaintiffs'

7  burden here, Your Honor, and we would respectfully ask that the

8  Court deny the motion.

9            THE COURT:  Thank you.

10           MR. HUMPHREYS:  Thank you.

11           THE COURT:  Anything pressing for you, Ms. Swift,

12  that you need to respond to?

13           MS. SWIFT:  I would like to make a few quick

14  points.

15           THE COURT:  Okay.

16           MS. SWIFT:  First, Your Honor, I would like to keep

17  my commitment and specify some citations that you asked for

18  that I didn't have at hand before.

19           THE COURT:  Okay.

20           MS. SWIFT:  The first is for the Economy Act

21  provision specifying that you can't detail employees from a

22  nonagency.  That is 31 U.S.C. 1535.

23           THE COURT:  Okay.

24           MS. SWIFT:  The second is with respect to *O'Leary,* I

25  think I did have the page number wrong.  The pages that I would

1    point the Court to there are 245 and 246.  I think 246 perhaps

2    is the most helpful to the Court.  When discussing why they

3    didn't find intrusion upon seclusion there, what the Court

4    actually found is that he hadn't adequately pled that.  The

5    Court specified that he pleaded that he chose to hand over his

6    partial Social Security number in exchange for getting

7    information from the defendant.

8         With respect to --

9         THE COURT:  I don't know, I think the case says what

10   it says.  It does make it sound like intrusion upon seclusion

11   means somehow is associated with one's home.  I'm not sure that

12   that's -- I answer to higher courts and that's the Fourth

13   Circuit.  But -- and I think there are other examples in the

14   restatement that support what you say, but that is what *O'Leary*

15   says.  It may be that that's the context, it wasn't necessary

16   to look beyond that in that particular case.

17        MS. SWIFT:  I think that's right, Your Honor.

18   *O'Leary* is fact dependent but specific to what he did allege,

19   there's also some other procedural anomalies.  He's the one who

20   asked the Court to look into standing, et cetera.

21        I do actually want to reference the Restatement quickly

22   because I think it directly links the harm to irreparable

23   injury and defendants' arguments on that point.  As the Court

24   said in *Neal*, an invasion of privacy is one of the core factors

25   for the intrusion upon seclusion tort.  The Restatement gives

1   as an example somebody's wallet or bank account information.

2   It cannot be that if I were to walk up to my colleague and take

3   her wallet that there was nothing that the Court could do about

4   it as long as I kept her wallet with me.

5        Yes, there was an injury when I took her wallet.  There's

6   also an injury every day that I have unchecked access to her

7   credit card information and Social Security card and personal

8   address.  So, yes, there is an immediate injury.  It's

9   irreparable but it's ongoing.

10       Hundreds and millions of records of pieces of data are at

11  issue in this case.  It's possible that some of plaintiffs'

12  members' data hasn't yet been seen but that doesn't make it

13  speculative.  Defendants have the records.  They are going

14  through the records, and they're doing that without any

15  oversight and unchecked by law.  So I think we have ongoing

16  and -- ongoing risk of irreparable injury, and I wouldn't

17  characterize it as risk; I would characterize it as a

18  likelihood.

19       Just a few other quick points for the Court, if I may.

20  Defendants suggest that the compatibility provision in the

21  Privacy Act doesn't limit interagency disclosure.  It certainly

22  does.  The Privacy Act says to any person, and it is not the

23  case that everyone at the Social Security Administration has

24  access to all data at the Social Security Administration.

25  Defendants' arguments otherwise are belied by their own

1    evidence.  Not every claims administrator has unfettered access

2    to every piece of information about the American public.  As

3    defendant Russo himself stated in the submission to the Court,

4    that number is about 30 to 40 out of 52,000.

5        So this is not a workaday decision about a employee.  It's

6    a decision about the SSA defendants giving and allowing access

7    to EDW and the other systems of records that SSA maintains to

8    unauthorized DOGE employees who do not have a need to know that

9    information.

10            THE COURT:  So let's see if I can interrupt for a

11    minute.  You say they're unauthorized.  I think the government

12    has established from its perspective that they're not

13    unauthorized, that they work for -- they've been assigned, if

14    you will, to SSA.  So let's leave unauthorized out.  What if

15    they're authorized?

16            MS. SWIFT:  Even if they're authorized by virtue of

17    their assignment to SSA, plaintiffs maintain that they are not

18    authorized because they haven't been fully trained.  Yes,

19    defendants are correct that they signed some forms, and it

20    appears from the declarations attended perhaps two Teams

21    meetings about privacy and information security.  Ms. Flick's

22    declaration makes clear that while those are the baseline

23    training requirements for SSA employees, there are many complex

24    subcomponent trainings required before an employee can be

25    granted access to SSA data systems.  Those usually take months.

1      It is impossible that they have happened so far and

2   defendants don't allege that it has.  Regardless --

3           THE COURT:  So let's say the decision from SSA

4   allowing access to records to unauthorized -- you said DOGE

5   employees I think?

6           MS. SWIFT:  I did.

7           THE COURT:  And then what?  If they're SSA employees,

8   how does it change?

9           MS. SWIFT:  If they're SSA employees, it's still

10  clear that they don't have a need to know, and that is at the

11  core of this inquiry.  And I think it's why I find

12  defendants' suggestions that this is just workaday decisions

13  about employee access --

14          THE COURT:  So let me ask you this.

15          MS. SWIFT:  Please.

16          THE COURT:  You say no need to know, and the

17  government says it's not for you to say whether they have a

18  need to know; that's the agency's prerogative to decide what

19  its employees need to know.  What's wrong with that?  That

20  that's getting into the weeds of agency management which is not

21  something I'm supposed to do or you're supposed to do.

22          MS. SWIFT:  Nor do I want to, Your Honor.

23  Defendants' proposition for how this Court should approach the

24  need to know standard would obliviate the standard.  It cannot

25  be that Congress, reacting to the privacy violations of the

1    Nixon Administration, enacted a law that said:  Federal

2    agencies, we require you to give us one sentence explaining

3    your need to know and then the Privacy Act doesn't apply.

4         Need to know, I think, probably -- I think there is room

5    for more exploration of that which is why I would request that

6    Your Honor grant a TRO at this point and not a preliminary

7    injunction.  But, again, it hasn't been fully briefed in the

8    courts because nobody has ever tried to do this before, and I

9    think if we do look at the plain meaning of the statute and

10   principles of statutory construction, it's clear that not only

11   does need to know be tethered in some basis to fact but also

12   that it pertains to the scope of access and disclosure that the

13   individuals are allowed to obtain.

14        Here there is no relationship.  I don't want to burden the

15   Court with taking more of your time but, again, as the Court

16   and defendants have acknowledged, investigating fraud is

17   routine at the Social Security Administration.  There are, in

18   fact, hundreds of fraud investigators.  To my knowledge, none

19   of them have unfettered access to personally identifiable

20   information about anyone who has ever gotten a Social Security

21   number or received benefits through SSA.

22        At the end of the day, plaintiffs are indeed requesting

23   that the Court revert us back and preserve the status quo.

24             THE COURT:  Can I ask you this?  Is there any record

25   that system, or whatever phraseology would best describe it, at

1    Social Security Administration that they don't have access to?

2    You-all have somewhat described the various records, the EDW,

3    the Numident, et cetera.  Is there anything else in their

4    wheelhouse that isn't included?

5              MS. SWIFT:  I think -- one moment, Your Honor, I

6    apologize.

7              THE COURT:  I'm sure if they want it, they'd get it,

8    but that isn't really what I'm asking.

9              MS. SWIFT:  As a preliminary matter, I would be more

10   than happy to walk through the different systems of record at

11   issue in this case.  My understanding is that defendants --

12   both DOGE personnel at defendants' election do have access to

13   all of those data systems.  I'd point the Court specifically to

14   the Enterprise Data Warehouse which is a mirror or a repository

15   of all of the other information in SSA's systems of record.

16             THE COURT:  That's what it sounded like but I wasn't

17   really sure.  That it's the umbrella and everything else falls

18   under it?  Is that not right?

19             MS. SWIFT:  My understanding, Your Honor -- and I

20   admit that more clarity on this point would be helpful which is

21   perhaps something that we could accomplish through discovery,

22   but my understanding is that there are four systems of record

23   at the Social Security Administration.  There's the Numident

24   Master File which I should point out does far more than link

25   names to Social Security information.  There's the Master

1  Beneficiary Record and that includes, among other things,

2  financial data like routing numbers.  There is the SSI record

3  and Special Veterans Benefits system of record.  That is the

4  record system -- the system of records in which health data is

5  contained.

6      I'm happy to speak more on that, but I would just direct

7  the Court to the declaration of Ann Widger.  I unfortunately

8  don't have the exhibit in front of me, but we submitted it with

9  our motion and cite it therein --

10          THE COURT:  I'm familiar with it.

11          MS. SWIFT:  -- detailing the kind of health

12  information that is housed in that system of record.

13          THE COURT:  She doesn't work for the Social Security

14  Administration.

15          MS. SWIFT:  She does not, Your Honor.

16          THE COURT:  That's why it's kind of hard to know what

17  would she know.

18          MS. SWIFT:  Well, I would direct the Court in that

19  case, one, to Ms. Flick's declarations and, two, to again our

20  firm belief that discovery is needed in this case.

21      The fourth system of record at issue is the SS Online

22  Counting and Reporting System.

23          THE COURT:  Say that one more time.

24          MS. SWIFT:  SS Online Counting and Reporting System.

25  Those are the four systems of record at issue in this case.

1    THE COURT:  My question was, are there any others

2    that they don't have?  Is that everything?

3    MS. SWIFT:  My understanding is that there are others

4    than those four but, again, not just those four, but all of the

5    systems of record feed into the Enterprise Data Warehouse.  So

6    because defendants have unfettered access to the Enterprise

7    Data Warehouse, they have access not just to the four

8    delineated in the papers but also to all data SSA maintains.

9    THE COURT:  So essentially everything.

10   MS. SWIFT:  Correct.

11   Again, Your Honor, I don't want to take up too much of the

12   Court's time.  I would just note that contrary to

13   defendants' assertions to the Court today, Section (b)(1) of

14   the Privacy Act is not broad.  That is why only 30 to 40

15   employees out of the 52,000 at the Social Security

16   Administration have access which, again, is not something that

17   we hear just from Ms. Flick but from defendants themselves.

18   Defendants don't offer a cite for that because it's not the

19   case.

20   The Privacy Act was part of a robust system of statutes

21   passed by Congress to ensure protection of just this type of

22   data.  It's not broad, it's very specific.  It requires very

23   specific disclosures and type relationships between need to

24   know, reason for use, and scope of access.

25   And I'd be remiss before I sit down if I just didn't again

1    note that while we are confident that our claims -- that we're

2    likely to succeed on the merits of our claims under the

3    statutes that we cite, that this is, in fact, the definition of

4    arbitrary and capricious behavior, and there is no other

5    alternative for plaintiffs than for the Court to enjoin that.

6         Again, the Privacy Act is not designed for this, and given

7    what defendants have disclosed publicly and the opacity of the

8    information that they are sharing with this Court, I'll refer

9    again to the nameless employees identified in their

10   declarations.  It would be nigh impossible for the millions of

11   Americans impacted by this disclosure to learn about it, pursue

12   it within the agency, and then pursue it in court.  Nor, I

13   would humbly suggest, would that be in service of judicial

14   efficiency.  This is not the kind of personalized,

15   individualized harm covered by the Privacy Act's individual

16   rights of action, and that is why Judge Boardman and others

17   have found that injunctive relieve should be granted under the

18   APA.

19             THE COURT:  Okay, thank you.

20             MS. SWIFT:  Thank you, Your Honor.

21             THE COURT:  Are you itching to say something?

22             MR. HUMPHREYS:  I'm itching to say a few things, Your

23   Honor.  I appreciate your patience.

24        Just a couple of points.  I wanted to address your factual

25   question about the systems of records, the different systems.

1  The Social Security Administration has a lot of different

2  systems and different SORNs.  The ten individuals here do not

3  have access to all of them although these are the major ones

4  that include beneficiary data.

5          THE COURT:  These are the major ones, and would you

6  agree that the Enterprise Data Warehouse is a repository for

7  basically everything?

8          MR. HUMPHREYS:  No, I wouldn't agree with that, Your

9  Honor.  I believe it's a clearing warehouse system that does

10  give access to other systems so, in effect, that may be true

11  that if you have access to EDW, you can access the other

12  systems but not as a technical matter.

13          THE COURT:  Not --

14          MR. HUMPHREYS:  Not as a technical matter that EDW

15  contains.

16          THE COURT:  I'm not sure I understood what you just

17  said because you just said it could.

18          MR. HUMPHREYS:  I'm not sure that I understand

19  technically, Your Honor.

20          THE COURT:  It sounded like you were saying it does

21  enable you to look at other systems.

22          MR. HUMPHREYS:  Sorry, yes, Your Honor.  I think if

23  you do have access through EDW, then you can get access through

24  other systems.

25          THE COURT:  So -- well, would you agree this is very

1    broad access?

2           MR. HUMPHREYS:  I would agree that the employees at

3    the agency have access to a lot of personal data.  Now, of

4    course, they can't transmit that data publicly.  This is not a

5    FOIA case.  There are restrictions in place.  They can only

6    disclose that data pursuant to the Privacy Act but, yes, the

7    data systems they've been given access to do have a lot of

8    personal data.

9           I would point out, Your Honor, plaintiffs have mentioned a

10   couple of times about the need for discovery.  We don't think

11   discovery is appropriate here.  Plaintiffs have decided to

12   pursue their claims through the APA.  We don't think they

13   allege a viable APA claim but having chosen that, the Court

14   should limit any merits review if it can get past standing and

15   final agency action to the agency's administrative record.

16          I'd also note, Your Honor, that a colleague very recently

17   in this district -- colleague of yours, not mine -- denied a

18   motion for expedited discovery in Mayor and City Council in

19   Baltimore.  I think that came out today, that was Judge Maddox.

20   We'd point the Court to that decision.

21          THE COURT:  Judge Maddox you said?

22          MR. HUMPHREYS:  I believe so, yes.

23          THE COURT:  Isn't that a Consumer Financial

24   Protection Bureau case.

25          MR. HUMPHREYS:  You're aware, Your Honor.  There are

1    different facts but --

2              THE COURT:  Totally.  I didn't know his opinion came

3    out.

4              MR. HUMPHREYS:  That's correct, Your Honor.  But on

5    the need --

6              THE COURT:  If you want to cite recent opinions, you

7    can tell me about Judge Bredar's which also came out, I think

8    last night.

9              MR. HUMPHREYS:  I'm not aware of that one, Your

10   Honor.

11             THE COURT:  Well, it was a nationwide injunction

12   requiring the government to restore -- I may be

13   mischaracterizing it, I did read it very quickly this

14   morning -- restore the probationary employees across the board

15   who were terminated or RIF'd.

16             MR. HUMPHREYS:  I did read about that decision.

17   Thank you, Your Honor.

18        I wanted to address plaintiffs' point about not being a

19   good use of judicial resources.  If there were actual

20   disclosures for people who were harmed by the misuse of data

21   and they had Article III standing, it's not like they'd have to

22   each file suit.  There could be a class action, and that would

23   be the better course of action as opposed to APA which doesn't

24   provide review in these --

25             THE COURT:  I guess, just to come full circle because

1    we sort of touched on this a while back -- and I know it's

2    getting late.  But you make this point that the disclosures

3    were not disseminated so anyone who received the information,

4    they were authorized is your argument, and they were designated

5    to the agency and were in need of it.  I assume it's -- there's

6    room for discussion on that point, but just for the sake of the

7    issue of the disclosure itself, I think what you're saying is

8    that you couldn't be harmed anyway unless they disseminated.

9    And my question to you was coming back to something I asked

10   earlier.

11        When it comes to information of this type, if it was

12   improperly disclosed even within the agency but not

13   disseminated, you make it sound like that's okay because it was

14   all within the agency.  And my concern is that sometimes there

15   are categories of information that the mere disclosure that was

16   improper is unlawful because -- or certainly troubling.

17   Because -- I said this earlier so I'm sorry if I'm repeating

18   myself but it's in response to what you just said.  There are

19   things that people experience that they have to disclose to

20   pursue their benefits, let's say, but they don't expect anybody

21   to know about it except people who have to know.

22        And so if you're the person who's got HIV or you're the

23   person who had some kind of serious psychiatric disorder, or

24   you previously suffered from addiction of some sort that led to

25   having filed a claim, whatever it might be, some kind of

1  medical condition that is really embarrassing or not even

2  embarrassing but just maybe it's a stigma, maybe it's just so

3  painful for you as an individual, you don't have to tell people

4  and you don't want anyone to know.

5      And what troubles me about your argument is that you

6  think, it seems, that "It's okay, too bad.  We say all of this

7  is private, but we don't really mean it because if you work for

8  the agency, you can find out and that's okay."

9              MR. HUMPHREYS:  Well, I disagree with that

10  characterization, Your Honor.

11              THE COURT:  Okay.

12              MR. HUMPHREYS:  We take the privacy very seriously

13  and have only given access to authorized employees and subject

14  to restrictions.

15              THE COURT:  But who's not authorized?

16              MR. HUMPHREYS:  Well --

17              THE COURT:  If you work there, it sounds like you're

18  authorized.

19              MR. HUMPHREYS:  There still has to be a specific need

20  for the information and our position --

21              THE COURT:  We've come full circle with that.

22              MR. HUMPHREYS:  We sure have.  You're right, Your

23  Honor.

24      I would point out at the last -- I think we're getting

25  some criticism from plaintiffs about redacting the names of the

1    employees, at least that's what I'm hearing.  Those individuals

2    have been subject to harassment and sometimes physical threat,

3    and I think there is some tension in this case --

4                THE COURT:  I think I raised it.  I just pointed out

5    that it was an anomaly here because in all the other cases,

6    everybody's names were mentioned.

7                MR. HUMPHREYS:  Well, either way, the reason we did

8    that was to protect their privacy, Your Honor.

9                THE COURT:  That was obvious.  I understood that.

10               MR. HUMPHREYS:  Thank you, Your Honor.

11               THE COURT:  I just made the point that's interesting,

12   isn't it, they're very concerned about the privacy.

13               MR. HUMPHREYS:  We are, Your Honor.

14               THE COURT:  It was hard to let that one go, sorry.

15               MR. HUMPHREYS:  Thank you, Your Honor.  Anything else

16   for me?

17               THE COURT:  No.

18               MR. HUMPHREYS:  Thank you.

19               THE COURT:  I don't have a timeline.  I know it's a

20   rush, but -- this isn't a criticism of plaintiffs, but the

21   motion was filed a week ago, about 10:30 at night on a Friday,

22   and actually I did see it come in.  But I was pretty much

23   hamstrung until Monday and we got right on it, so we had issues

24   and set it to give you time to brief it as quickly as I could.

25   I'm sure I'll be here all weekend, but I don't have a timetable

1    on an answer.  I think you've done -- both sides have made some

2    very cogent points, so obviously I have a lot to consider.  So

3    I'll do the best I can as quickly as I can, but I'm not

4    promising when that will be.

5         I only was saying indirectly that I'm not saying it isn't

6    an emergency and a lot changed between your first lawsuit and

7    your amended lawsuit, but you took two weeks so I might too.

8    We'll see.

9         Anyway, anything else, Counsel?

10             MS. SWIFT:  No, Your Honor.

11             MR. HUMPHREYS:  Not from the government, Your

12   Honor.

13             THE COURT:  We'll stand in recess.  Thank you.

14             THE CLERK:  All rise.  This Honorable Court is now

15   adjourned for the day.

16        (Proceedings concluded at 3:49 p.m.)

17

18                CERTIFICATE OF OFFICIAL REPORTER

19        I, Patricia G. Mitchell, Registered Merit Reporter,
     Certified Realtime Reporter, in and for the United States
20   District Court for the District of Maryland, do hereby certify,
     pursuant to 28 U.S.C. § 753, that the foregoing is a true and
21   correct transcript of the stenographically-reported proceedings
     held in the above-entitled matter and the transcript page
22   format is in conformance with the regulations of the Judicial
     Conference of the United States.
23        Dated this 17th day of March 2025.

24   _____
            *Patricia G. Mitchell*
25        Patricia G. Mitchell, RMR, CRR
             Federal Official Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERTION OF
STATE, COUNTY AND
MUNICIPAL EMPLOYEES, AFL-
CIO, *et al.*

    *Plaintiffs*,

    v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*

    *Defendants*.

Civil Action No. ELH-25-0596

**TEMPORARY RESTRAINING ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is this 20th day of

March 2025, at ___2:12___ p.m. by the United States District Court for the District of Maryland,

**ORDERED**:

1. Plaintiffs' Motion for Temporary Restraining Order ("TRO," ECF 21) is **GRANTED**.

    a. Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the United States
Social Security Administration ("SSA"), Leland Dudek, and Michael Russo
(collectively, "SSA Defendants"), and any and all of their agents and employees,
and any person working in concert with them, directly or indirectly, are
**ENJOINED** and **RESTRAINED** from granting access to any SSA system of
record containing personally identifiable information ("PII"), as defined in
paragraph 10 hereof, or PII obtained, derived, copied, or exposed from any SSA
system of record, including, but not limited to, records known as the Enterprise
Data Warehouse ("EDW"), Numident, Master Beneficiary Record ("MBR"), and
Supplemental Security Record ("SSR"), to the Department of Government

1

Efficiency ("DOGE"); the United States DOGE Service; the United States DOGE Service Temporary Organization; members of the DOGE Team established at the Social Security Administration, as defined in ¶ 10(a); Elon Musk; Amy Gleason; and/or any DOGE Affiliate, as defined in ¶ 10(b);

b.  U.S. DOGE Service, U.S. DOGE Service Temporary Organization, Elon Musk, and Amy Gleason (collectively, "DOGE Defendants"), as well as all SSA DOGE Team members and DOGE Affiliates, shall disgorge and delete all non-anonymized PII data in their possession or under their control, provided from or obtained, directly or indirectly, from any SSA system of record to which they have or have had access, directly or indirectly, since January 20, 2025;

c.  All DOGE Defendants, as well as all SSA DOGE Team members and DOGE Affiliates, are **ENJOINED** and **RESTRAINED** from installing any software on SSA devices, information systems, or systems of record, and shall remove any software that they previously installed since January 20, 2025, or which has been installed on their behalf;

d.  All DOGE Defendants, as well as all SSA DOGE Team members and DOGE Affiliates, are **ENJOINED** and **RESTRAINED** from accessing, altering, or disclosing any SSA computer or software code.

2.  This Order does not preclude SSA from providing members of the DOGE Team with access to redacted or anonymized data and records of SSA. However, no data shall be provided unless and until the persons to whom access is to be provided have received all training that is typically required of individuals granted access to SSA data systems, including training regarding federal laws, regulations, and policies governing the privacy

2

of PII; a background investigation is completed, comparable to the quality of background investigation conducted for SSA employees whose duties involve access to PII; detailing agreements are completed for any individual who is assigned to the DOGE Team from another agency; and all required Agency paperwork is completed, including execution of the SSA documents acknowledging the Systems Sanctions Policy and the duty to protect PII.

3. SSA may provide members of the DOGE Team with access to discrete, particularized, and non-anonymized data, in accordance with the Privacy Act, and in accordance with the conditions set forth herein: SSA must first comply with the provisions in ¶ 2 of this Order and, in addition, SSA must first obtain from the DOGE Team member, in writing, and subject to possible review by the Court, a detailed explanation as to the need for the record and why, for said particular and discrete record, an anonymized or redacted record is not suitable for the specified use. The general and conclusory explanation that the information is needed to search for fraud or waste is not sufficient to establish need.

4. On or before March 24, 2025, at 1:00 p.m. EDT, the SSA Defendants **SHALL FILE** a Status Report documenting the actions that they have taken to comply with this Order, and certifying the following:

   a. That no DOGE Defendant, DOGE Team member, or DOGE Affiliate shall be provided with access to any SSA systems, whether or not anonymized, unless and until these persons have been provided with all training that is typically required of individuals granted access to the SSA data systems, including training regarding federal laws, regulations, and policies governing the privacy of personally identifiable information;

3

    b. That no DOGE Defendant, DOGE Team member, or DOGE Affiliate shall have access to any SSA system of records, whether or not anonymized, unless and until a background investigation is completed, comparable to the quality of investigation for SSA employees whose duties involve access to PII, and that all required Agency paperwork is completed, including execution of the SSA documents acknowledging the Systems Sanctions Policy and the duty to protect PII;

    c. As to individuals detailed to SSA from another agency, only DOGE Team members whose detail agreements are complete shall have access to any SSA records;

    d. An explanation of why each DOGE Defendant, DOGE Team member, and/or DOGE Affiliate is in need of non-anonymized access to the PII in each SSA data system to which access is sought.

5. The Court may require further Status Reports, which may, in turn, require the SSA Defendants and the DOGE Defendants to provide further detail as to their compliance activities. The Court may also enter further orders as necessary to ensure compliance with this Order.

6. This Order applies to SSA at every and any place where record systems are located, maintained, accessed, or available.

7. Pursuant to Fed. R. Civ. P. 65(c), each plaintiff organization **SHALL POST BOND** with the Clerk of the Court in the sum of $250, for a total of $750, due by 12:00 p.m. EDT on March 24, 2025.

8. Unless the Court orders otherwise, pursuant to a motion for extension, this Order **SHALL EXPIRE** fourteen (14) days after entry. *See* Rule 65(b)(2).

4

9. The parties shall meet and confer to discuss a schedule for any request for limited discovery, and a briefing schedule for a preliminary injunction motion, if necessary, and shall file a joint status report on these matters by 5:00 p.m. on March 27, 2025.

10. For purposes of this Order, the following definitions apply:

    a. The Court has not been provided with the names of the people who are assigned to SSA to implement the DOGE agenda. Because the number of people and the people themselves may change, the definition of the term is fluid. But, as used herein, the term "DOGE Team" refers to any person assigned to SSA to fulfill the DOGE agenda, including Executive Order 14,158.

    b. "DOGE Affiliate" shall mean any employee, agent, officer, contractor, special government employee, or consultant employed by or affiliated in any way with the Department of Government Efficiency, the United States DOGE Service, the United States DOGE Service Temporary Organization, members of the DOGE Team established at the Social Security Administration; any SSA employee, contractor, special government employee, or consultant working on or implementing the DOGE agenda; anyone who has been granted access by SSA to SSA records for the purpose of implementing the DOGE agenda with respect to SSA; and any persons working, directly or indirectly, in concert with any of the above individuals;

    c. "Personally identifiable information" or "PII" shall mean "information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual," and shall include, *inter alia*, Social Security numbers; medical records; mental health

records; medical provider information; medical and mental health treatment records; employer and employee payment records; employee earnings; addresses; bank records; tax information.

Ellen L. Hollander

Ellen Lipton Hollander
United States District Judge

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| AMERICAN FEDERTION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.* | |
| *Plaintiffs*, | |
| v. | Civil Action No. ELH-25-0596 |
| SOCIAL SECURITY ADMINISTRATION, *et al.* | |
| *Defendants*. | |

**MEMORANDUM OPINION**

# Table of Contents[*]

I.   **Introduction** ............................................................................................. 1

II.  **Summary** ................................................................................................... 2

III. **Background** ............................................................................................. 11

    A.  The Parties ........................................................................................... 11

        1.  Plaintiffs ....................................................................................... 11

        2.  Defendants ................................................................................... 12

    B.  Post-Election Period ............................................................................ 16

    C.  Post-Inauguration Period .................................................................... 17

        1.  Executive Order 14,158 ............................................................... 17

        2.  Executive Order 14,210 ............................................................... 19

        3.  SSA in the Crosshairs .................................................................. 20

    D.  Exhibits to the Motion ........................................................................ 23

        1.  Plaintiffs ....................................................................................... 24

        2.  Defendants ................................................................................... 43

IV.  **Overview of the Statutory Framework** .............................................. 44

    A.  Administrative Procedure Act ............................................................. 44

    B.  Privacy Act .......................................................................................... 45

    C.  Internal Revenue Code ........................................................................ 50

    D.  Federal Information Security Modernization Act ................................ 50

V.   **Standing** .................................................................................................. 51

    A.  Legal Standard ..................................................................................... 51

    B.  The Contentions ................................................................................... 60

    C.  Analysis ................................................................................................ 65

        1.  Interruption of Benefits ............................................................... 65

        2.  Identity Theft ............................................................................... 65

        3.  Intrusion Upon Seclusion ............................................................ 67

        4.  Other Elements of Associational Standing .................................. 85

VI.  **APA Claims** ............................................................................................ 88

---

[*] Because the Memorandum Opinion has not yet been docketed, the Court cites to the numbers that appear on the pages of the Memorandum Opinion, rather than the electronic pagination.

i

A. Judicial Review of APA Claims ............................................................ 89

B. Final Agency Action ........................................................................... 91

C. The Contentions ................................................................................ 94

D. Analysis ............................................................................................. 96

E. No Other Adequate Remedy ............................................................ 101

VII. **Temporary Restraining Order** ...................................................... 103

A. Likelihood of Success on the Merits ................................................ 107

1. Privacy Act ................................................................................. 107

a. Zone of Interests ................................................................... 107

b. Access to SSA Records ......................................................... 108

c. DOGE is an Agency .............................................................. 109

d. Authorization ....................................................................... 111

e. Need ..................................................................................... 116

f. Routine Use .......................................................................... 123

2. Arbitrary and Capricious ........................................................... 125

B. Irreparable Harm ............................................................................ 126

C. Balance of the Equities and the Public Interest ............................... 130

VIII. **Conclusion** ............................................................................... 132

IX. **Bond** ............................................................................................ 133

## I.    Introduction

This case is one of dozens of lawsuits filed since the inauguration of President Donald J. Trump on January 20, 2025, challenging a wide swath of executive orders as well as the implementation of them.  In particular, this case concerns the decision of the Social Security Administration ("SSA" or the "Agency") to provide ten anonymous individuals affiliated with the Department of Government Efficiency ("DOGE") with unfettered access to the SSA records of millions of Americans.

"[W]e've just never seen anything like it," proclaimed plaintiffs' counsel at a motion hearing held on March 14, 2025.  ECF 45 (Tr., March 14, 2025), at 64.[1]  Defense counsel acknowledged at the hearing that SSA has, indeed, provided DOGE affiliates with access to a "massive amount" of records.  *Id.* at 17.  But, counsel claimed that such access is needed so that DOGE personnel can search for "improper or fraudulent payments" made by SSA.  *Id.* at 22.

Ironically, the identity of these DOGE affiliates has been concealed because defendants are concerned that the disclosure of even their names would expose them to harassment and thus invade their privacy.  The defense does not appear to share a privacy concern for the millions of Americans whose SSA records were made available to the DOGE affiliates, without their consent, and which contain sensitive, confidential, and personally identifiable information ("PII").  As used here, "'Personally identifiable information' means information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual."  Office of Mgmt. & Budget, Exec. Office of the President,

---

[1]  With the exception of the Table of Contents, the Court cites to the electronic pagination.  However, the electronic pagination does not always correspond to the page number imprinted on a particular submission.

1

OMB Circular A-130, *Managing Information as a Strategic Resource* (2016), https://perma.cc/L3CV-M6RF.

In particular, the information in SSA's records includes Social Security numbers, personal medical and mental health records, driver's license information, bank account data, tax information, earnings history, birth and marriage records, home and work addresses, school records, immigration and/or naturalization records, health care providers' contact information, family court records, and employment and employer records.

## II.  Summary

Plaintiffs, two national labor and membership associations and one grassroots advocacy organization, filed suit against the Social Security Administration and three other defendants on February 21, 2025, challenging the legality of SSA's decision to provide unlimited access to an enormous quantity of sensitive, personal, protected, and confidential information pertaining to millions of Americans.  ECF 1.[2]  On March 7, 2025, plaintiffs filed a "First Amended Complaint For Declaratory and Injunctive Relief," ECF 17 ("Amended Complaint"), which substantially

---

[2] Several cases have been filed throughout the country asserting similar allegations with respect to disclosures of confidential information by other federal agencies.  *See, e.g., American Federation of Teachers, at al., v. Bessent, et al.*, 25-DLB-0430, 2025 WL 582063 (D. Md. Feb. 24, 2025) (granting TRO against U.S. Department of Education, and Denise L. Carter, Acting Secretary of Education, as well as against the Office of Personnel Management and its Acting Director, Charles Ezell); *Electronic Privacy Information Center, et al., v. U.S. Office of Personal Management, et al.*, 25-RDA-255, 2025 WL 580596 (E.D. Va. Feb. 21, 2025) (denying preliminary injunction because plaintiffs failed to show irreparable harm); *New York, et al. v. Trump, et al.*, 25-JAV-1144, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) (granting preliminary injunction against U.S. Department of the Treasury and Scott Bessent, the Secretary of the Treasury); *New Mexico, et al., v. Musk, et al.*, 25-TSC-429, 2025 WL 520583 (D.D.C. Feb. 18, 2025) (denying TRO because plaintiffs did not show irreparable harm); *Univ. of California Student Ass'n v. Carter*, 25-RDM-354, __ F. Supp. 3d __, 2025 WL 542586 (D.D.C. Feb. 17, 2025) (denying TRO because plaintiffs did not show irreparable harm); *Am. Fed'n of Lab. & Cong. of Indus. Organizations, et al. v. Dep't of Lab., et al.*, 25-JDB-0339, 2025 WL 542825, at *5 (D.D.C. Feb. 14, 2025) (denying TRO because plaintiffs did not show that they were highly likely to succeed on the merits).

2

revised the lawsuit and added three defendants. As discussed, *infra*, on the same date, plaintiffs also filed a motion for a temporary restraining order. ECF 21.

The plaintiffs are the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"); Alliance for Retired Americans ("ARA" or "Alliance"); and American Federation of Teachers ("AFT"). They have sued the Social Security Administration; Leland Dudek, in his official capacity as "purported Acting Commissioner" of the SSA; Michael Russo, in his official capacity as Chief Information Officer ("CIO") of the Agency; Elon Musk, in his official capacity as "Senior Advisor to the President and de facto head of" the Department of Government Efficiency; the "U.S. DOGE Service"; the U.S. DOGE Service Temporary Organization; and Amy Gleason, in her official capacity as the DOGE Acting Administrator.

I shall refer to the SSA, Dudek, and Russo collectively as the "SSA Defendants." I shall refer to the Department of Government Efficiency as "DOGE" and U.S. DOGE Service as "USDS." USDS; U.S. DOGE Service Temporary Organization; Musk; and Gleason shall be collectively referenced as the "DOGE Defendants." And, for convenience, I shall sometimes refer to all of the defendants collectively as the "government." The anonymous individuals associated with DOGE, to whom SSA has granted access to its records, shall be referred to as the "DOGE Team."

Plaintiffs allege that the SSA "has abandoned its commitment to maintaining the privacy of personal data" provided to the Agency by millions of Americans and has unlawfully "opened its data systems to unauthorized personnel from [DOGE] in violation of applicable laws and with disregard fo[r] the privacy interest of the millions of Americans that SSA serves." ECF 17, ¶ 2. They also maintain that the "White House" has demonstrated "a breathtaking disregard for the legal protections Congress and the Executive Branch implemented to protect data belonging to or

3

pertaining to individual Americans." *Id.* ¶ 12. And, they assert that it is unprecedented for "a group of unelected, unappointed, and unvetted individuals," described variously as White House employees, employees of agencies, and advisors, to gain access to such sensitive information. *Id.* ¶ 10. Similarly, referring to defendant Musk, they assert: "Never before has an industry mogul with countless conflicts of interest—not to mention an undefined role in the administration— sought and gained access to protected, private data on nearly every person in the country." *Id.* ¶ 11.

According to plaintiffs, defendants have "ransacked" the SSA, "installing DOGE associates without proper vetting or training . . . and demanding access to some of the agency's most sensitive data systems." *Id.* ¶ 83. This data includes, among other things, "Social Security numbers, employment and wage information, medical histories, tax return information, and personal addresses . . . ." *Id.* ¶ 1; *see also id.* ¶ 35. Thus, the suit "seeks to protect Plaintiffs and their members against the ongoing (and ever increasing) harm caused by DOGE and certain SSA executives' unlawful seizure of personal, private, and sensitive data from SSA systems." *Id.* ¶ 13.[3]

The Amended Complaint contains seven counts. Counts I, III, IV, and V allege unlawful and arbitrary and capricious Agency action, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

Count I alleges that the SSA Defendants have unlawfully disclosed and continue to disclose "personal records contained in systems of records under their control," without consent of plaintiffs' members, in violation of the Privacy Act, 5 U.S.C. § 552a, and § 706(2) of the APA. ECF 17, ¶ 101. Count I also alleges that the SSA Defendants "entered inter-agency data sharing

---

[3] Subject matter jurisdiction is founded on 28 U.S.C. § 1331 because this action arises under federal law. ECF 17, ¶ 14.

agreements without abiding [by] the process prescribed by law, 5 U.S.C. § 552a(o)." *Id.* ¶ 102. According to plaintiffs, this conduct constitutes final agency action under 5 U.S.C. § 704. *Id.* ¶ 103. And, plaintiffs allege that the SSA Defendants "have thereby engaged in conduct that is contrary to law, in excess of statutory authority, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2). *Id.* ¶ 104.

In Count II, plaintiffs allege that the SSA Defendants have violated the Privacy Act, 5 U.S.C. § 552a(o), by the same actions identified in Count I. *Id.* ¶ 108–09. Accordingly, plaintiffs allege that they are entitled to civil remedies under 5 U.S.C. § 552a(g). *Id.* ¶ 110.

Count III alleges that the SSA Defendants "unlawfully permitted DOGE Defendants to access and inspect tax return information protected by the Internal Revenue Code, 26 U.S.C. §§ 6103, 7213A, and the Social Security Act, 42 U.S.C. § 1306." *Id.* ¶ 114. According to plaintiffs, this conduct constitutes final agency action under 5 U.S.C. § 704. Therefore, under 5 U.S.C. § 706(2), plaintiffs allege that defendants have "engaged in conduct that is contrary to law, in excess of statutory authority, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Id.* ¶¶ 115, 116.

Count IV alleges that the SSA Defendants "have administered systems containing vast quantities of sensitive personal information without complying with statutorily required security protections" under the Federal Information Security Modernization Act ("FISMA"), 44 U.S.C. §§ 3554(a)(1)–(2), and thus they assert a violation of the APA, 5 U.S.C. § 706(2). *Id.* ¶ 118. Plaintiffs assert that this conduct constitutes a final agency action under 5 U.S.C. § 704 and is arbitrary and capricious under 5 U.S.C. § 706(2).

Count V alleges: "SSA Defendants have disclosed an unfathomable amount of sensitive, personally identifying information about the American public without acknowledging that SSA

5

was changing its policies, identifying the source of its authority to do so, or providing any analysis whatsoever of why its decision is not arbitrary and capricious, and without considering the consequences, including the reliance interests of Plaintiffs and their members," in violation of 5 U.S.C. § 706(2). *Id.* ¶ 122.

In Count VI, plaintiffs allege *ultra vires* actions by the DOGE Defendants. They assert that, "[i]n directing and controlling the use and administration of Defendant SSA's systems, the DOGE Defendants have breached secure government systems and caused the unlawful disclosure of the personal data of tens of millions of people." *Id.* ¶ 126. And, according to plaintiffs, this constitutes "*ultra vires* actions that injure Plaintiffs by exposing their sensitive, private, and personally identifiable information and increasing the risk of further disclosure of their information." *Id.* ¶ 129.

Count VII asserts that the naming of Leland Dudek as the Acting Commissioner of SSA constitutes a violation of the Appointments Clause of the Constitution, U.S. CONST. art. II, § 2, cl. 2. Specifically, plaintiffs assert that as "Acting Commissioner, Defendant Dudek is exercising significant authority and discretion. He therefore was purporting to act as an officer for purposes of the Appointments Clause." *Id.* ¶ 132. But, they observe that "Defendant Dudek was neither nominated by the President nor confirmed by the Senate. Nor has Congress enacted a law authorizing him to perform the functions and duties of the Commissioner without Senate confirmation." *Id.* ¶ 133. Therefore, plaintiffs posit that Dudek is acting in violation of 42 U.S.C. § 902, *id.* ¶ 134, and his "grant of initial and continued access to SSA systems is thus unlawful and must be invalidated." *Id.* ¶ 135.

At approximately 10:20 p.m. on Friday, March 7, 2025—two weeks after suit was initially filed—plaintiffs filed a "Motion For Temporary Restraining Order, Preliminary Injunction, and/or

5 U.S.C. § 705 stay." ECF 21. The motion is supported by a memorandum (ECF 21-1, collectively the "Motion") and numerous exhibits. *See* ECF 22. Plaintiffs seek a temporary restraining order ("TRO") that, among other things, does the following, ECF 21 at 1–2: (1) enjoins the DOGE Defendants from accessing, using, or disclosing tax "return information, personally identifiable information, or non-anonymized information" housed by the SSA; (2) directs the DOGE Defendants to "disgorge or delete all unlawfully obtained, disclosed, or accessed data"; (3) prohibits the DOGE Defendants from "installing any software on SSA devices" or "accessing, or disclosing any SSA computer or software code"; and (4) enjoins all defendants' "access, inspection, disclosure, or use of any SSA information system," or "data obtained therefrom," for any purpose other than those permitted by the Privacy Act and other applicable laws.

On Monday, March 10, 2025, the Court held a telephone scheduling conference with counsel, on the record. ECF 25. Pursuant to the Scheduling Order that followed (ECF 30), defendants filed an opposition to the Motion on March 12, 2025. ECF 36 ("Opposition"). The Opposition is supported by two exhibits. Plaintiffs replied on March 13, 2025. ECF 39 ("Reply). With the Reply, they submitted additional exhibits. Neither side has challenged the Court's consideration of any of the exhibits.[4]

The Court held a Motion hearing on March 14, 2025, at which argument was presented. ECF 43. I briefly summarize each side's arguments, focusing on the points of contention that are pertinent to resolution of the Motion.

Plaintiffs contend that they have standing to pursue their claims. ECF 39 at 6. They point to "three concrete, particularized, and actual or imminent injuries" suffered by their members: "(1)

---

[4] In the Motion, the parties never address the Appointments Clause claim in Count VII. Therefore, I shall not do so here.

an invasion of privacy akin to intrusion upon seclusion, (2) exposure to an increased and non-speculative risk of identity theft, and (3) an increased likelihood of disruption in benefit payments." *Id.* at 7. These harms, plaintiffs say, are far more than a "'bare statutory violation'" of the Privacy Act. *Id.* at 8 (citation omitted). And, plaintiffs argue that participation of their individual members is not necessary to establish standing because they seek injunctive relief. *Id.* at 12.

Further, plaintiffs argue that the Court has authority to resolve their APA claims because plaintiffs "clearly challenge" a final agency action, identified as SSA's decision to open its "'data systems to unauthorized personnel'" from DOGE, "'in violation of applicable laws and with disregard for the privacy interests' of millions of Americans." *Id.* at 13 (citation omitted). According to plaintiffs, this constitutes an "agency action" because, *inter alia*, it is "'discrete' and 'circumscribed'", and "a far cry from the types of 'workaday' dealings at issue in the cases Defendants cite." *Id.* at 14 (citation omitted). And, plaintiffs posit that this agency action is "final" because the "'practical effect' of Defendants' decision to grant DOGE personnel access to SSA systems . . . is that unauthorized personnel can view, copy, and analyze extensive PII about Plaintiffs' members." *Id.* at 15. In turn, "[t]hat decision . . . 'determined' DOGE's rights to those data systems and 'determined' Plaintiffs' rights with respect to the privacy of its PII—both of which independently render the decision final agency action." *Id.*

Turning to the TRO elements, plaintiffs argue that they are likely to succeed on the merits of their claims, because defendants' actions "flout" the Privacy Act, the Social Security Act, the Tax Reform Act of 1976 (*i.e.*, the Internal Revenue Code), and SSA's own rules and regulations. ECF 21-1 at 24; *see also id.* at 22–26. In short, they argue that SSA granted DOGE affiliates "nearly unlimited access to systems of records containing sensitive personally identifiable information," without requesting or receiving the consent of plaintiffs' members. *Id.* at 23. And,

8

JA252

according to plaintiffs, the exception in the Privacy Act that permits disclosure of information to an agency's employees who "need" access to it does not apply here. ECF 39 at 18. As plaintiffs put it, *id.*: "Defendants' broad invocations of 'modernization' and 'detecting fraud, waste, and abuse' are simply insufficient to justify the unprecedented level of access provided here."

According to plaintiffs, their members are "irreparably harmed by DOGE's ongoing, illegal access to their sensitive information." ECF 21-1 at 29 (boldface omitted). They highlight that SSA databases contain "among the most sensitive personal data the government has," such as extensive medical information, and some of this information "concerning 'health conditions like HIV or STDs can result in stigma, social isolation, job loss, housing loss, and other harms.'" *Id.* at 29, 30 (citation omitted). In their view, this type of privacy violation "cannot be rectified by money damages down the road." *Id.* at 30. Plaintiffs also argue that their members are irreparably harmed "by the now-increased risk that their information is more easily accessible by bad actors." *Id.* at 31 (boldface omitted). The information that SSA maintains, plaintiffs say, has "'anything a scammer would want to know, to do just about anything a scammer would want to do.'" *Id.* (citation omitted). Finally, plaintiffs argue that the balance of the equities and public interest weigh in favor of issuing a TRO because "'there is a substantial public interest in having governmental agencies abide by the federal laws'" and the "government cannot suffer harm from [a TRO] that merely ends an unlawful action . . . ." *Id.* at 33 (citation omitted).

Defendants maintain that plaintiffs lack standing to pursue their claims. They argue, *inter alia*, that plaintiffs' members have not suffered a concrete injury in fact. ECF 36 at 11. In defendants' view, disclosure of information to government employees cannot qualify as an injury in fact, *id.* at 13, and the alleged increased risk of identity theft and disruption of Social Security payments are too speculative so as to be concrete for purposes of Article III of the Constitution.

Defendants also argue that participation of plaintiffs' individual members is necessary for Counts I and II, which implicate the Privacy Act, and therefore plaintiffs lack standing as to those claims. *Id.* at 14–15.

As to SSA, defendants contend that plaintiffs have failed to identify a final agency action, and therefore plaintiffs' claims are precluded under the APA. *Id.* at 16. In particular, defendants argue that "day-to-day" agency operations are not "agency action" within the meaning of the APA. *Id.* at 17, 19. And, in defendants' view, even if there was an "agency action" here, it is not a "final" one. *Id.* at 19. That is so, according to defendants, because plaintiffs' "identified actions are both tentative and interlocutory in nature"; "no new finalized policy has been implemented"; no existing policy has been "definitively changed"; and "the data access decision alleged has no 'direct and appreciable legal consequences'" for plaintiffs. *Id.* at 19, 20, 21. Further, defendants argued at the hearing that DOGE is not a government agency.

In addition, defendants contend that plaintiffs are not likely to succeed on the merits of their claims. *Id.* at 22. According to defendants, the Privacy Act "does not permit organizations to sue for injunctive relief over a decision to provide access to particular government employees." *Id.* at 23. Even if it did, defendants argue that there is no Privacy Act violation because the members of the DOGE Team working at SSA are employees of SSA, and they are in need of the data that was made accessible to them to perform their duties. *Id.* at 23–24. For similar reasons, defendants contend that there is no violation of the other statutes or regulations at issue. *See id.* at 26–28.

Moreover, defendants contend that plaintiffs cannot show irreparable harm. *Id.* at 31. They largely rehash the same arguments they raised with respect to standing, *i.e.*, that plaintiffs' alleged injuries are not concrete or are too speculative. *Id.* But, they also assert that there is no irreparable

harm because plaintiffs can pursue the recovery of monetary damages under the Privacy Act. *Id.* at 32. Finally, defendants argue that a TRO would "harm" the public interest because it would limit "the President's ability to effectuate the policy choices the American people elected him to pursue", including "identifying fraud, waste, and abuse throughout the federal government." *Id.* at 33.

For the reasons that follow, I shall grant the Motion. A TRO shall issue.

### III.    Background

### A. The Parties

### 1. Plaintiffs

AFSCME is a "national labor organization and unincorporated membership organization" headquartered in Washington, D.C. ECF 17, ¶ 16. According to the Amended Complaint, "AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils, and other affiliates in 46 states, the District of Columbia, and Puerto Rico." *Id.* Of AFSCME's members, "approximately 200,000 are retired public service workers who continue to remain members of AFSCME, participate in its governance, and advocate for fairness, equality, and income security for retired Americans." *Id.*

Alliance is a "grassroots advocacy organization with 4.4 million members headquartered in Washington, D.C." *Id.* ¶ 17. The ARA was founded by the AFL-CIO Executive Council in 2001 and has 40 state alliances, as well as members in every state. *Id.* The Alliance's retiree members include "former teachers, industrial workers, state and federal government workers, construction workers, and community leaders united in the belief that every American deserves a secure and dignified retirement after a lifetime of hard work." *Id.*

AFT is a "national labor organization headquartered in Washington, D.C." *Id.* ¶ 18.  It represents "over 1.8 million members who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals." *Id.*  According to the Amended Complaint, "[a]pproximately 490,000 of AFT's members are retired, and most benefit from programs administered by SSA." *Id.* Plaintiffs assert, *id.*: "Economic and retirement security is at the core of AFT's mission."

As I discuss in more detail, *infra*, each plaintiff has many members for whom SSA holds personal, sensitive information, such as Social Security Numbers ("SSN"), bank account numbers, medical and mental health information, tax information, and home addresses. *See, e.g.*, ECF 22-1 (Declaration of Ann Widger, Director of Retirees at AFSCME), ¶¶ 10–13; ECF 22-6 (Declaration of Richard J. Fiesta, Executive Director of Alliance), ¶ 9; ECF 22-8 (Declaration of Bernadette Aguirre, Director of the Retiree Division of AFT), ¶ 8.  And, members of each organization are concerned that DOGE's access to this information violates their privacy interests, increases their risk of identity theft, and increases the risk that the benefits to which they are entitled will be delayed or cut off.  *See* ECF 22-1, ¶¶ 16, 17, 27, 30, 32; ECF 22-6, ¶¶ 7, 12, 13; ECF 22-8, ¶¶ 12, 13, 15.

### 2.  Defendants

The Social Security Administration is an "independent federal agency," ECF 17, ¶ 19, founded in 1935, during the Great Depression.  *Id.* ¶ 28.  It was intended to "'give some measure of protection to the average citizen,' particularly those facing 'poverty-ridden old age.'"  *Id.* (quoting Soc. Sec. Admin., *Presidential Statement on Signing the Social Security Act* (August 14, 1935), https://perma.cc/7RDU-EDWD).

SSA is "the nation's principal benefit-paying agency," ECF 17, ¶ 28, and "manages and administers" several of "the largest federal benefit programs," including the Old-Age, Survivors, and Disability Insurance program ("OASDI") and the Supplemental Security Income program ("SSI"). *Id.* ¶¶ 19, 30. "Collectively, SSA pays over $1.5 trillion to seventy million people—more than one in five Americans—each year." *Id.* ¶ 32 (citing Soc. Sec. Admin., *Fact Sheet*, https://perma.cc/595S-B36F). SSA "has roughly 57,000" employees. ECF 39-1 (Supplemental Declaration of Tiffany Flick) ("Flick II Decl."), ¶ 7.

Most of Social Security's beneficiaries are retired. ECF 17, ¶ 31. But, "others receive benefits because they have a qualifying disability; are the spouse (or former spouse) or child of someone who receives or is eligible for Social Security; or are the spouse (or former spouse), child, or dependent parent of a deceased worker.[]" *Id.* (citing Soc. Sec. Admin., *Understanding the Benefits* (2025) 2, https://perma.cc/V2MH-VANX). The Agency "pays more benefits to children than any other federal program.[]" ECF 17, ¶ 31 (citing Soc. Sec. Admin., *Understanding the Benefits* (2025) 2, https://perma.cc/V2MH-VANX). The benefits SSA provides "lift 22 million people, including over 16 million adults aged sixty-five and over, out of poverty.[]" ECF 17, ¶ 32 (citing Kathleen Romig, *Social Security Lifts More People Above the Poverty Line Than Any Other Program*, Ctr. on Budget & Pol'y Priorities (Jan. 21, 2025), https://perma.cc/6U8X-7U9A).

In addition to dispersing funds to eligible beneficiaries, SSA issues Social Security Numbers to "U.S. citizens, permanent residents, and other eligible noncitizens." ECF 17, ¶ 29. To date, more than "450 million" SSNs have been issued. *Id.* SSA also "helps administer" federal programs, such as "Medicare, Medicaid, SNAP, eVerify, and the Help America Vote Act." *Id.* ¶ 33.

"To facilitate its work on behalf of the American public, SSA collects and houses some of the most sensitive, personally identifiable information (including personal health information) of

millions of seniors, working-age adults, and children." *Id.* ¶ 34. By way of example, Form SS-5, "which applicants must submit to SSA to receive a" SSN, "requires applicants to provide their name (including prior names or other names used), place and date of birth, citizenship, ethnicity, race, sex, phone number, and mailing address, as well as their parents' names and [SSNs]."

The Agency also collects a wide range of other personal information, including "driver's license and identification card information, bank and credit card information, birth and marriage certificates, pension information, home and work addresses, school records, immigration and/or naturalization records, health care providers' contact information, family court records, employment and employer records, psychological or psychiatric health records, hospitalization records, addiction treatment records, and tests for, or records about, HIV and AIDS." *Id.* ¶ 35.

Moreover, SSA collects tax and earnings information. *Id.* ¶ 36. In particular, employers submit to SSA a W-3 form each year that shows "total earnings, Social Security wages, Medicare wages, and withholdings for all employees for the previous year." *Id.*

Plaintiffs do not elaborate about required financial contributions paid to Social Security. But, the Court takes notice that retirement benefits are funded by the nation's workforce, through mandatory payment of payroll taxes by both employers and employees. At certain ages, individuals become eligible for retirement benefits, calculated based on work history and earnings. This means that SSA collects the work and earnings history of nearly all working Americans for the entirety of their working lives. *See*, *e.g.*, ECF 22-3 (Declaration of John Doe), ¶ 5 (stating that SSA has 65 years of his employment records); *see also* Social Security Administration, *Understanding the Benefits* (2025), https://www.ssa.gov/pubs/EN-05-10024.pdf.

The Agency is subject to a "panoply of laws" that govern and protect SSA's data systems and the disclosure of information held by SSA. ECF 17, ¶ 39. These include the Privacy Act, the

Social Security Act, the Tax Reform Act of 1976, the Taxpayer Browsing Protection Act, and FISMA. *Id.*

Leland Dudek is the "purported" Acting Commissioner of the SSA. *Id.* ¶ 20. He was selected by President Trump on or about February 16, 2025, after the resignation of Michelle King, then the Acting SSA Commissioner. ECF 1, ¶ 88.[5] Dudek approved the data access to the DOGE Team that is at issue here. *See* ECF 36-1 (Declaration of Russo), ¶ 6.

Michael Russo is the Chief Information Officer of the SSA. ECF 17, ¶ 21. He has served in this role since February 3, 2025. ECF 36-1 (Russo Declaration), ¶ 1. In this role, he is responsible for implementation and management of information technology, and he is "responsible for oversight of grants of permissions [sic] to access SSA systems." *Id.* ¶ 2.

Elon Musk is a "Senior Advisor to the President and the de facto Head of DOGE." ECF 17, ¶ 23. U.S. DOGE Service, previously the U.S. Digital Service,[6] was established by Executive Order 14,158 and renamed as the United States DOGE Service. *Id.* ¶ 24. USDS is part of the Executive Office of the President ("EOP"). *Id.* U.S. DOGE Service Temporary Organization is a "temporary organization also created by Executive Order 14,158 and headed by the U.S. DOGE Service Administrator." *Id.* ¶ 25.

---

[5] Dudek had previously been a GS-15 employee and a manager in SSA's Office of Program Integrity working on anti-fraud measures. ECF 1, ¶ 89. The SSA placed Dudek on administrative leave after "leadership received reports that Dudek had shared information with nonagency personnel as early as December 2024 and had reportedly pressured career staff to 'help DOGE representatives.'" *Id.* ¶ 90. Dudek reportedly wrote in a now-deleted LinkedIn post, "I confess. I moved contractor money around to add data science resources to my anti-fraud team to examine Direct Deposit Fraud . . . . I confess. I bullied agency executives, shared executive contact information, and circumvented the chain of command to connect DOGE with the people who get stuff done." *Id*.

[6] The United States Digital Service was a technology unit established in 2014 with Congressional appropriations, and housed within the Executive Office of the President.

15

Amy Gleason is the Acting Administrator of USDS and the U.S. DOGE Service Temporary Organization. *Id.* ¶ 26. She was named to the position on February 25, 2025. *See Citizens for Resp. & Ethics in Washington v. U.S. Doge Serv.* ("*CREW*"), No. 25-CV-511 (CRC), 2025 WL 752367, at *2 (D.D.C. Mar. 10, 2025).

### B. Post-Election Period

The presidential election was held on November 5, 2024. Days later, on November 12, 2024, President-elect Trump announced the formation of the "Department of Government Efficiency," with the stated goal "to dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies." Colleen Long & Jill Colvin, *Trump says Musk, Ramaswamy will form outside group to advise White House on government efficiency*, AP NEWS (Nov. 12, 2024), https://perma.cc/UW7W-GAQW; *see CREW*, 2025 WL 752367, at *1. Technology moguls Elon Mush and Vivek Ramaswamy were identified as the individuals who were to lead the new department. *Id.*

Musk and Ramaswamy subsequently published an opinion piece in the *Wall Street Journal*, declaring their intent to "advise DOGE at every step to pursue three major kinds of reform: regulatory rescissions, administrative reductions and cost savings." Elon Musk & Vivek Ramaswamy: *The DOGE Plan to Reform Government*, WALL ST. J. (Nov. 20, 2024), https://perma.cc/9TBR-E9ZF. According to Musk and Ramaswamy, DOGE would operate through "embedded appointees" at federal agencies and would identify "thousands" of regulations for repeal by the President. *Id.* In addition, they claimed that DOGE would seek "mass head-count reductions across the federal bureaucracy." *Id.*[7]

---

[7] Shortly after President Trump's inauguration on January 20, 2025, news reports indicated that Mr. Ramaswamy was no longer involved with DOGE. *See* Thomas Beaumont & Jonathan J. Cooper, *Ramaswamy won't serve on Trump's government efficiency commission as he mulls run*

16

### C. Post-Inauguration Period

### 1. Executive Order 14,158

Following President Trump's inauguration on January 20, 2025, he wasted no time in creating DOGE. On the day of his inauguration, President Trump issued Executive Order 14,158, Fed. Reg. 8441 (Jan. 20, 2025) ("Order" or "E.O."). It is titled "Establishing and Implementing the President's 'Department of Government Efficiency.'" The Order established the "Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* § 1. The E.O. also renamed the United States Digital Service as the "United States DOGE Service (USDS)" and declared that USDS "shall be established in the Executive Office of the President." *Id.* § (3)(a).[8] In addition, the Order established a "USDS Administrator . . . in the Executive Office of the President" who "shall report to the White House Chief of Staff." *Id.* § 3(b).

In addition, the E.O. creates "a temporary organization known as 'the U.S. DOGE Service Temporary Organization'" that "shall be headed by the USDS Administrator and shall be dedicated to advancing the President's 18-month DOGE agenda." *Id.* The Order states, *id.*: "The U.S. DOGE Service Temporary Organization shall terminate on July 4, 2026."

---

*for Ohio governor,* AP NEWS (Jan. 20, 2025), https://perma.cc/G8CF-FZFJ. Mr. Ramaswamy has since announced his campaign for governor of Ohio. *See* Ana Faguy & Brandon Drenon, *Vivek Ramaswamy announces run for governor in Ohio*, BBC NEWS (Feb. 25, 2025), https://perma.cc/9E6P-7D74.

[8] The distinctions between DOGE and USDS are not entirely clear. But, for the purpose of this Memorandum Opinion, the terms are largely interchangeable.

Further, the Order provides, *id.* § 3(c): "In consultation with USDS, each Agency Head[9] shall establish within their respective Agencies a DOGE Team of at least four employees, which may include Special Government Employees,[10] hired or assigned within thirty days of the date of this Order. Agency Heads shall select the DOGE Team members in consultation with the USDS Administrator. Each DOGE Team will typically include one DOGE Team Lead, one engineer, one human resources specialist, and one attorney. Agency Heads shall ensure that DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda."

Section 4 of the Order concerns "Modernizing Federal Technology and Software to Maximize Efficiency and Productivity." *Id.* § 4. It provides, *id.* § 4(a): "The USDS Administrator shall commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems. Among other things, the USDS Administrator shall work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization."

Relevant here, § 4(b) of the E.O. states: "Agency Heads shall take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to

---

[9] The Executive Order defines "Agency Head" as "the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order." Exec. Order. No. 14,158, § 2(b).

[10] A Special Government Employee may be a temporary "officer or employee" who is "retained, designated, appointed, or employed to perform, with or without compensation . . . temporary duties either on a full-time or intermittent basis" for up to 130 days in any 365-day period. 18 U.S.C. § 202(a). They are exempt from some of the ethics rules to which most federal employees are subject. *See* 18 U.S.C. §§ 203, 205, 207–209.

ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems.  USDS shall adhere to rigorous data protection standards."

## 2.  Executive Order 14,210

On February 11, 2025, President Trump signed an executive order titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." Executive Order 14,210, 90 Fed. Reg. 9669 (Feb. 14, 2025).  It states, in part, *id.* § 1: "To restore accountability to the American public, this order commences a critical transformation of the Federal bureaucracy. By eliminating waste, bloat, and insularity, my Administration will empower American families, workers, taxpayers, and our system of Government itself."

Section Three of the order is titled "Reforming the Federal Workplace to Maximize Efficiency and Productivity."  Section 3(a) provides: "Pursuant to the Presidential Memorandum of January 20, 2025 (Hiring Freeze), the Director of the Office of Management and Budget shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition (Plan)."  Subject to certain exceptions, the Plan requires "that each agency hire no more than one employee for every four employees that [sic] depart, consistent with the Plan and any applicable exemptions and details provided for in the Plan."

Section 3(b) requires "[e]ach Agency Head" to develop "a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas."  In connection with this directive, the order states: (i) "This hiring plan shall include that new career appointment hiring decisions shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law"; (ii) "The agency shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head

19

determines the positions should be filled"; and  (iii) "Each DOGE Team Lead shall provide the [USDS] Administrator with a monthly hiring report for the agency." *Id.* § 3(b)(i)–(iii).

Section 3(c) of the order concerns "Reductions in Force", but does "not apply to functions related to public safety, immigration enforcement, or law enforcement."  It states, in part: "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs."

### 3.  SSA in the Crosshairs

According to the Amended Complaint, "President Trump, Elon Musk, and other administration officials have had their sights set on Social Security for the past year . . . ."  ECF 17, ¶ 60.  For example, President Trump and Mr. Musk have "repeatedly suggested that there is widespread fraud within Social Security, as well as other entitlements." *Id.* ¶ 65.  On February 11, 2025, Musk posted on "X", formerly known as Twitter, as follows:



*See id*. ¶ 66.[11]  And, on February 17, 2025, Musk posted on X, *see id.* ¶ 67:

---

[11] Plaintiffs provided the permalink for all "X" posts.



Further, the Amended Complaint states, *id.* ¶ 68: "On February 17, 2025, White House Press Secretary Karoline Leavitt stated on Fox News that President Trump 'has directed Elon Musk and the DOGE team to identify fraud at the Social Security Administration.[]'" (Quoting Yamiche Alcindor & Raquel Coronell, *Top Social Security official steps down after disagreement with DOGE over sensitive data*, CNN (Feb. 17, 2025), https://perma.cc/9ZLL-VLFH). In particular, Leavitt claimed that Musk and the DOGE Team "'suspect that there are tens of millions of deceased people who are receiving fraudulent Social Security payments.[]'" ECF 17, ¶ 68 (quoting Zachary B. Wolf, *Trump and Musk set their sights on Social Security by spreading rumors*, CNN (Feb. 19, 2025), https://perma.cc/YY7H-8XPA).

On February 19, 2025, Howard Lutnick, the Secretary of the Department of Commerce, stated on Fox News: "'Back in October . . . I flew down to Texas, got Elon Musk [to set up DOGE], and here was our agreement: that Elon was gonna cut a trillion dollars of waste[,] fraud and abuse . . . . We have almost $4 trillion in entitlements, and no one's ever looked at it before. You know Social Security is wrong, you know Medicaid and Medicare are wrong . . . .[]'" ECF 17, ¶ 69 (citation omitted).

Also on February 19, 2025, Dudek "issued a press release endorsing DOGE and stating that DOGE 'is a critical part of President Trump's commitment to identifying fraud, waste, and

abuse.[]'" *Id.* ¶ 70 (quoting SOC. SEC. ADMIN., Press Release, *Statement from Lee Dudek, Acting Commissioner, about Commitment to Agency Transparency and Protecting Benefits and Information* (Feb. 19, 2025), https://perma.cc/W33R-QKEZ). And, on February 22, 2025, President Trump claimed that "tens of millions of Americans are improperly receiving Social Security benefits,[] calling Social Security 'the biggest Ponzi scheme of all time . . . It's all a scam, the whole thing is a scam.[]'" ECF 17, ¶ 71 (citations omitted).

Then, on February 28, 2025, Musk appeared on "'The Joe Rogan Experience'—a widely listened to podcast—and proclaimed that 'a basic search of the Social Security database' indicated '20 million dead people [were] marked as alive' and that 'Social Security is the biggest Ponzi Scheme of all time.'" *Id.* ¶ 72 (citation omitted; alteration in ECF 17). According to plaintiffs, "[t]hat claim is false." *Id.* (citing SOC. SEC. ADMIN., Off. of Inspector Gen., *IG Reports: Nearly $72 Billion Improperly Paid; Recommended Improvements Go Unimplemented* (Aug. 19, 2024), https://perma.cc/WR7T-3KZA).

President Trump continued to deride the SSA. On March 4, 2025, in his "his first speech before a joint session of Congress," President Trump "claimed there to be 'shocking levels of incompetence and probable fraud in the Social Security Program.'" ECF 17, ¶ 73 (citation omitted).

According to the Amended Complaint, "SSA leadership has sought to rework the agency." *Id.* ¶ 74. For example, on February 21, 2025, "SSA announced an 'organizational realignment' of its Office of Analytics, Review, and Oversight, which was responsible for addressing recommendations from external monitoring authorities and overseeing fraud detection." *Id.* ¶ 75 (citing SOC. SEC. ADMIN., Press Release, *Social Security Announces Change to Improve Agency Operations and Strengthen Protections* (Feb. 21, 2025), https://perma.cc/3EC7-KARR). On

February 24, 2025, "SSA announced it was closing the agency's Office of Transformation,[] which was dedicated to the digital modernization of SSA programs and services, including improving the agency's website." ECF 17, ¶ 76 (citation omitted). The next day, "SSA shuttered its Office of Civil Rights and Equal Opportunity,[] which had been tasked with overseeing the agency's civil rights, equal employment, harassment prevention, accommodations, and disability services." *Id.* (citation omitted).

Then, on February 27, 2025, "SSA announced that it was implementing an 'agency-wide organizational restructuring that will include significant workforce reductions'[] and began offering buyouts to agency employees.[]" *Id.* ¶ 77 (citations omitted). The following day, "SSA announced it was reducing the agency's workforce by 7,000 and reducing the number of regional SSA offices from ten to four.[]" *Id.* ¶ 78 (citation omitted). But, the Agency "had already been at a fifty-year staffing low.[]" *Id.* (citation omitted). And, on February 28, 2025, the same day that the Agency announced the significant workforce reduction, "twenty senior SSA leaders announced their resignations.[]" *Id.* ¶ 79 (citation omitted). "During this time," plaintiffs say, "DOGE has also been examining SSA's contracting and other systems, posting various cuts to agency contracts on its 'wall of receipts.[]'" *Id.* ¶ 80 (citation omitted). According to plaintiffs, Dudek "has confirmed: DOGE personnel—or, as he called them, 'outsiders who are unfamiliar with nuances of SSA programs'—are calling the shots.[]" *Id.* ¶ 81 (citing Lisa Rein *et al.*, *DOGE is driving Social Security cuts and will make mistakes, acting head says privately*, Wash. Post (Mar. 6, 2025), https://perma.cc/FYY3-QGRR).

### D. Exhibits to the Motion

Plaintiffs submitted ten declarations in support of their Motion, and added two more with their Reply. The defendants have submitted two declarations. I summarize some of the

23

declarations below, because they provide context for the allegations and are important to the resolution of the Motion.

### 1. Plaintiffs

Tiffany Flick retired from SSA on or about February 16, 2025, after almost 30 years of service at the Agency, where she held a variety of positions. ECF 22-10 ("Flick Declaration"), ¶¶ 1, 2, 45, 46. Most recently, Flick served as the Acting Chief of Staff to Acting SSA Commissioner Michelle King. *Id.* ¶ 2. She assumed that position after serving as Associate Commissioner for Budget, Facilities and Security in the Office of Hearing Operations. *Id.* Flick provides a blistering account of events that unfolded at SSA from late January through the time of her resignation in mid February 2025.

According to Flick, "[t]he importance of privacy is engrained in every SSA employee from day one" and, "[a]long with accurate and timely payment of benefits, attention to privacy is one of SSA's most fundamental duties." *Id.* ¶ 4. Indeed, she points out that "the first regulation adopted by the Social Security Board" in 1937 "outlined the rules regarding privacy and the disclosure of Social Security records." *Id.* Over time, the Privacy Act and other laws and regulations "have further defined [SSA's] responsibilities to ensure the confidentiality of the information the agency collects and holds." *Id.*; *see also id.* ¶ 5. The SSA's privacy protections and data systems are examined annually to help ensure compliance with security policies. *Id.* ¶ 7.

Flick indicates that every SSA employee is required to sign two documents each year. *Id.* ¶ 6. One is the "Systems Sanctions Policy," outlining sanctions for "unauthorized access or disclosure of SSA data." *Id.* The second document is "an annual reminder" about each employee's "duty to protect personally identifiable information, including when SSA employees need to, as a

24

JA268

part of their job, communicate with constituents outside the agency." *Id*. And, "annual information security training is required for all employees." *Id.*

Moreover, Flick explains that when there is "a need to share data between agencies," the SSA must follow "a detailed process," which involves multiple levels of review, including by the General Counsel's office. *Id.* ¶ 8. She states that it "generally takes months" to complete the process, "to ensure [that] the sharing of information accords with all applicable privacy laws and policies of both SSA and the partner agency." *Id.*

On the morning of January 30, 2025, Flick received a call from Dudek, who was then serving as a senior advisor in the Office of Program Integrity, where he worked on anti-fraud measures. *Id.* ¶ 9. Dudek told Flick that some members of DOGE requested to be on-site immediately and wanted to come to SSA Headquarters that day, and that two DOGE associates, Michael Russo and Scott Coulter, would be working at SSA. *Id.* Given Dudek's status as a mid-level employee, Flick asked him why he was communicating with anyone from DOGE. *Id.* ¶ 10. Dudek indicated that DOGE had reached out to him. *Id.* Flick instructed Dudek to "stand down and not have further contact with anyone from DOGE," and that the Commissioner's Office would handle the issue. *Id.* Flick then reported the call to Acting Commissioner King. *Id.* She states, *id.*: "We began to prepare to onboard Mike Russo, but Scott Coulter had not come to the agency prior to February 16, 2025."

Russo came onsite on January 31, 2025, to begin his onboarding process. *Id.* ¶ 11. He joined the Agency as the CIO on February 3. *Id.* Flick recounts that Russo "introduced himself as a DOGE representative to multiple employees on multiple occasions." *Id*.

According to Flick, as soon as Russo joined the SSA, "he requested to bring in a software engineer named Akash Bobba, who was already assisting DOGE in multiple agencies." *Id.* ¶ 13.

But, "there were challenges with Mr. Bobba's background check that took a few days to resolve." *Id.* On February 10, 2025, the Commissioner's Office and the Office of Human Resources "received phone calls and emails from Mr. Russo, DOGE manager Steve Davis, and people who stated they were associated with the White House's Presidential Personnel Office ('PPO') but who were working out of the Office of Personnel Management ('OPM')." *Id.* ¶ 14. These communications "were about onboarding" Bobba and "giving [him] the equipment and credentials he needed to access SSA data before midnight on February 10." *Id.*

Flick recalls that Russo and Davis "grew increasingly impatient over the course of the evening on February 10," and ultimately Bobba was sworn in "over the phone" at around 9 p.m. that evening, "contrary to standard practice." *Id.* ¶ 16. But, she asserts that "the credentialing process necessary for access to the systems would take longer." *Id.* Flick characterizes the request for same-day access for Bobba as "unprecedented" in her time working "for multiple SSA commissioners across multiple administrations . . . ." *Id.* ¶ 15. Nor did she understand "the apparent urgency with which Mr. Bobba needed to be onboarded and given access to SSA's systems and data," which she described as "highly sensitive." *Id.*

"[W]ith daily pressure" from Russo, the CIO's office "tried to rapidly train" Bobba during the week of February 10, 2025, in order "to get him access to SSA data systems . . . ." *Id.* ¶ 23. This was so that Bobba "could work on a special project for Mr. Russo at DOGE's request," and to enable him to "'audit' any of the work of SSA experts." *Id.*

Flick avers that because Bobba's "security training" was "truncated" and done "outside normal processes," *id.* ¶ 24, she does "not believe Mr. Bobba had a sufficient understanding of the sensitive nature of SSA data or the ways to ensure such data's confidentiality." *Id.* ¶ 25. She adds,

26

*id.*: "These are complicated systems with complex policies governing very large programs, and it simply is not possible to become proficient within a matter of a few days."

Also on February 10, 2025, Russo contacted several people, including Dudek, and assembled an "internal team to answer questions from DOGE." *Id.* ¶ 17. Because Russo "did not share many details of the questions or his conversations," Flick had "only limited information" on what the assembled team was doing. *Id.* She asserts: "Mr. Russo never fully disclosed to the Commissioner's office the details on what information DOGE wanted and issues it needed to address." *Id.* at 18. But, she understood that it related to fraud. *Id.* She states, *id.*:

> The information DOGE sought seemed to fall into three categories: (1) untrue allegations regarding benefit payments to deceased people of advanced age; (2) concern regarding single Social Security numbers receiving multiple benefits (which is normal when multiple family members receive benefits through one wage-earner); and (3) payments made to people without a Social Security number.

In Flick's view, these concerns were "invalid and based on an inaccurate understanding of SSA's data and programs." *Id.* ¶ 19. She explains, *id.*:

> As to the first [category], SSA's benefits' file contradicts any claim that payments are made to deceased people as old as 150 years. As to the second issue, DOGE seemed to misunderstand the fact that benefits payments to spouses and dependents will be based on the Social Security number of a single worker. As to the third [category], we were simply never given enough information to understand the source of the concern but had never encountered anything to suggest that inappropriate benefit payments were being made to people without a Social Security number.

Nevertheless, the Commissioner's Office "tried to assist" Russo "in the areas related to potential fraud," including by proposing briefings to help Russo and Bobba "understand the many measures the agency takes to help ensure the accuracy of benefit payments, including those measures that help ensure we are not paying benefits to deceased individuals." *Id.* ¶ 20. But, Flick claims that Russo was "completely focused on questions from DOGE officials based on the general myth of supposed widespread Social Security fraud, rather than facts." *Id.*

27

JA271

According to Flick, "Acting Commissioner King requested that Mr. Russo report to her, as the CIO normally would, but he consistently gave evasive answers about his work." *Id.* ¶ 22. But, Flick believed that Russo "was actually reporting to DOGE." *Id.* For example, according to Flick, Russo had conversations with other agencies about data sharing, including the Departments of Treasury, Education, and Homeland Security, and although data sharing with those agencies is "normal," the "lack of transparency" with Acting Commissioner King "is not." *Id.* ¶ 21.

In the meantime, on February 14, 2025, Dudek was placed on administrative leave. *Id.* ¶ 41. This was based on allegations of inappropriate conduct. *Id.*

Flick also provided details concerning Bobba's access to SSA systems and data. Based on Flick's conversations with experts in the CIO's office, she "determined" that Mr. Bobba would have "anonymized and read-only Numident data using a standard 'sandbox' approach," so that he would not have access to other data. *Id.* ¶ 26. She explained that this approach was consistent with the way that SSA handles "any request to review SSA's records for potential fraud, waste, and abuse by oversight agencies . . . or auditors. . . ." *Id.*

To illustrate, Flick explained that for auditors, SSA ordinarily provides data pertaining to a requested scope of review, which the requester would "outline in detail." *Id.* In response, SSA provides "anonymized or sanitized data needed for the type of review being conducted. If problems were identified, then the individual cases would be located and addressed." *Id.*

According to Flick, the access she had determined to provide Bobba would enable him to answer DOGE's "numident-related questions about fraud," as Flick understood them, without exposing personally identifiable information. *Id.* However, because of the expedited basis on which Bobba was granted access, the anonymized file he was provided had "technical glitches that created problems with the data in the file." *Id.* ¶ 27. Bobba reported the problems on February

28

15, 2025. *Id.* ¶ 28. At the time, she understood that Bobba was working off-site at OPM, pursuant to a telework agreement for Bobba that Russo had approved. *Id.*

Flick asserts that Bobba's work off-site did not align with the typical requirements of SSA's standard telework agreements, which "state that employees need to work in a private location and should be careful to protect systems and data from unauthorized access." *Id.* ¶ 42. Moreover, Flick states that she understood Bobba was not viewing data to which he was given access "in a secure environment because he was living and working at the Office of Personnel Management around other DOGE, White House, and/or OPM employees." *Id.* ¶ 43. She believes that non-SSA may have had access to the SSA data. *Id.* ¶ 28.

As noted, on February 15, 2025, Bobba experienced technical issues with the anonymized Numident file. *Id.* ¶ 28. Rather than waiting for SSA to resolve the technical issues, Russo obtained "an opinion" from the federal Chief Information Officer, a Presidential appointee housed within the Office of Management and Budget, stating that "he could give Mr. Bobba access to all SSA data." *Id.* ¶ 39. And, Russo and "other DOGE officials demanded that Mr. Bobba be given immediate, full access to SSA data in the Enterprise Data Warehouse ('EDW'), which included Numident files, the Master Beneficiary Record ('MBR') files, and the Supplemental Security Record ('SSR') files." *Id.* ¶ 30.

Moreover, Russo "repeatedly stated that Mr. Bobba needed access to 'everything, including source code.'" *Id.* ¶ 36. When the Commissioner's Office tried to determine why Bobba needed full access to the EDW, Russo was "evasive and never provided the kind of detail that SSA typically requires to justify this level of access." *Id.* ¶ 38.

Flick was contacted by SSA staff, who indicated that Russo requested full access to the EDW for Bobba. *Id.* ¶ 40. She instructed the CIO's office not to provide Bobba with such access

until Russo spoke with Acting Commissioner King. *Id.* Flick explained: "[W]e needed to understand why this level of access was necessary to address the specific questions or issues they were looking at." *Id.* Flick avers that SSA's delay in providing Bobba with full access to SSA's data systems "led to the escalation of tensions" over the weekend of February 15 and 16, 2025. *Id.* ¶ 42.

According to Flick, Acting Commissioner King requested additional details from Russo on "why this level of access was necessary for the work [of] Mr. Bobba . . . ." *Id.* ¶ 44. But, she did not receive an answer. *Id.* Instead, on February 16, 2025, Commissioner King "received an email from the White House noting that the President had named Mr. Dudek as the Acting Commissioner," although Flick understood that Dudek was on administrative leave. *Id.* ¶ 45.

Shortly after Acting Commissioner King informed Flick that Dudek had been elevated to Acting Commissioner, Flick retired. *Id.* ¶ 46. Flick claims that, upon her departure, Dudek gave Bobba and "the DOGE team access to at least the EDW database, and possibly other databases." *Id.* ¶ 47.

According to Flick, EDW contains "extensive information about anyone with a social security number, including names, names of spouses and dependents, work history, financial and banking information, immigration or citizenship status and marital status." *Id.* ¶ 31. The Numident file "contains information necessary for assigning and maintaining social security numbers." *Id.* ¶ 32. The MBR and SSR records "contain detailed information about anyone who applies for, or receives, Title II or Title XVI benefits." *Id.* ¶ 33.[12]

---

[12] Title II and Title XVI presumably refer to the Social Security disability insurance program (Title II of the Social Security Act) and the Supplemental Security Income (SSI) program (Title XVI of the Act). *See* Soc. Sec. Admin., *Disability Evaluation Under Social Security*, https://perma.cc/DGN9-5DPB.

30

Full access, according to Flick, means different levels of permission, depending on the data system. Full access to the EDW, for example, would provide "read" access to most of SSA's data, which would permit a user to copy and paste, export, screenshot, or otherwise compile data for analysis, but does not permit a user to change data. *Id.* ¶ 34. Full access to other SSA systems may also include "write" access, which would permit a user to change the data in the system. *Id.* ¶ 35.

Notably, Flick avers that SSA "would not provide full access [to] all data systems even to [SSA's] most skilled and highly trained experts." *Id.* ¶ 37. She explains, *id.*: "The scope of each official's access is job-dependent . . . ." Of import, she maintains that the request to give Bobba full access to SSA databases "without justifying the 'need to know' this information was contrary to SSA's long-standing privacy protection policies and regulations . . . ." *Id.* ¶ 43. She asserts: "[N]one of these individuals could articulate why Mr. Bobba needed such expansive access." *Id.*

Flick is "deeply concerned" about DOGE's access to SSA systems, given the potential for inappropriate disclosure, and in light of the "rushed" onboarding and training process for Russo and Bobba. *Id.* ¶ 48. Moreover, Flick states that she is "not confident that DOGE associates have the requisite knowledge and training to prevent sensitive information from being inadvertently transferred to bad actors." *Id.* ¶ 49. For Flick, this "concern is elevated" because Bobba is accessing SSA systems in a location that is not "secure . . . ." *Id.* ¶ 43. Specifically, he was working from OPM offices, where he is "surrounded by employees and officials of other agencies and White House components who have . . . never been vetted by SSA or trained on SSA data,

---

Plaintiffs allege that these particular records include "medical information about anyone" who applies for these benefits. ECF 17, ¶ 86(c). When the Court asked government counsel at the hearing if the SSR records contain detailed health information, he responded: "I don't know the answer to that . . . ." ECF 45 at 24.

systems, or programs." *Id.* ¶ 49; *see also id.* ¶ 43. And, she claims that, because of this "non-secure, off-site access, the protections built into SSA's data systems may not work." *Id.* ¶ 49. For example, Flick states that other individuals "could take pictures of the data, transfer it to other locations, and even feed it into AI programs." *Id.* She adds, *id.*: "In such a chaotic environment, the risk of data leaking into the wrong hands is significant."

Although access to the EDW alone would not affect benefit payment systems, *id.* ¶ 50, Flick "witnessed a disregard for critical processes—like providing the 'least privileged' access based on a 'need to know'—and lack of interest in understanding [SSA] systems and programs." *Id.* When "combined with the significant loss of expertise as more and more agency personnel leave," this gives rise to her apprehension regarding whether "SSA programs will continue to function and operate without disruption." *Id.* She adds, *id.*:

> SSA information technology is made up of an incredibly complex web of systems that are extremely reliable in making Social Security and Supplemental Security Income payments. Some of the system[s] operate based on old programming languages that require specialized knowledge. Such systems are vulnerable to being broken by inadvertent user error if SSA's longstanding development, separation of duties, and information security policies and procedures are not followed. That could result in benefits payments not being paid out or delays in payments. I understand that DOGE associates have been seeking access to the "source code" to SSA systems. If granted, I am not confident that such associates have the requisite understanding of SSA to avoid critical errors that could upend SSA systems.

Moreover, Flick contends that, even if DOGE members have only "read" access to SSA systems, they can, and already have, "used SSA data to spread mis/disinformation about the amount of fraud in Social Security benefit programs." *Id.* ¶ 51. She contends that "fraud is rare, and the agency has numerous measures in place to detect and correct fraud." *Id.*

Flick also submitted a Supplemental Declaration. ECF 39-1. She clarifies that several employees of the DOGE Team accessed SSA data systems prior to having signed, finalized detail

32

JA276

agreements from other agencies. *Id.*¶ 3. And, she claims that this "is not in keeping with agency practice because the agency does not consider a detailee to be an employee of SSA until a detail agreement is signed and finalized." *Id.*

In addition, Flick disputes defendants' assertion that the DOGE Team cannot perform its work with anonymized data. She states, *id.* ¶ 4.

> Normally when analysts or auditors review agency data for possible payment issues, including for fraud, the review process would start with access to high-level, anonymized data based on the least amount of data the analyst or auditor would need to know. If a subset of records within that data are flagged as suspicious, the analyst or auditor would access more granular, non-anonymized data to just that subset of files. In my experience, the type of full, non-anonymized access of individual data on every person who has a social security number or receives benefit[s] from Social Security is unnecessary at the outset of any anti-fraud or other auditing project. While agency anti-fraud experts would have access to the types of data that Mr. Russo describes, they also have significant training and expertise in agency programs and how to read and understand the data from agency systems.

Flick also explains that the "need to know" reason for full, non-anonymized access to SSA data systems articulated in this case are "far from sufficiently detailed to justify granting the level of access the DOGE Team now has." She clarifies that thirty to forty Agency employees have access similar to the DOGE Team, out of "roughly 57,000 employees." *Id.* ¶ 7. However, she contends that these thirty to forty employees are "highly skilled and highly trained." *Id.* She states: "I did not observe any DOGE personnel receiving the 'same level of training' as other SSA employees." *Id.*

In addition to the Flick declarations, plaintiffs have submitted declarations from ten other individuals: (1) Ann Widger, the Director of Retirees at AFSCME (ECF 22-1); (2) Sue Conard, a retiree member of AFSCME (ECF 22-2); (3) "John Doe," a retiree member of AFSCME (ECF 22-3); (4) Tamara Imperiale, a retiree member of AFSCME (ECF 22-4); (5) Charles "CK" Williams, a retiree member of AFSCME (ECF 22-5); (6) Richard J. Fiesta, the Executive Director of ARA

33

(ECF 22-6);[13] (7) Linda Somo, a member of Alliance (ECF 22-7); (8) Bernadette Aguirre, Director of the Retiree Division of AFT (ECF 22-8); (9) David Gray, a retired member of AFT (ECF 22-9); and (10) Kathleen Romig, the Director of Social Security and Disability Policy at the Center on Budget and Policy Priorities (ECF 39-2).[14]

Widger explains, ECF 22-1, ¶ 8: "AFSCME's mission has long included work to ensure that its members have access to Social Security benefits . . . ." She avers that since DOGE was granted access to SSA systems, retiree members have flooded AFSCME with questions, concerns, and fear about the security of their data, their health information, and their benefits. *Id.* ¶¶ 17, 18, 19, 27, 28, 29, 30. They are fearful that their private information will be compromised and/or that they will lose their benefits. *Id.* ¶ 17.

According to Widger, SSA "has in its systems the private medical information of AFSCME members who are applying for or have applied for disability insurance benefits, including about medical conditions that may carry with them a social stigma." *Id.* ¶ 10. She notes: "Medical records for one individual can exceed 1,000 pages." *Id.* Further, she avers, *id.* ¶ 11: "Required medical information includes all prescription and non-prescription medicines the person is currently taking; all health care providers from whom the individual has sought treatment (doctor, hospital, clinic, psychiatrist, nurse practitioner, therapist, physical therapist or other medical

---

[13] I note that Fiesta was a declarant on behalf of the Alliance in similar litigation in the District of Columbia. *See Alliance for Retired Americans v. Bessent*, 25-CKK-0313, 2025 WL 740401 (D.D.C. Mar. 7, 2025).

[14] Romig is the Director of Social Security and Disability Policy at the Center on Budget and Policy Priorities. She avers that on March 4, 2025, she attended a meeting held by the SSA at which Dudek spoke. ECF 39-3, ¶¶ 1, 2. According to Romig, the news article published by ProPublica describing what was said at the meeting, "is an accurate representation of that meeting." *Id.* at 3–4. But, the Court does not rely on this news article.

professional) and the medical conditions that were treated and evaluated; all medical tests performed by the listed providers (with the enumerated list including HIV and psychological/IQ tests); and other personal health information."  By way of example, Widger explains that, for a "mental health disability claim," information "could include notes from psychotherapists and counseling sessions."  *Id.* ¶ 12.  Widger states, *id.* ¶ 13: "AFSCME members share this information with SSA because they are required to do so to obtain benefits, and they expect the agency to follow the law and keep that data safe and secure."  She adds, *id.* ¶ 12: "Information disclosed concerning health conditions like HIV or other STDs can result in stigma, social isolation, job loss, housing loss, and other harms."

In addition, Widger states: "Many AFSCME Retiree members live on limited incomes of Social Security, personal savings, and a modest pension.  Many of our retirees are dependent on their direct deposits to get by in a month.  If something were to happen with their data and those payments were compromised, it could mean the difference between being able to afford groceries or going without.  We are advising our retiree members to run regular credit reports and to keep a close eye on their bank account activity."  *Id.* ¶ 24.  Relatedly, Widger states, *id.* ¶ 16: "If DOGE is accessing this data for the purpose of 'rooting out fraud,' it may also mean that AFSCME members have essential benefits slashed incorrectly or inadvertently, as DOGE personnel are not equipped to understand the complex SSA systems."

Widger explains that in December 2024, Congress passed the Social Security Fairness Act ("SSFA"), "which fully repealed the Government Pension Offset and Windfall Elimination Provision."  *Id.* ¶ 25.  The repeal, for which AFSCME advocated "extensively," permits "more than 3.2 million retired public service workers and their spouses to receive additional Social Security Benefits."  *Id.*  She claims that many AFSCME members are eligible for these benefits,

35

but are "concerned about DOGE's access at SSA." *Id.* ¶ 26.  Those who are eligible will need to

submit new paperwork to SSA, but they are hesitant to "provide new information to SSA" to obtain

the benefits. *Id.*  She states, *id.* ¶ 27: "AFSCME Retiree members have personally told us they are

particularly anxious and stressed because, while outside entities have attempted to steal their

identities in the past, they must now worry about threats from inside the SSA itself due to DOGE

access."  She asserts, *id.* ¶ 19: "The volume of communications and the level of fear within those

communications leads us to believe that a significant number of retirees, or soon-to-be retirees,

who are members of AFSCME will be chilled from applying for much needed benefits out of fear

of their data being compromised."

Further, Widger avers that she has personally been in contact with multiple retiree-

members of AFSCME. *Id.* ¶¶ 28, 29, 31.  For example, one eighty-year-old retiree told Widger

that he was "frightened" about who has access to his medical records. *Id.* ¶ 28.  Another retiree

participates in the Social Security Disability Program ("SSDI") and told Widger that she is

"frightened about her medical information being accessible by those who are targeting SSDI for

cuts." *Id.* ¶ 29.  Other retirees have contacted AFSCME and conveyed "their fear that DOGE

access to their data will . . . exacerbate their exposure to fraud and identity theft." *Id.* ¶ 30.

AFSCME retirees are "also fearful of retaliation and reprisals based on their roles as union

advocates for protecting Social Security and robust retirement benefits." *Id.* ¶ 31.  At least one of

these retirees has contacted Widger and expressed his concern that his sensitive, personal data may

be exposed in a way that could be used to attack and harass him because of his political views. *Id.*

In sum, Widger states, *id.* ¶ 32: "AFSCME retirees depend on Social Security to provide

for themselves and their families.  The benefits they receive allow them to stay in their homes, buy

groceries, and remain financially independent.  Social Security allows them to age with dignity.

They are experiencing great distress over the possibility of their private data being used to put the program at risk of substantial cuts.  They are worried about DOGE using their personal data to make the case for significant cuts to the program or train their [artificial intelligence] models for personal profit."

Richard J. Fiesta, the Executive Director of the Alliance, avers, ECF 22-6, ¶ 8: "ARA has members who receive Old-Age, Survivors, and Disability Insurance benefits from the [SSA] and from other programs that require SSA to collect or verify data, such as Medicare."  For these programs, Fiesta says, SSA "collects and maintains databases with sensitive personal and financial data about ARA's members.  This data includes information such as names, Social Security numbers, medical histories, dates and places of birth, home addresses, contact information, and bank account and financial information, including tax information."  *Id.* ¶ 9.

Moreover, ARA members "have submitted sensitive medical information to SSA to receive disability benefits, including health records and doctors' evaluations for physical and mental conditions.  This information is both highly personal and, if made public, could cause harm to members whose medical conditions may carry stigma (for example, treatment for mental health issues or HIV/AIDS)."  *Id.* ¶ 18.  Fiesta explains that members of the Alliance "share this data with SSA because they understand that the agency is committed and legally bound to protect the security of their information."  *Id.* ¶ 10.  But, he asserts that ARA members "did not consent to have their sensitive personal and financial data shared with DOGE, DOGE personnel (including Elon Musk), or any other unauthorized third parties or government 'departments.'  They only consented to have their data used for the purposes disclosed by SSA, and the procedures governing the protection of that data, in the agency's System of Record Notices."  *Id.* ¶ 12.

According to Fiesta, each year "millions of elderly Americans are the target of financial fraud and other scams", because they are "particularly attractive targets for scammers." *Id.* ¶ 7. This is so, according to Fiesta, because they are "often trusting and polite; might be less technologically adept; and are more likely to have financial savings, own a home, and have good credit." *Id.* He asserts that "one recent FBI report found" that "scams targeting individuals sixty and older led to at least $3.4 billion in losses in 2023." *Id.*

ARA members, according to Fiesta, are concerned with "bad actors" using SSNs to file fraudulent claims for unemployment benefits or to file fake tax returns. *Id.* ¶ 13. Fiesta posits that DOGE's "unfettered access" to SSA data "immediately increased the risk" that ARA "members' sensitive information will be stolen or misused, whether by DOGE personnel or criminal enterprises that gain access to the now unprotected data." *Id.*

Further, Fiesta states that the access to SSA data provided to DOGE personnel will alter the way "at least some ARA members interact with SSA . . . ." *Id.* ¶ 16. For example "some members will be less likely to submit sensitive information online out of fear that such information will be compromised, and will, in turn, be required to travel to local Social Security offices to deal with routine issues—a task that is being made even more burdensome as SSA continues to shutter such offices, requiring members to travel even further than before." *Id.*

In addition, Fiesta states that "thousands" of ARA members recently became eligible for Social Security benefits under the SSFA. *Id.* ¶ 17. To obtain these benefits, however, "members will now have to apply and submit personal and confidential information about themselves and their spouses to SSA." *Id.* But, in light of DOGE's access to "personal and sensitive information," Fiesta claims that some members may choose not to apply. *Id.* And, according to Fiesta, ARA

38

members "fear that if DOGE personnel are granted more access to SSA's systems, it may cause the interruption of timely payments, which [ARA] members rely on to live." *Id.* ¶ 15.

Bernadette Aguirre is the Director of the Retiree Division of AFT. ECF 22-8, ¶ 1. She states that AFT members participate in Social Security programs, such as OASDI and "other programs for which SSA collects and verifies data," such as Medicare, Children's Health Insurance Program, and Supplemental Nutrition Assistance Program. *Id.* ¶ 7. She notes that "sensitive information" pertaining to these programs, "including [SSNs], bank account numbers, details of personal finances, and personal information" are "contained in SSA record systems." *Id.* ¶ 8. Aguirre states, *id.* ¶ 9: "AFT members share this information with SSA based on their understanding that the agency is legally obligated—and committed—to keeping their data secure." Further, she posits, *id.* ¶ 11: "I am not aware of any AFT member who has requested or authorized DOGE or its representatives to access their personal data or who has consented to the use of this data for any reason other than for the purposes and through the procedures previously disclosed by SSA in its Systems of Record Notices."

Aguirre avers that she has "personally heard from retiree members who send data to SSA that they are concerned about DOGE's access to the private personal and financial information they have provided to SSA." *Id.* ¶ 12. She states: "AFT and its members are also deeply concerned about the possibility that DOGE, if able to further interfere with SSA data systems, may purposefully or even inadvertently disrupt the timely payment of SSA benefits." *Id.* ¶ 15. And, many AFT members "rely on those benefits to survive, and even one missed check could upend their lives." *Id.*

Moreover, Aguirre raises concerns about an increased risk of identity theft and related harms. *Id.* ¶ 13. In particular, she states, *id.*: "The improper disclosure of [private, personal, and

financial information] to DOGE immediately increased the risk of access by external actors, doxing, identity theft, invasion of personal privacy, and financial crimes against AFT members. That risk deepens every day that DOGE has access to AFT members' data. And feeding members' data into unauthorized or unprotected programs running artificial intelligence—as DOGE has done with data seized from other agencies—enhances these risks."

Individual members of all three plaintiff organizations have also expressed similar concerns with respect to DOGE's access to the personal data maintained by SSA, and have articulated that they expected SSA to maintain the privacy of their personal data. *See, e.g.*, ECF 22-2 (Conard Declaration, retiree member of AFSCME), ¶ 10 ("I always expected that the personal data I have submitted, and continue to submit when required, to SSA would remain private and used only to determine whether I was eligible for benefits, and not to be used for any other purpose. I have never consented for DOGE, Elon Musk or any other third party to have access to my . . . confidential information."); ECF 22-5 (Williams Declaration, AFSCME retiree member), ¶ 6 (same); ECF 23-3 (John Doe Declaration, retiree member of AFSCME), ¶ 6 (same); ECF 22-7 (Somo Declaration, retiree member of ARA), ¶ 9 ("When I shared my sensitive information with SSA, it was my understanding that it would be used for the calculation and receipt of government benefits and remain private.").

David Gray, a retired AFT member, recounts that when he applied for Social Security and Medicare, he provided various types of personal information to SSA, including his "name, bank account information, birth date, and Social Security number." ECF 22-9, ¶¶ 5, 6. He avers, *id.* ¶ 6: "When I applied for these programs, I provided this information to an intake person at my local social security office. I was told that it was going to be extremely confidential—that only specific,

qualified people at SSA would have access to it. I shared this information to receive the benefits that I worked so hard for and expected my information to remain private."

Tamara Imperiale is a 60-year-old retiree member of AFSCME. ECF 22-4, ¶¶ 1, 2. She participates in the SSDI program., *id.* ¶ 4, and "depend[s] on it to live." *Id.* ¶ 8. She explains that she was "forced to retire earlier than [she] would have wanted due to an injury [she] sustained while working . . . ." *Id.* ¶ 3. Imperiale avers, *id.* at 4: "I am now anxious and distressed about the access of my private data by DOGE, which the [SSA] stores and which I have submitted to SSA and continue to submit and update to receive SSDI benefits." She asserts, *id.* ¶ 7: "It was my expectation that the personal information I submitted and continue to submit to SSA—including private health information about my disability—would be used only to determine whether I was eligible for benefits, and not disclosed for any other purpose."

Moreover, plaintiffs' members do not want DOGE personnel to have access to their data. ECF 22-9 (Gray), ¶ 8 ("I do not want these people to have access to my data. It's personal and private."); ECF 22-2 (Conard), ¶¶ 7, 8 (stating that it is "very important" to her that her sensitive personal data remain private and that she is "worried about the access by DOGE . . . ."); ECF 22-4 (Imperiale), ¶ 5 ("As a retiree with a disability, it is very important to me that my data remain private.").

In addition, members of each plaintiff have expressed concern about the increased risk of identity theft. *See, e.g.*, ECF 22-3 (John Doe), ¶ 8 (describing his concern that his data could end up in the hands of scammers); ECF 22-7 (Somo), ¶¶ 7, 8, 11 (outlining similar concerns); ECF 22-9 (Gray), ¶¶ 8, 9 (expressing similar concerns). Somo, an ARA member, explained, ECF 22-7, ¶ 7: 'To receive Social Security and Medicare, my husband and I have both submitted extensive information to SSA. Put simply: SSA knows basically everything about us. They know our names.

41

JA285

They know our finances, including our bank account information. They know where we live. They know our [SSNs]. They know everything that a scammer would want to know, to do just about anything a scammer would want to do." And, several members explained that they are already the target of many scams, given their older ages. *See, e.g.*, *id.* ¶ 8 ("As someone over the age of seventy-five, I am constantly the target of scams.").

Plaintiffs' members also express fear that DOGE access to SSA systems will interfere with their receipt of benefits. *See, e.g.*, ECF 22-9 (Gray), ¶ 8 ("I worry that they will mess with my monthly benefits, which I rely on to live."); ECF 22-2 (Conard), ¶ 9 (expressing concern that "individuals who lack expertise or experience in providing Social Security benefits" she receives will now "be in charge of determining [her] eligibility for benefits and safeguarding [her] private information."); ECF 22-4 (Imperiale), ¶ 6 ("I am worried that unfettered access to my data by DOGE and Elon Musk will put my benefits at risk . . . .").

These members also describe the anxiety they are expreiencing as a result of DOGE's access to their data. ECF 22-9 (Gray), ¶ 10 ("My anxiety is at an all-time high because of the threats to my personal information and benefits that come from DOGE access to sensitive information like my Social Security information. I will remain anxious until people from DOGE are stopped."); ECF 23-3 (John Doe), ¶ 7 (expressing distress and anxiety about DOGE personnel having access to PII, including "current bank account information and [Doe's] entire work and income history."); ECF 22-4 (Imperiale), ¶ 8 ("I am experiencing great distress over the possibility of my private data being accessed by DOGE and potentially by other individuals . . . .").

Some of plaintiffs' members have also expressed concern about providing information to the SSA to obtain SSFA benefits. For example, Williams is "hesitant to provide additional information" to the SSA to establish his eligibility under the SSFA because of DOGE's access to

this data. *See* ECF 22-5, ¶ 7. And, Somo complains, ECF 22-7, ¶ 12: "Because of DOGE's access to SSA databases, I am going to have to think more carefully about submitting my information to SSA. But at the end of the day, what choice do I have? My ability to live is dependent on supplying information to the government, but I am deeply distressed about the threats I face from the breach of my sensitive information. I am in a Catch-22."

### 2. Defendants[15]

With their Opposition, defendants have submitted the declarations of Michael Russo (ECF 36-1) and Florence Felix-Lawson (ECF 36-2).

Russo has been the Chief Information Officer of the Office of the Chief Information Officer at the SSA since February 3, 2025. ECF 36-1, ¶ 1. He is a "Non-Career Senior Executive reporting directly to SSA's Acting Commissioner, Leland Dudek." *Id.* Felix-Lawson has been the Deputy Commissioner of Human Resources at the SSA since November 17, 2024. ECF 36-2, ¶ 1. She is a "Career Senior Executive reporting directly to SSA's Acting Commissioner, Leland Dudek." *Id.*

As the CIO, Russo is "responsible for oversight of grants of permissions [sic] to access SSA systems," including to SSA's DOGE Team. ECF 36-1, ¶ 2. Russo explains that, pursuant to E.O. 14,158, "there exists within SSA a 'DOGE [T]eam' responsible for 'implementing the President's DOGE agenda.' *Id.* § 3(c)." *Id.* ¶ 4. He asserts that the "SSA DOGE Team currently consists of ten SSA employees: four SSA special government employees (Employees 1, 4, 6, and 9) and six detailees to SSA from other government agencies and offices (Employees 2, 3, 5, 7, 8,

---

[15] As noted, defendants have not identified the names of the government employees who have been provided access to the SSA data at issue. In similar cases, however, the defendants have identified government employes by name. *See*, *e.g.*, *See Alliance for Retired Americans*, 2025 WL 740401, at *4–6; *American Federation of Teachers et al.*, 2025 WL 582063, at *2–3.

and 10)." *Id.* ¶ 4. But, "[t]o protect the privacy of these individuals, and to avoid exposing them to threats and harassment," Russo has not provided their names. *Id.*

Russo contends that the "overall goal of the work performed by SSA's DOGE Team is to detect fraud, waste and abuse in SSA programs and to provide recommendations for action to the Acting Commissioner of SSA, the SSA Office of the Inspector General, and the Executive Office of the President." *Id.* ¶ 5. He also describes the particular data access granted to each employee, as well as the stated need for the data, discussed in more detail, *infra*.

As the Deputy Commissioner of Human Resources, Felix-Lawson is "responsible for leading and overseeing human resource services to the agency, including but not limited to appointing and onboarding new personnel, including regular and special government employees and detailees." ECF 36-2, ¶ 2. She repeats some of the information in the Russo Declaration. *Compare*, *e.g.*, ECF 36-1, ¶¶ 4, 7 *with* ECF 36-2, ¶¶ 4, 7.[16] She also provides the dates when each DOGE Team member was brought onto the SSA DOGE Team, as well as additional details regarding their duties, training, and background investigations. I discuss this information in further detail, *infra*.

## IV.    Overview of the Statutory Framework

### A.    Administrative Procedure Act

The Administrative Procedure Act provides a cause of action against an "agency" or "an officer or employee thereof" to any "person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. It waives the sovereign immunity of

---

[16] Russo asserts that Employee 1 was granted access to certain SSA data on February 12, 2025. ECF 36-1, ¶ 7(a). Employee 1 is a SSA special government employee. *Id.* ¶ 7; ECF 36-2, ¶ 5. Yet, according to Felix-Lawson, Employee 1 was not appointed until February 13, 2025. ECF 36-2, ¶ 5. Although the initial disclosure to Employee 1 consisted of anonymized data, it appears that the data was disclosed to Employee 1 before he/she was an SSA employee.

the United States for "relief other than money damages" in such an action. *Id.*; *Medical Imaging & Technology Alliance v. Library of Congress*, 103 F.4th 830, 836 (D.C. Cir. 2024).

The APA provides for judicial review only for a "final agency action for which there is no adequate remedy in a court." *See* 5 U.S.C. § 702; *see also id.* ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."); *Abbott Labs. v. Gardner*, 387 U.S. 136, 140–41 (1967) (quoting 5 U.S.C. § 704); *Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600, 609 (4th Cir. 2018); *Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 629 n.3 (4th Cir. 2017); *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 586 (4th Cir. 2012).

The requirements under the APA are addressed in more detail, *infra*.

## B.  Privacy Act

The Privacy Act of 1974 (the "Act"), 5 U.S.C. § 552a, "came into being in conjunction with 1974 legislation amending the Freedom of Information Act (FOIA)." *Londrigan v. Fed. Bureau of Investigation*, 670 F.2d 1164, 1169 (D.C. Cir. 1981).  The Act "had its genesis in a growing awareness that governmental agencies were accumulating an ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the perpetuation of inaccuracies that the citizen would never know of, let alone have an opportunity to rebut or correct." *Id.*  It "was designed to provide individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves." *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 76 (D.C. Cir. 1982).  "The Act gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements." *Doe v. Chao*, 540 U.S. 614, 618 (2004).

In passing the Privacy Act in 1974, Congress made several findings that are noteworthy. Congress proclaimed: "The right to privacy is a personal and fundamental right protected by the Constitution of the United States[.]" Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(4), 88 Stat. 1896. Congress also found: "The privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by federal agencies[.]" *Id.* § 2(a)(1). It also said: "The increasing use of computers and sophisticated information technology, while essential to the efficient operations of the government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information[.]" *Id.* § 2(a)(2); *see Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016) (same). And, Congress stated: "In order to protect the privacy of individuals identified in information systems maintained by federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies." *Id.* § 2(a)(5).

The identified purposes of the Privacy Act were, *inter alia*, "to provide certain safeguards for an individual against an invasion of personal privacy by requiring federal agencies, except as otherwise provided by law, to— . . . (2) permit an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or made available for another purpose without his consent; . . . (4) collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information[.]" *Id.* §§ 2(b)(2), (b)(4).

The Senate Report is also instructive. It states that the purpose of the law "is to promote governmental respect for the privacy of citizens by requiring all departments and agencies of the executive branch and their employees to observe certain constitutional rules in the

46

JA290

computerization, collection, management, use, and disclosure of personal information about individuals." Senate Rep. No. 1183, 93d Cong., 2d Sess. (1974). The law was "designed to prevent the kind of illegal, unwise, overbroad, investigation and record surveillance of law-abiding citizens produced in recent years from actions of some over-zealous investigators, and the curiosity of some government administrators, or the wrongful disclosure and use, in some cases, of personal files held by Federal agencies." *Id.*

To that end, the Act establishes "certain minimum standards for handling and processing personal information maintained in the data banks and systems of the executive branch, for preserving the security of the computerized or manual system, and for safeguarding the confidentiality of the information." *Id.* In particular, it requires "every department and agency to insure, by whatever steps they deem necessary" that, *inter alia*, (1) "they take certain administrative actions to keep account of the employees and people and organizations who have access to the system or file, and to keep account of the disclosures and uses made of the information"; and (2) "they establish rules of conduct with regard to the ethical and legal obligations in developing and operating a computerized or other data system and in handling personal data, and take action to instruct all employees of such duties[.]" *Id.*

Under the Privacy Act, to the extent possible, agencies that collect information directly from individuals are to inform individuals of the purpose and authority for that collection. 5 U.S.C. § 552a(e)(2)–(3). The statute enacts additional requirements for agencies that maintain a "system of records," or maintain the information they collect such that information can be retrieved "by the name of [an] individual or by some identifying number, symbol, or other identifying particular." *Id.* § 552a(a)(5).

For example, agencies must continuously ensure that their systems of records are accurate and complete to the degree "necessary to assure fairness to the individual[s]" whose information has been recorded. 5 U.S.C. § 552a(e)(5). Individuals maintain the right to access and review all records "pertaining to" themselves in the agency's system, *id.* § 552a(d)(1), and to request an amendment if they identify an error. *Id.* § 552a(d)(2). If a request to review relevant records or to correct a record is denied, the individual may bring suit in federal district court and obtain an injunction ordering the agency to comply. *Id.* §§ 552a(d)(3), (g)(1)(A)–(B), (g)(2)–(3). And, if the agency makes an adverse determination as to an individual because of an inaccuracy in its records, the Act allows the individual to sue for damages. *Id.* §§ 552a(g)(1)(C), (g)(2)(4).

Relevant here, the Act prohibits federal agencies from sharing records about individuals, except under certain limited circumstances. It states, in part, 5 U.S.C. § 552a (italics added):

> **(b) Conditions of disclosure.**--No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be--
>> **(1)** to those officers and employees of the agency which maintains the record *who have a need for the record in the performance of their duties*.

The term "record" is broadly defined as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph[.]" 5 U.S.C. § 552a(a)(4).

The SSA regulations define "disclosure" as "making a record about an individual available to . . . another party." 20 C.F.R. § 401.25. The Privacy Act allows disclosure for "a routine use." 5 U.S.C. § 552a(b)(3). A "routine use" is a use of a record "for a purpose which is compatible with

48

the purpose for which it was collected." *Id.* § 552a(a)(7). And, each time an agency "establish[es] or revis[es]" a system of records, it must publish a System of Records Notice ("SORN") in the Federal Register detailing, among other things, "each routine use of the records contained in the system, including the categories of users and the purpose of such use." *Id.* § 552a(e)(4)(D).

The Act also provides for private enforcement of violations of the provisions. *See Univ. of California Student Ass'n v. Carter*, No. CV 25-354 (RDM), __ F. Supp. 3d __, 2025 WL 542586, at *2 (D.D.C. Feb. 17, 2025). In particular, it provides a "comprehensive remedial scheme" for injuries arising from the inappropriate dissemination of private information. *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008). Although individual government employees are not subject to civil suit for damages, an individual "may bring a civil action against the agency" for failure "to comply with any . . . provision of" the Act if the individual suffers "an adverse effect" due to that violation. 5 U.S.C. § 552a(g)(1).

Monetary damages are available only to individuals. *See id.* § 552a(g)(4); *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007). Prospective relief is reserved for Amendment or Access Actions. 5 U.S.C. § 552a(g)(2), (3).

The Act also establishes criminal penalties for willful violations of its requirements. *See* 5 U.S.C. § 552a(i). It is a federal crime for any agency officer or employee willfully to disclose a protected record "in any manner to any person or agency not entitled to receive it," *id.* § 552a(i)(1), or to maintain a system of records "without meeting the notice requirements" provided in the Act, *id.* § 552a(i)(2). It is also a federal crime for any person to "request[ ] or obtain[ ] any record concerning an individual from an agency under false pretenses." *Id.* § 552a(i)(3).

### C. Internal Revenue Code

Like the Privacy Act, the Internal Revenue Code (the "Code") controls disclosure of individuals' personal information, both within and outside the government.

The Code provides that, as a "general rule," tax "[r]eturns and return information shall be confidential." 26 U.S.C. § 6103(a) (capitalization altered). Moreover, it states, *id.*:

> [E]xcept as authorized by [the Code] . . . no officer or employee of the United States, . . . [and] no other person . . . who has or had access to returns or return information under [various Code provisions providing for that access], shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section.

The Internal Revenue Code provides for private enforcement for any knowing or negligent inspection or disclosure of tax returns or return information. 26 U.S.C. § 7431(a). The Code permits affected taxpayers to bring an action against the United States for damages of $1,000 or more. *Id.* But, the United States is not liable for any inspection or disclosure that the taxpayer requests or that results from "a good faith, but erroneous, interpretation" of the Code's confidentiality requirements. *Id.* § 7431(b).

It is a felony for "any officer or employee of the United States . . . willfully to disclose to any person, except as authorized by [the Code], any return or return information." *Id.* § 7213; *see also* 18 U.S.C. § 1905. And, any federal officer or employee convicted of such a violation "shall, in addition to any other punishment, be dismissed from office or discharged from employment." 26 U.S.C. § 7213(a)(1).

### D. Federal Information Security Modernization Act

The Federal Information Security Modernization Act of 2014 is intended to "provide a comprehensive framework for ensuring the effectiveness of information security controls over information resources that support Federal operations and assets." 44 U.S.C. § 3551(1). As

50

Congress recognized in FISMA, "the highly networked . . . Federal computing environment" faces significant "information security risks," including the threat of "unauthorized access, use, disclosure, disruption, modification, or destruction of" government information.  44 U.S.C. §§ 3551, 3553; *see also Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 457 (D.C. Cir. 2018).

FISMA requires the SSA to develop, document, and implement an Agency-wide information security program.  44 U.S.C. § 3554(b).  The SSA Commissioner is responsible for providing information security protections commensurate with the risk and magnitude of the harm resulting from the unauthorized access, use, disclosure, disruption, modification, or destruction of agency information and information systems.  *Id.* § 3554(a)(1)(A).  FISMA also requires that the Office of the Inspector General, or an independent external auditor as determined by the Inspector General, annually evaluate the SSA's information security program and practices to determine their effectiveness.  *Id.* §§ 3555(a)(1) and (b)(1).

## V.    Standing

The parties vigorously dispute whether plaintiffs have standing to pursue their claims.  The matter of standing is a "threshold jurisdictional question."  *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017); *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921 (4th Cir. 2022).  "The standing inquiry asks whether a plaintiff ha[s] the requisite stake in the outcome of a case . . . ."  *Deal v. Mercer Cty Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018).

## A.  Legal Standard

It is a bedrock principle that Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'"  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *see Murthy v. Missouri*, 603 U.S. 43, 56 (2024); *see also Fed. Election Comm'n*

*v. Cruz*, 596 U.S. 289, 295 (2022) ("The Constitution limits federal courts to deciding 'Cases' and 'Controversies.'") (quoting Art. III, § 2); *Carney v. Adams*, 592 U.S. 53, 58 (2020) (recognizing that Article III requires "a genuine, live dispute between adverse parties . . ."); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) ("Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'"); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (It is fundamental that Article III of the Federal Constitution confines the federal courts to adjudicating "actual, ongoing cases or controversies."); *Opiotennione v. Bozzuto Mgmt. Co.*, __ F.4th __, 2025 WL 678636, at *2 (4th Cir. Mar. 4, 2025) ("Article III of the constitution limits the judicial power of the United States to 'Cases' and 'Controversies.'"); *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) (same).

Indeed, "'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "Continued adherence to the case-or-controversy requirement of Article III maintains the public's confidence in an unelected but restrained Federal Judiciary . . . . For the federal courts to decide questions of law arising outside of cases and controversies would be inimical to the Constitution's democratic character." *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125, 133 (2011); *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("[T]he constitutional limitation of federal-court jurisdiction to actual cases or controversies" is "fundamental to the judiciary's proper role in our system of government[.]").

A federal court may resolve only "a real controversy with real impact on real persons . . . ." *American Legion v. American Humanist Assn.*, 588 U.S. 29, 87 (2019). Relevant here, "Federal courts can only review statutes and executive actions when necessary 'to redress or prevent actual

or imminently threatened injury to persons caused by . . . official violation of law.'" *Murthy*, 603 U.S. at 56 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 492 (2009)).  In the absence of a case or controversy, "the courts have no business deciding [the case] . . . ." *DaimlerChrysler Corp.*, 547 U.S. at 341. Therefore, "federal courts do not adjudicate hypothetical or abstract disputes." *TransUnion*, 594 U.S. at 423.  Nor do the courts "exercise general legal oversight" of other government branches, *id.*, or render "advisory opinions." *Id.* at 424.  And, when there is no case or controversy, "the court's subject matter jurisdiction ceases to exist . . . ." *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

A "case or controversy exists only when at least one plaintiff" establishes standing to sue. *Murthy*, 603 U.S. at 57 (citing *Raines*, 521 U.S. at 818).  Thus, "the doctrine of standing [serves] as a means to implement" the case or controversy requirement.  *Laufer*, 60 F.4th at 161; *see TransUnion LLC*, 594 U.S. at 423 ("For there to be a case or controversy under Article III, the plaintiff must have . . . standing."); *Spokeo, Inc.*, 578 U.S. at 338 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *Raines*, 521 U.S. at 818 ("One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue).

To establish standing under Article III of the Constitution, a plaintiff must satisfy three well established elements: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC*, 594 U.S. at 423 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)); *see Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *Cruz*, 596 U.S. at 296; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Clapper*, 568 U.S. at 409; *Fernandez v.*

53

*RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024); *Laufer*, 60 F.4th at 161; *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015). Requiring a plaintiff to demonstrate these three elements "ensures that federal courts decide only the 'rights of individuals,' and that federal courts exercise 'their proper function in a limited and separated government.'" *TransUnion LLC*, 594 U.S. at 423 (citations omitted).

And, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *see Trans Union LLC*, 594 U.S. at 431 (Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)"); *Garey*, 35 F.4th at 922 (same); *see also MSP Recovery Claims, Series LLC v. Lundbeck LLC*, __ F. 4th __, 2025 WL 610305, at *5 (4th Cir. Feb. 26, 2025); *Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 997 F.3d 149, 154 (4th Cir. 2021).

In general, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011) ("This court assumes the merits of a dispute will be resolved in favor of the party invoking our jurisdiction in assessing standing . . . ."). The *Laufer* Court said, 60 F.4th at 161: "A district court may limit its standing inquiry to the allegations of the complaint or, if there are any material factual disputes, it may conduct an evidentiary hearing."[17]

---

[17] At the pleading stage, to establish standing, a plaintiff must "'clearly allege facts demonstrating'" an injury in fact. *Opiotennione*, 2025 WL 678636, at *2 (citation omitted). When standing is challenged on the pleadings, "a court 'accept[s] as valid the merits of [the plaintiff's] legal claims.'" *Laufer*, 60 F.4th at 161 (quoting *Cruz*, 596 U.S. at 298) (alterations in *Laufer*); *see Deal*, 911 F.3d at 187 (stating that the court accepts "'as true all material allegations of the

54

Here, the plaintiffs are organizations, not individuals. An organization can assert two types of standing. *See Students for Fair Admissions, Inc.*, 600 U.S. at 199; *Warth*, 422 U.S. at 511; *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013). First, an organization "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S. at 511. And, "in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties." *Id.* Plaintiffs do not claim this type of standing.

It is the second kind of associational standing that has been asserted here. The Supreme Court has recognized that "there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004). "[A]n association may have standing solely as the representative of its members." *Warth,* 422 U.S. at 511; *see Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring suit on behalf of its members.").[18]

---

complaint and construe[s] the complaint in favor of the complaining party.'") (citation omitted); *see Button v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018).

[18] In *Students for Fair Admissions, Inc.*, 600 U.S. at 199, the Supreme Court referred to this form of standing as "organizational" standing. It seems, however, that this doctrine is typically called "associational" standing. *See, e.g., United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996); *see also, e.g., Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 398–404 (2024) (Thomas, J., concurring) (repeatedly referring to the doctrine as "associational standing"); *Thole v. U. S. Bank N.A*, 590 U.S. 538, 565 (2020) (Sotomayor, J., dissenting) (referring to the doctrine as "associational standing"); *see also People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 843 F. App'x 493, 495 (4th Cir. 2021); Wright & Miller, Federal Practice and Procedure, *Organizational and Associational Standing*, § 8345 (2d ed.) (June 2024 update). Therefore, when referring to a suit filed by an organization on behalf of its members, I shall refer to the form of standing as "associational" standing.

To have so called "representational" or "associational" standing, an organization must demonstrate that (a) "'its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc.*, 600 U.S. at 199 (quoting *Hunt*, 432 U.S. at 343); *see S. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 184 (same); *Equity In Athletics, Inc.*, 639 F.3d at 99 (same). To show that its members would have standing, an organization "must 'make specific allegations establishing that at least one *identified member* had suffered or would suffer harm.'" *S. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 184 (quoting *Summers*, 555 U.S. at 498) (emphasis in *S. Walk at Broadlands*).

Injury in fact is the "'[f]irst and foremost' of standing's three elements." *Spokeo, Inc.*, 578 U.S. at 338 (citing *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). "[A]n injury in fact is 'an invasion of a legally protected interest' which is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Opiotennione*, 2025 WL 678636, at *2 (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (requiring the plaintiff to allege a "concrete, particularized, and actual or imminent" injury). Therefore, under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a personal, particularized injury." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013).

"Concreteness and particularity are two different requirements that each must be met." *Opiotennione*, 2025 WL 678636, at *2. "[A]n injury is 'particularized' if it 'affect[s] the plaintiff in a personal and individual way.'" *Id.* (quoting *Spokeo, Inc.*, 578 U.S. at 339) (second alteration in *Opiotennione*; internal quotation marks omitted). A concrete injury is one that is "'real, and not

56

abstract.'" *TransUnion LLC*, 594 U.S. at 417 (citation omitted). "'[F]inancial harm is a classic and paradigmatic form of injury in fact.'" *Md. Shall Issue, Inc.*, 971 F.3d at 210) (citations omitted).

But, of relevance here, "[v]arious intangible harms can also be concrete." *TransUnion, LLC*, 594 U.S. at 425. The Supreme Court has said, *id.*: "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." (citing, *inter alia*, *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008) (disclosure of private information); *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (intrusion upon seclusion)); *see also Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019) ("Intrusions upon personal privacy were recognized in tort law and redressable through private litigation.").

"Reputational harm can be a concrete injury, but only if the misleading information was brought to the attention of a third party who understood its defamatory significance." *Fernandez*, 116 F.4th at 292. And, "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc.*, 578 U.S. at 339 n.7.

Of import here, the existence of an applicable statute that authorizes legal action under certain circumstances does not automatically create standing. "Congress's determination that a cause of action exists does not displace [the] 'irreducible constitutional minimum' of standing." *Krakauer*, 925 F.3d at 652 (citation omitted). To be sure, Congress is "well positioned to identify intangible harms that meet minimum Article III requirements," so "its judgment is . . . instructive and important." *Id.* at 341. Nevertheless, "plaintiffs cannot establish a cognizable injury simply

57

JA301

by pleading a statutory violation." *Garey*, 35 F.4th at 921; *see Raines*, 521 U.S. at 820 n.3 ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."). "Private litigation, even if authorized by statute to serve a range of public ends, must vindicate the plaintiffs' interests, rather than serve solely [as] a vehicle for ensuring legal compliance." *Krakauer*, 925 F.3d at 653. Thus, "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc.*, 578 U.S. at 341; *see TransUnion*, 594 U.S. at 426.

When plaintiffs proceed under a statutory cause of action, they can establish a cognizable injury by "identif[ying] a close historical or common-law analogue for their asserted injury," for which courts have "traditionally" provided a remedy. *TransUnion LLC*, 594 U.S. at 424. In other words, "[c]entral to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms . . . ." *Id.* at 417 (quoting *Spokeo, Inc.*, 578 U. S. at 340–41). Although there need not be "an exact duplicate in American history and tradition," a federal court is not entitled to "loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *TransUnion LLC*, 594 U.S. at 424–25.

As discussed, an injury in fact must also be actual or imminent. The concepts of actual, ongoing injury or imminent injury are "disjunctive." *Deal*, 911 F.3d at 189. Ongoing injuries are, "by definition, actual injuries for purposes of Article III standing." *Id.* The imminence requirement is a "'somewhat elastic concept.'" *Clapper*, 568 U.S. at 409 (citation omitted). Its "'purpose'" is "'to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.'" *Id.* (citation omitted) (emphasis in *Clapper*).

A threatened injury can also satisfy Article III standing. *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017); *see South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019). However, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis and second alteration in *Clapper*).

The second component of standing concerns traceability. This means that the injury in fact must be "fairly traceable to the challenged conduct of the defendant." *Md. Shall Issue*, 971 F.3d at 210. "For an injury to be traceable, 'there must be a causal connection between the injury and the conduct complained of' by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560). However, "the defendant's conduct need not be the last link in the causal chain . . . .'" *Air Evac EMS, Inc.*, 910 F.3d at 760; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing . . . ."). "[W]here the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendant's conduct 'upon the action of someone else,'" the traceability requirement is satisfied. *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

To satisfy the third element of standing, redressability, a plaintiff "'must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable [judicial] decision.'" *Deal*, 911 F.3d at 189 (quoting *Sierra Club*, 899 F.3d at 284). The "very essence" of the redressability requirement is that "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co.*, 523 U.S. at 107. But, the "burden imposed by

59

JA303

this requirement is not onerous." *Deal*, 911 F.3d at 189. For example, plaintiffs "'need not show that a favorable decision will relieve [their] every injury.'" *Id.* (citation omitted). "Rather, plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.'" *Id.* (quoting *Sierra Club*, 899 F.3d at 284).

"To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (citation omitted). Notably, the "second and third standing requirements— causation and redressability—are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (quoting *Sprint Commc'ns Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Food & Drug Admin.*, 602 U.S. at 380.

### B. The Contentions

Plaintiffs posit, ECF 17, ¶ 89: "SSA has collected and stored extensive personal and financial information about Plaintiffs' members, including their Social Security numbers, names and addresses, taxable income, and contributions to Social Security." Moreover, "many" of their members "have highly sensitive medical information on file with SSA, including members whose medical records may contain information that carries a stigma." *Id.* ¶ 90.

According to plaintiffs, "SSA Defendants are required by law to protect the sensitive personal and financial information that they collect and maintain about individuals from unnecessary and unlawful disclosure." *Id.* ¶ 92. In their view, "[t]he decision to grant DOGE personnel access to the extensive records that SSA maintains—and any future decisions to do so—

without obtaining or even requesting the consent of . . . Plaintiffs' members, violates those requirements and upends the reliance these members had on their data being secure." *Id.* ¶ 94.

In addition, plaintiffs claim, *id.* ¶ 95: "Plaintiffs' members—senior citizens—are also among the most targeted for and vulnerable to scams seeking or using their sensitive financial and medical information."  They assert, *id.* ¶ 97: "Defendants' actions have . . . harmed Plaintiffs' members by depriving them of privacy protections guaranteed by federal law and by making their information available for, and subject to, investigation by DOGE and scammers.  This harm is exacerbated by the attendant risk that this information, still being improperly disclosed, is more easily accessed and abused by malicious actors."

On the basis of these and other allegations, plaintiffs contend that their members have suffered an injury in fact because they have "three concrete, particularized, and actual or imminent injuries," ECF 39 at 7: "(1) an invasion of privacy akin to intrusion upon seclusion, (2) exposure to an increased and non-speculative risk of identity theft, and (3) an increased likelihood of disruption in benefit payments."

As to the first alleged injury in fact, plaintiffs argue that their members "'obvious[ly]'" have a legitimate expectation of privacy in the information SSA has collected about them, which includes "where they live, what benefits they receive, their medical histories, and their bank information."  *Id.* at 8 (citation omitted; alteration in ECF 39).  And, in plaintiffs' view, "Defendants' unauthorized disclosure of Plaintiffs' data is, as an objective matter, highly offensive." *Id.*

As to the second alleged injury in fact, plaintiffs argue, *id.*: "An agency's 'failure to adequately secure its databases' creates the sort of 'substantial risk' that constitutes a 'concrete, particularized, and actual injury' for Article III standing." (Quoting *In re U.S. Off. Of Pers. Mgmt.*

*Data Sec. Breach Litig.*, 928 F.3d 42, 54–55 (D.C. Cir. 2019)). Plaintiffs highlight that SSA's "record systems house among the most sensitive PII available" and the "sensitive nature of that data is what led Congress to protect against its misuse . . . ." ECF 39 at 10. Yet, plaintiffs posit, *id.*: "[T]he public record is replete with examples of DOGE personnel at other agencies being reckless with sensitive information.[]" (Citation omitted). Therefore, plaintiffs argue that defendants' "actions 'push the threatened injury of future identity theft beyond the speculative to the sufficiently imminent . . . .'" *Id.* (quoting *Beck*, 848 F.3d at 274).

Plaintiffs also argue that their members are "injured via [the threat of] disruption of life-sustaining benefits payments." *Id.* at 11 (emphasis omitted). According to plaintiffs, defendants' actions increase the likelihood of a disruption in the receipt of benefits on which their members rely "to live." *Id.* They point out that Dudek has "recently admitted that he 'doesn't know' whether DOGE's use of SSA data systems means the agency 'is going to break something'" and that DOGE personnel are 'unfamiliar with the nuances of [the Agency].[]'" *Id.* (citations omitted; alteration in ECF 39). Moreover, SSA employees have stated that "SSA tech systems 'seem to be crashing nearly every day, leading to more delays in serving beneficiaries.[]'" *Id.* (citation omitted). Thus, plaintiffs assert, *id.*: "This is exactly the type of injury that allows Plaintiffs to pursue 'forward-looking, injunctive relief.'" (citation omitted).

In addition, plaintiffs maintain that their individual members need not participate in the litigation. *Id.* at 12. As a general matter, plaintiffs argue that they seek injunctive relief under the APA and, therefore, "both the claim and relief generally do not require the participation of individual members." *Id.* They assert: "[C]ourts have repeatedly permitted groups asserting associational standing to challenge Privacy Act violations." *Id.* at 13 (citing cases).

Defendants insist that plaintiffs lack standing to pursue their claims. ECF 36 at 9. They posit, *id.* at 10: "The standing inquiry is especially rigorous when a plaintiff seeks to enjoin the executive branch . . . ." (Citing *Murthy*, 603 U.S. at 76).[19] Accordingly, defendants urge the Court to "deny Plaintiffs' Motion without further inquiry." ECF 36 at 9.

According to defendants, plaintiffs fail to satisfy "at least prongs one and three of the representational-standing inquiry." ECF 36 at 11. They assert, *id.* at 12: "Plaintiffs' theory of injury-in-fact is that their members have provided various forms of information to SSA with the expectation of confidentiality and privacy, and that Defendants' actions in allowing certain USDS employees to access those records violates members' reasonable expectations." In defendants' view, "[t]hat theory fails" because a statutory violation, "by itself, is not a cognizable Article III injury." *Id.* Moreover, defendants contend, *id.* at 13: "Access to information—if unaccompanied by disclosure of that information—is not a cognizable intangible harm." (Citing cases). In this regard, defendants note, *id.*: "Plaintiffs do not contend that their members were victims of any disclosure of their SSA information to non-government actors." They add, *id.* at 13 n.3: "Even if Plaintiffs were not required to show that their private information was disseminated to the public, the absence of any evidence that the information has been seen outside of SSA and a handful of USDS employees is fatal to their claim of Article III injury."

Further, defendants assert, *id.* at 13: "Were it enough for a plaintiff to establish standing simply by alleging that the holder of her personal information used it in a manner contrary to her subjective expectations, the limits the Supreme Court has carefully established to govern when disclosure of information constitutes injury-in-fact, including the requirement to identify a historical analogue, would be obliterated." They state: "Because USDS's mere access to SSA data

---

[19] A review of the citation does not reflect the government's assertion.

is not a physical, monetary, or cognizable harm, [plaintiffs] cannot establish injury-in-fact for Article III standing." *Id.* at 13–14.

In addition, defendants argue that plaintiffs fail to establish the "crucial" causation element of standing. *Id.* at 14. They spend little time addressing the issue, but illustrate their point with reference to the identity theft concerns of plaintiffs' members. *Id.* Claiming that plaintiffs have not shown "'a nonspeculative increased risk of identity theft,'" defendants argue that plaintiffs have failed to demonstrate causation as to all claims. *Id.*

As to the third prong of representational standing, defendants contend that the participation of individual members is necessary for the Privacy Act claims (Counts I and II). *Id.* In defendants' view, "a plaintiff cannot satisfy [this] prong of the representational-standing inquiry simply by stating that it seeks only injunctive relief." *Id.* at 15. They point out that the "Privacy Act does not provide for injunctive relief for disclosure claims and requires specific disclosures with respect to specific persons; in other words, the violations themselves are individualized." *Id.* Privacy Act claims, defendants say, "are specific and personal to individual persons." *Id.* They posit: "Plaintiffs must show that neither the claims they brought nor the relief they have sought 'requires the participation of individual members in the lawsuit.'" *Id.* (quoting *S. Walk at Broadlands*, 713 F.3d at 184).

In sum, defendants argue that "[b]ecause the Privacy Act requires 'individualized determinations' to establish violations, the participation of individual members is required—and Plaintiffs lack representational standing." ECF 36 at 15.

64

## C. Analysis

### 1. Interruption of Benefits

I decline to spill ink on plaintiffs' claim of standing based on a potential interruption of Social Security benefits. This is precisely the abstract, speculative, and hypothetical concern that does not pass muster under Article III.

### 2. Identity Theft

The heightened concern of plaintiffs' members regarding possible identity theft arising from a potential data breach exposing their personal information, all due to the unfettered access to PII provided by SSA to the DOGE Team, is insufficient to establish standing. This amount to a "one-step removed, anticipatory" concern, *Murthy*, 603 U.S. at 57, for which plaintiffs seek "forward-looking relief." *Id.* at 58. But, "[a]n allegation of future injury may suffice [only] if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (internal quotation marks omitted); *see also Murthy*, 603 U.S. at 58. Plaintiffs "must show a substantial risk that, in the near future," they will suffer injury. *Murthy*, 603 U.S. at 44. The allegations here are worrisome, but they do not satisfy this requirement.

I recognize that the case of *New York v. Trump*, 25-JAV-01144, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025), reaches a different result. There, nineteen states filed suit against President Trump, the U.S. Department of Treasury, and Treasury Secretary Bessent, challenging access to financial and other information provided to members of the DOGE Team by the United States Department of Treasury. *Id.* at *1. The disbursements included funding to state governments for Medicaid, FEMA, education, and foster care programs. *Id.* at *2. And, payment files contained Social Security and bank account numbers as well as federal tax return information.

65

*Id.* at *7. The court granted a preliminary injunction that, *inter alia*, enjoined the Treasury Department from granting any DOGE affiliates access to any payment record or payment system containing personally identifiable information and/or confidential financial information of the payees. *Id.* at *27.

Relevant here, the court found that the plaintiff-states had standing to sue. The court said: "Plaintiffs have adequately alleged both past harm in the unauthorized disclosure of the States' confidential financial information to the DOGE Team, *and the risk of future harm*, in the risk of exposure of their confidential information to officials of USDS/DOGE and to the public through potential hacking." *Id.* at *12 (emphasis added). As to future harm, the court explained, *id.*: "Courts have routinely found that plaintiffs have standing to seek injunctive relief where inadequate cybersecurity measures put their confidential information at risk of disclosure."

The court reasoned that there "is a realistic danger that the rushed and ad hoc process that has been employed to date by the Treasury DOGE Team has increased the risk of exposure of the States' information." *Id*. In reaching this conclusion, the court noted that one member of the Treasury DOGE Team was mistakenly granted "'read/write permissions instead of read-only'" permission. *Id.* (citation omitted). As the court put it, *id.*: "The critical sensitivity of the information contained in the [Bureau of the Fiscal Service] payment systems, which includes the PII and confidential information of both the States and millions of their residents, requires more than a band-aid approach to cybersecurity."

The hurried manner in which the Treasury DOGE Team was granted access to Treasury systems mirrors the rushed manner in which at least some members of the SSA DOGE Team were granted access to SSA systems. *See* ECF 22-10 (Flick Decl.), ¶¶ 15, 16, 23, 24, 27, 29, 40, 48 (repeatedly referencing the "rushed nature" of the onboarding and training of Bobba and Russo).

66

JA310

For example, several members of the SSA DOGE Team were granted access to SSA systems before their background checks were completed or their inter-agency detail agreements were finalized. *See* ECF 36-2, ¶¶ 5, 11, 15. Flick also raised concerns regarding Bobba's offsite access to SSA systems, which could increase the risk of the data falling into the hands of unauthorized persons. *See* ECF 22-10, ¶¶ 28, 43, 49.

But, I am guided by *Beck*, 848 F.3d 262. There, the personal information of the plaintiffs was actually compromised because of a data breach. Even so, the Court said "the mere theft" of personal information, "without more, cannot confer Article III standing." *Id.* at 275. It found no Article III injury from the "increased risk of future identity theft . . . ." *Id.* at 267. To obtain Article III standing on these grounds, the Court stated that plaintiffs' allegations must go "beyond the speculative to the sufficiently imminent." *Id.* at 274.

The Supreme Court has "repeatedly reiterated" that "'[a]llegations of *possible* future injury' are not sufficient" and that a "'threatened injury must be *certainly impending* to constitute injury in fact.'" *Clapper*, 568 U.S. at 409 (quoting *Whitmore*, 495 U.S. at 158) (emphasis and second alteration in *Clapper*). At this juncture, I am not prepared to speculate that the actions at issue will result in a data breach, and that a breach will necessarily result in identity theft. This concern is not sufficient to satisfy the demands of Article III.

However, this does not end the inquiry. Plaintiffs also claim that they have standing because their members' injuries are similar to the common-law tort of intrusion upon seclusion. ECF 39 at 7. I turn to address this contention.

### 3. Intrusion Upon Seclusion

As noted, in *TransUnion*, 594 U.S. at 424, the Supreme Court clarified that plaintiffs challenging a statutory violation can establish standing by "identif[ying] a close historical or

common-law analogue for their asserted injury," for which courts have "traditionally" provided a remedy. The Supreme Court and other courts have explicitly recognized that intrusion upon seclusion is an intangible harm "with a close relationship" to a harm "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC*, 594 U.S. at 425; *see also Garey*, 35 F.4th at 921; *Gadelhak*, 950 F.3d at 462 (Barrett, J.). And, in the context of related cases involving disclosure of PII by federal agencies, several courts have recently concluded that an injury akin to what plaintiffs allege here has a close relationship to the harm associated with the tort of intrusion upon seclusion. *See Alliance for Retired Americans v. Bessent*, 25-CKK-0313, 2025 WL 740401, at *16 (D.D.C. Mar. 7, 2025); *American Federation of Teachers, et al., v. Bessent, et al.*, 25-DLB-0430, 2025 WL 582063, at *6 (D. Md. Feb. 24, 2025); *cf. New York v. Trump*, 2025 WL 455406, at *12.

"'Intrusion upon seclusion is one of the torts under invasion of privacy.'" *Neal v. United States*, 599 F. Supp. 3d 270, 306 (D. Md. 2022) (quoting *Demo v. Kirksey*, PX-18-00716, 2018 WL 5994995, at *3 (D. Md. Nov. 15, 2018)). The Restatement (Second) of Torts § 652B (1977) (October 2024 update) ("Restatement") defines intrusion upon seclusion as follows: "One who intentionally intrudes, *physically or otherwise*, upon the solitude or seclusion of another or his *private affairs or concerns*, is subject to liability to the other for invasion of privacy, if the intrusion would be *highly offensive to a reasonable person*." (Emphasis added); *see Furman v. Sheppard*, 130 Md. App. 67, 73, 744 A.2d 583, 585 (2000) (Intrusion upon seclusion occurs where there is an "intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person."); *see also Lipscomb v. Aargon Agency, Inc.*, PWG-13-2751, 2014 WL 5782040, at *2 (D. Md. Nov. 5, 2014); *Gamble v. Fradkin & Weber, P.A.*, 846 F. Supp. 2d 377, 383 (D. Md. 2012); *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 525–26,

687 A.2d 1375, 1380-81 (1997); *Mitchell v. Balt. Sun Co.*, 164 Md. App. 497, 522, 883 A.2d 1008, 1022 (2005).

"Conduct that a particular plaintiff finds offensive, but that would not offend a reasonable person, cannot establish intrusion upon seclusion." *Neal*, 599 F. Supp. 3d at 306; *see also Whye v. Concentra Health Servs., Inc.*, ELH-12-3432, 2013 WL 5375167, at *14 (D. Md. Sept. 24, 2013), *aff'd*, 583 Fed. App'x 159 (4th Cir. 2014). Rather, intrusion upon seclusion requires a "'substantial'" intrusion, judged by an objective reasonableness standard; it is irrelevant whether a particular plaintiff subjectively found conduct to be highly offensive. *Whye*, 2013 WL 5375167, at *14 (quoting Restatement § 652B, cmt. d).

"A legitimate expectation of privacy is the touchstone of the tort of intrusion upon seclusion." *Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 877 (8th Cir. 2000). And, "[a]n intrusion upon seclusion claim requires that the matter into which there was an intrusion is entitled to be private and is kept private by the plaintiff." *Barnhart v. Paisano Pubs., LLC*, 457 F. Supp. 2d 590, 593 (D. Md. 2006).

The Restatement provides several useful illustrations pertaining to the tort of intrusion upon seclusion. For example, it explains that an intrusion upon seclusion may occur by an "investigation or examination into [the plaintiff's] private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents." Restatement § 652B cmt. b. And, relevant here, the Restatement contemplates that inspection of certain private records can qualify as intrusion upon seclusion. *See id.* On the other hand, "there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection." *Id.* cmt. c.

69

JA313

The government argues that the alleged injuries of plaintiffs' members are not comparable to the harm associated with intrusion upon seclusion because their PII has been shared only with other government employees, and not the public. ECF 36 at 13. But, intrusion upon seclusion "does not depend upon any publicity given to the person whose interest is invaded or to his affairs." Restatement § 652B cmt. a (1977). In other words, "[t]he intrusion itself makes the defendant subject to liability, even though there is no publication . . . ." *Id.* § 652B cmt. b.

Moreover, the claim that plaintiffs' members suffered no injury in fact because the protected information was disclosed only to government employees carries no water. The SSA alone has "roughly 57,000" employees. ECF 39-1, ¶ 7. And, more broadly, the federal government is the largest employer in the United States. *Federal Employers*, U.S. DEP'T LABOR, https://perma.cc/RJ3F-XNXN. The harms associated with intrusion on seclusion do not dissipate merely because PII is accessed only by government employees who were not entitled to access the information. *See, e.g.*, *Parks v. U.S. IRS*, 618 F.2d 677, 683 (10th Cir. 1980) (concluding that plaintiffs had standing to sue for a Privacy Act violation, although there was only an intra-agency disclosure, because "plaintiffs are the objects or the subjects of the disclosure and the allegation is that they suffered a personal invasion").[20]

Defendants rely, *inter alia*, on the Supreme Court's decision in *TransUnion, LLC*, 594 U.S. 413, and the Fourth Circuit's decision in *O'Leary v. TrustedID, Inc.*, 60 F.4th 240 (4th Cir. 2023), to support their position.[21]

---

[20] In the case of the government, this means, in theory, that plaintiffs would have no claim if the entire SSA workforce, consisting of thousands of people, obtained access to the PII.

[21] Many of the authorities cited by the government in support of its argument do not involve the tort of intrusion upon seclusion. *See, e.g.*, ECF 36 at 12, 13 (citing Restatement (Second) of Torts § 652D (1977) ("Publicity Given to Private Life"); *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1245 (11th Cir. 2022) (en banc) (same); *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (plaintiff proposed no common law analogue

70

In *TransUnion, LLC*, 594 U.S. 413, a class of 8,185 individuals filed suit against TransUnion, a credit reporting agency, seeking damages for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. *Id.* at 417. TransUnion compiled and sold consumer reports, containing personal and financial information, to banks, landlords, and car dealerships "that request information about the creditworthiness of individual consumers." *Id.* at 419. It also used a software product that compared names with individuals listed on the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"). *Id.* In particular, OFAC maintains a list of "'specially designated nationals'" believed to pose a threat to America's national security, such as terrorists, drug traffickers, and other serious criminals. *Id.* Because it is generally unlawful to transact business with any person on the OFAC list, TransUnion created the "OFAC Name Screen Alert to help businesses avoid transacting with individuals on OFAC's list." *Id.*

The system generated "many false positives," however, as many "law-abiding Americans happen to share a first and last name" with someone on OFAC's list. *Id.* at 420. The named plaintiff, Ramirez, was one of them. When he sought to buy a car at a dealership, his name was flagged as a "potential match" on the OFAC list. *Id.* As a result, the car dealership refused to sell the vehicle to him. *Id.* The plaintiffs filed suit, alleging that TransUnion "failed to use reasonable procedures to ensure the accuracy of their credit files, as maintained internally by TransUnion." *Id.* at 417.[22]

---

for his alleged Fair Credit Reporting Act injury, and the Court could not find one; no discussion of intrusion upon seclusion)).

[22] Two other claims were lodged by all 8,185 class members. *TransUnion, LLC*, 594 U.S. at 418. In those claims, the plaintiffs alleged "formatting defects in certain mailings sent to them by TransUnion." *Id.* However, only the named plaintiff, Ramirez, demonstrated that the alleged formatting errors caused him any concrete harm. *Id.* Therefore, the Court determined that he was the only class member with Article III standing to pursue the formatting defect claims. *Id.*

71

As to 1,853 members of the class, such as Ramirez, "TransUnion provided misleading credit reports to third-party businesses." *Id.* at 417  But, the "internal credit files of the other 6,332 class members were *not* provided to third-party businesses . . . ." *Id.* (emphasis in *TransUnion*).

To determine whether the class members had standing to recover monetary damages, the Supreme Court assessed "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 424 (quoting *Spokeo, Inc.*, 578 U.S. at 341 (2016)).  The Court had "no trouble" concluding that the 1,853 class members whose credit reports were published to third parties containing OFAC alerts that misleadingly labeled them as potential terrorists, drug traffickers, or serious criminals "suffered a concrete harm that qualifies as an injury in fact." *Id.* at 432. The Court reasoned that the publication to a third party of a credit report bearing a misleading OFAC alert shared a "'close relationship'" to the harm associated with the tort of defamation.  *Id.* However, because the credit reports of the remaining 6,332 class members were never disseminated to third parties, they did not suffer concrete harm for purposes of Article III.  *Id.* at 433.

The Court explained that "[p]ublication is 'essential to liability' in a suit for defamation." *Id.* at 434 (citation omitted).  As the Court put it, *id.*: "[T]here is 'no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury.'"  (Citation omitted).  Thus, "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.*

The class members advanced an additional contention based on "*risk of future harm.*" *Id.* at 435 (emphasis in *TransUnion*).  They argued, *id.*: "[T]he existence of misleading OFAC alerts in their internal credit files exposed them to a material risk that the information would be disseminated in the future to third parties and thereby cause them harm."  The Court rejected that

argument as well. Nevertheless, it said, *id.*: "*[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring,* at least so long as the risk of harm is sufficiently imminent and substantial." (Emphasis added). The plaintiffs did not seek injunctive relief, however. And, they did not "factually establish a sufficient risk of future harm to support Article III standing." *Id.* at 437–38. Accordingly, the Court concluded that these class members did not have standing.

The class members also argued for the first time before the Supreme Court that TransUnion "published" their information internally. *Id.* at 434 n.6. The Court stated that the "new argument" was "forfeited" but in any event was unavailing. It reasoned, *id.*: "Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation." *Id.* Although the government relies on this quote, ECF 36 at 13, the Court's statement pertained to the tort of defamation, not intrusion upon seclusion.

Of significance, *TransUnion* recognizes that, for purposes of standing, a concrete harm can be intangible. *TransUnion*, 594 U.S. at 425. And, it mentioned intrusion upon seclusion as a traditionally recognized harm. *Id.* But, the alleged harm in *TransUnion* was reputational harm, akin to the tort of defamation. And, for class members for whom there was no dissemination of information, there was no harm. The harm did not concern privacy interests stemming from sensitive PII, such as medical records and tax return information.

In *O'Leary*, 60 F.4th 240, the Fourth Circuit considered whether the plaintiff, Brady O'Leary, had standing to bring suit under South Carolina's Financial Identity Fraud and Identity Theft Protection Act, S.C. Code Ann. § 37-20-180 ("SC Act"). *Id.* at 241. The SC Act prohibited "'requir[ing] a consumer to use his social security number or a portion of it containing six digits or more to access an Internet web site, unless a password or unique personal identification number

73

JA317

or other authentication device is also required to access the Internet web site.'" *Id.* (citation omitted; alteration in *O'Leary*).

Equifax, a nonparty to the case, was subject to a data breach. *Id.* Equifax engaged its subsidiary, defendant TrustedID, Inc., "to use TrustedID's website to inform customers whether they were impacted by the data breach." *Id.* The plaintiff visited TrustedID's website to learn whether his data had been compromised. *Id.* The website required O'Leary to enter his six-digit SSN, but it did not use "any other safety precautions." *Id.* After entering his SSN, O'Leary was informed that he was not impacted by Equifax's data breach. *Id.* But, he alleged that TrustedID "shared the six digits of his SSN with Equifax." *Id.*

O'Leary filed suit against TrustedID in state court, "alleging that TrustedID's practice of requiring six digits of consumers' SSNs violated the [SC] Act and South Carolina's common-law right to privacy." *Id.* at 241. The case was removed to federal court under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). *Id.* Thereafter, the plaintiff amended his complaint, adding a negligence claim. *Id.* TrustedID moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6). *Id.* While that motion was pending, the plaintiff filed a motion to "Determine Subject Matter Jurisdiction Or, in the Alternative, to Remand." *Id.* at 242. He took no position as to whether he had standing, but the defendant argued that the plaintiff had sufficiently alleged standing. *Id.*

At the hearing, TrustedID referred to the alleged injury as "'an invasion of privacy or intrusion upon seclusion.'" *Id.* (citation omitted). And, O'Leary "said he was injured when TrustedID 'intentionally [took] personal identifying information and monetiz[ed] it in some way.'" *Id.* (citation omitted; alterations in *O'Leary*). The district court determined that O'Leary had alleged "'an intangible concrete *harm* in the manner of an invasion of privacy,' which the court said was 'enough to give [it] subject-matter jurisdiction at this early stage of the case.'" *Id.*

74

JA318

(citations omitted; alteration and emphasis in *O'Leary*).  Accordingly, the district court determined that the plaintiff had standing.  But, it dismissed his claims pursuant to Fed. R. Civ. P. 12(b)(6). *Id.*  The plaintiff appealed only the district court's decision to dismiss the case for failure to state a claim.  *Id.*

On appeal, the Fourth Circuit concluded that the plaintiff "alleged only a bare statutory violation and no Article III injury." *Id.*  The Court explained, *id.* at 243: "The intangible harm of enduring a statutory violation, standing alone, typically won't suffice under Article III—unless there's separate harm (or a materially increased risk of another harm) associated with the violation."  Extrapolating, *inter alia*, from cases involving the Fair and Accurate Credit Transactions Act ("FACTA"), 15 U.S.C. § 1681 *et seq.*, as well as data breach cases, the Fourth Circuit said, *id.* at 244: "Article III excludes plaintiffs who rely on an abstract statutory privacy injury unless it came with a nonspeculative increased risk of identity theft."  But, O'Leary had not alleged, "even in a speculative or conclusory fashion," that "entering six digits of his SSN on TrustedID's website has somehow raised his risk of identity theft."  *Id.*  In sum, the Court determined that "O'Leary relies entirely on a mere procedural violation of a statute, which Article III rejects."  *Id.* at 245.

The Court also concluded that O'Leary had not alleged "an injury with a 'close relationship' to a traditional or common-law analog", because "he appears to rely on some abstract privacy interest in his SSN itself."  *Id.* (citation omitted).  It considered two traditional analogs for intangible harms that confer standing: intrusion upon seclusion and disclosure of private information.  *Id.* at 245–46.

The Court defined intrusion upon seclusion as a cause of action "'against defendants who invade[ ] the private solitude of another.'"  *Id.* at 245 n.2 (quoting *Gadelhak*, 950 F.3d at 462).  It

acknowledged that the Supreme Court in *TransUnion* "mention[ed] intrusion upon seclusion as a traditionally recognized harm that provides a basis for lawsuits in federal court." *O'Leary*, 60 F.4th at 245 (citing *TransUnion*, 594 U.S. at 425). It noted that *TransUnion* cited "as an example then-Judge Barrett's holding in *Gadelhak* that receiving unwanted text messages (which violated the Telephone Consumer Protection Act of 1991) could be a concrete injury in fact, as it closely relates to intrusion upon seclusion." *Id.* at 245 (citing *Gadelhak*, 950 F.3d at 462). And, the Fourth Circuit acknowledged that it, too, had recognized that "violations involving unwanted calls under the Telephone Consumer Protection Act are concrete injuries in fact, based on federal courts' traditional protection of 'privacy interests in the home.'" *O'Leary*, 60 F.4th at 245 (quoting *Krakauer*, 925 F.3d at 653).

However, the Court concluded that O'Leary's alleged injury did not bear a close relationship to intrusion upon seclusion. *O'Leary*, 60 F.4th at 245. Specifically, O'Leary alleged that he "chose to hand over his partial SSN '[i]n exchange for' finding out whether he was impacted by Equifax's data breach." *Id.* (citation omitted; alteration in *O'Leary*). And, the Fourth Circuit said, *id.*: "It's the unwanted intrusion *into the home* that marks intrusion upon seclusion, and O'Leary hasn't pleaded anything that closely relates to that." (Emphasis added).

With respect to disclosure of private information, the Court recognized that it "can be another traditional analog for intangible harms that confer standing[.]" *Id.* at 246 (citing *Davis*, 554 U.S. 733). However, neither party had advanced that argument. *Id.* at 246. The parties' silence on this theory, the Court said, was "likely for good reason." *O'Leary*, 60 F.4th at 246.

The Court reviewed *Davis*, noting that it "held that a self-financed political candidate had standing to challenge a statute that would require him to disclose to the government when he spent more than $350,000 in personal funds on his campaign," because it "implicated the candidate's

privacy of association guaranteed by the First Amendment." *Id.* (citing *Davis*, 554 U.S. at 733, 744). But, the Court determined that O'Leary's "associational rights" were not impacted. It said, 60 F.4th at 246: "And he (voluntarily) disclosed his partial SSN to TrustedID, not to the government." In conclusion, the Court said, *id.*: "O'Leary hasn't adequately pled that he was injured by the alleged statutory violation at all—much less in a way that closely relates to a traditional analog for a federal lawsuit."

Defendants point to the *O'Leary* Court's determination that the tort of intrusion upon seclusion is inapplicable because it is the "unwanted intrusion into the home that marks intrusion upon seclusion." *O'Leary*, 60 F.4th at 245. But, as indicated, the Court also defined intrusion upon seclusion as a cause of action "'against defendants who invade[ ] the private solitude of another.'" *Id.* at 245 n.2 (quoting *Gadelhak*, 950 F.3d at 462). In turn, *Gadelhak* cited the Restatement, which does not limit intrusion upon seclusion to the home.

*Gadelhak* is instructive. There, in an opinion for the Seventh Circuit authored by then Judge Barrett, the court concluded that "unwanted text messages can constitute a concrete injury-in-fact for Article III purposes." 950 F.3d at 463. In reaching that conclusion, the *Gadelhak* Court observed, *id.* at 462: "The common law has long recognized actions at law against defendants who invaded the private solitude of another by committing the tort of 'intrusion upon seclusion.'" The court reasoned that "irritating intrusions," such as persistent telephone calls and unwanted text messages, "pose the same *kind* of harm that common law courts recognize . . . ." *Id.* at 462–63 (emphasis in original). Of import here, the unwanted text messages did not involve the home. Nevertheless, Judge Barrett wrote, *id.* at 462: "The harm posed by unwanted text messages is analogous to that type of intrusive invasion of privacy", *i.e.*, intrusion on seclusion.

In any event, *O'Leary* is factually distinguishable. Moreover, the government overlooks other Fourth Circuit cases that lend support to the conclusion that invasion of privacy (including the form known as intrusion upon seclusion) is a proper analog here.

In *Garey*, 35 F.4th 917, the Fourth Circuit considered whether plaintiffs had standing to sue for an alleged violation of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.* The statute provides a private cause of action against "'[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record,' for an impermissible purpose." *Id.* at 920 (citing 18 U.S.C. § 2724(a)). The defendants, personal injury lawyers, obtained motor vehicle accident reports from North Carolina law enforcement agencies or "private data brokers," *id.* at 919, which contained names and home addresses of the drivers. *Id.* at 919–20. The defendants used the personal information in the reports "to mail unsolicited attorney advertising materials to the drivers involved in those crashes." *Id.* at 920; *see also id.* at 919.

The *Garey* Court determined that plaintiffs' allegation that their "privacy [was] invaded by Defendants' knowingly obtaining his or her name and address from a motor vehicle record for an impermissible purpose in violation of law" constituted a "legally cognizable privacy injury." *Id.* at 922. It reasoned that the alleged harm was "closely related to the invasion of privacy, which has long provided a basis for recovery at common law." *Id.* at 921. Therefore, the Fourth Circuit concluded that the DPPA's private right of action satisfied Article III. *Id.* at 922.[23]

---

[23] The *Garey* Court also determined that the group of plaintiffs seeking injunctive relief did not have standing because there was no evidence they were subject to imminent or certainly impending harm. *Garey*, 35 F.4th at 923. The Court observed that a plaintiff can meet "'the injury-in-fact requirement for prospective relief' either by demonstrating 'a sufficiently imminent injury in fact' or by demonstrating 'an ongoing injury'. . . ." *Id.* at 922 (quoting, *inter alia*, *Deal*, 911 F.3d at 189). The Court agreed with the district court that plaintiffs did not show that they were "'subject to any imminent harm.'" *Id.* at 922. Specifically, because the plaintiffs "narrowed their case" to the unlawful "obtaining" of protected information, rather than using or disclosing, and the "obtaining of [plaintiffs'] personal information is a *fait* accompli," there was no "ongoing

78

In reaching its conclusion, the *Garey* Court cited *Krakauer*, 925 F.3d 643. *Krakauer* involved the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, which, among other things, prohibits telephone calls to residential phone numbers on the national "Do-Not-Call" registry. *Id.* at 648. The TCPA provides a private right of action for violations of the statute. *Id.* at 649. The plaintiffs filed a class action lawsuit, alleging that the defendant's sales representatives "routinely flouted" the TCPA *Id.* at 648. The Fourth Circuit concluded that the private right of action "plainly satisfies the demands of Article III." *Id.* at 653. It said, *id.*: "Our legal traditions . . . have long protected privacy interest in the home." But, more broadly, the Court also said, citing the Restatement: "Intrusions upon personal privacy were recognized in tort law and redressable through private litigation." *Id.*

Moreover, in the context of related cases involving agency disclosures of confidential information to DOGE Teams, at least three federal courts have recently found standing based on the analogs of intrusion upon seclusion or public disclosure of private information.

In *Alliance for Retired Americans*, 2025 WL 740401, Judge Kollar-Kotelly, of the United States District Court for the District Court of Columbia, found that three plaintiff-organizations had standing to sue the Department of Treasury and Treasury Secretary Scott Bessent, among other defendants, on behalf of their members. There, DOGE personnel were provided access to systems of records maintained by the Department of Treasury that contained sensitive and personal information. such as routing and bank account numbers, as well as information about individual credit and debit card numbers. *Id.* at *5–8, *16.

---

or imminent injury." *Id.* at 923. The Court added that the "mere possibility" of a "future 'obtaining' violation cannot support injunctive relief. *Id.*; *see City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (stating that "past wrongs do not in themselves amount to that real and immediate threat of injury" needed for prospective relief). Here, plaintiffs have alleged an on-going injury, which distinguishes the instant case from *Garey*. *See* ECF 17, ¶¶ 2, 94, 97.

79

Notably, the court rejected the argument that the plaintiffs lacked standing because the members' information was shared only within the government, and not to the public. The court acknowledged that a "lack of public exposure supports an argument that the harm that Plaintiffs describe is not analogous to the reputational harm caused by defamation." *Id.* at *15. But, it explained that a defendant can be liable for intrusion upon seclusion without any publication. *Id.* at *16. And, the court concluded that the alleged injury of plaintiffs' members—the same one alleged by plaintiffs here—"bears a close relationship to the harm essential to an intrusion upon seclusion at common law." *Id.*

In particular, the court found that the plaintiffs' members had a reasonable expectation of privacy in the records at issue because, *inter alia*, it is "entirely reasonable for [plaintiffs'] members to rely on the explicit statutory protections provided by the Privacy Act and the Internal Revenue Code." *Id.* Further, she found that the intrusion at issue would be highly offensive to a reasonable person, pointing, among other things, to "the sensitivity of the information at issue." *Id.* at *17.

In *American Federation of Teachers et al.*, 2025 WL 582063, Judge Boardman of this Court reached the same conclusion. In particular, Judge Boardman concluded that the plaintiffs, five organizations and six individuals, had standing to sue the Department of Education, among other defendants, because the alleged harm—DOGE affiliates' unauthorized access to sensitive PII of the plaintiffs or their members—resembled the tort of intrusion upon seclusion. *Id.* at *6. The information included, *inter alia*, "bank account numbers; Social Security numbers; dates of birth; physical and email addresses; disability status; income and asset information; marital status; demographic information . . . ." *Id.*

Judge Boardman concluded that the "unauthorized disclosure of this massive amount of personal information can be considered an 'unwanted intrusion into the home that marks intrusion upon seclusion.'" *Id.* (quoting *O'Leary*, 60 F.4th at 246). And, she rejected the argument that the plaintiffs did not have standing because the information was only provided to government employees. *American Federation of Teachers et al.*, 2025 WL 582063, at *6. In doing so, she distinguished the tort of intrusion upon seclusion from the tort of public disclosure of private information. *Id.* She also relied on the purpose of the Privacy Act, which, as noted earlier, includes "'prevent[ing] the kind of illegal, unwise, overbroad, investigation and record surveillance of law abiding citizens produced in recent years from actions of some overzealous investigators, and the curiosity of some government administrators, or the wrongful disclosure and use, in some cases, of personal files held by Federal agencies.'" *Id.* (quoting *Doe v. DiGenova*, 779 F.2d 74, 84 (D.C. Cir. 1985)) (alteration in *American Federation of Teachers*).

As discussed earlier, in *New York v. Trump*, 2025 WL 573771, the court granted the requests of nineteen states for a preliminary injunction which, *inter alia*, enjoined the Treasury Department from granting any DOGE affiliates access to any of its payment systems. *Id.* at *27. Relying on the Second Circuit's decision in *Bohank v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276 (2d Cir. 2023), the court found that the plaintiff-states had standing to sue. Specifically, the court reasoned that the plaintiffs adequately alleged "past harm in the unauthorized disclosure of [their] confidential financial information to the DOGE Team . . . ." *New York v. Trump*, 2025 WL 573771, at *12. The court analogized the case to *Bohank*, in which the Second Circuit concluded that "'exposure of [the plaintiff's] private PII to unauthorized third parties' bore a 'close relationship to a well-established common-law analog: public disclosure of private facts.'" *Id.* at *11 (quoting *Bohnak*, 79 F.4th at 285).

81

JA325

Applying the principles gleaned from the cases discussed above to the allegations here, I conclude that the wholesale access to SSA records that the Agency has provided to the DOGE Team is sufficiently analogous to the tort of intrusion upon seclusion.  There is an expectation of privacy with respect to the PII.  And, the unrestricted access to PII that SSA provided to the DOGE Team, without specified need, and/or without adequate training, detail agreements, and/or background investigations of all DOGE Team members, discussed *infra*, would be highly offensive to an objectively reasonable person.

To be sure, plaintiffs cannot establish a cognizable injury in fact merely by pleading a statutory violation of the Privacy Act.  But, the Supreme Court has made clear that the judgment of Congress remains "instructive and important."  *Spokeo, Inc.*, 578 U.S. at 341; *see TransUnion LLC*, 594 U.S. at 425 ("Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation.").  By enacting the Privacy Act, the Social Security Act, FISMA, and the Internal Revenue Code, Congress has recognized, in general, that improper access to or disclosure of personally identifiable information—even to government employees—poses a harm to legitimate privacy interests.

Upon review of the tort of intrusion on seclusion, it is clear that plaintiffs' members have expressed that they expected their data, maintained by SSA, to remain private.  *See, e.g.*, ECF 22-2 (Conard), ¶ 10 ("I always expected that the personal data I have submitted, and continue to submit when required, to SSA would remain private and used only to determine whether I was eligible for benefits, and not to be used for any other purpose."); ECF 22-5 (Williams), ¶ 6 (same); ECF 22-3 (Doe), ¶ 6 (same); ECF 22-4 (Imperiale), ¶ 5 ("As a retiree with a disability, it is very

important to me that my data remain private."); ECF 22-9 (Gray), ¶¶ 6, 8 (expectation that data

would remain "confidential", and data is "personal and private.").

Moreover, the expectation of privacy as to this information is objectively reasonable. "The

question of what kinds of conduct will be regarded as a 'highly offensive' intrusion is largely a

matter of social conventions and expectations." J. Thomas McCarthy, *The Rights of Publicity and

Privacy* § 5.1(A)(2) (1993). In enacting the Privacy Act, concerning the government's collection

of personal information, Congress recognized that the "right to privacy is a personal and

fundamental right . . . ." Pub. L. No. 93-579, § 2(a)(4), 88 Stat. 1896.

The expectation of privacy shared by plaintiffs' members is objectively reasonable. It is

almost self-evident that, in our society, PII, such as SSNs, medical information, and certain

financial records, are regarded as private, sensitive, and confidential information.[24] Indeed, in

some jurisdictions the disclosure of "medical records amounts to a per se intrusion into seclusion

if the records contain sensitive materials." *Sabrowski v. Albani-Bayeux, Inc.*, 124 F. App'x 159,

161 (4th Cir. 2005) (citing *Toomer v. Garrett,* 574 S.E.2d 76 (N.C. Ct. App. 2002)). The enactment

of the Health Insurance Portability and Accountability Act ("HIPPA"), 29 U.S.C. § 1181 *et seq.*,

---

[24] Just as the Court was about to submit this Memorandum Opinion for filing, the news
reported that the SSNs of some 200 people were included in the release of files concerning the
death of President John F. Kennedy. *See* William Wan, et al., *Social Security Numbers and Other
Private Information Unmasked in JFK Files*, WASH. POST (Mar. 19, 2025),
https://perma.cc/C4VG-PY9F. The reaction to the disclosure is telling, and underscores the
expectation of privacy associated with SSNs. "It's absolutely outrageous," said former Trump
campaign lawyer Joseph diGenova, whose information was disclosed. *Id*. Mary Ellen Callahan,
former Chief Privacy Officer at the Department of Homeland Security, aptly stated, *id.*: "Social
Security is literally the keys to the kingdom to everybody. It's absolutely a Privacy Act violation."

Here, the access to private information includes SSNs, but also other personal data.
Although the access was made to the DOGE Team, and not (yet) disseminated publicly, the
reaction to the disclosure of SSNs in regard to the Kennedy files supports the conclusion here that
there is an expectation of privacy with respect to SSNs.

is a reflection of societal views as to the sanctity of medical information. HIPPA "is the primary federal law which was passed to ensure an individual's right to privacy over medical records." *United States v. Elliott*, 676 F. Supp. 2d. 431, 436 (2009). Although HIPPA does not apply to the government, *see* 45 C.F.R. §§ 160.102, 164.104, the statute speaks to the expectation of privacy in medical records that is engrained in our culture.

The evidentiary "psychotherapist-patient privilege" also illustrates the importance of confidentiality that our society attaches to health matters. The privilege is "'rooted in the imperative need for confidence and trust'" between a physician and patient in regard to discussions concerning health issues. *Jaffee v. Redmond*, 518 U.S. 1, 10 (1996); *see also id.* at 12 (noting that "all 50 States and the District of Columbia have enacted into law some form of psychotherapist privilege."). Some of those kinds of discussions are likely contained in the wide swath of information collected by SSA in certain circumstances. *See* ECF 17 (Widger Decl.), ¶ 12 (medical records can include "notes from psychotherapist and counseling sessions").

The information that SSA holds, such as birth and marriage records, SSNs, tax and earnings records, and health records are typically found in equivalents to "private and personal mail," a "wallet," a "safe," or at home. Restatement § 652B cmt. b. Unauthorized or improper access is a "highly offensive" intrusion. *See Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009) (stating that "conduct giving rise to unauthorized viewing of personal information such as a plaintiff's Social Security number and other identifying information can constitute an intrusion that is highly offensive to any reasonable person"); *Toomer*, 574 S.E.2d at 90 ("The unauthorized examination of the contents of one's personnel file, especially where it includes sensitive information such as medical diagnoses and financial information, like the unauthorized opening and perusal of one's mail, would be highly offensive to a reasonable person.").

Therefore, I am satisfied that the harm alleged here is akin to the tort of intrusion upon seclusion. *See TransUnion LLC*, 594 U.S. at 424–25 (recognizing that there need not be "an exact duplicate in American history and tradition"). It follows that the invasion of privacy harm alleged by plaintiffs satisfies the injury in fact requirement of Article III.

### 4. Other Elements of Associational Standing

In addition to injury in fact, the remaining requirements of the first element of associational standing—whether the individual members would have standing to sue in their own right—are also met here. Defendants' actions have caused injury to plaintiffs' members, and the members' injuries would be redressable by judicial relief. *See Lujan*, 504 U.S. at 561; *see also Food & Drug Admin.*. 602 U.S. at 380 ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."); *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury.") (cleaned up; emphasis in original). Defendants do not argue otherwise.[25]

As discussed, the second element of associational standing requires that the interests the organization "'seeks to protect are germane to the organization's purpose.'" *Students For Fair Admissions, Inc.*, 600 U.S. at 199 (citation omitted). Plaintiffs posit that among their "organizational goals is ensuring that their members have access to and are able to benefit from well run programs by SSA, making the privacy interests it seeks to protect via this lawsuit germane to its purpose." ECF 21-1 at 21 n.32. Defendants do not dispute this element.

---

[25] Defendants dispute causation in the context of the alleged injury in fact of an increased risk of identity theft. ECF 36 at 14. Because I do not reach that issue, I need not address defendants' argument.

85

All three plaintiff-organizations seek to ensure protection of their members to Social Security benefits. ECF 22-1 (Widger Decl.), ¶¶ 7, 8; ECF 22-6 (Fiesta Decl.), ¶ 3; ECF 22-8 (Aguirre Decl.), ¶¶ 3, 5. Each plaintiff has members for whom SSA holds personal, sensitive information, such as bank account numbers, medical information, tax information, and home addresses. ECF 22-1 (Widger Decl.), ¶¶ 10–13; ECF 22-6 (Fiesta Decl.), ¶ 9; ECF 22-8 (Aguirre Decl.), ¶ 8. And, in view of the access provided to the DOGE Team, plaintiffs' members are now subject to an ongoing invasion of privacy, which has made at least some members anxious and distressed, *see, e.g.*, ECF 22-3 (Doe Decl.),¶ 7; ECF 22-4 (Imperiale Decl.), ¶ 8; ECF 22-7 (Somo Decl.), ¶¶ 11, 13; ECF 22-9 (Gray Decl.), ¶ 10, and concerned about pursuing benefits under the SSFA. *See* ECF 22-1 (Widger Decl.), ¶ 26; ECF 22-6 (Fiesta Decl.), ¶ 17; *see also* ECF 22-5 (Williams Decl.), ¶ 7; ECF 22-7 (Somo Decl.), ¶ 12. I am satisfied that the interests plaintiffs seek to protect are "'germane'" to plaintiffs' organizational purposes.

The third element of associational standing requires that "'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc.*, 600 U.S. at 199 (citation omitted). "'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members . . . ." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (quoting *Hunt*, 432 U.S. at 343).

Defendants assert that the participation of plaintiffs' individual members is necessary for Counts I and II, which implicate the Privacy Act. ECF 36 at 14. This argument is founded on two primary grounds, *id.* at 15: (1) the Privacy Act does not provide for injunctive relief for disclosure claims; and (2) Privacy Act claims are "specific and personal to individual persons."

Plaintiffs seek declaratory and injunctive relief. In *Warth*, 422 U.S. at 515, the Court distinguished associational standing when "a declaration, injunction, or some other form of prospective relief" is sought, and associational standing when "an association seeks relief in damages for alleged injuries to its members." As to the latter, "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Id.* at 515–16. But, as to the former, individual participation is ordinarily not necessary because "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.* at 515.

Defendants are correct that the Privacy Act does not provide for injunctive relief for disclosure claims. *See* 5 U.S.C. § 552a(g). However, in *Doe v. Chao*, 435 F.3d 492, 504 n.17 (4th Cir. 2006), the Fourth Circuit indicated in dicta that, pursuant to the APA, a plaintiff may pursue injunctive relief for a disclosure claim under the Privacy Act. And in dicta, the Supreme Court has alluded to the same conclusion. *Doe v. Chao*, 540 U.S. at 619 n.1 ("The Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the [APA] . . . .").

As to defendants' second argument, this prong of the "associational standing test is best seen as focusing on . . . matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food & Com. Workers Union Loc. 751*, 517 U.S. at 557. As a matter of judicial economy, lawsuits filed by each of plaintiffs' members would be more burdensome on the Court than adjudicating the one case filed by plaintiffs on behalf of their members.

Again, this case involves sweeping access to PII, and the challenged conduct pertains to most if not all of plaintiffs' members, representing masses of people. If plaintiffs' members were to bring suit on their own behalf, the courts would be flooded. And, the challenged conduct would generally implicate the same facts, the same defendants, and the same data systems that were made available to DOGE personnel. Because plaintiffs do not seek monetary damages with respect to their Privacy Act claims, the participation of individual members is not necessary to resolve this case.

Notably, the government has not identified a case where a court concluded that a plaintiff-organization did not have associational standing to assert a Privacy Act claim on the ground that participation of individual members was necessary. But, plaintiffs have identified several cases in which judges have concluded that a plaintiff-organization had standing to bring a Privacy Act claim on behalf of its members. ECF 39 at 14 (citing, *inter alia*, *Democratic Party of Virginia v. Brink*, 599 F. Supp. 3d 346, 356 (E.D. Va. 2022); *Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d 665, 671–72 (S.D.N.Y. 2009)).

In sum, I conclude that plaintiffs have standing to pursue their claims.[26]

## VI.    APA Claims[27]

Plaintiffs primarily pursue claims under the APA. *See* Counts I, III, IV, V. They contend that SSA's conduct is unlawful, arbitrary, and capricious because SSA is "sharing the public's data without even acknowledging the seismic shift in agency policy." ECF 21-1 at 26.

---

[26] I express no opinion as to whether plaintiffs have standing to pursue their Appointments Clause claim. That issue has not been raised by either side.

[27] I incorporate here the statutory overview set forth earlier.

Defendants counter that plaintiffs' APA claims fail for three main reasons: (1) plaintiffs fail to identify a final agency action subject to judicial review, (2) plaintiffs have no right to interfere with the day-to-day operations of the Agency, and (3) plaintiffs have an adequate remedy at law available to them under the Privacy Act if, in fact, a violation has occurred.

### A.  Judicial Review of APA Claims

Section 702 of the APA provides, in part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see also id.* § 794 (permitting review of "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court").

"The APA establishes a 'basic presumption of judicial review' of agency action." *Lovo v. Miller*, 107 F.4th 199, 205 (4th Cir. 2024) (quoting *Lincoln v. Virgil*, 508 U.S. 182, 190 (1993) (internal quotation marks and citation omitted)); *see Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018) ("The Administrative Procedure Act creates a basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'") (citation and some internal quotations omitted; alteration in *Weyerhaeuser*); *see also Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697 (4th Cir. 2019); *Speed Mining, Inc. v. Fed Mine Safety & Health Review Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008). The presumption of judicial review "may be rebutted only if the relevant statute precludes review, 5 U.S.C. § 701(a)(1), or if the action is 'committed to agency discretion by law,' § 701(a)(2)." *Weyerhaeuser Co.*, 586 U.S. at 23; *see Gonzalez v. Cuccinelli*, 985 F.3d 357, 366 (4th Cir. 2021). The latter exception is read "quite narrowly." *Weyerhaeuser Co.*, 586 U.S. at 23; *accord Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977). This

applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* (quoting *Lincoln*, 508 U.S. at 191); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (judicial review is unavailable if the statute provides "no judicially manageable standards . . . for judging how and when an agency should exercise its discretion"); *see also Speed Mining, Inc.*, 528 F.3d at 317.

"The APA provides that a reviewing court is bound to 'hold unlawful and set aside agency action' for certain specified reasons, including whenever the challenged act is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Back Bay*, 681 F.3d at 586–87 (quoting 5 U.S.C. § 706(2)(A)); *see United States v. Bean*, 537 U.S. 71, 77 (2002). Review under the APA is highly deferential, and the agency action enjoys a presumption of validity. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citing *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993)).

Notably, "the power of . . . agencies is circumscribed by the authority granted," and courts are "entrusted" with "protect[ing] justiciable individual rights against administrative action fairly beyond the granted powers." *Stark v. Wickard*, 321 U.S. 288, 309–10 (1944). In other words, "Agencies must operate within the legal authority conferred by Congress, and when those limits are transgressed, an individual may seek recourse in the Article III courts." *Medical Imaging & Technoloy Alliance*, 103 F.4th at 838.

As the D.C. Circuit has said, "Congress's 'historic practice' of providing for judicial review of administrative action reflects the importance of an independent check on the exercise of executive power." *Med. Imaging & Tech. All.*, 103 F.4th at 839 (quoting *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 670–73 (1986)). Unless Congress makes a decision to withhold

judicial review, "courts have the power and the duty to review agency action for conformity with the law." *Med. Imaging & Tech. All.*, 103 F.4th at 839.

The Fourth Circuit has set forth limitations on judicial review. The Court has said: "Review is available only when acts are discrete in character, required by law, and bear on a party's rights and obligations. The result is a scheme allowing courts to review only those acts that are specific enough to avoid entangling the judiciary in programmatic oversight, clear enough to avoid substituting judicial judgments for those of the executive branch, and substantial enough to prevent an incursion into internal agency management." *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 432 (4th Cir. 2019) (citing *Norton v. Southern Wilderness Alliance ("SUWA")*, 542 U.S. 55, 64–65 (2004)). "In determining whether a 'meaningful standard' for reviewing agency discretion exists, courts consider the particular language and overall structure of the statute in question, as well as 'the nature of the administrative action at issue.'" *Speed Mining, Inc.*, 528 F.3d at 317 (internal citations omitted) (quoting 470 U.S. at 830 and *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002)).

## B. Final Agency Action

Under the APA, the federal government waives sovereign immunity for a suit brought by "'a person suffering legal wrong because of agency action'" who seeks to obtain relief "'other than money damages.' 5 U.S.C. § 702." *City of New York*, 913 F.3d at 430. "The term 'action' as used in the APA is a term of art that does not include all conduct" of the government. *Vill. Of Bald Head Island v. U.S. Army Corps. Of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(B). As Judge Bredar recently noted, the term "'agency action' is a capacious term, 'cover[ing] comprehensively every manner

in which an agency may exercise its power.'" *Maryland, et al. v. United States Dep't of Agriculture, et al.*, JKB-25-0748, 2025 WL 800216, at \*11 (D. Md. Mar. 13, 2025) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)) (alteration in *United States Dep't of Agriculture*).

The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see Lovo*, 107 F.4th at 205; *City of New York*, 913 F.3d at 430–31; *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019); *Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438, 445 (4th Cir. 2014); *Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 432–33 (4th Cir. 2010).[28]    Indeed, a court lacks subject matter jurisdiction if the plaintiff challenges an "agency action" that is not "fit for review." *City of New York*, 913 F.3d at 430.

Under *Bennett v. Spear*, 520 U.S. 154 (1997), an agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177-78; *see Biden v. Texas*, 597 U.S. 785, 808 (2022). Notably, courts take a "'pragmatic' approach . . . to finality." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Labs.*, 387 U.S. at 149); *see Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (noting that the finality requirement is applied in a "'flexible and pragmatic way'").

---

[28] The requirement of final agency action applies to plaintiffs' APA claims, but not to their *ultra vires* claim or Privacy Act claim in Count II. For example, Judge Bredar noted in *Maryland, et al. v. United States Dep't of Agriculture, et al.*, 2025 WL 800216, at \*11 n.4, that "the right of action for an *ultra vires* claim flows from the federal courts' equity jurisdiction, not from the APA."

The finality requirement ensures that judicial intervention does not deny an agency the "opportunity to correct its own mistakes and to apply its expertise." *Federal Trade Comm'n. v. Standard Oil Co. of California*, 449 U.S. 232, 242 (1980); *see also Univ. of Medicine & Dentistry of New Jersey v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003). It also avoids "piecemeal review," which is "inefficient" and might prove to be "unnecessary" upon the agency's completion of its process. *Standard Oil Co. of California*, 449 U.S. at 242. Notably, the APA does not allow a court to review an agency's "day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).

The scope of judicial review is limited in "two important respects." *City of New York*, 913 F.3d at 431. First, the plaintiff must "identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on the government's operations." *Id.* at 431 (quoting *SUWA*, 542 U.S. at 64). The Fourth Circuit has explained, *City of New York*, 913 F.3d at 431: "This distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers. Courts are well-suited to reviewing specific agency decisions, such as rulemakings, orders, or denials. [Courts] are woefully ill-suited, however, to adjudicate generalized grievances asking us to improve an agency's performance or operations."

Second, "the definition of 'agency action' is limited to those governmental acts that determin[e] rights and obligations.'" *Id.* (quoting *Clear Sky Car Wash LLC,* 743 F.3d at 445 (alteration in *City of New York*). The Fourth Circuit has explained, *City of New York*, 913 F.3d at 431: "This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties." In order to satisfy the requirement, "a party must demonstrate that the challenged act had

93

'an immediate and practical impact,' *Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010), or 'alter[ed] the legal regime' in which it operates." *Id.* (citing *Bennett*, 520 U.S. at 178).

"The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (plurality opinion); *see Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 858 (4th Cir. 2002) ("[T]he critical issue is whether the [agency's action] gives rise to legal consequences, rights, or obligations.").

To satisfy the consummation element, the challenged agency action need not be reduced to writing. *See, e.g.*, *Her Majesty the Queen in Right of Ontario*, 912 F.2d at 1531 (noting that "the absence of a formal statement of the agency's position . . . is not dispositive); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) ("Agency action, however, need not be in writing to be final and judicially reviewable."). Indeed, a "contrary rule would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" *R.I.L-R*, 80 F. Supp. 3d at 184 (citation omitted). And, agency action has legal consequences if it "alters the legal regime[.]" *Bennett*, 520 U.S. at 178; *see Hawkes*, 578 U.S. at 598–99; *Nat'l Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011).

### C. The Contentions

Plaintiffs maintain that they "clearly challenge the decision of 'SSA and its acting officials' to 'open[] [SSA] data systems to unauthorized personnel from [DOGE] in violation of applicable laws and with disregard for the privacy interests' of millions of Americans." ECF 39 at 13 (quoting ECF 17, ¶¶ 2, 86, 101, 114, 122). In their view, the decision of the SSA Defendants to "approve DOGE's request for access to certain agency record systems and the PII on those data systems"

constitutes an "agency action" because it is a "final disposition," both "discrete" and "circumscribed." ECF 39 at 14 (citing *SUWA*, 542 U.S. at 62). Moreover, plaintiffs insist that they do not challenge the day-to-day operations of the SSA, including "the fact of SSA's onboarding of Mr. Bobba or other DOGE associates." ECF 39 at 14.

Defendants argue that no final agency action is implicated here. ECF 36 at 16. Instead, defendants characterize the access provided by SSA to the DOGE Team as "precisely the day-to-day operations the Supreme Court in *Lujan* advised not to sweep into the APA's ambit." *Id.* at 19.

According to defendants, their "declarations demonstrate [that] no new finalized policy has been implemented—or existing policy definitively changed—as SSA continues to onboard employees where needed in a workaday application of previous standards." *Id.* at 20.[29] Further, defendants argue that plaintiffs have failed to "demonstrate how providing a new employee with system access necessary to his or her function 'consummat[es]' the hiring agency's decision-making process in such a way that legal consequences flow to Plaintiffs." ECF 36 at 20.[30]

The defense also asserts, *id.* at 17: "It is unclear, for example, whether the alleged wrongful action is the provision of access to Mr. Bobba, the provision of access to Mr. Bobba and to other

---

[29] Defendants are inconsistent regarding the number of employees who have signed the Acknowledgement of SSA Information Security and Privacy Awareness Training. Defendants' brief states the number is nine, *see* ECF 36 at 6, while the Felix-Lawson Declaration states that ten employees have signed it. ECF 36-2, ¶ 13. Felix-Lawson also "outlines how each individual associated with SSA's DOGE team has been onboarded with SSA" and also that her office "is working to ensure all onboarding requirements are met." *Id.* ¶¶ 3, 17; *see also* ECF 39 at 14 n.11.

[30] Defendants' citation to *Sierra Club v. E.P.A.*, 955 F.3d 56, 63 (D.C. Cir. 2020), is misplaced. *See* ECF 36 at 20. There, the court found that there was no final agency action where the agency's action ""impose[d] no obligations, prohibitions or restrictions on regulated entities," and "[did] not subject them to new penalties or enforcement risks." *Sierra Club*, 955 F.3d at 63. But, the court was evaluating whether *agency guidance statements* constituted final agency actions. *Id.* ("When deciding whether guidance statements meet prong two, this Court has considered factors including . . .").

95

JA339

employees, or the advent of a new—or change to an existing—formal agency policy regarding access to agency informational systems, or sharing of data from those systems." And, they explain that without clear identification, "it is impossible to examine such alleged action under the APA's standards or to craft meaningful preliminary relief." *Id*.

Defendants add, *id.* at 19: "Agencies make thousands of such decisions every day, whenever they decide to open an e-mail account for an employee, to staff an employee on a particular matter, or that an employee has the relevant training to access systems or participate in certain programs. A court could not review such decisions without bringing within the scope of the APA virtually every aspect of an agency's relationship with its employees, a result the "final agency action" limitation of the APA is designed to prevent."

Moreover, defendants argue that the actions identified by plaintiffs "are both tentative and interlocutory in nature," and not final, as required. ECF 36 at 19. They claim that plaintiffs "have not identified: (1) whether additional government employees will be involved in implementing the DOGE Agenda at SSA; (2) what the status of those employees will be (*i.e.* detailees from USDS, direct hires at SSA, or detailees from other agencies); and (3) what systems they will have access to." *Id*.

### D. Analysis

In my view, the government misses the mark in claiming that no final agency action is implicated here and, in effect, that it is merely business as usual at SSA. Contrary to SSA's well entrenched policy and practice, Dudek made the unprecedented decision to provide the DOGE Team with non-anonymized access to virtually all SSA records. And, when he did so, some of the DOGE Team members were not yet entitled to access, because they either were not properly detailed to SSA, or had not been vetted or adequately trained, or necessary work documents were

not signed. Moreover, there was no demonstrated need for access to such a massive quantity of PII. At best, there was only a vague and conclusory assertion that access to the entirety of SSA's systems of records was needed to root out fraud.

SSA's decision to provide such access upended the longstanding policy and practice that had governed SSA with respect to access to PII. The Agency's wholesale provision of access to the PII of millions of Americans, under the circumstances alleged here, is a sea change that falls within the ambit of a final agency action.

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925 (D.C. Cir. 2008), is instructive. There, the employer, the operator of a casino, sought an injunction to bar the Equal Employment Opportunity Commission ("EEOC") from releasing without notice confidential documents that the employer provided during various EEOC investigations. The EEOC claimed that the employer's claims were not cognizable under the APA because the EEOC's disclosure policy as to the confidential information was not a final agency action and because the matter of disclosure is committed to the discretion of the agency and thus not reviewable. *Id.* at 931.

As the court explained, the employer was challenging the agency decision to adopt a policy of disclosing confidential information without notice. *Id.* The D.C. Circuit concluded: "Adopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process,' and 'one by which [the submitter's] rights [and the agency's] obligations have been determined.'" *Id.* at 931.[31] Nothing in *Venetian* was specific to *third-party* access to the information. The same logic applies here.

---

[31] The court had previously determined that the plaintiff had standing because it had demonstrated "a substantial probability that the alleged disclosure policy will harm its concrete and particularized interest in retaining the confidentiality of protected information." *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 367 (D.C. Cir. 2005).

As Russo avers: "In the case of DOGE team data access, data access to the DOGE team was first approved by SSA's Acting Commissioner [Dudek]." ECF 36-1 ("Russo Decl."), ¶ 6. And, he concedes that on February 12, 2025 and February 20, 2025, access to personally identifiable information was granted with respect to SSA's MBR, SSR, Numident, and Treasury Payment Files. *Id.* ¶ 7. Thus, the access concerned virtually all data and records systems maintained by SSA, despite a longstanding policy and practice at SSA of guarding the confidentiality and privacy of PII, except as needed.

Flick's detailed Declaration, which is unrefuted, bolsters the conclusion that the access that SSA provided constitutes a dramatic change in policy at SSA. She attests that "[t]he importance of privacy is engrained in every SSA employee from day one" and, "[a]long with accurate and timely payment of benefits, attention to privacy is one of SSA's most fundamental duties." ECF 22-10, ¶ 4. To that end, employees are required to sign documents every year acknowledging their duty to protect PII and are also required to attend annual information security training. *Id.* ¶ 6.

Critically, the DOGE Team received far broader access than what is automatically afforded when SSA records are reviewed "for potential fraud, waste, and abuse by oversight agencies . . . or auditors. . . ." ECF 22-10, ¶ 26. Flick avers that typically, "when analysts or auditors review agency data for possible payment issues, including for fraud, the review process would start with access to high-level, anonymized data based on the least amount of data the analyst or auditor would need to know." ECF 39-1, ¶ 4. Then, if a subset of the data are "flagged as suspicious, the analyst or auditor would access more granular, non-anonymized data to just that subset of files." *Id.* She also insists that "the type of full, non-anonymized access of individual data on every person who has a social security number or receives benefit from Social Security is unnecessary at the outset of any anti-fraud or other auditing project." *Id.*

98

JA342

Indeed, Flick avers that SSA "would not provide full access to all data systems even to our most skilled and highly trained experts." ECF 22-10, ¶ 37. Rather, she asserts that the scope of access requires a "'need to know.'" *Id.* ¶ 43. She explains that the "need to know" reason for full, non-anonymized access to SSA data systems articulated in this case are "far from sufficiently detailed to justify granting the level of access the DOGE Team now has." ECF 39-2, ¶ 5.

More than just the scope of the access, it is clear that the SSA has made a change to what requirements need to be met by employees to obtain such broad access. Flick provides several examples of occurrences that reflect that Dudek's decision to authorize the DOGE Team to obtain access to the SSA data systems is at odds with SSA's earlier policy and practices. According to Flick, the onboarding process for one of the DOGE Team employees was "contrary to standard practice," ECF 22-10, ¶ 16, and the speed at which access to systems was provided was "unprecedented." *Id.* ¶ 15.

Flick makes clear, and the timeline included in declarations submitted by defendants, discussed *infra*, confirms, that several employees of the DOGE Team accessed SSA data systems prior to having signed finalized detail agreements from other agencies. ECF 39-2, ¶ 3. According to Flick, this "is not in keeping with agency practice because the agency does not consider a detailee to be an employee of SSA until a detail agreement is signed and finalized." *Id.* And, defendants' declarations demonstrate that, currently, some of the background investigations for some DOGE Team members are still pending. Yet, they were provided access to PII in the SSA data systems. *See* ECF 36-2, ¶ 15.[32]

---

[32] The declarations of Russo and Felix-Lawson glaringly fail to specify dates when the DOGE Team members completed "Privacy Training" or "Ethics Training," or when they signed "Acknowledgement of SSA Information Security and Privacy Awareness Training." *See* ECF 36-1, ¶ 21; ECF 36-2, ¶ 13. This raises the specter that the requirements had not been met when access was provided.

Although not cited by the parties, SSA's policy of respecting privacy is consistent with federal regulations governing the Social Security Administration, which admonish SSA employees to be mindful of their responsibilities under the Privacy Act. The Employee Standards of Conduct for SSA state, 20 C.F.R. Pt. 401, App. A(a):

> All SSA employees are required to be aware of their responsibilities under the Privacy Act of 1974, 5 U.S.C. 552a. . . . Instruction on the requirements of the Act and regulation shall be provided to all new employees of SSA. In addition, supervisors shall be responsible for assuring that employees who are working with systems of records or who undertake new duties which require the use of systems of records are informed of their responsibilities. Supervisors shall also be responsible for assuring that all employees who work with such systems of records are periodically reminded of the requirements of the Privacy Act and are advised of any new provisions or interpretations of the Act.

SSA's regulations also provide that "Systems Employees shall: (a) Be informed with respect to their responsibilities under the Privacy Act; . . . [and] (c) Disclose records within SSA only to an employee who has a *legitimate need to know* the record in the course of his or her official duties." 20 C.F.R. Pt. 401, App. A(d)(1) (emphasis added).

Dudek's decision to provide the DOGE Team with access to all SSA record systems, and to do so without signed detail agreements, adequate training, completed background investigations, and/or executed work forms for all DOGE Team members, and without actual "need," "is surely a 'consummation of the agency's decisionmaking process,' and 'one by which [the submitter's] rights [and the agency's] obligations have been determined.'" *Venetian Casino Resort, L.L.C.*, 530 F.3d at 931. In granting the DOGE Team access to records in the manner alleged, SSA veered far from principles that have been the mainstay of the Agency. The decision to do so qualifies as a final agency action.

### E. No Other Adequate Remedy

Plaintiffs assert that "nothing absent an injunction will prevent Defendants' ongoing disclosure of and access to the data in question." ECF 21-1 at 23. But, both plaintiffs and defendants agree that the Privacy Act does not provide for injunctive relief for disclosure claims. *See* ECF 21-1 at 23 (plaintiffs); ECF 36 at 15 (defendants).

Defendants argue that the APA provides for judicial review only in circumstances where there is no other adequate remedy. *See* ECF 36 at 22. But, defendants contend that "the Privacy Act provides a 'comprehensive remedial scheme' for injuries arising out of the inappropriate dissemination of private information about individuals." *Id.* (quoting *Wilson*, 535 F.3d at 703). Therefore, they contend that plaintiffs "cannot use the APA to circumvent the Privacy Act's carefully drawn limitations on the types of relief they can seek." ECF 36 at 22.

Review under the APA is limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. And, the statute "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts,* 487 U.S. 879, 903 (1988). Plaintiffs "may advance an APA claim as well as another type of claim only if the APA claim does not duplicate 'existing procedures for review of an agency action.'" *Cent. Platte Nat. Res. Dist. v. U.S. Dep't of Agric.*, 643 F.3d 1142, 1148 (8th Cir. 2011) (citing *Radack v. U.S. Dep't of Justice,* 402 F.Supp.2d 99, 104 (D.D.C. 2005)).

Courts have stated that an adequate alternative remedy "does not need to provide relief 'identical' to that available to a party under the APA—it must merely be of the 'same genre.'" *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014) (quoting *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)); *see also El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S.*

*Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005). Where courts have held that a plaintiff could not also bring an APA claim to obtain relief for an agency's alleged Privacy Act violation, it has been where the Privacy Act provided the kind of relief plaintiff sought. *See, e.g.*, *Westcott*, 39 F. Supp. 3d 21 (no APA claim because Privacy Act permits removal or revision of memorandum of reprimand contained in official military records); *Poss v. Kern*, No. 23-CV-2199 (DLF), 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024) (no APA claim when seeking "removal and deletion of the allegedly defamatory report from DOD's database"); *Haleem v. U.S. Dep't of Def.*, No. CV 23-1471 (JEB), 2024 WL 230289, at *14 (D.D.C. Jan. 22, 2024) ("The Privacy Act and FOIA thus provide adequate remedies to compel responses to his requests and the production of withheld records, meaning Plaintiff cannot premise an APA claim on Defendants' alleged failure to respond to such requests or produce such records."); *Harrison v. BOP*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017) (finding no APA claim because Privacy Act provided relief when agency failed to provide requested records); *Wilson v. McHugh*, 842 F. Supp. 2d 310, 320 (D.D.C. 2012) (finding no APA claim because Privacy Act applied when agency refused to withdraw a press release).

The injunctive relief sought by plaintiffs here is not available under the Privacy Act. And, the Supreme Court has stated: "The Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the Administrative Procedure Act (APA), 5 U.S.C. § 706." *Doe v. Chao*, 540 U.S. at 619 n.1.

I conclude that plaintiffs are not barred from seeking relief under the APA.

## VII.    Temporary Restraining Order

Plaintiffs seek a TRO to enjoin DOGE's access to SSA's data systems.  The purpose of a TRO is to "preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (quotation omitted).  A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Alternatively, plaintiffs seek a stay under 5 U.S.C. § 705.  Pursuant to 5 U.S.C. § 705, a reviewing court may stay "agency action" pending judicial review "to prevent irreparable injury." The standards for granting a TRO, a preliminary injunction, and a § 705 stay are essentially the same.  *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 949–50 (D. Md. 2020) (citing cases); *Maags Auditorium v. Prince George's Cty., Md.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014) ("The standard for a temporary restraining order is the same as a preliminary injunction."), *aff'd*, 681 F. App'x 256 (4th Cir. 2017).

The party seeking a TRO must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20; *see Frazier v. Prince George's Cty., Md.*, 86 F. 4th 537, 543 (4th Cir. 2023) (same).  The plaintiff must satisfy each requirement as articulated.  *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009).

To meet the first requirement, the plaintiffs must "clearly demonstrate that [they] will likely succeed on the merits," rather than present a mere "grave or serious question for litigation." *Real Truth About Obama, Inc.*, 575 F.3d at 346–47.  But, plaintiffs "need not establish a 'certainty of

success.'" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)).

Simply "providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) standard of *Twombly* and *Iqbal*" does not meet the rigorous standard required for a TRO. *Allstate Ins. Co. v. Warns*, CCB-11-1846, 2012 WL 681792, at *14 (D. Md. Feb. 29, 2012). However, the court need only find that a plaintiff is likely to succeed on one of his claims in order for this factor to weigh in favor of a TRO. *PFLAG, Inc. v. Trump*, ___ F. Supp. 3d. ___, BAH-25-337, 2025 WL 510050, at *12 (D. Md. Feb. 14, 2025); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, ___ F. Supp. 3d. ___, No. 25-239 (LLA), 2025 WL 368852, at *9 (D.D.C. Feb. 3, 2025); *Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 747 (D. Md. 2020).

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991)). In other words, the plaintiffs must show that harm is not just a mere possibility, but that harm is truly irreparable and cannot be remedied at a later time with money damages. "[T]he harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Mountain Valley Pipeline, LLC*, 915 F.3d at 216 (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

Irreparable harm "is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (quoting *Danielson v. Loc. 275, Laborers Int'l Union of N. Am., AFL-CIO*, 479 F.2d 1033, 1037 (2d Cir. 1973)). A plaintiff may also establish irreparable harm

when its costs are unrecoverable due to the government's sovereign immunity.  *See Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *City of New York*, 913 F.3d at 430; *see also Portée v. Morath*, No. 1:23-CV-551-RP, 683 F.Supp.3d 628, 636 (W.D. Tex. July 21, 2023) ("[C]laims for money damages against state entities and officials are generally barred by sovereign immunity, which makes Portée's harm irreparable for purposes of seeking preliminary injunctive relief."); *Texas v. U.S. Dep't of Homeland Sec.*, 700 F. Supp. 3d 539, 546 (W.D. Tex. 2023).

"'There is generally no public interest in the perpetuation of unlawful agency action.'" *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (quoting *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)).  To the extent an agency's acts facilitate rather than prevent unlawful conduct, such acts implicate the "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  Indeed, "the 'public undoubtedly has an interest in seeing its governmental institutions follow the law. . . .'" *Roe v. Dep't of Defense*, 947 F.3d 207, 230–31 (4th Cir. 2020) (quoting district court).

When a TRO will "adversely affect a public interest . . . the court may . . . withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–13 (1982).  In fact, "courts . . . should pay particular regard for the public consequences in employing th[is] extraordinary remedy." *Id.* at 312.

In addition to the public interest determination, the balance of equities must tip in favor of the movants in order for a TRO to be granted. *Winter*, 555 U.S. at 20.  Courts must weigh any

potential harm to the nonmoving party, and also any potential harm to the public if relief is granted. *Continental Group Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 356–57 (3d Cir. 1980).

These final two factors—balance of the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). But, a court "may not collapse this inquiry with the first *Winter* factor." *Maryland, et al. v. United States Dep't of Agriculture, et al.*, 2025 WL 800216; *see USA Farm Lab, Inc. v. Micone*, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025) (explaining that it is "circular reasoning" to argue that a government "program is against the public interest because it is unlawful" and that such argument "is nothing more than a restatement of their likelihood of success argument").

"Crafting a preliminary injunction [or TRO] is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017); *see Roe*, 947 F.3d at 231. But, a court should "'mold its decree to meet the exigencies of the particular case.'" *Roe*, 947 F.3d at 231 (citation omitted). Moreover, a court must ensure that the TRO is "'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (discussion preliminary injunction) (citation omitted).

Under Fed. R. Civ. P. 65(b)(2), a TRO expires after fourteen days. But, it may be extended for a "like period" for good cause. *Id.*

### A. Likelihood of Success on the Merits

### 1. Privacy Act

### a. Zone of Interests

In order to bring a statutory claim, plaintiffs must satisfy the zone of interest test. Specifically, plaintiffs must demonstrate that the "'interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Bennett*, 520 U.S. at 163 (quoting *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)). In other words, the zone-of-interests test asks "whether the statute grants the plaintiff the cause of action that he asserts." *Bank of Am. Corp. v. Miami*, 581 U.S. 189, 196–97 (2017); *see Lexmark Int'l, Inc.*, 572 U.S. at 127 ("Whether a plaintiff comes within the zone of interests" turns on "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim") (internal quotation marks omitted)). However, when the plaintiff asserts a cause of action under the APA, the inquiry focuses on the relevant zone of interest defined by the substantive statute, not the APA. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345–48 (1984); *Am. Inst. of Certified Pub. Accountants v. IRS*, 746 F. App'x. 1, 7 (D.C. Cir. 2018) (collecting cases); *Mendoza v. Perez*, 754 F.3d 1002, 1017 (D.C. Cir. 2014).

The "zone-of-interests limitation" applies to "all statutorily created causes of action." *Lexmark Int'l, Inc.*, 572 U.S. at 129. However, unlike standing and ripeness, the test is not jurisdictional because "'the absence of a valid . . . cause of action does not implicate . . . the court's statutory or constitutional power to adjudicate the case.'" *Id.* at 128 (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)). Moreover, the zone-of-interests test "is not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Sec. Industry Ass'n*, 479 U.S. 388,

399 (1987)).  The Supreme Court has explained that it "always conspicuously" includes the word

"'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Patchak*, 567

U.S. at 225.  In other words, the "test forecloses suit only when a plaintiff's 'interests are so

marginally related to or inconsistent with the purposes implicit in the statute that it cannot

reasonably be assumed that Congress intended to permit the suit.'" *Id.* (citation omitted).

As discussed, the Privacy Act only protects information regarding individuals, which the

statute defines as "a citizen of the United States or an alien lawfully admitted for permanent

residence." 5 U.S.C. § 552a(a)(2); s*ee also New York et al. v. Trump*, 2025 WL 573771, at *15.

And, plaintiffs' members "are no doubt individuals whose information is protected by the Privacy

Act from unlawful disclosure." *Id.* at *16.  In my view, the claims fall within the zone of interests.

### b.  Access to SSA Records

The Privacy Act limits disclosure of records.  *See* 5 U.S.C. § 552a.  The defendants suggest

that mere access does not constitute disclosure of them.

The Privacy Act does not define the word "disclosure."  But, SSA has done so in its

regulations.  "[D]isclosure" is defined as "making a record about an individual available to or

releasing it to another party."  20 C.F.R. § 401.25.  And, the Office of Management and Budget

Guidelines state:  "A disclosure may be either the transfer of a record or the granting of access to

a record."  Off. of Mgmt. & Bdgt., Exec. Off. of Pres., Guidelines, 40 Fed. Reg. 28948, 28953

(July 9, 1975).  OPM defines "disclosure" to "mean[] providing personal review of a record, or a

copy thereof, to someone other than the data subject or the data subject's authorized representative,

parent, or legal guardian."  5 C.F.R. § 297.102.

Other courts have generally interpreted "disclosure" "'liberally to include not only the

physical disclosure of the records, but also the accessing of private records.'"  *American*

*Federation of Teachers et al.*, 2025 WL 582063, at *9 n.8 (citing *Wilkerson v. Shinseki*, 606 F.3d 1256, 1268 (10th Cir. 2010)); *see Tolbert-Smith v. Chu*, 714 F. Supp. 2d 37, 43 (D.D.C. 2010) (construing "disclosure" to include "plac[ing] records . . . on a server accessible by other federal employees and members of the public"); *cf. Wilborn v. Dep't of Health & Human Servs.*, 49 F.3d 597, 600–01 (9th Cir. 1995) ("[T]he Privacy Act, if it is to be given any force and effect, must be interpreted in a way that does not 'go[] against the spirit' of the Act" (quoting *MacPherson v. IRS*, 803 F.2d 479, 481 (9th Cir. 1986)), *abrogated on other grounds by Doe v. Chao*, 540 U.S. 614. But, even when courts that have interpreted the term to require "more than mere transmission of records" they "have suggested that disclosure occurs when 'information has been exposed in a way that would facilitate easy, imminent access.'" *American Federation of Teachers et al.*, 2025 WL 582063, at *9 n.8 (citing *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 29 (D.D.C. 2014)).

### c. DOGE is an Agency

In their Reply, plaintiffs raise the question of whether DOGE is an agency. Plaintiffs state: "DOGE was established (1) by an Executive Order, (2) in the Executive Office of the President ('EOP'), and (3) separate from the few EOP components courts have deemed agencies." ECF 39 at 17.

During the hearing, defendants took the position that DOGE is not an agency. [33] This is curious. If DOGE is not an agency, then its employees cannot be detailed from DOGE to the SSA under the Economy Act. This is because the Economy Act only grants an agency the authority to

---

[33] Defendants claimed that because the plaintiffs raised the matter of DOGE's status for the first time in the Reply, defendants had not had the opportunity to address this question in their briefing. This makes no sense. If defendants wanted to assert that DOGE is not an agency, they could have (and should have) raised it in their Opposition.

detail a federal employee to another agency. ECF 39 at 17 (quoting 31 U.S.C. § 1535(a)); *see also id.* at 18. It follows that the DOGE Team would have no right of access to SSA records.

Other courts have recently concluded, in well reasoned opinions, that USDS (*i.e.*, DOGE) is an agency. An answer to this question is not dispositive here. But, I will address the issue briefly.

In a case evaluating whether USDS is an agency subject to FOIA, the district court considered whether "the entity in question 'wielded substantial authority independently of the President.'" *CREW*, 2025 WL 752367, at *10 (quoting *Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009)) (citation omitted).[34] Judge Cooper observed that "the relevant executive orders appear to endow USDS with substantial authority independent of the President," and recent statements by President Trump and Mr. Musk, as well as news reports, "suggest that the President and USDS leadership view the department as wielding decision-making authority to make cuts across the federal government." *CREW*, 2025 WL 752367 at *11. The court "conclude[d] that in practice, USDS is likely exercising substantial independent authority much greater than other EOP components held to be covered by FOIA." *Id.*[35]

In *American Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. CV 25-0339 (JDB), 2025 WL 542825, at *3 (D.D.C. Feb. 14, 2025), the government took the view that USDS falls within the Economy Act's definition of agency. Borrowing from FOIA's definition of an agency, Judge Bates concluded that USDS "wield[s] substantial authority independently of

---

[34] The plaintiffs rested their argument on the contention that DOGE is not agency but did not contest the issue of whether the employees had a "need" for these records.

[35] The court recognized that "much, though by no means all, of the evidence supporting its preliminary conclusion that USDS is wielding substantial independent authority derives from media reports" but noted that USDS did not contest "any of the factual allegations suggesting its substantial independent authority" in briefing or at oral argument. *Id.* at 12.

110

the President." *Id.* (quoting *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 315 (D.D.C. 2017)). The court noted that "it is apparent that USDS is coordinating teams across multiple agencies with the goal of reworking and reconfiguring agency data, technology, and spending." *American Fed'n of Lab. & Cong. of Indus. Organizations*, 2025 WL 542825, at *3. Curiously, defendants' counsel took the position at the TRO hearing that USDS is an agency under the Economy Act but not under FOIA, the Privacy Act, or the APA. This, according to the court, rendered it "a Goldilocks entity: not an agency when it is burdensome but an agency when it is convenient." *Id.*

I agree with Judge Bates and Judge Cooper. Guided by case law, and without the benefit of briefing on the issue, I am satisfied, for the purposes of this opinion, that DOGE is an agency with the meaning of the Privacy Act. Were I to rule otherwise, I would be compelled to conclude that disclosure of SSA records to the DOGE Team constituted a violation of the Privacy Act, because members of the DOGE Team could not qualify as employees of an agency detailed to SSA.

### d. Authorization

Relevant here, the Privacy Act prohibits agencies from disclosing any records contained in systems of records, unless an exception applies. 5 U.S.C. § 552a(b). Defendants assert that 5 U.S.C. § 552a(b)(1) applies here. They claim that the members of the DOGE Team are employees of the SSA and that the plaintiffs' records were not disseminated outside SSA.

The Executive Order directs the heads of each federal agency to "establish within their respective agencies a DOGE Team of at least four employees" within 30 days. *See Alliance for Retired Americans v. Bessent*, 2025 WL 740401, at *4 (citing Exec. Order No. 14,158 § 3(c)). These employees may include "Special Government Employees." *Id.* As relevant here, a Special

111

Government Employee is a temporary "officer or employee" who is "retained, designated, appointed, or employed to perform, with or without compensation . . . temporary duties either on a full-time or intermittent basis" for a limited period of time.  18 U.S.C. § 202(a).[36]

Currently, defendants claim there are ten members of the DOGE Team working at SSA. Defendants concede that seven of the ten employees have and have had access to personally identifiable information contained in SSA data systems.  ECF 36 at 7.

Specifically, Employee 1 is a software engineer, appointed as an expert, and a special government employee under 5 U.S.C. § 3109 and 5 C.F.R. Part 304.  ECF 36-2, ¶ 5.  His duties purportedly relate to improper payments and SSA's Death Master File, or records maintained by SSA on deceased individuals.  *Id.*  Felix-Lawson states: "SSA is currently working with the Small Business Administration (SBA) to effectuate an interagency agreement for Employee 1 to be detailed temporarily to SBA."  *Id.*  Although Employee 1's background investigation is still pending, *id.* ¶ 15, Russo states that Employee 1 has access to PII from MBR, SSR, Numident, and Treasury payment files showing SSA payments.  ECF 36-1, ¶ 7.  In other words, Employee 1 has access to SSA records even though his detail agreement and background investigation are incomplete.

Employee 2 is a Senior Advisor ((Program Specialist AD-0301-00) and serves as the DOGE Team lead.  ECF 36-2, ¶ 8.  His interagency detailing agreement from NASA is not yet finalized and his background investigation is still pending.  *Id.*; *see also id.* ¶ 15.  Although Employee 2 has had no access to "any SSA programmatic data or systems," he has accessed SSA personnel data provided to him by Human Resources.  ECF 36-1 (Russo Decl.), ¶ 13.  He is

---

[36] Special Government Employees are exempt from some of the ethics rules that apply to most federal employees. *See* 18 U.S.C. §§ 203, 205, 207–209.

responsible for consulting on the SSA's workforce plans, including but not limited to reorganization and hiring. *Id*. As with Employee 1, his access to PII was premature.

Employee 3 is a Schedule C Policy Advisor, detailed from the Department of Labor to SSA. ECF 36-2, ¶ 6. His duties relate to improper payments and SSA's Death Master File. *Id*. His background investigation is complete. *Id.* ¶ 15. Like Employee 1, he has access to PII from MBR, SSR, Numident, and Treasury payment files showing SSA payments. ECF 36-1, ¶ 8. He also has access to the National Directory of New Hire Data, maintained on SSA's network for Office of Child Support Services. *Id.* ¶ 15.

Employee 4 was appointed as an expert, special government employee. ECF 36-2, ¶ 11. His duties currently relate to improper payments and death data. *Id*. His background investigation is still pending. *Id.* ¶ 15. However, he has not yet been granted access to SSA data or PII or access to systems containing such information. ECF 36-1, ¶ 16.

Employee 5 is an engineer detailed from the United States DOGE Service to SSA. ECF 36-2, ¶ 7. He is subject to an Interagency Agreement with U.S. Digital Service (now U.S. DOGE Service), which authorizes his work to include, but does not limit work to, increasing efficiency and the modernization of SSA IT infrastructure and systems, detecting waste, fraud, and abuse. *Id*. His background investigation is complete. *Id.* ¶ 15. Like Employees 1 and 3, he has access to PII from MBR, SSR, Numident, and Treasury payment files showing SSA payments. ECF 36-1, ¶ 9. He has also apparently been granted access to "several other databases but never accessed the data in them." *Id*.

Employee 6 was appointed as an expert, and is a special government employee. ECF 36-2, ¶ 11. His duties currently relate to improper payments and death data. *Id*. His background

113

investigation is still pending. *Id.* ¶ 15. But, he has not been granted access to SSA data or PII or access to systems containing such information. ECF 36-1, ¶ 16.

Employee 7 is described as a detailee from Department of Labor ("DOL") to SSA, but the detailing agreement is not yet finalized. ECF 36-2, ¶ 11. His duties relate to improper payments. *Id*. And, despite the fact that his background investigation is still pending, *id.* ¶ 15, he was granted access to "SSA Systems." ECF 36-1, ¶ 14. According to Russo, Employee 7 has so far only accessed Numident. He was apparently granted access because "his work involves analysis of improper payments relating to death records maintained in the Numident." *Id*. However, "[a]ll other access initially granted has since been revoked pending review of further data access needs." *Id.*[37] Like Employee 3, he also has access to the National Directory of New Hire Data, maintained on SSA's network for Office of Child Support Services. *Id.* ¶ 15.

Employee 8 is an engineer, detailed from OPM to SSA, whose duties relate to improper payments and death data. ECF 36-2, ¶ 10. His background investigation is complete. *Id.* ¶ 15. And, like Employees 1, 3, and 5, he has access to PII from MBR, SSR, Numident, and Treasury payment files showing SSA payments. ECF 36-1, ¶ 12.

Employee 9 was appointed as an expert, and is a special government employee. ECF 36-2, ¶ 11. His duties relate to improper payments and death data. *Id*. Although his background investigation is still pending, *id.* ¶ 15, Employee 9 has access to PII from MBR, SSR, Numident, and Treasury payment files showing SSA payments. ECF 36-1, ¶ 11. In other words, access to the records appears premature.

---

[37] On March 5, 2025, the SSA "began onboarding" Employee 7, although the detail agreement from the DOL is pending. ECF 36-2, ¶ 12. On March 11, 2025, in the midst of the briefing for the Motion, Employee 7 "was granted access to SSA systems." ECF 36-1, ¶ 14. But, by the time the defendants' brief was filed on March 12, 2025 at 4:03 p.m., Employee 7's access had been revoked, pending review of further data access needs. *Id.*

114

Employee 10 is a software engineer, detailed from the Office of the Administrator at the General Services Administration to SSA. ECF 36-2, ¶ 9. His duties include "supporting the leadership team with the assessment and enhancement of internal processes and operational procedures" by "focusing on identifying inefficiencies and areas for improvement and ensuring that the administrative and programmatic functions align with the best practices for effectiveness and accountability." *Id*. His background investigation is complete. *Id.* ¶ 15. And, like Employees 1, 3, 5, 8, and 9, he has access to PII from MBR, SSR, Numident, and Treasury payment files showing SSA payments. ECF 36-1, ¶ 10.

As noted, defendants claim that the members of the DOGE Team are employees of the SSA and that the plaintiffs' records were not disseminated outside SSA. But, based on the current record, it does not seem that this is true for all employees identified by defendants. Employees 1 and 9, for example, do not have finalized detail agreements, nor are their respective background investigations complete. Yet, both were granted access to PII in the SSA data systems. And, the background investigation for Employee 9 has not been completed. Yet, this employee also has the same access.

During the hearing, the Court asked counsel for the government if the "detail agreement[s] were effectuated before the access was provided." ECF 45 at 20. Counsel sidestepped the question, answering: "All of the detail arrangements are complete." Counsel did not say they were complete before access was provided, however. *Id*. The Court rephrased, asking if the agreements were complete when "the disclosures were first made or access provided." *Id*. Counsel for the government responded that he "believe[d]" that was the case but would need to follow up. *Id*. Thus, it is unclear whether all members of the DOGE Team were SSA employees at the time access was granted.

### e. Need

Under the Privacy Act, access to the records is permitted to Agency employees only when there is "a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The critical question here is whether the access to records that SSA provided to the DOGE Team violated the Privacy Act because of a lack of "need" for the data.

The issue of need is perhaps the central issue in the case. Defendants maintain that those employees who have access to virtually all SSA data "need" the information to perform their work. As discussed, *infra*, the statute does not define the term "need." And, neither side has provided the Court with any helpful discussion concerning this statutory requirement in the Privacy Act.

Other than recent cases involving access by DOGE affiliates to the PII in the records of other government agencies, the Court can find no precedent with similar facts interpreting the "need" requirement. But, Judge Boardman recently concluded in a case with facts similar to those here that "the alleged unauthorized disclosure of millions of records . . . appear[ed] to be unlawful." *American Federation of Teachers et al.*, 2025 WL 582063, at *11.

Cases interpreting the "need" requirement typically consider need as "need to know" and ask "whether the official examined the record in connection with the performance of duties assigned to him and whether he had to do so in order to perform those duties properly." *Doe v. U.S. Dep't of Justice,* 660 F. Supp. 2d 31, 44–46 (D.D.C. 2009). Interestingly, these cases typically involve the disclosure of records concerning a single person or a small number of people, and not access to a massive quantity of records for untold millions of people. *See, e.g., deLeon v. Wilkie*, No. CV 19-1250 (JEB), 2020 WL 210089, at *8 (D.D.C. Jan. 14, 2020) (finding "need to know" exception was met in disclosure of single plaintiff's personnel records); *Walia v. Napolitano*, 986 F. Supp. 2d 169, 186–87 (E.D.N.Y. 2013), *on reconsideration in part* (Feb. 4, 2014) (finding "need

116

to know" exception was not met in disclosure of single plaintiff's personnel records); *Middlebrooks v. Mabus*, No. 1:11CV46 LMB/TCB, 2011 WL 4478686, at *5 (E.D. Va. Sept. 23, 2011) (finding that "internal disclosures of plaintiff's record to key senior agency personnel were permissible"); *Viotti v. U.S. Air Force,* 902 F.Supp. 1331, 1337 (D. Colo. 1995) (holding that disclosure of information about acting head of political science department to "political science department staff" not improper "as a matter of law" under need to know exception).

As noted, the term "need" is not defined in the Privacy Act. This implicates principles of statutory construction, which the parties have not addressed.

Generally, "[w]hen faced with a statutory provision, 'the starting point for any issue of statutory interpretation . . . is the language of the statute itself.'" *Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince George's Cty., Md.*, 17 F.4th 497, 508 (4th Cir. 2021) (quoting *D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016)) (alteration in original); *see Groff v. Dejoy*, 600 U.S. 447, 468 (2023) (stating that "statutory interpretation must 'begi[n] with,' and ultimately heed, what a statute actually says") (citation omitted) (alteration in *Groff*); *Murphy v. Smith*, 583 U.S. 220, 223 (2018) ("As always, we start with the specific statutory language in dispute."); *Pharmaceutical Coalition for Patient Access v. United States*, 126 F. 4th 947, 953 (4th Cir. 2025) ("Statutory interpretation begins with the text of the statute."); *Williams v. Carvajal*, 63 F.4th 279, 285 (4th Cir. 2023) ("As always, an issue of statutory interpretation begins with the text."); *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020) ("'As in all statutory construction cases,' we start with the plain text of the provision.") (quoting *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013)); *see also McAdams v. Robinson*, 26 F.4th 149, 156 (4th Cir. 2022); *United States v. Bryant*, 949 F.3d

117

168, 174–75 (4th Cir. 2020); *Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2013); *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012).

A statute "means what it says." *Simmons v. Himmelreich*, 578 U.S. 621 (2016); *see United States v. Cohen*, 63 F.4th 250, 253 (4th Cir. 2023). "'[A]bsent ambiguity or a clearly expressed legislative intent to the contrary,'" courts apply the "plain meaning" of the statute. *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (quoting *United States v. Bell*, 5 F.3d 64, 68 (4th Cir. 1993)); *see United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) ("When interpreting a statute, courts must 'first and foremost strive to implement congressional intent by examining the plain language of the statute.'") (quoting *Abdelshafi*, 592 F.3d at 607). A court determines a statute's plain meaning by referencing the "ordinary meaning [of the words] at the time of the statute's enactment." *United States v. Simmons*, 247 F.3d 118, 122 (4th Cir. 2001); *see also HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021); *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018). Courts may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

Moreover, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *see Gundy v. United States*, 588 U.S. 128, 141 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)); *see also United States v. Hansen*, 599 U.S. 762, 775 (2023) ("When words have several plausible definitions, context differentiates among them."); *King v. Burwell*, 576 U.S. 473, 486 (2015); *Pharmaceutical Coalition for Patient Access*, 126 F. 4th at 953. Critically, however, "the text and structure" of the statute is not analyzed in "a

118

vacuum. . . . Rather, [a court] must interpret the statute with reference to its history and purpose as well." *Bryant*, 949 F.3d at 174–75 (4th Cir. 2020) (citing *Abramski v. United States*, 573 U.S. 169, 179 (2014) and *Gundy*, 588 U.S. at 141).

Terms in a statute that are not defined are "'interpreted" in accordance with "their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *see Holly Frontier Cheyenne Refining, LLC*, 594 U.S. at 388; *George*, 946 F.3d at 645; *see also Tankersley*, 837 F.3d at 395 ("Where Congress has not defined a term, we are "bound to give the word its ordinary meaning unless the context suggests otherwise.") (citation omitted). Need would seem to be a word that even a child would grasp. But, courts may "consult dictionaries" to decipher a term's ordinary or plain meaning. *In re Constr. Supervision Servs., Inc.*, 753 F.3d 124, 128 (4th Cir. 2014); *see also Navy Fed. Credit Union*, 972 F.3d at 356; *Blakely v. Wards,* 738 F.3d 607, 611 (4th Cir. 2013).

Relying on the Privacy Act, defendants assert that the employees on the DOGE Team "have a need for the records to which they have access in the performance of their duties." ECF 36 at 24. They state: "As an overarching matter, the DOGE Team exists under Executive Order 14,158 to modernize technology and to 'maximize efficiency and productivity.'" *Id.* (quoting Exec. Order 14,158 § 4). In addition, the DOGE Team at the SSA is "charged with 'detect[ing] fraud, waste and abuse in SSA programs,' and with 'provid[ing] recommendations for action to the Acting Commissioner of SSA, the SSA Office of the Inspector General, and the Executive Office of the President.'" ECF 36 at 24 (quoting ECF 36-1, Russo Decl., ¶ 5).

In considering the meaning of "need," the parties did not reference the legislative history of the Act. But, it is informative. *See, e.g.*, *Bryant*, 949 F.3d at 174–75. It shows that one of the identified purposes of the Privacy Act was "to provide certain safeguards for an individual against

an invasion of personal privacy by requiring federal agencies, except as otherwise provided by law, to— . . . (4) collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information[.]"  Privacy Act of 1974, Pub. L. No. 93-579, § 2(b)(4), 88 Stat. 1896.  And, Congress found that, "[i]n order to protect the privacy of individuals identified in information systems maintained by federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies."  *Id.* § 2(a)(5).

The Senate Report is also instructive.  It states that the law was "designed to prevent the kind of illegal, unwise, overbroad, investigation and record surveillance of law-abiding citizens produced in recent years from actions of some over-zealous investigators, and the curiosity of some government administrators, or the wrongful disclosure and use, in some cases, of personal files held by Federal agencies."  Senate Rep. No. 1183, 93d Cong., 2d Sess. (1974).  Relevant here, the bill established "certain minimum standards for handling and processing personal information maintained in the data banks and systems of the executive branch, for preserving the security of the computerized or manual system, and for safeguarding the confidentiality of the information."  *Id.*  To this end, it required "every department and agency to insure, by whatever steps they deem necessary" that, *inter alia*, (1) "they take certain administrative actions to keep account of the employees and people and organizations who have access to the system or file, and to keep account of the disclosures and uses made of the information"; and (2) "they establish rules of conduct with regard to the ethical and legal obligations in developing and operating a

computerized or other data system and in handling personal data, and take action to instruct all employees of such duties[.]"  *Id.*

Because the word "need" is not defined, I may also consult the dictionary, even though the word "need" is part of everyday parlance.  In dictionaries, "need" can be defined as "a requirement, necessary duty, or obligation, or a lack of something wanted or deemed necessary," "urgent want, as of something requisite," or "a condition marked by the lack of something requisite."  RANDOM HOUSE COLLEGE DICTIONARY at 890 (rev. ed.1980); *see also Need,* American Heritage Dictionary, https://perma.cc/M32F-ZVM2 (defining "need" as "[s]omething required or wanted; a requisite" and "[n]ecessity; obligation").

However, it seems clear that, in context, and under Social Security Administration regulation 20 C.F.R. Pt. 401, App. A, discussed earlier, the term "need" actually refers to "need to know."  *See American Federation of Teachers, et al.,* 2025 WL 582063, at *10.  According to Black's Law Dictionary, "need-to-know basis" is defined as follows:  "A justification for restricting access to information to only those with a clear and approved reason for requiring access—used as a means of protecting confidential information that affects a range of interests, from national security to trade secrets to the attorney-client privilege."  *Need-to-know basis*, Black's Law Dictionary, at 1194 (12th ed. 2024).

At the Motion hearing, the Court repeatedly questioned government counsel to explain the "need" for the breadth of access to SSA records that was provided to the DOGE Team.  Counsel offered no meaningful explanation as to why the DOGE Team was in "need" of unprecedented, unfettered access to virtually SSA's entire data systems in order to accomplish the goals of modernizing technology, maximizing efficiency and productivity, and detecting fraud, waste, and abuse.

For example, the Court asked counsel for the government: "[W]hat was the mission and what was the need?  What was the purpose in providing access to all of this information?"  ECF 45 at 23.  The Court again pressed about why the DOGE Team would "need" the scope of information at issue here.  *Id.* at 24, 38.  And, toward the end of the hearing, the Court once again gave the government the opportunity to explain the "need for all of those records."  *Id.* at 84.

Besides cursory, circular statements about members of the DOGE Team in need of all SSA data because of their work to identify fraudulent or improper payments, counsel provided no explanation as to why or how the particular records correlated to the performance of job duties. *See, e.g.*, *id.* at 21–22 ("The goal is to review . . . the Social Security Administration's records to see if there are improper or fraudulent payments.  Naturally if one is looking for improper or fraudulent payments, one looks at the data to see if any such payments are made."); *id.* at 23 ("[If] one is looking for fraudulent or improper payments that may or may not be going out by the Social Security Administration, one would need to look at the records, the beneficiary data, the payment data in order to do an assessment of that and to recommend potential changes."); *id.* at 24 ("I can tell you that they are looking for instances of improper or fraudulent payments and that it is natural that one would look at the data in that system to see if they've been substantiated . . . ."); *id.* at 39 ("These particular people are working at the agency in order to carry out the sort of broad policy prescription contained in the Executive Order.  They are also looking at improper payments and potential waste or improper or fraudulent payments. . . ."); *id.* at 85 ("[I]f you wanted to decide whether or not [a claim for benefits] was improper or not, you would need to look at the records to see if the payment was properly made or if it was fraudulent.").

Defendants have not submitted declarations from the hired experts on the DOGE Team explaining why such unrestricted and unfettered access is necessary.  They have not provided a

122

JA366

particularized explanation of how or why virtually the entire data base of SSA is needed to conduct the investigation, or why redacted or anonymized records, at least initially, would be inadequate. The silence on this issue is deafening.

In my view, plaintiffs have shown a likelihood of success on the merits as to their claim that the access to records provided by SSA to the DOGE Team does not fall within the need-to-know exception to the Privacy Act. Therefore, the access violates both the Privacy Act and the APA.

### f. Routine Use

Defendants maintain that, to the extent employees of the DOGE Team cannot be considered employees of the SSA, the access they have obtained is not improper under the Privacy Act because it "fits within the routine use exception." ECF 36 at 25 (citing 5 U.S.C. § 552a(b)(3)). The defendants' attempt to plug the events here into the routine use exception of the Privacy Act, 5 U.S.C. § 552a(b)(3), is unavailing. It amounts to the proverbial effort to fit a square peg into a round hole.

In 5 U.S.C. § 552a(b)(3) it states:

> **(b) Conditions of disclosure.—**No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—
>
> * * *
>
> **(3)** for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section; . . . .

In turn, 5 U.S.C. § 552a(a)(7) states:

> **(7)** the term "routine use" means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected; . . . .

123

Relevant here, the statute also requires the agency to "publish in the Federal Register . . . a notice . . . which notice shall include . . . (D) each routine use of the records contained in the system, including the categories of users and the purpose of such use." 5 U.S.C. § 552a(e)(4)(D). To justify the information shared with the DOGE Team, defendants point to SSA Privacy Act systems of records notices "("SORN"), corresponding to each data system to which access has been granted. ECF 36 at 25. These SORNs contain the following "routine use," which defendants argue applies to the facts here: "'To student volunteers, individuals working under a personal services contract, and other workers who technically do not have the status of Federal employees, when they are performing work for us, as authorized by law, and they need access to personally identifiable information (PII) in our records in order to perform their assigned agency functions.'" *Id*. But, defendants do not explain how this routine use applies here.

Members of the DOGE Team with access to these systems are not "student volunteers," nor are they "individuals working under a personal services contract." As employees of DOGE, these individuals would be considered federal employees or contractors, even if they are not employees of SSA. Thus, they are not "other workers who technically do not have the status of Federal employees."

Even assuming these individuals fit into one of the categories outlined in the SORN, and there is no evidence to demonstrate that they do, the SORN still requires that these individuals "*need access* to personally identifiable information (PII) . . . in order to perform their assigned agency functions" (emphasis added). As discussed earlier, no such need has been proffered to justify the wholesale access of a vast quantity of PII belonging to millions of people.

For these reasons, plaintiffs are likely to succeed on their claim that SSA's provision to the DOGE Team of access to SSA systems is "not in accordance with" the Privacy Act, and therefore in violation of the APA. *See* 5 U.S.C. § 706(2).

## 2. Arbitrary and Capricious

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

But, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). Agency action is generally considered arbitrary or capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43.

As discussed, defendants have not provided the Court with a reasonable explanation for why the DOGE Team needs access to the wide swath of data maintained in SSA systems in order to root out fraud and abuse. And, as detailed by Flick, SSA has practices in place for audits or other searches for alleged fraud or abuse. Instead, defendants disregarded protocols for proper hiring, onboarding, training, and access limitations, and, in a rushed fashion, provided access to a

125

massive amount of sensitive, confidential data to members of the DOGE Team, without any articulated explanation for the need to do so.

Defendants clearly understand why guarding privacy, rather than waiting for harm to occur, is important. After all, that is precisely the reason why they have withheld even the names of the members of the SSA DOGE Team. But, defendants have not shown the same level of care with the far more sensitive, confidential data of millions of Americans who entrusted their government with their personal and private information. The trust appears to have been violated, without any articulated need. Plaintiffs are likely to succeed on a claim that the conduct at issue was unreasonable and capricious. Plaintiffs have therefore shown a likelihood of success on their arbitrary and capricious claim.

### B. Irreparable Harm

Plaintiffs contend that their members "are irreparably harmed by DOGE's ongoing, illegal access to their sensitive information." ECF 21-1 at 29 (emphasis omitted). In their view, that "harm will continue until DOGE is blocked from SSA systems, forced to destroy any data it or its associates retain, and prohibited from re-entering SSA systems moving forward." *Id.*

For example, plaintiffs contend that some of their members receive disability benefits. ECF 21-1 at 30 (citing ECF 22-1, Widger Declaration, ¶ 10); ECF 22-4, Imperiale Declaration, ¶ 4); ECF 22-6, Fiesta Declaration, ¶ 18)). According to plaintiffs, to receive these benefits, "members must submit extensive medical information, including details about the prescription and non-prescription medicines the applicant takes; lists of their healthcare providers and the medical conditions for which they were evaluated and treated, including mental health conditions; and other sensitive medical information." ECF 21-1 at 30 (citing ECF 22-1, ¶ 11). Plaintiffs argue, ECF 21-1 at 30 (quoting ECF 22-1, ¶ 12): "Some of this information, including concerning 'health

conditions like HIV or other STDs, can result in stigma, social isolation, job loss, housing loss, and other harms.'"

"The disclosure of this information to DOGE," plaintiffs say, "is an actual, ongoing harm to Plaintiffs' members, who did not consent to DOGE accessing their sensitive information and who face injury in the form of a privacy violation each day the department retains that access." ECF 21-1 at 30.  According to plaintiffs, their members "are irreparably harmed by DOGE's ongoing, illegal access to their sensitive information." *Id.* at 29 (emphasis omitted).  In their view, that "harm will continue until DOGE is blocked from SSA systems, forced to destroy any data it or its associates retain, and prohibited from re-entering SSA systems moving forward." *Id.*  And, citing Judge Boardman's decision in *American Federation of Teachers et al.*, 2025 WL 582063, at *14, plaintiffs assert: "[T]hat harm cannot be rectified by money damages down the road."  ECF 21-1 at 30.

Defendants argue that plaintiffs have not established that they will suffer irreparable harm for the same reasons defendants argue that plaintiffs do not have standing—their claimed injury "is not concrete".  *See* ECF 36 at 31.  Defendants also allege that plaintiffs' argument fails because they "have an adequate alternative remedy to the emergency relief they seek: a private right of action under the Privacy Act." *Id*. at 32 (citing 5 U.S.C. § 552a(g)(4)).

The government cites two recent cases from the D.C. District Court denying a TRO or a preliminary injunction because the plaintiffs in each case did not establish irreparable harm.  ECF 36 at 31 (citing *Carter*, 2025 WL 542586, at *5; *Alliance for Retired Americans*, 2025 WL 740401, at *20–24).  But, defendants do not explain that the D.C. Circuit appears to maintain a higher bar for injunctive relief in these types of cases, as explained by Judge Kollar-Kotelly in *Alliance for Retired Americans*, 2025 WL 740401.  She stated that in the D.C. Circuit, plaintiffs' asserted injury

127

"'must be both certain and great'" to support a preliminary injunction.  *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

And, in the context of disclosure of private information, courts in the D.C. Circuit "have consistently 'declined to find irreparable injury . . . where the challenged disclosure is not public' but instead is to a small number of 'individuals obligated to keep [the information] confidential.'" *Alliance for Retired Americans*, 2025 WL 740401, at *21 (quoting *Carter*, 2025 WL 542586, at *5) (alteration in *Alliance*) (cleaned up).  This is because, she noted, the court could order adequate corrective relief after the fact.  *See Alliance for Retired Americans*, 2025 WL 74040, at *21.  For example, she explained that the court "could order the small number of individuals who received the information to return or destroy it," and the possibility that adequate relief would later be available weighed against a finding of irreparable harm.  *See id.*

Defendants also cite *Electronic Privacy Information Center v. U.S. Office of Personnel Management.*, No. 1:25-CV-255 (RDA/WBP), 2025 WL 580596 (E.D. Va. Feb. 21, 2025), in support of their argument.  That case involved the accessing of data systems containing "Social Security numbers, dates of birth, salaries, home addresses, and job descriptions of all civil government workers, along with any disciplinary actions they have faced."  However, the extensive data housed within the SSA's systems is not limited to government workers.  *See id.* at *2.  Moreover, Judge Alston emphasized that plaintiffs' arguments about "heightened risk of exposure or exfiltration by hostile actors"; future "misuse" of private data "by arbitrarily stopping payments through access to [the Treasury Department's] system"; and risk of "future identity theft because OPM's network is regularly subject to hacking attempts," which plaintiffs claimed were "more likely to be successful as a result of Defendants' actions," were "unpersuasive" and "too speculative."  *Id.* at *6–7.  But, what is critical here is the irreparable harm associated with

128

defendants' ongoing, unprecedented, unfettered access to the income history, tax return data, and medical information of millions of Americans.

In a case involving the disclosure of records by the Departments of Education, Treasury, and OPM, Judge Boardman determined that plaintiffs had "made a clear showing that they are likely to suffer irreparable harm without injunctive relief." *American Federation of Teachers et al.*, 2025 WL 582063, at *13. She explained, *id.*: "DOGE affiliates have been granted access to systems of record that contain some of the plaintiffs' most sensitive data—Social Security numbers, dates of birth, home addresses, income and assets, citizenship status, and disability status—and their access to this trove of personal information is ongoing. There is no reason to believe their access to this information will end anytime soon because the government believes their access is appropriate." Here, several individuals affiliated with DOGE have been granted access to additional, arguably even more sensitive data, including medical information. And, because defendants believe this access is necessary for these employees, there is no reason to think it will end anytime soon. *See* ECF 36 at 20.

Plaintiffs' members do not know if their information has been viewed or documented by any of these employees, nor how many times it has been viewed or will continue to be viewed in the coming hours, days, weeks, or months. But, plaintiffs know their sensitive, personally identifiable information is accessible to the DOGE Team on a daily basis, with no proper justification.

Money damages cannot rectify this invasion of privacy of plaintiffs' members. *See, e.g.*, *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1275 (9th Cir. 1998) (finding "the retention of [the plaintiff's] undisputedly intimate medical information [without consent] . . . would constitute a continuing 'irreparable injury' for purposes of equitable relief"); *In re Meta Pixel*

*Healthcare Litig.*, 647 F. Supp. 3d 778, 802 (N.D. Cal. 2022) ("The invasion of privacy triggered by the Pixel's allegedly ongoing disclosure of plaintiffs' medical information is precisely the kind of intangible injury that cannot be remedied by damages."); *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000) (Disclosure of data including psychiatric and medical treatment and diagnoses "is the quintessential type of irreparable harm that cannot be compensated or undone by money damages."); *Haw. Psychiatric Soc. v. Ariyoshi*, 481 F. Supp. 1028, 1038 (D. Haw. 1979) (finding irreparable injury because "[t]he disclosure of the highly personal information contained in a psychiatrist's files to government personnel is itself a harm that is both substantial and irreversible").

### C.  Balance of the Equities and the Public Interest

As noted, the third and fourth elements, which address whether the balance of the equities tip in the movant's favor and whether the injunction is in the public interest, merge "when the Government is the opposing party." *Nken*, 556 U.S. at 435.

Plaintiffs posit, ECF 21-1 at 33: "The government cannot suffer harm from an injunction that merely ends an unlawful action because '[the government] is in no way harmed by issuance of a preliminary injunction which prevents the [government] from enforcing restrictions likely to be found unconstitutional' or which 'merely ends an unlawful practice.'"  (Quoting *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021)).   In other words, plaintiffs argue that "'there is a substantial public interest in having governmental agencies abide by federal laws'" and, "'[i]f anything, the system is improved by such an injunction.'"  ECF 21-1 (quoting *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 686 (D. Md. 2020) and then *Centro Tepeyac v. Montgomery Cnty*., 722 F.3d 184, 191 (4th Cir. 2013)).

In sum, plaintiffs contend, ECF 21-1 at 33: "Defendants' actions violate numerous federal laws and will cause increasing harm to Plaintiffs' 7.7 million members as long as they are allowed to continue.  Those members, along with countless similarly situated Americans, would benefit from the Court's grant of the relief requested herein."

According to defendants, ECF 36 at 32: "Plaintiffs' argument for why the equities and the public interest fall in their favor largely collapse into the merits."  In defendants' view, even if plaintiffs are correct that defendants' practices are unlawful, "considering only likelihood of success is insufficient to justify injunctive relief."  *Id.* at 33 (citing *Winter*, 555 U.S. at 22).  In any event, defendants argue that the proposed TRO would "harm" the public interest "by limiting the President's ability to effectuate the policy choices the American people elected him to pursue by limiting his advisors and other employees' ability to access information necessary to inform that policy."  ECF 36 at 33.  Defendants add that the proposed TRO "would also frustrate the President's ability to identify fraud, waste, and abuse throughout the federal government."  *Id.*

Logically, "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of United States*, 838 F.3d at 12.  On the other hand, there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations."  *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *see Roe*, 947 F.3d at 230–31.  Nonetheless, the Fourth Circuit has recently stated that it is improper to collapse "the first *Winter* factor—likelihood of success on the merits—with the merged balance of equities and public interest factor."  *USA Farm Lab., Inc.*, 2025 WL 586339, at *4.  Likelihood of success on the merits alone does not suffice.  *Id.*

Nevertheless, as addressed earlier, there is a strong public interest in maintaining the confidentiality of PII, such as medical records and financial information.  Indeed, society expects

131

as much. Defendants admit that the SSA granted DOGE personnel broad access to millions of Americans' sensitive PII. This intrusion into the personal affairs of millions of Americans—absent an adequate explanation for the need to do so—is not in the public interest. To be sure, rooting out possible fraud, waste, and mismanagement in the SSA is in the public interest. But, that does not mean that the government can flout the law to do so. The President's advisors and employees are not exempt from the statutes Congress enacted to protect American citizens from overbroad and unnecessary access to their PII.

## VIII.  Conclusion

The American public may well applaud and support the Trump Administration's mission to root out fraud, waste, and bloat from federal agencies, including SSA, to the extent it exists. But, by what means and methods?

The DOGE Team is essentially engaged in a fishing expedition at SSA, in search of a fraud epidemic, based on little more than suspicion. It has launched a search for the proverbial needle in the haystack, without any concrete knowledge that the needle is actually in the haystack.

To facilitate the expedition, SSA provided members of the SSA DOGE Team with unbridled access to the personal and private data of millions of Americans, including but not limited to Social Security numbers, medical records, mental health records, hospitalization records, drivers' license numbers, bank and credit card information, tax information, income history, work history, birth and marriage certificates, and home and work addresses.

Yet, defendants, with so called experts on the DOGE Team, never identified or articulated even a single reason for which the DOGE Team needs unlimited access to SSA's entire record systems, thereby exposing personal, confidential, sensitive, and private information that millions of Americans entrusted to their government. Indeed, the government has not even attempted to

explain why a more tailored, measured, titrated approach is not suitable to the task. Instead, the government simply repeats its incantation of a need to modernize the system and uncover fraud. Its method of doing so is tantamount to hitting a fly with a sledgehammer.

In my view, plaintiffs are likely to succeed on their claim that such action is arbitrary and capricious, and in violation of the Privacy Act and the APA. Plaintiffs have also demonstrated that their members will suffer irreparable harm in the absence of a TRO, the equities tip in their favor, and the TRO serves the public interest.

For the foregoing reasons, plaintiffs' Motion (ECF 21) is granted. A Temporary Restraining Order shall issue.

## IX. Bond

Fed. R. Civ. P. 65(c) states, in relevant part: "The court may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The purpose of this Rule is "to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co.*, 174 F.3d at 421. A district court has discretion in setting the bond amount. *See id.* at 421 n.3; *Maryland Dep't of Hum. Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 (4th Cir. 1992); *Maryland, et al. v. United States Dep't of Agriculture, et al.*, 2025 WL 800216, at *26. The amount "ordinarily depends on the gravity of the potential harm to the enjoined party . . . ." *Hoechst Diafoil Co.*, 174 F.3d at 421 n.3.

Plaintiffs ask the Court to "exercise its discretion to waive or set at $0 the security requirement . . . because Defendants will face no monetary injury from any relief ordered by the Court." ECF 21-1 at 35 n.39. Defendants' Opposition is silent on the security requirement.

133

I conclude that a nominal bond is appropriate.  Accordingly, I shall require each plaintiff to pay a bond of $250, for a total of $750.

Date:    March 20, 2025

_____/s/_____
Ellen Lipton Hollander
United States District Judge

### United States District Court
### District Of Maryland

Chambers of
**Ellen Lipton Hollander**
District Court Judge

101 West Lombard Street
Baltimore, Maryland 21201
410-962-0742

March 21, 2025

LETTER TO COUNSEL

Re:    *American Federation of State, County and Municipal Employees,*
*AFL-CIO, et al. v. Social Security Administration, et al.*
Civil Action No. ELH-25-0596

Dear Counsel:

I write with respect to the Temporary Restraining Order issued yesterday afternoon in the above captioned matter.  ECF 48 ("Order" or "TRO").

Among other things, except under conditions as described in the Order, the TRO enjoins and restrains the United States Social Security Administration ("SSA"), Leland Dudek, and Michael Russo from granting access to *non-anonymized* personally identifiable information  in any SSA system of record to the Department of Government Efficiency ("DOGE"); the United States DOGE Service; the United States DOGE Service Temporary Organization; members of the DOGE Team at the SSA; Elon Musk; Amy Gleason; and "DOGE Affiliates," as defined in the Order.  Conversely, paragraph 2 of the Order *expressly allows* the SSA to provide access to redacted or anonymized data and records to the DOGE Team, subject to proper training and the like.  Notably, paragraph 3 of the TRO permits the SSA to provide non-anonymized data to the DOGE Team, subject to certain conditions.

The Court is aware of several news reports claiming that Acting Social Security Commissioner Dudek believes that virtually all employees of SSA fall within the scope of the Order, including his "IT Staff" and his "anti-fraud team."  And, according to the news reports, Mr. Dudek apparently believes he is required to terminate their access to SSA's IT systems, in order to comply with the Order.

Such assertions about the scope of the Order are inaccurate.  Employees of SSA who are not involved with the DOGE Team or in the work of the DOGE Team are not subject to the Order.  A DOGE Affiliate is defined in the Order, *inter alia*, as a person working on or implementing the DOGE agenda.  *See* ¶ 10(b).  Moreover, any suggestion that the Order may require the delay or suspension of benefit payments is incorrect.

However, if the government has any concern about the text of the Order, or otherwise seeks clarification of it, I instruct government counsel to contact Chambers immediately to arrange a telephone conference with counsel.

Despite the informal nature of this letter, it is an Order of the Court and the Clerk is directed to docket it as such.

Very truly yours,

_____/s/_____

Ellen Lipton Hollander
United States District Judge

2

JA380

### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

Chambers of
**Ellen Lipton Hollander**
District Court Judge

101 West Lombard Street
Baltimore, Maryland 21201
410-962-0742

March 21, 2025

LETTER TO COUNSEL

Re:     *American Federation of State, County and Municipal Employees,*
        *AFL-CIO, et al. v. Social Security Administration, et al.*
        Civil No.:  ELH-25-0596

Dear Counsel:

It continues to come to my attention that Acting Commissioner Dudek persists in making threats about shutting down operations at the Social Security Administration, claiming that the TRO that I issued in this case on March 20, 2025, applies to almost all SSA employees.  *See* ECF 48.  As I stated in my letter to counsel of March 21, 2025 (ECF 51), the assertion that the TRO applies to all SSA employees is patently incorrect.

The TRO expressly applies only to SSA employees working on the DOGE agenda.  It has no bearing on ordinary operations at SSA.  In fact, if others at SSA are involved with DOGE, as Mr. Dudek seems to claim, then I was misled by counsel for the government.

The government represented that ten unnamed DOGE people are assigned to SSA to further the DOGE agenda.  *See*, *e.g.*, ECF 45 (Tr., 3/14/25), at 16 ("[T]en employees do have access to the system."); ECF 36 at 5 ("Ten individuals at the Social Security Administration ('SSA'), all federal employees, are assisting with implementing the President's directives from the EO as part of the SSA's DOGE Team."); ECF 36-1 (Russo Decl.), ¶ 4 ("The SSA DOGE Team *currently* consists of ten SSA employees[]") (emphasis added); ECF 36-2 (Felix-Lawson Decl.), ¶ 4 (same).  The term "DOGE Affiliate" was included in the TRO merely to address the possibility that others at SSA could be working at DOGE's direction or added to the Team, as suggested by Russo and Felix-Lawson's use of the word "currently."

More to the point, in my earlier letter today (ECF 51), I directed the government to contact Chambers *immediately* if there is any need for clarification of the TRO.  As I write this letter, it is well after 6:00 p.m. and the government has yet to contact the Court.

Sincerely,

/s/

Ellen Lipton Hollander
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.*,

        *Plaintiffs*,

    v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*,

        *Defendants*.

Case No. 1:25-cv-00596-ELH

## DEFENDANTS' STATUS REPORT AND CERTIFICATION

The Social Security Administration files this Status Report as required by paragraph 4 of the Court's March 20, 2025, Temporary Restraining Order, ECF No. 48. As confirmed by the attached declaration of Leland Dudek, the SSA's Acting Commissioner, SSA has taken all necessary steps to implement the Court's Order.

Specifically, SSA has revoked all SSA DOGE Team members' access to SSA systems of records, including but not limited to the Enterprise Data Warehouse, Numident, Master Beneficiary Record, and Supplemental Security Record. Declaration of Leland Dudek ("Dudek Decl.") ¶ 4. SSA understands that the "Department of Government Efficiency" is a general term used to describe the President's initiatives to modernize Federal technology and maximize governmental efficiency and productivity. It does not exist as an entity apart from the U.S. DOGE Service and therefore could not have access to SSA systems of records. SSA has never granted

access to SSA systems of records to the United States DOGE Service, the U.S. DOGE Service Temporary Organization, Elon Musk, or Amy Gleason (collectively "DOGE Defendants"). *Id.*[1]

The DOGE Defendants have never had the ability to install any software on SSA devices, information systems, or systems of record, or to access, alter, or disclose any SSA computer or software code. *Id.* ¶ 9. Any software installed since January 20, 2025, by SSA DOGE Team members or DOGE Affiliates on SSA devices, information systems, or systems of records, or installed on their behalf or on behalf of the DOGE Defendants, has been removed. *Id.* ¶ 10. Further, SSA DOGE Team members and DOGE Affiliates do not have the ability to access, alter, or disclose any SSA computer or software code. *Id.* ¶ 9.

In addition, SSA certifies that, while the Court's Order remains in effect:

(1) No DOGE Defendants, SSA DOGE Team member, or DOGE Affiliate shall be provided with access to any SSA system, whether or not anonymized, unless and until these persons have been provided with all training that is typically required of individuals granted access to SSA data systems, including training regarding federal laws, regulations, and policies governing the privacy of personally identifiable information. *Id.* ¶ 11.

(2) No DOGE Defendants, SSA DOGE Team member, or DOGE Affiliate shall have access to any SSA system of records, whether or not anonymized, unless and until a background investigation is completed, comparable to the quality of investigation for SSA employees whose duties involve access to PII, and that all required Agency paperwork is completed, including

---

[1] Paragraph 4 of the Court's Order directed only the SSA Defendants to file a status report documenting the actions that they have taken to comply with the Order and certifying the information contained in paragraphs 4.a through 4.d. However, counsel for the government has also informed the DOGE Defendants, through counsel, of the Court's Order and the requirement to "disgorge and delete all non-anonymized PII data in their possession or under their control, provided form or obtained directly or indirectly, from any SSA system of record to which they have or have had access, directly or indirectly, since January 20, 2025."

execution of the SSA documents acknowledging the Systems Sanctions Policy and the duty to protect PII. *Id.*

(3) As to individuals detailed to SSA from another agency, only SSA DOGE Team members whose detail agreements are complete shall have access to any SSA records. *Id.*

(4) At this time, in light of the Court's Order, SSA does not seek to provide SSA DOGE Team Members with access to "discrete, particularized, and non-anonymized data" as permitted under the conditions contained in paragraph 3 of the Order.

Defendants also write to address the issues raised in the Court's letters to counsel on March 21, 2025. ECF Nos. 50, 51, and 52. On its face, the definition of "DOGE Affiliate" could be read to apply to a large number of SSA employees. That is because the President's "DOGE Agenda" is not defined, either in the Executive Order or the Court's Order, and implementing the President's priorities is broadly the responsibility of all federal agency employees. Defendants appreciate the Court's clarification that the term "DOGE Affiliate" was included in the Temporary Restraining Order "to address the possibility that others at SSA could be working at DOGE's direction or added to the [SSA DOGE] Team," ECF No. 52, and SSA is complying with the Temporary Restraining Order consistent with that clarification.

In particular, the SSA DOGE Team members are not directing, or involved in, any SSA projects, including those that the SSA DOGE Team members previously led or worked on. Consistent with the Court's Order as clarified, however, SSA may continue work on those projects without the SSA DOGE Team members' involvement.

In addition, the Acting Commissioner, the OCIO, and other SSA employees are not accessing SSA records at the direction of, or for, the SSA DOGE Team members or the DOGE

Defendants.  But the Acting Commissioner, Mr. Russo, and other SSA employees may continue to access SSA records for other official SSA duties.

Dated:  March 24, 2025                    Respectfully submitted,

                                          YAAKOV M. ROTH
                                          Acting Assistant Attorney General
                                          Civil Division, Federal Programs Branch

                                          */s/ Elizabeth J. Shapiro*
                                          ELIZABETH J. SHAPIRO
                                          Deputy Branch Director
                                          Civil Division, Federal Programs Branch

                                          BRADLEY P. HUMPHREYS
                                          Senior Trial Counsel
                                          MARIANNE F. KIES
                                          BENJAMIN S. KURLAND
                                          SIMON G. JEROME
                                          Trial Attorneys
                                          Civil Division, Federal Programs Branch
                                          United States Department of Justice
                                          1100 L Street NW
                                          Washington, DC 20005
                                          Telephone: (202) 305-0878
                                          Bradley.Humphreys@usdoj.gov

                                          Kelly O. Hayes
                                          Interim United States Attorney

                                          MICHAEL J. WILSON
                                          USDC Md Bar No. 18970
                                          Assistant United States Attorney
                                          36 S. Charles St., 4th Floor
                                          Baltimore, Maryland 21201
                                          Tel: (410) 209-4941
                                          Fax: (410) 962-2310
                                          Michael.Wilson4@usdoj.gov

                                          *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on March 24, 2025, I electronically filed the foregoing and thereby caused a copy to be served on counsel of record.

*/s/ Elizabeth J. Shapiro*
ELIZABETH J. SHAPIRO

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

     *Plaintiffs*,
     *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

     *Defendants*.

Civil Action No. 1:25-cv-00596

**<u>DECLARATION OF LELAND DUDEK</u>**

I, Leland Dudek, hereby declare upon penalty of perjury:

1. I am the Acting Commissioner at the Social Security Administration (SSA), in Woodlawn, Maryland, and I have served in this role since February 16, 2025.

2. In my role as Acting Commissioner, I am responsible for the exercise of all powers and the discharge of all duties of the agency and have authority and control over all personnel and activities thereof. This includes assigning duties and authority to act to officers and employees of the agency, including information and systems access by SSA's DOGE Team.

3. I provide this declaration in support of the Status Report and Certification required by the Court's March 20, 2025 Temporary Restraining Order (Order). This declaration outlines what actions SSA has taken to comply with the Order. These statements are made with my personal knowledge, discussion with SSA staff, and review of documents and information furnished to me in the course of my official duties.

4.  As of Monday, March 24, 2025, SSA revoked all SSA DOGE Team[1] members' access to SSA systems containing personally identifiable information (PII) or systems of record, including the Enterprise Data Warehouse, Numident, Master Beneficiary Record, and Supplemental Security Record. *See* Order ¶ 1.a.  The DOGE Defendants have never had access to SSA systems of record.

5.  As of March 24, the SSA DOGE Team is not directing, or involved, in any SSA projects, including those that the SSA DOGE Teams previously led or were involved that include use of, access to, or otherwise involve systems containing personally identifiable information (PII) or systems of record.  However, these agency projects may continue without the SSA DOGE Team members' involvement.

6.  As of March 24, SSA employees, including myself, are not accessing SSA records at the direction of, or for, the SSA DOGE Team or the U.S. DOGE Service, the U.S. DOGE Service Temporary Organization, Elon Musk, and Amy Gleason (collectively "DOGE Defendants").  However, SSA employees continue to access SSA records for other official SSA duties.

7.  SSA has directed DOGE Team members and DOGE Affiliates to delete all non-anonymized PII in their possession or control, if any, to the extent obtained from prior access to an SSA system.  *See* Order ¶ 1.b.

8.  The DOGE Defendants, as well as the SSA DOGE Team and DOGE Affiliates, do not have access to non-anonymized PII derived, contained, copied, or exposed from any SSA system.  Order ¶ 1.a.  Any non-anonymized PII previously obtained by the SSA DOGE

---

[1] Currently, SSA's DOGE Team consists of eleven members, one of which we began onboarding on March 17, 2025.

Team or DOGE Affiliates since January 20, 2025 has been permanently deleted. Order ¶ 1.b.

9. As of March 24, the DOGE Defendants, SSA DOGE Team members, and DOGE Affiliates do not have the ability to install any software on SSA devices, information systems, or systems of record, or to access alter, or disclose any SSA computer or software code. Order ¶¶ 1.c, d. The DOGE Defendants have never had the ability to do so.

10. Any software on SSA devices, information systems, or systems of record installed since January 20, 2025 by the SSA DOGE Team members, or DOGE Affiliates, or anyone acting on their behalf or on behalf of the DOGE Defendants, has been removed. *See* Order ¶ 1.c.

11. Before seeking to provide access to systems or records containing PII any DOGE Defendant, SSA DOGE Team member, or DOGE Affiliate, SSA will ensure that the individual seeking access has been provided all training required for such access; that a background investigation has been completed comparable to the quality of an investigation for SSA employees with similar access, including execution of SSA documents acknowledging the duty to protect PII; and that any agreement concerning the individual's employment at SSA (such as detail agreements) is complete. Order ¶¶ 4.a, b, c. Moreover, before seeking to provide any SSA DOGE Team member access to non-anonymized data from SSA systems containing PII, SSA will obtain from the SSA DOGE Team member, in writing, a detailed explanation as to the need for the record and why, for said particular and discrete record, an anonymized or redacted record is not suitable for the specified use. Order ¶ 3.

12. Before seeking to provide a DOGE Defendant, DOGE Team member, or DOGE Affiliate access to non-anonymized PII in an SSA system, SSA will provide the Court with an

explanation of why the person for whom access is sought is in need of non-anonymized access to the PII in the relevant SSA data system.  Order ¶ 4.d.

I declare the foregoing to be true and correct, upon penalty of perjury.

Date: _____3/24/2025_____        Signed: ____/S/ Leland Dudek_____

                                        Leland Dudek
                                        Acting Commissioner
                                        Social Security Administration

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> SOCIAL SECURITY ADMINISTRATION, *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-00596-ELH |

**NOTICE OF COMPLIANCE WITH PARAGRAPHS 2-3**

The Social Security Administration files this Notice to inform the Court that four employees of the agency who are members of the agency's DOGE Team now satisfy the criteria for data access established in paragraphs 2 and 3 of the Court's Temporary Restraining Order, ECF No. 48.

Specifically, as described in the accompanying declaration of Deputy Commissioner of Human Resources Florence Felix-Lawson, those four employees have fully signed and completed agreements onboarding them as agency employees. Declaration of Florence Felix-Lawson ¶ 4, appended. All four employees have also completed all training typically required of individuals granted access to SSA systems, including privacy training, ethics training, and completion of signed acknowledgments regarding SSA information security and privacy awareness. *Id.* ¶ 5. Although the full background investigation for the four employees is not complete, those

employees have completed all steps in the background investigation process that SSA would ordinarily require before granting access to personally identifiable information.  *Id*. ¶¶ 6–12.

Further, SSA has obtained from each of those four DOGE Team members, in writing, and subject to possible review by this Court, a detailed explanation as to the need for access to specific data in the Enterprise Data Warehouse necessary to perform their job duties.  Those explanations are summarized in the accompanying declaration of Acting Commissioner of the Social Security Administration Leland Dudek.  *See* Declaration of Leland Dudek, appended.

In particular, Employees 1 and 9 are working on a project to ensure SSA records accurately reflect whether an individual is alive or deceased.  *Id*. ¶ 9. That project is aimed at preventing improper payments and fraud, waste, and abuse, and, to perform work on the project, Employees 1 and 9 need access to individuals' Social Security numbers (SSNs), demographics, benefits status, and contact information, among other fields.  *Id.* ¶ 9.  Access is necessary to examine whether the agency has assigned SSNs to all individual records and to research and conduct outreach (as needed) to confirm a person's status as living or deceased.  *Id.*  Because Employee 1 and Employee 9 are working on individual cases and may be reaching out to individuals in connection with those cases, data anonymization would make it impractical for those employees to conduct their work.  The data schemas to which Employee 1 and Employee 9 seek access is the lowest level of access available that would still allow them to perform their work on behalf of the agency.  *Id.*

Employee 5 is working on a separate project, focusing on ensuring that death records can be updated based on information currently available in agency records where SSA has sufficient confidence that would allow it to conclude a person is deceased.  *Id.* ¶ 10.  To work on that project, Employee 5 needs access to data such as SSNs, names, dates of birth, dates of death, and benefits information indicating signs of life.  *Id.*  Because the project involves updates to individual-level

2

JA392

records, anonymization is not feasible.  *Id.*  The data access sought by Employee 5 is the lowest

level access available containing the information needed for the work to be performed.  *Id.* ¶ 10.

Finally, Employee 8 is working on a project aimed at finding new ways to identify fraud

with respect to direct deposits, new claims, and wage reporting.  *Id.* ¶ 11.  The project involves

looking for patterns of fraud in these filings on an individual case level, and anonymization is not

feasible because it could obscure information useful for identifying fraud.  *Id.*  The data access to

which Employee 8 needs access to obtain information necessary for the project are the most

restrictive possible to perform the work.  *Id.*

SSA has fully complied with paragraphs 2 and 3 of the Court's Order as to these employees

with respect to the specific projects described above and in Acting Commissioner Dudek's

declaration.  Accordingly, SSA believes it is appropriate and consistent with the Court's Order to

provide the access described above to the four DOGE Team members.  Out of an abundance of

caution, however, SSA will not provide access until 1:00 p.m. on March 27, 2025.  Counsel for

the government is available to answer any questions regarding such access and compliance with

the Court's order if the Court finds it appropriate to arrange a telephonic conference.


Dated:  March 27, 2025                     Respectfully submitted,

                                           YAAKOV M. ROTH
                                           Acting Assistant Attorney General
                                           Civil Division, Federal Programs Branch

                                           */s/ Elizabeth J. Shapiro*
                                           ELIZABETH J. SHAPIRO
                                           Deputy Branch Director
                                           Civil Division, Federal Programs Branch
                                           Elizabeth.Shapiro@usdoj.gov
                                           202-514-5302

                                           BRADLEY P. HUMPHREYS

Senior Trial Counsel

Marianne F. Kies
Trial Attorney
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005

Kelly O. Hayes
Interim United States Attorney

MICHAEL J. WILSON
USDC Md Bar No. 18970
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4941
Fax: (410) 962-2310
Michael.Wilson4@usdoj.gov

*Attorneys for Defendants*

4

## CERTIFICATE OF SERVICE

I certify that on March 27, 2025, I electronically filed the foregoing and thereby caused a copy to be served on counsel of record.

/s/ Elizabeth J. Shapiro
ELIZABETH J. SHAPIRO

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, | |
| *Plaintiffs,* | |
| *vs.* | Civil Action No. 1:25-cv-00596 |
| SOCIAL SECURITY ADMINISTRATION, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF LELAND DUDEK**

I, Leland Dudek, hereby declare upon penalty of perjury:

1. I am the Acting Commissioner at the Social Security Administration (SSA), in Woodlawn, Maryland, and I have served in this role since February 16, 2025.

2. In my role as Acting Commissioner, I am responsible for the exercise of all powers and the discharge of all duties of the agency and have authority and control over all personnel and activities thereof. This includes assigning duties and authority to act to officers and employees of the agency, including information and systems access by SSA's DOGE Team.

3. I provide this declaration to explain the access required by Employee 1, Employee 5, Employee 8, and Employee 9 on the SSA DOGE Team to personally identifiable information (PII) in SSA records. These statements are made with my personal knowledge, discussion with SSA staff, and review of documents and information furnished to me in the course of my official duties.

1

4.  Employee 1, Employee 5, Employee 8, and Employee 9 all require access to PII through schema in SSA's Enterprise Data Warehouse (EDW).

5.  The vast majority of SSA employees routinely access agency PII from SSA's program records (such as claims or enumeration records) in performing "front line" duties–i.e., individuals working directly with the public or otherwise working internally to process claims and enumeration related matter., including claims representatives and hearings office employees.  This front-line employee PII access generally occurs by electronically querying (searching based on an identifier, such as Social Security number) through "dashboards" (i.e., screens created to present information in an manner helpful to the employees based on the work they are performing) which retrieve claims or enumeration file information directly from production systems (i.e., the systems holding the custodial, controlling records, such as our Master Beneficiary Record or MBR) ..  By contrast, non-front line employees use the EDW to obtain access to the same agency records, but in a non-production data environment.  This is the case where, for example, non-front line employees are conducting fraud or similar analysis.  Members of the SSA DOGE Team are non-front line employees because they are not working directly with the public or working on processing individual requests for claims or enumeration records.

6.  Data access through EDW is granted through "schema" levels.  SSA's EDW contains hundreds of schema levels, each of which contains different data types. When access is granted to a particular schema, the employee has *permission* to access the data in the schema, but the employee does not automatically *see* all those records.  Similar to front-line employees who need to query SSA systems to retrieve needed records, non-front line

employees granted access to EDW schemas must specifically search for relevant records in a schema for the records to be viewable.

7. As I discuss in greater detail below (paragraph 9), SSA seeks to grant the four DOGE Team employees (Employees 1, 5, 8, 9) access only to the seven EDW schemas containing the information needed to perform their job duties; these are the lowest level schemas for these data groupings that SSA's systems can grant access to–i.e., there is no more restrictive schema that would provide access to the data. SSA is unable to grant an employee access only to certain data fields within a given schema, making it impossible to minimize access further using current agency systems.

8. As stated above, an SSA employee viewing an EDW schema will not have the ability to view data under the schema absent a search for that specific information. As with all SSA employees, Employee 1, Employee 5, Employee 8, and Employee 9 on the SSA DOGE Team have been directed to search and retrieve only data within the schema levels that they will be granted that is necessary for the performance of their tasked work for SSA. This work and the corresponding need for specific schema access is defined further below for each employee.

9. Employees 1, and 9 are working on a project relating to ensuring SSA records accurately reflect whether an individual is alive or deceased (hereafter, "Are You Alive"). This Are You Alive Project is aimed at preventing improper payments and fraud, waste, and abuse related to decedent identities. To perform the Are You Alive Project, Employees 1, and 9 need access to individual Social Security numbers (SSNs), demographics, benefits status, and contact information, among other fields. . The access is necessary to examine whether the agency has assigned SSNs to all individual records, and to research and conduct

3

JA398

outreach (as needed) to confirm a person's status as living or deceased. Because Employees 1, and 9 are working on individual cases and may be reaching out to individuals in connection with those cases, data anonymization would make it impracticable for these employees to conduct the Are You Alive Project. The data schemas to which these employees need access for this Project are the Numident, MBR, SSR, PROME, PCHIP, PVIP, and PVIPR schemas. These schema names (with acroynms) are the full schema names. These schemas are the lowest schemas available containing the information needed for this effort–i.e., there is no more restrictive schema that would provide access to the data. For instance, the Numident has SSNs; the MBR and SSR have benefits information; PROME contains login data to mySSA.gov; PCHIP has 1-800 number caller data; PVIP contains field office call data; and PVIPR contains field office appointments. These are examples of data relevant to this analysis, which would help demonstrate whether a person is alive or deceased.

10. Employee 5 is working on a project focusing on ensuring death records that can be updated based on information currently available in agency records, for which we have sufficient confidence that would allow us to conclude a person is deceased (hereafter, "Death Data Clean Up Project"). Employee 5 is using records such as SSNs, names, dates of birth, dates of death, and benefits information indicating signs of life. Because the Death Data Clean Up Project involves updates to individual-level records, anonymization is not feasible. The data schemas to which Employee 5 needs access to obtain information necessary for this Project are the Numident, MBR, and SSR schemas. These schemas are the lowest schemas available containing the information needed for this effort–i.e., there is no more restrictive schema that would provide access to the data.

11. Employee 8 is working on direct-deposit change, new claim, and wage-reporting fraud detection (hereafter, "Fraud Detection"). The Fraud Detection Project is aimed at finding new ways to identify fraud in the foregoing areas. The Project involves looking for patterns of fraud in these filings on an individual case level. Anonymization is not feasible because it could obscure information useful for identifying fraud: for instance, name matching would not be possible. The data schemas to which Employee 8 needs access to obtain information necessary for this Project are the Numident, MBR, SSR, PROME, PCHIP, PVIP, and PVIPR schemas. These schemas are the lowest schemas available containing the information needed for this effort–i.e., there is no more restrictive schema that would provide access to the data.

I declare the foregoing to be true and correct, upon penalty of perjury.

Date: __3/26/2025__        Signed: _/s/ Leland Dudek_____

                           Leland Dudek
                           Acting Commissioner
                           Social Security Administration

5

JA400

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

     *Plaintiffs*,
    *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,
     *Defendants*.

Civil Action No. 1:25-cv-00596

## DECLARATION OF FLORENCE FELIX-LAWSON

I, Florence Felix-Lawson, hereby declare upon penalty of perjury:

1. I am the Deputy Commissioner of Human Resources at the Social Security Administration (SSA), in Woodlawn, Maryland, and I have served in this role since November 17, 2024. I am a Career Senior Executive reporting directly to SSA's Acting Commissioner, Leland Dudek.

2. In my role as Deputy Commissioner of Human Resources, I am responsible for leading and overseeing human resource services to the agency, including but not limited to appointing and onboarding new personnel, including regular and special government employees and detailees.

3. I provide this declaration to explain the manner in which employees on the SSA DOGE teams' background investigations and clearances were determined or given reciprocal agreement from and between the Executive Office of the President (EOP) and SSA, and otherwise address the onboarding of these employees. This declaration is given specifically in explanation related to security clearances and onboarding for Employee 1, Employee 5,

1

JA401

Employee 8, and Employee 9. These statements are made with my personal knowledge, discussion with SSA staff, and review of documents and information furnished to me in the course of my official duties.

4. Employee 1, Employee 5, Employee 8, and Employee 9 have fully signed and completed agreements onboarding them as agency employees. This includes Special Government Employee (SGE) hire paperwork for Employees 1 and 9, and detailee agreements that are fully signed by both SSA and the detailing agency for Employees 5 (detailed from U.S. DOGE Service) and 8 (detailed from the Office of Personnel Management).

5. Employee 1, Employee 5, Employee 8, and Employee 9 have completed all training typically required of individuals granted access to SSA data systems. The training includes:

   a. Privacy Training covering privacy laws applicable to agency data and penalties for improper use;

   b. Ethics Training covering ethics laws applicable to agency employees; and

   c. Signed Acknowledgements of SSA Information Security and Privacy Awareness Training, covering requirements for compliance with information security and privacy policies of SSA.

6. SSA Human Resources worked closely with EOP when onboarding Employees 1, 5, 8, and 9, as most of the investigations are initiated through the Federal Bureau of Investigation (EOP's Investigative Service Provider (ISP)). SSA's process is to conduct a prescreen check based on the SF Questionnaire (SF-85) review, Declaration of Federal Employment (OF-306), resume review and education check, and NUMIDENT check

2

before releasing it to our ISP (Defense Counterintelligence and Security Agency (DCSA)) for a full investigation.

7. DCSA conducts a full investigation, and SSA reviews it and adjudicates it once it closes. EOP conducts a similar pre-appointment approval process; however, EOP provides an adjudication date at the time EOP approves an onboarding employee's "pre-appointment" (or, prescreen). When EOP releases the investigation to the FBI (as EOP's ISP), they are making a pre-appointment verification and approve the individuals to work for the employing agency. When the FBI investigation closes, SSA adjudicates the results from DCSA and makes SSA's final adjudication. We do not have access to the FBI's database, so we frequently must contact them to by email or phone to obtain any investigation updates.

8. In this instance, SSA conducted the pre-screening for Employee 9, which he passed. EOP conducted the pre-screening for Employees 1, 5 and 8 and informed us by telephone that Employees 1, 5 and 8 had passed. SSA does this similar pre-appointment screening when we on-board employees at SSA. All four individuals have background investigations pending—i.e., with DSCA—which have not been finally adjudicated by SSA. Once these four SSA DOGE Team employees are adjudicated by SSA, they will be eligible to receive clearances.

9. When SSA on-boards new employes, generally the new employees do not have a fully adjudicated investigation until DCSA (for SSA) or FBI (for EOP) completes a full investigation, which normally takes months or up to a year depending upon the employee. During this time, the new employee is working and may have access to SSA's systems, including personally identifiable information.

10. Granting of reciprocity for security clearances that are of the equivalent to what SSA would require is a long-standing federal practice and supported by Federal guidance such as Executive Order 12968, Access to Classified Information (August 2, 1995); Executive Order 13467, Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information (June 30, 2008); and Executive Order 13488, Granting Reciprocity on Excepted Service and Federal Contractor Employee Fitness and Reinvestigating Individuals in Positions of Public Trust (January 16, 2009).

11. Because EOP confirmed Employees 1, 5 and 8 had passed their pre-appointment clearance, which was equivalent to the pre-appointment clearance SSA would conduct, they were permitted to access SSA records and systems necessary to perform their job duties.

12. At this time, Employee 1, Employee 5, Employee 8, and Employee 9 have completed the steps in the background investigation process that SSA would require prior to granting access to personally identifiable information.

I declare the foregoing to be true and correct, upon penalty of perjury.

Date: March 26, 2025          Signed: _Florence Felix-Lawson_____

Florence Felix-Lawson
Deputy Commissioner
Human Resources
Social Security Administration

4

### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

Chambers of                                                        101 West Lombard Street
**Ellen Lipton Hollander**                                         Baltimore, Maryland 21201
District Court Judge                                               410-962-0742

March 27, 2025

LETTER TO COUNSEL

Re:     *American Federation of State, County and Municipal Employees, AFL-CIO et al.*
        *v. Social Security Administration et al.*
        Civil No.:  ELH-25-00596

Dear Counsel:

As you know, the Court held an emergency hearing beginning at 12:15 p.m. on March 27, 2025, in response to the government's filing of ECF 62 at about 10:00 a.m.  Given that the government has filed an appeal in this case with the Fourth Circuit, the question of the Court's jurisdiction to hear the matter remains unresolved.

I shall assume, *arguendo*, that the Court has jurisdiction.  Therefore, this letter confirms the following schedule, to which the parties have agreed.

1.  The government's memorandum addressing this Court's jurisdiction is due by **4:00 p.m. today**.
2.  Plaintiffs shall respond by **noon on March 28, 2025**.  The government indicated that it does not anticipate a need to reply.
3.  With respect to ECF 62, the plaintiffs' opposition is due by **9:00 a.m. on March 31, 2025**.
4.  The government's reply is due by **10:00 a.m. April 1, 2025**.

During the hearing, Mr. Dudek addressed the subject matter of his Declaration, docketed at ECF 62-1.  Among other things, he indicated that ¶ 11 of his Declaration did not accurately reflect what he meant to convey.  Therefore, I ask the government to submit a Supplemental Declaration from Mr. Dudek, due by **Friday, March 28, 2025, at 4:00 p.m.**, clarifying ¶ 11.

In addition, Mr. Dudek avers in ¶ 11 that the Fraud Detection Project is "aimed at finding new ways to identify fraud . . . ."  ECF 62-1 at 5.  And, Mr. Dudek claims that "[a]nonymization is not feasible" in regard to the Fraud Detection Project.  *Id.*  He adds that "name matching would not be possible."  *Id.*

JA405

As I understand ¶ 11, the Fraud Detection Project appears to amount to an attempt to uncover fraud, without particular, specific grounds that suggest fraud.  With the Privacy Act in mind, as addressed in ECF 49, it is unclear to me why there is any need to disclose PII before there is a basis to believe that fraud has occurred.  Therefore, the Supplemental Declaration should also clarify the work of the Fraud Detection Project, to include whether there are known, identifiable instances of fraud for which particular PII is sought.  And, if there are no such specific, identifiable instances of fraud, then Mr. Dudek should address the need for the disclosure of non-anonymized data before there is a factual basis to support a belief that fraud has occurred or is occurring.

Despite the informal nature of this letter, it is an Order of the Court and shall be docketed as such.

Sincerely,

/s/

Ellen Lipton Hollander
United States District Judge

2

JA406

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

Chambers of
**Ellen Lipton Hollander**
District Court Judge

101 West Lombard Street
Baltimore, Maryland 21201
410-962-0742

March 27, 2025

LETTER TO COUNSEL

Re:    *American Federation of State, County and Municipal Employees,*
       *AFL-CIO, et al. v. Social Security Administration, et al.*
       Civil Action No. ELH-25-0596

Dear Counsel:

As you know, at approximately 2:12 p.m. on March 20, 2025, I issued a Temporary Restraining Order ("TRO") in this case.  ECF 48.  Two letters from the Court to counsel followed on March 21, 2025.  ECF 51; ECF 52.  On March 24, 2025, the government noted an appeal to the Fourth Circuit.  ECF 57.

At approximately 11:15 a.m. on March 26, 2025, almost a week after I issued the TRO, defendants filed in this Court a motion to stay the TRO, "as clarified" by ECF 51 and ECF 52. ECF 60 ("Stay Motion").[1]  In view of the appeal, however, I asked the parties to address the question of this Court's jurisdiction to consider the Stay Motion.  ECF 61.  Those submissions have not yet been filed.

In the meantime, during the evening of March 26, 2025, defendants filed with the Fourth Circuit a motion to stay the TRO pending appeal ("Fourth Circuit Stay Motion").  The government did not provide this Court with the courtesy of notice of the filing.  Although the Stay Motion filed in this Court is six pages in length, including a cover page (ECF 60), the Fourth Circuit Stay Motion is approximately twenty-eight pages in length, exclusive of attachments.

In the Fourth Circuit Stay Motion, defendants audaciously assert that this Court merely "piggyback[ed] on" the opinion in *American Federation of Teachers, at al., v. Scott Bessent, et al.*, DLB-25-0430, 2025 WL 582063 (D. Md. Feb. 24, 2025), "adopting" that court's reasoning "nearly wholesale."  *See* Fourth Circuit Stay Motion at 1.  The 135-page Memorandum Opinion (ECF 49) that I issued speaks for itself.

---

[1] ECF 51 and ECF 52 were only intended to correct Acting Commissioner Dudek's interpretation of the TRO.

       The defendants' approach of simultaneously filing two stay motions in two courts does not promote judicial economy.  And, I am hard pressed to rule on the Stay Motion when the very same matter is under consideration in the Fourth Circuit.

Very truly yours,

                  /s/

               Ellen Lipton Hollander
               United States District Judge

cc:  Nwamaka C. Anowi, Clerk,
     United States Court of Appeals
     for the Fourth Circuit

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

        *Plaintiffs*,

        *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

        *Defendants*.

Civil Action No. 1:25-cv-00596

**JOINT STATUS REPORT**

Per the Court's request, *see* Dkt. 48, the parties respectfully propose the following schedule for preliminary injunction briefing and to determine if limited discovery is appropriate.

**First,** in accordance with Federal Rule of Civil Procedure 65(b)(2), the parties agree to extend the Temporary Restraining Order, Dkt. 48, through April 17, 2025.

**Second,** the parties propose the following agreed schedule:

| | |
|---|---|
| Wednesday, April 2 | Defendants file administrative record by 5:00 p.m. ET |
| Friday, April 4 | Plaintiffs file motion for preliminary injunction ("PI") |
| Tuesday, April 8 | Defendants file opposition to motion for PI |
| Friday, April 11 | Plaintiffs file reply in support of motion for PI |

Plaintiffs' agreement to the above is without prejudice to their ability to seek a revised schedule (1) if they consider the administrative record insufficient or (2) in the unlikely event that Defendants need to seek leave for additional time to file the administrative record.

**Third,** the parties propose that the Court, if its schedule permits, hold a hearing regarding Plaintiffs' motion for preliminary injunction on Tuesday, April 15 (or on another date between April 14 and 17). Plaintiffs' position is that an evidentiary hearing would be most beneficial for the Court, but Defendants disagree. The parties have therefore agreed to address the need for witness testimony in their respective briefing, with Plaintiffs stating their position in their reply.

**Fourth**, as noted above, Defendants have agreed to file the administrative record by 5:00 p.m. ET on Wednesday, April 2. Plaintiffs have shared the scope of material they expect the administrative record to contain with counsel for Defendants. Plaintiffs do not waive their right to seek additional limited discovery or supplementation of the record if Defendants' filing does not include those materials. Defendants have not expressed a position regarding the material identified by Plaintiffs. Their position is that SSA will give due consideration to Plaintiffs' input but make its own determination about what is appropriate to include based on what was before the decisionmaker with respect to the alleged agency action Plaintiffs challenge.

The parties agree that Plaintiffs must file with the Court any motion for limited discovery related to alleged deficiencies in the administrative record by 9:00 a.m. ET on April 3, with Defendants' response due at 12:00 p.m. ET on April 4. That deadline does not apply to discovery requests based on Defendants' subsequent disclosure or Plaintiffs' identification of other DOGE Team members, DOGE affiliates, decisionmakers, or relevant records.

Dated: March 27, 2025                Respectfully submitted,

_Alethea Anne Swift_
Alethea Anne Swift (Bar No. 30829)
Karianne M. Jones[*+]
Emma R. Leibowitz[*+]
Mark B. Samburg (Bar No. 31090)
Robin F. Thurston[*+]

Carrie Y. Flaxman[+]
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
aswift@democracyforward.org
kjones@democracyforward.org
eleibowitz@democracyforward.org
rthurston@democracyforward.org
msamburg@democracyforward.org
cflaxman@democracyforward.org

*Counsel for Plaintiffs*

\* Admission to this Court pending
+ Admitted *pro hac vice*

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division, Federal Programs Branch

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

BRADLEY P. HUMPHREYS
Senior Trial Counsel

/s/ Marianne F. Kies
*Signed by filer with permission*
MARIANNE F. KIES
Trial Attorney
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 353-1819
marianne.f.kies@usdoj.gov

KELLY O. HAYES
Interim United States Attorney

MICHAEL J. WILSON
USDC Md Bar No. 18970
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201

Tel: (410) 209-4941
Fax: (410) 962-2310
Michael.Wilson4@usdoj.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERTION OF
STATE, COUNTY AND
MUNICIPAL EMPLOYEES, AFL-
CIO, *et al.*

    *Plaintiffs*,

    v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*

    *Defendants*.

Civil Action No. ELH-25-0596

## ORDER

The Court has reviewed the Joint Status Report docketed at ECF 68. It is this 27th day of

March 2025, by the United States District Court for the District of Maryland, **ORDERED**:

1.  The following schedule shall govern:

| | |
|---|---|
| Wednesday, April 2, 2025, by 3:00 p.m. | Defendants shall file the administrative record |
| Friday, April 4, 2025, by noon | Plaintiffs shall file a motion for preliminary injunction ("PI") |
| Monday, April 7, 2025, by 10:00 a.m. | Defendants' opposition to motion for PI |
| Thursday, April 10, 2025, by 3:00 p.m. | Plaintiffs' reply in support of motion for PI |
| Tuesday, April 15, 2025, at 10:00 a.m. | PI Hearing |

2.  In accordance with the parties' agreement, the Temporary Restraining Order (ECF 48) is

hereby extended through April 17, 2025.

_____/s/_____
Ellen Lipton Hollander
United States District Judge

```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MARYLAND
 2                            NORTHERN DIVISION


 3      AMERICAN FEDERATION OF STATE,  )
        COUNTY and MUNICIPAL EMPLOYEES,)
 4      AFL-CIO, et al.,               )
                                       )
 5              Plaintiffs,            )
                                       )
 6          v.                         )CASE NUMBER: 1:25-cv-00596-ELH
                                       )
 7      SOCIAL SECURITY ADMINISTRATION,)
        et al.,                        )
 8                                     )
                Defendants.            )
 9      _____)


10

                TRANSCRIPT OF PROCEEDINGS - TELEPHONE CONFERENCE
11                 BEFORE THE HONORABLE ELLEN L. HOLLANDER
                      UNITED STATES DISTRICT JUDGE
12                      Thursday, March 27, 2025

13                     A P P E A R A N C E S

14      FOR THE PLAINTIFFS:
             BY: ALETHA ANNE SWIFT, ESQUIRE
15           BY: KARIANNE JONES, ESQUIRE
             BY: EMMA R. LEIBOWITZ, ESQUIRE
16           BY: ROBIN THURSTON, ESQUIRE
             BY: MARK SAMBURG, EQUIRE
17              DEMOCRACY FORWARD
                1445 New York Ave, NW
18              Washington, DC  20005

19      FOR THE DEFENDANTS:
             BY: ELIZABETH J. SHAPIRO, ESQUIRE
20           BY: MARIANNE F. KIES, ESQUIRE
                DEPARTMENT OF JUSTICE - CIVIL DIVISION
21              1100 L Street, NW
                Washington, DC  20005
22

        Also Present:
23
        Leland Dudek, Acting Commissioner of Social Security
24      _____

25            ***Proceedings Recorded by Mechanical Stenography***
               Transcript Produced by Computer-Aided Transcription
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA415

```
 1                    P R O C E E D I N G S

 2      (12:16 p.m.)

 3                THE COURTROOM DEPUTY:  The United States District

 4      Court for the District of Maryland is now in session.  The

 5      Honorable Judge Ellen L. Hollander presiding.

 6           The matter now pending before this Court is civil docket

 7      number ELH-25-cv-00596, American Federation of State, County

 8      and Municipal Employees ASL-CIO, et al., v. Social Security

 9      Administration, et al.  This matter now comes before the Court

10      for the purpose of a telephone conference.

11           Will counsel for the plaintiffs please introduce

12      themselves for the record.

13                MS. SWIFT:  Good afternoon, Your Honor.  This is Anne

14      Swift for plaintiffs.  I'm joined by my colleagues, Karianne

15      Jones, Robin Thurston, Emma Leibowitz and Mark Samburg.

16                THE COURT:  Yes, good afternoon.

17                THE COURTROOM DEPUTY:  And will counsel for

18      defendants please introduce themselves for the record?

19                MS. SHAPIRO:  Yes.  Good afternoon, Your Honor.

20      This is Elizabeth Shapiro.  And with me is Marianne Kies and

21      the Acting Commissioner of Social Security, Leland Dudek.

22                THE COURT:  And good afternoon to you as well.

23           Counsel, thank you so much for making yourselves

24      available on a rather short notice.  I asked to schedule this

25      conference call in response to a filing at approximately 10
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA416

```
 1    a.m. this morning, ECF-62, filed by the Government with some
 2    attachments; two affidavits, specifically.
 3          And I just want to remind everybody we do have a court
 4    reporter who is transcribing this conference.  I also have a
 5    public access line.  And in addition, I just want to remind
 6    everyone that there's absolutely no recording that is
 7    permissible at any time with respect to what transpires here.
 8    And, of course, there is a transcript that would be available,
 9    if necessary.
10          I wanted to convene the conference and wanted to do it
11    quickly because the Government gave me a deadline of 1:00 in
12    order for me to make sure that I was satisfied that there had
13    been compliance with paragraphs 2 and 3.  And fortunately I
14    could actually have an opportunity to look at it.  I think
15    that was a little worrisome going forward.  I don't recommend
16    that style, counsel, because I could easily have been on the
17    bench and wouldn't have had a chance to look at it.
18          So if you're going to file something with a deadline, I
19    would certainly appreciate you letting me know in advance.
20    That way we can be sure whether I can actually accomplish the
21    task you've assigned to me.
22          I did look at it, however, and that did spawn a few
23    questions.  And I thought the best way to proceed so that I
24    could accommodate the 1 p.m. request, which is how I'll
25    construe it, would be to just review some of the assertions in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA417

1    Mr. Dudek's affidavit.  They're technical, so I'm grateful to

2    you, Mr. Dudek, that you've joined us because my guess is that

3    you're the person who will be able to provide the answers.

4        First of all, nothing in here speaks to medical records

5    so I couldn't tell, is that part of what is encompassed in

6    these schema levels?

7            MR. DUDEK:  Well, ma'am, may I answer your question?

8    And I understand it's technical, so that I --

9            THE COURT:  And sir, I'm sorry.  Just to be clear,

10   because we're not actually in court, no one can see each

11   other.  And so in order for the court reporter to know who is

12   speaking, I have to ask you to please state your name and then

13   tell me what it is you want me to know.

14           MR. DUDEK:  Yes, ma'am.  My name is Leland Dudek.

15           THE COURT:  Thank you.

16           MR. DUDEK:  I just wanted to ask -- I'm not used to

17   this.  I'm just an anti-fraud security guy that wound up being

18   the Commissioner of Social Security for a temporary time, so

19   it's a fairly technical answer.  I'm happy to walk you through

20   it.

21           THE COURT:  Sure.

22           MR. DUDEK:  I'm happy to show you the problems in

23   person, answer the questions.

24        The challenge that SSA has, so the DOGE folks have access

25   to what we call the Enterprise Data Warehouse.  And SSA, and

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA418

1   in our infinite wisdom and judgment, did not -- the EDW is

2   what's called a data link.  And when we architected that data

3   link, it's a copy of records that are in our master file.  And

4   the challenge that we have is that even though our folks, or

5   the DOGE folks, or any SSA employee that looks at the data in

6   the Enterprise Data Warehouse, those folks that have access to

7   those records within the EDW as we call it, they have access

8   to multiple specks of affiliated data within it.  So that's

9   kind of the first problem.  It was architected in a way that

10  very similar to the way our mainframes are, that once you have

11  access to it, you're going to have access to a *[audio*

12  *interruption].*  And that same is true for our anti-fraud

13  employees.  It was not designed in a way as a data link to

14  individually perforate it.  Now I'd argue it should be and we

15  could get there, but the challenge is is that if you want me

16  to partition it that way, then I would have to rearchitect the

17  entire enterprise.  And I'm looking at doing that with the

18  appropriate granular level controls on each piece within that

19  system of record, right?

20      But previous commissioners didn't do that because they

21  figured that the people who have access to that have the

22  requisite background checks, the requisite trainings, the

23  requisite ethics.  And the Enterprise Data Warehouse is used

24  throughout the agency to do a whole set of tasks.  It's used

25  by the actuaries, it's used by my anti-fraud team.  It's used

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA419

1    by -- and what we emphasize when we train and we have

2    individuals that take the training actually sign a set of

3    rules that governs their behavior if they violate it.  And

4    that's true of the DOGE Teams.  If they violate that access or

5    if they tear that data, the government will fire them.

6        But it's a custodial duty.  I take PII and FTI very

7    seriously.  And so if they have access to that -- and there

8    are many folks in the agency that have access to this -- they

9    have to respect the rules around it.

10        The secondary factor is that we have lots of records in

11    the EDW.  I think the one everyone is concerned with is

12    Numident, we call it Numi.  And they see that as oh, it's the

13    keys to the kingdom within SSA.  It has everything about those

14    query numbers, and names, and dates of birth, and dates of

15    death, and address information.  And the truth is is that it's

16    an extracted data from our master records on the mainframe and

17    it's a compilation of data sets that have accrued over the

18    past 50 years.

19        And the data there is really messy and it is in no way

20    super authoritative.  It takes a lot of complex joints and

21    queries within the EDW to actually get the truth and just --

22    the three things that the DOGE Team is interested in which is

23    Social Security numbers, names, and dates of birth.  And I

24    should say and dates of death, right?

25        So you can't just rely on Numi alone.  In fact, if you

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA420

 1    notice, the president made some claims about Social Security
 2    and DOGE made some claims about Social Security early on.
 3    Those are based on them having access to the Numi data
 4    themselves without intervening data sets.  And they could have
 5    embarrassed themselves pretty substantially.  And we corrected
 6    the record on that.  They need to have cross joint against
 7    other data sets to get to the truth of what they're working
 8    on.  And what they're working on is trying to clean up the
 9    master death record.
10         The challenge we have is we have -- they found, you know,
11    10 million people that should be on death that are not and
12    that SSA has never got around to getting a death certificate
13    for.  And my response to them was, okay, well you found this
14    data, what I want you to do now is go to my anti-fraud team,
15    my folks in my anti-fraud team and they need to replicate your
16    result.  You give them the challenge, they need to come back
17    and confirm it, and they did.
18         And then I said okay, that's still not good enough to
19    prove there's death on people that are over 115.  I need to
20    know I'm not going to kill anyone by taking their benefits
21    away.  So give me proof, a reasonable person standard that
22    these folks are not using Medicare and they don't have a
23    credit record.  And do it in tranches.  So not all 10 million,
24    not all 15 million at a time, but 2 or 3 million at a time.
25         And that's what they've been doing is 2 or 3 million,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA421

 1   looking at those records individually to see if these people

 2   that are over 115 are actually dead.  And--

 3           THE COURT:  So that's -- I'm sorry, I didn't mean to

 4   interrupt.  But just before I lose track, so you've been very

 5   helpful in clarifying.  So it's 2 to 3 million at a time.  But

 6   I was actually wondering from what you just said, looking, for

 7   example, at this concern about the Are You Alive set of

 8   records, are they narrowed by a search of just, for example, 2

 9   to 3 million people who by information you have on date of

10   birth you would think are possibly dead and don't show up as

11   dead?  Or I guess that's the part that I'm still not really

12   clear about.

13           MR. DUDEK:  Yeah, let's look at the date of birth

14   and let's look at the utilization so that we can ascertain

15   that they're really dead, because I don't want to hurt

16   anybody.

17           THE COURT:  Right.  So in other words, so the search

18   -- the search for the Are You Alive Project as you call it in

19   your affidavit is tailored to people for whom you have, based

20   at least on chronology, might suspect they're dead based on

21   the fact that they might have the dates of birth that suggest

22   they're 120 years old or something like that.  In other words,

23   are you searching -- I guess what I'm trying to ask is is this

24   a search that is based on and narrowed to a group where based

25   on age what you have as to the dates of birth there would be

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA422

```
 1    reason to question whether they're still alive, as opposed to

 2    searching everybody's records?

 3           MR. DUDEK:   Well, the thing, the query searches on a

 4    constraint which is the chronological for the date of birth

 5    and then it tries to do the associations based on that pattern

 6    and other data sets to ensure this person is actually dead so

 7    that we can meet the standard of the law.

 8           THE COURT:   Okay.  Is there some way -- does this

 9    correspond in any way to whether these people are also getting

10    benefits or is that --

11           MR. DUDEK:   Yes, yes.  And if they are, they need to

12    refer that to OIG for a formal investigation because we may

13    have an identity theft problem.

14           THE COURT:   Okay, so but the search itself for the

15    people who are believed to be possibly in a group of people

16    too old to be receiving benefits, is there a corollary that

17    it's not just their age, but they're also receiving benefits

18    or do you just want to clean it up to reflect that they're

19    actually dead?

20           MR. DUDEK:   We're trying to clean it up so we can

21    get actual deaths so that we can give as part of our

22    responsibility to Treasury, and Do Not Pay, the actuary data.

23           THE COURT:   But are you saying that these very

24    people for whom you question whether they are still alive are

25    also receiving benefits and therefore you need to know if
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA423

```
 1    they're alive?  Or are you just going by their information you
 2    have on dates of birth?
 3              MR DUDEK:  Just on their dates of birth, ma'am.
 4    Dates of birth.
 5              THE COURT:  Oh, so that doesn't show --
 6              MR. DUDEK:  So --
 7              THE COURT:  Yeah, go ahead.  Sorry.
 8              MR. DUDEK:  Yeah, so you take the whole universe,
 9    you cross-sample them against dates of birth.  Then you look
10    at the dates of birth.  And then the next question you ask is
11    do they have benefits or not.  For the ones that are not
12    receiving benefits, then it's a cross-match of are they
13    receiving Medicare, are they receiving -- do they have credit?
14    And if not, put them on the death list.
15              THE COURT:  So is it accurate to say that it's a
16    narrow search of only a discrete group of people who fit the
17    description of possibly, based on information that SSA has as
18    to date of birth, would possibly be too old to be receiving --
19    wouldn't likely be alive?  Let's put it that way.
20              MR. DUDEK:  Yes, ma'am.  That's correct.  It's work
21    we've never gotten around to as an agency, but these numbers
22    come up a lot of times in benefit theft or in authentic
23    identity and we're trying to -- yeah.
24              THE COURT:  Okay.  That was actually helpful.
25          And then you mentioned the -- is that the death -- what's
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA424

1    the difference really between the Death Data Clean Up Project

2    and the Are You Alive Project?

3              **MR. DUDEK:**  So the Are You Alive is an ability for

4    those who are uncertain about within the population or

5    individuals to assert so that they can tell us that they're

6    alive.  And this is a notion from the White House to do this.

7              **THE COURT:**  And I'm sorry, could you just repeat

8    that last sentence?  I missed it.

9              **MR. DUDEK:**  Well, so what they want to do there is

10   where we have reliable data that we can use and there -- we

11   used to have this project called the Centenarian Project where

12   we used to actually send people out to knock on doors of

13   individuals.  And we would give them a little certificate if

14   they were over 100.  We would knock on doors and actually see

15   if these people are alive.

16       In some circumstances, and they're gruesome, where we

17   have someone who is, say, taking care of their mother and it's

18   a joint household and the parent passes away, instead of

19   reporting the death they go to Costco instead and they buy a

20   freezer.  And we've had more than one of those.

21       And so for certain age groups, we want to do something

22   similar to what we were doing with the Centenarian Project to

23   be a crosscheck where people can affirm that they're okay. I

24   think we're not marketing it properly.  It's very similar to

25   what we were physically doing with the Centenarian project by

1  checking in on people.

2      **THE COURT:**  Okay.  Well, in paragraph 9 and

3  paragraph 10, for example, of your affidavit which is ECF-62-1

4  for the record, you do say, Employees -- now speaking in

5  paragraph 9 which pertains to the Are You Alive Project,

6  Employees 1 and 9 are working on individual cases.

7      And then for paragraph 10 which is the Death Data Clean

8  Up Project you say Employee 5 is updating individual level

9  records.  And therefore, for both of these, anonymization

10  would not be feasible or practical.

11      And I just wanted to make sure I understood what you were

12  trying to tell me, which is that I took this to mean that this

13  is not what I previously have characterized, for example, as

14  an unbridled, unfettered search of every -- the records of

15  millions of Americans; but to the contrary, that this is now a

16  more focused search.

17      I can't tell if I'm right, but is that accurate, sir?

18      **MR. DUDEK:**  Ma'am, I was hired at the Department of

19  Interior to build their security architecture during Cobell

20  litigation.  I am very aware of the responsibility that I have

21  to protect PII and FTI.  This is a narrow search.  They're

22  simply trying to clean up their death records and then get

23  where we have questions to get positive assertions from the

24  public and the [audio gap] that people are alive.

25      The DOGE team does not have any privilege, whatsoever, to

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA426

```
 1    update anything in the master records, our system of records,
 2    with the ledgers.  It has to go through the Government.  It
 3    has to go through a separation of duties.  There must be
 4    checks and balances.  They must -- the actual update of
 5    information must be affirmed and validated.
 6              THE COURT:  But again, these are -- you used the --
 7    this is I'm quoting you, "working on individual cases," that's
 8    in paragraph 9; and paragraph 10, "individual level records"
 9    and then, paragraph 11 which is your Fraud Detection Program,
10    again you say "individual case level."  So I took that to mean
11    that this was a focused search and not just a search of the
12    records of millions of Americans.
13              MR. DUDEK:  It is not searching records of millions
14    of Americans.  Where it gets complicated as when we have rep
15    payees where sometimes you have somebody representing someone
16    else and you have to dig into the details to make sure the
17    person who is represented by the rep payee is actually still
18    alive and actually that the benefits are going to the right
19    place.
20              THE COURT:  Okay.  Paragraph 11 talks about your
21    Fraud Detection Program.  And here too I was just wanting to
22    be sure I understood what you were trying to tell me.  And you
23    say that the project is aimed at finding new ways to identify
24    fraud in regard to direct-deposit, new claims.  I don't know
25    what "new claims" means exactly, wage-reporting fraud.  And
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA427

1   then that anonymization isn't feasible because it would

2   obscure information -- go ahead, sir.

3        **MR. DUDEK:**  That's not really what I meant.  Here is

4   the problem with obfuscation.  So if you want to do

5   obfuscation and it really -- it's not obfuscation.  You're

6   talking about getting cash values at 640-3, that's a SHA3-512

7   scrambled data, okay?  It's a really long data string.

8        The problem is a Social Security number in itself is not

9   inherently secure.  And because it consists of all numbers,

10  that I could run in the Cloud today a list of all possible

11  Social Security numbers and run those SHA values and create

12  what's called a rainbow table in about five minutes.

13       In about -- the date of birth I can do it in about one

14  minute, and names I can take the entire names sets, last name

15  and first names of New York; Austin, Texas; San Francisco from

16  the White Pages and do that in a creative lookup table in

17  about a half-a-day.

18       So all it does is by using SHA hashing to protect it, it

19  just closes the searches down and it doesn't actually really

20  protect it.  And I'm happy to show the Court what I mean.

21       **THE COURT:**  Okay.

22       **MR. DUDEK:**  I believe in encryption.  But at this

23  level to do the queries, it's not being facially intensive to

24  do the queries; and it's not being facially meaningless to

25  actually encrypt that data because it's easy to ascertain what

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA428

1    they're looking for anyhow.

2         THE COURT:  Okay.  So let me ask -- well, first of

3    all, Mr. Dudek, again, thank you for your time.  Was there

4    anything else you wanted to tell me about the need for these

5    searches?

6         MR. DUDEK:  I'm happy to show you the controls we

7    have in place.  I'm happy to show you the EDW.  I'm happy to

8    do whatever it takes to assure the Court and the defense that

9    we're really not on a goose hunt; we're really trying to do

10   the right thing by cleaning up our records so that we can

11   improve data exchange and we can be more accurate.

12        THE COURT:  Okay.  Well, thank you.

13      And let me ask Government's counsel first if there's

14   anything you'd like to add.

15        MS. SHAPIRO:  Your Honor, I do want to apologize for

16   putting Your Honor in such a time bind.  It is not the

17   ordinary course of how we would normally litigate these things

18   and we very much appreciate your patience and willingness to

19   get on the phone and hear us out.

20        THE COURT:  Sure.  Anything else?

21        MS. SHAPIRO:  No.

22        THE COURT:  Let me invite plaintiff 's counsel then

23   and I should have asked you to identify yourself.  Let me go

24   back to defense counsel first so the court reporter would know

25   who was speaking.  Could you just give us your name?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA429

```
 1              MS. SHAPIRO:  This is Elizabeth Shapiro.

 2              THE COURT:  Thank you.

 3         And now is there anyone on behalf of plaintiffs who would

 4    like to address the Court?  And please start by saying your

 5    name.

 6              MS. SWIFT:  Yes, Your Honor.  This is Anne Swift on

 7    behalf of plaintiffs.

 8         I feel like the Court, I appreciate Mr. Dudek's

 9    contributions here today, but I think a scope of the

10    conversation at this hearing today is obscuring the issue

11    raised by defendants' filing.  And if you look at the filing

12    and the affidavits, it seems clear that they are, in fact,

13    seeking unbridled, unfettered searches of data for millions of

14    Americans.

15         And the Court a few minutes ago raised a concern and said

16    that you can't tell whether or not you're right about that.

17    And plaintiffs will submit that it is impossible to ascertain

18    that in this hearing and on the artificial timeline that

19    defendants have given not just plaintiffs, but also the Court.

20         Moreover, Mr. Dudek just testified that this is work SSA

21    has never gotten around to and wants to get around to now,

22    which would seem to suggest that the urgency created by this

23    filing is artificial.

24         Substantively, I'd like to clarify that based on our

25    understanding of SSA systems of records and the access that
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA430

1    DOGE seeks -- and the Court did, I think, get into this a

2    little bit with Mr. Dudek -- that while he is referring to

3    searches of say 2 to 3 million records, I did not hear Mr.

4    Dudek say that the 2 to 3 million people whose personal

5    identifying information is contained in those records were

6    already identified as having extremely old dates of birth or

7    something that would suggest that their death records should

8    be updated.  Instead, those affiliates are fishing through

9    random pools of records for 2 to 3 million people.

10       With respect to the broader concerns and alleged needs to

11   know raised in the declarations and in the filings, we talked

12   about this at the hearing, but the SSA IG does do audits

13   routinely.  And I think it's notable that nowhere in their

14   filing, in the declarations, or in Mr. Dudek's testimony have

15   defendants suggested that scores of people throughout Social

16   Security have the same access to data that the IG's office

17   does, or even that people in the IG's office needs the amount

18   of data access that defendants are trying to give the DOGE

19   affiliates here.

20       With respect to the Enterprise Data Warehouse

21   specifically, obviously plaintiffs, you know, don't --

22   plaintiffs agree that that system is used throughout the

23   agency, but it's used throughout the agency with respect to

24   severe and diverse limits on access which is evidenced in many

25   places.  But here I point the Court to Mr. Russo's own

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA431

 1    declaration which we discussed in length at the hearing which
 2    identified about 30 to 40 people who have access like the one
 3    -- like the type of access that's being discussed here.
 4          Ms. Flick's declaration which again, remain unrefuted,
 5    detail usually even for inquiries like this if someone is
 6    accessing the EDW they are given access to discrete portions
 7    of it in a sandbox environment where the data is anonymized
 8    and it is not possible for the reviewer to link it to other
 9    systems of record or other identifying information.
10          And whether -- you know, Mr. Dudek referenced I think
11    some public statements that she said were based on data from
12    Numident.  Whether anyone has quoted on or reported on small,
13    discrete pieces of data from Numident, anonymous pieces of
14    data I would note, has no bearing on whether or not DOGE
15    affiliates should be granted access to the entire system of
16    records.  And while this declaration refers to things like
17    Numident as schemas, I would love to be wrong, but the way
18    that they are described suggests that these schema are, in
19    fact, entire systems of record, again, that are governed by
20    Thorne, by the Privacy Act, by the Court's order.
21          And I think what we see here today, in addition to an
22    artificially compressed deadline, is that the defendants have
23    added a lot of words to the access that they seek, but they're
24    still asking for the same thing.  Whether or not --
25                THE COURT:  They're asking for what?  I'm sorry, I

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA432

1    missed that.  They're asking for what?

2         **MS. SWIFT:**  For the same access that they've been

3    asking for all along.  Mr. Dudek listed the types of searches

4    that one might be able to do, but the Government's filing

5    seeks access to the entire databases.  And the Government --

6    neither the Government, nor Mr. Dudek has made any

7    representations that the DOGE affiliates, given access to

8    these systems of record, will limit their use of that access

9    to those kinds of searches.

10        So plaintiffs' position is that it's clear in the record

11   that there's no need for them to have access to non-anonymized

12   data in the first instance.  There may be a situation in a

13   much different circumstance where a DOGE affiliate needs and

14   should have access to much, much, much smaller sets of

15   non-anonymized data that are revealed by the searches Mr.

16   Dudek is referring to of the broader system.  But the access

17   contemplating -- but the access that defendants are requesting

18   to grant to those affiliates, and I think "request" is a

19   generous term there, is so far from that situation that it's

20   really almost impossible to compare the two.

21        If defendants -- if defendants want DOGE affiliates to be

22   able to search these databases, they can certainly give, in

23   keeping with the Temporary Restraining Order, access to

24   anonymized data in those databases.  And then it may be that

25   down the line once they have complied with the TRO and

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA433

1   provided written explanations of a need to know from the DOGE

2   affiliates themselves, that they do need and should get access

3   to PII.  But here they haven't demonstrated that need and

4   there's a lot of window dressing, but they're asking to give

5   DOGE affiliates access to not all, but close to all of the

6   same SSA systems of records which as Your Honor is well aware,

7   contain incredibly sensitive information.

8          **THE COURT:**  So let me inquire -- first of all, it's

9   about 12 of 1, so I just want to make it clear that until I

10  resolve this, I'm not -- I guess I'll have to say I'm ordering

11  that nothing be released or authorized as far as DOGE

12  employees are concerned until I make the decision.  And I

13  can't -- I can't make it yet because I'm still gathering

14  information.

15         So I just have to say I have to agree this far with what

16  plaintiffs have said and that is I'm not sure why I had only

17  such a short time to even consider this.  And I think it's

18  really not an appropriate deadline.  Normally I set the

19  deadline, and this is not the way it works.  And I don't think

20  I've gotten enough time to consider it.  I need to hear from

21  both sides.  Plaintiff had a right to respond and this is the

22  first I'm hearing and it's not really the best format either.

23         My concern too is this, which is really an overarching

24  question and that is, I don't even know that this court has

25  jurisdiction at this point because the Government noted an

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA434

```
 1    appeal.  Now I'm not sure whether a TRO in the context here is
 2    appealable, but there's an appeal that's been taken and
 3    ordinarily -- an appeal to I guess the district court of
 4    jurisdiction.  And I asked the Government to file a memorandum
 5    by 2 o'clock addressing because this was a gaping hole in the
 6    information I got yesterday which was a request from the
 7    Government to stay my ruling was the first time that request
 8    had been made.  This TRO was about six days old at the time of
 9    that request.  And what stood out to me was the glaring
10    omission of whether I could even issue a stay, given that fact
11    that the Government had noted an appeal to the Fourth Circuit.
12    And I asked the Government to provide authority to me by 2
13    o'clock today as to whether I even have authority to consider
14    a stay.
15         And then, of course, the way we work I get to hear the
16    benefit of both sides' points of view.  I needed to give the
17    plaintiff a chance to respond.  And then if the Government
18    wanted to reply I asked that you would let me know and then
19    I'll know when I can rule.
20         And the same holds true here.  The plaintiff has the
21    right to respond.  And -- but until I know if I have
22    jurisdiction, I'm not really sure I can even be lawfully
23    entertaining this request.
24         So I don't know if you all want to speak to this.
25              MS. SHAPIRO:  Your Honor, this is Elizabeth Shapiro
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA435

```
 1    for defendants.  We intend to respond, of course, to your

 2    Court's direction to address the jurisdiction.  We will file

 3    by 2 o'clock.

 4        As a preview, we think the Court certainly has

 5    jurisdiction to entertain the stay motion, and also continues

 6    to have jurisdiction to entertain the preliminary injunction

 7    motion by virtue of the injunction that's up on appeal being

 8    of a different temporal duration and a different injunction

 9    than the one that would be proceeding before Your Honor, but

10    we will --

11        THE COURT:  That's very nominal, though.  I mean, I

12    cited cases in my letter to you and I think I brought that

13    out.  I'm in the courtroom, actually.  My letter is ECF-61 and

14    I cite a few cases that would make it sound like I am stripped

15    of my jurisdiction to rule on any matters involved in the

16    appeal.  And I don't know if that kind of language from the

17    Fourth Circuit would embrace the very issue you've generated

18    now, or even something as I suppose ordinary as a request for

19    a stay.

20        I pointed out in my letter, of course, there are limited

21    exceptions for matters that are either collateral to the

22    appeal or that aid the appellate process whether this, for

23    example, a motion to stay is under that umbrella.  I'm looking

24    for guidance from counsel, but -- and then what does the

25    plaintiff wish to say on the topic of my jurisdiction?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA436

1          **MS. SWIFT:**  Your Honor, plaintiff agrees that the

2     Court does have jurisdiction and we look forward to having an

3     opportunity to brief both that issue, and the stay.

4          **THE COURT:**  Okay, so I think the only practical

5     thing I can do today, counsel, I have to just assume arguendo

6     that I have jurisdiction as we go forward.  And what I would

7     ask is I think the issue that has been presented with respect

8     to compliance is important.  And I appreciate the effort that

9     went in on the part of the Government to address the Court's

10    concern.

11         What I was expressing, it's hard to summarize an opinion

12    of 130 or so pages, but -- 135 maybe, but what I think the

13    Privacy Act required was some very clear indication of need.

14    And so I think that is what the Government was attempting to

15    do today.  And I appreciate that, but I need to hear from the

16    other side as to whether the need has, in fact, been

17    adequately presented.

18         So the way it works in our system of justice as everyone

19    here well knows is both sides get to talk, and that I need to

20    give the plaintiff a chance to respond.

21         So Mr. Dudek, I need your cooperation because I know

22    you're as the saying goes, "champing at the bit" to get

23    started.  And I'm not trying to be difficult, but I have a job

24    to do and I need to give everybody a chance to be heard.  And

25    I don't know that that's happened.  This clearly is helpful,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA437

```
 1    but I would benefit from a memorandum of sorts or some
 2    response from the plaintiff.
 3         So I want to ask if that can be -- I would like it
 4    tomorrow.  I think we're on a short time frame here because of
 5    what appears to be --
 6              AN UNIDENTIFIED MALE VOICE:  And also, the
 7    procurement process has not yet begun.  No, no, not yet
 8    initiated.  And our actions will --
 9              THE COURT:  I'm not sure who is talking.  Who was
10    that who was speaking?  And I don't know if the court reporter
11    was able to get what I said, but I hope so.
12              THE COURT REPORTER:  Yes, I was, Your Honor.
13              THE COURT:  Mr. Dudek, I need to impose on you to
14    understand our process.  You have yours, we have ours.  It's
15    called due process.  The other side gets the chance to respond
16    and it helps the Court too to reach the right result when the
17    Court gives each side a chance to respond.
18         So I appreciate all your comments and they were very
19    helpful.  I don't know if there is something the Government
20    would like to add in reply, which is obviously something I
21    would invite as well.
22         So my question is, can I impose on the parties to be
23    patient for just a few more days?  I need to be sure I do the
24    best I can do with the information I'm given, assuming I even
25    have jurisdiction and that's the big elephant in the room
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA438

1    right now.

2        Assuming I do, I'd like to ask the plaintiff to respond

3    by tomorrow to ECF-62, but it's a lot on everybody's plate

4    because we also have the jurisdiction issue.

5        I would ask that -- yes, go ahead, sir.

6            **MR. DUDEK:**   This is Leland Dudek.  I respect the

7    Court.  I will obey your command.

8            **THE COURT:**   Thank you.

9        I would like to say to the -- I ask the plaintiff to

10   provide a response tomorrow by the close of business, and then

11   the Government can give me a reply by 9 a.m. Monday morning.

12   And then I will try to make a very quick decision about the

13   request that's embodied in ECF-62.  So if I get a response

14   from plaintiff -- I'm saying these times because I know that

15   you both are working on your jurisdiction matter.  I don't

16   have it yet from the Government.  I'm expecting it by 2.  And

17   then tomorrow I was expecting the plaintiff to respond and

18   then the Government was going to let me know if it needed or

19   wanted to reply.  I can set a time for that because if the

20   Government didn't want to reply I could just get right on it.

21   And I know the Government can't know that until it sees what

22   the plaintiff submits.

23       So we're sort of working on a couple of fronts at the

24   same time and I'm trying to keep that in mind as I set these

25   deadlines.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA439

```
 1              So is it workable for everybody if the plaintiff by let's

 2       say 5:00 tomorrow gives me a response to ECF-62 and on Monday

 3       morning at 9 a.m. or if you need more time you'll let me know,

 4       10 a.m., whatever.  On Monday morning, the Government give me

 5       a reply to what the Government receives tomorrow and what I

 6       receive tomorrow from plaintiff.  My goal is to -- I know you

 7       know this, but I work very hard to reach the result that I

 8       think the law requires.  And I can't do it with my hands tied

 9       behind my back.

10              The lawyers play a central role here in educating the

11       Court and I don't want to do -- make any ruling where I don't

12       have all of the information and arguments that I think each

13       side is entitled to present.  So that's where I'm coming from.

14              So is this workable to everybody?  Mr. Dudek, is this

15       workable for you?

16                   MR. DUDEK:  Your Honor, absolutely.

17                   THE COURT:  Okay, well that's very helpful and I

18       thank you.

19              And is it acceptable to counsel, the schedule I'm

20       proposing?

21                   MS. SWIFT:  Your Honor, Anne Swift for plaintiffs.

22       We, of course, will meet whatever deadline the Court imposes.

23       Given our initial time frame and Mr. Dudek's comments today

24       regarding the lack of urgency with respect to this issue,

25       especially in light of the jurisdictional briefing, we would
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA440

1  request that perhaps plaintiffs file their response by 9 a.m.

2  Monday and defendants, if they choose to file a reply, by 5

3  p.m. Monday.  Certainly we don't want to hold things up, but

4  we do want to make sure that we're able to adequately

5  investigate and describe the relevant issues for the Court.

6    **THE COURT:**  Well, I would say if you want 9 a.m.

7  Monday, that's certainly fine with me.  But I also don't think

8  I would then require the Government to respond by 5 p.m.

9  That's not fair.  So I would give the Government whatever time

10  they would like, reasonably speaking, of course. So I don't

11  see a reason why I shouldn't accommodate your request.  I

12  don't actually think it's unreasonable.

13    Is there a problem from the Government's point of view

14  with 9 a.m. Monday for the plaintiffs to respond?

15    **MS. SHAPIRO:**  Your Honor, it's not a problem, but I

16  don't want to just accept the proposition that there's a lack

17  of urgency.

18    **THE COURT:**  No, I understand.  I understand.  Your

19  concern is noted.  We'll go with 9 a.m. Monday for plaintiffs.

20  And then I know it's hard to know how much time you'll need,

21  but everybody is wanting to work on a very shortened time

22  frame.  So is 10 a.m. Tuesday good for the Government to reply

23  if you're going to?  If you're not going to you should let me

24  know because then I'll know I can get started working.

25    **MS. SHAPIRO:**  Yes, on the response to the motion --

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA441

```
 1    not the motion, but to the notice that we filed today.  Not

 2    the jurisdictional question.

 3              THE COURT:  Yes, jurisdiction, we'll talk about that

 4    in a minute.  But this is with respect to ECF-62, the

 5    Government's reply would be the next day.  So I'll give

 6    plaintiff until Monday and then the Government would have

 7    until 10 a.m. on Wednesday -- I mean, Tuesday, Tuesday.

 8         Does that work?

 9              MS. SHAPIRO:  That does work for us.  Thank you.

10              THE COURT:  Okay.  And now for the jurisdiction, do

11    you contemplate -- this is directed to the Government --

12    filing a reply?  I know you don't know what it's going to say

13    in response to yours, but shall I assume you're going to want

14    to so that I can set a deadline and then what deadline would

15    you like?

16              MS. SHAPIRO:  Based on -- Your Honor, this is

17    Elizabeth Shapiro for the Government.  And based on the

18    plaintiffs' representation that they seem to agree with us, I

19    think we would wait to see what they say and if we don't need

20    a reply, we'll promptly notify the Court.  And if we do want

21    to reply, we can do that very quickly.  The filing that we're

22    prepared to submit shortly is a very brief filing.

23              THE COURT:  Okay.  Now, of course when I sent that

24    letter I didn't know ECF-62 was coming.  So frankly -- and not

25    to throw sort of any wrinkles in the plan so-to-speak, but the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA442

```
1    issue of jurisdiction for the request for a stay versus

2    jurisdiction on ECF-62 feels a little different to me.  And

3    I'm wondering if you wish to -- I know this may cause some

4    delay, but it's pretty important.  Even if I conclude that I

5    have jurisdiction to consider the request for a stay, I feel

6    like we're in a totally different wheelhouse when we talk

7    about ECF-62.

8              MS. SHAPIRO:  Your Honor, we're happy to address

9    that if we could maybe extend the time to 3:00.

10             THE COURT:  Yes, I think that's wise.  I think we

11   should because I think this is definitely of a different

12   character than just -- not to minimize the motion for stay,

13   but I think this is far more substantive.  So I would feel

14   better if I had you specifically address this type of request.

15        So what would you like?

16             MS. SHAPIRO:  I think 3:00 should be sufficient or

17   if we want to say 4:00 just to be safe, but we can turn it

18   around quickly.

19             THE COURT:  And then, of course, I have to give an

20   extension to plaintiff, as well.  So where I said the

21   plaintiff response would be 10 a.m., if you're going to do 4

22   p.m. then we'll make that noon on the 28th of March.  And that

23   would cover both topics.

24        I see this, I see this one as more challenging so I hope

25   what you give me is helpful.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA443

```
1          MS. SWIFT:  I will endeavor to make sure that it is.

2          THE COURT:  Okay.

3          MS. SWIFT:  For the court reporter, this is Ms.

4     Swift, for plaintiffs.  One clarifying question, Your Honor.

5     Just because there are so many filings that are at issue,

6     would the Court also like plaintiffs to respond to the

7     substance of the stay motion?

8          THE COURT:  Well, yes.  That was a given, I'm sorry.

9     The jurisdiction issue, but most definitely I need your

10    position on the stay issue.

11         MS. SWIFT:  Okay.  And would it be helpful for

12    plaintiffs to submit those in the same filing or should we

13    plan to do that in separate filings?

14         THE COURT:  I really don't have a position, but

15    probably easier if you separate them.

16         MS. SWIFT:  Okay.  We will, of course, do that and

17    unless the Court directs otherwise, understand that the

18    deadline for both will be the one -- I'm sorry, Your Honor,

19    the one that you just said.

20         THE COURT:  Tomorrow.  You should already be working

21    on your response to the stay itself, subject to my agreeing

22    that I have jurisdiction.  But I don't see this as sort of a

23    piecemeal; I think I have to move quickly.

24         And just a reminder, I think today we had a deadline for

25    any status -- for a status report and possible PI briefing or
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA444

```
 1    I don't know if there's going to be a motion to extend the TRO
 2    or even if I have authority to grant it in light of the
 3    appeal, but I just want to make sure everybody is on the same
 4    page with respect to -- and the Government seems to have been
 5    very diligent in trying to meet these deadlines.  But I just
 6    want to remind everybody about today's deadline.  So that's
 7    another one that was set before all of this unfolded.
 8         MS. SHAPIRO:  Yes, Your Honor.  This is Ms. Shapiro.
 9    I was going to say that the plaintiffs, we have been
10    communicating and we intend to submit the joint status report
11    on time.
12         THE COURT:  And I'm just curious.  I think in the
13    motion that the Government filed for a stay, the Government
14    indicated it was going to also ask the Fourth Circuit for a
15    stay.  I have not checked the docket in the Fourth Circuit.
16    Has that happened?
17         MS. SHAPIRO:  Yes, Your Honor.  There was a motion
18    filed in the Fourth Circuit last night.
19         THE COURT:  Okay.  So that may make this all moot.
20    But I don't know even if that stay is granted then I'll be
21    wondering what is the effect of the stay, is it the whole case
22    or is it just -- I mean, really this is complicated because I
23    won't -- I don't know what the stay will look like,
24    necessarily.  I assume, but I can't -- I'll ask counsel to
25    confirm.  In the request to the Fourth Circuit did you
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA445

```
 1    indicate that you also asked the District Court for a stay but
 2    haven't had a ruling yet?
 3             MS. SHAPIRO:  Yes, Your Honor.  This is Ms. Shapiro.
 4    I think that was indicated in the Fourth Circuit paper.
 5             And just to make it even more complicated, as Your Honor
 6    knows there is a similar case before Judge Boardman and a
 7    preliminary injunction was entered and appealed to the Fourth
 8    Circuit and the Fourth Circuit last night asked for the
 9    plaintiffs to respond by tomorrow.  And the threshold issues
10    that will be addressed by the Fourth Circuit in that case
11    overlap completely with threshold issues in this case.  So
12    that's another I think permutation over sort of the future of
13    the proceedings before Your Honor that when the Fourth
14    Circuit--
15             THE COURT:  Well, I think there are similarities.  I
16    think the cases are also very different.  But I certainly
17    cited Judge Boardman's case, as you know, and I'm certainly
18    aware of it.  But thank you for the guidance.  I appreciate
19    that.
20        Okay, so I guess the question I have is is this a sort of
21    -- I don't want to spin wheels.  If you've asked the Fourth
22    Circuit, then you've asked the Fourth Circuit.  Why would I
23    make any ruling if it's in the Fourth Circuit?
24             MS. SHAPIRO:  That is a question, Your Honor, that
25    probably my appellate colleagues are better equipped to answer
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA446

```
 1        as to whether the request in the Fourth Circuit renders that
 2        motion moot.
 3                THE COURT:  I mean, the Fourth Circuit could
 4        possibly say go back to the District Court and see what they
 5        say, but I don't know if they'll do that.  And once you've
 6        asked the Fourth Circuit, I mean, I would feel obliged to
 7        defer to the Fourth Circuit.  I've got plenty of other work to
 8        do.  I don't want to spend my time on something you've asked
 9        them to do.
10                MS. SHAPIRO:  Your Honor, in our filing at 4:00
11        we're happy to provide what guidance we can obtain on that
12        question, if it's helpful.
13                THE COURT:  Okay, well that will be appreciated as
14        well.  I thank you for that because I hope you can appreciate
15        where I'm coming from.  My plate is full and if you've asked
16        the Fourth Circuit, you're asking both of us, to me I have to
17        wait and see what the Fourth Circuit says.  I wouldn't rule
18        while they're also considering the same thing.  At least I
19        haven't had this particular circumstance before.  I have to
20        confess to that.
21            Okay, so I think we have a rough game plan.  I want to
22        make sure everybody feels that they've had a chance to address
23        the Court and say whatever else is out there that you needed
24        to bring to my attention.
25            Did we miss anything?  Okay.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA447

```
 1                    MS. SHAPIRO:  Thank you.

 2               THE COURT:  Okay, well thank you all and this

 3     conference call is concluded.

 4               THE COURTROOM DEPUTY:  Thank you, everyone.  This

 5     Honorable Court now stand adjourned.

 6               (Proceeding concluded at 1:12 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA448

CERTIFICATE OF OFFICIAL REPORTER

I, Nadine M. Bachmann, Certified Realtime Reporter and Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 27th day of March, 2025.

-S-

_____

NADINE M. BACHMANN, CRR, RMR
FEDERAL OFFICIAL COURT REPORTER

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA449

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.*,

       *Plaintiffs*,

     v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*,

       *Defendants*.

Case No. 1:25-cv-00596-ELH

### NOTICE OF FILING

The Social Security Administration files this notice to provide the Court with the supplemental declaration of Acting Commissioner Leland Dudek, as ordered in the Court's March 27, 2025 letter to counsel.

Dated:  March 28, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division, Federal Programs Branch

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Senior Trial Counsel
MARIANNE F. KIES
SAMUEL HOLT
BENJAMIN S. KURLAND
SIMON G. JEROME
Trial Attorneys

Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

Kelly O. Hayes
Interim United States Attorney

MICHAEL J. WILSON
USDC Md Bar No. 18970
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4941
Fax: (410) 962-2310
Michael.Wilson4@usdoj.gov

*Attorneys for Defendants*

2

## **CERTIFICATE OF SERVICE**

      I certify that on March 28, 2025, I electronically filed the foregoing and thereby caused a copy to be served on counsel of record.

                                */s/ Bradley P. Humphreys*
                                  BRADLEY P. HUMPHREYS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, | |
| *Plaintiffs*, *vs.* | Civil Action No. 1:25-cv-00596 |
| SOCIAL SECURITY ADMINISTRATION, *et al.*, | |
| *Defendants*. | |

## SUPPLEMENTAL DECLARATION OF LELAND DUDEK

I, Leland Dudek, hereby declare upon penalty of perjury:

1. I am the Acting Commissioner at the Social Security Administration (SSA), in Woodlawn, Maryland, and I have served in this role since February 16, 2025.

2. In my role as Acting Commissioner, I am responsible for the exercise of all powers and the discharge of all duties of the agency and have authority and control over all personnel and activities thereof.  This includes assigning duties and authority to act to officers and employees of the agency, including information and systems access by SSA's DOGE Team.

3. I provide this declaration to provide the supplemental clarification sought in the Court's March 27, 2025, Letter to Counsel (ECF 64).  These statements are made with my personal knowledge, discussion with SSA staff, and review of documents and information furnished to me in the course of my official duties.

4.  During the March 27, 2025, telephone conference with the Court, I represented that paragraph 11 of my March 26, 2025, declaration (ECF 62-1) did not accurately describe the complete nature of this project.  Paragraph 11 reads:

> Employee 8 is working on direct-deposit change, new claim, and wage-reporting fraud detection (hereafter, "Fraud Detection"). The Fraud Detection Project is aimed at finding new ways to identify fraud in the foregoing areas.  The Project involves looking for patterns of fraud in these filings on an individual case level. Anonymization is not feasible because it could obscure information useful for identifying fraud: for instance, name matching would not be possible. The data schemas to which Employee 8 needs access to obtain information necessary for this Project are the Numident, MBR, SSR, PROME, PCHIP, PVIP, and PVIPR schemas.  These schemas are the lowest schemas available containing the information needed for this effort–i.e., there is no more restrictive schema that would provide access to the data.

5.  The reason paragraph 11 of my earlier declaration was not complete was because I did not provide details about specifics of fraud detection efforts, due to their sensitive nature. Public dissemination of known fraud, fraud technique, or specific actions to combat specific types of fraud would assist bad actors in further perpetrating harm against the government.

6.  This project is designed to respond to specific instances of known fraud in direct-deposit change (i.e., allowing an individual to change what bank account benefits payments are deposited into), new claims (e.g., claims for Supplemental Security Income (SSI) and Old-Age, Survivors and Disability Insurance (OASDI)) and wage-reporting (i.e., the amount of wages an individual reports to SSA, which directly impacts the amount of benefits the

person is entitled to receive). It is also designed to identify whether we can develop new ways to identify fraud. For example, we would like to identify if a higher-than-expected number of wage reports come from extremely young and extremely old individuals, as this would be suspicious and indicative of likely fraud.

7. The agency has a strong business need to identify fraud that it has not yet identified to ensure stewardship of agency funds. Even outside the SSA DOGE Team efforts, SSA employees pursue efforts, on an ongoing and daily basis, to detect fraud in agency programs.

8. Employee 8 plans to work with non-DOGE Team SSA employees in order to retrieve anonymized, aggregated data for the Fraud Detection Project, in order to look for anomalies that may be indicative of fraud. Employee 8 needs access to discrete individual data only when anomalies are identified, in order to detect fraud in specific instances.

   a. The non-DOGE Team SSA employees creating the anonymized aggregate data sets would compile these aggregates from the following EDW schema: Numident, MBR, SSR, PVIPR, PVIP, PCHIP, PTCAS, PMISCS, PT16SI, PTCAS, PDIPS, HRODS, MT2, PERSUB, PMEF, PROME, PIMG and PNDRED. The non-DOGE Team SSA employees may also use other schemas housing program integrity-specific information, which are used in anti-fraud work.

   b. Employee 8 would only directly access individual records from a small subset of these schema when a case-specific anomaly is indicated. The subset of these schema to which Employee 8 may need individual level access, in specific instances where anomalies indicate possible fraud, are: Numident, MBR, SSR, PROME, PCHIP, PVIP, and PVIPR.

I declare the foregoing to be true and correct, upon penalty of perjury.


Date: __3/28/2025_____         Signed: _____/s/ Leland Dudek_____

                                        Leland Dudek
                                        Acting Commissioner
                                        Social Security Administration

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

     *Plaintiffs*,
     *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,
     *Defendants*.

Civil Action No. 1:25-cv-00596

## DECLARATION OF LELAND DUDEK

I, Leland Dudek, hereby declare upon penalty of perjury:

1.     I am the Acting Commissioner at the Social Security Administration (SSA), in Woodlawn, Maryland, and I have served in this role since February 16, 2025.

2.     In my role as Acting Commissioner, I am responsible for the exercise of all powers and the discharge of all duties of the agency and have authority and control over all personnel and activities thereof. This includes assigning duties and authority to act to officers and employees of the agency, including information and systems access by SSA's DOGE Team.

3.     I have expertise in SSA systems, data, and fraud efforts based on my current oversight of the agency as well as my prior work history. I previously served as a Senior Advisor in SSA's Office of Program Integrity (OPI), which provides oversight of the agency's anti-fraud program, improper payment initiatives, and related activities. OPI's key workloads include fraud detection analytics and models. I have extensive other work experience in data safeguarding in government projects, to include inter-governmental data encryption efforts as well as serving as

1

the Chief Information Security Officer for the Recovery Accountability and Transparency Board, created by the American Recovery and Reinvestment Act of 2009.

4.      I provide this declaration in response to the March 30, 2025, Declaration of Ann Lewis (ECF No. 77-2) to further explain why it is not feasible to anonymize the data to which the SSA DOGE Team members require access. I previously explained why anonymization is not feasible for purposes of the SSA DOGE Team projects in my March 27 and 28, 2025 declarations (ECF Nos. 62-1 and 74-1), which remain true and accurate.

5.      De-identification of large data sets—such as the data sets contained in the Numident, MBR, and SSR schema—is a highly complex technical and statistical skill that takes large amounts of employee and systems resources to complete. In addition to being impracticable, anonymization of large data sets would result in the removal of information relevant to the SSA DOGE Team's analysis, such as names and Social Security numbers used to connect records between files and dates of birth (which may indicate if a person is living and is directly relevant to the fraud analysis being conducted). SSA made efforts to attempt to anonymize the first access granted to Employee 1 for the Are You Alive Project but found that the data became of a quality that was unusable for the project due to the information stripped from the data set that was needed to conduct the reviews of whether individuals were living or deceased.

6.      Even if SSA attempted to anonymize the individual level data to which the SSA DOGE Team currently needs access, the resulting dataset would almost certainly still contain personally identifiable information (PII)–*i.e.*, information that, when combined with other information, could be used to identify a person, because even when individual-level information is stripped, these types of large data sets are often easily used with other programs and data sets to reidentify individuals. This occurs because with large and multi-field individual data sets a person

2

can use other personal characteristics, beyond direct identifiers (such as name), to identify the individual whose record it is. Moreover, as explained in my March 27 and 28, 2025 declarations (ECF Nos. 62-1 and 74-1), PII is needed for the Are You Alive, Death Data Clean Up, and Fraud Analysis Projects.

I declare the foregoing to be true and correct, upon penalty of perjury.

Date: _____4/1/2025_____          Signed: ____/s/_Leland Dudek_____

                                                  Leland Dudek
                                                  Acting Commissioner
                                                  Social Security Administration

3

USCA4 Appeal: 25-1411   Doc: 33-1   Filed: 06/09/2025   Pg: 465 of 538

USCA4 Appeal: 25-1291   Doc: 20   Filed: 04/01/2025   Pg: 1 of 3
Case 1:25-cv-00596-ELH   Document 83   Filed 04/01/25   Page 1 of 3

FILED: April 1, 2025

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————————

No. 25-1291
(1:25-cv-00596-ELH)

———————————————

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO; ALLIANCE FOR RETIRED AMERICANS;
AMERICAN FEDERATION OF TEACHERS

        Plaintiffs - Appellees

v.

SOCIAL SECURITY ADMINISTRATION; LELAND DUDEK, in his official
capacity as purported Acting Commissioner, Social Security Administration;
MIKE RUSSO, in his official capacity as Chief Information Officer, Social
Security Administration; ELON MUSK, in his official capacity as Senior Advisor
to the President and de facto head of DOGE; U.S. DOGE SERVICE; U.S. DOGE
SERVICE TEMPORARY ORGANIZATION; AMY GLEASON, in her official
capacity as DOGE Acting Administrator

        Defendants - Appellants

———————————————

### C O R R E C T E D   O R D E R

———————————————

Having assessed the contentions of the parties, this appeal is dismissed for

lack of jurisdiction.

USCA4 Appeal: 25-1411     Doc: 33-1     Filed: 06/09/2025     Pg: 466 of 538

USCA4 Appeal: 25-1291     Doc: 20     Filed: 04/01/2025     Pg: 2 of 3
Case 1:25-cv-00596-ELH     Document 83     Filed 04/01/25     Page 2 of 3

Entered at the direction of Judge King with the concurrence of Judge Agee

and Judge Richardson.

For the Court

/s/ Nwamaka Anowi, Clerk

USCA4 Appeal: 25-1411    Doc: 33-1        Filed: 06/09/2025    Pg: 467 of 538

USCA4 Appeal: 25-1291    Doc: 20        Filed: 04/01/2025    Pg: 3 of 3
Case 1:25-cv-00596-ELH    Document 83    Filed 04/01/25    Page 3 of 3

AGEE, Circuit Judge, concurring:

In resolution of the pending motion for a preliminary injunction, the parties should explain in specific detail the basis for their respective arguments. Generalized explanations are unlikely to meet the burdens of proof required. Furthermore, I recommend the district court move expeditiously and without delay to render its opinion on the motion for preliminary injunction while also allowing the introduction of relevant evidence.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

Chambers of
**Ellen Lipton Hollander**
District Court Judge

101 West Lombard Street
Baltimore, Maryland 21201
410-962-0742

April 2, 2025

LETTER TO COUNSEL

Re:     *American Federation of State, County and Municipal Employees,*
        *AFL-CIO, et al. v. Social Security Administration, et al.*
        Civil Action No. ELH-25-0596

Dear Counsel:

The Court has just received defendants' Motion for Entry of Protective Order (ECF 84) and accompanying proposed Protective Order Regarding Confidential Information ("C.I.") (ECF 84-1, "Proposed Protective Order") (collectively, the "Motion"). Plaintiffs oppose the Proposed Protective Order, as written. ECF 89. They also ask the Court to modify the briefing schedule for the impending motion for preliminary injunction. *Id.* at 3. Upon a quick review of the Proposed Protective Order, I spot several glaring issues.

First, paragraphs 14 and 36 of the Proposed Protective Order appear to be inconsistent. Paragraph 14 states that ". . . this Protective Order does not govern the Parties' use of Confidential Information in open court at any hearing . . . ." ECF 84-1 at 3. But, in paragraph 36, it states: "No party may disclose Confidential Information in a proceeding in open court for any reason without first giving seven (7) days' notice to the Designating Party who, after a good faith effort to meet-and-confer, may seek additional relief from the Court . . . ." *Id.* at 9.

Paragraph 36 appears problematic and unworkable. For example, the Court may pose a question at a hearing for which the answer requires reference to C.I. Clearly, seven days' notice would not be possible.

Second, paragraph 35, as written. is unacceptable. SSA is a defendant. Therefore, the provision would seemingly permit disclosure of C.I. to anyone at SSA. Conversely, disclosure to plaintiffs, but not plaintiffs' members, is prohibited. But, paragraph 35 does not specify who at plaintiffs' organizations is entitled to access the C.I.

The government was previously ordered to produce the Administrative Record to plaintiffs by **3:00 p.m.** today. ECF 69. However, defense counsel advised the Court, by email, that because of the dispute concerning the Motion, the government has not yet produced the Administrative Record to counsel for plaintiffs. *See* ECF 90.

Delay of the disclosure of the Administrative Record is not acceptable. Therefore, the government is directed to produce the Administrative Record to counsel for plaintiffs **immediately**, so that plaintiffs can begin their work on the motion for preliminary injunction, due

JA464

on **April 4, 2025**.  However, until further notice, plaintiffs' counsel shall abide by the terms of the Proposed Protective Order, pending further Order of the Court.

Plaintiffs shall further respond to the Motion by **9:00 a.m. on April 3, 2025**.  Defendants shall reply by **2:00 p.m. on April 3, 2025**.  Due to a speaking engagement on Thursday, I cannot hold a hearing on Thursday afternoon.  Instead, the Court will hold a telephone hearing on the Motion beginning at **10:00 a.m. on April 4, 2025**.  The government is directed to provide conference call information.  A public access line will be provided by the Court.

In view of the time of the hearing on the Motion, the Court will extend the time for plaintiffs' submission of the motion for preliminary injunction to **2:00 p.m. on April 4, 2025**.

Despite the informal nature of this letter, it is an Order of the Court and the Clerk is directed to docket it as such.

Very truly yours,

_____/s/_____
Ellen Lipton Hollander
United States District Judge

2

JA465

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERTION OF
STATE, COUNTY AND
MUNICIPAL EMPLOYEES, AFL-
CIO, *et al.*

    *Plaintiffs*,

    v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*

    *Defendants*.

Civil Action No. ELH-25-0596

**MEMORANDUM AND ORDER**

The Court issued a Temporary Restraining Order on March 20, 2025. ECF 48 ("TRO").

On March 24, 2025, the government noted an appeal of the TRO to the Fourth Circuit. ECF 57.

The Fourth Circuit dismissed the appeal on April 1, 2025, based on lack of jurisdiction. ECF 81

(Order); ECF 82 (Judgment); ECF 83 (Corrected Order).

In the interim, on March 26, 2025, defendants filed with this Court a Motion for Stay

Pending Appeal. ECF 60. Several hours later, defendants also moved for a stay in the Fourth

Circuit. *See* Case No. 25-1291, Docket Entry No. 5. By Memorandum (ECF 78) and Order (ECF

79) of March 31, 2025, I denied the Motion for Stay.

At approximately 10:00 a.m. on March 27, 2025, the government filed a "Notice of

Compliance with Paragraphs 2-3" of the TRO, claiming that, as to four DOGE Team members, it

has satisfied the criteria set by the Court for access to personally identifiable information ("PII")

in SSA's data systems. ECF 62 ("Notice"). The Notice is supported by two exhibits: (1) the

Declaration of Leland Dudek, Acting Commissioner of the Social Security Administration

1

("SSA") (ECF 62-1); and (2) the Declaration of Florence Felix-Lawson, Deputy Commissioner of Human Resources for SSA (ECF 62-2).

In addition, the Notice advised the Court that SSA intended to provide the four DOGE employees with access to SSA data systems at 1:00 p.m. on March 27, 2025, unless it heard otherwise from the Court. ECF 62 at 3.[1] These employees, whose identities remain unknown, are referenced as Employees 1, 5, 8, and 9. Upon review of the Notice, I convened an emergency telephone hearing, which began at 12:16 p.m. on March 27, 2025. *See* ECF 63; ECF 73 (Tr., 3/27/25). Mr. Dudek participated in the emergency hearing. After the hearing, Mr. Dudek submitted a Supplemental Declaration. ECF 74-1 ("Supplemental Declaration").

In accordance with a briefing schedule set by the Court during the telephone conference (*see* ECF 64), plaintiffs filed an opposition to the Notice on March 31, 2025. ECF 77 ("Opposition"). The Opposition is supported by the Declaration of "Alex Doe," a former Digital Services Expert at the United States Digital Service (ECF 77-1), and the Declaration of Ann Lewis, former Director of the Technology Transformation Services within the U.S. General Services Administration (ECF 77-2).

Defendants replied on April 1, 2025. ECF 80 ("Reply").[2] The Reply is supported by another Declaration from Mr. Dudek. ECF 80-1 ("Second Supplemental Declaration").

---

[1] Fortunately, when the Notice was docketed, I was not on the bench and saw the filing. But, I easily could have been handling other matters, and thus would not have seen ECF 62 when it was docketed. Therefore, I remind the government that it is the Court that sets deadlines with respect to the TRO. *See* ECF 73 (Tr., 3/27/25), at 15, 20.

[2] In the Reply, defendants state that Mr. Dudek has provided "live testimony." ECF 80 at 2, 3. To be clear, the Court had little preparation time on March 27, but posed a handful of questions to Mr. Dudek at the hearing. However, Mr. Dudek was not under oath, nor was he cross-examined by plaintiffs' counsel.

2

The Notice implicates paragraphs two and three of the TRO. They state, ECF 48, ¶¶ 2–3 (emphasis added):

> 2. This Order does not preclude SSA from providing members of the DOGE Team with access to redacted or anonymized data and records of SSA. However, no data shall be provided unless and until the persons to whom access is to be provided have received all training that is typically required of individuals granted access to SSA data systems, including training regarding federal laws, regulations, and policies governing the privacy of PII; a background investigation is completed, comparable to the quality of background investigation conducted for SSA employees whose duties involve access to PII; detailing agreements are completed for any individual who is assigned to the DOGE Team from another agency; and all required Agency paperwork is completed, including execution of the SSA documents acknowledging the Systems Sanctions Policy and the duty to protect PII.

> 3. SSA may provide members of the DOGE Team with access to discrete, particularized, and non-anonymized data, in accordance with the Privacy Act, and in accordance with the conditions set forth herein: SSA must first comply with the provisions in ¶ 2 of this Order and, in addition, *SSA must first obtain from the DOGE Team member, in writing, and subject to possible review by the Court, a detailed explanation as to the need for the record and why, for said particular and discrete record, an anonymized or redacted record is not suitable for the specified use.* The general and conclusory explanation that the information is needed to search for fraud or waste is not sufficient to establish need.

As mentioned, in the Notice the government "inform[ed] the Court that four employees of the [SSA] who are members of the agency's DOGE Team now satisfy the criteria for data access established in paragraphs 2 and 3 of the Court's [TRO]." ECF 62 at 1. They are designated as Employee 1, Employee 5, Employee 8, and Employee 9. *See id.*; *see also* ECF 62-2. Further, Acting Commissioner Dudek avers that these four DOGE Team Employees require access to PII in SSA records. ECF 62-1, ¶¶ 3, 4. He explains that Employees 1 and 9 are working on the "Are You Alive Project" (*id.* ¶ 9); Employee 5 is working on the "Death Data Clean Up Project" (*id.* ¶ 10); and Employee 8 is working on the "Fraud Detection Project." *Id.* ¶ 11.[3]

---

[3] A recent news article reports that DOGE plans to rebuild SSA's code base. Makena

3

According to Acting Commissioner Dudek, the Enterprise Data Warehouse ("EDW") contains "hundreds of schema levels", and each "contains different data types. *Id.* ¶ 6. He posits that "*permission* to access the data" does not mean that an employee will "*see* all those records." *Id.* (emphasis in ECF 62-1). He also explains that an employee with access "must specifically search for relevant records in a schema for the records to be viewable." *Id.*; *see also id.* ¶ 8 ("[A]n SSA employee viewing an EDW schema will not have the ability to view data under the schema absent a search for that specific information.").

In his Declaration, Acting Commissioner Dudek represents that Employees 1 and 9, assigned to the Are You Alive Project, "are working on individual cases . . . ." ECF 62-1, ¶ 9. He claims that, for those cases, "data anonymization" would be "impracticable." *Id.* Employee 5 is assigned to the Death Data Clean Up Project, which "involves updates to individual-level records," and therefore "anonymization is not feasible." *Id.* ¶ 10. As to Employee 8, assigned to Fraud Detection, Mr. Dudek avers, *id.* ¶ 11: "The project involves looking for patterns of fraud in these files on an individual case level. Anonymization is not feasible because it could obscure information useful for identifying fraud . . . ."

During the hearing on March 27, 2025, the Court sought to ascertain from Mr. Dudek whether the DOGE Team would be conducting "a focused search" or, instead, "a search of the records of millions of Americans." ECF 73 at 13; *see id.* at 12. For example, with respect to the

---

Kelly, *DOGE Plans to Rebuild SSA Code Base in Months, Risking Benefits and System Collapse*, WIRED, (March 28, 2025) available at https://perma.cc/3C6W-WXGY. And, according to the article, the "Are You Alive Project" is connected with those plans. *Id.* The article states that the code rebuilding project may put the "benefits on which tens of millions of Americans rely . . . at risk." *Id.* Specifically, the article raises concerns over the speed with which DOGE plans to complete this undertaking. *Id.* According to the article, in 2017 SSA predicted that the project would take about five years. *Id.* Yet, DOGE intends to complete it in a matter of months. *Id.*

4

Are You Alive Project, the Court asked Mr. Dudek, *id.* at 8–9: "[I]s this a search that is based on and narrowed to a group where based on . . . what you have as to the dates of birth there would be reason to question whether they're still alive, as opposed to searching everybody's records?" Mr. Dudek's answer was not entirely clear to the Court. *See id.* at 9–10. Thus, I continued, *id.* at 10: "So is it accurate to say that it's a narrow search of only a discrete group of people who fit the description possibly, based on information that SSA has as to date of birth, . . . wouldn't likely be alive?" Mr. Dudek responded, *id.*: "Yes, ma'am. That's correct."

In general, Acting Commissioner Dudek denied that the work involves a search of the records of millions of Americans. He said, *id.* at 12: "This is a narrow search." He added, *id.* at 13: "It is not searching records of millions of Americans."

The Court also questioned Mr. Dudek as to ¶ 11 of his Declaration (ECF 62-1), which pertains to Employee 8 and the Fraud Detection Program. ECF 73 at 13–14. Specifically, I asked Mr. Dudek about his claim that "anonymization isn't feasible" for that project "because it would obscure information . . . ." *Id.* at 14. Mr. Dudek indicated that ¶ 11 of his Declaration does not accurately reflect "what [he] meant." *Id.* Therefore, at the direction of the Court (ECF 64), Mr. Dudek submitted the Supplemental Declaration. ECF 74-1.

In his Supplemental Declaration, Mr. Dudek clarified that "Employee 8 plans to work with non-DOGE Team SSA employees in order to retrieve anonymized, aggregated data for the Fraud Detection Project, in order to look for anomalies that may be indicative of fraud." *Id.* ¶ 8. According to Mr. Dudek, Employee 8 only "needs access to discrete individual data . . . when anomalies are identified, in order to detect fraud in specific instances." *Id.* Further, Mr. Dudek avers that the "non-DOGE Team SSA employees" create "anonymized aggregate data sets" from eighteen EDW schema. *Id.* ¶ 8(a). Then, Employee 8 "would only directly access individual

5

records from a small subset of these schema when a case-specific anomaly is indicated." *Id.* ¶ 8(b).

As indicated, Mr. Dudek asserts that DOGE Employees 1, 5, 8, and 9 require non-anonymized access to SSA systems of record, but he identified schema that were not previously disclosed to the Court. Previously, in opposing plaintiffs' TRO Motion, the government only addressed access to SSA's MBR, SSR, Numident, and EDW systems, as well as SSA's Master Earnings File and Treasury Payment Files. *See, e.g.*, ECF 36-1 (Declaration of Michael L. Russo, Chief Information Officer at SSA), ¶¶ 7, 8, 9, 10, 11, 12. But, in Mr. Dudek's Declaration of March 26, 2025 (ECF 62-1), he states, *id.* ¶ 9: "The data schemas to which these employees need access for this Project are Numident, MBR, SSR, PROME, PCHIP, PVIP, and PVIPR schemas." The identification of schema that were not previously disclosed or addressed is of concern to the Court. Of import, no explanation has been provided as to the specific nature or content of these schema.

Significantly, defendants did not submit with the Notice any written explanation provided to SSA by any of the four DOGE employees, explaining the need for access to non-anonymized data, as required by paragraph 3 of the TRO. Plaintiffs raised the issue (ECF 77 at 4), but defendants did not address this argument in the Reply. *See generally* ECF 80. This is a glaring omission.

The TRO expressly provides that the required written statements by the SSA DOGE Team contemplated in ¶ 3 are "subject to possible review by the Court . . . ." ECF 48, ¶ 3. In order to resolve the government's request, the Court believes that it is necessary to the Court's analysis to review the written submissions of the SSA DOGE Team members, explaining the scope of each data request and the need for access to non-anonymized records to complete their respective

6

projects.

Accordingly, by **noon on April 7, 2025**, the government is directed to file with the Court the written submissions provided to SSA by DOGE Employees 1, 5, 8, 9, setting forth the "need" for access to non-anonymized data contained in the eight schema identified by Mr. Dudek in order to conduct the "Are You Alive Project", the "Death Data Clean Up Project", and the "Fraud Detection Project."

In the event that the written statements do not exist, the Court expects counsel to advise the Court accordingly. On the assumption that the written statements were provided to SSA, the government may file the statements under seal, but only if they contain confidential information. For purposes of this Memorandum and Order, the term "confidential information" shall have the meaning set forth in paragraph three of the Proposed Protective Order (ECF 84-1). However, the government shall provide copies of all filings to plaintiffs' counsel, who are, until further notice, subject to the Proposed Protective Order. *See* ECF 84-1. And, in the event that the written statements contain confidential information, the government shall file a redacted version of each submission on the public docket.

It is so **ORDERED** this 2nd day of April 2025.

_____/s/_____
Ellen Lipton Hollander
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.*,

        Plaintiffs,

        v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*,

        Defendants.

Case No. 1:25-cv-00596-ELH

### CERTIFICATION OF ADMINISTRATIVE RECORD

I, Leland Dudek, am Acting Commissioner at the Social Security Administration (SSA).  I am familiar with the claims asserted against SSA in the above-captioned action regarding the granting of access to systems maintained by the agency to employees implementing Executive Order 14,158.

I hereby certify, to the best of my knowledge, that the accompanying administrative record is complete and contains all non-deliberative documents and materials directly or indirectly considered regarding the SSA actions challenged in this case.[1]

---

[1] Notwithstanding the Court's order to file an administrative record in this case, Defendants maintain that the Amended Complaint does not challenge any final agency action and reserve their right to argue in further proceedings in this case, including in any subsequent appeal, that the Administrative Procedure Act does not provide for review.

In accordance with 28 U.S.C. § 1746, I hereby certify and declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

/s/  Leland Dudek
Leland Dudek

## INDEX TO ADMINISTRATIVE RECORD

| Tab | Description | Bates Numbers |
|-----|-------------|---------------|
| 1 | FW: Decision Memo – EDW Data Access (and attachments, Commissioner Transmittal and Decision Memo) | AFSCME Case 000001–8 |
| 2 | RE: Proposal for Death data Improvement 100+ -- Memo (and attachment) | AFSCME Case 00009–18 |
| 3 | RE: Access Request for [Employee 9] | AFSCME Case 000019–20 |
| 4 | RE: [Employee 9] Access Request | AFSCME Case 000021–22 |
| 5 | RE: Request for Assistance – IRON Website Access | AFSCME Case 000023–24 |
| 6 | RE: SAM Request-[Employee 9] | AFSCME Case 000025–26 |
| 7 | RE: SSI Claims Data | AFSCME Case 000027–29 |
| 8 | UPDATE – Proposal for Death Data Improvement (and attachment) | AFSCME Case 000030–32 |
| 9 | FS Form 7600B | AFSCME Case 000033–40 |
| 10 | MOU Between DOL and SSA | AFSCME Case 000041–47 |
| 11 | FS Form 7600A | AFSCME Case 000048–51 |
| 12 | FS Form 7600A | AFSCME Case 000052–55 |
| 13 | FS Form 7600B | AFSCME Case 000056–63 |
| 14 | IAA Between NASA and SSA | AFSCME Case 000064–65 |
| 15 | MOU Between SSA and NASA | AFSCME Case 000066–71 |
| 16 | Special Government Employee Agreement Between OPM and SSA | AFSCME Case 000072–75 |
| 17 | MOU Between GSA and SSA | AFSCME Case 000076–79 |
| 18 | MOU Between DOL and SSA | AFSCME Case 000080–86 |
| 19 | FS Form 7600A | AFSCME Case 000087–90 |
| 20 | FS Form 7600B | AFSCME Case 000091–100 |
| 21 | Terms and Conditions for Reimbursable Work | AFSCME Case 000101–105 |
| 22 | Amendment to the Terms and Conditions for Reimbursable Work | AFSCME Case 000106–108 |
| 23 | Access Certifications Tab | AFSCME Case 000109–110 |
| 24 | Office of Information Security Account Type Matrix Guideline | AFSCME Case 000111–115 |
| 25 | Material Resources Manual Excerpts | AFSCME Case 000116–148 |
| 26 | General Administration Manual Excerpts | AFSCME Case 000149–283 |
| 27 | Access Security and Privacy Risks | AFSCME Case 000284–290 |
| 28 | Office of Information Security Information Security Officer Manual | AFSCME Case 000291–367 |
| 29 | Information Security Policy | AFSCME Case 000368–523 |
| 30 | Personnel Security and Suitability | AFSCME Case 000524–526 |
| 31 | Office of Information Security – Principle of Least Privilege | AFSCME Case 000527–528 |

| Tab | Description | Bates Numbers |
|---|---|---|
| 32 | Expert or Consultant Appointment Request & Certification | AFSCME Case 000529–530 |
| 33 | Expert or Consultant Appointment Request & Certification | AFSCME Case 000531–534 |
| 34 | Expert or Consultant Appointment Request and Certification | AFSCME Case 000535–538 |
| 35 | Expert or Consultant Appointment Request & Certification | AFSCME Case 000539–541 |
| 36 | Expert or Consultant Appointment Request & Certification | AFSCME Case 000542–545 |
| 37 | Standard Form 50 | AFSCME Case 000546 |
| 38 | Standard Form 50 | AFSCME Case 000547 |
| 39 | Standard Form 50 | AFSCME Case 000548 |
| 40 | Standard Form 50 | AFSCME Case 000549 |
| 41 | Standard Form 50 | AFSCME Case 000550 |
| 42 | Standard Form 50 | AFSCME Case 000551 |
| 43 | Appointment Affidavits | AFSCME Case 000552 |
| 44 | Appointment Affidavits | AFSCME Case 000553 |
| 45 | Appointment Affidavits | AFSCME Case 000554 |
| 46 | Appointment Affidavits | AFSCME Case 000555 |
| 47 | Appointment Affidavits | AFSCME Case 000556 |
| 48 | Appointment Affidavits | AFSCME Case 000557 |
| 49 | Information Security and Privacy Awareness / Rules of Behavior | AFSCME Case 000558–562 |
| 50 | Information Security and Privacy Awareness / Rules of Behavior | AFSCME Case 000563–567 |
| 51 | Information Security and Privacy Awareness / Rules of Behavior | AFSCME Case 000568–572 |
| 52 | Information Security and Privacy Awareness / Rules of Behavior | AFSCME Case 000573–575 |
| 53 | Information Security and Privacy Awareness / Rules of Behavior | AFSCME Case 000576–580 |
| 54 | Information Security and Privacy Awareness / Rules of Behavior | AFSCME Case 000581–585 |
| 55 | Information Security and Privacy Awareness / Rules of Behavior | AFSCME Case 000586–590 |
| 56 | Information Security and Privacy Awareness / Rules of Behavior | AFSCME Case 000591–595 |
| 57 | Information Security and Privacy Awareness / Rules of Behavior | AFSCME Case 000596–600 |
| 58 | Information Security and Privacy Awareness / Rules of Behavior | AFSCME Case 000601–605 |
| 59 | Privacy Training Slides | AFSCME Case 000606–610 |

# EXHIBIT A

PLFS-068

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

        *Plaintiffs*,

        *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

        *Defendants*.

Civil Action No. 1:25-cv-00596

## SUPPLEMENTAL DECLARATION OF ANN WIDGER

I, Ann Widger declare as follows:

1. My name is Ann Widger. I am the Director of Retirees at the American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME). The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me in the course of my duties at AFSCME. I previously submitted a declaration in this matter; everything I stated in that declaration remains true and correct.

2. As I wrote in my last declaration, our members submit highly sensitive, personally identifying information to the Social Security Administration ("SSA"). This information includes financial information (such as the bank account information they provide SSA to receive monthly benefits through direct deposit) and medical information (such as information about the prescription drugs they receive through Medicare Part D). Our members also receive sensitive information from SSA, such as Social Security numbers they have long understood they should not share with anyone.

PLFS-069

3.   In the weeks since I submitted my last declaration, AFSCME has continued to hear from many of our members who are concerned about improper access to their sensitive information housed at the Social Security Administration ("SSA") and about the consequences that could result from the improper handling of this sensitive information, such as threats to the data systems that permit them to get the monthly benefits on which they rely to live. The volume of calls, emails, and other communications has grown since my last declaration. The engagement rate with our retiree focused online content has increased over 30% in the last several weeks, in part because of these concerns.

4.   My team and I have continued to hear from members who feel that their privacy was violated by SSA's decision to grant DOGE personnel access to databases containing sensitive information and worry about what will happen if the agency is permitted to do so again. Many members have contacted us to reiterate that they never gave SSA authorization or permission to give information to DOGE, that they feel like their privacy has been violated, and that their sensitive information (including both financial and medical information) is personal and not the business of DOGE.

5.   Our members are also worried about the cross-agency transfer of this information. Although our members know that these agencies work together and share information (for example, to share information related to Medicare), they did not permit the agency to share it for DOGE's purported purposes or for political gain. And they did not consent to the agency combing through their data as one step in a process to undermine the Social Security system itself.

6.   In recent weeks, our members have also raised concerns that DOGE personnel will break SSA systems. Our members have told us that they have received direct deposits on a delay, that they have been unable to access information on the SSA website because it has gone down, and

PLFS-070

that they have spent hours on the phone trying to make updates to their SSA accounts. We specifically heard from a retiree member who worked for over thirty years as a first responder. She reported that, after filing a disability claim with SSA over a year ago, she was informed in January but before Inauguration Day that the agency was nearly done with the process and that she would receive an answer within 15-30 days. She still has not heard back from the agency.

7.    Our members know the SSA systems are vulnerable to being broken, and they worry that untrained DOGE engineers will alter them in a way that will cause delays to their benefits or prevent them from getting benefits at all. For example, our members are worried that their benefits will be delayed or discontinued by DOGE errantly marking them as dead in SSA systems. That fear has been heightened by DOGE's public statements about "clearing out" and "cleaning up" SSA death records.

8.    As stated in my prior declaration, we have many members who rely on Social Security payments to survive. I have had members tell me, for example, that they fear they will lose their homes if something goes wrong, as they rely on their monthly payments to pay their mortgages.

9.    Our members also fear that DOGE access to SSA data will make their sensitive data more vulnerable to bad actors. AFSCME's retiree members are senior citizens who are particularly targeted by scammers. Because they know that DOGE had access to their data at SSA, they have become increasingly distrusting of communications that they assume are spam or a scam.  For example, I have been forwarded an email circulated among seniors with recommendations on how to protect their data from DOGE. One of the recommendations was for beneficiaries to set up a "My SSA" account, a site run by SSA for beneficiaries to review their benefit information and work history.  Members are concerned about setting up these accounts on the SSA website because

PLFS-071

they fear providing information to set up or change their account may give DOGE even more access to their data and some even expressed concern whether the website was even real.

10. Other members who are recipients of new and additional Social Security benefits because of the recently enacted Social Security Fairness Act have expressed concerns about seeing recent lump sum direct deposits (of 2024 back payments) from SSA in their bank accounts. They are concerned the payments are not real and that SSA might ask for the money back. They are concerned that these payments could be in error because of DOGE's access to data in SSA and some are not using money that they earned and to which they are entitled to help them with their household expenses or other needed purchases.

11. Our members do not know what DOGE personnel will do with their data if they are granted access to it again and are taking precautions to make sure that they are protected, for example by checking their bank accounts more regularly and changing their passwords. Still, they know that if such sensitive data about them is exposed, it will be difficult to defend against identity theft and other fraud.

I declare under penalty of perjury as prescribed in 28 U.S.C.§ 1746 that the foregoing is true and correct.

Executed on April 3, 2025, in Washington, D.C.

Ann Widger

4

PLFS-072

# EXHIBIT B

PLFS-073

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*,<br><br>          *Plaintiffs*,<br><br>        *vs.*<br><br>SOCIAL SECURITY ADMINISTRATION, *et al.*,<br><br>          *Defendants*. | Civil Action No. 1:25-cv-00596 |

## SUPPLEMENTAL DECLARATION OF SUE CONARD

I, Sue Conard, declare as follows:

1. I am a retiree member of AFSCME and the president of the AFSCME Wisconsin Retiree Chapter. I previously submitted a declaration in this matter. Everything I said in that declaration remains true. I submit this declaration to provide additional information relevant to this case.

2. I remain very concerned about DOGE personnel accessing my sensitive information at the Social Security Administration ("SSA"). I have handed over a lot of information to SSA, including my home address, my phone number, and sensitive financial information, on the promise that they will keep it confidential and on the understanding, made clear by the agency's own website, that they value privacy and security.

3. SSA has also provided me with information—namely, my Social Security Number ("SSN")—which I also believe should stay private. I have had it drilled into me over the course of my lifetime that I shouldn't tell anyone my SSN because it is a unique identifier and could be used by bad actors to commit identity theft.

**PLFS-074**

4.  SSA permitting DOGE to access the sensitive information about me contained in their systems is a severe violation of my trust and an invasion of my privacy and person. As a survivor of sexual assault, I know what that feels like. In the past few months, as I've watched Elon Musk and his DOGE team run rampant at government agencies, including SSA, I have felt an eerie déjà vu. Who are these people? How can they do this to me? What right do they have?

5.  I have family members who work in computers, and I know that it is important to keep sensitive data in secure locations. I worry that bad actors will get access to my sensitive information if it gets back into DOGE's hands. I am also terrified about what will happen to my benefits.

6.  Because of DOGE's prior access to sensitive data housed in SSA systems, I have taken a number of precautions to protect against identity theft and to try to make sure I get my benefits. For example, I have changed all of the passwords that allow me to get into my SSA accounts (on login.gov and ID.me) because I am worried that someone may have access to my SSN and could try to log in. I have also changed the pin for my debit card.

7.  These concerns are shared by many (if not most) of my fellow AFSCME Wisconsin Retirees.

I declare under penalty of perjury, as prescribed in 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on April 3, 2025, in La Crosse, Wisconsin.

_Sue Conard_

Sue Conard

2

PLFS-075

# EXHIBIT C

PLFS-076

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

     *Plaintiffs*,

     *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

     *Defendants*.

Civil Action No. 1:25-cv-00596

## <u>SUPPLEMENTAL DECLARATION OF RICHARD FIESTA</u>

I, Richard Fiesta, declare as follows:

1.  I am the Director of the Alliance for Retired Americans ("ARA"). The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me in the course of my duties at ARA. I previously submitted a declaration in this matter; everything I stated in that declaration remains true and correct.

2.  ARA continues to hear from our members about personnel from the Department of Government Efficiency (or "DOGE") at the Social Security Administration ("SSA").

3.  For many of our members, Social Security and other benefits facilitated by SSA are a large part of their retirement income. Social Security in particular is a program that our members care about a lot and that they have worked and paid into for most of their lives. Because Social Security is such an important economic lifeline, they pay attention to what is going on at the agency and are troubled by anything that may harm the agency.

4.   As discussed in my prior declaration, our members submit significant personal information to the agency including financial information (such as bank routing numbers and account information), medical and health information, income information, and other identifying information such as the Social Security numbers that they have been assigned by the agency and their home addresses. They also submit data (such as income information) that they know goes back and forth between SSA and other agencies (for example, for Medicaid payment information).

5.   Our members have a baseline expectation of privacy at the agency; they assume that any information they submit to SSA will be used only for purposes of processing their benefits applications and for other known purposes.

6.   When DOGE had access to their sensitive data, they felt that both their privacy and their long-standing expectations of privacy at the agency were violated. If DOGE were to have access to their data again, that sense of violation would resume. Just this week, we spoke to our state presidents, who conveyed that each chapter's members have a lot of angst and concern about the state of their data.

7.   Our members are also very concerned about how DOGE access to SSA systems will make their data less secure. As discussed, our members are chronic victims of cyber-scams and other fraud efforts. In light of DOGE's arrival at SSA, they are thinking significantly more about their security. ARA is encouraging its members to check their SSA account information and bank accounts to make sure everything seems right.

8.   Our members are additionally concerned that DOGE's attempts to access SSA data will also lead to a disruption of benefits. These people are trying to access sensitive SSA data systems without knowledge of how they work and at a rapid pace that risks damaging them.  We have heard from countless members about issues at SSA, including extremely long wait times to reach SSA

PLFS-078

employees on the phone, being unable to access the website, having difficulty making in-person appointments, and having to wait many weeks for those appointments once they are finally scheduled. This all comes on top of SSA being a historically underfunded, understaffed agency. Our members are worried that if something happens to their benefits, they will be hard-pressed—in light of cuts to the agency—to get them back easily.

I declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on April 3, 2025, in Las Vegas, Nevada.

_____

Richard Fiesta

PLFS-079

# EXHIBIT D

PLFS-080

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, | |
| *Plaintiffs*, | |
| *vs.* | Civil Action No. 1:25-cv-00596 |
| SOCIAL SECURITY ADMINISTRATION, *et al.*, | |
| *Defendants*. | |

## SUPPLEMENTAL DECLARATION OF LINDA SOMO

I, Linda Somo, declare as follows:

1. I am a member of the Alliance for Retired Americans and the head of the Arizona state chapter. I previously submitted a declaration in this matter. Everything I said in that declaration remains true. I submit this declaration to provide additional information relevant to this case.

2. I remain very concerned about the violation of my privacy that is the result of DOGE personnel accessing my sensitive information at the Social Security Administration ("SSA"). I have heard the same from my peers here in Arizona.

3. I have submitted significant personal information to SSA, including, most concerningly, information about my bank account and the credit union to which I belong.

4. I do not understand why DOGE personnel need access to this and other sensitive information of mine. SSA has a specific function—to ensure that Social Security and other benefits pay out to those who have contributed to the programs throughout their working lifetimes or are otherwise qualified. I have an expectation that the agency will keep my information private because it's what they told me.

5.   DOGE says it is rifling through all of the data at SSA to try and find anything that indicates that there is waste or that is a signal of fraud. But DOGE personnel don't know these systems, they don't know how SSA is supposed to function, and there is no reason why they need to have all of my sensitive information.

6.   I am worried that DOGE—led by unvetted people who don't really report to SSA—will do something at SSA that will interrupt the Social Security benefits that I rely on to help pay for my mortgage, my car payments, my groceries, and my prescription drugs—and that really allow me and my husband to survive.

7.   I am also worried that access by DOGE personnel will make it more likely that scammers and other bad actors outside of government could get access to my information on SSA data systems. For example, my monthly Social Security checks are submitted by direct deposit, which means that SSA systems have information about the credit union at which I bank, my routing number, and my account number. Whoever has that information would be able to access any of the savings we have; savings that my husband and I have worked for years to collect to support us in old age.

8.   In light of DOGE's prior access to my data, I have been more vigilant in checking to make sure that nothing is different in my bank account or with my credit score. On the days when I don't check these things, I start to panic and worry.

9.   I believe that, as a private citizen, my information should not be disclosed to anyone who I don't authorize to see it. DOGE having access to my sensitive information is almost like someone breaking into my house and stealing stuff. It's a horrible feeling, and if DOGE is permitted to access sensitive SSA data again, it will continue.

I declare under penalty of perjury, as prescribed in 28 U.S.C. § 1746, that the foregoing is true and correct.

2

PLFS-082

Executed on April 3, 2025, in Fountain Hills, Arizona.

*Linda Somo*
Linda Somo

3

PLFS-083

# EXHIBIT E

PLFS-084

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

      *Plaintiffs*,

      *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

      *Defendants*.

Civil Action No. 1:25-cv-00596

### <u>SUPPLEMENTAL DECLARATION OF BERNADETTE AGUIRRE</u>

I, Bernadette Aguirre, declare as follows:

    1.  I am the Director of the Retiree Division of the American Federation of Teachers ("AFT"). The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me in the course of my duties at AFT. I previously submitted a declaration in this matter; everything I stated in that declaration remains true and correct.

    2.  Since DOGE accessed SSA data systems, AFT has convened a number of meetings and conversations with our members, and we are in the process of putting together a Social Security town hall. I have continued to hear from members who are concerned about DOGE accessing their sensitive information at the Social Security Administration ("SSA"). Our members have expressed a lot of anxiety and fear about what is to come in both the short and long term, and they have conveyed that they feel like their privacy has been invaded.

1

PLFS-085

3.   As discussed in my prior declaration, our members have submitted significant amounts of personal identifying information to SSA, including sensitive medical and financial information. They have told me that they feel like they have given over just about everything to the agency.

4.   Our members remain concerned about Elon Musk and other DOGE personnel—people within what our members think of as an unsanctioned "department" running outside the normal business of government—accessing this data. Our members have never consented to DOGE accessing their data and they do not know why DOGE personnel need such broad access to their information housed at Social Security.

5.   They also worry that their data is being accessed to perpetuate a myth of rampant fraud at the agency. This notion that SSA is full of fraud stands in stark contrast to the experiences of our members, who know how thorough SSA processes are and have had to take many steps and provide significant information to the agency to gain their benefits.

6.   I've heard from at least one member who specifically asked why, if SSA already has a standard practice for investigating fraud, DOGE would need access to extremely large amounts of sensitive information, separate and apart from normal course of investigations. She expressed concern that DOGE personnel may be manufacturing instances of fraud.

7.   Our members are also concerned that their Social Security information will be shared across agencies—such as with the agencies that are responsible for other essential programs such as Medicare. Their fear arises from a lack of information and transparency regarding why DOGE urgently needs this information without following an established process or oversight.

8.   Additionally, our members fear that DOGE will use their sensitive information without regard for important security practices and in a manner that might open the data up to people who would use it for scams or fraud. Our retiree members are senior citizens who, although they try,

PLFS-086

cannot always keep up with the technology that is developing so fast around them. They worry that DOGE personnel will be careless with their data or use it in ways that are less secure than standard SSA practices such that it will be taken and misused. I've heard from more and more members who have become scared to open even routine emails, frozen by fear that any link they click will be lethal.

9.   Lastly, our members fear that DOGE personnel will do something that puts their benefits at risk. Before DOGE came into being, our members were most concerned about improving Social Security. Now, they are scared about losing it.  Our members lack a clear understanding of what DOGE is doing, and given the outcomes we've seen in other government departments, they fear that their benefits may be reduced, eliminated, or disrupted. They feel that DOGE has not shown concern for the consequences this will take on their lives and the lives of those dependent on these benefits.

10. If DOGE is permitted to access more data at SSA, these fears and sense of privacy violation will not only continue, they will grow.

I declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on April 4, 2025, in Washington, D.C.

Bernadette Aguirre

3

PLFS-087

# EXHIBIT F

PLFS-088

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

           *Plaintiffs*,

           *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

           *Defendants*.

Civil Action No. 1:25-cv-00596

## SUPPLEMENTAL DECLARATION OF DAVID GRAY

I, David Gray, declare as follows:

1. I am a member of the American Federation of Teachers. I previously submitted a declaration in this matter. Everything I said in that declaration remains true. I submit this declaration to provide additional information and to reiterate my concerns about DOGE accessing my sensitive information housed in data systems at the Social Security Administration ("SSA").

2. My privacy is sacred to me. I am the only person that has a right to share my information and to determine who knows about my personal business.

3. I have submitted significant personal information to SSA, including my date and place of birth, my work history, and my banking information. It's almost like my DNA, and I consider that information to be private. If I want to share it, that's my business.

4. Although I've shared it with SSA for purposes of administering my benefits that I have earned after paying into Socia Security over many years, I have never given DOGE or anyone affiliated with DOGE permission to access that information. I have serious concerns about what they are doing with my data and why they need to be going through my data. From the way I see

**PLFS-089**

Elon Musk talking about SSA, it's almost as if he and his DOGE team are trying to access the sensitive information of myself and millions of others for marketing purposes—to try and find something that justifies the agenda they've been pushing.

5.   Since DOGE has accessed data at SSA, my anxiety level has been through the roof. I am worried that bad actors will get access to my data. Seniors like myself are quite vulnerable. There are all types of schemers and scammers that prey on us. And I am worried that if my information is taken by a bad actor, I won't know until it's too late.

6.   To try to make sure nothing has gone awry, I am constantly checking my bank account and making sure that I get my Social Security check each third week of the month.

7.   If DOGE is permitted to continue unchecked at SSA, the invasion of my privacy and my concerns about third parties accessing my data will only continue.

I declare under penalty of perjury, as prescribed in 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on April 4, 2025, in Baltimore, Maryland.

David Gray

2

PLFS-090

# EXHIBIT G

PLFS-091

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, | |
| *Plaintiffs*, | |
| *vs.* | Civil Action No. 1:25-cv-00596 |
| SOCIAL SECURITY ADMINISTRATION, *et al.*, | |
| *Defendants*. | |

## <u>DECLARATION OF ERIE MEYER</u>

I, Erie Meyer, declare as follows:

1.      I am a founding member of the U.S. Digital Service and have served as the Chief Technologist of two federal agencies. I have significant experience in technology policy, data security, and artificial intelligence.

2.      Public statements and reporting indicate that the Department of Government Efficiency (DOGE) plans to incorporate artificial intelligence (AI) into its operations, including at the Social Security Administration. However, AI is a broad marketing term encompassing various technologies, and it remains unclear which specific AI tools will be used and for what exact purposes.

3.      A critical concern is the potential use of sensitive data from the Social Security Administration (SSA) in AI applications. If such data is used with AI models, the AI system itself integrates that data into its training process. This means that even if DOGE's direct access to SSA data is later revoked, the AI models will have already been trained by that data. In many

**PLFS-092**

AI systems, once data is used for training, removing it would require deleting or retraining the entire system.

4.    For example, if SSA data has been integrated into Grok, an AI tool owned by Elon Musk, this would create an unfair advantage, granting it access to uniquely sensitive government-held information that no competitor could obtain. Even if the data was later deleted, Grok would have already gleaned the benefit.

5.    During my time at the Federal Trade Commission, we introduced algorithmic deletion remedies to address cases where companies were alleged to have used improperly obtained data to train their AI. This remedy is essential to curbing the relentless collection and exploitation of such data. Without intervention, once your information is absorbed into an AI system, it becomes an integral part of how that company operates – fueling further exploitation. This enforcement approach was first established under the Trump administration and continued under the Biden administration.[1]

6.    Additionally, many AI systems have known security vulnerabilities, including instances where adversarial attackers have bypassed safeguards – such as security researchers successfully extracting private financial data from AI models. This poses significant privacy and security risks for the American public if those models have been granted access to sensitive data held by SSA.

7.    Research shows that the now familiar problem of large language models (LLMs) routinely inserting incorrect details into factual statements is inherent to large AI models. In fact, these errors, often rebranded as "hallucinations." are fundamental to how LLMs work, and

---

[1] Example provisions in the following cases call for the deletion of "Affected Work Product," meaning any models or algorithms developed in whole or in part using improperly obtained data: Decision and Order at 3–7, *In the Matter of Everalbum, Inc.*, F.T.C. Matter No. 1923172 (May 7, 2021), Dkt. No. C-4743; Commission Final Order at 3–5, *In the Matter of Cambridge Analytica*, F.T.C. Matter No. 1823107 (Dec. 6, 2019), Dkt. No. 9383; Stipulated Order at 7–14, *FTC v. Ring, LLC*, No. 1:23-cv-1549 (D.D.C. June 16, 2023), ECF No. 12.

PLFS-093

researchers say that eliminating them completely is impossible.[2] I would be deeply concerned with SSA relying on systems with these kinds of unpredictable but routine failures.

8.    As the Chief Technologist of the Consumer Financial Protection Bureau (CFPB), I oversaw a report on the use of chatbots in banking services. The report found that when organizations attempt to cut costs by replacing human customer service agents with AI chatbots for complex financial conversations, they can create "doom loops" that prevent consumers – particularly seniors and veterans – from getting timely and meaningful help. Troublingly, recurring complaints indicated that chatbots failed to fulfill legally mandated responsibilities, such as conducting reasonable investigations into claims of fraud. Many consumers did not realize that sloppy AI was the cause of their frustration; they simply knew they were unable to reach a human representative to resolve urgent financial issues before losing their money.[3]

Executed on April 3, 2025, in Columbus, Ohio.

_Erie Meyer_
Erie Meyer

---

[2] Nicola Jones, *AI hallucinations can't be stopped — but these techniques can limit their damage*, Nature (Jan. 21, 2025), https://perma.cc/W2WM-P3G7.
[3] *Chatbots in consumer finance*, Consumer Financial Protection Bureau (June 2023), https://perma.cc/9WBZ-NMNN.

3

PLFS-094

# EXHIBIT H

PLFS-095

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.*,

   *Plaintiffs*,

    *vs.*        Civil Action No. 1:25-cv-00596

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

   *Defendants*.

## <u>DECLARATION OF MARCELA ESCOBAR-ALAVA</u>

I, Marcela Escobar-Alava, declare as follows:

 1. I am a former Chief Information Officer at the Social Security Administration ("SSA"). In that role, I worked on helping to develop IT modernization and best-practice efforts at the agency. I recently left the agency.

 2. In my experience, SSA's IT and data security practices are driven by a few ideas: (1) use least privilege access; (2) segregation of duties; and (3) incorporate other "Zero-Trust" principles (including assuming breach and verifying any requests for information as though they originated outside of the system).  These principles are used widely both in and outside of government as standard best practices for any information security system.

 3. "Least privilege access" is the idea that users should be granted permission to access the smallest amount of and least identifying data possible to complete their jobs. Least privilege access also includes the notion that users should be granted the most restrictive type of access—for example, read-only access instead of write access. Data should be sanitized or anonymized

PLFS-096

wherever possible; users should be required to validate or explain what they are trying to access and why; and they should not be permitted to access production data with "write" permissions unless absolutely necessary, authorized and documented. Least privilege access is important because it prevents systems from having over-privileged users that may increase the potential for breach or misuse.

4.    "Segregation of duties" ("SoD") is the idea that no user should have enough privileges to misuse a system on their own. For example, the person in charge of issuing benefits through a system should not be the same person crafting the code that govern that system. SoD likewise prevents misuse. Although SoD is not always operable at small tech start-ups (where, for example, a team may only include five people), it is easily incorporated into the organizational structure at larger entities such as SSA.

5.    In my work at SSA, I saw these principles put into practice. For example, as required by the Privacy Act, anyone seeking access to sensitive data housed in SSA systems was required to provide a justification as to why they needed access to specific systems, information of that kind, of that quantity, or in that way.

6.    SSA also conforms with industry-standard IT and data security practices by requiring a completed background check for employees who will be given access to PII. At SSA, no employees are given such access until they have been fully cleared. That often takes months, even when someone already has clearance from the White House or another agency.

7.    In keeping with the principles outlined above, SSA's Enterprise Data Warehouse, or EDW, includes many sandbox functions. I have reviewed the declarations made in this case by Tiffany Flick, and I agree that standard practice would be to (1) grant DOGE Team members access to the

PLFS-097

data they sought in a "sandbox" environment with anonymized data, and (2) refuse requests for write-access and access to SSA source code.

8.  Before I left SSA, I was introduced to Steve Coulter at agency headquarters. Mr. Coulter identified himself as being from DOGE.

I declare under penalty of perjury under the laws of the United States of America, as prescribed in 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on April 3, 2025, in Mexico City, Mexico.

_____
Marcela Escobar-Alava

PLFS-098

# EXHIBIT I

PLFS-099

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

       *Plaintiffs*,

       *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

       *Defendants*.

Civil Action No. 1:25-cv-00596

## SECOND SUPPLEMENTAL DECLARATION OF TIFFANY FLICK

I, Tiffany Flick, declare as follows:

1. My name is Tiffany Flick. I previously submitted declarations in this case based on my nearly 30 years of experience working at the Social Security Administration ("SSA") prior to my recent retirement.

2. SSA has production data as well as systems with copies of these data for management purposes. Production data refer to live case or beneficiary information housed in a system of record like, for example, the Master Beneficiary Record ("MBR"). Whereas, data accessed through the Enterprise Data Warehouse ("EDW") for analysis, reporting, or managing the agency's workloads, contains a copy of system-of-record data.

3. SSA has a very controlled process for allowing its employees and other personnel to access personally identifiable information ("PII") and for identifying the "need to know" to access such information. The processes are governed by the Privacy Act and regulations, and are laid out in agency policies, such as the Information Systems Security Handbook

4.    The agency's policy and procedures follow a "need to know" and "least privilege" method for granting access, which means that people are permitted to access only the lowest amount of information that will allow them to accomplish their jobs. Operating with least privilege access is common practice in data security.  Access to any sensitive information is only available to someone with a job duty that requires that access, and this method of granting access applies to all agency systems and data, including the MBR, Supplemental Security Income Record, Numident, Master Earnings File, and to any mechanism through which one can access data (for example, through both the EDW and via direct access to systems of record like the MBR).

5.    For example, the former Office of Analytics, Review, and Oversight included an Office of Program Integrity, which managed SSA's anti-fraud work and contained two components that separated the duties within the anti-fraud work: the fraud analytics team, which examined SSA data for patterns of fraud; and the fraud investigations team, which probed specific instances of fraud referred by the analytics team. Employees in each of these components had access to different levels of data.

6.    The analytics team (comprised of data scientists, mathematicians, and statisticians) looks for patterns and thus needs access to less granular information. They look for a pattern by using structured query language to determine, for example, a list of Social Security Numbers ("SSNs") associated with dates of birth before 1920.

7.    By contrast, the certified fraud investigators in the investigations component need more specific information. For example, to examine an instance of direct-deposit fraud, they need to review specific data on an individual's MBR (such as the history of changes to routing number or contact information). They access that detailed data through the EDW and search for those details by SSN.

PLFS-101

8. When determining whether an individual employee has a defined business need for accessing PII, SSA considers factors including the type of work that person will do (e.g., fraud analytics versus fraud investigations); the means through which they will access data (i.e., through EDW or via direct access to production data); and the way in which one will interact with that data (i.e., read-only access versus write access).

9. Access to and editing of production data is audited, meaning there is a recorded, detailed history of access that is subject to examination.

10. Changes to production data are made either through programmatic systems used by the front-line employees who work in local Social Security offices to process benefits or update Social Security records for the public or through "batch jobs," which are programs written by IT programmers (or software engineers) to update production systems or data. Batch jobs are subject to extensive process controls, including multiple layers of testing, integration, and data validation.

11. Due to SSA's requirement to utilize a separation of duties, generally programmers who write code to update programmatic systems that affect benefit payments or maintenance of Social Security records do not have access to update or "write" to production systems or data. However, if there is an emergency business need that requires an IT programmer (or software engineer) to update a programmatic system or data, they must make a special request with justification, and would have time-limited access, which would only be provided on an "emergency" basis and last for the duration of the specific action but no longer than 24 hours.

12. The access to PII that employees working on IT or fraud efforts have is very different from the access that front-line workers have. Front-line staff do not have the ability to conduct broad queries on SSA data (e.g., "everyone born before 1920"), nor do they have access to the entire EDW. Rather, front-line workers can generally only access data by searching individual SSNs. In

3

PLFS-102

addition, they generally can only update data on one SSN at a time based on the workload handled by their office.

13. The CIO's office closely monitors access to and editing of production systems and data to ensure that access is only granted and used for specific, necessary purposes germane to the work an individual employee is doing. That is true regardless of who, and from which office, one is seeking access.

14. Access to the EDW is also recorded through an audit trail. An employee seeking access to data in the EDW must submit a request explaining the scope of access they seek and their need for the covered data. Those requests are adjudicated by the person's supervisor and the team that oversees the EDW, and the granting or denial of access is recorded in the system and available to view.

15. SSA also has protocols governing employees' suitability to access PII, including requisite background checks and clearance levels. These protocols are outlined in the agency's Personnel Policy Manual and the Administrative Instruction Manual System.


I declare under penalty of perjury, as prescribed in 28 U.S.C. § 1746, that the foregoing is true and correct.


Executed on April 4, 2025, in Valparaiso, Indiana.

_Tiffany Flick_
Tiffany Flick

4

PLFS-103

# EXHIBIT J

**PLFS-104**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

        *Plaintiffs*,

        *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

        *Defendants*.

Civil Action No. 1:25-cv-00596

## DECLARATION OF BRADY DOE

I, Brady Doe, declare as follows:

1.     I previously worked at the Social Security Administration.

2.     I am submitting this declaration pseudonymously because I fear retaliation. But if the Court would like to know my name or job position, I would be willing to provide it ex parte and under seal.

3.     When I started at SSA, I already had a fully adjudicated Top Secret-eligible clearance from the federal government.

4.     Even so, I was not able access SSA email systems until I completed a full background check at the agency, much less get access to the Enterprise Data Warehouse.

     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

     Executed on April 4, 2025.

                            Brady Doe

PLFS-105

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

       *Plaintiffs,*

       *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

       *Defendants.*

Civil Action No. 1:25-cv-00596

**INDEX OF DECLARATIONS IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
AND/OR 5 U.S.C. § 705 STAY**

| EX. | PAGE NOS. | EXHIBIT DESCRIPTION |
|-----|-----------|---------------------|
| A | PLFS-068–PLFS-072 | Supplemental Declaration of Ann Widger, Director of Retirees, AFSCME |
| B | PLFS-073–PLFS-075 | Supplemental Declaration of Sue Conard, Retiree Member, AFSCME |
| C | PLFS-076–PLFS-079 | Supplemental Declaration of Richard J. Fiesta, Executive Director, ARA |
| D | PLFS-080–PLFS-083 | Supplemental Declaration of Linda Somo, Member, ARA |
| E | PLFS-084–PLFS-087 | Supplemental Declaration of Bernadette Aguirre, Director of Retiree Division, AFT |
| F | PLFS-088–PLFS-090 | Supplemental Declaration of David Gray, Member, AFT |
| G | PLFS-091–PLFS-094 | Declaration of Erie Meyer, Founding Member, U.S. Digital Service |
| H | PLFS-095–PLFS-098 | Declaration of Marcela Escobar-Alava, Former Chief Information Officer, SSA |
| I | PLFS-099–PLFS-103 | Second Supplemental Declaration of Tiffany Flick, Former Employee, SSA |
| J | PLFS-104–PLFS-105 | Declaration of Brady Doe, Former Employee, Social Security Administration |

# EXHIBIT A

## **TABLE**

| Employee # | Employment Designation | Employment Information | Security and Privacy Acknowledgment |
|---|---|---|---|
| 1 | SGE | AR-000529–532, 548, 552 | AR-000575 |
| 2 | Detailee | AR-000052–63 | AR-000611–615 (AR Supp.) |
| 3 | Detailee | AR-000033-40, 48–51, 80-86 | AR-000572 |
| 4 | SGE | AR- 000531–534, 547, 549, 554 | AR-000600 |
| 5 | Detailee | AR-000101–109 | AR-000585 |
| 6 | SGE | AR- 000535–538, 550, 555 | AR- 000567 |
| 7 | Detailee | AR-000041–47 | AR-000580 |
| 8 | Detailee | AR-000072–75 | AR-000595 |
| 9 | SGE | AR-000542–545, 551, 556 | AR-000562 |
| 10 | Detailee | AR-000076–79 | AR-000605 |
| 11 | SGE | AR-000539–541, 546, 557 | AR-000590 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.,*

          Plaintiffs,

      v.

SOCIAL SECURITY
ADMINISTRATION, *et al.,*

          Defendants.

Case No. 1:25-cv-00596-ELH

### NOTICE OF FILING OF STATEMENTS OF NEED

On April 2, 2025, this Court ordered Defendant Social Security Administration ("SSA") to file the "written submissions provided to SSA by DOGE Employees . . . setting forth the 'need' for access to non-anonymized data" to conduct three projects: (1) "Are You Alive Project", (2) "Death Data Clean Up Project", and (3) "Fraud Detection Project." ECF 95 at 7. SSA respectfully directs the Court to the statements in Exhibit A hereto.

Dated: April 7, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division, Federal Programs Branch

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

BRADLEY P. HUMPHREYS
Senior Trial Counsel

*/s/ Samuel S. Holt*
SAMUEL S. HOLT
MARIANNE F. KIES
Trial Attorneys
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

Kelly O. Hayes
Interim United States Attorney

MICHAEL J. WILSON
USDC Md Bar No. 18970
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4941
Fax: (410) 962-2310
Michael.Wilson4@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 7, 2025, I electronically filed the foregoing and thereby caused a copy to be served on counsel of record.

*/s/ Samuel S. Holt*
SAMUEL S. HOLT

# Exhibit A

**Project Request:** Are You Alive

**Project Description:** The Are You Alive campaign aims to bolster program integrity by identifying individuals that are deceased, but still collecting benefits. It aims to do this by identifying "active" beneficiaries through their Medicare utilization patterns, their response to emails, their response to phone calls, their interactions with MySSA.gov, and their interactions with field offices.

**From:** Employee #1 and Employee #9

**Data Access Requested:** Access to the following schemas in the EDW including fields, such as, Social Security number (SSN), beneficiary status, phone, email, and last "active" date:

- Numident (NUMI) – This contains data on enumerations and death.

- MBR – This contains data on individuals receiving benefits and their benefit status.

- SSR – This contains data on individuals receiving benefits and their benefit status.

- PROME: This contains login data to MySSA.gov. This will be used to identify "active" beneficiaries through their login patterns into MySSA.gov.

- PCHIP: This contains calls to the 1-800 line. This will be used to identify "active" beneficiaries through their call patterns with the 1-800 line.

- PVIP: This contains calls to the field offices. This will be used to identify "active" beneficiaries through their call interactions with agency field offices.

- PVIPR: This contains field office appointments. This will be used to identify "active" beneficiaries through their in person interactions agency field offices.

**Is this the lowest schema level (i.e., no other schema containing the data needed is more restrictive) available?** Yes

**Explanation of Data Need for the Project:** The call, email, and field office campaign portion of Are You Alive has three conceptual stages: a) identify the contact information of active beneficiaries b) contact and track engagement across various channels (phone, email, in person) c) map engagement back to beneficiaries.

Part a and c requires beneficiary level information that exists in NUMI, MBR, and SSR. It requires identifying active beneficiaries to contact and mapping back engagement to these beneficiaries. Aggregates are not sufficient to execute these parts.

Part b requires PROME, PCHIP, PVIP, and PVIPR to collect and process engagement with the agency across various channels. Again, aggregates are not sufficient to execute on this part.

**Is Anonymization Possible; if not, why:** Anonymization would block our ability to execute on this project entirely. Anonymizing contact information, for example, would make it impossible to execute a call or email campaign.

**Project Request:** Fraud Detection

**Project Description:** We have identified three major vectors of fraud at SSA: direct deposit changes, new claims, and wage reporting. For each of these we would like to develop new detection techniques. For example, we would like to identify if a higher than expected number of wage reports come from extremely young and extremely old individuals, as this would be suspicious and indicative of likely fraud.

**From:** Employee #8

**Data Access Requested:** I need access to the data used for direct deposit change, new claim, and wage reporting fraud detection. As part of this effort, I will be working with career SSA employees, including those on the Fraud Analytics team.

**Explanation of Data Need for the Project:** This data access is needed to detect fraud in direct deposit change, new claim, and wage reporting.

**Is Anonymization Possible; if not, why:** No, Data minimization and anonymization is not possible because fraud detection at scale by its very nature requires looking for unexpected and suspicious patterns over large quantities of data. Minimizing or anonymizing the data will make identifying unexpected suspicious patterns impossible.

1

DOGE Team Data Access Request and Justification

**Explanation by DOGE Team about the type of access granted through the Enterprise Data Warehouse (EDW) Applicable to All DOGE Team Requests Below**

**From:** Provided by `Employee #5` acting as a coordinating DOGE Team Member for the four individuals noted below:

**Explanation:**

The vast majority of SSA employees routinely access agency personally identifiable information (PII) from SSA's program records (such as claims or enumeration records) in performing "front line" duties–i.e., individuals working directly with the public or otherwise working internally to process claims and enumeration related matter., including claims representatives and hearings office employees. This front-line employee PII access generally occurs by electronically querying (searching based on an identifier, such as Social Security number) through "dashboards" (i.e., screens created to present information in an manner helpful to the employees based on the work they are performing) which retrieve claims or enumeration file information directly from production systems (i.e., the systems holding the custodial, controlling records, such as our Master Beneficiary Record or MBR). By contrast, non-front line employees use the EDW to obtain access to the same agency records, but in a non-production data environment. This is the case where, for example, non-front line employees are conducting fraud or similar analysis. Members of the SSA DOGE Team are non-front line employees because they are not working directly with the public or working on processing individual requests for claims or enumeration records

Data access through EDW is granted through "schema" levels. SSA's EDW contains hundreds of schema levels, each of which contains different data types. When access is granted to a particular schema, the employee has permission to access the data in the schema, but the employee does not automatically see all those records. Similar to front-line employees who need to query SSA systems to retrieve needed records, non-front line employees granted access to EDW schemas must specifically search for relevant records in a schema for the records to be viewable.

---

**Project Request:** Death Data Clean Up

**Project Description:** Identify number holders who we are confident are deceased based on their age and lack of signs of life, and mark them as deceased.

**From:** `Employee 5`

**Data Access Requested:** Access to the following schema in the Enterprise Data Warehouse:

- Numident (NUMI) – This contains data on enumerations and deaths
- MBR – This contains data on who is currently receiving benefits
  SSR – This contains data on who is currently receiving benefits

1

**Is this the lowest schema level (i.e., no other schema containing the data needed is more restrictive) available?** Yes

**Explanation of Data Need for the Project:** This project involves two main steps:

1. Identify number holders who we are confident are deceased based on their age and lack of signs of life.
2. Add death information for the identified individuals.

The Numident, MBR, and SSR all have information required for step 1. For example:

- Date of birth information is stored across the Numident, MBR, and SSR, and is required for identifying number holders who are beyond a maximum reasonable age.
- Benefit information is stored across the MBR and SSR, and is required for checking whether number holders have signs of life.

The Numident, MBR, and SSR all have information required for step 2. For example:

- Part of step 2 involves creating a death entries file with a list of the number holders to be marked deceased, including their SSNs, names, dates of birth, and dates of death. These pieces of data are stored across the Numident, MBR, and SSR, and are required to create such a death entries file.

Having access to the Numident, MBR, and SSR schemas is the most restricted level of access one could have while being able to execute on this project.

**Is Anonymization Possible; if not, why:** No. As mentioned above, this project involves preparing a file with a list of the number holders to be marked deceased, including their SSNs, names, dates of birth, and dates of death. Preparing this list would not be possible with anonymized data.

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.*,

   *Plaintiffs*,

     *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

   *Defendants*.

Civil Action No. 1:25-cv-00596-ELH

## NOTICE REGARDING DEFENDANTS' STATEMENTS OF NEED

The Temporary Restraining Order currently in effect, ECF 48, establishes the circumstances in which Defendants can provide DOGE Team members access to SSA records. The TRO states, in relevant part:

> SSA may provide members of the DOGE Team with access to discrete, particularized, and non-anonymized data, in accordance with the Privacy Act, and in accordance with the conditions set forth herein: SSA must first comply with the provisions in ¶ 2 of this Order and, in addition, SSA must first obtain from the DOGE Team member, in writing, and subject to possible review by the Court, a detailed explanation as to the need for the record and why, for said particular and discrete record, an anonymized or redacted record is not suitable for the specified use. The general and conclusory explanation that the information is needed to search for fraud or waste is not sufficient to establish need.

*Id.* ¶ 3. On March 27, Defendants filed a "Notice of Compliance" claiming that, as to Employees 1, 5, 8, and 9, it had satisfied the criteria set by the Court for granting access to personally identifiable information ("PII") in SSA data systems. ECF 62 ("Notice"). That filing was supported by the declarations of Acting SSA Commissioner Leland Dudek, ECF 62-1, and Deputy SSA Commissioner of Human Resources Florence Felix-Lawson, ECF 62-2. The Notice advised that,

1

absent Court intervention, SSA intended to provide the four DOGE Team members access to SSA data systems, including PII, within three hours. ECF 62 at 3. The Court thus convened an emergency hearing, at which Defendant Dudek appeared. *See* ECF 67; Transcript, ECF 73.

In a subsequent order, the Court noted that Defendants "did not submit with the Notice any written explanation provided to SSA by any of the four DOGE employees, explaining the need for access to non-anonymized data, as required by paragraph 3 of the TRO." Mem. Op. and Order, ECF 95 (the "Order"). At no point did Defendant Dudek aver that such statements exist. *See* Dudek Decl. ¶ 3, ECF 62-1 (stating obliquely that his statements were made with his "personal knowledge, discussion with SSA staff, and review of documents and information furnished to [him] in the course of [his] official duties); Supp. Dudek Decl. ¶ 3, ECF 74-1. And, despite Plaintiffs raising that deficiency both at the emergency hearing and in their briefing, Defendants' reply was silent on the issue. Tr. at 19:21-20:3, ECF 73; ECF 77 at 4; ECF 80. The Court thus ordered Defendants to file the required written submissions or, "[i]n the event that the written statements [did] not exist," to advise the Court accordingly. In so doing, the Court termed Defendants' failure to disclose the written submissions "a glaring omission." Order at 6, ECF 95.

## I. The Statements appear to be post hoc justifications for Defendants' actions that do not comply with the TRO.

Yesterday, Defendants filed what they describe as "statements of need" for the relevant employees. ECF 114 ("Second Notice"); ECF 114-1 ("Statements"). But, like Mr. Dudek's declarations, the Second Notice is silent as to whether the employees provided those statements to SSA before the agency sought to grant them access. *See generally id.* The Statements themselves are undated and, despite including a "from" line, do not indicate to whom they were directed. *See generally* ECF 114-1.

Indeed, the record raises reasonable concerns that Defendants did not, as the TRO requires, "*first* obtain from the DOGE Team member, in writing, and subject to possible review by the Court, a detailed explanation as to the need for the record . . . ." TRO ¶ 3, ECF 48. Defendants imposed an artificial and extraordinarily brief timeline on this Court, despite Defendant Dudek describing the DOGE Team's work as "work we've never gotten around to as an agency." Tr. at 10: 20-21, ECF 73. They advanced such inconsistent explanations as to why anonymization is not possible that, at one point, the Court ordered Defendant Dudek to submit an additional declaration clarifying his position. Letter to Counsel, ECF 64, at 1-2; *compare* Dudek Decl. ¶ 11, ECF 62-1 ("[For Employee 8], [a]nonymization is not feasible because it could obscure information useful for identifying fraud."), *with* Transcript at 13:20-14:3, ECF 73 (explaining that his declaration in support of the Notice did not "really" reflect "what [he] meant"), Supp. Dudek Decl. ¶ 8, ECF 74-1 ("Employee 8 plans to work with non-DOGE Team SSA employees in order to retrieve anonymized, aggregated data . . . . Employee 8 needs access to discrete individual data only when anomalies are identified, in order to detect fraud in specific instances."), *and* Third Dudek Decl. ¶ 5, ECF 80-1 (describing "[d]e-identification of data" as "impracticable" and apt to "result in the removal of information relevant to the SSA DOGE Team's analysis").[1]

## II.    The Statements are insufficient to demonstrate that data anonymization is impossible and are contradicted by record evidence on that point.

Additionally, the Statements are not responsive to this Court's previous determination that the DOGE Team members have not "provided a particularized explanation of how or why virtually the entire data base of SSA is needed to conduct [their] investigation, or why redacted or

---

[1] Furthermore, while Plaintiffs acknowledge that the SSA Defendants may seek relatively unique written justifications for purposes of complying with the TRO, it is notable that the form of the proffered Statements differs substantially from the written statements in the Administrative Record. *See, e.g.*, AR 000010-11; AR 000019-20; AR 000023; AR 000025-26.

anonymized records, at least initially, would be inadequate." TRO Mem. Op. at 121-22, ECF 49.

As described above, Defendant Dudek has acknowledged that anonymization is possible in the

first instance with respect to at least some of the DOGE Team's work. *See* Supp. Dudek Decl. ¶ 8,

ECF 74-1. Plaintiffs have also offered evidence from former SSA CIO Marcela Escovar-Alava and

former Acting Chief of Staff to the Acting SSA Commissioner Tiffany Flick, both of whom aver

that anonymization is not only feasible but routine. In the words of Ms. Flick, which have gone

largely unrefuted:

> Normally when analysts or auditors review agency data for possible payment
> issues, including for fraud, the review process would start with access to high-level,
> anonymized data based on the least amount of data the analyst or auditor would
> need to know. If a subset of records within that data are flagged as suspicious, the
> analyst or auditor would access more granular, non-anonymized data to just that
> subset of files.

Sec. Flick Decl. ¶ 4, ECF 39-1; *see, e.g.*, Escobar-Alava Decl. ¶ 7, ECF 111-10 ("standard practice

would be to (1) grant DOGE Team members access to the data they sought in a 'sandbox'

environment with anonymized data, and (2) refuse requests for write-access and access to SSA

source code"); *id.* ¶ 3 (explaining that, under the principle of "least privilege access" followed by

SSA, "[d]ata should be sanitized or anonymized wherever possible"); Third Flick Decl. ¶¶ 5-6

(explaining that the agency's fraud analytics team, "which examined SSA data for patterns of

fraud," only needs access to "less granular information").

Defendants' own statements further undercut their claims that anonymization is impossible

and/or impracticable. For example, they protest that Employees 1 and 9 cannot use anonymized

data, in the first instance, for their work on the "Are You Alive" project. The relevant portion of

that project allegedly has three stages: (a) identifying contact information for active beneficiaries;

(b) contacting and tracking engagement across SSA channels;[2] and (c) mapping engagement back to beneficiaries. *See* Statements at 2, ECF 114-1. The Statements explain that anonymization "would block [their] ability to execute on this project entirely," "mak[ing] it impossible to execute a call or email campaign." *Id.* But nothing suggests that the project could not proceed in a different order, beginning with tracking anonymous beneficiaries' "engagement across various channels" and only later matching that data to a smaller subset of the hundreds of millions of individuals whose data is contained in the Numident, MBR, SSR, and other SSA systems of record. Indeed, as Ms. Flick has stated, that would be agency's the usual practice. Sec. Flick Decl. ¶ 4, ECF 39-1.

**CONCLUSION**

The Court should, at minimum, require counsel for Defendants to (1) affirm their compliance with the Court's April 2 directive that they "advise the Court accordingly" if the statements required by the TRO did not exist, *see* Order at 7, ECF 95; and (2) aver that the Statements were provided to SSA by the DOGE Team members before SSA sought to provide access to Employees 1, 5, 8, and 9, *see* TRO ¶ 3, ECF 48; Notice, ECF 62. More fundamentally, because the Statements are insufficient to evidence compliance with the TRO, the Court should not authorize Defendants to provide Employees 1, 5, 8, or 9 the access they seek.

*Signatures on following page.*

---

[2] Plaintiffs are unclear as to why "contacting and tracking engagement" appear in the same stage of the process and have previously expressed concern regarding Defendants' attempt to facilitate calls from DOGE Team members to specific individuals.

Dated: April 8, 2025

Respectfully submitted,

*Alethea Anne Swift*

Alethea Anne Swift (Bar No. 30829)
Mark B. Samburg (Bar No. 31090)
Robin F. Thurston[*+]
Emma R. Leibowitz[*+]
Carrie Y. Flaxman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
aswift@democracyforward.org
msamburg@democracyforward.org
kjones@democracyforward.org
rthurston@democracyforward.org
eleibowitz@democracyforward.org
cflaxman@democracyforward.org

*Counsel for Plaintiffs*

[*] Admission to this Court pending
[+] Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I, Alethea Anne Swift, certify that I filed the foregoing document under seal with the Clerk of Court for the United States District Court for the District of Maryland, Northern Division, and served it on counsel for Defendants via CM-ECF.

/s/ Alethea Anne Swift__
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on June 9, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Jacob Christensen*
Jacob Christensen