**No. 25-1411**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

―――――――――――

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, et al.,

Plaintiffs-Appellees,

v.

SOCIAL SECURITY ADMINISTRATION, et al.,

Defendants-Appellants.

―――――――――――

On Appeal from the United States District Court
for the District of Maryland

―――――――――――

### JOINT APPENDIX – VOLUME III (JA1166–JA1449)
―――――――――――

ALETHEA ANNE SWIFT
MARK B. SAMBURG
EMMA R. LEIBOWITZ
ROBIN F. THURSTON
   *Democracy Forward Foundation*
   *P.O. Box 34553*
   *Washington, DC 20043*
   *(202) 448-9090*

ANNA-ROSE MATHIESON
BRIAN ADAIR SUTHERLAND
   *Complex Appellate Litigation*
     *Group LLP*
   *96 Jessie Street*
   *San Francisco, CA 94105*
   *(415) 649-6700*
*Counsel for Plaintiffs*

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

GERARD SINZDAK
JACK STARCHER
SIMON JEROME
JACOB CHRISTENSEN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7525*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-5048*

*Counsel for Defendants*

# TABLE OF CONTENTS

## VOLUME I

Docket Report ........................................................................ JA1

Amended Complaint (Dkt. 17) ........................................... JA19

Declarations in Support of Plaintiffs' Motion for Temporary
    Restraining Order (Dkt. 22 to 22-10) ......................... JA51

Declarations in Support of Defendants' Opposition to Temporary
    Restraining Order (Dkt. 36-1 to 36-2) ..................... JA113

Declarations in Support of Plaintiffs' Motion for Temporary
    Restraining Order (Dkt. 39-1 to 39-2) ..................... JA125

Transcript of Hearing on Temporary Restraining Order
    (Dkt. 45) ..................................................................... JA132

Temporary Restraining Order (Dkt. 48) ......................... JA236

Memorandum Opinion (Dkt. 49) ...................................... JA242

Letter to Counsel (Dkt. 51) .............................................. JA379

Letter to Counsel (Dkt. 52) .............................................. JA381

Defendants' Status Report and Certification (Dkt. 56 to 56-1) ....... JA382

Notice of Compliance (Dkt. 62 to 62-2) .......................... JA391

Letter to Counsel (Dkt. 64) .............................................. JA405

Letter to Counsel (Dkt. 65) .............................................. JA407

Joint Status Report (Dkt. 68) .......................................... JA409

Order (Dkt. 69) ................................................................... JA413

Transcript of Proceedings on March 27, 2025 (Dkt. 73) ................. JA415

Notice of Filing (Dkt. 74 to 74-1) ...................................................... JA450

Declaration of Leland Dudek (Dkt. 80-1) ......................................... JA457

CA4 Corrected Order Dismissing Appeal (Dkt. 83) ......................... JA461

Letter to Counsel (Dkt. 91) ............................................................... JA464

Memorandum and Order (Dkt. 95) ..................................................... JA466

Certification of Administrative Record and Index
  (Dkt. 100-1 to 100-2) ..................................................................... JA473

Declarations in Support of Plaintiffs' Motion for Preliminary
  Injunction (Dkt. 111-3 to 111-13) ............................................... JA477

Exhibit in Support of Defendants' Opposition to Motion for
  Preliminary Injunction (Dkt. 113-1) ........................................... JA516

Notice of Filing of Statements of Need (Dkt. 114 to 114-1) ............. JA518

Notice Regarding Defendants' Statements of Need (Dkt. 120) ....... JA527

## VOLUME II

Administrative Record (Redacted):

Notice of Filing of Redacted Administrative Record
  (Dkt. 121) .................................................................................... JA534

Certification of Administrative Record (Dkt. 121-1) ............... JA537

Index to Administrative Record (Dkt. 121-2) ......................... JA539

Administrative Record (Redacted) (Dkt. 121-3 to 121-5) ....... JA542

Supplement to the Administrative Record
  (Dkt. 112 to 112-1) .................................................................. JA1157

# VOLUME III

Declaration in Support of Plaintiffs' Motion for Preliminary
Injunction (Dkt. 126-1).............................................................. JA1166

Letter to Counsel (Dkt. 127) ........................................................ JA1170

Plaintiffs' Notice of Supplemental Declaration
(Dkt. 136 to 136-1)................................................................. JA1173

Letter to Counsel (Dkt. 137) ........................................................ JA1179

Notice Regarding Hearing (Dkt. 138).............................................. JA1182

Transcript of Hearing on Preliminary Injunction (Dkt. 143)........ JA1185

Order Granting Preliminary Injunction (Dkt. 147) ...................... JA1293

Amended Memorandum Opinion (Dkt. 157) .................................. JA1299

Notice of Appeal (Dkt. 148) .......................................................... JA1447

# VOLUME IV – SEALED

Administrative Record (Unredacted) (Dkt. 86)............................... JA1450

Notice of Filing of SSA DOGE Team List (Dkt. 118 to 118-1) ...... JA2062

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

        *Plaintiffs*,

        *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

        *Defendants*.

Civil Action No. 1:25-cv-00596

**SUPPLEMENTAL DECLARATION OF ERIE MEYER**

I, Erie Meyer, declare as follows:

1.    I am a founding member of the U.S. Digital Service and have served as the Chief Technologist of two federal agencies. I have significant experience in technology policy, data security, and artificial intelligence.

2.    I previously submitted a declaration in this matter. Everything I said in that declaration remains true. I submit this declaration to provide additional information relevant to this case.

3.    According to filings from the defendants in this case, the Department of Government Efficiency ("DOGE") has requested broad access to numerous Social Security Administration ("SSA") data systems, including the Numident, Master Beneficiary Record ("MBR"), Supplemental Security Record ("SSR"), and other databases that collectively contain deeply personal information about nearly every person ever born in the United States. These records include Social Security numbers, birthdates, home addresses, employment history,

earnings, disability records, bank account information, medical documentation, and in some limited cases, classified data used to support national security.[1]

4.    The access DOGE is requesting materially increases the risk of hacking and data exploitation. The SSA operates one of the most sensitive data environments in the federal government. Centralizing this information, along with a mandate to rapidly deploy AI and automation tools, introduces unprecedented cybersecurity risk. The possibility of compromise— whether through external cyberattacks or internal misuse—becomes far greater as more individuals and systems gain programmatic access to sensitive personal data.

5.    Stalkers, scammers, and spies materially benefit when a group of people— particularly those who have not been subject to full vetting and data controls—are granted broad and centralized access to personally identifiable information ("PII") on nearly every American. For example, access to SSA's disability systems includes detailed psychotherapy notes, records of reproductive health, and comprehensive data about children's medical and school history. If this data were to be improperly accessed, misused, or leaked, it could cause irreparable harm to the privacy, safety, and dignity of vulnerable individuals, including children, veterans, and survivors of domestic violence, and open them up to economic exploitation.

6.    Security research and prior incidents have shown that once a system with broad access to sensitive information is compromised, it is nearly impossible to contain the damage. Threat actors, whether criminal organizations, hostile nation-states, or malicious insiders, routinely seek access to government databases. By consolidating access to all of SSA's systems with aggressive timelines and AI ambitions, the risk is exponentially compounded.[2]

---

[1] Jacob Leibenluft et al., *Trump Administration, DOGE Activities Risk SSA Operations and Security of Personal Data*, Ctr. on Budget and Policy Priorities 18 (April 1, 2025), https://perma.cc/EM5E-GPUZ.
[2] *Id.* at 3, 19-20.

7.      The use of AI tools, including large language models, further complicates the risk profile. If DOGE integrates SSA data into any AI system the data may be retained in the model in ways that cannot later be reversed. Even brief access can result in permanent informational extraction, even if formal access is later revoked.[3]

8.      Researchers have uncovered methods for data exposure from AI tools using straightforward prompts. For example, using a portion of the text of a news article to get the system to produce more verbatim text from that news article. If these systems are being given access to personally identifiable information at scale, related adversarial methods could be used by bad actors to potentially exfiltrate information and use it to commit fraud.[4]

9.      In my previous declaration, I posed a theoretical example of how Grok, an AI tool owned by Elon Musk, could unfairly benefit if trained on sensitive SSA data. In the subsequent days, public reporting alleged that DOGE has indeed "heavily" deployed Grok as part of their work.[5] To my knowledge, Grok has not been vetted and approved for federal use via the Federal Risk and Authorization Management Program, does not use government servers, and has not completed other means to ensure that this cloud-based tool has been vetted for government use.

10.      DOGE's request for expansive and expedited access to SSA systems, which hold information on essentially every living American, presents an unacceptable risk and would meaningfully make Americans less safe.

Executed on April 10, 2025, in Washington, D.C.

_____
Erie Meyer

---

[3] Apostol Vassilev et al., *Adversarial Machine Learning: A Taxonomy and Terminology of Attacks and Mitigations*, U.S. Dep't of Commerce xii, 40 (March 2025), https://perma.cc/9HKR-YAER.
[4] Ellen Su et al., *Extracting Memorized Training Data Via Decomposition*, arXiv 1-2 (Oct. 1, 2024), https://perma.cc/2E53-TD3G.
[5] Alexandra Ulmer et al., *Exclusive: Musk's DOGE using AI to snoop on U.S. federal workers, sources say*, Reuters (April 8, 2025), https://perma.cc/F327-EURP.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

Chambers of
**Ellen Lipton Hollander**
District Court Judge

101 West Lombard Street
Baltimore, Maryland 21201
410-962-0742

April 11, 2025

LETTER TO COUNSEL

Re:     *American Federation of State, County and Municipal Employees,*
        *AFL-CIO, et al. v. Social Security Administration, et al.*
        Civil Action No. ELH-25-0596

Dear Counsel:

I write to address several matters.

**1.**

As you know, I issued a Temporary Restraining Order ("TRO") on March 20, 2025. ECF 48. The government noted an appeal of the TRO to the Fourth Circuit on March 24, 2025. ECF 57. Then, on March 26, 2025, almost a week after I issued the TRO, defendants filed in this Court a motion to stay the TRO, "as clarified" by my letters of March 21, 2025 (ECF 51, ECF 52). *See* ECF 60 ("Stay Motion").[1] Several hours later, defendants also moved for a stay in the Fourth Circuit. *See* Case No. 25-1291, Docket Entry No. 5.

By agreement of the parties on March 27, 2025 (ECF 68), I extended the TRO through April 17, 2025. *See* ECF 69 (Order of 3/27/25, extending TRO). And, by Memorandum (ECF 78) and Order (ECF 79) of March 31, 2025, I denied the Stay Motion. The Fourth Circuit dismissed the appeal on April 1, 2025, based on lack of jurisdiction. ECF 81 (Order); ECF 82 (Judgment); ECF 83 (Corrected Order).

On April 7, 2025, the government filed a "Notice of Recent Decision and Request for Reconsideration." ECF 117 ("Motion for Reconsideration"). In the Motion for Reconsideration, the government notified the Court that the Fourth Circuit granted a stay pending appeal in the case of *American Federation of Teachers, et al v. Bessent, et al.*, DLB-25-0430 (D. Md.). ECF 117 at 1; *see American Federation of Teachers, et al. v. Bessent, et al.*, No. 25-1282, 2025 WL 1023638

---

[1] ECF 51 and ECF 52 were intended to correct Acting Commissioner Dudek's interpretation of the TRO.

1

(4th Cir. Apr. 7, 2025) (Order).[2]  Defendants noted that Judge Agee and Judge Richardson concluded that the plaintiffs in *Bessent* likely do not have standing to pursue their claims.  ECF 117 at 1; *see Bessent*, 2025 WL 1023638, at *1–5.  In light of *Bessent*, defendants ask the Court to "reconsider its earlier decision to deny Defendants' request for a stay during the pendency of the preliminary injunction proceedings and any subsequent appeal."  ECF 117 at 2.

Plaintiffs oppose the Motion for Reconsideration.  *See* ECF 119.  They ask the Court to consider *Bessent*, to the extent applicable, "in the regular course when deciding the preliminary injunction . . . ."  *Id.* at 10.

As noted, defendants expressly agreed to extend the TRO through April 17, 2025.  ECF 68.  By Order of March 27, 2025 (ECF 69), I extended the TRO through that date.  The hearing on the preliminary injunction motion (ECF 110, "P.I. Motion") is scheduled for Tuesday, April 15, 2025.  ECF 69.  Given the impending P.I. Motion hearing and the agreement of the parties to extend the TRO through April 17, 2025, I shall **DENY** the Motion for Reconsideration (ECF 117).

**2.**

As indicated, a hearing is scheduled for Tuesday, April 15, 2025, with respect to the P.I. Motion.  ECF 69.  In a joint status report of March 27, 2025 (ECF 68), the "parties agreed to address the need for witness testimony in their respective briefing, with Plaintiffs stating their position in their reply."  *Id.* at 2.  The government's brief does not address the matter of witness testimony.  *See* ECF 113.  Plaintiffs, for their part, "defer to the Court regarding whether testimony from Defendants would aid the Court's evaluation of Plaintiffs' motion."  ECF 122 at 15 n.18.

A recent news article reports that the Social Security Administration is "repurposing Social Security's 'death master file'" in an effort to pressure immigrants to "'self deport.'"  Alexandra Berzon, et al., *Pushing 'Self-Deportation,' White House Moves to Cut Migrants' Social Security*, N.Y. TIMES (Apr. 10, 2025), https://perma.cc/H67G-6L2M.  The article also mentions that Acting Commissioner Dudek sent an email to SSA staff regarding this project.  But, no details concerning this project are contained in the Administrative Record.  *See* ECF 86.  Moreover, according to information provided by defendants, the SSA DOGE Team is working on a project involving the death master file that does not correspond to what was described in the news.  *See, e.g.*, ECF 62-1, ¶ 10; ECF 73 (Tr. 3/27/25), at 7.

Testimony from Acting Commissioner Dudek may be helpful as to the various SSA projects that Mr. Dudek has referenced in his declarations, and for which he claims the DOGE Team requires access to PII.  Therefore, I ask that Acting Commissioner Dudek appear at the P.I. Motion hearing on April 15, 2025, in order to clarify information that has been provided.

Despite the informal nature of this letter, it is an Order of the Court and the Clerk is directed to docket it as such.

---

[2] The Court was already aware of the ruling, as reflected in a letter to counsel.  *See* ECF 116.

2

Very truly yours,

_____/s/_____
Ellen Lipton Hollander
United States District Judge

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SOCIAL SECURITY ADMINISTRATION, *et al.*,<br><br>Defendants. | Civil Action No. 1:25-cv-00596 |

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL DECLARATION**

As permitted by the Court, *see* ECF 133, Plaintiffs attach to this notice a supplemental declaration regarding the Social Security Administration's "Death Master File."

Dated: April 14, 2025

Respectfully submitted,

*/s/ Mark B. Samburg*
Mark B. Samburg (Bar No. 31090)
Alethea Anne Swift (Bar No. 30829)
Emma R. Leibowitz*+
Robin F. Thurston*+
Carrie Y. Flaxman+
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
msamburg@democracyforward.org
aswift@democracyforward.org
eleibowitz@democracyforward.org
rthurston@democracyforward.org
cflaxman@democracyforward.org

*Counsel for Plaintiffs*

* Admission to this Court pending
+ Admitted *pro hac vice*

JA1173

**CERTIFICATE OF SERVICE**

I, Mark B. Samburg, certify that I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Maryland, Northern Division, by using the CM/ECF system, which sent a notice of such filing to all registered CM/ECF users who have appeared in this case.

/s/ Mark B. Samburg
*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, *et al.*,

        *Plaintiffs*,

        *vs.*

SOCIAL SECURITY ADMINISTRATION,
*et al.*,

        *Defendants*.

Civil Action No. 1:25-cv-00596

### THIRD SUPPLEMENTAL DECLARATION OF TIFFANY FLICK

I, Tiffany Flick, declare as follows:

1.  My name is Tiffany Flick. I previously submitted declarations in this case based on my nearly 30 years of experience working at the Social Security Administration ("SSA") prior to my recent retirement.

2.  SSA uses Numident information to create a record of reported deaths known as the Death Master File ("DMF") and shares the full DMF, as authorized, with federal benefit-paying agencies to assist with benefits administration and preventing and detecting fraud. The DMF includes each deceased number holder's Social Security Number ("SSN"), name, date of birth, and date of death. As of December 2023, the full DMF contained information on more than 141 million deceased number holders.

3.  SSA collects death data for the purpose of ensuring the integrity of its benefit programs. That includes discontinuing benefits payments to deceased individuals, confirming an individual's

right to survivor benefits, and identifying fraud carried out by individuals using a dead person's SSN.

4. Generally speaking, SSA posts a date of death to the Numident when the report is received from states, family members, and funeral homes without further verification. Payments are then terminated if that number holder is a Social Security beneficiary or a recipient of Supplemental Security Income. For other reports, such as those the agency receives from a non-family member, employees take steps to verify that the beneficiary is indeed deceased before stopping payments. When someone seeks survivor benefits, the agency must have proof of the death, from a death certificate, death information from the State, a report from a funeral home, or similar documentation. If an individual is not receiving or applying for benefits, SSA does not obtain proof of death because it is not necessary to administer SSA's programs.

5. SSA worked with States on the use of Electronic Death Registration ("EDR"), which automates the receipt of death information and is administered by the nonprofit National Association for Public Health Statistics and Information Systems ("NAPHIS"). Now all 50 States use EDR, resulting in the transmission of death information to SSA faster and more accurately. Generally, SSA receives these death reports within 5 days of the individual's death and within 24 hours after the State receives them. EDR is highly accurate because the States first verify the names and SSNs of deceased individuals against SSA records before they issue death certificates or actually transmit the death reports to us.

6. While SSA collects and uses the death data it receives solely to determine eligibility for and termination of benefit payments, federal benefit-paying agencies, banks, identity authentication companies, and others rely on the death.

7.  The DMF contains a great deal of state data—as of 2019, most of the death reports SSA data collected by SSA and maintained in the DMF came from the states through EDR.

8.  SSA interprets Section 205(r) of the Social Security Act as barring the agency from sharing state data with the private sector and most non-benefit-paying federal agencies.[1] Therefore, SSA also provides a subset of the full file, known as the Limited Access DMF, to the Department of Commerce, which, in turn, sells the data to public and private customers. It is available only to customers who can certify their ability to protect the data and does not contain data from the last three years.

9.  Under the Consolidated Appropriations Act of 2021, SSA has been also required, since December 2023, to share the full DMF with the U.S. Department of Treasury's Bureau of the Fiscal Service for use in its Do Not Pay initiative as an effort to reduce improper payments.

10. Federal benefit-paying agencies in receipt of the state death data are required to verify independently the fact of death before acting on the information.

11. Errors in SSA's death data are minimal. In 2019, the agency reported correcting approximately one-third of one percent of the approximately 2.9 million death reports received each year.

12. Intentionally marking people who are still living as dead in the Numident and/or Death Master File is unheard of and improper.

13. For people erroneously recorded as dead, the consequences are severe. Loans may be terminated, and banking and credit card accounts may be closed. Affected individuals may be unable to open new accounts or apply for loans. Medicare and Medicaid coverage will immediately stop, as both coverage and claims will be rejected. Life insurance policies may be canceled, and

---

[1] Social Security Act §205(r)(3)(A)).

future applications may be rejected. Affected individuals may not be able to obtain a job (for example, as an Uber driver) or get approved for an apartment. They may not be able to rent a car, open a utility account, access FEMA benefits, or—in some states—even get a driver's license. Any tax return filed electronically will be rejected, delaying tax refunds, and affected persons may be arrested for identity theft.

14. Applications and renewals for CHIP, Basic Health Program, Affordable Care Act, and Multi-State Plan insurance coverage will likely be rejected, as states use data from the DMF—accessed through the CMS hub—to process those applications. SNAP applications and recertification will likely be discontinued, as state SNAP agencies use data from the DMF—accessed through SSA data exchanges—to process those applications.

15. It is possible that some people on the Department of Homeland Security list are representative payees for other people who are receiving SSA benefits, including children, other people on SSI, and retirees. If the representative payees are marked dead, the person's benefits will be paused until SSA can identify a new representative payee.

I declare under penalty of perjury, as prescribed in 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on April 14, 2025, in Valparaiso, Indiana.

_Tiffany Flick_
_____
Tiffany Flick

4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

Chambers of
**Ellen Lipton Hollander**
District Court Judge

101 West Lombard Street
Baltimore, Maryland 21201
410-962-0742

April 14, 2025

LETTER TO COUNSEL

Re:    *American Federation of State, County and Municipal Employees,*
       *AFL-CIO, et al. v. Social Security Administration, et al.*
       Civil Action No. ELH-25-0596

Dear Counsel:

As you know, I issued a Temporary Restraining Order ("TRO") in this case on March 20, 2025. ECF 48. By agreement of the parties (ECF 68), the TRO was extended through April 17, 2025. ECF 69. A preliminary injunction ("P.I.") hearing is scheduled for tomorrow, Tuesday, April 15, 2025, at 10:00 a.m. *Id.*

At approximately 2:30 p.m. on April 11, 2025, the Court sent a letter to counsel. ECF 127. In relevant part, I addressed the matter of witness testimony at the P.I. hearing. *Id.* at 2. In particular, I noted that the government did not address the matter in its briefing, and plaintiffs deferred to "'the Court regarding whether testimony from Defendants would aid the Court's evaluation of Plaintiffs' [P.I.] motion.'" *Id.* (quoting ECF 122 at 15 n.18).

In the letter, I referenced a New York Times article that reported that the Social Security Administration is "'repurposing Social Security's death master file' in an effort to pressure immigrants to 'self deport.'" ECF 127 at 2 (quoting Alexandra Berzon, et al., *Pushing 'Self-Deportation,' White House Moves to Cut Migrants' Social Security*, N.Y. TIMES (Apr. 10, 2025), https://perma.cc/H67G-6L2M ("N.Y. Times Article")) (some internal quotations omitted). Acting SSA Commissioner Dudek stated during a telephone hearing on March 27, 2025, that the SSA DOGE Team is working on a project involving the "master death record." ECF 73 (Tr. 3/27/25), at 7; *see also* ECF 62-1 (Dudek Declaration of March 26, 2025), ¶ 10 (referencing "Death Data Clean Up Project"). But, the Administrative Record does not "correspond to what was described in the news." ECF 127 at 2. Because testimony from Mr. Dudek "may be helpful as to the various SSA projects that Mr. Dudek has referenced . . .," the Court has asked the government to produce Mr. Dudek at the P.I. hearing, "in order to clarify information that has been provided." *Id.*

Thereafter, at approximately 7:10 p.m. on Friday, April 11, 2025, plaintiffs filed under seal a "Motion to Expand Hearing Scope and For Leave to File Supplemental Declarations." ECF 129 ("Motion"); *see also* ECF 130 (public, redacted version). The Motion is based on the content of the N.Y. Times Article. *See* ECF 129. Plaintiffs ask the Court to (1) "expand the scope" of the

1

P.I. hearing to include defendants' "compliance with the TRO and the veracity of representations made to the Court"; and (2) "grant leave for Plaintiffs to file one or more supplemental declarations regarding the [N.Y.] Times Article before 3:00 p.m. on Monday, April 14." *Id.* at 1.

That evening, April 11, 2025, I entered an Order granting the Motion, in part. ECF 131. Specifically, I permitted plaintiffs to file "supplemental declarations related to the New York Times reporting described in ECF 127 by 3:00 p.m. on Monday, April 14." *Id.* However, I declined to rule on the request to expand the hearing. *Id.* And, I stated that "by noon on 4/14/25, defendants may move to rescind this Order as improvidently granted." *Id.*

Defendants timely filed an opposition to the Motion on April 14, 2025. ECF 132 ("Opposition"). The government argues that the Court "should rescind its order as improvidently granted, because Plaintiffs' requested relief is at odds with basic principles of fairness." *Id.* at 1. In short, the government reasons that (1) it produced the Administrative Record on April 2, 2025, and plaintiffs did not pursue discovery; (2) plaintiffs' Motion was filed less than two business days before the scheduled P.I. hearing; (3) plaintiffs propose to file "additional declarations late in the afternoon on the day before the hearing"; and (4) "[w]ithout knowing what Plaintiffs propose to introduce, Defendants cannot prepare adequately to address any new information contained in those declarations for a hearing the following morning." *Id.* at 1, 2. For these reasons, the government contends that allowing plaintiffs "to supplement the record for tomorrow's hearing with declarations they have known they want to submit for at least three days but that Defendants will have fewer than 24 hours to analyze[]" would give plaintiffs "an unfair advantage." *Id.* at 2. Defendants also stated, *id.* at 3: "If Plaintiffs wish to litigate Defendants' compliance with the TRO, they should file a standalone motion identifying their concerns, and Defendant should be allowed to respond in the normal course."

At approximately 2:57 p.m. on today's date, plaintiffs filed a Third Supplemental Declaration of Tiffany Flick. ECF 136; ECF 136-1 (the "Flick Declaration"). It is approximately four pages in length and primarily pertains to SSA's "Death Master File." *See* ECF 136-1.

The Court agrees with the government that the issue of compliance with the TRO is a standalone matter separate from the merits of plaintiffs' P.I. Motion. The hearing tomorrow shall focus solely on the issues pertaining to the merits of the P.I. Motion. To that extent, plaintiffs' Motion to expand the scope of the P.I. hearing is **DENIED**.

On the other hand, the Flick Declaration may be relevant to the resolution of the P.I. Motion. It does not concern the issue of the government's compliance with the TRO. Instead, it purports to explain the operation of a data system central to the dispute. Therefore, I shall **GRANT** plaintiffs' request to submit the Flick Declaration.

The Court understands the government's concern regarding a lack of time to analyze and respond to the Flick Declaration. But, the Flick Declaration is only four pages long, and the assertions are not complicated. *See* ECF 136-1. The allegations largely provide background information.

2

The government may file a written submission or an additional declaration in response to the Flick Declaration, due by **9:00 a.m. on April 15, 2025**.

Despite the informal nature of this letter, it is an Order of the Court and the Clerk is directed to docket it as such.

Very truly yours,

_____/s/_____

Ellen Lipton Hollander
United States District Judge

3

JA1181

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.,*

    Plaintiffs,

    v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*,

    Defendants.

Case No. 1:25-cv-00596-ELH

## NOTICE REGARDING APRIL 15, 2025, HEARING ON
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

  This afternoon, the Court denied Plaintiffs' motion to expand the scope of the preliminary

injunction hearing scheduled at 10:00 a.m. Tuesday, April 15.  ECF 137.  The Court also accepted

Plaintiffs' submission of a third declaration executed by Ms. Tiffany Flick.  *Id.*; *see* ECF 136-1.

The Court had requested that Acting Social Security Administration Commissioner Leland Dudek

participate in the hearing scheduled for tomorrow morning.  *E.g.*, ECF 127.  Defendants have

reviewed the evidentiary record and considered the demands on the Acting Commissioner's time.

They have decided to stand on the record in its current form.  Defendants will rest their opposition

to Plaintiffs' motion for a preliminary injunction on the information contained in briefing, stated

at oral argument, and in the administrative record produced by the Social Security Administration.


Dated:  April 14, 2025        Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Senior Trial Counsel
MARIANNE F. KIES
SAMUEL S. HOLT
Trial Attorneys
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005
Bradley.Humphreys@usdoj.gov
Phone: (202) 305-0878

Kelly O. Hayes
Interim United States Attorney

MICHAEL J. WILSON
USDC Md Bar No. 18970
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4941
Fax: (410) 962-2310
Michael.Wilson4@usdoj.gov

*Attorneys for Defendants*

2

## CERTIFICATE OF SERVICE

I certify that on April 14, 2025, I electronically filed the foregoing and thereby caused a copy to be served on counsel of record.

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS

1

```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
2                         NORTHERN DIVISION

3    AMERICAN FEDERATION OF STATE,  )
     COUNTY and MUNICIPAL EMPLOYEES,)
4    AFL-CIO, et al.,               )
                                    )
5             Plaintiffs,           )
                                    )
6          v.                       )CASE NUMBER: 1:25-cv-00596-ELH
                                    )
7    SOCIAL SECURITY ADMINISTRATION,)
     et al.,                        )
8                                   )
              Defendants.           )
9    _____ )

10

            TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION
11            BEFORE THE HONORABLE ELLEN L. HOLLANDER
                   UNITED STATES DISTRICT JUDGE
12                   Tuesday, April 15, 2025

13                 A P P E A R A N C E S

14   FOR THE PLAINTIFFS:

15       BY: ALETHEA ANNE SWIFT, ESQUIRE
             EMMA R. LEIBOWITZ, ESQUIRE
16           MARK B. SAMBURG, ESQUIRE
             DEMOCRACY FORWARD
17           1445 New York Ave, NW
             Washington, DC  20005
18
     FOR THE DEFENDANTS:
19       BY: BRADLEY HUMPHREYS, ESQUIRE
             ELIZABETH J. SHAPIRO, ESQUIRE
20           MARIANNE KIES, ESQUIRE
             SAMUEL S. HOLT, ESQUIRE
21           DEPARTMENT OF JUSTICE - CIVIL DIVISION
             1100 L Street NW
22           Washington , DC  20005

23   Also Present:
     Jessica Vollmer, Social Security Administration
24   Mark Steffensen, Social Security Administration

25   _____
             ***Proceedings Recorded by Mechanical Stenography***
             Transcript Produced by Computer-Aided Transcription
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1185

2

```
 1                      P R O C E E D I N G S

 2      (10:08 a.m.)

 3              THE COURTROOM DEPUTY:  The matter now pending before

 4      this Court is Civil Matter ELH-25-00596, American Federation

 5      of State, County and Municipal Employees, AFL-CIO, et al., v.

 6      Social Security Administration, et al. This matter comes

 7      before this Court for the purpose of a Preliminary Injunction

 8      hearing.

 9          Counsel for the record, starting with the plaintiff.

10              MS. SWIFT:  Good morning, Your Honor.  My name is

11      Anne Swift.  I'm here for plaintiffs.  I'm joined by my

12      colleagues, Emma Leibowitz and Mark Samburg.

13              THE COURT:  Good morning.  And you may have a seat.

14      Thank you.

15              MR. HUMPHREYS:  Good morning, Your Honor.

16              THE COURT:  And our visitors may have a seat, of

17      course.  Before defense counsel introduce themselves, just a

18      reminder, absolutely no cell phone usage at any time.

19      Absolutely no recording of anything that transpires in the

20      Court.

21          And counsel.

22              MR. HUMPHREYS:  Thank you, Your Honor.  Bradley

23      Humphreys on behalf of the defendants.  I have with me

24      Elizabeth Shapiro of the Department of Justice; Jessica

25      Vollmer of the Social Security Administration; Mark Steffensen
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1186

1    of the Social Security Administration; Marianne Kies of the

2    Department of Justice; and Samuel Holt of the Department of

3    Justice.

4            **THE COURT:**  All right, good morning to everyone and

5    welcome.  You may have a seat.  Let me just give a brief

6    overview so we'll have some context for today's hearing.

7            The plaintiffs are the American Federation of State,

8    County and Municipal Employees, AFL-CIO, sometimes called

9    "AFSCME"; the Alliance for Retired Americans, sometimes called

10    "ARA" or "Alliance"; and the American Federation of Teachers.

11            Plaintiffs filed suit on February 21 of 2025; that would

12    be ECF-1.  The suit was lodged against the Social Security

13    Administration and three other defendants challenging the

14    decision of SSA to provide what was alleged to be unlimited

15    access to an enormous quantity of sensitive personal protected

16    and confidential information belonging to millions of

17    Americans.  The plaintiffs amended their suit on March 7 of

18    2025 at ECF-17.  Among other things, that amended Complaint

19    added three defendants.

20            The defendant are the Social Security Administration.  I

21    refer to the Social Security Administration either as "SSA" or

22    the "Agency"; Leland Dudek in his official capacity.

23    According to plaintiffs, it's their word, "purported" Acting

24    Commissioner of the SSA; Michael Russo in his official

25    capacity as Chief Information Officer of the Agency, although

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1187

```
 1      there is a suggestion he no longer serves in that role, but no
 2      one has been substituted for him.  The news reports indicated
 3      there is a person, not Mr. Russo, occupying that position;
 4      Elon Musk in his official capacity as senior advisor to the
 5      president and de facto head of the Department of Government
 6      Efficiency which is also referred to as DOGE; the U.S. DOGE
 7      Service and the U.S. DOGE Service Temporary Organization; as
 8      well as Amy Gleason in her official capacity as the DOGE
 9      Acting Administrator.
10          As everyone here knows, there previously was a motion by
11      plaintiffs for a Temporary Restraining Order docketed at
12      ECF-21.  That motion was briefed and heard at a hearing on
13      March 14 of 2025.  Ultimately it resulted in this Court's
14      issuance of a Temporary Restraining Order for the reasons I
15      stated.  And I reference ECF-48 and ECF-49.
16          There's been an unusual amount of activity, in my
17      opinion, since then.  I'm not going to review all of it today
18      because it's not why we're here, but I do make note of the
19      fact that by the time the reason we are gathering has actually
20      been docketed, we were up to ECF-110.  And that refers to the
21      Motion for Preliminary Injunction and/or 5 U.S.C. Section 705
22      stay filed on April 4 by the plaintiffs supported by a
23      memorandum at ECF-110-1 and exhibits.  And that motion is
24      opposed by the Government.  And I often refer to all the
25      defendants collectively as "the Government."  The opposition
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1188

5

```
 1    is at ECF-113.  Plaintiffs replied on April 10 -- yeah, April
 2    10 of 2025 at ECF-122.
 3        A number of exhibits have been filed; some in connection
 4    with the Motion for Preliminary Injunction, but not entirely,
 5    as the parties here know.
 6        So I have a number of affidavits or declarations from Mr.
 7    Dudek, but not technically in connection with the PI motion.
 8    And there are a number of exhibits of the same type, meaning
 9    declarations that counsel, I'm sure, will reference.
10        In addition, of course, we now have the Administrative
11    Record which was filed by the Government and I have a redacted
12    version for the public, and an unredacted version as well.
13    And it's my understanding that with the exception of two
14    people, the Government still wishes to refer to the members of
15    the DOGE team, now up to 11.  At the time of the TRO there
16    were 10 people consisting of the DOGE team.  And only two of
17    them, according to the Government, have agreed to have their
18    names publicly used.
19        So for those -- with the exception of those two people,
20    we will be referring to any DOGE team members if that becomes
21    necessary, by their employee number.
22        Then we have some housekeeping matters I just want to
23    point out that have never been resolved.  We've had several
24    emergency hearings in this case.  As part of my commentary
25    about an unusual amount of activity, there's been several
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1189

```
 1    hearings.  One of them involved the Government's eleventh hour
 2    Motion for a Protective Order.  And when we finished that
 3    hearing I thought there had been an agreement.  Then I would
 4    simply be awaiting the presentation by counsel of a Protective
 5    Order to which both sides agreed and nothing has ever been
 6    presented to the Court.
 7         So as a result, plaintiffs, in an abundance of caution,
 8    have continued to file matters under seal for fear of
 9    violating the Protective Order that the Government had
10    proposed which I temporarily blessed just so we could keep the
11    case moving.  It was never my intention to make that
12    necessarily the final version of the Protective Order.
13         So where are we on that?
14              MR. SAMBURG:  Your Honor, Mark Samburg for the
15    plaintiffs.  I don't want to characterize the nature of
16    ongoing negotiations with the Government, but the Government
17    and the plaintiffs are continuing to attempt to reach
18    consensus on a Protective Order.
19              THE COURT:  And will it be in this decade?
20              MR. SAMBURG:  That is my profound hope, but I don't
21    wish to make any assurances on which I can't deliver.
22              THE COURT:  Okay, well I'm very sensitive to the
23    need for the public to have access to whatever transpires in
24    this case.  And to some extent there's been unnecessary
25    filings under seal for fear of apparently on the plaintiffs'
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1190

1  part that they would be in violation of this what I will call

2  temporary Protective Order.  So I'm interested in making sure

3  that we don't forget that this has to be attended to.

4       Today there's been also some discussion of events at

5  Social Security which have led the plaintiff to assert in a

6  filing to the Court that there's concern that SSA is not

7  complying with the Court's TRO.  And there was the motion, as

8  you know, to expand the record and to also submit additional

9  declarations.  Only one additional declaration ultimately was

10  submitted by someone from whom we've all heard several times

11  like Mr. Dudek, also Ms. Flick.  It's all background and I

12  gave the Government a chance to respond.  I don't think

13  anything came in this morning.  Is that right?  I didn't miss

14  it?

15          **MR. HUMPHREYS:**  That's correct, Your Honor.  You did

16  not miss it.

17          **THE COURT:**  I didn't agree to expand the scope of

18  the hearing because if there is an issue of a breach of the

19  Court's Temporary Restraining Order, that I perceive as a

20  separate issue, not on the agenda for today.  If there's an

21  issue to be pursued, that will be up to counsel, but I'm not

22  entertaining it today.  I understand the concern at least

23  according to the news reports, but that's definitely not

24  something I plan to address today.

25       So what did I fail to mention by way of background before

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1191

```
1    we get started that would have been helpful or that you want
2    to correct if I've said something that's inaccurate?
3        Anything from the plaintiffs?
4            MS. SWIFT:  No, Your Honor.
5            THE COURT:  From the Government?
6            MR. HUMPHREYS:  No, Your Honor.  Thank you.
7            THE COURT:  Okay.  So it's your motion, Ms. Swift,
8    and I'm ready when you are.
9        I think where you have to start is with the Fourth
10   Circuit's decision in Bessent.  A two-to-one panel of the
11   Fourth Circuit in Bessent denied -- or rather granted I should
12   say, the Government's motion for a stay.
13       And coincidently, that panel is the very panel in this
14   case that denied the Government's appeal of the TRO.  The
15   denial was for lack of jurisdiction.  The Government attempted
16   to characterize my TRO as a preliminary injunction and then
17   use that as a springboard to argue that it should be stayed.
18   And the Fourth Circuit rejected that.
19       However, the panel in that ruling happens to be the same
20   panel that ruled in the Bessent case.  So, all right.  I can't
21   read tea leaves, but I think that would be a good place for
22   you to start.
23            MS. SWIFT:  Of course, Your Honor.
24       It's important to note that much of the concurrence
25   language in Bessent was explicitly predicated on the facts or
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1192

```
1    lack thereof in the record at the time the Fourth Circuit saw
2    the case.
3              THE COURT:  A lack of what?  I'm sorry.
4              MS. SWIFT:  Certain facts in the record.
5              THE COURT:  Oh.  Well, I noted that Judge Agee in
6    this case -- I thought this was interesting -- admonished the
7    parties to be very specific.  And I'm not quoting, I'm
8    paraphrasing.  And also suggested the Court should consider
9    relevant evidence.  Of course I would do that.  So I guess
10   that would be a good opportunity for you to comment on what do
11   you think was missing in Bessent that's not missing in this
12   case.
13             MS. SWIFT:  Your Honor, there's four things:  The
14   first is the record regarding the unease that the affected
15   parties feel as a result of the privacy intrusion.  Judge
16   Richardson in his concurrence was careful to note that
17   intrusion upon seclusion is understood to guard not just
18   against the disclosure of sensitive information as such, but
19   specifically against the feeling of unease, when and where one
20   should be at peace.
21        The supplemental declarations that plaintiffs submitted
22   speak directly to this point.  The declaration of Ms. Conard
23   which is ECF-111-4 discusses SSA permitting DOGE to access her
24   sensitive information.  And I will read this into the record.
25   And this was a statement that originated with Ms. Conard.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1193

1      "SSA permitting DOGE to access the sensitive information

2   about me contained in their systems is a severe violation of

3   my trust and invasion of my privacy and person.  As a survivor

4   of sexual assault, I know what that feels like.  In the past

5   few months as I've watched Elon Musk and his DOGE team run

6   rampant at Government agencies, including SSA, I have felt an

7   eerie déjà vu."

8        That declaration standing alone I think is quite

9   powerful; but Ms. Conard is by no means individual with

10   respect to her characterization of the harm.

11        The declaration of David Gray which is at ECF-111-8

12   describes the information he was compelled to share with SSA

13   and that DOGE is now seeking access to as being almost like

14   his DNA.

15        And the declaration of Linda Somo which is ECF-111-6 says

16   that "This is a horrible feeling; almost like someone breaking

17   into my house and stealing stuff."

18        Nothing approaching those facts was in the record in the

19   *Bessent* case and so obviously the Fourth Circuit did not

20   consider it.

21           **THE COURT:**  Well, it seems much of their discussion

22   was about why Judge Boardman was wrong in relying on *Garey* and

23   drawing distinctions between *Garey* and *Krakauer,* if I'm

24   pronouncing it right.  And, if you will, suggesting that she

25   was, therefore, wrong to conclude on the basis of *Garey* that

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1194

11

1    the facts were akin to the tort of intrusion on seclusion.

2         So that seems to me to be where you should be focusing.

3         **MS. SWIFT:**  Thank you, Your Honor.

4         **THE COURT:**  And far be it for this Court to suggest

5    to the Fourth Circuit that they were wrong.

6         **MS. SWIFT:**  Of course not.

7         With respect to *Garey*, the case law there is very clear.

8    Defendants allege at some points that we are alleging a harm

9    that is just sort of passive access to plaintiffs' data.  I

10   think we allege more than that.  But even if we didn't, *Garey*

11   is explicit that obtaining the data, having a disclosure

12   impermissible and unlawful is fine as long as plaintiffs

13   allege that defendants are currently obtaining their personal

14   information, or will do so imminently.

15        So, for example, in *Garey*, the issue was that the way

16   that the parties got the data was through sort of one-off

17   events, car crashes.  And so it was unlikely that the specific

18   plaintiffs would again suffer disclosure of their information

19   to the defendants, unless they were in another car crash, that

20   car crash was reported by the same law enforcement officers,

21   et cetera.

22        Here, that's not the case at all --

23        **THE COURT:**  But, I mean, that isn't really --

24   respectfully, I don't believe that's what the Fourth Circuit

25   was talking about; nor do I believe that's what *Garey* was

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1195

1   talking about.  *Garey*, the issue was improper access to the

2   accident records.  And then I think in the opinion -- I was

3   looking for this.  Judge Motz wrote the opinion.  And I think

4   she mentions perhaps once that it was home addresses.  And

5   that the point was that these letters were intrusive and sent

6   to the people who were involved in these accidents to solicit

7   business.  And there's not a lot of emphasis by her of the

8   fact that it went to the home, but I think you can basically

9   infer that from what the facts are about what's contained on

10  the accident reports:  Names and home addresses.

11      And then she compared it to *Krakauer.*  And there's the

12  view I think of the panel majority that *Krakauer* was all about

13  the home.  It doesn't say -- again, I'm interpreting; I'm not

14  quoting.

15          **MS. SWIFT:**  Yes, Your Honor.  And I do think there's

16  some inconsistency in the Fourth Circuit's approach which is

17  reflected in the concurrence of Judge King, joined by five

18  other judges.  I think if you read *Krakauer, O'Leary,* and

19  *Garey* together, while the most traditional analogs to the tort

20  of intrusion upon seclusion relate to in the home --

21          **THE COURT:**  Or even Judge Richardson says that's

22  really too narrow.

23          **MS. SWIFT:**  Exactly.  And *O'Leary* also says that it

24  doesn't need to be specifically within the home; that it can

25  be in other places.  And, of course, these judges are all

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1196

13

```
 1        citing the restatement.  And in the restatement we know that a
 2        person could suffer intrusion upon seclusion via their bank
 3        account or their wallet.
 4            And so here I think where we end up is that defendants,
 5        and perhaps some judges on the Fourth Circuit, are looking for
 6        a specific analog, that piece by piece maps onto --
 7                THE COURT:  It only has to be similar.
 8                MS. SWIFT:  Exactly.
 9                THE COURT:  Let me ask you this:  You don't talk
10        about this and maybe you don't know and we're only at the
11        early stages of the case if the case continues.  But one, as I
12        see it there are some very obvious differences between -- and
13        I'll be asking the Government this so they can start thinking
14        about their answer, but I think there are some very big
15        differences about the two cases.
16            One, do the other agencies have a steeped history of
17        respecting and protecting confidential information?  I mean,
18        that is the guiding principle of the Social Security
19        Administration since its inception in 1935.  Is that a
20        hallmark of the other agencies?
21            Another concern, and you can speak to this, would be that
22        these records or these systems I should say, include -- so
23        this is really going to be directed to both sides, in the case
24        of certain kinds of benefits, medical and mental health
25        records.  I didn't remember reading anything about that in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1197

14

```
 1    Bessent.  There may have been in student loans some personal
 2    information, but it seems to me that is a critical difference.
 3         And a third critical difference, this agency is involved
 4    with children and family records.  I didn't see that in
 5    Bessent.
 6         But I don't see where you really make much use of that.
 7    And the other thing you don't talk about is when an applicant
 8    for disability or some of these other types of benefits
 9    applies to Social Security, it's not a one-off.  You don't
10    mention this.  But I think the Court can take notice of the
11    process at Social Security which is -- I think it actually has
12    a name, continuing review or something.  I forget what it's
13    called.  But there's a process where the agency can require
14    you to verify that you're still disabled, for example, if
15    you're receiving disability benefits.  Which means the records
16    aren't stale.  They're current for those people who are being
17    asked to prove they're still disabled.
18         You don't talk about that, but to me these are important
19    distinctions from this case and Bessent.
20         My question is are the records that have been sought by
21    the, what I'll call the DOGE team, records that include
22    information about children and information about people with
23    disabilities where -- and Mr. Dudek makes this point in one of
24    his declarations.  Well, just because you have access doesn't
25    mean you're looking.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1198

```
 1              But the bottom line is, is the access to that kind of
 2       information part of the access that you claim has been
 3       provided here.  And if so, I see that and I'll be interested
 4       in the Government's response, is this a distinction between
 5       this case and Bessent.
 6              MS. SWIFT:  Yes, Your Honor.  I do think --
 7              THE COURT:  Yes, what?
 8              MS. SWIFT:  Yes, it is a major distinction with
 9       respect to the data that SSA seeks -- excuse me, that DOGE
10       seeks access to SSA pertaining to sensitive medical
11       information and families.
12              THE COURT:  Is it part of these records?  Which one
13       would have it, the SSR records?
14              MS. SWIFT:  The SSR, exactly.  The SSR, exactly.
15       The SSR includes Medicaid eligibility determinations and
16       alcoholism or drug addiction data, living arrangements, a
17       number of other diagnoses and treatments.
18              THE COURT:  Which one includes -- which category
19       includes for someone who seeks disability?
20              MS. SWIFT:  Disability would be through I believe
21       the Master Beneficiary Record.
22              THE COURT:  So if those records are produced, are
23       these kinds of things produced or made available I should say?
24              MS. SWIFT:  Yes.  If we look at the word
25       "disclosure" and we use that for what plaintiffs are seeking
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1199

1  here, yes.

2      As has been discussed many times before this Court, the

3  Government is not asking for limited access to these databases

4  or the data contained therein.  They have rejected the

5  standard practice of in the first instance, looking at

6  deidentified or anonymized data.  And so when they get access

7  to these systems -- and most of that access runs through the

8  Enterprise Data Warehouse, but not all of it, they have access

9  to every comprehensive piece of data contained therein.

10      Your Honor, I also appreciate that you raised the medical

11  records issue in *Bessent*.  And I can say that I have not read

12  every page of the administrative record in *Bessent*, but I have

13  read the District Court's opinions many times.  And --

14          **THE COURT:**  Well, that makes two of us then.

15          **MS. SWIFT:**  On my read, the District Court in

16  *Bessent* only ever refers to medical records or health when

17  quoting a statute about some other purpose.  So there's no

18  discussion of whether or not the systems at issue in *Bessent*

19  contain medical records and if they do, how that changes the

20  analysis.

21      As Your Honor knows, the Fourth Circuit has previously

22  recognized the right to privacy in these types of records.

23  That was in *Doe v. Broderick*.  It was in a Fourth Amendment

24  privacy context, but found an objectively reasonable privacy

25  interest in substance abuse treatment records.  Which as I

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1200

```
 1    mentioned, are exactly the type of records that are contained
 2    in the SSR.
 3         One of the other factual distinctions between this case
 4    and Bessent is with respect to the relationship between need
 5    and scope of access.  In Bessent, Judge Richardson questioned
 6    whether the DOGE affiliates' need as specified in the
 7    Executive Order was actually untethered.  He said on that
 8    point, more record evidence may be needed.  And here we have
 9    that evidence.  We have conflicting declarations from Acting
10    Commissioner Dudek.  We have conflicting and perhaps
11    conclusory explanations in the administrative record.  And
12    most importantly, we have a disconnection between what SSA
13    says DOGE is doing, key projects combating fraud and waste
14    versus what the Executive Order actually asks it to do.
15         We also have a disconnection between the actual projects
16    that SSA is representing it is using this data for, versus
17    reporting on what they are, in fact, doing with the data.  And
18    I understand that's a TRO compliance issue, but I do think it
19    speaks to the merits with respect to this connection between
20    need and scope of access.
21              THE COURT:  I've been pondering this because the
22    Court -- as we all know, the administrative record is a
23    crucial document.  I don't know what the Court is supposed to
24    do with an allegation that documents might say one thing and
25    there's something else actually going on.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1201

1          **MS. SWIFT:**  If I could address that, Your Honor.  We

2     haven't fully briefed this case yet given the fast-breaking

3     developments, but I think the case that's most instructive is

4     the *Department of Commerce v. New York*.  That's 588 U.S. 752

5     from 2019.  And that is an APA case, but I think it's

6     instructive to all of the issues here.

7          In that case, the Supreme Court notes that of course

8     Courts are generally limited to evaluating an agency's

9     contemporaneous explanation --

10          **THE COURT:**  And that was going to be my question

11     when we got to it.  I have this one for both sides as well

12     which is, what does the Court do with all of Mr. Dudek's

13     explanations?  Do I rely on those or do I look to what the

14     administrative record says?  So I'm giving Mr. Humphreys

15     advanced warning of another question, but I am puzzling about

16     that too.

17          I didn't mean to interrupt, but I just wanted you to know

18     that all of these thoughts are flooding my little brain up

19     here with what do I do with five affidavits from him or five

20     declarations explaining things that don't necessarily

21     correspond to what's in the administrative record.

22          **MS. SWIFT:**  Your Honor, I too have those thoughts

23     and I will preview that plaintiffs' view is that those are all

24     post hoc explanations that do not carry--

25          **THE COURT:**  The post hoc rationalizations.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1202

19

```
 1              MS. SWIFT:  Yes.  But back to the --
 2              THE COURT:  But then the law does say, I think, that
 3       the Court can -- a record can be -- for one, there can be
 4       experts that the Court could hear from.  I don't have any, but
 5       I could.  And, for example, I was hoping that Mr. Dudek would
 6       come today.  And the record should reflect that I did ask the
 7       Government to bring him because I think there are some --
 8       there is some confusion in some of these affidavits both as
 9       one against the other and then vis-à-vis the record.  And I
10       thought it would be helpful if he could explain.  But the
11       Government advised last night he's not going to appear.  Mr.
12       Steffensen is here, but I don't know that he can speak for Mr.
13       Dudek.  He didn't write those.
14          So I'm very much aware of this conundrum and I'm trying
15       to figure out how I sort it out.
16              MS. SWIFT:  I understand, Your Honor.
17          The way that the Supreme Court approached it in the
18       Department of Commerce was that yes, of course we know that we
19       are generally limited to the contemporaneous explanations and
20       comparison and in light of the administrative record.  But
21       that in certain situations, Courts can expand the record and
22       inquire into the mental processes of administrative
23       decision-makers when there's a strong showing of either bad
24       faith or improper behavior.  And the Court relies on Overton
25       Park for that.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1203

1          And I think that the facts of that case and the Supreme

2     Court's characterization of them are useful here.  The Court

3     recognized, of course, that an agency can come into the office

4     with policy preferences and ideas, talk with people about

5     those, work with staff attorneys, et cetera.  But the Supreme

6     Court says that we have to look at all the evidence as a

7     whole.

8          And in Department of Commerce, the Court concluded that

9     there was a substantial mismatch between the secretary's

10     decision and the rationale provider, and that the story didn't

11     match the secretary's explanation for its decisions.

12          The Court recognized that, of course, agencies can have

13     multiple reasons for doing something and some may be stated,

14     some may be not.  But when you look at the full scope of the

15     evidence, and in that case they determined that the rationale

16     seemed to be contrived.

17          I do think that that case may have some relevance here,

18     specifically with respect to the circumstances of Mr. Dudek's

19     promotion to Acting Commissioner with respect to the actions

20     that led to him being placed on administrative leave before

21     that promotion, and with his approach to getting access for

22     DOGE team members immediately after that promotion.

23          I think also -- and again, not to harp on the more recent

24     reporting, but I was struck that if you look back through the

25     records that the Government has provided for Employee 7, there

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1204

21

```
1    are many references to needing to work with death data.  They
2    referred primarily to updating it or working on ways to
3    improve its accuracy.
4        What the New York Times reports is that Employee 7 used
5    the data, excuse me, used the access that he gained based on
6    those explanations to, in fact, introduce inaccurate records
7    into the death master file in facilitation not of a Social
8    Security Administration purpose, but at the minimum, a USCIS
9    purpose.  And I think more broadly, a political purpose
10   originating with the White House.
11           THE COURT:  So what are you telling me?  Are you
12   saying that Mr. Dudek's declarations are asserting the need
13   for the access to the death data files I'll just say are
14   inaccurate?
15           MS. SWIFT:  Yes, Your Honor.
16           THE COURT:  Or could it be that's one reason, but
17   there's more than one reason, as you said before.
18           MS. SWIFT:  I think that that is an example of why
19   further discovery or perhaps questioning of Mr. Dudek would be
20   helpful.  But there is actually no evidence in the record of
21   the data being used that way.  And so --
22           THE COURT:  Of which way?
23           MS. SWIFT:  Of Employee 7's access to the data that
24   he sought being used to improve accuracy of the death file or
25   to work on systems to improve that accuracy.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1205

1          **THE COURT:**  Okay.

2          **MS. SWIFT:**  While we're on that topic, Your Honor, I

3     would like to note that the recent reporting -- and again, not

4     with respect to TRO compliance, but with respect to the issue

5     before us today, I think is relevant to a couple different

6     aspects of the case.

7          The first is the irreparable harm inquiry.

8          **THE COURT:**  Yes.  I wanted you to speak about that

9     because Judge Richardson suggested that the burden required

10    the plaintiffs in *Bessent* to be highly likely to succeed on

11    the merits, if my memory is correct.  And there was no case

12    cited for that assertion, but I didn't think that was the

13    standard.  Now I have to consider is that the standard.

14    That's what he said.  Something like that, anyway.

15         **MS. SWIFT:**  Sure.  Plaintiffs share your confusion

16    and I think that other recent Fourth Circuit cases are more in

17    line with the standard as we understand it.

18         I think that Judge Richardson's mathematic probabilistic

19    approach to likelihood of success would swallow the Fourth

20    Circuit's clear instruction that plaintiffs do not have to

21    establish a certainty of success to obtain a preliminary

22    injunction.

23         Regardless, I would note that the scope of our claims

24    here is much broader than the scope in *Bessent*.  So even if we

25    were going to adopt this probabilistic mathematics-based

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1206

23

1    approach, plaintiffs here would stand a much higher chance of

2    meeting their burden than did the plaintiffs in *Bessent*.

3              **THE COURT:**  Can you repeat that?

4              **MS. SWIFT:**  Sure, Your Honor.  Judge Richardson's

5    mathematical probabilistic approach depends in part on the

6    different claims that are brought.

7         Here, plaintiffs bring more claims than did the

8    plaintiffs in *Bessent,* or at least that reached the Fourth

9    Circuit in *Bessent*.  And so as a matter of math, and I agree

10   with Your Honor that this approach is distinct, if the

11   plaintiffs were to succeed on a number of their claims here

12   and then it were to go up to the Fourth Circuit, and I think

13   the Court would be more likely to find -- plaintiffs would be

14   more likely to demonstrate likelihood of success just, again,

15   as a matter of mathematics.

16             **THE COURT:**  Okay.  I wanted to ask you about --

17   assuming the Court can consider these declarations of Mr.

18   Dudek, and remembering that Judge Agee said the Court should

19   consider relevant evidence, in ECF-74-1, it's the affidavit of

20   March 28, 2025.  Just to illustrate referring to paragraph 8,

21   Mr. Dudek says that Employee 8 plans to work with non-DOGE

22   team SSA employees in order to retrieve anonymized aggregated

23   data for the Fraud Detection Project.  In order to look for

24   anomalies that may be indicative of fraud, Employee 8 needs

25   access to discrete individual data only when anomalies are

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1207

24

```
 1      identified in order to detect fraud in specific instances.

 2           And isn't that what you are asking for?  Because there,

 3      as I've understood it, and if you go through that

 4      administrative record and I know of course you have, there's

 5      some very interesting information in there, including the

 6      Least Privilege, the separation of duties.  These are

 7      important principles it would seem to the agency.  And that

 8      includes as I've understood it, that basically there's a sort

 9      of an approach of one step at a time.  You don't get

10      everything and one person doesn't get everything.  What you

11      get is as the statute says, there has to be a need, the

12      Privacy Act.  But even then it's the -- when you need

13      something, it's not necessarily the kitchen sink; it's maybe

14      the sponge or the Brillo pad.  Because -- and he says as much.

15           So isn't this what you were hoping and asking for?  Isn't

16      this what you want?  Why would I reject this?

17           MS. SWIFT:  As a general matter I think yes, that is

18      part of what plaintiffs want.

19           THE COURT:  I mean, I may have cherry-picked, but

20      that paragraph is here.

21           MS. SWIFT:  Yes.  And I think that that is important

22      and what the SSA leadership tried to do in the first instance

23      upon DOGE's arrival.  I only say in part because of the other

24      agency policies that SSA has sort of laid ways to with respect

25      to suitability, to access data in the first place.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1208

1      I would also note that that explanation of need was, of

2   course, preceded by Your Honor's questioning and represented a

3   substantive change from what defendant Dudek previously

4   represented about how Employee 8 could go about their duties.

5      And I will also note that Employee 8's hiring agreement

6   which is at pages 72 to 75 of the administrative record is

7   extremely narrowly tailored to IT and tech modernization.  It

8   mentions software engineering, debugging, and IT projects

9   including infrastructure.

10      So taken as a whole, I do think it's fair to make the

11   inference that the statements of need proffered for Employee 8

12   and perhaps the statements of defendant Dudek about why that

13   need is necessary don't seem consistent or particularly

14   compelling.

15      **THE COURT:**  But would I be correct that if

16   anonymized data is made available, that you wouldn't have an

17   objection to that.  And if as a result of the access to

18   anonymize data, anomalies across the board at any of the three

19   projects that Mr. Dudek mentioned, the Are You Still Alive

20   Project -- I mean, he argues elsewhere in his various

21   affidavits that anonymization is not feasible.  But assume for

22   the moment he identified three projects: The Death Data

23   Cleanup, the Are You Alive Project and the Fraud Detection

24   Project.  And if, in fact, SSA makes available anonymized data

25   from which if anomalies are detected access on a more specific

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1209

```
 1    basis is then provided, that's the way the agency is supposed
 2    to work, isn't it?  It's never been my understanding that the
 3    employees of Social Security don't have access across the
 4    board ever to non-anonymized data.  We know that's not so and
 5    they can't function that way.
 6         MS. SWIFT:  I agree, Your Honor.  And I think that
 7    that is exactly what plaintiffs have been saying all along.
 8    It's what Ms. Flick and Ms. Escobar-Alava discussed in their
 9    declarations.  And it is reflected in the principles that you
10    referenced throughout the administrative record.
11         Again, I think there are two issues here which is
12    anonymization of data -- and I agree that the approach that
13    you described is the ideal approach and is in keeping with
14    standard agency practice.  But also, who gets access to the
15    systems in the first place.
16         THE COURT:  And who what?
17         MS. SWIFT:  Who gets access to the systems and the
18    data in the first place.
19         And with respect to Employee 8 -- I'm so sorry; I'm just
20    checking my notes.  His background check I believe was not
21    finally adjudicated as of March 27th.  And his SSA and OPM
22    detailing agreement has never been signed.  And that goes to I
23    think in particular, plaintiffs' arbitrary and capricious
24    claims because those are both contrary to long-standing SSA
25    policies and procedures.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1210

27

```
 1          THE COURT:  So Employee 8 may under your scenario,

 2    may not be the appropriate employee.  But generally, if SSA

 3    has put in place a system of making available only anonymized

 4    aggregated data for review in order to look for these

 5    anomalies indicative of fraud and only when there are

 6    anomalies will it seek discrete individual data; is that a

 7    problem?

 8          MS. SWIFT:  No, Your Honor.

 9          THE COURT:  Okay, I didn't think so.  And that's

10    what he says.

11          MS. SWIFT:  It is what he said after your prompting.

12      I do think it is worthwhile to note that he said that far

13    after the decision point, the final agency action in this

14    case.  And so while I am glad that defendant Dudek reached

15    that conclusion, it should have no bearing on whether or not

16    the Court grants this Preliminary Injunction.  At this point

17    the Temporary Restraining Order is what is making defendant

18    Dudek tether and narrow access in that way.

19          THE COURT:  If the Court makes a ruling that

20    conforms with what Mr. Dudek says the agency is going to do

21    and the agency does something different, I obviously would not

22    know necessarily that that's what's happening.  But this

23    seemed to be a turnaround, I do think that, from the way it

24    was originally presented to me.  And why there's a turnaround

25    I don't know.  I mean, you have your reasons of suspecting
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1211

```
 1    why, but I obviously do not know.

 2         What I have been told, though, may well be a post hoc

 3    change of plan, but there it is.  And if it conforms with the

 4    law, that's my concern.

 5              MS. SWIFT:  I agree, Your Honor.

 6         I would note that I think there was actually another

 7    turnaround that followed that one.

 8              THE COURT:  Okay.

 9              MS. SWIFT:  In Docket 80-1, another declaration from

10    Mr. Dudek with respect to Employee 8, he describes --

11              THE COURT:  Let me get to 80-1.  Okay, that's April

12    1 of 2025.  And what are you referring to?

13              MS. SWIFT:  He describes in paragraph 5 the

14    deidentification of data as impractical and acts to result in

15    the removal of information relevant to the SSA DOGE team's

16    analysis.

17              THE COURT:  So was this in connection with the fraud

18    detection or some general statement?  I'm looking at it.

19              MS. SWIFT:  I believe it is in connection with the

20    fraud statement.  One moment.

21              THE COURT:  I thought this was part of the Death

22    Data Cleanup, but I could be wrong.

23              MS. SWIFT:  I think that this statement actually is

24    general with respect to data access across the agency.  I

25    apologize.  And so despite saying what he did about Employee 8
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1212

 1   in his second declaration on the topic, here a little bit

 2   later Mr. Dudek returns and says, deidentification of large

 3   data sets is impractical and was -- would result in the

 4   removal of information relevant to the DOGE team's analysis.

 5       I can talk about why the evidence shows that that is

 6   incorrect.  But for purposes of this conversation, I do think

 7   it's worth noting because of Your Honor's point that while

 8   defendant Dudek did sort of have a turnaround and reach the

 9   conclusion that plaintiffs, for example, would consider

10   appropriate, lawful and in line with SSA practice and

11   policies, it is --

12           **THE COURT:**  I guess I'm trying to understand and I

13   didn't mean to interrupt you and this will also be a question

14   for Mr. Humphreys.  I'm struggling with what the problem is to

15   deidentify, a new word I learned.  Because I thought that the

16   way the agency always operated was to do as much as possible

17   on a broad scale by anonymization.

18       Obviously in the field, or I don't know what terms the

19   people who work at SSA would actually use, but the front

20   office people, the frontline people.  A woman comes in and

21   says hey, you just declared me dead and I'm really here and

22   alive.  You have to go into that person's record, obviously.

23   You're going to -- that's not going to be anonymous.  But that

24   doesn't have anything to do with a search of the records of

25   all Americans.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1213

1          So I'm trying to understand what is it that the agents --

2     this is why I thought it would be helpful if Mr. Dudek had

3     come here and tell me.  When the agency is trying to do a

4     death data cleanup, exactly what requires this broad,

5     seemingly unfettered access to this Numident, MBR and SSR

6     records, et cetera.  And then there's this complaint that it's

7     impracticable.  But what is it that we're doing that needs all

8     of that information?  That's the part that hasn't really been

9     made clear to me yet.  But Mr. Dudek isn't here.

10          **MS. SWIFT:**  I suffer from the same confusion and I

11     think that the record evidence is clear that deidentification,

12     anonymization, et cetera, is, in fact, possible and that the

13     agency often uses it.

14          And with respect to sort of the scope that Your Honor was

15     just mentioning, I'd refer the Court to the second

16     supplemental declaration of Ms. Flick which is at docket

17     111-11.

18          And I would note that in their response, defendants sort

19     of characterize Ms. Flick as a disgruntled former employee.

20     And I'll just note for the record that she was Chief of Staff

21     to the Acting Commissioner when she retired and she has nearly

22     30 years of experience at the Social Security Administration,

23     including in senior roles, including in the CIO's office which

24     is particularly relevant to the issues before the Court.

25          At paragraph 6 and 7 of Ms. Flick's declaration, she

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1214

1    discusses the way that the Office of Analytics review and

2    oversight.  And its Office of Program Integrity ran before the

3    arrival of DOGE.  And in paragraph 6, she explains what I

4    think is sensible practice, which is that the analytics team

5    which is comprised of data scientists, statisticians,

6    engineers, looks for patterns and so they don't need access to

7    granular information and they don't use it.

8        They look for patterns by using structured query

9    languages and they might return, for example, a list of Social

10   Security numbers associated with birthdates before 1920, not

11   associated with any other information.

12       The certified fraud investigators are a completely

13   separate part of that process.  And they need more specific

14   information.  So for example, to examine an instance of direct

15   deposit fraud, Ms. Flick says of course they would need to

16   review specific data on an individual's MBR record, like the

17   history of changes to their routing number.

18       But there are very few instances, probably none that I

19   can think of where deidentifying data, using anonymized data

20   or providing access to less granular data in the first

21   instance is not workable and in keeping with the agency's need

22   to know and Least Duty Principles.

23           THE COURT:  Okay.  What didn't I ask you that you

24   wished I had so you could tell me?

25           MS. SWIFT:  I'd like to just touch on the merits of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1215

1    the Privacy Act claim a little bit.  I know that we've talked

2    about need, but I wanted to point the Court as you're very

3    much aware of the Appendix A to the Social Security regulation

4    Section 401 that puts color on the Privacy Act's definition of

5    need.  There it says an employee who has a legitimate need to

6    know the record in the --

7            **THE COURT:**  I'm sorry, what were you citing?

8            **MS. SWIFT:**  It's 20 CFR Section 401, Appendix A,

9    Subsection (d)(1).

10           **THE COURT:**  Thank you.

11           **MS. SWIFT:**  Limited to an employee who has a

12   legitimate need to know that specific record in the course of

13   their official duties.

14       Similarly, the Privacy Act exception that defendants

15   routinely point to at Section (b)(1) permits disclosure to

16   those officers and employees of the agency who have a need for

17   the record in the performance of their duties.

18       As I mentioned before, I think there's still outstanding

19   questions about whether Employee 5 and Employee 8 are, in

20   fact, employees within the meaning of the Privacy Act and SSA

21   regulations.

22       We discussed Employee 5 -- I'm sorry, we discussed

23   Employee 8.  Employee 5 is purporting to be a detailee from

24   DOGE itself; but the Government's counsel in the TRO hearing

25   said quite emphatically that the Government does not concede

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1216

33

1    that DOGE is an agency and was invited to qualify that

2    statement and did not.  So in a world where the Government

3    says that DOGE is not an agency, Employee 5 cannot be detailed

4    to Social Security Administration.  And that's as of course

5    Your Honor knows, because of the Economy Act.

6            **THE COURT:**  But I didn't agree with the Government.

7            **MS. SWIFT:**  Well, there is that.

8        I'd also note, Your Honor, that the Government engages in

9    sort of a two-step process to try and justify what they're

10   doing under the Privacy Act.  The first is with respect to

11   exception (b)(1).

12       The second is with respect to the routine use exceptions

13   in this System of Records Notice, the SORNs for the relevant

14   systems.  The Government didn't include any of those SORNs in

15   the administrative record.  And so in addition to the fact

16   that the routine use exception plainly does not apply

17   certainly to anyone who is an employee.  And for anyone who is

18   not an employee as we discussed at the last hearing, likely

19   not there either.  Any reference to the routine use exception

20   in this case given the administrative record that the

21   Government has put before the Court I think would be rightly

22   excluded as a post hoc justification.

23           **THE COURT:**  Okay.

24           **MS. SWIFT:**  Thank you.

25           **THE COURT:**  Thank you.  You'll have your right of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1217

```
 1    rebuttal.  Thank you.
 2         Mr. Humphreys. We should start with what is your
 3    position, is DOGE still an agency?  Is it still that DOGE is
 4    not an agency or is it an agency?
 5              MR. HUMPHREYS:  Thank you, Your Honor.  Our position
 6    has not changed on that point.
 7              THE COURT:  So DOGE is not an agency.  If DOGE is
 8    not an agency, tell me about Employee 5.  How is Employee 5
 9    detailed to SSA?
10              MR. HUMPHREYS:  Our argument is that under the
11    Economy Act of 1934, DOGE is an instrumentality, which is
12    broader than agencies, and therefore still may detail within
13    the scope of that statute.
14              THE COURT:  So tell me what authority you have for
15    that.
16              MR. HUMPHREYS:  The definition's portion of the
17    Economy Act of 1934 defines agency as -- I don't have that
18    specific language in front of me, but agency and
19    instrumentality of the Executive Branch.
20              THE COURT:  You're saying -- but what makes DOGE an
21    instrumentality is the question.
22              MR. HUMPHREYS:  It's a component of EOP.  It is not
23    an agency.  It is an instrumentality of the Executive Branch.
24              THE COURT:  So you have to go slowly for me because
25    you didn't brief any of this.  I'm trying to make sure I have
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1218

```
 1      everything down that you say.
 2          So your argument is DOGE is not an agency, but it is an
 3      instrumentality and an instrumentality is even broader than an
 4      agency.  And your cite for that is the Economy Act of 1934.
 5      And I'm asking you what provision.  Give me a cite so I'll
 6      look it up when we're done.
 7               MR. HUMPHREYS:  We have not briefed that, Your
 8      Honor.  You're correct.  Your opinion cites the Economy Act, I
 9      believe.
10               THE COURT:  No, I know that, but I did not argue for
11      your side that it was so-to-speak an instrumentality.  I said
12      it qualifies as an agency.  So I never got into this point and
13      I'm doing it for the first time today.
14               MR. HUMPHREYS:  Yes, Your Honor.  You made a ruling
15      in your TRO opinion obviously -- I can point you to it.  It is
16      the definition section of the same title of the United States
17      Code where there is a definition of --
18               THE COURT:  Okay.  And what section is that?
19               MR. HUMPHREYS:  I do not recall off the top of my
20      head.  The parties have not briefed that, Your Honor.
21               THE COURT:  Is there any Court, to your knowledge,
22      that has concluded that DOGE is not an agency?
23               MR. HUMPHREYS:  Not to my knowledge, Your Honor.
24               THE COURT:  It has been raised because I cited that
25      in my TRO opinion that this issue was presented to other
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1219

```
 1    Courts and all of those Courts rejected it.
 2              MR. HUMPHREYS:  Yes, Your Honor.
 3              THE COURT:  And I basically relied on those rulings
 4    to reach the same conclusion.
 5              MR. HUMPHREYS:  Yes, Your Honor.  Our legal argument
 6    is set forth in the Judge Bates decision in that case and I
 7    would refer the Court to that.
 8              THE COURT:  He rejected your view, right?
 9              MR. HUMPHREYS:  That's correct, Your Honor.
10              THE COURT:  Okay.  So under your analysis, DOGE is
11    an instrumentality and therefore Employee 5 is properly
12    detailed to SSA.
13              MR. HUMPHREYS:  That's correct.  I do want to
14    clarify my statement about Judge Bates.  He in a Temporary
15    Restraining Order context included some language questioning
16    whether or not DOGE falls within the definition of an
17    instrumentality as opposed to an agency.  I don't believe he's
18    definitively ruled on that and there has been ongoing
19    discovery in that case because the Economy Act issue is more
20    squarely presented there.
21              THE COURT:  Okay, well thank you.
22              MR. HUMPHREYS:  Yes.
23              THE COURT:  Okay, so I didn't give you a chance to
24    get started.  Why don't you take it from there.
25              MR. HUMPHREYS:  I think the Court is probably
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1220

```
 1    unsurprised that I will start with standing and the Fourth
 2    Circuit's panel decision.
 3         What did not come up in your discussion with plaintiffs'
 4    counsel, Your Honor, is I think the extraordinary step which
 5    even Judge Wynn called it in his dissent that the panel
 6    decision was reviewed for initial en banc consideration and
 7    the Fourth Circuit decided not to overturn the panel's --
 8              THE COURT:  Was that 8 to 7, I think?
 9              MR. HUMPHREYS:  You're correct, Your Honor.  That is
10    8 to 7.
11         I mean, the touchstone of the Court's analysis for a
12    Preliminary Injunction motion has to be are plaintiffs likely
13    to prevail in their case.  And that is plaintiffs' burden to
14    show.  And it's not just a preponderance of the evidence.
15    Plaintiffs must put forth a clear showing that they are likely
16    to prevail.
17         But, in Bessent as the Court is very well aware, which in
18    our view is substantially identical to this case in terms of
19    injury in fact, a majority panel of the Fourth Circuit has
20    already concluded that similarly situated plaintiffs lack
21    standing.  And so I think just if you -- I don't have a
22    crystal ball about what those 8 to 7 votes were, but if we're
23    talking about just likelihood, what is the information that
24    the Court has before it, I think the indication is that the
25    Eighth Circuit at least does not believe that plaintiffs'
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1221

```
1    allegation of a analog to the common law tort of intrusion

2    upon seclusion applies here.  And I'd also --

3              THE COURT:  So let's stop there for a moment.

4              MR. HUMPHREYS:  Yes, Your Honor.

5              THE COURT:  So essentially we have Judges Agee and

6    Richardson agreeing that the ruling of Judge Boardman fails on

7    standing because she was incorrect in finding that the tort of

8    intrusion on seclusion was a proper analog to the facts

9    alleged in Bessent.

10   Would that be sort of an accurate summary of what the

11   divided panel ruled?

12             MR. HUMPHREYS:  I think that's accurate, although I

13   think the same logic applies here, Your Honor.

14             THE COURT:  No, I understand that.  But I just want

15   to make sure we agreed on what that Court was saying in

16   Bessent.  Was that a fair summary?

17             MR. HUMPHREYS:  Yes, I think that's a fair summary.

18             THE COURT:  Okay.  So the tort of intrusion on

19   seclusion, I think that maybe Judges Agee and Richardson were

20   -- saw it a little differently.  I don't know if that's a fair

21   way to put it, but Judge Richardson wrote separately and he

22   didn't limit himself to just the issue of the tort.

23   Let's take some of what Judge Richardson had to say.  One

24   thing that he suggested was with respect to the District

25   Court's reliance on dicta in Chow 1 and Chow 2.  The Supreme
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1222

```
 1    Court Chow and the Fourth Circuit Chow which seemed to suggest
 2    -- at least this was the inference drawn and I think one that
 3    other judges have drawn, that for the Privacy Act, basically
 4    because there is no injunctive relief, the APA is a proper
 5    vehicle.  Would I be right to have said that?  Did I misstate
 6    anything?
 7            MR. HUMPHREYS:  I believe this is on the other
 8    adequate remedies argument.
 9            THE COURT:  Yes.  I was saying Judge Richardson
10    didn't just limit himself to the discussion of the tort of
11    intrusion on seclusion.
12            MR. HUMPHREYS:  Yes. There are other portions of his
13    concurring opinion, Your Honor.
14            THE COURT:  So I was just wondering, I mean, what's
15    a District Court to do when there isn't anything else out
16    there.  But their opinion also, it's unreported.  So if a
17    Court shouldn't adopt dicta, does that opinion carry any
18    weight for me?
19            MR. HUMPHREYS:  I see where you're going, Your
20    Honor.
21            THE COURT:  I was just wondering.  It begs the
22    question.  We look to dicta when there isn't anything else.
23    And I'm asking you, do you know of any opinion that says more
24    about what I just identified than the two Chow cases, for
25    example?  Or any case that says the opposite of what was the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1223

```
 1      construction of those two footnotes in the two Chow cases.

 2      It's both of them are in footnotes.  Footnote 1 for the

 3      Supreme Court and I think footnote 17 or 18 -- 17 I think for

 4      the Fourth Circuit opinion.

 5              MR. HUMPHREYS:  Well, I would note that even though

 6      it is Judge Richardson's decision or opinion, portion of the

 7      opinion, it is also joined by Judge Agee and vice versa.

 8      Judge Richardson joined Judge Agee's concurrence.

 9          On the issue of other alternate remedies in which the

10      discussion of the two Doe v. Chow cases come up, yes.  We

11      recognize there is that dicta in the Fourth Circuit and the

12      Supreme Court.  We have preserved the argument.  But as Judge

13      Richardson notes, that is more of an issue for the first

14      impression for the Court of Appeals.

15              THE COURT:  And I was just unable to find anything

16      that would controvert Judge Boardman's construction of those

17      two paragraphs.  Although they are dicta, again, I wasn't even

18      able to find anything more specific than those two footnotes.

19      So I was asking does the Government have a case to cite to me

20      that would support the view that somehow the interpretation of

21      the paragraphs, for example, was at odds with some case that

22      came out a different way?  I don't know of one and I'm

23      wondering if you know of one.

24              MR. HUMPHREYS:  I don't have anything directly on

25      point, Your Honor.  I do think it's a question of going back
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1224

```
 1        to first principles.  As we explained in our brief on the
 2        issue of other adequate remedies, we think that Congress, both
 3        in the Privacy Act and in the Internal Revenue Code has set
 4        out a specific statutory structure and I suspect we would
 5        pursue that argument on appeal.
 6             THE COURT:  Okay.  I didn't read the parties' briefs
 7        in that case, so I only read Judge Boardman's opinion and the
 8        Fourth Circuit opinion.  So --
 9             MR. HUMPHREYS:  I don't believe it was squarely or
10        at least not extensively addressed, Your Honor.  Of course the
11        Fourth Circuit has ordered expedited briefing in the Bessent
12        case.  I believe the hearing is scheduled for May 5th, so we
13        may get some further developments soon.
14             THE COURT:  Okay, that's helpful.  Thank you.
15             MR. HUMPHREYS:  Back to the issue of standing.  I do
16        think it's also worth noting, again, looking at likelihood of
17        success, that Judge Vargas as in the SDNY opinion -- excuse
18        me, court case also addressing DOGE data team access recently
19        partially lifted --
20             THE COURT:  Yes, I saw that.
21             MR. HUMPHREYS:  I think that in our view shows which
22        way these cases are trending, in addition to, of course, the
23        Fourth Circuit indications that we've discussed.  And I think
24        when looking at are plaintiffs ultimately likely to prevail,
25        we do not think they are and we think that should end the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1225

42

1    Court's analysis.

2         **THE COURT:**  Well, she had a sort of, a very narrow I

3    thought ruling, that in terms of maybe I'm not remembering

4    correctly, one category that there was -- she basically I

5    think allowed the access.  Would that be accurate?

6         **MR. HUMPHREYS:**  It was with respect to a single

7    individual who had gone through specific training.

8         **THE COURT:**  Right.

9         **MR. HUMPHREYS:**  That's correct.

10        **THE COURT:**  It's just very limited is the way I

11   understood it.

12        **MR. HUMPHREYS:**  That is true and we would not

13   necessarily sign onto everything in Judge Vargas' opinion.

14   Certainly we have our disagreements, but she has allowed a

15   DOGE data team member to have access to the treasury systems

16   in that case.

17        Going back to the -- I think specifically Judge Agee's

18   discussion of standing -- well, my colleague has a point for

19   me to make which I'll go ahead and make.

20        Plaintiffs have tried to draw distinctions between this

21   case because of the sensitivity of Social Security records and

22   it sounds like the Court is interested in that.  We don't

23   think that materially distinguishes this case from *Bessent*.

24   We acknowledge they're not exactly the same sorts of

25   disability information, but there are very sensitive records

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1226

43

```
 1    in Treasury, OPM, and Education systems of records also.

 2         Just an example, at OPM it includes the personal

 3    employment history of every federal employee.  Some of that

 4    includes disciplinary actions, it includes family member

 5    information for the purposes of --

 6              THE COURT:  Family what?

 7              MR. HUMPHREYS:  Family member information for the

 8    purposes of insurance coverage.  And so I don't think that it

 9    is reasonable to draw a distinction that the Court --

10              THE COURT:  Are there medical record?  Are there

11    mental health records?  Are there addiction records?  Are

12    there family court records?

13              MR. HUMPHREYS:  I'm not aware of those specifically,

14    Your Honor.  But certainly the plaintiffs in *Bessent* --

15              THE COURT:  And are there children involved?  That

16    could be for insurance.

17              MR. HUMPHREYS:  There are children involved in

18    insurance.

19              THE COURT:  Any beyond naming them as a covered

20    person for insurance?

21              MR. HUMPHREYS:  Not that --

22              THE COURT:  In other words, the child is -- in my

23    understanding of Social Security, a parent dies, for example,

24    and the child has not yet reached the age of 18.  There would

25    be possible eligibility for Social Security benefits based on
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1227

1    the fact of the deceased parent.  So information has to be

2    provided.  Is anything like that provided in any of the

3    records for Treasury, OPM, or Education?

4         **MR. HUMPHREYS:**  Not that specifically, Your Honor.

5    I would say that the plaintiffs in the *Bessent* case would make

6    a very full-throated argument that the information in those

7    records is particularly sensitive.

8         **THE COURT:**  Sure.  I get it.  That was their

9    argument.  But that was largely, as I understood it,

10   pertaining to financial things which is only a part of what

11   we're talking about here is all I was trying to ask you.

12      So the overlap would be on the financial side.

13        **MR. HUMPHREYS:**  Well, I think there's also overlap

14   on not maybe specifically the sort of medical information

15   you're talking about, but certainly disciplinary records of

16   federal employees I think are sensitive.

17        **THE COURT:**  Yes, they're sensitive.  But again, it

18   sounds to me like really the overlap concerns financial

19   material, financial related to earnings, work history, that

20   tax information.  And the one thing you've pointed out that

21   isn't in this case, to my knowledge, would be disciplinary

22   records.

23        **MR. HUMPHREYS:**  Those would also include

24   descriptions of misconduct, I believe.  They could be quite

25   sensitive, Your Honor.  I would not characterize them as

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1228

45

```
1    limited to financial information.
2         THE COURT:  Okay.  So with the exception of
3    disciplinary records, is there anything that's not financial
4    in the case before Judge Boardman?
5         MR. HUMPHREYS:  I'm not confident enough to say
6    everything that's in those systems here today, Your Honor, but
7    I think our point is just there is also very sensitive
8    information in those files.
9        But I think the focus on the specific type of information
10   contained --
11        THE COURT:  Can I ask you one other thing while
12   we're on the topic?
13        MR. HUMPHREYS:  Of course.
14        THE COURT:  Does OPM, or Education, or Treasury
15   publish on its website, for example, the importance of
16   confidentiality and protection of records as one of its
17   hallmarks?  Is that something that's sort of integral to the
18   -- I want to say the defining kind of characteristic of the
19   agency in the way that the public perceives Social Security?
20        MR. HUMPHREYS:  I don't know off top of head what
21   those three agencies have.
22        THE COURT:  Is there anything like what I was just
23   describing for those agencies?
24        MR. HUMPHREYS:  I don't have those in front of me,
25   Your Honor.  However, I would say that the history of the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1229

```
1    agency, even if the Court draws a distinction between Social

2    Security and those other agencies, is not in our view relevant

3    to whether or not the plaintiffs themselves have suffered a

4    concrete injury, which is necessary under *Clapper* and

5    *TransUnion*.

6         I will say, Your Honor, again with a little help from my

7    colleagues, that the OPM system does include a system on

8    employee medical file system records.  So there's medical

9    information in OPM files.  If the Court wants further

10   information about what those specific files in the *Bessent*

11   case involved, we're happy to dig that up and give it to you.

12             **THE COURT:**  Okay, thank you.  Were they involved in

13   the *Bessent* case at all?

14             **MR. HUMPHREYS:**  OPM is a defendant in the *Bessent*

15   case.

16             **THE COURT:**  No, I know that.  The medical files.

17             **MR. HUMPHREYS:**  I believe that the system access in

18   the *Bessent* files was also broad and would cover those files.

19        And so going back to Judge Agee's concurrence, again

20   joined by Judge Richardson, I think the distinction to draw is

21   not so much what type of information is at issue, whether or

22   not there are medical files or otherwise, but what the

23   intrusion is.  What is the type of activity?  What is the

24   intrusion upon seclusion?

25        And as I read the panel's decision, Judge Agee explained
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1230

47

```
1    looking at O'Leary and the Garey case and also pointing back
2    of course to Krakauer which the Court mentioned, that there
3    has to be something like an intrusion into the home.  And I
4    think if you look at those cases --
5         THE COURT:  Well, Judge Richardson doesn't agree
6    with that.
7         MR. HUMPHREYS:  I agree that Judge Richardson's
8    description is slightly broader, but it's not just unease
9    which I think would be inconsistent with the Supreme Court's
10   decision in TransUnion.  I mean, certainly I would hazard to
11   guess that the plaintiffs in TransUnion were quite ill at ease
12   when finding out that their records had been -- that they had
13   been marked as potential terrorists or drug traffickers.  But
14   the Court still found no standing without something more,
15   without a disclosure in that case.
16      Judge Richardson talks about unease --
17        THE COURT:  I mean, he says, to be sure the examples
18   show intrusion upon seclusion can occur beyond the confines of
19   the home and the Government overreaches when arguing for such
20   a limited understanding of the tort.
21        MR. HUMPHREYS:  Yes.  He does say that, Your Honor.
22   But he also goes on to say that the unease -- but intrusion
23   upon seclusion has long been understood to guard not against
24   the sensitivity of information as such, but against the
25   feeling of unease when and where one should ideally be at
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1231

1    peace.  And our view in this case, Your Honor, is that SSA has

2    given its own employees for its own purposes, access to its

3    own systems.  And it is appropriate within the rights of the

4    agency and managing the Executive Branch to do so.

5         And so I think the when and the where there is important.

6    The plaintiffs in this case or their members do not have a

7    reasonable expectation that new employees will be going into

8    their files.  Indeed, as we put in our opposition to the TRO

9    motion, as Mr. Russo included in his declaration, there are 30

10   to 40 other employees within the agency who have similar

11   access to --

12        **THE COURT:**  Out of 57,000 people?

13        **MR. HUMPHREYS:**  We had this discussion before, Your

14   Honor.  I remember -- I mean, that is true.  This is a large

15   agency.  But as I pointed out previously, the line --

16        **THE COURT:**  Who are those 40 -- I don't mean by

17   name, but what category of people are we talking about?

18        **MR. HUMPHREYS:**  They are with -- I don't have that

19   off the top of my head.  They are I think within the policy

20   staff of the Social Security Administration which would be

21   sort of similar in some sense to the --

22        **THE COURT:**  Does Social Security keep a record of

23   who accesses some of the information that we're talking about?

24   So they're still subject to the same restrictions as anybody

25   else.  If you don't have a need for the information, you just

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1232

```
 1    don't get a right to look at it.  Isn't that true?  I mean,
 2    just because you are one of those 30 to 40 people doesn't give
 3    you the right to start looking.  You have to have a reason, a
 4    need.
 5            MR. HUMPHREYS:  Well, that would be the same as to
 6    the DOGE team.
 7            THE COURT:  No, I'm not asking that.  I'm just
 8    clarifying that among those 30 to 40 people it doesn't mean
 9    they can come to work and decide to look up your records.
10    They have to have a need, right?  They're still subject to
11    that.
12            MR. HUMPHREYS:  I think there has to be a legitimate
13    job purpose.  Yes, Your Honor, sure.
14            THE COURT:  But 30 to 40 people out of the 57,000
15    would be eligible if there were a need to look.
16            MR. HUMPHREYS:  Sure.  But as Your Honor -- as we
17    discussed I believe last time, the front office staff -- not
18    front office staff, let's call it field office staff who are
19    out there as you described earlier interacting with the
20    public, I mean, they may also access anyone's records and they
21    only do so when a need comes in the course of their duties to
22    look at that specific person's file.
23        But that is the case here too.  They are granted broad
24    access, just like the DOGE team are.  And this case is a
25    challenge to access to data systems.  You know, if there's any
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1233

1     specific alleged misuse --

2          **THE COURT:**  Well, no.  You've just confused me

3     because to use that illustration, you go to the front office

4     and you say, I'm not dead; I'm alive and now I'm here.  Please

5     make sure you undo this designation.  And that field office

6     person would go into the record of the person who just showed

7     up to say, I'm not really dead; you've just caused a

8     catastrophe for me.  And they would work on that person's

9     record.

10         But that's not what you're talking about here.  We're not

11    talking about, at least as I understood it, an access on --

12    for a particular person when there's a need.  As I understood

13    it it's produce the records or make the records available,

14    provide access to all of the records.  And we think we need

15    everything.

16         Isn't that what the allegation is, essentially?

17         **MR. HUMPHREYS:**  Both sets of people have broad

18    access if they choose to.  Or they don't now because of the

19    TRO.  But, you know, in the field office example, the person

20    has broad access and in the course of their duties may go in

21    to search for a specific person, for example a person who

22    comes into the field office with a question.

23         The same access is available to the DOGE team.  But I

24    think this discussion just shows that their need is actually

25    broader because they're looking at systematic --

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1234

51

```
 1          THE COURT:  But I don't think it's comparable at
 2   all.  And I think that's just a mischaracterization of what
 3   the allegations are.
 4       If the DOGE team wants to look up a particular person's
 5   records because there's an anomaly or a concern, I don't think
 6   anybody is saying they can't do that.  That's not what they're
 7   asking to do.
 8       One of the very first pages in this administrative
 9   record, it's a form and I didn't bring that page out with me.
10   It's in the book; maybe I can find it.  That's the redacted
11   one.  Let me see.  They asked for access to all records.
12          MR. HUMPHREYS:  Well, right.  But the individual in
13   the course of his duties has to then go and do something in
14   the record.
15          THE COURT:  It sounds like Alice in Wonderland;
16   sentence first, verdict afterwards.  You want all the
17   information available and then you're going to tell us why.
18          MR. HUMPHREYS:  I dis --
19          THE COURT:  That's not the same as the field office
20   person who is presented with an individual with a problem and
21   that field office worker has a responsibility to sort out that
22   person's problem by going into the record of that person.  The
23   fact that if somebody else came in they could look at that
24   person's record too for the next person who has -- if there's
25   any offices to still go to, they would obviously be required
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1235

```
 1      and duty bound to do it.  But that's not the way I understood
 2      the facts here.  And if these facts are wrong, please tell me.
 3      But as I've understood them, the request was for access to
 4      everything.  And then we are going to do what we want to look
 5      through these records to figure out our Death Data update and
 6      Are You Still Alive Project and our Fraud Detection and use
 7      them as we see fit.
 8              MR. HUMPHREYS:  Both sets of individuals have broad
 9      access.  And it's a question of what they do in the systems
10      after they're granted broad access.  So in this case, I mean,
11      we should discuss at some point I want to respond to what the
12      Court should look for in considering the merits of plaintiffs'
13      claims, but Mr. Acting Commissioner Dudek explains in his
14      declaration at 62-1, that because Employee 1 and 9 are working
15      on individual cases and may be reaching out to individuals,
16      data anonymization would make it impractical for those
17      employees to conduct the Are You Alive Project.  So in the
18      course of the Are You Alive Project they identify, my
19      understanding, people who are of -- in the agency's records of
20      extreme old age.  And then when they see that there is a
21      person who may not, in fact, be alive, they go into the system
22      in a targeted way to look at those records to see if they can
23      corroborate SSA's data to determine if they are, in fact,
24      still alive.  So I think --
25              THE COURT:  Show me where that is.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1236

53

```
 1          MR. HUMPHREYS:  That's 62-1.

 2          THE COURT:  Okay, so we should talk about this too.

 3     Am I allowed to consider these?  Are these post hoc

 4     rationalizations that are not part of the administrative

 5     record and therefore, am I able to consider them?

 6          MR. HUMPHREYS:  These declarations were submitted in

 7     connection with compliance with the TRO, our notice to allow

 8     the agency and SSA DOGE team to continue with specific work.

 9     We don't think that they are properly before the Court for the

10     merits.  Although I can't point you to information in the

11     administrative record that says something similar, it's the

12     first thing I thought of.  The Court under the normal

13     administrative record rule should be limited to the

14     administrative record.

15          I mean, the Courts have said in APA cases that the Court

16     can look to declarations as relevant background information.

17     I think that's particularly in the case like this where there

18     is no actual final agency action.  It's not a rulemaking.

19     It's not an adjudication.  So the record is -- please, Your

20     Honor.

21          THE COURT:  No, no.  Go ahead.

22          MR. HUMPHREYS:  Is necessarily sparse.  But in

23     general, in terms of the merits as Judge Boardman did, the

24     Court should look at the administrative record itself.

25          THE COURT:  And now I have 62-1.  So which paragraph
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1237

54

1   did you want me to look at?

2           MR. HUMPHREYS:  I was reading, Your Honor, from

3   paragraph 9, although when it carries over to paragraph 4.

4           THE COURT:  Paragraph 9 though you said?

5           MR. HUMPHREYS:  Yes, Your Honor.

6           THE COURT:  Okay, let me just take a look.  So tell

7   me how this actually works.  It says they're working on

8   individual cases.  That makes sense.  Reaching out to

9   individuals, okay.  But the first part says that the project

10  is aimed at preventing improper payments and fraud waste and

11  abuse related to decedent identities.  So they need access to

12  Social Security numbers, demographics, benefit status, contact

13  information, among other fields to confirm if a person is

14  living or deceased.

15      And I guess this is where I get confused because how are

16  these individuals identified?  It struck me, and I apologize

17  for not following this very clearly which is again why I

18  thought Mr. Dudek would shed light on this for me, but I

19  thought that this project was one for which the request was

20  essentially access to the SSA records that pertained to not

21  just a sort of isolated group, but it wasn't as if from some

22  computer model that there had been Social Security numbers

23  identified that seemed to be suspicious for misuse, but rather

24  the access to Numident, MBR, and then other ones we had never

25  heard of until this affidavit, I think.  The PROME, the PCHIP,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1238

55

```
1      the PVIP, PVIPR schemas.  And that it wasn't sort of a
2      discrete access, it was full access searching for somebody who
3      might be involved in fraud.
4           MR. HUMPHREYS:  It is full access, Your Honor.
5      Similar to a field office representative.  And then when there
6      is a need for the job that the DOGE team is conducting, they
7      go specifically into the file system, the file of the
8      individual --
9           THE COURT:  Well, how is the need determined?  The
10     reason you know when a person goes to a field office, the need
11     is obvious.  I was just told I'm dead and that's not true.
12     I'm standing here before you.  Please help me go undo this
13     declaration that I'm dead and make it so I can still get my
14     Social Security benefits.  That's an obvious -- it's not
15     parallel to what you just used as an example.  Yes, that
16     worker in the field office has full access if you're telling
17     me so.  I have no reason to doubt it.  But the only record
18     that person is going to look at is the one from me because I
19     was just -- I just learned I'm dead and I'm really not and I
20     need you to fix it because you've crippled me.
21         That's not the same.  What you're telling me here is full
22     access.  Then what?  What happens after the full access?
23          MR. HUMPHREYS:  Your Honor, I think it is the same
24     because the DOGE individual in this case with respect to a
25     specific project --
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1239

1      THE COURT:  Okay, but what do they do with the full

2  access?  That's the part I'm still not getting.  Full access

3  has been provided.  Then what happens for this Are You Alive

4  Project?  What are they doing that they need full access?

5      MR. HUMPHREYS:  The best I can do, Your Honor, is in

6  the record at pages 12 to 13 where the -- I think it's called

7  the Proposal for Death Improvement Data 100 Plus in this memo,

8  but it's the same as the Are You Alive Project.

9      And so when they identify people who in the records have

10  a birthdate of an extremely high age, then they go into those

11  specific records and look at proof of life in other SSA files.

12      THE COURT:  Sure, that makes sense.  I would imagine

13  there's a computer program that produces for Social Security

14  everyone who is 100 years and older or 95 and older or 90 and

15  older or 110 and older.  That doesn't seem difficult.  And

16  then you're going to look at those.  I get that and that makes

17  sense to me.  I don't think that's what this says.

18      MR. HUMPHREYS:  I mean, the access is broad.  But

19  with respect to this specific project --

20      THE COURT:  I was just trying to understand what is

21  the -- I guess I was telling you in my illustration, you're

22  saying it's the same, the access is the same.  The field

23  office person has full access and they are getting full

24  access.  And I answered you by saying it's not the same.  The

25  full access, the field office employee has a job.  A person

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1240

57

```
 1    comes in with a complaint, a concern, an issue.  The field
 2    office person is limited to that person's look.  Yes, are they
 3    deputized to look at some other person's record if another
 4    person comes in?  Of course.  But what this is isn't that.
 5    This is give me the access and then I'm going to look and
 6    figure out what the problem is if there's a problem or no
 7    problem.  But you get the access first without anybody
 8    particularizing anything.  That's the way this looked to me.
 9    So I was asking you to please help me if that's not true.
10        How does this work is a very fundamental question.  I
11    can't really figure it out.  I don't know if this is like
12    double-talk or what, but it doesn't sound -- it doesn't make
13    any sense to me.  And so I was asking you to help me
14    understand the way this is supposed to work for this project,
15    for example, the Are You Alive Project, preventing improper
16    fraud and waste.  And the claim is they need all this access
17    and then they're going to reach out.  And I understand that
18    part.  But it sounded like at first you get the full access.
19    And somehow doing something you're eventually lead to some
20    people you may want to reach out to.
21             MR. HUMPHREYS:  This may help --
22             THE COURT:  I'm sorry, one last thing.  So why can't
23    some of that be anonymized?  Why is it that in order to get to
24    the part where you want to reach out to particular individuals
25    before you do that some of it -- the part that would be PII
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1241

 1  couldn't be anonymized, at least in some respect?

 2          **MR. HUMPHREYS:** Again, my understanding, Your Honor,

 3  is they only see the PII when there is a need tied to the job

 4  they're doing, just as the field --

 5          **THE COURT:** Okay, but it doesn't say that.

 6          **MR. HUMPHREYS:** Well, that may be. I mean, I think

 7  it is I think clear in the declaration that Mr. Dudek

 8  submitted that because Employee 1 and 9 are working on

 9  individual cases, they may be reaching out to individuals and

10  therefore, data anonymization would not be practical.

11          **THE COURT:** And I think that makes sense. I

12  understand that. If you're working on an individual case,

13  just like the field office person, you need to be able to

14  confer, converse, contact that person.

15          **MR. HUMPHREYS:** But that is the same as the field

16  office, Your Honor. I mean, I know you're not loving my

17  analogy. But I think under plaintiffs' reasoning that you

18  should only get -- the field office should only get access to

19  the system after the person walks in the door. Like I only

20  need access -- I only need access to that person's specific

21  data. So don't grant me access to things that I may not need

22  to see. But of course the field office person doesn't know

23  until the person walks in the door and that would be

24  impractical and we think that's a similar situation.

25          **THE COURT:** Impractical or inconvenient? I mean, is

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1242

1    that the test?  It's a little more effort?

2            MR. HUMPHREYS:  I think the test is -- well, there

3    are lots of legal problems with plaintiffs' claim, starting

4    with standing, final agency action, all of those.  I think

5    this sort of very granular analysis of what constitutes need

6    and sort of deciding which specific employees should have

7    access at this granular level would grind agency operations to

8    a halt.  And I don't think that is what is intended in the

9    Privacy Act, Your Honor.

10            THE COURT:  Can we go back to the standing for a

11   moment?  Because we didn't really exhaust that.

12            MR. HUMPHREYS:  Yes.  May I point Your Honor to one

13   thing in the same declaration which is paragraph 6?

14            THE COURT:  Sure.  So which -- this is 62?

15            MR. HUMPHREYS:  62-1, Your Honor.  And it says

16   clearly there that when access -- this is in the second

17   sentence.  "When access" --

18            THE COURT:  I'm sorry, sir.  Let me just get there.

19   I had closed it.  Okay, I'm there.

20            MR. HUMPHREYS:  Thank you.  "When access" -- second

21   sentence of paragraph 6.  "When access is granted to a

22   particular schema, the employee has permission to access the

23   data in the schema, but the employee does not automatically

24   see all those records.  Similar to frontline employees who

25   need to query SSA systems to retrieve needed records,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1243

 1  non-frontline employees granted access to EDW schemas must

 2  specifically search for relevant records in a schema for the

 3  records to be viewed."

 4          THE COURT:  So are you saying that they have access,

 5  but they are not necessarily availing themselves of the

 6  access?

 7          MR. HUMPHREYS:  Yes, Your Honor.  They would look at

 8  the data, much like the frontline employee at a field office,

 9  if there is a need that arises through the performance of the

10  duties.

11      I would also say, Your Honor --

12          THE COURT:  Can I ask you this, though?

13          MR. HUMPHREYS:  Please.

14          THE COURT:  You say it's similar to frontline

15  employees and I don't really have any actual understanding of

16  how this operates in the real world.  When you have access to

17  the EDW, for example, are you saying that Social Security

18  numbers -- well, that's the Numident file.  But my impression

19  was that the EDW was sort of a -- kind of contains everything.

20  That's sort of what everybody was saying last time.

21          MR. HUMPHREYS:  That is still my general

22  understanding.

23          THE COURT:  Okay.  So just to use this as an

24  example, it may not be accurate and please correct me.  But

25  let's say you are working with the EDW file -- system, rather,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1244

1    of records and it gives you more than you need is what you're

2    telling me.  So you're only going to be accessing what you

3    need.  And what you need to do, one of these projects might

4    not require you to look at someone's health records.

5              **MR. HUMPHREYS:**  That's right.  You get -- I think in

6    any job you get access to a system, or at least in a job in

7    the Federal Government, more broadly than you may need.

8    Because you should not have to go back to -- up your

9    management chain or in this case, to the head of the agency.

10             **THE COURT:**  I mean, what is the goal here?  There's

11   these allegations of rampant fraud and that the DOGE team is

12   going to uncover all this fraud and save the taxpayers all

13   this money and that's to be commended.

14        I just was curious because Mr. -- Acting Commissioner

15   Dudek says in ECF-60-1, paragraph 4, The SSA DOGE team

16   partners with SSA's antifraud offices to address fraud costing

17   taxpayers and Social Security beneficiaries up to $521 billion

18   annually.  And the support was a link from the Government

19   accountability office.  And it was a pie chart.  And it didn't

20   even have Social Security as one of the -- part of the pie.

21   They were, I assume, in the one called "other."  And it was

22   for a period, I think it was -- excuse me, 2019 or maybe 2018

23   to 2023 for the entire U.S. Government.

24        So that was a complete inaccuracy to suggest that this

25   $521 billion annually for Social Security beneficiaries, the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1245

```
 1    fraud for them was costing the taxpayers that sum.  And that
 2    was the maximum as I said across the United States Government
 3    in its entirety for a period of years, not specifically Social
 4    Security.  And this I found very concerning.  And I was trying
 5    to understand.
 6         It seems like the overarching theme here, you can call
 7    the projects what you will.  The Death Data Update, the Fraud
 8    Detection and the Are You Alive, they're all related to an
 9    effort to weed out fraud.  And I was trying to understand how
10    the production or access to all these records is going to
11    enable that to be accomplished.
12              MR. HUMPHREYS:  I mean, I think --
13              THE COURT:  They have auditors.  There's people
14    whose job it has been all along to do this.
15         As I said last time, I think in my career here and I
16    certainly am just estimating, but I may have had around three
17    cases, but people are prosecuted if they are caught with
18    receipt of benefits that belong to someone else.  I've had
19    those cases.
20              MR. HUMPHREYS:  Your Honor, this starts to feel like
21    a policy disagreement.
22              THE COURT:  No, I'm just asking.  Could you explain
23    to me how this is going to further that mission?
24              MR. HUMPHREYS:  Well, the SSA DOGE team I think
25    you're correct, Your Honor, is broadly charged with looking at
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1246

63

```
 1    fraud at the agency.  And of course just because you have one
 2    auditor doesn't make it illegal to have another.  But, you
 3    know, so I think that you can look at the administrative
 4    record at AR-5 to 6 which describes the decision approved by
 5    the head of the agency to grant access to DOGE team members in
 6    order to review concerns about -- I'm reading it right now --
 7    potentially large scale fraud and improper payments related to
 8    data systems in payment files SSA sends to BFS.  And concerns
 9    that those potential issues in those payment files may relate
10    in part to SSNs without associated dates of death in SSA's
11    Numident master files.
12          THE COURT:  So I guess I'm trying to get you to
13    explain to me how the access furthers that need.  Because need
14    is relevant.  The Privacy Act says "need."  And I was trying
15    to understand.  And that's why I'm sorry if it sounds like I'm
16    a broken record, but I don't feel I understand it.
17          MR. HUMPHREYS:  I think if you --
18          THE COURT:  I don't understand the way in which this
19    works that producing all these records will help further that
20    need.  I'm just going with what the statute says.
21          MR. HUMPHREYS:  Again, I don't think it's producing
22    the records.  It's giving access to then go in and look at the
23    record if it's part of the job duties.  Just like --
24          THE COURT:  I guess the reason I'm struggling -- and
25    I do take offense at your comment because I'm just trying to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1247

64

 1   understand the system.  I'm not challenging -- it's not a

 2   political question; I am offended by that.  But I am trying to

 3   understand why the -- why access to all the records is needed

 4   in order to do those tasks.  I don't sort of see anywhere in

 5   here that it explains it to me.  And I looked at the

 6   administrative record.

 7       For example, the decision memorandum of February 19, 2025

 8   says, SSA has a need to rapidly respond to concerns regarding

 9   potentially large-scale fraud and improper payments related to

10   data issues and payment files SSA sends to BFS, and concerns

11   that those potential issues and those payment files may relate

12   in part to SSNs without an associated date of death in SSA's

13   Numident master files.

14       So couldn't you then just provide access to the SSNs

15   without an associated date of death?

16          MR. HUMPHREYS:  First of all, Your Honor, I

17   apologize for the offense.  I did not mean it in any sort of

18   political way.

19          THE COURT:  Fine.  I'm just trying.  I just need you

20   to understand, I'm trying to make sure I understand your

21   arguments.

22          MR. HUMPHREYS:  Potential large-scale fraud.  If I

23   were an auditor going to an agency looking for a potential

24   large-scale fraud, I would want to be able to look in the

25   files of the payment records to be able to uncover fraud.  If

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1248

```
 1    my task is broad in order to identify potentially improper or
 2    wasteful spending, then it is -- I think it naturally follows
 3    from the function that these individuals intend to perform
 4    within the agency, that they would have broad access to be
 5    able to go into specific records as the need arises, rather
 6    than I just found out there might be a problem in file X and
 7    now I need to run up whether or not I can have access to file
 8    X.
 9         THE COURT:  But I guess -- but I thought I raised a
10    good point.  If the goal is to -- I think everyone is
11    concerned if there's a misuse of anybody's records and for
12    people to get something that they're not entitled to.  And
13    this says SSNs without an associated date of death.
14         So I guess I was trying to ask, wouldn't that just mean
15    you should provide access to the SSNs that don't have an
16    associated date of death and then find out if they're dead or
17    alive?  But why would you need more than that?
18         In other words, I mean, the question I'm being asked to
19    decide, I think, is has the agency complied with the Privacy
20    Act which requires that there is a need.  And if this is more
21    than that -- I think that's the question, isn't it?
22         MR. HUMPHREYS:  We think there's some important
23    threshold questions first.
24         THE COURT:  Yes, of course.  We talked about some of
25    those.  I didn't mean the only question, but that is a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1249

66

1    question.

2           **MR. HUMPHREYS:**  Yes, Your Honor.

3           **THE COURT:**  So I was trying to understand, reading

4    what was written here.

5           Another thing I wanted to ask you was also I gleaned

6    these from the administrative records.  But referring also to

7    that decision memorandum of February 19, the statement is that

8    options were investigated for protecting PII and FTI fields.

9    They didn't come up with a solution -- and this is a quote --

10   "that enables the necessary analysis to continue at the pace

11   necessary to respond timely to the fraud and improper

12   payment-related concerns."

13          So to me, I read that and I thought, okay, is that

14   telling me that it can be done, but it just might slow down

15   the speed at which the team works?  Because that's what it

16   says, "to continue at the pace necessary."

17          **MR. HUMPHREYS:**  So I read it the same way, Your

18   Honor.  My understanding is that while anonymization is

19   possible, it is extremely burdensome.  And certainly in our

20   view the Privacy Act does not -- "need" does not mean you must

21   do the most Privacy Act protected thing at all times, even if

22   it will grind policy, you know, priorities at the agency to a

23   halt.

24          **THE COURT:**  Okay.  So let's go back to standing.

25   The way I was reading it and this may be wrong so I invite you

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1250

 1    to correct me, but it seemed that the panel majority was in

 2    disagreement with Judge Boardman's construction of *Garey* and

 3    its reliance on *Garey*.  And the Fourth Circuit, the majority

 4    points to language in *Garey* in which Judge Motz writing for

 5    the *Garey* Court and basically said, and I'm just paraphrasing,

 6    but words to the effect that this is like the standing

 7    analysis in *Krakauer*.  And then *Krakauer* -- and I guess what

 8    confused me with what the Fourth Circuit said is clearly

 9    *Krakauer* is completely different factually.  *Krakauer* involves

10    the Telephone Consumer Protection Act and this statute was a

11    totally different statute in *Garey*.  And that was one major

12    difference and pretty significant difference.  One involved

13    telephones and one involved access to accident records or

14    obtaining those records.

15        So I thought Judge Motz was saying the standing analysis

16    is the same, but the way I understood the panel majority in

17    the issue of the stay in *Bessent* was somewhat different than

18    that.  And I took the words of Judge Motz -- I don't think --

19    I may have brought *Garey* out here so I wouldn't have to

20    misquote it, but that it was.  She was only referring to how

21    she went about analyzing standing.  I do have *Garey* out here.

22    But if you want to comment, I can look for what I had in mind.

23                **MR. HUMPHREYS:**  Yes, Your Honor.  So I think what

24    the majority panel -- I'm not a mind reader.  Obviously we

25    have the words we have.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1251

68

```
 1              THE COURT:  Sorry, I should have just said the
 2     specific statute in Garey is the Driver's Privacy Protection
 3     Act.
 4              MR. HUMPHREYS:  Sure.  I don't think that the
 5     distinction in the statutes is relevant for the legal analysis
 6     because it goes to the harm.  The standing question is is
 7     there concrete harm.  And that's under TransUnion.  So
 8     whichever statute we're talking about, you have to look at are
 9     the specific plaintiffs in the specific case concretely
10     harmed.
11         And the through line that -- I mean, I see in cases, in
12     Garey as I think the Court mentioned earlier this morning,
13     there are unsolicited mailings that go out to the home.
14     Krakauer has multiple intrusive calls to the home.  Gagelhock,
15     the Seventh Circuit decision which is cited in TransUnion
16     dealt with unwanted text messages that went out to the
17     clients.
18              THE COURT:  Not necessarily in the home.
19              MR. HUMPHREYS:  That's fair, but there's some
20     intrusion external being put on the plaintiff I would say is
21     the through line of this case.  That's also the case in a
22     Sixth Circuit case, Dixon v. Direct Energy, 69 F.4th 338 where
23     the Court found that invasion of privacy-like harm flows from
24     unwanted telephonic communications in part because such
25     communications interject -- I'm paraphrasing a little bit --
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1252

```
 1    interject the caller into the recipient's private sphere.

 2         Also Tenth Circuit, Lupia v. Medicredit, 8 F.4th 1184.

 3    Court found standing based on unwanted telephonic

 4    communications because they were an unwanted intrusion into

 5    the plaintiff's peace and quiet.  I mean, that is very

 6    different from the situation we have here where there are

 7    admittedly very private records, but they are housed within

 8    the agency.  And there is no reasonable expectation that the

 9    agency will not be able to access those records for purposes

10    of antifraud or for technology improvement.

11         So we don't think that the intrusion upon seclusion tort

12    is analogous at all based on that sort of line of cases.  And

13    again, the best indication we have, Your Honor, in a case like

14    this is the one Court of Appeals decision.  It's acknowledged

15    not binding on you, but if we're looking at what's likely to

16    happen, are plaintiffs likely to prevail, we don't think they

17    are on standing, Your Honor.

18         THE COURT:  And the phrase I think that I was

19    referring to is, "Indeed, following Spokeo and foreshadowing

20    TransUnion, we recently rebuffed a nearly identical standing

21    challenge in a case arising under the Telephone Consumer

22    Protection Act."  And she was citing Krakauer.

23         MR. HUMPHREYS:  Right.  I think the "nearly

24    identical" there is as I read it, in Garey, there's the

25    unsolicited communications that go out and in Krakauer there's
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1253

```
 1      the unsolicited phone calls.

 2          On standing, in addition, I have no reason to doubt and

 3      certainly respect and understand plaintiffs' generalized

 4      concern.  But respectfully, the sort of subjective fears are

 5      not sufficient to cause a concrete injury under Clapper and

 6      TransUnion.  And as I alluded to earlier, Your Honor,

 7      certainly the plaintiffs in TransUnion I imagine were quite

 8      distressed to learn that they had been marked as a potential

 9      terrorist or drug trafficker in the agency's records.  But

10      even in that extreme situation, the Supreme Court held that

11      there was no standing unless there was some additional

12      concrete injury.

13          And, of course, as we discussed at the last hearing,

14      other indicators in the Fourth Circuit in terms of risk of

15      future data loss we'll call it, have found no standing still.

16      And that's Beck v. McDonald, 848 F.3d 262.

17          Final agency action, if the Court is ready for it.

18              THE COURT:  Okay.

19          MR. HUMPHREYS:  Your Honor, you know, the Court

20      concluded on a preliminary basis already that there was final

21      agency action here.  We disagree, of course, for the reasons

22      stated in our briefing.

23          I will say, however, Your Honor, that the administrative

24      record with the benefit of that, the Court can see how these

25      decisions are more iterative than would be required for a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1254

71

```
 1    final agency action as the Supreme Court has explained it.

 2        And so I could point you to, Your Honor, of course the

 3    February 19th memo which was accessed for one purpose, but

 4    then later in the record in the teens you see members of the

 5    DOGE team coming back to the agency head saying hey, I need

 6    access for this reason; here is why.  And that's granted

 7    because there's a need for it in the performance of the

 8    duties.  And that sort of ministerial, you employee may now

 9    have access to the agency's own data systems is just not the

10    sort of agency action or final in any sense that it creates

11    rights or obligations for third parties like plaintiffs here,

12    Your Honor.

13        Plaintiffs are not regulated entities.  Unlike an

14    adjudication decision, this internal housekeeping of who gets

15    access is not final action under the APA.

16        THE COURT:  I guess looking at the administrative

17    record, it supports the view that ordinarily this least

18    privilege principle applies and the separation -- so the

19    principle of least privilege is -- there is a cite, 86-5 at

20    18.  And requires that a user be given no more privileges than

21    those necessary to perform their job.  And then there's

22    discussion of the separation of duties.

23        So I thought looking at the administrative record that,

24    in fact, it supported, it strengthened my original conclusion

25    of a final agency action because ordinarily things aren't done
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1255

72

1    this way.  You don't get access to the entire system of

2    records to one person.  It's very much separated by one

3    person.  And there's other places in the record that I think

4    support this.  One individual employee might have one

5    responsibility and somebody else has another responsibility.

6    And supervisors have to verify every 30 days different aspects

7    of the access.  And so that was the sea change I mentioned in

8    providing full access.

9              **MR. HUMPHREYS:**  I mean --

10              **THE COURT:**  I mean, that isn't the typical way,

11   according to looking at the administrative record, that things

12   are handled at the agency.  It seemed like that to me.

13              **MR. HUMPHREYS:**  So we, of course, disagree with the

14   sea change characterization.  I mean, I don't think that the

15   principle of least privilege, which is a broad sort of data

16   access policy principle that applies more broadly than this

17   agency, can properly fit within the final agency analysis.

18       Now it might -- final agency action analysis.  It might

19   fit within arbitrary and capricious or a need analysis.  And

20   we would, of course, say that it doesn't actually show

21   arbitrary capriciousness or that there is no need, but I am

22   struggling to see how it fits within the final agency action.

23              **THE COURT:**  Because the decision to allow access

24   under the circumstances alleged of full access was a decision.

25              **MR. HUMPHREYS:**  Well, it was --

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1256

73

```
 1              THE COURT:  A change in policy, in other words.

 2          MR. HUMPHREYS:  It is not a change in policy, Your

 3   Honor, because the access to the system is given because the

 4   employees here have a broad need.  It is consistent with the

 5   principle of least privilege because they serve an antifraud

 6   role.  And so we don't think that that shows any sort of

 7   change in policy, Your Honor.

 8          THE COURT:  And again, where would I -- where would

 9   you point me to support that assertion that access of this

10   magnitude was or is needed for these projects?  That's what

11   I'm looking for.  What would you like me to rely on for that?

12          MR. HUMPHREYS:  Well, for the broad --

13          THE COURT:  Well, that you said -- I'm trying to

14   write it down, but access to -- this isn't a quote, but

15   basically what you were telling me was that access to the

16   systems was given because of a broad need.  And I was -- for

17   the antifraud role.  And I was trying to ask could you show me

18   where that is.

19          MR. HUMPHREYS:  Yes, Your Honor.  That is at the

20   memo we've been discussing, the February 19th memo that starts

21   at AR-5 where antifraud is discussed.  It also is --

22          THE COURT:  So is that -- this takes me back to --

23   sorry if it seems like I'm repeating myself, but I think I

24   said something like this before which is that the overarching

25   theme then of all three projects is really about fraud.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1257

74

```
 1            MR. HUMPHREYS:  I think that's fair at a high level,
 2    Your Honor.
 3            THE COURT:  Because -- so it permeates basically all
 4    three projects.
 5            MR. HUMPHREYS:  Yes.  To put some color on it we
 6    would say just like an auditor would want broad access in
 7    order to find where the fraud is, that it is appropriate to
 8    give members of the DOGE team a broad access so they can make
 9    that determination.
10            THE COURT:  Okay, so I interrupted you.  I
11    apologize.  Go ahead.
12            MR. HUMPHREYS:  Right.  AR-5 I think is, 5 and 6 are
13    probably the most concise formulation.  As we go forward in
14    the administrative records there are additional statements
15    with respect to narrower access.  There's also the memo at 12
16    through -- well, I'm not sure this is redacted for privilege,
17    but 12 through 14 would be the non-privileged portions I would
18    point the Court to.
19        In addition, AR-19 where access is requested for specific
20    data for a specific purpose.  Similarly, AR-21, 23, 25, 27
21    through 29 and 30 through 32.  And then it would take me a
22    long time to dig through them all right now, Your Honor, but I
23    would also point to the job descriptions of the individual
24    employees and in the Executive Order itself in which the
25    president creates a role within the agencies for these
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1258

1      specific DOGE teams.

2              **THE COURT:**  So I was just trying to look through

3      some of these quickly.  And were there any that were rejected,

4      any requests that were rejected?

5              **MR. HUMPHREYS:**  I don't believe so, Your Honor.  If

6      so, I'm not sure that we would have included them in the

7      record since this is a case challenging grants of access.

8              **THE COURT:**  Okay.  Thank you for that.

9              **MR. HUMPHREYS:**  A couple of points:  Irreparable

10     harm.  I mean, I'm happy to answer any additional question

11     about the Privacy Act claim, but I think in the course of our

12     conversation we've gone through need and I don't have anything

13     to add on my own.

14         Irreparable harm, as Judge Richardson of the Fourth

15     Circuit indicated, which again, Judge Agee joined that

16     concurrence, there are also serious questions for irreparable

17     harm here even if plaintiffs can establish standing.  There is

18     a delta in the case law between just because there's injury

19     does not mean there's a clearly impending irreparable harm.

20     And specifically, the Privacy Act allows and the Internal

21     Revenue Code both allow for private actions if there is down

22     the line something bad that happens with this data and there's

23     actual injury, then that plaintiff could come to court and

24     seek recompense for any harm that's done, which takes this out

25     of the irreparable harm sphere. In our legal system, money

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1259

76

```
1        damages compensate for harm all the time.
2            Finally, a couple of points, Your Honor.  Even if the
3        Court is inclined to grant the Motion for Preliminary
4        Injunction, we would ask that the Court stay the Injunction
5        pending an appeal.  We don't think plaintiffs are entitled to
6        a Preliminary Injunction.  But certainly given the indication,
7        the only indication we have by a Court of Appeal in the Fourth
8        Circuit that plaintiffs are likely to not have standing, that
9        we think a stay is appropriate.
10           Then finally, Your Honor, we would ask that if the Court
11       does grant the Preliminary Injunction, that it impose a
12       significant bond to take into account the considerable effects
13       that an Injunction would have on the agency's day-to-day
14       operations and the hindrance toward the agency's policy
15       priorities.
16           THE COURT:  Day-to-day operations, why would they be
17       affected?
18           MR. HUMPHREYS:  Day-to-day operations in that the
19       DOGE team at issue here has been unable for almost a month now
20       to carry on its work.  We consider that part of the day-to-day
21       operations of the agency and to identify fraud which the
22       public interest has a significant need -- a significant public
23       interest in addressing.  And it's a policy priority for the
24       agency and the president.
25           THE COURT:  Okay.  Anything I didn't ask you that
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1260

1   you wished I had so you could tell me?

2         **MR. HUMPHREYS:**  Probably, but nothing comes to mind

3   right now, Your Honor.

4         **THE COURT:**  Well, if you think of it, let me know.

5      Would anybody like a break before we hear rebuttal or --

6   let me check with my court reporter.  Do you need a break?

7         **THE COURT REPORTER:**  No, Your Honor.

8         **THE COURT:**  Can we keep going?

9         **MS. SWIFT:**  Of course.

10        **THE COURT:**  Okay.

11     So let me start with the standing issue.  Mr. Humphreys

12  makes the point that in these other cases where there was

13  standing, there was some external conduct, if you will.  Some

14  event. Either the mailing of a letter or the intrusive phone

15  calls that led to the determination of standing.

16     There are cases, for example, like *TransUnion* that access

17  to or involving the Fair Credit Reporting Act where there is

18  an improper access.  What would you say would be akin to that

19  in this case and is that necessary?

20        **MS. SWIFT:**  Based on the Fourth Circuit case law,

21  plaintiffs disagree that any sort of physical intrusion is

22  necessary.  With respect to --

23        **THE COURT:**  Well, it's not a physical -- I guess you

24  could try to characterize it that way, but it's more -- I

25  think Mr. Humphreys used the word "external."

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1261

1          **MS. SWIFT:**  Plaintiffs would argue that there is an

2     external intrusion here.  The external intrusion has been made

3     by the SSA and DOGE defendants gaining access to comprehensive

4     sensitive personally identifying information to which both law

5     and agency practice says they shouldn't have access to.

6          And I think --

7          **THE COURT:**  How is that comparable to mailing a

8     letter, making a phone call?

9          **MS. SWIFT:**  I actually think that Judge Richardson's

10    concurrence is helpful here in a respect because there he

11    talks about what the real core inquiry here is and it's with

12    respect to unease.  And as we discussed, I think that

13    plaintiffs have more than made that subjective showing.  I

14    think it is also objectively reasonable for reasons the Court

15    discussed in its prior order, but I'm happy to discuss more

16    fulsomely.

17         But here there is an intrusion into their data, their

18    data that they have stored at Social Security Administration

19    because of the agency's long-standing promises to handle that

20    data in accordance with both law and the agency's own

21    regulations and internal policies.

22         And I don't want to get away from your question, but this

23    brings me to a point that I did want to make sure to make

24    which is that I was surprised to hear the Government's counsel

25    say that access is not the issue; that sure we can give them

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1262

1    unfettered access and it's what they choose to go look at that

2    matters.  That's flatly at odd with the Privacy Act and also

3    with Social Security regulations.

4        20 CFR 40125 defines disclosure as making a record about

5    an individual available to or releasing to another party.  So

6    in the agency's own estimation, access is disclosure.

7        So if we consider it that way and look back at standing,

8    there is intrusion.  The intrusion is the access.  That

9    intrusion causes an objective, reasonable sense of unease,

10   sense of personal matters being violated or intruded upon.

11   And that is, I think, very appropriately analogized to

12   intrusion on seclusion.

13        **THE COURT:**  Okay, thank you.

14        And then with regard to final agency action, the

15   Government takes the position that the administrative record

16   would establish that -- I don't want to misstate what Mr.

17   Humphreys said, but the bottom line is he argues now as he did

18   before that there was no final agency action.

19        **MS. SWIFT:**  And in doing that the Government I think

20   is forced to rely on a mischaracterization of what is at issue

21   here.

22        Defendants would say that what is at issue here is just

23   SSA's granted access to a new employee with respect to SSA

24   records.  And of course we know that that's not true.  What is

25   at issue here is that SSA abruptly changed its long-standing

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1263

 1    practices by giving access to sensitive and legally protected

 2    records in violation of SSA's practices and policies, federal

 3    statutes, and frankly, even unconnected to the terms of the

 4    DOGE Executive Order.

 5        So this is a radical departure from established

 6    safeguards and it was done without any evidence of

 7    consideration of plaintiffs' reliance interests, which I think

 8    Your Honor touched upon with respect to the history of the

 9    agency.  And without respect for the agency's many, many

10    safeguards with respect to segregation of duties, least

11    privilege, need to know and, of course, without respect to the

12    law.

13        So this is not a work-a-day type of issue.  I think if

14    you were to take defendants at their characterization, we

15    would be talking about something akin to the agency's

16    provision of ID cards to swipe into the building, or PID cards

17    and whether or not you can leave them at your desk.

18        This is not that.  This is as Your Honor said, a sea

19    change in the way that the agency safeguards and uses

20    comprehensive personally identifying information about

21    millions of Americans.

22        What's instructive I think here is that in their

23    response, when the Government talks about this being, you

24    know, committed to agency discretion or that this is

25    work-a-day, the cases they cite are quite telling.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1264

81

```
1        The first one is Jones v. Secret Service which is a DC
2   District case from 2023.  There the plaintiffs got an
3   injunction compelling the Secret Service to train officers to
4   deal with a specific situation, photographers, but the
5   plaintiffs never alleged that the agency was even required to
6   train its officers in dealing with that.  So they were just
7   sort of inventing out of whole cloth a proposed obligation for
8   the agency.
9        The second case on which the Government rests its
10  argument is Independent Equipment Dealers Association v. EPA.
11  That's also -- that's a DC circuit case for 2004.  And I truly
12  struggle to understand its applicability here because in that
13  case the Court assessed the import of an EPA letter that
14  restated for the umpteenth time the agency's long-standing
15  interpretation of a policy.  The letter was pre-written.  They
16  sent it to another person.
17       And then the third case is Fun For Animals v. Bureau of
18  Land Management.  And the plaintiffs in that case challenged
19  two documents specifically.  One, a memorandum that had
20  already expired; and then two, a budget request to Congress.
21  Those are the best cases the Government can give this Court to
22  advance its argument that this is somehow about work-a-day
23  operations.  It speaks to the strength of that argument.
24       I'd also like to just discuss plaintiffs' arbitrary and
25  capricious claims more generally since I know we haven't
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1265

```
 1        talked on those.  Excuse me, talked about those.

 2             THE COURT:  Okay.

 3             MS. SWIFT:  As the Court is aware and the District

 4        Court in Bessent did not reach the arbitrary and capricious

 5        claims and so those were not before the Fourth Circuit.  And

 6        that, of course, is a central difference with respect to our

 7        case.  I'm happy to dig in on any point that would be helpful

 8        to the Court.  But here we have a final agency action.  They

 9        didn't provide any sort of satisfactory explanation and --

10             THE COURT:  So are you saying the standing analysis

11        would be different?

12             MS. SWIFT:  No, Your Honor.  I'm just talking about

13        the claim generally as a way to distinguish this case from the

14        Bessent record at the Fourth Circuit.

15             THE COURT:  Okay.

16             MS. SWIFT:  And then, of course -- and I know that

17        we have discussed this both in this courtroom and in briefing,

18        but Plaintiffs' position is that there is no other adequate

19        remedy.  Defendants themselves argue that the Privacy Act

20        doesn't provide injunctive or declaratory relief.  And if that

21        is the case then they are certainly entitled to injunctive

22        relief via the APA.

23        Moreover, plaintiffs don't seek monetary relief and they

24        don't do that because it wouldn't stop the illegal disclosures

25        that are alleged or undue any of their effects.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1266

83

```
 1          If it would be helpful to Your Honor, I'd also like to
 2     address the Economy Act point.
 3                THE COURT:  I was just going to ask you about that.
 4                MS. SWIFT:  Great.  This isn't in the record because
 5     the Government didn't raise this question previously.  But I
 6     would direct the Court to an OLC opinion at 300.OP.OLC.
 7                THE COURT:  300 what?
 8                MS. SWIFT:  .OP.OLC.  I'm sorry.  One moment, Your
 9     Honor.  I'm sorry, thank you.  I too need support from the
10     table.  It's OLC opinion 300.OP.OLC.111.
11                THE COURT:  Am I going to find that?
12                MS. SWIFT:  I think it is available and plaintiffs
13     would be happy to file it with the Court after this hearing.
14                THE COURT:  That might be useful.
15                MS. SWIFT:  We will do that.
16     I reference that opinion because it says that an
17     instrumentality is a thing through which a person or entity
18     acts.  But the Government has taken the position in many cases
19     that DOGE can only advise.  And if that's the case, it
20     certainly can't be the thing through which someone acts.
21     I'm going to withdraw that argument.  But I will focus
22     on--
23                THE COURT:  Want a chance to confer?  Looks like
24     you're getting signals.
25                MS. SWIFT:  Yeah, I am.  Okay, Your Honor.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1267

1    Hopefully I should be able to provide more clarity.

2            **THE COURT:**  Okay.

3            **MS. SWIFT:**  Defendants have said here today and in

4    their briefing that DOGE exists within the executive office of

5    the presidency.  And if it does so, then it can only advise.

6    And if it can only advise, then it cannot be an

7    instrumentality through which a person acts.

8            I'd also note that just the list in the Economy Act

9    separating out agencies, instrumentality, et cetera, suggests

10    that there are clear categories and that in this case, DOGE is

11    not one of them.

12            Again, that's most relevant in the current facts to

13    Employees 5 and 8.  But, of course, it is relevant more

14    broadly to whether or not SSA has decided to grant

15    non-employees access to millions of Americans' sensitive data.

16            With respect to the Southern District of New York, I'd

17    like to counter my colleague's contention that Vargas is a

18    trend for these kinds of cases.  Vargas dissolved the

19    Preliminary Injunction -- Judge Vargas, I'm sorry, dissolved

20    the Preliminary Injunction as to one person who Judge Vargas

21    determined had been trained, vetted and that the risk of

22    disclosure to third parties had been mitigated.  That opinion

23    came out just this last Friday.

24            Meanwhile, there's a new SDNY case before Judge Cote.

25    That's at a motion to dismiss posture, but it involves similar

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1268

```
 1    issues with respect to OPM.  The case number is --

 2             THE COURT:  Yes, I read that case.

 3             MS. SWIFT:  Great.  So there I think Judge Cote

 4    reached an opposite conclusion.  And some of the findings

 5    there were based on the motion to dismiss standard and what

 6    the plaintiffs there had alleged.  I would submit that the

 7    record is replete with similar allegations from plaintiffs in

 8    this case.  And here they are, in fact, supplemented by

 9    declarations from former SSA employees, from our own clients,

10    and then, of course, from the administrative record.

11             THE COURT:  Well, is there anyone in this case that

12    you would concede has been framed, vetted, and cleared by way

13    of an adequate background check?

14             MS. SWIFT:  I'm glad Your Honor asked because we do

15    have some confusion on that point.  Based on the

16    administrative record, it is unclear to plaintiffs whether

17    Employees 1, 4, 5, 8, 6, 7 have --

18             THE COURT:  1, 4, 5, 8, 6, 7?

19             MS. SWIFT:  I'm sorry, 1, 4, 5, 6, 7, 8, whether

20    those employees had completed their background checks before

21    accessing data.  We do know that for Employee 5, his -- they

22    represent that his background -- I'm sorry, that their

23    background check was favorably adjudicated as of March 12th.

24    If we actually go to the record, it looks like it was finally

25    adjudicated on March 27th.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1269

 1            **THE COURT:**  What's the cite for that?

 2        **MS. SWIFT:**  ECF 36-2 paragraph 15.

 3        And then, of course, with respect to Employee 11, there's

 4    absolutely nothing in the administrative record regarding

 5    background checks.

 6        **THE COURT:**  So would you agree this is a fluid

 7    topic?  For example, the administrative record captures a

 8    period of time, but if as in Judge Vargas' case somebody were

 9    to have the proper -- as they represent I think this has been

10    the subject of an affidavit, but that these individuals have

11    been subjected to the proper training and background

12    investigations have gone as far as they can go and they would

13    at this stage absent not this case, but in any case would be

14    able to access records, et cetera, does that end the

15    discussion?

16        **MS. SWIFT:**  I would agree and hope that there are

17    ongoing developments with respect to getting everyone fully

18    buttoned up on background checks, training, et cetera.  I

19    don't think it ends the discussion, because of course what

20    we're looking at is the decision-making.  And the

21    decision-making was to give DOGE team members access when they

22    did not have those things.  So I think that developments are

23    relevant to, at a granular level which I hope this Court would

24    not be involved in, sort of who is bound if the Court were to

25    want to release a specific person from it, but not relevant to

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1270

 1    whether relief is appropriate.

 2         **THE COURT:**  Well, I guess the question is if it

 3    turns out that somebody that was provided access prematurely

 4    but that has been rectified, then what?  Apart from your -- I

 5    mean, I know there's the need issue, but in terms of this

 6    argument I think had more a gravitas, if you will, if that's

 7    the right word at the TRO stage.  By this point it seems that

 8    much of these concerns have been addressed.

 9         **MS. SWIFT:**  Two notes, Your Honor.  One, I think the

10    law is clear that parties are not able to sort of paper over

11    the initial violation or in this case, final agency action.

12    And that is I think very clearly what's going on here.

13       Again, the Court's inquiry is to look at the decision

14    that was made.  And the decision that was made was to give

15    access to sensitive, legally protected records in violation of

16    SSA's practices, statutes and regulations.

17         **THE COURT:**  I'm not sure if I'm remembering

18    correctly, but I thought in the *Bessent* case in the Fourth

19    Circuit there was some reference to what has happened versus

20    something ongoing.  And I may be remembering incorrectly.

21         **MS. SWIFT:**  I don't think you are, Your Honor.  I

22    just want to make sure that I get on the right page.  I'd be

23    happy to, of course, provide further briefing on this.  My

24    understanding is that --

25         **THE COURT:**  Well, we really don't have time for

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1271

```
 1           that.

 2                 MS. SWIFT:  Amen.  My understanding is that that

 3           would relate to irreparable injury and there was some

 4           discussion there about whether or not --

 5                 THE COURT:  Right.

 6                 MS. SWIFT:  --this injury had already happened.

 7              Here I think there is plenty -- first of all, I think

 8           that more fulsome briefing and perhaps a more fulsome record

 9           would have assisted Judge Richardson in evaluating whether or

10           not the alleged harm was a one-off event or whether or not it

11           continued.

12              Here, as we know, the only reason that DOGE team members

13           do not have access to massive quantities of PII at SSA is

14           because of Your Honor's TRO.  If the TRO was lifted, DOGE

15           would, I think the record is clear, immediately seek access

16           and immediately seek access --

17                 THE COURT:  Right, because now they're qualified, if

18           you will.  If they've gone through the training, if they've

19           signed the necessary documents.  There was an issue last time

20           about some of the documents not having been signed.  If the

21           detail agreements hadn't been in place.  All of those things

22           it seems like for the most part those problems have been

23           cured.  Is that not true?

24                 MS. SWIFT:  I think there are some employees for

25           which they have not quite been cured.  But to Your Honor's
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1272

89

1    more broad point, let's assume that they do cure all of the
2    suitability issues with respect to background checks, privacy
3    statements and acknowledgement, trainings, et cetera.  There
4    still is the question of whether or not defendants are giving
5    the DOGE team members access based on their need in accordance
6    with the Privacy Act and SSA regulations, based on their need
7    with respect to SSA internal policies and, of course, based on
8    SSA policies governing data access and security more broadly,
9    which as we all know at this point include need to know, lease
10   privilege, and segregation of duties.

11        **THE COURT:**  But that was really why I'm asking.  At
12   the end of the day, have we moved on from the claim that the
13   information or access to the information was prematurely
14   provided to people who did not qualify, if you will, as just a
15   shorthand term to cover the issues of the various aspects that
16   I've mentioned.  No detail agreement, or no documentation, or
17   no training, or inadequate training, or no background
18   investigation.  For the most part it seems that's a work in
19   progress.

20        **MS. SWIFT:**  I would agree it's a work in progress
21   for which plaintiffs are appreciative.  I don't think that
22   disturbs the question of whether or not there was an arbitrary
23   and capricious agency action in the first place and whether --

24        **THE COURT:**  Right, but it would go -- if that were
25   all there was then wouldn't you have an irreparable harm

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1273

```
 1   problem?

 2          MS. SWIFT:  I don't think so, because I think the

 3   need inquiry --

 4          THE COURT:  No, no.  Leave the need inquiry out of

 5   it.  I said if that's all there was.  If all you had is a

 6   claim that this information was released or provided or access

 7   was allowed before the i's were dotted and the t's were

 8   crossed with all of these people on the DOGE team, but now

 9   that's been addressed, how are you irreparably harmed going

10   forward?

11          MS. SWIFT:  I would certainly hope that we wouldn't

12   be.  But again, what we're challenging here is a sweeping

13   change in --

14          THE COURT:  I guess the question could be this way:

15   Where should I spend my time?  Is this the heart of your case

16   anymore?

17          MS. SWIFT:  I think that it is with respect to need.

18          THE COURT:  No, no.  I know need, but the issue of

19   the ability of these people to have even been provided access

20   in the first place because the i's weren't dotted and the t's

21   weren't crossed.  There was no detail agreement or there was

22   no signing of the paperwork or the training that's required

23   for people who are onboarding at the agency or the background

24   investigation.  Hasn't that ship sort of sailed?

25          MS. SWIFT:  I think the ship is preparing to sail.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1274

1    I hope that it continues on its course.  As I mentioned,

2    there's no information at all on a background check for

3    Employee Number 11.  Several of the employees don't appear to

4    have an adjudicated background --

5              THE COURT:  Which one, 11?

6              MS. SWIFT:  11.

7              THE COURT:  Anybody else?

8              MS. SWIFT:  Yes, one moment.  Okay, we've talked

9    several times about docket 62 and Ms. Felix-Lawson's

10   declaration in support of that.  Docket 62-2 which was filed

11   on March 27th indicates that there are no background checks

12   finally adjudicated for Employees 1, 5, 8 or 9.  There's no --

13   in this vein, there's nothing in the administrative record to

14   suggest that Employee 8 ever signed his Employment Agreement

15   and he has, of course -- excuse me, they have, of course, had

16   access to PII and the Government seeks it again.

17        And with respect to read only and write access, the

18   Government has throughout this litigation represented that the

19   DOGE team members seek only read access, but I think both

20   public reporting and the administrative record itself suggest

21   that that may not be true.

22        And I don't want to belabor the point because I know that

23   Your Honor would like to leave compliance for another day, but

24   again, I do think that this all speaks to whether or not

25   defendants have walked back this policy of unauthorized,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1275

92

1    unvetted access.  And while plaintiffs appreciate that subject

2    to the TRO and specifically to fulfill the TRO they are making

3    that effort with respect to four employees, I certainly don't

4    think the ship has sailed on the question more generally.

5              **THE COURT:**  Okay.

6         What did you, if anything, wish to say -- I was trying

7    with Mr. Humphreys to go over some of the information in the

8    administrative record from the request for access.  What makes

9    them insufficient from your perspective?  And if you want to

10   go by date, I suppose that would be helpful.

11             **MS. SWIFT:**  One moment, Your Honor.  I apologize.

12   Okay.  I'll start with Employee 1 who is a special Government

13   employee.  With Employee 1 when access was granted on February

14   20th and I'm starting ECF-36-1, Mr. Russo's declaration, the

15   reasons given were fraud, waste, and abuse.  And it said can't

16   use anonymized data because there's a need for individual

17   level data.

18        Suddenly on March 27th in ECF-62-1, Mr. Dudek's

19   declaration, that request was expanded from MBR, SSR,

20   Numident, and Treasury to Numident, MBR, SSR, PROME, PCHIP,

21   PVIP and PVIPR.  And the explanation had shifted to Employee 1

22   couldn't use anonymized data because individual cases and

23   potential outreach.

24        And I will note as an aside that as we have noted in a

25   footnote before, I find it alarming that DOGE team members at

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1276

93

```
 1    Social Security either are or intend to conduct individual
 2    outreach to people who get SSA payments, people who have SSA
 3    numbers.  It seems dramatically untethered to the Executive
 4    Order and it seems dramatically untethered to the alleged
 5    needs they have given the Court, most of which pertain to
 6    creating systems that will make detecting fraud easier or
 7    systems that will assist the agency in cleaning up death
 8    files.
 9         And, of course, for systems as we know from Ms. Flick's
10    declaration as well as Ms. Myers; and Ms. Escobar-Alava's, for
11    system level projects, there is usually very, very minimal
12    need for individualized information.  That is, of course,
13    because you can use deidentified information to identify areas
14    where a fraud may be more prevalent and that dig down at the
15    second level into discrete individual data.
16         And I would note on that point that most of the
17    Employment Agreements for the DOGE team members reference that
18    there will be security controls implemented to prevent that
19    team member from accessing or viewing sensitive data within
20    any of those records.  That's at AR-529.  And another example
21    is at AR-531.  And, of course, we know from the administrative
22    record and the Government's representations to this Court,
23    that those individuals do, in fact, seek access to
24    individualized information in PII.
25         I'd also point the Court to Employee 6.  At
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1277

 1   administrative record 27 as a purported justification for

 2   getting access to I think several records including the SSR,

 3   Employee 6 says that the non-anonymized data is necessary to

 4   understand how many people request SSI benefits.  And I will

 5   admit that I was somewhat confounded by Judge Richardson's

 6   math.  I'm not a statistician; I didn't study it in school.

 7   But it does seem to me that understanding how many people

 8   request SSI benefits is an inquiry that could be easily

 9   resolved.

10           THE COURT:  I had that thought.  It seemed easy; you

11   just have to count.

12           MS. SWIFT:  That explanation was also used for

13   Employee 7.  Also for Employee 7 at page 28 of the

14   administrative record, the explanation is just to audit how

15   fraudulent SSNs are issued, and that it uses a justification

16   to get access to SSI claim data, USCIS, SAVE and PSSNAP.

17       I don't want to belabor the point.  I know that the Court

18   has spent a lot of time with us already.

19           THE COURT:  Well, I just was going to sort of go

20   back, listening to this, to something else Judge Richardson

21   said when he was discussing the tort of exclusion on seclusion

22   in the context of standing.  And he talked about -- there's

23   the Westlaw version and I had both.  But I'm looking at the

24   one that was on the Court website.  He says, it is not the

25   information obtained, but the knowledge that the third-party

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1278

```
 1        is engaged in targeted snooping that causes the harm, and then
 2        quotes a Fordham Law Review article.  The harm from an
 3        intrusion occurs even when no information is acquired because
 4        the intrusive act itself, the conduct that invades one's space
 5        or disrupts one's daily activities takes away from one's
 6        interest in being left alone.  And he goes on to say that harm
 7        is not present here to -- this was the part I wanted to quote
 8        to you.  "To begin with, I question whether entries of
 9        information stored in Government databases could be part of
10        any plaintiff's seclusion at all."
11            And they're not the targets.  The plaintiffs have
12        targeted investigations.  Each plaintiff's information is one
13        row in various databases that are millions upon millions of
14        rows long.
15            MS. SWIFT:  Yes, Your Honor.  With respect to the
16        question of whether or not any data in a governmental database
17        is something that you could have an expectation of seclusion
18        or privacy on, I think that the Privacy Act itself would
19        suggest that that is certainly the case.  That is why the
20        Privacy Act was created.  It also explains much of FOIA and
21        the FOIA principles that SSA uses to guide disclosures.
22            With respect to it being one row of data, in the abstract
23        that is true.  To the Court's earlier point, though, there are
24        millions of people for whom that one row of data contains
25        information about their mental health conditions; about their
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1279

```
1     other diagnoses or treatments; about addiction; about a

2     variety of issues that are not only sensitive, but might carry

3     a stigma.  And I think that that is actually a key point of

4     distinction between this case and Bessent.

5          First of all, again, the Bessent -- regardless of whether

6     or not sort of medical records were at issue in Bessent, I

7     don't challenge the Government's assertion that perhaps

8     employee medical records are included in the data at issue

9     there.  The point is that Judge Boardman, and thus the Fourth

10    Circuit, didn't consider them.

11         Here, of course, there has been much discussion on it.

12    There has been analysis by this Court already and there have

13    been numerous declarations about the type of information that

14    SSA has and why it is so sensitive.  And I would say past

15    sensitive, really confidential.  And carries a stigma that

16    would far exceed something like might be in a disciplinary

17    report at work.

18              THE COURT:  Is it enough if the agency says --

19    excuse me, a member of the DOGE team says to the agency, We

20    need it.  We need access because we're searching for fraud and

21    we need to see what we find.  Is that good enough?  And is

22    there more than that here or less than that or is that about

23    what it is?  Or does it vary?  Do I have to make a ruling for

24    all three projects separately?

25              MS. SWIFT:  I hope not, Your Honor.  Certainly
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1280

 1    plaintiffs do not seek to insert this Court into decisions

 2    about every access request that comes from a DOGE team member.

 3    We are, again, challenging the overall sweeping change in

 4    policy.

 5         With respect to whether any just asserted bald flatly

 6    stated need is sufficient, the answer to that is no.

 7         With respect to the Privacy Act, it is tethered to the

 8    job functions of that particular employee.  Moreover, if it

 9    were that the White House could create some sort of creature

10    and send that creature's agents into all federal agencies and

11    have them say I need access to all of your information for

12    fraud, there would be no restriction associated with the

13    Privacy Act.  At that point, we'll take DOGE, any DOGE agent

14    in any agency could get access to all information.  And, of

15    course, that's exactly what Congress was trying to guard

16    against with the Privacy Act.

17         And with respect to SSA regulations and policies, that

18    also would not be sufficient both because SSA regulations,

19    limit to need to know and job duties and, of course, because

20    the agency's policies include a number of limiting principles

21    which we've discussed here.

22         But I think Your Honor's question gets to really what is

23    the core of what's going on here which is that the

24    Government's position seems to be that anyone within any

25    agency can baldly state, I need this access, when that access

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1281

98

1    is accessed to massive amounts of comprehensive PII, extremely

2    sensitive PII, and that the agency and the Courts just say

3    yes.

4        That is not what was contemplated by Congress.  It is at

5    odds with the Privacy Act, the Internal Revenue Code, numerous

6    other statutes and it is, of course, and flatly at odds with

7    SSA regulations and policies.

8        **THE COURT:**  Would there be any of these files or

9    systems that you would agree that the agency could allow

10   access to?  I've got Numident, EDW, MBR, SSR.  Is anything

11   fair game so-to-speak?

12       **MS. SWIFT:**  I think most anonymized data would be

13   fair game.  And here SSA tried to provide that in a sandbox

14   environment and DOGE rejected it and installed defendant Dudek

15   as acting commissioner.  Certainly there might be --

16       **THE COURT:**  How would you anonymize a Social

17   Security number, just give the last four digits?

18       **MS. SWIFT:**  I am not a tech wizard.  I would refer

19   Your Honor to the declarations of Ann Lewis and Eerie Meyer.

20   But my understanding is that SSA can and does often use

21   something known as hashing which is basically where you -- and

22   I apologize for any computer scientists in the room, but where

23   you for each number in a Social Security number, replace that

24   with some sort of symbol or number or something like that

25   that, of course, can be traced back to what the Social

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1282

1    Security number actually is, but doesn't reveal that on its

2    face.

3         And to Your Honor's point, plaintiffs' position is not

4    that no DOGE team member at SSA should ever be given access to

5    any non-anonymized data.  I appreciated that earlier Your

6    Honor raised defendant Dudek's sort of initial walk back,

7    although it seems to have been then rescinded, with respect to

8    giving access to anonymized data in the first instance.  And

9    then when an actual need which is what is at play in SSA

10   policies and regulations, when an actual need is articulated

11   for non-anonymized data for a much smaller group of

12   individuals, then to proceed that way.

13        I think when we were talking about this concept of access

14   before need or when you were discussing it with the Government

15   and there was some frustration and you described it as

16   double-talk.  And, of course, I think what we were describing

17   at that exact point was whether frontline employees have the

18   same type of access that the DOGE members seek.  That is, of

19   course, not true.  Frontline employees can input one Social

20   Security number and get back information about that one

21   person.

22             **THE COURT:**  One at a time.  But Mr. Humphreys was

23   making the point that they could do it ad infinitum and so

24   effectively have the same access as what DOGE is seeking.  In

25   other words, the whole field is available; it's just one step

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1283

1    at a time.  At least that's what I thought he was telling me.

2        **MS. SWIFT:**  I believe it is the Government's

3    position and I think that that position is not well-founded.

4    And I say that because it goes to what kind of access, what

5    kind of information the person who is using this access might

6    be getting.  And if it is a field officer who is presented

7    with one Social Security number and then gets data, limited

8    data about that person, that is wholly different than being

9    able to get unlimited data about let's take 10 million people.

10   And that is what is being asked for here.

11       **THE COURT:**  I guess my question goes to in order to

12   effectuate the Are You Alive Project, the Death Data Cleanup

13   and the Fraud Detection which are the three projects Mr. Dudek

14   described, the claim is that there is a need for access to the

15   various systems to accomplish that.  I did try; I don't think

16   I was successful in asking Mr. Humphreys to explain to me how

17   this works.  What is it about these projects that would

18   require that kind of access?  I still don't know that I have a

19   sense of that.  But do you have anything you want to add to

20   that question that I kept trying to pursue?

21       **MS. SWIFT:**  I do.  And I would just say quickly two

22   points.  The first is that the overwhelming majority of the

23   alleged needs to know here pertain to identifying systematic

24   opportunities for fraud and creating systems and procedures to

25   tighten that up.  Working at the top level to adjust a system

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1284

```
1    or review, the processes does not require access to granular
2    data, certainly in the first instance.
3        And second, I do think that at this point in the case it
4    is necessary to consider whether the asserted needs align with
5    what the data and what the access is used for.  And for
6    Employee 7, defendants -- and this is ECF-36-1 paragraphs 15.
7            THE COURT:  15 or 13?  I'm sorry.
8            MS. SWIFT:  15.  Defendants said in that
9    declaration -- I believe that's Mr. Russo's declaration, that
10   Employee 7 was granted access to SSA systems, but that he had
11   only accessed systems writ large.  But that he had only
12   accessed data from Numident.  And so in seeking to comply with
13   the TRO, SSA had revoked the rest of that access.
14       And I think that is relevant to what we see in these
15   statements of need which are that sure, there may be relevant
16   information in the system of record.  One, there is very often
17   no need for identifiable information; and two, even if DOGE
18   team members are asking for a subset of that information, they
19   are using that statement of need to get access to all of the
20   information in the database.  And I think the recent reporting
21   about introducing inaccuracy into death records speaks to why
22   that is problematic.
23       If you look through Employee 7's justifications to the
24   Court made by defendant Dudek and in the administrative
25   record, they talk about Death Records Cleanup.  They don't
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1285

```
 1    talk about erroneously marking thousands of non-citizens as

 2    dead.

 3         I want to be clear, Your Honor, because I know that we're

 4    really in the weeds here.  That plaintiffs are not asking the

 5    Court to insert itself into the everyday workings of the

 6    Social Security Administration.  They are asking the Court to

 7    ensure that SSA respects the reliance interests of millions of

 8    Americans, millions of individuals; that it does not violate

 9    numerous federal statutes and regulations regarding the

10    importance of keeping that data secure; and that it does not

11    with no notice, no reasoned explanation and very likely

12    because of nothing more than a political purpose, abandon

13    decades of policy and procedures seeking to ensure the

14    integrity of our data.

15         THE COURT:  I guess the one thought that I had when

16    you both had referenced the work-a-day operations, if you

17    will, that this didn't seem work-a-day.  And I'm not saying

18    that's a bad thing, I'm just saying it's not work-a-day.

19         What we have is an Executive Order that mandates that

20    efforts be made to modernize the technology, et cetera, root

21    out fraud.  That's new.  I mean, I think that many people are

22    applauding this effort.  But it doesn't feel like work-a-day

23    is all I'm saying.  It's just nitpicking and I apologize, but

24    it's something that has -- it's a new -- we don't know what it

25    is.  I know what I said it was; the Government disagrees, but
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1286

```
 1     whether it's an agency, an instrumentality, whatever it is.
 2     DOGE is new, so how could anything DOGE does be work-a-day?
 3          MS. SWIFT:  I don't think it's a technicality; I
 4     think it is a very important point.  I also think the fact
 5     that DOGE and its allies within the White House and SSA forced
 6     out members of SSA leadership who sought to continue operating
 7     based on existing policies and procedures, that Mr. Dudek was
 8     elevated to acting commissioner while he was on administrative
 9     leave, and that he immediately sought access, full access for
10     Employee Number 1.
11          I'll speak to the fact that this cannot be work-a-day.
12     This is not about giving new employees a computer.  Although
13     to be clear, at SSA that is in itself a complex process.  And
14     this is about the agency's entire approach to securing the
15     huge amounts.  I think defense counsel used the word "massive"
16     amounts of data at the TRO hearing that SSA is entrusted with.
17          And Your Honor knows because we've said it before that
18     the very first regulation that SSA promulgated was respect,
19     was with respect to privacy.  Here we're talking about almost
20     100 years of respect to privacy that infuses not just the
21     agency's workings, but also the representations that it makes
22     to the public.  And that's also not just history, right?  The
23     agency is making those representations today on its website,
24     in field offices, et cetera.
25          So to say that this is just an issue of giving certain
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1287

1    employees access to certain data, quite frankly, I think is an

2    insult to the millions of Americans whose data Social Security

3    holds.

4        As we've discussed, that data is extremely sensitive.  It

5    is extremely personal and defendants have an objectively

6    reasonable expectation that it will be kept private because

7    both Social Security Administration and the laws of this

8    country have told them that it will be.

9        **THE COURT:**  But I think you would agree I'm sure

10   there is a public interest in weeding out fraud.  The question

11   is -- I said this in the first opinion, this is like hitting a

12   fly with a sledgehammer because that is an applaudable goal,

13   but is it the way to go about it.  Has the, for example, not

14   to say it's the only law or provision, but just to use the

15   Privacy Act as an example, has a need for the information been

16   adequately identified?

17       **MS. SWIFT:**  Yes.  And I would add that there are, of

18   course, there's the public interest that you identified, and

19   there's also a strong public interest in maintaining the

20   confidentiality of PII which as you're including medical

21   records respectfully, but also financial information.  And we

22   see that evidence from Congress with respect to the Privacy

23   Act, HIPAA, FOIA, et cetera.  We see it in the Court's own

24   jurisprudence with respect to doctor/patient privilege,

25   psychotherapist/patient privilege.  None of this is new.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1288

```
 1            And so while the Government certainly has -- while the
 2     public has an interest in rooting out fraud, again, crying
 3     fraud at the first instance and not saying anything more
 4     cannot be an all access pass.  And based off of the
 5     administrative record and the Government's arguments here
 6     today, that does seem to be its position.
 7            THE COURT:  Okay, well thank you all.
 8            Looking at the time table, I just want to review with
 9     everyone the TRO expires on Thursday.  It wasn't extended to a
10     particular time so I've understood it to be midnight.  Does
11     anybody quarrel with that?
12            MS. SWIFT:  No, Your Honor.
13            MR. HUMPHREYS:  I think you indicated 2:12 p.m. on
14     your Order, Your Honor.
15            THE COURT:  Right, but then when it was extended,
16     does that mean it's only extended to 2:12 p.m.?  Because the
17     extension request or agreement rather didn't specify a time,
18     so I extended it through Thursday.
19            MR. HUMPHREYS:  Rule 65 references two, 14-day
20     periods and the Government's position is that would be 14 days
21     exactly from 2:12 p.m.
22            THE COURT:  And what was the plaintiffs' position?
23            MS. SWIFT:  Plaintiffs did not operate with that
24     understanding.  As the Court knows under Rule 65 the parties
25     can agree to extend the TRO and our understanding was that we
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA1289

```
 1      had done that through the entire day on Thursday.

 2              THE COURT:  So nobody had said anything about the

 3      time.  I understood the parties to agree to an extension

 4      through Thursday.  That was the way I read it.  Obviously I

 5      need as much time as I can to address everything that is

 6      required, so I was hoping that my understanding was the right

 7      one, that the time of 2:12 did not apply because the agreement

 8      was through Thursday.  But it was not articulated either way.

 9      And I when I signed off on it, my mind was that whoa, I have

10      until 11:59 on Thursday to finish my work.  So I don't know,

11      we'll see what happens.  I mean, obviously I've been doing

12      work all along on the case, but there's still a lot to do.  So

13      okay, so I don't know the answer to that question.

14          Anything else, counsel, before we conclude from either

15      side?  Anything, Mr. Humphreys, you just are itching to tell

16      me that just -- I'll give plaintiffs the last word, but if you

17      have something you really are anxious to share, I'm obviously

18      anxious to hear.

19              MR. HUMPHREYS:  I'm not, Your Honor.  Thank you very

20      much.

21              THE COURT:  How is Baltimore?

22              MR. HUMPHREYS:  Really enjoying being close to home.

23      Thank you, Your Honor.

24              THE COURT:  Good, good.

25          Anything else from you, Ms. Swift?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1290

**MS. SWIFT:**  With respect to the time table, the only thing I would note is that plaintiffs do intend to file a motion with respect to defendants' apparent noncompliance with the TRO.  At your Court's direction, we'll do that separately.

**THE COURT:**  You'll what?  You'll file it separately?

**MS. SWIFT:**  Yes.

**THE COURT:**  Okay. All right, if there's nothing further we'll cross that bridge when we get to it and I'll cross the first bridge first.  And okay, you've given me a lot of homework, counsel.  We will stand in recess.  Thank you.

**(Proceeding was concluded at 1:15 p.m.)**

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1291

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5            I, Nadine M. Bachmann, Certified Realtime Reporter

 6      and Registered Merit Reporter, in and for the United States

 7      District Court for the District of Maryland, do hereby

 8      certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

 9      true and correct transcript of the stenographically-reported

10      proceedings held in the above-entitled matter and that the

11      transcript page format is in conformance with the regulations

12      of the Judicial Conference of the United States.

13

14                            Dated this 16th day of April, 2025.

15

16                            -s-

17                            _____

18                            NADINE M. BACHMANN, CRR, RMR
                              FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA1292

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERTION OF
STATE, COUNTY AND
MUNICIPAL EMPLOYEES, AFL-
CIO, *et al.*

    *Plaintiffs*,

    v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*

    *Defendants*.

Civil Action No. ELH-25-0596

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is this 17th day of

April 2025, by the United States District Court for the District of Maryland, **ORDERED**:

1. Plaintiffs' Motion for Preliminary Injunction ("PI Motion," ECF 110) is **GRANTED**.

    a. Pursuant to Rule 65 of the Federal Rules of Civil Procedure, and subject to the

        exception in ¶ 3 hereof, the United States Social Security Administration ("SSA"),

        Leland Dudek, and Michael Russo and/or his successor (collectively, "SSA

        Defendants"), and any and all of their agents and employees, and any person

        working in concert with them, directly or indirectly, are **ENJOINED** and

        **RESTRAINED** from granting access to any SSA system of record containing

        personally identifiable information ("PII"), as defined in paragraph 9 hereof, or PII

        obtained, derived, copied, or exposed from any SSA system of record, including,

        but not limited to, records known as the Enterprise Data Warehouse ("EDW"),

        Numident, Master Beneficiary Record ("MBR"),  Supplemental Security Record

        ("SSR"), and Treasury Payment Files, to the Department of Government Efficiency

1

("DOGE"); the United States DOGE Service; the United States DOGE Service Temporary Organization; members of the DOGE Team established at the Social Security Administration, as defined in ¶ 11(a); Elon Musk; Amy Gleason; and/or any DOGE Affiliate(s), as defined in ¶ 11(b);

b.  U.S. DOGE Service, U.S. DOGE Service Temporary Organization, Elon Musk, and Amy Gleason (collectively, "DOGE Defendants"), as well as all SSA DOGE Team members and DOGE Affiliates, shall disgorge and delete all non-anonymized PII data in their possession or under their control, provided from or obtained, directly or indirectly, from any SSA system of record to which they have or have had access, directly or indirectly, since January 20, 2025;

c.  All DOGE Defendants, as well as all SSA DOGE Team members and DOGE Affiliates, are **ENJOINED** and **RESTRAINED** from installing any software on SSA devices, information systems, or systems of record, and shall remove any software that they previously installed since January 20, 2025, or which has been installed on their behalf;

d.  All DOGE Defendants, as well as all SSA DOGE Team members and DOGE Affiliates, are **ENJOINED** and **RESTRAINED** from accessing, altering, or disclosing any SSA computer or software code.

2.  This Order does not preclude SSA from providing members of the DOGE Team with access to redacted or anonymized data and records of SSA. However, no data shall be provided unless and until the persons to whom access is to be provided have received all training that is typically required of individuals granted access to SSA data systems, including training regarding federal laws, regulations, and policies governing the privacy

2

of PII; a background investigation is completed, comparable to the quality of background investigation conducted for SSA employees whose duties involve access to PII; detailing agreements are completed for any individual who is assigned to the DOGE Team from another agency; and all required Agency paperwork is completed, including execution of the SSA documents acknowledging the Systems Sanctions Policy and the duty to protect PII.

3.  SSA may provide members of the DOGE Team with access to discrete, particularized, and non-anonymized data, in accordance with the Privacy Act, and in accordance with the conditions set forth herein:  SSA must first comply with the provisions in ¶ 2 of this Order and, in addition, SSA must first obtain from the DOGE Team member, in writing, and subject to possible review by the Court, a detailed explanation as to the need for the record and why, for said particular and discrete record, an anonymized or redacted record is not suitable for the specified use.  The general and conclusory explanation that the information is needed to search for fraud or waste is not sufficient to establish need.

4.  On or before 5:00 p.m. on April 23, 2025, Defendants **SHALL FILE** a Status Report documenting the actions that they have taken to comply with this Order, and certifying the following:

    a.  That no DOGE Defendant, DOGE Team member, or DOGE Affiliate shall be provided with access to any SSA systems, whether or not anonymized, unless and until these persons have been provided with all training that is typically required of individuals granted access to the SSA data systems, including training regarding federal laws, regulations, and policies governing the privacy of personally identifiable information;

3

JA1295

b. That no DOGE Defendant, DOGE Team member, or DOGE Affiliate shall have access to any SSA system of records, whether or not anonymized, unless and until a background investigation is completed, comparable to the quality of investigation for SSA employees whose duties involve access to PII, and that all required Agency paperwork is completed, including execution of the SSA documents acknowledging the Systems Sanctions Policy and the duty to protect PII;

c. As to individuals detailed to SSA from another agency, only DOGE Team members whose detail agreements are complete shall have access to any SSA records;

d. An explanation of why each DOGE Defendant, DOGE Team member, and/or DOGE Affiliate is in need of non-anonymized access to the PII in each SSA data system to which access is sought.

5. The Court may require further Status Reports, which may, in turn, require the SSA Defendants and the DOGE Defendants to provide further detail as to their compliance activities. The Court may also enter further orders as necessary to ensure compliance with this Order.

6. This Order applies to SSA at every and any place where record systems are located, maintained, accessed, or available.

7. To avoid confusion or doubt, this Order expressly applies only to SSA employees working on the DOGE agenda. Employees of SSA who are not involved with the DOGE Team or otherwise involved in the work of the DOGE Team are not subject to the Order. Therefore, this Order has no bearing on the ordinary operations of SSA.

8. The request to provide access to four DOGE Team members, as outlined in ECF 62, is **DENIED,** as moot.

4

9. The TRO issued on March 20, 2025 (ECF 48), and extended by the Court's Order of March 27, 2025 (ECF 69), is **VACATED** and superseded by this Order.

10. Counsel shall meet and confer to discuss whether the government intends to file a notice of appeal or whether the Court should enter a scheduling order.  The parties shall file a joint status report on these matters by 5:00 p.m. on April 29, 2025.

11. For purposes of this Order, the following definitions apply:

    a. As used herein, the term "DOGE Team" refers to any person assigned to SSA to fulfill the DOGE agenda, including Executive Order 14,158.  Because the members of the DOGE Team and the number of people on the DOGE Team may change, the Court has not referenced individuals by employee number.

    b. "DOGE Affiliate" shall mean any employee, agent, officer, contractor, special government employee, or consultant employed by or affiliated in any way with the Department of Government Efficiency, the United States DOGE Service, the United States DOGE Service Temporary Organization, members of the DOGE Team established at the Social Security Administration; any SSA employee, contractor, special government employee, or consultant working on or implementing the DOGE agenda; anyone who has been granted access by SSA to SSA records for the purpose of implementing the DOGE agenda with respect to SSA; and any persons working, directly or indirectly, in concert with any of the above individuals;

    c. "Personally identifiable information" or "PII" shall mean "information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual," and shall

5

include, *inter alia*, Social Security numbers; medical records; mental health records; medical provider information; medical and mental health treatment records; employer and employee payment records; employee earnings; addresses; bank records; tax information; family court and related records.

_____/s/_____
Ellen Lipton Hollander
United States District Judge

JA1298

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERTION OF
STATE, COUNTY AND
MUNICIPAL EMPLOYEES, AFL-
CIO, *et al.*

    *Plaintiffs*,

    v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*

    *Defendants*.

Civil Action No. ELH-25-0596

**MEMORANDUM OPINION**[*]

---

[*] The Court's Temporary Restraining Order ("TRO") (ECF 48) was set to expire on April 17, 2025. Accordingly, it was necessary to docket the Memorandum Opinion (ECF 146) on that date, before the TRO expired. Unfortunately, time constraints did not allow for a thorough "bluebooking" of the Memorandum Opinion (ECF 146). This Memorandum Opinion amends ECF 146 by way of non-substantive, typographical, and "bluebook" corrections. *See also* ECF 156.

# Table of Contents[†]

I.  Introduction ............................................................................................................ 1

II. Procedural Summary ............................................................................................. 5

III. Background .......................................................................................................... 11

    A.  The Parties ..................................................................................................... 11

        1.  Plaintiffs .................................................................................................. 11

        2.  Defendants ............................................................................................... 12

    B.  Post-Inauguration Period ............................................................................... 15

        1.  Executive Order 14,158 ......................................................................... 15

        2.  SSA in the Crosshairs ............................................................................ 17

        3.  Recent Changes at SSA .......................................................................... 19

    C.  Declarations ................................................................................................... 21

    D. Administrative Record .................................................................................... 29

        1.  Legal Standard ....................................................................................... 29

        2.  DOGE Team ........................................................................................... 33

        3.  SSA Systems of Record .......................................................................... 34

IV. Standing ............................................................................................................... 35

    A.  Legal Standard ............................................................................................... 36

    B.  Discussion ...................................................................................................... 45

        1.  Associational Standing ........................................................................... 46

        2.  Injury in Fact .......................................................................................... 51

V.  APA Claims .......................................................................................................... 82

    A.  Judicial Review of APA Claims ..................................................................... 82

    B.  The Contentions ............................................................................................. 89

    C.  Analysis .......................................................................................................... 91

    D.  No Other Adequate Remedy ......................................................................... 102

VI. Preliminary Injunction ....................................................................................... 105

    A.  Likelihood of Success on the Merits ............................................................ 109

        1.  Privacy Act ........................................................................................... 109

            a.  Need ................................................................................................. 113

---

[†] Because the Memorandum Opinion has not yet been docketed, the Court cites to the numbers that appear on the pages of the Memorandum Opinion, rather than the electronic pagination.

i

b.  Routine Use..................................................................................................... 132

2.  Arbitrary and Capricious.................................................................................. 134

B.  Irreparable Harm.................................................................................................. 135

C.  Balance of the Equities and the Public Interest.................................................. 140

VII. Conclusion ................................................................................................................ 143

VIII. Bond ........................................................................................................................ 143

IX.  Stay Pending Appeal ................................................................................................ 144

# I.  Introduction

The Social Security Administration was established in 1935.  Almost from its inception, it has collected, stored, respected, and protected the private, personal, and confidential information of the American people.  Indeed, ensuring confidentiality of personal records has been a bedrock principle of the agency.  *See* Soc. Sec. Admin., *SSA's Commitment to Protecting Privacy through Compliance*, https://perma.cc/DF3N-VQS6.  In recent months, however, the Social Security Administration has abruptly changed course.

This case concerns the decision of the Social Security Administration ("SSA" or the "Agency") to provide eleven individuals affiliated with the Department of Government Efficiency ("DOGE") with unlimited access to the SSA records of millions of Americans.[1]  On January 20, 2025, following the inauguration of President Donald J. Trump, the President issued Executive Order 14,158, which established DOGE.  *See* 90 Fed. Reg. 8441 (Jan. 29, 2025).

According to plaintiffs, SSA "has abandoned its commitment to maintaining the privacy of personal data" and has unlawfully "opened its data systems to unauthorized personnel from [DOGE] in violation of applicable laws and with disregard fo[r] the privacy interest of the millions of Americans that SSA serves."  ECF 17, ¶ 2.  At the hearing (ECF 43) held on plaintiffs' motion

---

[1] At the outset of the case, SSA sought to provide records access to ten people.  But, the number has since increased to eleven.  The government has concealed the identity of these individuals because of concern that the disclosure of their names would expose the individuals to harassment and thus invade their privacy.  *See* ECF 36-1 (Russo Declaration), ¶ 4.

At a hearing on April 4, 2025, defense counsel agreed to ask the DOGE affiliates if they would consent to disclosure of their identities.  Only two have agreed to disclosure:  Antonio Gracias (Employee 4) and Aram Moghaddassi (Employee 7).  ECF 134.  Therefore, with the exception of Gracias and Moghaddassi, I shall refer to the DOGE Team members by the employee numbers assigned to them by the government in submissions to the Court.  However, where affiants or news articles have used specific names, I will do the same.  This does not mean that the individuals are necessarily DOGE personnel, however.

1

for temporary restraining order ("TRO"), defense counsel acknowledged that SSA did, indeed, provide DOGE affiliates with access to a "massive amount" of records. ECF 45 (TRO Tr., 3/14/25), at 17.[2] The appointment form for SSA DOGE Employee 1 seeks "[a]ccess to *all* SSA systems and the associated source code to assist with modernization efforts . . . ." ECF 86-5 at 20 (emphasis added). Moreover, it is undisputed that these records contain sensitive, confidential, and personally identifiable information ("PII").[3]

Plaintiffs, the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"); Alliance for Retired Americans ("ARA" or "Alliance"); and American Federation of Teachers ("AFT"), are two national labor and membership associations and one grassroots advocacy organization. They filed suit against SSA and three other defendants on February 21, 2025, challenging the legality of the Agency's decision to provide DOGE with unlimited access to a trove of personal and confidential information pertaining to millions of Americans. ECF 1.[4]

---

[2] With the exception of the Table of Contents, the Court cites to the electronic pagination. However, the electronic pagination does not always correspond to the document's native numbering.

[3] Subject matter jurisdiction is founded on 28 U.S.C. § 1331 because this action arises under federal law. ECF 17, ¶ 14.

[4] Several cases have been filed throughout the country asserting similar allegations with respect to disclosure of confidential information by other federal agencies. *See, e.g., American Federation of Labor and Congress of Industrial Organizations v. Dep't of Labor*, No. 25-339 (JDB), 2025 WL 1129227 (D.D.C. Apr. 16, 2025), at *21 (denying motion to dismiss, except for standalone Privacy Act violation, because the cause of action does not extend to organizations); *American Fed'n of Gov't Employees v. U.S. Office of Personnel Mgmt.*, 25cv1237 (DLC), 2025 WL 996542 (S.D.N.Y. Apr. 3, 2025) (denying motion to dismiss APA claims and granting dismissal of injunctive relief claims under the Privacy Act, "except insofar as they are a predicate to" claims under the Administrative Procedure Act); *American Federation of Teachers, at al., v. Bessent, et al.*, DLB-25-0430, 2025 WL 895326 (D. Md. Mar. 24, 2025) (granting preliminary injunction against U.S. Department of Education, and Denise L. Carter, Acting Secretary of Education, as well as against the Office of Personnel Management and its Acting Director, Charles Ezell), *but see American Federation of Teachers, et al. v. Bessent, et al.*, No. 25-1282, 2025 WL 1023638, at *1 (4th Cir. Apr. 7, 2025) (granting stay pending appeal); *Electronic Privacy Information Center, et al., v. U.S. Office of Personal Management, et al.*, 25-RDA-255, 2025 WL

2

On March 7, 2025, plaintiffs filed a "First Amended Complaint For Declaratory and Injunctive Relief." ECF 17 ("Amended Complaint"). They added three defendants.

The defendants are the Social Security Administration; Leland Dudek, in his official capacity as "purported Acting Commissioner" of the SSA; Michael Russo, in his official capacity as Chief Information Officer ("CIO") of the Agency;[5] Elon Musk, in his official capacity as "Senior Advisor to the President and de facto head of" DOGE; the "U.S. DOGE Service"; the U.S. DOGE Service Temporary Organization; and Amy Gleason, in her official capacity as the DOGE Acting Administrator.

As discussed, *infra*, I issued a Temporary Restraining Order on March 20, 2025, barring the disclosure of PII to DOGE personnel under certain circumstances. *See* ECF 48, ECF 49. The government appealed that ruling to the Fourth Circuit on March 24, 2025. ECF 57. The Fourth Circuit dismissed the appeal on April 1, 2025, based on lack of jurisdiction. ECF 81 (Order); ECF 82 (Judgment); ECF 83 (Corrected Order).

---

580596 (E.D. Va. Feb. 21, 2025) (denying preliminary injunction because plaintiffs failed to show irreparable harm); *New York, et al. v. Trump, et al.*, 25-JAV-1144, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) (granting preliminary injunction against U.S. Department of the Treasury and Scott Bessent, the Secretary of the Treasury); *New Mexico, et al., v. Musk, et al.*, 25-TSC-429, 2025 WL 520583 (D.D.C. Feb. 18, 2025) (denying TRO because plaintiffs did not show irreparable harm); *Univ. of California Student Ass'n v. Carter*, 25-RDM-354, __ F. Supp. 3d __, 2025 WL 542586 (D.D.C. Feb. 17, 2025) (denying TRO because plaintiffs did not show irreparable harm); *American Federation of Labor and Congress of Industrial Organizations, et al. v. Dep't of Lab., et al.*, 25-JDB-0339, 2025 WL 542825, at *5 (D.D.C. Feb. 14, 2025) (denying TRO because plaintiffs did not show that they were highly likely to succeed on the merits).

[5] According to plaintiffs, Michael Russo has been replaced as CIO. ECF 110-1 at 4 n.3. News reports indicate that Scott Coulter is his successor. Hannah Natanson & Lisa Rein, *Inside DOGE's Push to Defy a Court Order and Access Social Security Data*, WASH. POST (Apr. 15, 2025), https://perma.cc/A343-RDKD; Alexandra Berzon, et al., *Social Security Lists Thousands of Migrants as Dead to Prompt Them to 'Self-Deport'*, N.Y. TIMES (Apr. 10, 2025), https://perma.cc/H67G-6L2M. But, plaintiffs have not named a substitute for Mr. Russo. *See* Fed. R. Civ. P. 25(d).

3

Thereafter, plaintiffs moved for a preliminary injunction (ECF 110), which defendants oppose. ECF 113. This Memorandum Opinion addresses that motion. As I consider the preliminary injunction motion, I am mindful of the decision of a divided panel of the Fourth Circuit on April 7, 2024, granting a stay pending appeal as to the preliminary injunction issued in the case of *American Federation of Teachers, et al. v. Bessent, et al.*, DLB-25-0430, 2025 WL 895326 (D. Md. Mar. 24, 2025). *See American Federation of Teachers, et al. v. Bessent, et al.*, No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025). There, in an unpublished opinion, the panel majority concluded that the government "made a strong showing that it will succeed on the merits as to standing." *Id.* at *1 (Agee, J.). And, in an eight to seven vote, the Fourth Circuit declined to hear the *Bessent* matter en banc. Notably, the panel in *Bessent* is the same panel that considered and dismissed the government's appeal of the TRO issued in this case.[6]

In my view, this case differs markedly from *Bessent*, in several important respects. First, virtually from its inception, SSA has been guided by an abiding commitment to the privacy and confidentiality of the personal information entrusted to it by the American people. Regulation No. 1, adopted by the Social Security Board in 1937, governed privacy and disclosure of Social Security records. SOC. SEC. ADMIN., *Social Security History Regulation No. 1*, https://perma.cc/H59K-PMN2; *see also* ECF 22-10, ¶ 4. This principle has informed the expectations of the American public that the information held by SSA is private and confidential.

---

[6] I am also mindful that on April 9, 2025, a divided panel of the Fourth Circuit granted a stay pending appeal in *Maryland, et al. v. United States Department of Agriculture, et al.*, JKB-25-748, 2025 WL 973159 (D. Md. Apr. 1, 2025), involving a suit brought by nineteen states challenging the termination of federal probationary employees. There, the panel majority concluded that the government "is likely to succeed in showing that the district court lacked jurisdiction over Plaintiffs' claims, and the Government is unlikely to recover the funds disbursed to reinstated probationary employees." *Maryland v. United States Department of Agriculture.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025).

Second, this case involves access to personal information of children. Notably, the Agency "pays more benefits to children than any other federal program.[]" ECF 17, ¶ 31 (citing Soc. Sec. Admin., *Understanding the Benefits* (2025) 2, https://perma.cc/V2MH-VANX). The Agency's records include family court records and school records. ECF 17, ¶ 35.

Third, this case involves SSA's access, *inter alia*, to extensive medical and mental health records of SSA beneficiaries. As "the nation's principal benefit-paying agency" (*id.* ¶ 28), SSA "manages and administers" several of "the largest federal benefit programs," including the Old-Age, Survivors, and Disability Insurance programs ("OASDI") and the Supplemental Security Income program ("SSI"). *Id.* ¶¶ 19, 30. Although most of Social Security's beneficiaries are retired, *id.* ¶ 31, many others "receive benefits because they have a qualifying disability; are the spouse (or former spouse) or child of someone who receives or is eligible for Social Security; or are the spouse (or former spouse), child, or dependent parent of a deceased worker.[]" *Id.* (citing Soc. Sec. Admin., *Understanding the Benefits* (2025) 2, https://perma.cc/V2MH-VANX). Individuals must submit medical and/or mental health information to SSA to receive disability benefits. These include medical and mental health treatment records, prescription medications, hospitalization records, records of medical tests performed by the listed providers (with the enumerated list including HIV, AIDS, and psychological/IQ tests), and addiction treatment records. ECF 17, ¶ 35; ECF 22-1, ¶¶ 11, 12. And, SSA periodically conducts reviews of disability determinations, so the medical records of beneficiaries are updated.

## II.   Procedural Summary

The Amended Complaint (ECF 17) contains seven counts. Four counts allege violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) (ECF 17, Counts I, III, IV, V); Count II alleges a violation of the Privacy Act, 5 U.S.C. § 552a(o); Count VI alleges *ultra vires*

5

JA1306

actions by the DOGE Defendants; and Count VII alleges violation of the Appointments Clause of the Constitution, U.S. CONST. art. II, § 2, cl. 2.

On March 7, 2025, plaintiffs moved for a temporary restraining order. ECF 21. It was supported by a memorandum (ECF 21-1) (collectively, the "TRO Motion") and numerous exhibits. *See* ECF 22.[7] Defendants opposed the TRO Motion (ECF 36), supported by two exhibits. Plaintiffs replied on March 13, 2025 (ECF 39) and submitted additional exhibits.

The Court held a TRO Motion hearing on March 14, 2025, at which argument was presented. ECF 43; ECF 45 (Transcript). By Memorandum Opinion (ECF 49) and Order (ECF 48) of March 20, 2025, I granted the TRO. In the interest of judicial economy, I incorporate by reference the opinion docketed at ECF 49.

Subject to certain exceptions, the TRO enjoins SSA, Dudek, and Russo from providing the DOGE Defendants, SSA DOGE Team members, and DOGE affiliates with access to any SSA system of record containing PII. It also required the DOGE Defendants, SSA DOGE Team members, and DOGE affiliates to disgorge and delete all PII in their possession or under their control that was obtained from a SSA system of record. ECF 48, ¶ 1. But, the TRO does not preclude SSA from providing members of the SSA DOGE Team with access to redacted or anonymized data of SSA, provided that a) the persons to whom access is given have completed training and background checks comparable to that which is typically required for SSA employees with such access; b) inter-agency detailing agreements are completed, where required, for members of the SSA DOGE Team; and c) all required Agency paperwork is completed. *Id.* ¶ 2. Moreover, the TRO permits SSA to provide the DOGE Team with access to "discrete,

---

[7] Neither the TRO Motion nor the preliminary injunction motion addresses the Appointments Clause claim in Count VII.

particularized, and non-anonymized" data, provided that SSA complies with the requirements of paragraph 2 of the TRO and SSA obtains a written statement from the DOGE Team member explaining the need for the record and why anonymization is not feasible. *Id.* ¶ 3.

Defendants filed a status report on March 24, 2025 (ECF 56), along with a Declaration of Dudek. ECF 56-1. As noted, they appealed to the Fourth Circuit on the same date. ECF 57. Then, on March 26, 2025, defendants moved for a stay pending appeal. ECF 60. Several hours later, defendants also moved for a stay in the Fourth Circuit. *See* Case No. 25-1291, Docket Entry No. 5. By Memorandum (ECF 78) and Order (ECF 79) of March 31, 2025, I denied the Motion for Stay. And, by agreement of the parties (ECF 68), the TRO was extended through April 17, 2025. ECF 69.

On March 27, 2025, the government filed a "Notice of Compliance with Paragraphs 2-3" of the TRO ("Notice"). ECF 62. The government claimed that, as to four DOGE Team members, SSA satisfied the criteria set by the Court in the TRO for access to PII. *Id*. The Notice is supported by two declarations. ECF 62-1 (Dudek); ECF 62-2 (Florence Felix-Lawson). In response to the filing, I convened an emergency telephone hearing (ECF 67), in which Acting Commissioner Dudek participated. The transcript of the hearing is docketed at ECF 73. In accordance with a briefing schedule set by the Court during the telephone hearing (*see* ECF 64), Mr. Dudek filed a Supplemental Declaration. ECF 74-1.

Plaintiffs oppose the Notice (ECF 77), supported by the Declaration of "Alex Doe," a former Digital Services Expert at the United States Digital Service (ECF 77-1), and the Declaration of Ann Lewis, former Director of the Technology Transformation Services within the U.S. General Services Administration (ECF 77-2). Defendants replied on April 1, 2025 (ECF 80), and submitted another Declaration of Mr. Dudek. ECF 80-1. On the same date, the Fourth Circuit dismissed the

appeal for lack of jurisdiction.  ECF 81, ECF 82, ECF 83.

By Memorandum and Order of April 2, 2025 (ECF 95), the Court requested additional documentation from the government with respect to the Notice, pursuant to paragraph three of the TRO.  Defendants submitted the additional documentation on April 7, 2025.  ECF 114.  Then, in a submission of April 8, 2025, plaintiffs challenged defendants' compliance.  ECF 120.  The matter is pending.

Defendants filed the Administrative Record, under seal, on April 2, 2025.  ECF 86; ECF 86-1 to ECF 86-6.  The certification of the Administrative Record ("A.R.") (ECF 100-1) and the index (ECF 100-2) were submitted on April 3, 2025.  On April 4, 2025, the Court held a hearing (ECF 108) to resolve several disputes in connection with the Administrative Record.  *See* ECF 84, ECF 96, ECF 106.  Defendants supplemented the A.R. on April 7, 2025.  ECF 112.  And, on April 9, 2025, they filed a redacted version on the public docket.  ECF 121.

Plaintiffs filed a "Motion for Preliminary Injunction And/Or 5 U.S.C. § 705 Stay" on April 4, 2025.  ECF 110.  It is supported by a memorandum (ECF 110-1) (collectively, the "Motion" or "P.I. Motion"), and exhibits.  Defendants oppose the Motion.  ECF 113 (the "Opposition" or "P.I. Opposition").  Plaintiffs replied on April 10, 2025 (ECF 122) (the "Reply") and submitted another exhibit.

At the request of the Court (ECF 116), plaintiffs filed a supplemental memorandum (ECF 119) addressing the decision of the divided panel of the Fourth Circuit in *Bessent*, 2025 WL 1023638, granting the government's motion for a stay of the preliminary injunction issued by the District Court.  The ruling in *Bessent* also prompted the government to ask this Court to reconsider its stay decision.  ECF 117.  Plaintiffs opposed that request, noting defendants' consent to the extension of the TRO.  ECF 119.  By Order of April 11, 2025 (ECF 127), I denied the government's

8

JA1309

renewed stay request, in light of its consent to an extension of the TRO (ECF 68). ECF 127.

During the evening of Friday, April 11, 2025, plaintiffs filed a motion to expand the scope of the P.I. Motion hearing and to submit supplemental declarations. ECF 129. By Order of April 11, 2025, I approved the request as to the filing of additional declarations, but granted defendants leave to move to rescind the Order as improvidently granted. ECF 131. Defendants responded on April 14, 2025, opposing plaintiffs' motion to expand the scope of the P.I. Motion hearing and to file supplemental declarations. ECF 132.

Also on April 14, 2025, plaintiffs submitted a four-page Supplemental Declaration of Tiffany Flick. ECF 136-1. And, by Order of April 14, 2025 (ECF 137), I granted leave to the government to respond to ECF 136-1 by 9:00 a.m. on April 15, 2025.

In a concurrence dismissing the government's appeal of the TRO, Judge Agee admonished the parties, with regard to the preliminary injunction motion that had not then been filed, to "explain in specific detail the basis for their respective arguments." ECF 83 at 3. And, he "recommend[ed] the district court move expeditiously . . . while also allowing the introduction of relevant evidence." *Id.*

While preparing for the P.I. Motion hearing, I identified issues of concern regarding certain submissions by SSA. Therefore, mindful of Judge Agee's comment, I wrote to counsel on April 11, 2025 (ECF 127) and said, in part, *id.* at 2:

> Testimony from Acting Commissioner Dudek may be helpful as to the various SSA projects that Mr. Dudek has referenced in his declarations, and for which he claims the DOGE Team requires access to PII. Therefore, I ask that Acting Commissioner Dudek appear at the P.I. Motion hearing on April 15, 2025, in order to clarify information that has been provided.

To be clear, I did not order Mr. Dudek to appear. And, by letter of April 14, 2025 (ECF 138), the government advised that it would "stand on the record in its current form." *Id.*

9

The Court held a hearing on the P.I. Motion on April 15, 2025. ECF 139; ECF 143 (Tr. 4/15/25).[8] The Court heard argument of counsel, but no evidence was presented. Mr. Dudek did not appear, and the clarification was not provided. *See* ECF 143 at 19.

I shall refer to SSA, Dudek, and Russo collectively as the "SSA Defendants." As indicated, I shall refer to the Department of Government Efficiency as "DOGE." And, I shall refer to U.S. DOGE Service as "USDS." Collectively, I shall refer to USDS; U.S. DOGE Service Temporary Organization; Musk; and Gleason as the "DOGE Defendants." And, for convenience, I shall sometimes refer to all of the defendants collectively as the "government." The eleven individuals assigned to, detailed to, employed by, or working at SSA to implement the DOGE Agenda, as contemplated by § 2(c) of Executive Order 14,158, shall be referred to as the "DOGE Team." And, I use the term "DOGE affiliate" to refer to any SSA employee, contractor, special government employee, expert, or consultant working in concert with or at the direction of the DOGE Team, directly or indirectly, to implement the DOGE agenda.

As used here, PII or "'personally identifiable information' means information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual." OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB Circular A-130, *Managing Information as a Strategic Resource* (2016) 33, https://perma.cc/L3CV-M6RF. SSA's records include Social Security Numbers ("SSNs"), medical and mental health records, driver's license information, bank account data, tax information, employer and employee payment records, earnings history, birth and marriage

---

[8] The transcript of the P.I. Motion hearing was docketed on the afternoon of April 16, 2025. *See* ECF 143. In the time available, I have done my best to cite to the transcript, where appropriate. But, due to the compressed timeline, requiring a ruling by April 17, 2025, I have not included every useful citation to the transcript.

records, home and work addresses, immigration records, health care providers' contact information, and family court records. Such information is generally considered PII.

### III.    Background

#### A. The Parties

##### 1. Plaintiffs

AFSCME is a "national labor organization and membership organization" headquartered in Washington, D.C. ECF 17, ¶ 16. It "is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils, and other affiliates in 46 states, the District of Columbia, and Puerto Rico." *Id.* Of AFSCME's members, "approximately 200,000 are retired public service workers who continue to remain members of AFSCME, participate in its governance, and advocate for fairness, equality, and income security for retired Americans." *Id.*

Alliance is a "grassroots advocacy organization with 4.4 million members headquartered in Washington, D.C." *Id.* ¶ 17. It was founded by the AFL-CIO Executive Council in 2001 and has 40 state alliances as well as members in every state. *Id.* The Alliance's retiree members include "former teachers, industrial workers, state and federal government workers, construction workers, and community leaders, all united in the belief that every American deserves a secure and dignified retirement after a lifetime of hard work." *Id.*

AFT is a "national labor organization headquartered in Washington, D.C." *Id.* ¶ 18. It represents "over 1.8 million members who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals." *Id.* According to the Amended Complaint, "[a]pproximately 490,000

11

of AFT's members are retired, and most benefit from programs administered by SSA." *Id.*
Plaintiffs assert, *id.*: "Economic and retirement security is at the core of AFT's mission."

As I discuss in more detail, *infra*, each plaintiff organization has many members for whom
SSA holds personal, sensitive information, such as SSNs, bank account numbers, medical and
mental health information, tax information, and home addresses. *See, e.g.*, ECF 22-1 (Declaration
of Ann Widger, Director of Retirees at AFSCME), ¶¶ 10–13; ECF 22-6 (Declaration of Richard J.
Fiesta, Executive Director of Alliance), ¶¶ 8, 9; ECF 22-8 (Declaration of Bernadette Aguirre,
Director of the Retiree Division of AFT), ¶ 8. And, members of each organization are concerned
that DOGE's access to this information violates their privacy interests, increases their risk of
identity theft, and increases the risk that the benefits to which they are entitled will be delayed or
cut off. *See* ECF 22-1, ¶¶ 16, 17, 27, 30, 32; ECF 22-6, ¶¶ 7, 12, 13; ECF 22-8, ¶¶ 12, 13, 15.

### 2. Defendants

The Social Security Administration is an "independent federal agency." ECF 17, ¶ 19.
Founded in 1935, during the Great Depression, (*id.* ¶ 28), SSA was intended to "'give some
measure of protection to the average citizen,' particularly those facing 'poverty-ridden old age.'[]"
*Id.* (quoting SOC. SEC. ADMIN., *Presidential Statement on Signing the Social Security Act* (August
14, 1935), https://perma.cc/7RDU-EDWD). "Collectively, SSA pays over $1.5 trillion to seventy
million people—more than one in five Americans—each year.[]" ECF 17, ¶ 32 (citing SOC. SEC.
ADMIN., *Fact Sheet*, https://perma.cc/595S-B36F). The Agency employs "roughly 57,000"
people. ECF 39-1 (Supplemental Declaration of Tiffany Flick), ¶ 7.

In addition to dispersing funds to eligible beneficiaries, SSA issues Social Security
Numbers to "U.S. citizens, permanent residents, and other eligible noncitizens." ECF 17, ¶ 29. To

12

date, more than "450 million" SSNs have been issued. *Id.* SSA also "helps administer" federal programs, such as "Medicare, Medicaid, SNAP, eVerify, and the Help America Vote Act." *Id.* ¶ 33.

"To facilitate its work on behalf of the American public, SSA collects and houses some of the most sensitive, personally identifiable information (including personal health information) of millions of seniors, working-age adults, and children." *Id.* ¶ 34. By way of example, Form SS-5, "which applicants must submit to SSA to receive" a SSN, "requires applicants to provide their name (including prior names or other names used), place and date of birth, citizenship, ethnicity, race, sex, phone number, and mailing address, as well as their parents' names and [SSNs]." *Id.*

The Agency also collects a wide range of other personal information, including "driver's license and identification card information, bank and credit card information, birth and marriage certificates, pension information, home and work addresses, school records, immigration and/or naturalization records, health care providers' contact information, family court records, employment and employer records, psychological or psychiatric health records, hospitalization records, addiction treatment records, and tests for, or records about, HIV and AIDS." *Id.* ¶ 35. Moreover, SSA collects tax and earnings information. *Id.* ¶ 36. For example, employers submit to SSA a W-3 form each year that shows "total earnings, Social Security wages, Medicare wages, and withholdings for all employees for the previous year." *Id.*

The Court takes notice that retirement benefits are funded by the nation's workforce, through mandatory payment of payroll taxes by both employers and employees. At certain ages, individuals become eligible for retirement benefits, calculated based on work history and earnings records maintained by SSA. Simply put, SSA collects and maintains the work and earnings history of nearly all working Americans for the entirety of their working lives. *See, e.g.*, ECF 22-3

(Declaration of John Doe), ¶ 5 (stating that SSA has 65 years of his employment records); *see also* Soc. Sec. Admin., *Understanding the Benefits* (2025) 2, https://perma.cc/V2MH-VANX.

The Agency is subject to a "panoply of laws" that govern and protect SSA's data systems and the disclosure of PII held by SSA. ECF 17, ¶ 39. These include the Privacy Act, the Social Security Act, the Tax Reform Act of 1976, the Taxpayer Browsing Protection Act, and the Federal Information Security Modernization Act ("FISMA"). *Id.*; *see* ECF 49 at 45–51.

Leland Dudek is the Acting Commissioner of the SSA. ECF 17, ¶ 20. He was selected by President Trump on or about February 16, 2025, after the resignation of Michelle King, then the Acting SSA Commissioner. ECF 1, ¶ 88. Dudek approved the data access to the DOGE Team that is at issue here. *See* ECF 36-1 (Declaration of Russo), ¶ 6; *see also, e.g.*, ECF 86-2 at 1–30.

At the outset of the litigation, Michael Russo was the Chief Information Officer of the SSA. ECF 17, ¶ 21. He assumed the position on February 3, 2025. ECF 36-1, ¶ 1. As the CIO, Russo was responsible for implementation and management of information technology, and he was "responsible for oversight of grants of permissions [sic] to access SSA systems." *Id.* ¶ 2. As noted, he has since been replaced in this role. *See* 110-1 at 4 n.3.

Elon Musk is a "Senior Advisor to the President and the de facto Head of DOGE." ECF 17, ¶ 23.[9] Executive Order 14,158 established the U.S. DOGE Service, previously the U.S. Digital Service,[10] and renamed it as the United States DOGE Service. *Id.* ¶ 24. USDS is part of the Executive Office of the President ("EOP"). *Id.* U.S. DOGE Service Temporary Organization is a

---

[9] Referring to defendant Musk, plaintiffs assert: "Never before has an industry mogul with countless conflicts of interest—not to mention an undefined role in the administration—sought and gained access to protected, private data on nearly every person in the country." ECF 17, ¶ 11.

[10] The United States Digital Service was a technology unit established in 2014 with Congressional appropriations, and housed within the Executive Office of the President.

14

"temporary organization also created by Executive Order 14158 and headed by the U.S. DOGE Service Administrator." *Id.* ¶ 25.

Amy Gleason is the Acting Administrator of USDS and the U.S. DOGE Service Temporary Organization. *Id.* ¶ 26. She was named to the position on February 25, 2025. *See Citizens for Resp. & Ethics in Washington v. U.S. Doge Serv.* ("*CREW*"), No. 25-CV-511 (CRC), 2025 WL 752367, at *2 (D.D.C. Mar. 10, 2025).

### B. Post-Inauguration Period

#### 1. Executive Order 14,158

Following President Trump's inauguration on January 20, 2025, he signed Executive Order 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025) ("E.O." or "DOGE Order"), titled "Establishing and Implementing the President's 'Department of Government Efficiency.'" The E.O. established DOGE "to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* § 1. It renamed the United States Digital Service as the "United States DOGE Service (USDS)" and moved it from the Office of Management and Budget to the EOP. *Id.* § (3)(a).[11] In addition, the DOGE Order established a USDS Administrator in the EOP, who "shall report to the White House Chief of Staff." *Id.* § 3(b). And, the DOGE Order creates "a temporary organization known as 'the U.S. DOGE Service Temporary Organization,'" which is "dedicated to advancing the President's 18-month DOGE agenda." *Id.*

---

[11] The distinctions between DOGE and USDS are not entirely clear. But, for the purpose of this Memorandum Opinion, the terms are largely interchangeable.

15

Further, the DOGE Order provides, *id.* § 3(c): "In consultation with USDS, each Agency Head[12] shall establish within their respective Agencies a DOGE Team of at least four employees, which may include Special Government Employees,[13] hired or assigned within thirty days of the date of this Order.  Agency Heads shall select the DOGE Team members in consultation with the USDS Administrator.  Each DOGE Team will typically include one DOGE Team Lead, one engineer, one human resources specialist, and one attorney.  Agency Heads shall ensure that DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda."

Section 4 of the DOGE Order concerns "Modernizing Federal Technology and Software to Maximize Efficiency and Productivity."  *Id.* § 4.  It provides, *id.* § 4(a): "The USDS Administrator shall commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems.  Among other things, the USDS Administrator shall work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization."

Relevant here, § 4(b) of the E.O. states: "Agency Heads shall take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to

---

[12] The Executive Order defines "Agency Head" as "the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order."  Exec. Order. No. 14,158, § 2(b).

[13] A Special Government Employee is a temporary "officer or employee" who is "retained, designated, appointed, or employed to perform, with or without compensation . . . temporary duties either on a full-time or intermittent basis" for up to 130 days in any 365-day period.  18 U.S.C. § 202(a).  They are exempt from some of the ethics rules to which most federal employees are subject.  *See* 18 U.S.C. §§ 203, 205, 207–209.

16

ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems. USDS shall adhere to rigorous data protection standards."

### 2. SSA in the Crosshairs

According to the Amended Complaint, "President Trump, Elon Musk, and other administration officials have had their sights set on Social Security for the past year . . . ." ECF 17, ¶ 60. For example, President Trump and Mr. Musk have "repeatedly suggested that there is widespread fraud within Social Security, as well as other entitlements." *Id.* ¶ 65. On February 11, 2025, Musk posted on "X", formerly known as Twitter, as follows:



*See id.* ¶ 66.[14] And, on February 17, 2025, Musk posted on X, *see id.* ¶ 67:

---

[14] Plaintiffs provided the permalink for all "X" posts.

JA1318



Further, the Amended Complaint states, *id.* ¶ 68: "On February 17, 2025, White House Press Secretary Karoline Leavitt stated on Fox News that President Trump 'has directed Elon Musk and the DOGE team to identify fraud at the Social Security Administration.[]'" (Quoting Yamiche Alcindor & Raquel Coronell, *Top Social Security Official Steps Down After Disagreement With DOGE Over Sensitive Data*, CNN (Feb. 17, 2025), https://perma.cc/9ZLL-VLFH). In particular, Leavitt claimed that Musk and the DOGE Team "'suspect that there are tens of millions of deceased people who are receiving fraudulent Social Security payments.[]'" ECF 17, ¶ 68 (quoting Zachary B. Wolf, *Trump And Musk Set Their Sights On Social Security By Spreading Rumors*, CNN (Feb. 19, 2025), https://perma.cc/YY7H-8XPA).

On February 19, 2025, Howard Lutnick, the Secretary of the Department of Commerce, stated on Fox News: "'Back in October . . . I flew down to Texas, got Elon Musk [to set up DOGE], and here was our agreement: that Elon was gonna cut a trillion dollars of waste[,] fraud and abuse . . . . We have almost $4 trillion of entitlements, and no one's ever looked at it before. You know Social Security is wrong, you know Medicaid and Medicare are wrong . . . .[]'" ECF 17, ¶ 69 (citation omitted).

In a press release on February 19, 2025, Dudek stated "that DOGE 'is a critical part of President Trump's commitment to identifying fraud, waste, and abuse.[]'" *Id.* ¶ 70 (quoting Soc.

SEC. ADMIN., Press Release, *Statement from Lee Dudek, Acting Commissioner, About Commitment to Agency Transparency and Protecting Benefits and Information* (Feb. 19, 2025), https://perma.cc/W33R-QKEZ). And, on February 22, 2025, President Trump claimed that "tens of millions of Americans are improperly receiving Social Security benefits,[] calling Social Security 'the biggest Ponzi scheme of all time . . . It's all a scam, the whole thing is a scam.[]'" ECF 17, ¶ 71 (citations omitted).

Then, on February 28, 2025, Musk appeared on "'The Joe Rogan Experience'—a widely listened to podcast—and proclaimed that 'a basic search of the Social Security database' indicated '20 million dead people [were] marked as alive' and that 'Social Security is the biggest Ponzi Scheme of all time.'" *Id.* ¶ 72 (citation omitted; alteration in ECF 17). According to plaintiffs, "[t]hat claim is false.[]" *Id.* (citing SOC. SEC. ADMIN., Off. of Inspector Gen., *IG Reports: Nearly $72 Billion Improperly Paid; Recommended Improvements Go Unimplemented* (Aug. 19, 2024), https://perma.cc/WR7T-3KZA).

President Trump continued to deride the SSA. On March 4, 2025, in the President's first speech of his second term to a joint session of Congress, he "claimed there to be 'shocking levels of incompetence and probable fraud in the Social Security Program.[]'" ECF 17, ¶ 73 (citation omitted).

### 3. Recent Changes at SSA

Plaintiffs assert that DOGE and the DOGE Team "have wrought havoc" on SSA in the past few months. ECF 110-1 at 7. For example, recent news reports claim that DOGE has weaponized SSA as a vehicle to financially cripple immigrants, even some with legal status, allegedly to coerce them to "self deport." *See* ECF 129 at 1; *see also* Alexandra Berzon, et al., *Social Security Lists Thousands of Migrants as Dead to Prompt Them to 'Self-Deport'*, N.Y. TIMES (Apr. 10, 2025),

https://perma.cc/H67G-6L2M.  In particular, the Agency has allegedly added to its "death master file," renamed the "ineligible master file," the names of people who are actually alive.  As a result of being added to the death database, these people are then "blacklisted from a coveted form of identity" needed for virtually all financial transactions.  *Id.*; *see also* Hannah Natanson & Lisa Rein, *Inside DOGE's Push to Defy a Court Order and Access Social Security Data*, WASH. POST (Apr. 15, 2025), https://perma.cc/A343-RDKD.  The news has also reported crashes of the SSA website.  *See, e.g.*, Lisa Rein, et al., *Social Security Website Keeps Crashing, As DOGE Demands Cuts to IT Staff*, WASH. POST (Apr. 7, 2025), https://perma.cc/LXM2-SRHH.

On February 21, 2025, "SSA announced an 'organizational realignment' of its Office of Analytics, Review, and Oversight, which was responsible for addressing recommendations from external monitoring authorities and overseeing fraud detection.[]"  ECF 17, ¶ 75 (citing SOC. SEC. ADMIN., Press Release, *Social Security Announces Change to Improve Agency Operations and Strengthen Protections* (Feb. 21, 2025), https://perma.cc/3EC7-KARR).  On February 24, 2025, "SSA announced it was closing the agency's Office of Transformation,[] which was dedicated to the digital modernization of SSA programs and services, including improving the agency's website." ECF 17, ¶ 76 (citation omitted).  The next day, "SSA shuttered its Office of Civil Rights and Equal Opportunity,[] which had been tasked with overseeing the agency's civil rights, equal employment, harassment prevention, accommodations, and disability services."  *Id.* (citation omitted).

The Agency has also closed local offices and "drastically reduc[ed] customers' ability to access services . . . ."  ECF 110-1 at 7.  On February 27, 2025, "SSA announced that it was implementing an 'agency-wide organizational restructuring that will include significant workforce reductions'[] and began offering buyouts to agency employees.[]"  ECF 17, ¶ 77 (citations omitted).

20

The following day, "SSA announced it was reducing the agency's workforce by 7,000 and reducing the number of regional SSA offices from ten to four.[]" *Id.* ¶ 78 (citation omitted).  But, the Agency "had already been at a fifty-year staffing low.[]" *Id.* (citation omitted).  And, on February 28, 2025, the same day that the Agency announced the significant workforce reduction, "twenty senior SSA leaders announced their resignations.[]" *Id.* ¶ 79 (citation omitted).  In addition, "DOGE has also been examining SSA's contracting and other systems, posting various cuts to agency contracts on its 'wall of receipts.[]'" *Id.* ¶ 80 (citation omitted).

According to plaintiffs, Dudek "has confirmed: DOGE personnel—or, as he called them, 'outsiders who are unfamiliar with nuances of SSA programs'—are calling the shots.[]" *Id.* ¶ 81 (citing Lisa Rein *et al.*, *DOGE Is Driving Social Security Cuts and Will Make Mistakes, Acting Head Says Privately*, WASH. POST (Mar. 6, 2025), https://perma.cc/FYY3-QGRR).

### C.  Declarations

In connection with their TRO Motion, plaintiffs submitted declarations from eleven individuals: (1) Ann Widger, the Director of Retirees at AFSCME (ECF 22-1); (2) Sue Conard, a retiree member of AFSCME (ECF 22-2); (3) "John Doe," a retiree member of AFSCME (ECF 22-3); (4) Tamara Imperiale, a retiree member of AFSCME (ECF 22-4); (5) Charles "CK" Williams, a retiree member of AFSCME (ECF 22-5); (6) Richard J. Fiesta, the Executive Director of ARA (ECF 22-6); (7) Linda Somo, a member of Alliance (ECF 22-7); (8) Bernadette Aguirre, Director of AFT'S Retiree Division (ECF 22-8); (9) David Gray, a retired member of AFT (ECF 22-9); (10) Tiffany Flick, a former long-term SSA employee who most recently served as Acting Chief of Staff to Acting SSA Commissioner Michelle King (ECF 22-10; ECF 39-1); and (11) Kathleen Romig, the Director of Social Security and Disability Policy at the Center on Budget and Policy Priorities (ECF 39-2).

21

Plaintiffs have submitted eleven additional declarations in support of their P.I. Motion. These include supplemental declarations from Widger (ECF 110-3); Conard (ECF 110-4); Fiesta (ECF 110-5); Somo (ECF 110-6); Aguirre (ECF 110-7); and Gray (ECF 110-8), who confirm that everything they stated in their previous declarations remains true. ECF 110-3, ¶ 1; ECF 110-4, ¶ 1; ECF 110-5, ¶ 1; ECF 110-6, ¶ 1; ECF 110-7, ¶ 1; ECF 110-8, ¶ 1. Plaintiffs also filed declarations of Erie Meyer, founding member of the U.S. Digital Service and former Chief Technologist of two federal agencies (ECF 110-9); Marcela Escobar-Alava, former CIO at SSA (ECF 110-10); and "Brady Doe," an SSA employee (ECF 110-12), as well as two supplemental declarations of Flick. ECF 110-11; ECF 136-1. With their Reply, plaintiffs filed a Supplemental Declaration of Meyer. ECF 122-1.

Defendants did not submit any declarations in connection with their P.I. Opposition. *See* ECF 113. But, they have submitted several declarations in connection with the TRO Opposition and in subsequent filings, including their Notice of Compliance (ECF 62). *See, e.g.*, ECF 36-1 (Russo); ECF 36-2 (Felix-Lawson); ECF 62-2 (Felix Lawson); ECF 56-1 (Dudek, 3/24/25); ECF 60-1 (Dudek, 3/26/25); ECF 62-1 (Dudek, 3/27/25); ECF 74-1 (Dudek, 3/28/25); ECF 80-1 (Dudek, 4/1/25).

In plaintiffs' opposition (ECF 77) to the Notice of Compliance filed by defendants (ECF 62), plaintiffs submitted two declarations. One is the Declaration of Alex Doe, a former "Digital Services Expert at the United States Digital Services . . . ." ECF 77-1. The other is the Declaration of Ann Lewis, the former Director of the Technology Transformation Services within the U.S. General Services Administration. ECF 77-2.

I previously discussed the declarations submitted in connection with the TRO in my Memorandum Opinion of March 20, 2025 (ECF 49), which I incorporate here. I generally discuss

22

the declarations in the context of the issues, to the extent relevant. However, for background, I briefly discuss below a few of the declarations.

Tiffany Flick retired from SSA on or about February 16, 2025, after almost 30 years of service at the Agency, where she held a variety of positions. ECF 22-10 ("Flick Declaration"), ¶¶ 1, 2, 45, 46. Most recently, Flick served as the Acting Chief of Staff to Acting SSA Commissioner Michelle King. *Id.* ¶ 2. Flick provides a blistering account of events that unfolded at SSA from late January through the time of her resignation in mid February 2025.

On the morning of January 30, 2025, Flick received a call from Dudek, who was then serving as a senior advisor in the Office of Program Integrity. *Id.* ¶ 9. Dudek told Flick that two DOGE associates, Michael Russo and Scott Coulter, would be working at SSA. *Id.* Flick reported the call to Acting Commissioner King. *Id.* ¶ 10.

Russo began his onboarding process on January 31, 2025. *Id.* ¶ 11. He joined the Agency as the CIO on February 3. *Id.* Upon arrival, Russo "requested to bring in a software engineer named Akash Bobba, who was already assisting DOGE in multiple agencies." *Id.* ¶ 13. But, "there were challenges with Mr. Bobba's background check that took a few days to resolve." *Id.*

Flick recounts that on February 10, 2025, the Commissioner's Office and the Office of Human Resources were contacted by several people, including DOGE manager Steve Davis, about giving Mr. Bobba immediate access to SSA data. *Id.* ¶ 14. Russo and Davis "grew increasingly impatient" and ultimately Bobba was sworn in "over the phone" at around 9 p.m. that evening, "contrary to standard practice." *Id.* ¶ 16. Flick characterizes the request for same-day access for Bobba as "unprecedented" in her time working "for multiple SSA commissioners across multiple administrations . . . ." *Id.* ¶ 15. Nor did she understand "the apparent urgency with which Mr. Bobba needed to be onboarded and given access to SSA's systems and data," which she described

23

as "highly sensitive." *Id.* And, she asserts that "the credentialing process necessary for access to the systems would take longer." *Id.* ¶ 16.

Flick "determined" that Mr. Bobba would have "anonymized and read-only Numident data using a standard 'sandbox' approach," so that he would not have access to other data. *Id.* ¶ 26. According to Flick, the access she had determined to provide Bobba would enable him to answer DOGE's "numident-related questions about fraud," as Flick understood them, without exposing personally identifiable information. *Id.* And, this approach was consistent with the way that SSA handles "any request to review SSA's records for potential fraud, waste, and abuse by oversight agencies . . . or auditors. . . ." *Id.*

However, because of the expedited basis on which Bobba was granted access, the anonymized file provided to him had "technical glitches that created problems with the data in the file." *Id.* ¶ 27. On February 15, 2025, after Bobba had experienced technical issues with the anonymized Numident file (*id.* ¶ 28), he did not wait for SSA to resolve the technical issues. Rather, Russo obtained "an opinion" from the federal Chief Information Officer, a Presidential appointee housed within the Office of Management and Budget, stating that "he could give Mr. Bobba access to all SSA data." *Id.* ¶ 39. And, Russo and "other DOGE officials demanded that Mr. Bobba be given immediate, full access to SSA data in the Enterprise Data Warehouse ('EDW'), which included Numident files, the Master Beneficiary Record ('MBR') files, and the Supplemental Security Record ('SSR') files." *Id.* ¶ 30. Moreover, Russo "repeatedly stated that Mr. Bobba needed access to 'everything, including source code.'" *Id.* ¶ 36. But, Russo "never provided the kind of detail that SSA typically requires to justify this level of access." *Id.* ¶ 38.

According to Flick, Acting Commissioner King requested additional details from Russo on "why this level of access was necessary for the work [of] Mr. Bobba . . . ." *Id.* ¶ 44. But, she did

not receive an answer. *Id.* Instead, on February 16, 2025, Commissioner King "received an email from the White House noting that the President had named Mr. Dudek as the Acting Commissioner," although Flick understood that Dudek was on administrative leave. *Id.* ¶ 45. Shortly after Acting Commissioner King informed Flick that Dudek had been elevated to Acting Commissioner, Flick retired. *Id.* ¶ 46. Flick claims that, upon her departure, Dudek gave Bobba and "the DOGE team access to at least the EDW database, and possibly other databases." *Id.* ¶ 47.

In a Supplemental Declaration (ECF 39-1), Flick maintains that several employees of the DOGE Team accessed SSA data systems prior to having signed finalized detail agreements from other agencies. *Id.* ¶ 3. And, she claims that this "is not in keeping with agency practice because the agency does not consider a detailee to be an employee of SSA until a detail agreement is signed and finalized." *Id.*

In addition, Flick disputes the contention that the DOGE Team cannot perform its work using anonymized data. She states, *id.* ¶ 4:

> Normally when analysts or auditors review agency data for possible payment issues, including for fraud, the review process would start with access to high-level, anonymized data based on the least amount of data the analyst or auditor would need to know. If a subset of records within that data are flagged as suspicious, the analyst or auditor would access more granular, non-anonymized data to just that subset of files. In my experience, the type of full, non-anonymized access of individual data on every person who has a social security number or receives benefit[s] from Social Security is unnecessary at the outset of any anti-fraud or other auditing project. While agency anti-fraud experts would have access to the types of data that Mr. Russo describes, they also have significant training and expertise in agency programs and how to read and understand the data from agency systems.

Flick also explains that the "need to know" reason for full, non-anonymized access to SSA data systems articulated in this case are "far from sufficiently detailed to justify granting the level of access the DOGE Team now has." She posits that only thirty to forty Agency employees have the extent of access that is sought by the DOGE Team, out of "roughly 57,000 employees." *Id.*

25

¶ 7.  However, she contends that, unlike the DOGE Team, these thirty to forty employees are "highly skilled and highly trained."  *Id.*

Russo became the Chief Information Officer at SSA on February 3, 2025.  ECF 36-1, ¶ 1. He is a "Non-Career Senior Executive reporting directly to SSA's Acting Commissioner, Leland Dudek."  *Id.*  Felix-Lawson has been the Deputy Commissioner of Human Resources at SSA since November 17, 2024.  ECF 36-2, ¶ 1.  She is a "Career Senior Executive reporting directly to SSA's Acting Commissioner, Leland Dudek."  *Id.*

As the CIO, Russo is "responsible for oversight of grants of permissions [sic] to access SSA systems," including to SSA's DOGE Team.  ECF 36-1, ¶ 2.  In his Declaration of March 12, 2025, Russo asserted that the "SSA DOGE Team currently consists of ten SSA employees: four SSA special government employees (Employees 1, 4, 6, and 9) and six detailees to SSA from other government agencies and offices (Employees 2, 3, 5, 7, 8, and 10)."  *Id.* ¶ 4.  However, the DOGE Team now consists of eleven people.  ECF 56-1 (Dudek Declaration), at 2 n.1.[15]

Russo contends that the "overall goal of the work performed by SSA's DOGE Team is to detect fraud, waste and abuse in SSA programs and to provide recommendations for action to the Acting Commissioner of SSA, the SSA Office of the Inspector General, and the Executive Office of the President."  ECF 36-1, ¶ 5.  He also describes the particular data access granted to each employee, as well as the stated need for the data, discussed in more detail, *infra*.

Felix-Lawson is "responsible for leading and overseeing human resource services to the agency, including but not limited to appointing and onboarding new personnel, including regular

---

[15] Various news articles have identified some of the DOGE Team members.  *See*, *e.g.*, Berzon, *supra*, https://perma.cc/H67G-6L2M.

and special government employees and detailees." ECF 36-2, ¶ 2.[16]  She provided the dates when each DOGE Team member was brought onto the SSA DOGE Team, as well as additional details regarding their duties, training, and background investigations.[17]  I discuss this information, *infra*.

Felix-Lawson also described the background investigation process for DOGE Team members.  As of March 27, 2025, she claimed that "Employee 1, Employee 5, Employee 8, and Employee 9 have completed the steps in the background investigation process that SSA would require prior to granting access to personally identifiable information."  ECF 62-2, ¶ 12.  But, she stated: "All four individuals have background investigations pending—i.e., with [Defense Counterintelligence and Security Agency, "DSCA"]—which have not been finally adjudicated by SSA. Once these four SSA DOGE Team employees are adjudicated by SSA, they will be eligible to receive clearances."  *Id.* ¶ 8.

Dudek, now Acting Commissioner at SSA, was previously "a Senior Advisor in SSA's Office of Program Integrity ("OPI"), which provides oversight of the agency's anti-fraud program, improper payment initiatives, and related activities. OPI's key workloads include fraud detection analytics and models."  ECF 80-1, ¶ 3.  Dudek claims that he has "extensive other work experience in data safeguarding in government projects, to include inter-governmental data encryption efforts as well as serving as the Chief Information Security Officer for the Recovery Accountability and Transparency Board, created by the American Recovery and Reinvestment Act of 2009."  *Id.*

---

[16] Felix-Lawson repeats some of the information in the Russo Declaration.  *Compare*, *e.g.*, ECF 36-1, ¶¶ 4, 7 *with* ECF 36-2, ¶¶ 4, 7.

[17] Russo asserts that Employee 1 was granted access to certain SSA data on February 12, 2025.  ECF 36-1, ¶ 7(a).  Employee 1 is a SSA special government employee.  *Id.* ¶ 7; ECF 36-2, ¶ 5.  Yet, according to Felix-Lawson, Employee 1 was not appointed until February 13, 2025.  ECF 36-2, ¶ 5.  Although the initial disclosure to Employee 1 consisted of anonymized data, it appears that the data was disclosed to Employee 1 before he/she was an SSA employee.

Dudek has described himself as having "expertise in SSA systems, data, and fraud efforts" based on his current role, as well as his prior work history. *Id.*

Along with the Status Report submitted by defendants on March 24, 2025 (ECF 56), they submitted a Declaration of Dudek, certifying SSA's compliance with the TRO. *See* ECF 56-1. In connection with the motion for stay pending appeal, filed March 26, 2025, defendants submitted another Declaration of Dudek (ECF 60-1), explaining the "operational burden on the agency to continue to comply" with the TRO. *Id.* ¶ 3. SSA also identified, for the first time, specific efforts of the DOGE Team concerning detection of fraud, including detection of "Direct Deposit Fraud"; "Wage Reporting Fraud"; "Improved Fraud Detection"; and "Extreme Age Records." *Id.* ¶ 6.

In the Notice (ECF 62) filed on March 27, 2025, the government asked the Court to authorize access to PII. Dudek submitted another Declaration (ECF 62-1) in support of the Notice. For the first time, Dudek identified specific projects on which DOGE Employees 1, 5, 8, and 9 are working, and for which he claims access to PII is necessary. The projects are as follows: (1) "Are You Alive Project," ECF 62-1, ¶ 9; (2) "Death Data Clean Up Project," *id.* ¶ 10; and (3) "direct-deposit change, new claim, and wage-reporting fraud detection," or "Fraud Detection." *Id.* ¶ 11.

In response to the submission of ECF 62, the Court promptly held a telephone hearing on March 27, 2025. ECF 63, ECF 67. Mr. Dudek participated and responded to a handful of questions from the Court. *See* ECF 73 (Transcript). However, he was not questioned by either side, nor was he under oath.

On March 28, 2025, in response to an Order of March 27, 2025 (ECF 64), seeking clarification regarding the Notice and some comments of Mr. Dudek (ECF 62), Dudek filed another Declaration. ECF 74-1. He provided additional information regarding the "Fraud Detection" project, on which Employee 8 is working. In connection with defendants' reply

28

JA1329

concerning the Notice (ECF 80), defendants submitted yet another Declaration of Dudek (ECF 80-1) on April 1, 2025.

### D. Administrative Record

Defendants filed the Administrative Record, under seal, on April 2, 2025.  ECF 86; ECF 86-1 to ECF 86-6.  They filed a redacted version on the public docket on April 9, 2025.  ECF 121.  And, they provided a supplement on April 7, 2025.  ECF 112.

### 1. Legal Standard

The parties do not address the role of an administrative record in a challenge to an agency action.  Generally, "claims brought under the APA are adjudicated without a trial or discovery, on the basis of an existing administrative record[.]"  *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007).

In *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467 (4th Cir. 2013), the Fourth Circuit stated that the court "must only consider the record made before the agency at the time the agency acted" and "may not 'intrude upon the domain which Congress has exclusively entrusted to an administrative agency.'" (Quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (stating that judicial review "is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'") (citation omitted).  Moreover, "judicial inquiry into 'executive motivation' represents 'a substantial

29

intrusion' into the workings of another branch of Government and should normally be avoided." *Dep't of Commerce v. New York*, 588 U.S. 752, 780–81 (2019) (citation omitted).

Section 706 of the APA requires the reviewing court to review the "whole record or those parts of it cited by a party . . . ."  5 U.S.C. § 706; *see Ergon-W. Va., Inc. v. EPA*, 980 F.3d 403, 410 (4th Cir. 2020) (stating that, in its "evaluation of the agency action" the court "'shall review the whole record or those parts of it cited by a party' . . . .") (citation omitted).  Ordinarily, this inquiry "is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."  *New York*, 588 U.S. at 780 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)); *see Overton Park*, 401 U.S. at 420.

The record includes "the facts presented to the agency" and "the reasons given by the agency for taking the action."  *Dow AgroSciences LLC*, 707 F.3d at 468.  "The whole administrative record includes pertinent but unfavorable information, and an agency may not exclude information on the ground that it did not 'rely' on that information in its final decision." *Tafas v. Dudas*, 530 F. Supp. 2d 786, 793 (E.D. Va. 2008) (collecting cases).

Of relevance, "the focal point for judicial review" under the APA "should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).  In other words, the record does not include "facts and justifications for agency action provided to a reviewing court for the first time." *Tafas*, 530 F. Supp. 2d at 793.  Moreover, the court "'may not accept [agency] counsel's *post hoc* rationalizations for agency action'" because the "court may look only to these *contemporaneous* justifications in reviewing the agency action."  *Dow AgroSciences LLC*, 707 F.3d at 467-68 (quoting *Motor Vehicle Mfr. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)) (emphasis

30

in *Dow AgroSciences*). "[O]n the basis of the record the agency provides," the court decides "whether the action passes muster under the appropriate APA standard of review." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

A "complete administrative record" does not include "privileged materials, such as documents that fall within the deliberative process privilege, attorney-client privilege, and work product privilege." *Tafas*, 530 F. Supp. 2d at 794 (citing *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1457–58 (1st Cir. 1992)); *see, e.g.*, *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279 (D.C. Cir. 1998) ("Agency deliberations not part of the record are deemed immaterial."); *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1549 (9th Cir. 1993) (noting that "neither the internal deliberative processes of the agency nor the mental processes of individual agency members" are proper components of the administrative record); *Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 312 (S.D.N.Y. 2012) ("[C]ourts have consistently recognized that, for the purpose of judicial review of agency action, deliberative materials antecedent to the agency's decision fall outside the administrative record."); *Oceana, Inc. v. Locke*, 634 F. Supp. 2d 49, 54 (D.D.C. 2009) ("[A]gencies need not place predecisional and deliberative material in the administrative record, so their absence from the record does not mean that the record is 'incomplete.'[ ]"), *rev'd on other grounds*, 670 F.3d 1238 (D.C. Cir. 2011). This is because "it is the agency's articulated justification for its decision that is at issue; the private motives of agency officials are immaterial." *Comprehensive Cmty. Dev. Corp.*, 890 F. Supp. 2d at 312.

Of course, "there are cases that do not fit the mold." *Mayor & City Council of Baltimore v. Trump*, 429 F. Supp. 3d 128, 137 (D. Md. 2019). To accommodate those cases, courts have recognized several narrow exceptions to the APA's record rule. *Tafas*, 530 F. Supp. 2d at 795;

James N. Saul, *Overly Restrictive Administrative Records and the Frustration of Judicial Review*, 38 Envtl. L. 1301, 1308 (2008) (cataloguing exceptions). For example, discovery beyond the record may be appropriate where the record is incomplete; where additional information would provide helpful context; where supplemental information would assist the court in determining whether the agency failed to consider relevant factors; and, where the record's integrity has been impugned. Saul, *supra*, Envtl. L. at 1308–11.

Notably, a "court may go outside [the] record for explanation of highly technical matters." *J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1147 (E.D. Va. 1995) (citing *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159–60 (9th Cir. 1980)); *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir. 1977) ("[C]ourts are not straightjacketed to the original record in trying to make sense of complex technical testimony, which is often presented in administrative proceedings without ultimate review by nonexpert judges in mind."). Also of import, if the record is inadequate or "fail[s] to explain administrative action" and, as a result, "frustrate[s] effective judicial review," the court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Camp*, 411 U.S. at 142; *see Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981) (noting that "[w]hen the record is inadequate," the court may seek "additional explanations," but "[t]he new materials should be merely explanatory of the original record and should contain no new rationalizations") (citing *Bunker Hill Co.*, 572 F.2d at 1291).

In my view, SSA's system of records is not a subject of common knowledge. The various declarations submitted by the parties, concerning the Agency's system of records and the protocols

at SSA for managing and protecting these records, are important to the Court's understanding of the issues.[18]

## 2. DOGE Team

The SSA DOGE Team consists of five special government employees and six detailees from other federal agencies. In particular, Employee 2 is detailed from the National Aeronautics and Space Administration ("NASA") (ECF 86-2 at 52–63); Employee 3 is detailed from the Department of Labor ("DOL") (*id.* at 33–40; *id.* at 48–51); Aram Moghaddassi,[19] who is Employee 7, is detailed from the DOL (*id.* at 41–47); Employee 8 is detailed from the Office of Personnel Management (*id.* at 72–75); Employee 10 is detailed from the General Services Administration ("GSA") (*id.* at 76–79); and it appears that Employee 5 is detailed from USDS (*id.* at 101–09; *see* ECF 143 at 32, 34).

The special government employees are all appointed as "experts." Employee 1 was appointed on February 10, 2025 (ECF 86-5 at 43); Antonio Gracias, Employee 4, was appointed on February 23, 2025 (*id.* at 45); Employee 6 was appointed on February 24, 2025 (*id.* at 46); Employee 9 was appointed on February 23, 2025 (*id.* at 47); and Employee 11 was appointed on March 16, 2025 (*id.* at 48). Employee 1 is described as an expert in "modern computer programming languages, cloud and other infrastructure, AI, etc." *Id.* at 20. Gracias is described as having "over 25 years of experience in private equity investing" and "was a Director of Tesla

---

[18] At the hearing on the P.I. Motion, the government suggested that, to resolve the Motion, the Court must look to the Administrative Record, not Dudek's Declarations. ECF 143 at 53. But, as I discuss, *infra*, the Administrative Record is wholly inadequate to explain the need for access to the PII of countless Americans.

[19] In the Administrative Record, the surname is spelled "Mog**a**haddassi." *See, e.g.*, ECF 86-2 at 27 (boldface added). I have used the spelling provided by the government (ECF 118-1), which is consistent with the spelling that appears on a document signed by Mr. Moghaddassi. *See* ECF 86-6 at 21.

from 2007 to 2021." *Id.* at 22. Employee 6's investing-related experience is described in the list of his special qualifications. *Id.* at 27. Employee 9's described experience includes design, development, and implementation of automation and scheduling tools, an inventory-tracking system, an analytics database, and a forecasting model. *Id.* at 34. Employee 11 is described as having "over ten years of experience building cloud-native geospatial solutions." *Id.* at 31.

I discuss, *infra*, various documents that were executed by these SSA DOGE Team members. I also discuss, *infra*, SSA policies contained in the Administrative Record.

### 3. SSA Systems of Record

The SSA's Information Security Policy (ECF 86-3 at 168 through ECF 86-5 at 14) provides a useful summary of several of the SSA systems of record at issue in this case. They are as follows, ECF 86-4 at 54 (emphasis omitted):

- "Death Master File (DMF) – Publicly available database containing death notices for individuals enrolled in the U.S. Social Security program since 1936."

- "Document Management Architecture (DMA) – Architecture that addresses SSA document capture, indexing, routing, storge retrieval, and management needs. DMA uses hardware and software components to create an object repository for storage and retrieval of information."

- "Master Beneficiary Record (MBR) – Payment file from which Social Security checks are paid. The MBR contains information on Title II[20] beneficiaries, such as payment status, type, and amount."

---

[20] Title II and Title XVI refer to the Social Security disability insurance program (title II of the Social Security Act) and the Supplemental Security Income ("SSI") program (title XVI of the Act). *See* Soc. Sec. Admin., *Disability Evaluation Under Social Security*, https://perma.cc/CTM5-GLXC.

34

- "Master Earnings File (MEF) – File of workers' earning records and information on the individual's entire work experience."

- "NUMIDENT – Master file of assigned Social Security Numbers (SSNs). This file contains identifying information given by the applicant for an SSN."

- "Supplemental Security Record (SSR) – Payment file from which Social Security Income (SSI) checks are paid. The SSR contains information on Title XVI beneficiaries, such as payment status, type, and amount."

In addition, in Dudek's Declaration of March 26, 2025 (ECF 62-1), he references data "schema" in EDW. These include PROME, PCHIP, PVIR, and PVIPR. *Id.* ¶ 9. Dudek states, *id.*: "PROME contains login data to mySSA.gov; PCHIP has 1-800 number caller data; PVIP contains field office call data; and PVIPR contains field office appointments."

In Russo's Declaration of March 12, 2025 (ECF 36-1), he indicates that access was granted to certain DOGE Team members to "Treasury Payment Files Showing SSA Payments (containing information from Social Security Online Accounting and Reporting System, System of Records (SSOARS) . . . ." *See, e.g.*, *id.* ¶ 7. The Administrative Record does not describe these files.

## IV.    Standing

The parties vigorously dispute whether plaintiffs have standing to pursue their claims. The matter of standing is a "threshold jurisdictional question." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017). "The standing inquiry asks whether a plaintiff ha[s] the requisite stake in the outcome of a case . . . ." *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018).

### A. Legal Standard

It is a bedrock principle that Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *see Murthy v. Missouri*, 603 U.S. 43, 56 (2024) ("Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"); *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 295 (2022) ("The Constitution limits federal courts to deciding 'Cases' and 'Controversies.'") (quoting Art. III, § 2); *Carney v. Adams*, 592 U.S. 53, 58 (2020) (recognizing that Article III requires "a genuine, live dispute between adverse parties . . ."); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) ("Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'"); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (It is fundamental that Article III of the Federal Constitution confines the federal courts to adjudicating "actual, ongoing cases or controversies."); *Opiotennione v. Bozzuto Mgmt. Co.*, 130 F.4th 149, 153 (4th Cir. 2025) ("Article III of the constitution limits the judicial power of the United States to 'Cases' and 'Controversies.'"); *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) (same).

A federal court may resolve only "a real controversy with real impact on real persons . . . ." *American Legion v. American Humanist Assn.*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring). Indeed, "'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "Continued adherence to the case-or-controversy requirement of Article III maintains the public's confidence in an unelected but restrained Federal Judiciary . . . . For the federal courts to decide questions of law arising outside of cases and controversies would be

inimical to the Constitution's democratic character." *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125, 133 (2011); *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("[T]he constitutional limitation of federal-court jurisdiction to actual cases or controversies" is "fundamental to the judiciary's proper role in our system of government[.]").

Relevant here, "Federal courts can only review statutes and executive actions when necessary 'to redress or prevent actual or imminently threatened injury to persons caused by . . . official violation of law.'" *Murthy*, 603 U.S. at 56 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 492 (2009)). Courts "do not adjudicate hypothetical or abstract disputes." *TransUnion LLC*, 594 U.S. at 423. Nor do courts "exercise general legal oversight" of other government branches, *id.*, or render "advisory opinions." *Id.* at 424. Simply put, in the absence of a case or controversy, "the courts have no business deciding [the case] . . . ." *DaimlerChrysler Corp.*, 547 U.S. at 341. And, when there is no case or controversy, "the court's subject matter jurisdiction ceases to exist . . . ." *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

A "case or controversy exists only when at least one plaintiff" establishes standing to sue. *Murthy*, 603 U.S. at 57 (citing *Raines*, 521 U.S. at 818). Thus, "the doctrine of standing [serves] as a means to implement" the case or controversy requirement. *Laufer*, 60 F.4th at 161; *see TransUnion LLC*, 594 U.S. at 423 ("For there to be a case or controversy under Article III, the plaintiff must have . . . standing."); *Spokeo, Inc.*, 578 U.S. at 338 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *Raines*, 521 U.S. at 818 ("One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue.).

To establish standing under Article III of the Constitution, a plaintiff must satisfy three well established elements: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC*, 594 U.S. at 423 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)); *see Food and Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *Cruz*, 596 U.S. at 296; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Clapper*, 568 U.S. at 409; *Delmarva Fisheries Ass'n, Inc. v. Atl. States Marine Fisheries Comm'n*, 127 F.4th 509, 515 (4th Cir. 2025); *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024); *Laufer*, 60 F.4th at 161; *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015).  Requiring a plaintiff to demonstrate these three elements "ensures that federal courts decide only the 'rights of individuals,' and that federal courts exercise 'their proper function in a limited and separated government.'" *TransUnion LLC*, 594 U.S. at 423 (citations omitted).

Notably, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *see Trans Union LLC*, 594 U.S. at 431 (Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)."); *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("'[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'") (citation omitted); *see also MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F. 4th 91, 104 (4th Cir. 2025); *Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 997 F.3d 149, 154 (4th Cir. 2021).

38

And, a plaintiff must demonstrate each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the preliminary injunction stage, "the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58 (citation omitted).

But, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see Cruz*, 596 U.S. at 298 ("For standing purposes, we accept as valid the merits of [the plaintiff's] claims . . . ."); *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011) ("This court assumes the merits of a dispute will be resolved in favor of the party invoking our jurisdiction in assessing standing . . . ."). As the *Laufer* Court said, 60 F.4th at 161: "A district court may limit its standing inquiry to the allegations of the complaint or, if there are any material factual disputes, it may conduct an evidentiary hearing."

Here, the plaintiffs are organizations, not individuals. For an organization, there are two paths to standing. *See Students for Fair Admissions, Inc.*, 600 U.S. at 199; *Warth*, 422 U.S. at 511; *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013). First, an organization "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S. at 511. This is sometimes called organizational standing. *See, e.g.*, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Second, "an association may have standing solely as the representative of its members." *Warth*, 422 U.S. at 511; *see Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring suit on behalf of its members."). This is often called "associational" standing, which is a

type of representational standing.[21]  The Supreme Court has recognized that "there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004).

Plaintiffs claim associational standing.[22]  For associational standing, an organization must demonstrate that (a) "'its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc.*, 600 U.S. at 199 (quoting *Hunt*, 432 U.S. at 343); *see S. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 184 (same); *Equity In Athletics, Inc.*, 639 F.3d at 99 (same).  An organization "must 'make specific allegations establishing that at least one

---

[21] In *Students for Fair Admissions, Inc.*, 600 U.S. at 199, the Supreme Court referred to this form of standing as "organizational" standing.  It seems, however, that this doctrine is typically called "associational" standing.  *See, e.g.*, *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996); *see also, e.g., Food and Drug Admin.*, 602 U.S. at 398–404 (Thomas, J., concurring) (repeatedly referring to the doctrine as "associational standing"); *Thole v. U.S. Bank N.A*, 590 U.S. 538, 565 (2020) (Sotomayor, J., dissenting) (referring to the doctrine as "associational standing"); *see also People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 843 F. App'x 493, 495 (4th Cir. 2021); Wright & Miller, Federal Practice and Procedure, *Organizational and Associational Standing*, § 8345 (2d ed.) (June 2024 update).  Therefore, when referring to a suit filed by an organization on behalf of its members, I shall refer to the form of standing as "associational" standing.

[22] The Supreme Court recently stayed a preliminary injunction pending appeal in *Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, WHA-25-01780, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025).  The case concerns certain federal probationary employees whose employment had been terminated.  The Ninth Circuit denied the government's request for stay pending appeal.  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, 2025 WL 835337 (9th Cir. Mar. 17, 2025) (denying request for administrative stay); *id.*, 2025 WL 914823 (9th Cir. Mar. 26, 2025) (denying motion for stay pending appeal).  In reversing, the Supreme Court said: "The District Court's injunction was based solely on the allegations of the nine non-profit-organization plaintiffs in this case.  But under established law, those allegations are presently insufficient to support the organizations' standing."  *OPM v. AFGE*, No. 24A904, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025).  Because that language is the extent of the Court's analysis on the issue, I cannot determine if the ruling is relevant here.

40

*identified member* had suffered or would suffer harm.'" *S. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 184 (quoting *Summers,* 555 U.S. at 498) (emphasis in *S. Walk at Broadlands*).

Injury in fact is the "'[f]irst and foremost' of standing's three elements." *Spokeo, Inc.*, 578 U.S. at 338 (citing *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). "[A]n injury in fact is 'an invasion of a legally protected interest' which is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Opiotennione*, 130 F.4th at 153 (quoting *Lujan*, 504 U.S. at 560); *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (requiring the plaintiff to allege a "concrete, particularized, and actual or imminent" injury); *see also TransUnion LLC*, 594 U.S. at 423. Therefore, under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a personal, particularized injury." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013).

The injury in fact requirement protects the federal courts "from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *Food and Drug Admin.*, 602 U.S. at 382 (citation omitted). It "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381; *see Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 473, 487 (1982).

"Concreteness and particularity are two different requirements that each must be met." *Opiotennione*, 130 F.4th at 153. "[A]n injury is 'particularized' if it 'affect[s] the plaintiff in a personal and individual way.'" *Id.* (quoting *Spokeo, Inc.*, 578 U.S. at 339) (second alteration in *Opiotennione*); *see Food and Drug Admin.*, 602 U.S. at 381. A concrete injury is one that is "'real, and not abstract.'" *TransUnion LLC*, 594 U.S. at 417 (citation omitted); *see Food and Drug*

41

*Admin.*, 602 U.S. at 381. "'[F]inancial harm is a classic and paradigmatic form of injury in fact.'" *Md. Shall Issue, Inc.*, 971 F.3d at 210) (citations omitted).

But, of relevance here, "[v]arious intangible harms can also be concrete." *TransUnion, LLC*, 594 U.S. at 425. The Supreme Court has said, *id.*: "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Those include, for example, reputational harms,[23] disclosure of private information, and intrusion upon seclusion." (Citing, *inter alia*, *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008) (disclosure of private information); *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.), *cert. denied,* 141 S.Ct. 2552 (2021) (intrusion upon seclusion)); *see also Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019) ("Intrusions upon personal privacy were recognized in tort law and redressable through private litigation."). And, "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc.*, 578 U.S. at 339 n.7.

The existence of an applicable statute that authorizes legal action under certain circumstances does not automatically create standing. In other words, "plaintiffs cannot establish a cognizable injury simply by pleading a statutory violation." *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921 (4th Cir. 2022); *see Raines*, 521 U.S. at 820 n.3 ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."). "Congress's determination that a cause of action exists does not displace [the] 'irreducible constitutional minimum' of standing." *Krakauer*, 925 F.3d at 652 (citation omitted). But, Congress can "'elevat[e] to the status of legally cognizable injuries

---

[23] "Reputational harm can be a concrete injury, but only if the misleading information was brought to the attention of a third party who understood its defamatory significance." *Fernandez*, 116 F.4th at 292.

42

concrete, *de facto* injuries that were previously inadequate in law.'" *Spokeo, Inc.*, 578 U.S. at 341 (citation omitted) (alteration in *Spokeo, Inc.*). In this regard, I pause to reference the Privacy Act, which Congress enacted to "protect the privacy of individuals identified in information systems maintained by Federal agencies." Privacy Act of 1974, Pub. L. 93-579, § 2(a)(5), 88 Stat. 1896 (1974).

"Private litigation, even if authorized by statute to serve a range of public ends, must vindicate the plaintiffs' interests, rather than serve solely [as] a vehicle for ensuring legal compliance." *Krakauer*, 925 F.3d at 653. Thus, "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc.*, 578 U.S. at 341; *see TransUnion LLC*, 594 U.S. at 426. Nevertheless, Congress is "well positioned to identify intangible harms that meet minimum Article III requirements," so "its judgment is . . . instructive and important." *Spokeo, Inc.*, 578 U.S. at 341.

The Supreme Court has made clear that when plaintiffs proceed under a statutory cause of action, they can establish a cognizable injury by "identif[ying] a close historical or common-law analogue for their asserted injury," for which courts have "traditionally" provided a remedy. *TransUnion LLC*, 594 U.S. at 424. The Court has said: "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms . . . ." *Id*. at 417 (quoting *Spokeo, Inc.*, 578 U. S. at 340–41). Critically, there need not be "an exact duplicate in American history and tradition," although a federal court is not entitled to "loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *TransUnion LLC*, 594 U.S. at 424–25.

As discussed, an injury in fact must also be actual or imminent. The concepts of actual, ongoing injury or imminent injury are "disjunctive." *Deal*, 911 F.3d at 189. Ongoing injuries are, "by definition, actual injuries for purposes of Article III standing." *Id.* The imminence requirement is a "'somewhat elastic concept.'" *Clapper*, 568 U.S. at 409 (citation omitted). Its "'purpose'" is "'to ensure that the alleged injury is not too speculative for Article III purposes— that the injury is *certainly* impending.'" *Id.* (citation omitted) (emphasis in *Clapper*).

Notably, a threatened injury can satisfy Article III standing. *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017); *see South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019). However, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis and second alteration in *Clapper*).

The second component of standing concerns traceability. This means that the injury in fact must be "fairly traceable to the challenged conduct of the defendant." *Md. Shall Issue*, 971 F.3d at 210. "For an injury to be traceable, 'there must be a causal connection between the injury and the conduct complained of'" by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560). However, "the defendant's conduct need not be the last link in the causal chain . . . .'" *Air Evac EMS, Inc.*, 910 F.3d at 760; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing . . . ."). "[W]here the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendant's conduct 'upon the action of someone else,'" the traceability requirement is satisfied. *Lansdowne on the Potomac*

44

*Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

To satisfy the third element of standing, redressability, a plaintiff "'must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable [judicial] decision.'" *Deal*, 911 F.3d at 189 (quoting *Sierra Club*, 899 F.3d at 284). The "very essence" of the redressability requirement is that "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co.*, 523 U.S. at 107. But, the "burden imposed by this requirement is not onerous." *Deal*, 911 F.3d at 189. For example, plaintiffs "'need not show that a favorable decision will relieve [their] every injury.'" *Id.* (citation omitted). "Rather, plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.'" *Id.* (quoting *Sierra Club*, 899 F.3d at 284).

"To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (citation omitted). Notably, the "second and third standing requirements— causation and redressability—are often 'flip sides of the same coin.'" *Food & Drug Admin.*, 602 U.S. at 380–81 (quoting *Sprint Commc'ns Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Food & Drug Admin.*, 602 U.S. at 380.

### B. Discussion

In analyzing the issue of standing, I am not writing on a blank slate. Several district judges have found standing in analogous cases involving agency dissemination of PII to DOGE personnel. *See American Federation of Labor and Congress of Industrial Organizations, et al., v. Department of Labor, et al.*, JDB-25-339, 2025 WL 1129227, at *10 (D.D.C. Apr. 16, 2025) ("*AFL-CIO*");

45

*American Federation of Government Employees, AFL-CIO v. U.S. Office of Personnel Management*, DLC-25-1237, 2025 WL 996542, at *9 (S.D.N.Y. Apr. 3, 2025) ("*New York OPM Action*"); *American Federation of Teachers, et al., v. Bessent, et al.*, DLB-25-0430, 2025 WL 895326, at *13 (D. Md. Mar. 24, 2025); *Alliance for Retired Americans v. Bessent*, CKK-25-0313, 2025 WL 740401, at *16 (D.D.C. Mar. 7, 2025); *New York v. Trump*, JAV-25-01144, 2025 WL 573771, at *12 (S.D.N.Y. Feb. 21, 2025).

However, as noted earlier, in *Bessent*, a divided panel of the Fourth Circuit recently granted the government's motion for a stay of the preliminary injunction, pending appeal. *Bessent*, 2025 WL 1023638. Judges Agee and Richardson concluded, *inter alia*, that the plaintiffs, both organizations and individuals, "seemingly lack standing." *Id.* at *4.

### 1. Associational Standing

The parties primarily dispute the injury in fact requirement of associational standing. Therefore, before turning to that issue, I shall briefly address the other elements.

As noted, the first element of associational standing requires that at least one member of each plaintiff organization has standing to sue in his or her own right. *Students for Fair Admissions, Inc.*, 600 U.S. at 199; *S. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 184. In other words, at least one member of each plaintiff organization must show "(i) that he suffered an injury in fact . . . . ; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC*, 594 U.S. at 423.

Here, there is no dispute that if plaintiffs' members have suffered an injury in fact, then such an injury was caused by defendants' actions and would be redressable by judicial relief. *See Food & Drug Admin.*, 602 U.S. at 380 ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."); *Massachusetts v.*

*EPA*, 549 U.S. 497, 525 (2007) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury.") (cleaned up; emphasis in original).[24]

As discussed, the second element of associational standing requires that the interests the organization "'seeks to protect are germane to the organization's purpose.'" *Students For Fair Admissions, Inc.*, 600 U.S. at 199 (citation omitted). Plaintiffs posit: "Among Plaintiffs' organizational goals is ensuring that their members have access to and are able to benefit from well-run programs by SSA. Plaintiffs also seek to ensure protection of their members' data and Social Security benefits, so that they can retire with the dignity they deserve." ECF 110-1 at 13; *see* ECF 22-1 (Widger Decl.), ¶¶ 7, 8; ECF 22-6 (Fiesta Decl.), ¶ 3; ECF 22-8 (Aguirre Decl.), ¶¶ 3, 5. Each plaintiff has members for whom SSA holds personal, sensitive information, such as bank account numbers, medical information, tax information, and home addresses. ECF 22-1 (Widger Decl.), ¶¶ 10–13; ECF 22-6 (Fiesta Decl.), ¶ 9; ECF 22-8 (Aguirre Decl.), ¶ 8. And, in view of the access to PII provided to the DOGE Team, several of plaintiffs' members assert an ongoing invasion of privacy, which has made at least some members anxious and distressed, *see, e.g.*, ECF 22-3 (Doe Decl.), ¶ 7; ECF 22-4 (Imperiale Decl.), ¶ 8; ECF 22-7 (Somo Decl.), ¶¶ 11, 13; ECF 22-9 (Gray Decl.), ¶ 10, and concerned about pursuing benefits under the newly-enacted Social Security Fairness Act. *See* ECF 22-1 (Widger Decl.), ¶ 26; ECF 22-6 (Fiesta Decl.), ¶ 17; *see also* ECF 22-5 (Williams Decl.), ¶ 7; ECF 22-7 (Somo Decl.), ¶ 12.

---

[24] Defendants dispute causation in the context of the alleged injury in fact of an increased risk of identity theft. ECF 113 at 14. In ECF 49, I rejected the claim of standing on this basis.

47

Defendants do not contend that the interests of plaintiffs in protection of their members' privacy are not germane to plaintiffs' purposes. I am satisfied that the interests plaintiffs seek to protect are "germane" to plaintiffs' organizational purposes.

The third element of associational standing requires that "'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc.*, 600 U.S. at 199 (citation omitted). "'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members . . . ." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (quoting *Hunt*, 432 U.S. at 343).

Plaintiffs seek declaratory and injunctive relief, not monetary damages. Nevertheless, defendants assert that the participation of plaintiffs' individual members is necessary for Counts I and II, which implicate the Privacy Act, 5 U.S.C. § 552a. ECF 113 at 14. This argument is founded primarily on two grounds. First, as defendants point out, the Privacy Act does not provide injunctive relief for disclosure claims. *Id.* at 15 (citing 5 U.S.C. § 552a(g)). Therefore, in defendants' view, plaintiffs necessarily seek monetary damages, which requires participation of individual members. ECF 113 at 15. Second, defendants argue that organizations cannot bring Privacy Act claims because such claims are "specific and personal to individual persons." *Id.*

In *Warth*, 422 U.S. at 515, the Court distinguished associational standing, when "a declaration, injunction, or some other form of prospective relief" is sought, and associational standing, when "an association seeks relief in damages for alleged injuries to its members." As to a damages request, "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Id.* at 515–16. But, as to a request for injunctive relief, individual participation is ordinarily not

48

necessary because "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.* at 515.

*Bessent* is pertinent to defendants' first contention, concerning the unavailability of injunctive relief under the Privacy Act for a disclosure claim. The District Court in *Bessent* said that although the plaintiffs do not have an adequate remedy under the Privacy Act, they have an available remedy under the APA. The District Court relied on *Doe v. Chao*, 435 F.3d 492, 504 n.17 (4th Cir. 2006) ("*Chao II*"). *See Bessent*, 2025 WL 895326, at *19 n.17.

In *Chao II*, the Fourth Circuit suggested that a plaintiff may pursue injunctive relief for a Privacy Act disclosure claim through the APA. The Court said, 435 F.3d at 504 n.17: "We note that we do not read these cases to stand for the proposition that the Government may not be enjoined from violating the Privacy Act by disclosing personal records. Instead, we read these cases as stating that such relief is not authorized by the Privacy Act, standing alone. Often, however, and as was the case in the instant action, injunctive relief for a Government's violation of the Act will instead be appropriate and authorized by the APA." And, in 2004, the Supreme Court observed in *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) ("*Chao I*"): "The Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the [APA] . . . ."

As Judge Richardson observed in *Bessent*, 2025 WL 1023638, at *6, and as I recognized in my TRO Opinion (ECF 49 at 90, 105), the cited comments of the Fourth Circuit and the Supreme Court in *Chao I* and *Chao II* are dicta. But, defendants have not identified any case at odds with either *Chao I* or *Chao II*. And, at the P.I. Motion hearing, defense counsel acknowledged that he could not cite any case that disagreed with the dicta. ECF 143 at 40.

In the absence of other guidance, dicta is very helpful to a district judge laboring in the trenches.[25]  Indeed, "dicta from the Supreme Court is not something to be lightly cast aside." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997).  The Fourth Circuit has said as much, stating that "'carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.'"  *Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292, 298 n.3 (4th Cir. 2004) (citation omitted).

Moreover, this Court has identified a handful of cases that suggest that the dicta in *Chao I* and *Chao II* is sound.  In *F.A.A. v. Cooper*, 566 U.S. 284, 303 n.12 (2012), the Supreme Court stated, again in dicta, that the Privacy Act "deters violations of its substantive provisions," *inter alia*, "possibly by allowing for injunctive relief under the Administrative Procedure Act . . . .".  In *Doe v. Stephens*, 851 F.2d 1457, 1466–67 (D.C. Cir. 1988), the D.C. Circuit concluded that the plaintiff could pursue declaratory relief pursuant to the APA for his Privacy Act claim concerning the disclosure of medical records.  And, in *Radack v. U.S. Dep't of Just.*, 402 F. Supp. 2d 99, 103 (D.D.C. 2005), the plaintiff was permitted to pursue injunctive relief for a Privacy Act disclosure claim through the APA.

With respect to defendants' second argument, this prong of the "associational standing test is best seen as focusing on . . . matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution."  *United Food & Com. Workers Union Loc. 751*, 517 U.S. at 557.  This case involves alleged sweeping access to PII, and the challenged conduct pertains to most of plaintiffs' members, representing a large number of people.  If plaintiffs' members were to each bring suit on their own behalf, the challenged conduct

---

[25] Similarly, the panel opinion of the Fourth Circuit in *Bessent* is unreported.  But, of course, I must consider it.

would generally implicate the same facts, the same defendants, and the same data systems that were made available to DOGE personnel. As a matter of judicial economy, if plaintiffs' members were each to file suit, the courts would be flooded. It is far less burdensome on the courts to adjudicate one case filed by plaintiffs on behalf of their many members.

The government has not identified a case where a court concluded that a plaintiff organization did not have associational standing to assert a Privacy Act claim on the ground that participation of individual members was necessary. But, plaintiffs have previously identified several cases in which judges have concluded that a plaintiff organization had standing to bring a Privacy Act claim on behalf of its members. ECF 39 at 14 (citing, *inter alia*, *Democratic Party of Virginia v. Brink*, 599 F. Supp. 3d 346, 356 (E.D. Va. 2022); *Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d 665, 671–72 (S.D.N.Y. 2009)). Because plaintiffs do not seek monetary damages with respect to their Privacy Act claims, the participation of individual members is not necessary.

I turn to the requirement of an injury in fact, which is at the heart of the standing dispute.

### 2. Injury in Fact

The alleged harm is certainly particularized. Plaintiffs assert a violation of their members' privacy based on the Agency's disclosure of PII. In addition, the harm is ongoing and/or imminent, given that eleven members of the DOGE Team are working at SSA and Dudek has approved their access to PII. The harm must also be concrete. This is where the battle lies.

As noted, in *TransUnion LLC*, 594 U.S. at 424, the Supreme Court concluded that plaintiffs challenging a statutory violation can establish standing by "identif[ying] a close historical or common-law analogue for their asserted injury," for which courts have "traditionally" provided a

51

remedy. Plaintiffs argue that the harm their members are facing is akin to the tort of intrusion upon seclusion. ECF 110-1 at 11.[26] Defendants disagree. *See* ECF 113 at 11–13.

In *Bessent*, involving the disclosure of PII to DOGE by the departments of Treasury, Education, and the Office of Personnel Management, a divided panel of the Fourth Circuit rejected the District Court's reliance on the tort of intrusion on seclusion as a proper common law analog to establish a concrete injury in fact. *Bessent*, 2025 WL 1023638, at *2, *5. But, there are important factual distinctions between *Bessent* and this case.

The Supreme Court and other courts have explicitly recognized that intrusion upon seclusion is an intangible harm "with a close relationship" to a harm "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC*, 594 U.S. at 425; *see also Krakauer*, 925 F.3d at 653; *Gadelhak*, 950 F.3d at 462. The tort is rooted in the common law right to privacy.

In 1890, in an influential Harvard Law Review article, Samuel Warren and Louis Brandeis articulated the conceptual basis for the right of privacy and claims based on invasion of that right. Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193 (1890). In *Howard v. Antilla*, 294 F.3d 244, 247–48 (1st Cir. 2002), the court said: "It is rare that the pedigree of a whole breed of common law tort claims can be traced with pinpoint accuracy. But in the case of common law claims for invasion of the right of privacy, most sources agree that the broad contours of these legal theories were first outlined by Samuel Warren and Louis Brandeis in the

---

[26] Plaintiffs argued in their TRO Motion that their members faced two additional injuries in fact: (1) "exposure to an increased and non-speculative risk of identity theft"; and (2) "an increased likelihood of disruption of benefit payments." ECF 39 at 3. I rejected these arguments. *See* ECF 49 at 68–70. Understandably, plaintiffs have abandoned the second theory and only mention the first theory in passing in the Reply. *See* ECF 110-1 at 10–13; ECF 122 at 2–4. To the extent relevant, I incorporate here my discussion in the TRO opinion pertaining to these alleged injuries in fact. ECF 49 at 68–70.

pages of the *Harvard Law Review*."[27] Warren and Brandeis succinctly defined the right to privacy as the right "'to be let alone.'" Warren, *supra*, 4 HARV. L. REV. at 193 (citation omitted).

William Prosser authored an equally influential article in 1960, which helped to shape modern privacy law. *Privacy*, William L. Prosser, 48 CAL. L. REV. 382 (August 1960);[28] *see West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 642–43 (Tenn. 2001) ("The protection of privacy rights are still reflected in current law, owing much to the efforts of Dean William L. Prosser . . . ."). Prosser described invasion of privacy as "not one tort, but a complex of four." Prosser, *supra*, 48 CAL. L. REV. at 389. He defined the four versions, as follows, *id.*:

1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.

2. Public disclosure of embarrassing private facts about the plaintiff.

3. Publicity which places the plaintiff in a false light in the public eye.

4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.

According to Prosser, these four torts "are tied together by the common name [*i.e.*, invasion of privacy], but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff . . . 'to be let alone.'" *Id.* at 389; *see also* William L. Prosser, *Handbook of the Law of Torts*, Ch. 22, at 832 (3d ed. 1964) (same).

The Restatement (Second) of Torts (1977) (October 2024 update) ("Restatement") adopts the four versions of the tort articulated by Prosser. *See id.* at Ch. 28A. Many states, as well as the District of Columbia, have done the same. *See, e.g.*, *Nayani v. Bhatia*, 899 S.E.2d 485, 488 (Ga. App. 2024); *Mitchell v. Baltimore Sun Co.*, 164 Md. App. 497, 522, 883 A.2d 1008, 1022 (2005);

---

[27] The Fourth Circuit has cited to this law review article. *See*, *e.g.*, *Garey*, 35 F.4th at 922.

[28] The Fourth Circuit has cited to this law review article. *See*, *e.g.*, *Bessent*, 2025 WL 1023638, at *5; *Garey*, 35 F.4th at 922.

*Busse v. Motorola, Inc.*, 813 N.E.2d 1013, 1017 (Ill. App. 2004); *Wolf v. Regardie,* 553 A.2d 1213, 1216–17 (D.C. 1989); *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 784 (Az. 1989).

Pertinent here, § 652B of the Restatement defines intrusion upon seclusion as follows: "One who intentionally intrudes, *physically or otherwise*, upon the solitude or seclusion of another or his *private affairs or concerns*, is subject to liability to the other for invasion of privacy, if the intrusion would be *highly offensive to a reasonable person*." (Emphasis added). This is the law in Maryland. It is also the law in most states. *See* Eli A. Meltz, *No Harm, No Foul: Attempted Invasion of Privacy and the Tort of Intrusion upon Seclusion*, 83 FORDHAM L. REV. 3431, 3440–41 (May 2015) (stating that approximately thirty-eight states have explicitly adopted the Restatement's formulation or one closely mirroring it); *see, e.g., Furman v. Sheppard*, 130 Md. App. 67, 73, 744 A.2d 583, 585 (2000) (Intrusion upon seclusion occurs where there is an "intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person."); *Lipscomb v. Aargon Agency, Inc.*, PWG-13-2751, 2014 WL 5782040, at *2 (D. Md. Nov. 5, 2014); *Gamble v. Fradkin & Weber, P.A.*, 846 F. Supp. 2d 377, 383 (D. Md. 2012); *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 525–26, 687 A.2d 1375, 1380-81 (1997); *Mitchell*, 164 Md. App. at 522, 883 A.2d at 1022; *Johnson v. Stewart*, 854 So. 2d 544, 547 (Ala. 2002); *Chicarella v. Passant*, 494 A.2d 1109, 1114 (Pa. 1985).

"A legitimate expectation of privacy is the touchstone of the tort of intrusion upon seclusion." *Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 877 (8th Cir. 2000). The "kind of harm vindicated by the intrusion-upon-seclusion tort is relatively broad." *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345 (6th Cir. 2023). However, "[c]onduct that a particular plaintiff finds offensive, but that would not offend a reasonable person, cannot establish intrusion upon seclusion." *Neal v. United States*, 599 F. Supp. 3d 270, 306 (D. Md. 2022); *see also Whye*

54

*v. Concentra Health Servs., Inc.*, ELH-12-3432, 2013 WL 5375167, at \*14 (D. Md. Sept. 24, 2013), *aff'd*, 583 Fed. App'x 159 (4th Cir. 2014).

"'The invasion may be (1) by physical intrusion into a place where the plaintiff has secluded himself, (2) by use of the defendant's senses to oversee or overhear the plaintiff's private affairs, *or (3) some other form of investigation or examination into plaintiff's private concerns*.'" *Yates v. Com. Index Bureau, Inc.*, 861 F. Supp. 2d 546, 552 (E.D. Pa. 2012) (citation omitted; emphasis added); *see also Broughton v. McClatchy Newspapers, Inc.*, 588 S.E.2d 20, 27 (N.C. App. 2003) ("Generally, there must be a physical or sensory intrusion or an unauthorized prying into confidential personal records to support a claim for invasion of privacy by intrusion."). But, intrusion upon seclusion requires a "'substantial'" intrusion, judged by an objective reasonableness standard. *Whye*, 2013 WL 5375167, at \*14 (quoting Restatement § 652B, cmt. d). And, "[a]n intrusion upon seclusion claim requires that the matter into which there was an intrusion is entitled to be private and is kept private by the plaintiff." *Barnhart v. Paisano Pubs., LLC*, 457 F. Supp. 2d 590, 593 (D. Md. 2006).

The Restatement provides several useful illustrations. For example, it explains that an intrusion upon seclusion may occur by an "investigation or examination into [the plaintiff's] private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents." Restatement § 652B cmt. b. And, relevant here, the Restatement contemplates that inspection of certain private records can qualify as intrusion upon seclusion. *See id.* On the other hand, "there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection." *Id.* cmt. c.

Courts have applied the tort in cases involving disclosure of medical records or other confidential information. The Fourth Circuit has said that "the disclosure of one's private personnel files and medical records amounts to a per se intrusion into seclusion if the records contain sensitive materials[.]" *Sabrowski v. Albani-Bayeux, Inc.*, 124 F. App'x 159, 161 (4th Cir. 2005) (per curiam) (citation omitted); *see Hooper v. United States*, CL-12-0297, 2013 WL 5530603, at *5 (D. Or. Sept. 25, 2013) ("[A] plaintiff's medical records are considered private, and the unauthorized access or disclosure of the records is an intrusion on seclusion."); David A. Elder, *Privacy Torts* §§ 2.6, 2:22 (December 2024 update) (providing numerous examples of cases where disclosure of medical or other confidential information amounted to an intrusion on seclusion).

"[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 763 (1989). As one commentator has explained: "Intrusion is an intentional tort violating the right to choose when and to what extent one will permit others to know personal affairs . . . ." Theodore R. LeBlang, *Invasion of Privacy: Medical Practice and the Tort of Intrusion*, 18 WASHBURN L.J. 205, 212 (Winter 1979). The alleged access to the PII of plaintiffs' members appears to fall under this umbrella.

The government relies heavily on the Fourth Circuit's decision in *O'Leary v. TrustedID, Inc.*, 60 F.4th 240 (4th Cir. 2023), to demonstrate that intrusion upon seclusion is not a proper analog here. ECF 113 at 11 ("The *O'Leary* decision controls here . . . ."); *id.* at 13 ("There is no material distinction between *O'Leary* and this case."). There, the Court considered whether the plaintiff, O'Leary, had standing to bring suit under South Carolina's Financial Identity Fraud and Identity Theft Protection Act, S.C. Code Ann. § 37-20-180 ("SC Act"). *O'Leary*, 60 F.4th at 241.

56

JA1357

The SC Act prohibited "'requir[ing] a consumer to use his social security number or a portion of it containing six digits or more to access an Internet web site, unless a password or unique personal identification number or other authentication device is also required to access the Internet web site.'"  *Id.* (citation omitted; alteration in *O'Leary*).

Equifax, a nonparty to the case, was subject to a data breach.  *Id.*  Equifax engaged its subsidiary, defendant TrustedID, Inc., "to use TrustedID's website to inform customers whether they were impacted by the data breach."  *Id.*  The plaintiff visited TrustedID's website to learn whether his data had been compromised.  *Id.*  The website required O'Leary to enter his six-digit SSN, but it did not use "any other safety precautions."  *Id.*  After entering his SSN, O'Leary was informed that he was not impacted by Equifax's data breach.  *Id.*  But, he alleged that TrustedID "shared the six digits of his SSN with Equifax."  *Id.*

O'Leary sued TrustedID, "alleging that TrustedID's practice of requiring six digits of consumers' SSNs violated the [SC] Act and South Carolina's common-law right to privacy."  *Id.* at 241.  He later added a claim of negligence.  *Id.*  TrustedID moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6).  *Id.*

The plaintiff "said he was injured when TrustedID 'intentionally [took] personal identifying information and monetiz[ed] it in some way.'"  *Id.* at 242 (citation omitted; alterations in *O'Leary*).  TrustedID referred to the alleged injury as "'an invasion of privacy or intrusion upon seclusion.'"  *Id.* (citation omitted).  The district court determined that O'Leary had alleged "'an intangible concrete *harm* in the manner of an invasion of privacy,' which the court said was 'enough to give [it] subject-matter jurisdiction at this early stage of the case.'"  *Id.* (citations omitted; alteration and emphasis in *O'Leary*).  Accordingly, the district court determined that the

57

plaintiff had standing. But, the court dismissed the plaintiff's claims pursuant to Rule 12(b)(6), and the plaintiff appealed. *Id.*

The Fourth Circuit concluded that the plaintiff "alleged only a bare statutory violation and no Article III injury." *Id.* The Court explained, *id.* at 243: "The intangible harm of enduring a statutory violation, standing alone, typically won't suffice under Article III—unless there's separate harm (or a materially increased risk of another harm) associated with the violation." Extrapolating, *inter alia*, from cases involving the Fair and Accurate Credit Transactions Act ("FACTA"), 15 U.S.C. § 1681 *et seq.*, as well as data breach cases, the Fourth Circuit said, *id.* at 244: "Article III excludes plaintiffs who rely on an abstract statutory privacy injury unless it came with a nonspeculative increased risk of identity theft." But, O'Leary had not alleged, "even in a speculative or conclusory fashion," that "entering six digits of his SSN on TrustedID's website has somehow raised his risk of identity theft." *Id.* Rather, "O'Leary relies entirely on a mere procedural violation of a statute, which Article III rejects." *Id.* at 245.

According to the Court, O'Leary had not alleged "an injury with a 'close relationship' to a traditional or common-law analog", because "he appears to rely on some abstract privacy interest in his SSN itself." *Id.* (citation omitted). The Court considered two traditional analogs for intangible harms that confer standing: intrusion upon seclusion and disclosure of private information. *Id.* at 245–46.

The Court defined intrusion upon seclusion as a cause of action "'against defendants who invade[ ] the private solitude of another.'" *Id.* at 245 n.2 (quoting *Gadelhak*, 950 F.3d at 462). It acknowledged that the Supreme Court in *TransUnion LLC* "mention[ed] intrusion upon seclusion as a traditionally recognized harm that provides a basis for lawsuits in federal court." *O'Leary*, 60 F.4th at 245 (citing *TransUnion LLC*, 594 U.S. at 425). It also noted that *TransUnion LLC* cited

"as an example . . . then-Judge Barrett's holding in *Gadelhak* that receiving unwanted text messages (which violated the Telephone Consumer Protection Act of 1991) could be a concrete injury in fact, as it closely relates to intrusion upon seclusion." *Id.* at 245 (citing *Gadelhak*, 950 F.3d at 462). And, the Fourth Circuit acknowledged that it, too, had recognized that "violations involving unwanted calls under the Telephone Consumer Protection Act are concrete injuries in fact, based on federal courts' traditional protection of 'privacy interests in the home.'" *O'Leary*, 60 F.4th at 245 (quoting *Krakauer*, 925 F.3d at 653).

However, the Court determined that O'Leary's alleged injury did not bear a close relationship to intrusion upon seclusion. *O'Leary*, 60 F.4th at 245. Specifically, O'Leary alleged that he "chose to hand over his partial SSN '[i]n exchange for' finding out whether he was impacted by Equifax's data breach." *Id.* (citation omitted; alteration in *O'Leary*). And, the Fourth Circuit said, *id.*: "It's the unwanted intrusion *into the home* that marks intrusion upon seclusion, and O'Leary hasn't pleaded anything that closely relates to that." (Emphasis added).

With respect to disclosure of private information, the Court recognized that it "can be another traditional analog for intangible harms that confer standing[.]" *Id.* at 246 (citing *Davis*, 554 U.S. at 733). The Court reviewed *Davis*, 554 U.S. at 733, 744, which "held that a self-financed political candidate had standing to challenge a statute that would require him to disclose to the government when he spent more than $350,000 in personal funds on his campaign," because it "implicated the candidate's privacy of association guaranteed by the First Amendment." *O'Leary*, 60 F.4th at 246. But, the Court determined that O'Leary's "associational rights" were not impacted, because "he (voluntarily) disclosed his partial SSN to TrustedID, not to the government." *Id.* at 246.

*O'Leary* involved what the Fourth Circuit characterized as an "abstract privacy interest in [a partial] SSN . . . ." *Id.* at 245. The *O'Leary* Court concluded, *id.* at 246: "O'Leary hasn't adequately pled that he was injured by the alleged statutory violation at all—much less in a way that closely relates to a traditional analog for a federal lawsuit."

Defendants contend that there is "no material distinction between *O'Leary* and this case . . . ." ECF 113 at 13. I disagree. For starters, this case concerns far more than access to even complete SSNs. It involves access to a wide swath of confidential and sensitive PII, such as medical and mental health records, financial and bank information, tax records, work histories, birth certificates, and personal records concerning children. In Judge King's dissent in *Bessent*, 2025 WL 1023638, which involved some of the same kinds of records, he characterized the records as "some of the most sensitive personal information imaginable . . . ." *Id.* at *7. The same cannot be said for the partial SSN at issue in *O'Leary*.

In *Bessent*, Judge Richardson acknowledged, *id.* at *5: "Prying eyes and probing fingers can be . . . disquieting when aimed at one's private affairs . . . ." Moreover, he cited Meltz, *supra*, 83 FORDHAM L. REV. at 3453, for the proposition that "'harm from an intrusion occurs even when no information is acquired,'" because it is the intrusive act itself that is problematic. *Bessent*, 2025 WL 1023638, at *5. But, he "question[ed] whether entries of information stored in government databases could be part of any plaintiff's seclusion at all." *Id.* As Judge Richardson put it, each "plaintiff's information" is just "one row in various databases that are millions upon millions of rows long." *Id.* He acknowledged that "intrusion upon seclusion has long been understood to guard not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace." *Id.* at *4 (citing Restatement § 652B cmt. a).

Here, even before *Bessent* was decided by the Fourth Circuit, at least one member of each plaintiff organization described the kind of "unease" that Judge Richardson regards as integral to an intrusion upon seclusion claim. *See*, *e.g.*, *Gray*, ECF 22-9, ¶ 10 ("My anxiety is at an all-time high because of the threats to my personal information and benefits that come from DOGE access to sensitive information like my Social Security information."); Doe, ECF 23-3, ¶ 7 (expressing distress and anxiety about DOGE personnel having access to PII, including "current bank account information and [Doe's] entire work and income history"); Imperiale, ECF 22-4, ¶ 8 ("I am experiencing great distress over the possibility of my private data being accessed by DOGE . . . ."); Somo, ECF 110-6, ¶ 9 ("DOGE having access to my sensitive information is almost like someone breaking into my house and stealing stuff. It's a horrible feeling . . . .").[29]

Defendants also point to *O'Leary* for the proposition that the tort of intrusion upon seclusion requires an "'unwanted intrusion *into the home* . . . .'" ECF 113 at 13 (quoting *O'Leary*, 60 F.4th at 245) (emphasis in ECF 113). But, that position is inconsistent with both the historical and modern understanding of the tort, and Judge Richardson acknowledged as much in *Bessent*, 2025 WL 1023638. He said: "To be sure, as the [Restatement] examples show, intrusion upon seclusion can occur beyond the confines of the home. And the government overreaches when arguing for such a limited understanding of the tort." *Id.* at *5; *see* Restatement § 652B cmt. c (recognizing that there can be an intrusion upon seclusion "[e]ven in a public place . . ." and referencing numerous examples that do not involve the home); Meltz, *supra*, 83 FORDHAM L. REV. at 3431 ("The tort of intrusion upon seclusion protects individuals from unwanted invasions into their personal space *and personal affairs*.") (emphasis added); Prosser, *supra*, 48 CAL. L. REV. at

---

[29] To my knowledge, such assertions are absent in the district court's opinion in *Bessent*.

389–90 (referencing numerous examples of the tort that do not involve the home); *see also, e.g.*, *Dickson*, 69 F.4th at 345, 347 (explaining that, "at its core," intrusion upon seclusion protects "the right to maintain a sense of solitude in one's life and *private affairs*" and intrusion upon seclusion can occur "even when the victim is physically present in a public place") (emphasis added); *Anthony v. United States*, 632 F. Supp. 3d 1017, 1039 (D. Ariz. 2022) (denying motion for summary judgment as to intrusion upon seclusion claim, where intrusion occurred at a hospital); *Doe v. Hosp. of Univ. of Pennsylvania*, 546 F. Supp. 3d 336, 353 (E.D. Pa. 2021) (denying motion to dismiss intrusion upon seclusion claim, where the alleged intrusion occurred at a hospital); *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1078 (Cal. 2009) (recognizing that intrusion upon seclusion can occur at the workplace).

The contention that intrusion upon seclusion is limited to the home is also inconsistent with *Gadelhak*, which the *O'Leary* Court cited. *See O'Leary*, 60 F.4th at 245 n.2 (quoting *Gadelhak*, 950 F.3d at 462). In *Gadelhak*, 950 F.3d at 463, authored by then Judge Barrett, the Seventh Circuit concluded that "unwanted text messages can constitute a concrete injury-in-fact for Article III purposes." The *Gadelhak* Court observed, *id.* at 462: "The common law has long recognized actions at law against defendants who invaded the private solitude of another by committing the tort of 'intrusion upon seclusion.'" The court reasoned that "irritating intrusions," such as persistent telephone calls and unwanted text messages, "pose the same *kind* of harm that common law courts recognize . . . ." *Id.* at 462–63 (emphasis in original). The unwanted text messages did not involve the home; text messages can be received almost anywhere. Nevertheless, Judge Barrett wrote, *id.* at 462: "The harm posed by unwanted text messages is analogous to that type of intrusive invasion of privacy", *i.e.*, intrusion on seclusion.

62

JA1363

The Seventh Circuit revisited *Gadelhak* in *Pucillo v. National Credit Systems, Inc.*, 66 F.4th 634, 641 (7th Cir. 2023). There, the court reiterated: "Text messages may create an injury because they can disrupt a person anytime, *anywhere*, thereby invading 'private solitude.'" *Id.* at 641 (quoting *Gadelhak*, 950 F.3d at 462) (emphasis added).

In *Bessent*, the panel majority criticized the District Court's reliance on *Garey*, 35 F.4th 917, to establish standing. *See Bessent*, 2025 WL 1023638, at *2, *4. In *Garey*, the Fourth Circuit considered whether plaintiffs had standing to sue for an alleged violation of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.* The statute provides a private cause of action against "'[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record,' for an impermissible purpose." *Garey*, 35 F.4th at 920 (citing 18 U.S.C. § 2724(a)). The defendants, personal injury lawyers, obtained motor vehicle accident reports from North Carolina law enforcement agencies or "private data brokers," *Garey*, 35 F.4th at 919, which contained names and home addresses of the drivers. *Id.* at 919–20. The defendants used the personal information in the reports "to mail unsolicited attorney advertising materials to the drivers involved in those crashes." *Id.* at 920; *see also id.* at 919.

The *Garey* Court concluded that the plaintiffs' allegation that their "privacy [was] invaded by Defendants' knowingly obtaining his or her name and address from a motor vehicle record for an impermissible purpose in violation of law" constituted a "legally cognizable privacy injury." *Id.* at 922. The Court reasoned that the alleged harm was "closely related to the invasion of privacy, which has long provided a basis for recovery at common law." *Id.* at 921 (internal

63

JA1364

quotations omitted).  Therefore, the Fourth Circuit concluded that the plaintiffs "alleged a legally cognizable privacy injury."  *Id.* at 922.[30]

In reaching its conclusion, the *Garey* Court cited *Krakauer*, 925 F.3d 643.  Specifically, the *Garey* Court said that *Krakauer* involved a "nearly identical *standing* challenge . . . ."  *Garey*, 35 F.4th at 921 (emphasis added).

*Krakauer* involved the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, which, among other things, prohibits telephone calls to residential phone numbers on the national "Do-Not-Call" registry.  *Krakauer*, 925 F.3d at 648.  The TCPA provides a private right of action for violations of the statute.  *Id.* at 649.  The plaintiffs filed a class action lawsuit, alleging that the defendant's sales representatives "routinely flouted" the TCPA.  *Id.* at 648.  The Fourth Circuit concluded that the private right of action "plainly satisfies the demands of Article III."  *Id.* at 653.  It said, *id.*: "Our legal traditions . . . have long protected privacy interests in the home."

---

[30] The *Garey* Court determined that the group of plaintiffs seeking injunctive relief did not have standing because there was no evidence they were subject to imminent or certainly impending harm.  *Garey*, 35 F.4th at 923.  Pertinent here, the Court observed that a plaintiff can meet "'the injury-in-fact requirement for prospective relief' either by demonstrating 'a sufficiently imminent injury in fact' or by demonstrating 'an ongoing injury'. . . ."  *Id.* at 922 (quoting, *inter alia*, *Deal*, 911 F.3d at 189).  And, the Court agreed with the district court that the plaintiffs did not show that they were "'subject to any imminent harm.'"  *Id.* at 922.  This was because the plaintiffs "narrowed their case" to the unlawful "obtaining" of protected information, rather than using or disclosing.  *Id.* at 923.  But, the "obtaining of [plaintiffs'] personal information [was] a *fait accompli*," so there was no "ongoing or imminent injury."  *Id.*  The Court added that the "mere possibility" of a "future 'obtaining' violation" cannot support injunctive relief.  *Id.*; *see City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (stating that "past wrongs do not in themselves amount to that real and immediate threat of injury" needed for prospective relief).

Here, plaintiffs have alleged an ongoing injury.  *See* ECF 17, ¶¶ 2, 94, 97.  This is not a "one and done" situation.  Every improper exposure is an invasion of privacy.  In the absence of an injunction, it is substantially likely that DOGE personnel will continue to seek and obtain access to SSA's systems of record.  So, the threat of an imminent injury, in the absence of an injunction, distinguishes this case from *Garey*.  *See Food and Drug Admin.*, 602 U.S. at 381 (explaining that "the injury must have already occurred or be likely to occur soon.").

64

Citing the Restatement, the Court also said: "Intrusions upon personal privacy were recognized in tort law and redressable through private litigation." *Id.* *Krakauer* analogized the harm in that case, unwanted phone calls to the home, to the harm associated with the tort of intrusion upon seclusion. *Id.*

*Krakauer* involves a statute altogether different from the one in *Garey*, and completely different facts. Nevertheless, as to standing, the *Garey* Court stated that it was "[a]pplying the same analysis as *Krakauer*" to "reach the same result." *Garey*, 35 F.4th at 922. Both *Garey* and *Krakauer* recognized that a claim of invasion of privacy, based on conduct in violation of a federal statute, satisfied Article III. The cases do not compel the conclusion that the tort is viable only when it involves the home.

Of course, we can parse both *Krakauer* and *Garey* to find distinctions with this case, just as those two cases also have differences. But, the Supreme Court has made clear that, as to the analog, there need not be "an exact duplicate in American history and tradition." *TransUnion LLC*, 594 U.S. at 424–25; *see also Salazar v. Paramount Glob.*, __ F.4th __, 2025 WL 1000139, at *2 (6th Cir. Apr. 3, 2025) ("We are analyzing whether the asserted harm is sufficiently analogous to a traditional harm recognized by law—not whether the plaintiff has pleaded an element-by-element match to a historical tort."); *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 542 n.6 (2d Cir. 2024) (a plaintiff need not "plead *every* element of a common-law analog to satisfy the concreteness requirement.") (emphasis in *Salazar*); *Drazen v. Pinto*, 74 F.4th 1336, 1343 (11th Cir. 2023) (en banc) (explaining that a common law analog does "not require carbon copies").

The proper focus is on the kind of harms protected at common law, not the degree of the harm. *See Krakauer*, 925 F.3d at 654 ("Our inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable."); *Gadelhak*, 950 F.3d

at 462 ("But when *Spokeo* instructs us to analogize to harms recognized by the common law, we are meant to look for a 'close relationship' in kind, not degree."); *see also Ward v. NPAS, Inc.*, 63 F.4th 576, 580–81 (6th Cir. 2023) (focusing on the "kind" of harm protected by common law intrusion upon seclusion); *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822 (5th Cir. 2022) (courts should "focus[ ] on types of harms protected at common law, not the precise point at which those harms become actionable") (citation omitted).

At least seven circuits, including the Fourth Circuit in *Krakauer*, "have held that receiving either one or two unwanted texts or phone calls resembles the *kind* of harm associated with intrusion upon seclusion," for purposes of standing, even though that harm would not rise to the "*degree* of offensiveness required to state a claim for intrusion upon seclusion at common law." *Drazen*, 74 F.4th at 1344 (citing cases) (emphasis in *Drazen*). In other words, courts look to the "'types of harms protected at common law, not the precise point at which those harms become actionable.'" *Id.* (quoting *Krakauer*, 925 F.3d at 654). Thus, the *Drazen* Court held, 74 F.4th at 1345, that "the harm associated" with even just one "unwanted text message shares a close relationship with the harm underlying the tort of intrusion upon seclusion," and constitutes "a concrete injury" for purposes of standing.

Cases from other courts support the conclusion that intrusion on seclusion is an appropriate analog here. *Persinger v. Southwest Credit Systems, L.P.*, 20 F.4th 1184 (7th Cir. 2021), is informative. There, the plaintiff alleged that a debt collection company accessed her credit information without a permissible purpose, in violation of the Fair Credit Reporting Act ("FCRA"). *Id.* at 1188. Specifically, the defendant obtained from a credit reporting agency the plaintiff's "propensity-to-pay score," which is intended to predict the likelihood of repayment of a debt. *Id.* at 1189. It is not a full credit report, but rather a form of "soft pull" that "is not visible

66

to third parties and does not affect one's credit score." *Id.* The plaintiff's only injury was an invasion of privacy. *Id.* at 1191.

The Seventh Circuit noted the four types of invasion of privacy discussed earlier, and considered intrusion upon seclusion as "the best comparator . . . ." *Id.* at 1192. Relevant here, the court said, *id.*: "An unauthorized inquiry into a consumer's propensity-to-pay score is analogous to the unlawful inspection of one's mail, wallet, or bank account." The court added, *id.*: "Whether [plaintiff] would prevail in a lawsuit for common law invasion of privacy is irrelevant.[] It is enough to say that the harm alleged in her complaint resembles the harm associated with intrusion upon seclusion." And, citing *Gadelhak*, 950 F.3d at 462, the *Persinger* Court stated, 20 F.4th at 1193, that "the FCRA's protection of consumer credit information is akin to the common law's protection of private information through the tort of invasion of privacy."

The case of *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480 (9th Cir. 2019), also provides guidance. There, the Ninth Circuit considered whether a "consumer suffers a concrete Article III injury in fact when a third-party obtains her credit report for a purpose not authorized by the FCRA. *Id.* at 487. The court described the alleged harm as "the release of highly personal information in violation of the FCRA . . . ." *Id.* at 491–92.

In evaluating the issue of standing, the court said, *id.* at 491: "The harm attending a violation of § 1681b(f)(1) of the FCRA is closely related to—if not the same as—a harm that has traditionally been regarded as providing a basis for a lawsuit: intrusion upon seclusion (one form of the tort of invasion of privacy)." The Ninth Circuit explained that intrusion upon seclusion does "'not always require additional consequences to be actionable.'" *Id.* at 491 (quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017)). Therefore, the *Nayab* Court reasoned, 942 F.3d at 492: "When a third party obtains the consumer's credit report in violation of 15 U.S.C.

§ 1681b(f)—that is, for a purpose not authorized by statute—the consumer is harmed because he or she is deprived of the right to keep private the sensitive information about his or her person. This harm is highly offensive and is not trivial because a credit report can contain highly personal information." (Internal citation omitted).

Plaintiffs advised the Court of the decision issued yesterday in *AFL-CIO*, 2025 WL 1129227. ECF 144 (notice); ECF 144-1 (copy of opinion).[31] On the matter of standing, the case is instructive. The plaintiffs, all organizations, allege that DOGE personnel have received unprecedented access to the systems of records containing PII maintained by the Department of Health and Human Services, the Consumer Financial Protection Bureau, and the DOL. *AFL-CIO*, 2025 WL 1129227, at *1–4. Among other things, the amended complaint asserts Privacy Act and APA claims. *Id.* at *4–5. The defendants moved to dismiss the amended complaint, which the court denied, except as to the standalone Privacy Act claim, because it is not available to an organization. *Id.* at *1, *21.[32]

Relevant here, the court concluded that the plaintiffs have both associational and organizational standing. Focusing on associational standing, Judge Bates determined that "the harm that plaintiffs allege their members are suffering has a close relationship with the harm asserted in a suit for the tort of intrusion upon seclusion." *Id.* at *7. Referring to United States DOGE Service as "USDS," *id.* at *1, the court reasoned, *id.* at *7: "USDS personnel have intruded upon their sensitive personal information within the agency systems."

---

[31] Plaintiffs alerted the Court just before 10:00 p.m. on April 16, 2025, while I was working on this Memorandum Opinion.

[32] The *AFL-CIO* Court had previously denied two TRO motions. *See AFL-CIO,* 2025 WL 543938, at *5 (D.D.C. Feb. 7, 2025); *AFL-CIO*, 2025 WL 542825, at *5 (D.D.C. Feb. 14, 2025).

68

Of note, the court considered the Fourth Circuit's decision in *Bessent*. Focusing on Judge Richardson's concurrence, Judge Bates said, *id.* at *8: "This Court is the first to admit that seeing someone's name and SSN in the 648th row of a spreadsheet is 'different in kind' from peeping into someone's bedroom window." But, the court explained that it "reads *TransUnion* and the cases it relied upon to leave it to *Congress*, not judges, to determine what is sufficiently bad to be deemed unlawful." *Id.* (emphasis in *AFL-CIO*).

Judge Bates observed that the "Supreme Court has routinely explained [that] Congress can 'elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'" *Id.* (quoting *Spokeo, Inc.*, 578 U.S. at 341) (alteration in *Spokeo, Inc.*). Moreover, he recognized that "Congress enacted the Privacy Act to 'protect the privacy of individuals identified in information systems maintained by Federal agencies.'" *AFL-CIO*, 2025 WL 1129227, at *8 (quoting *Chao II*, 540 U.S. at 618). He said, *AFL-CIO*, 2025 WL 1129227, at *8 (emphasis in *AFL-CIO*; internal citations omitted):

> Put simply, then, Congress 'identified' an individual's interest in his information being viewed only by the federal agency that maintains it—and even then, only by those employees with a need to view it—as a 'modern relative of a harm with long common law roots.' So [the Privacy Act] in effect created a new sphere in which individuals not only *expect* privacy, but have a right to it—*i.e.*, a sphere of seclusion. As a result, an intrusion upon that sphere—even if the sphere literally encompasses only one row of millions in a dataset—amounts to an injury similar to the intrusion upon other private spheres, such as one's home.

The court added that "the Privacy Act makes it so an individual 'should . . . be at peace' with the fact that his information is maintained and only reviewable by the relevant agency, and it is thus warranted that individuals like the union members here 'feel[] . . . unease' when outsiders view it." *Id.* (quoting *Bessent*, 2025, WL 1023638, at *4) (alteration in *AFL-CIO*). The court acknowledged that the harm "that results from such a disclosure may not seem as grave as the harm in a window-peeper intrusion-upon-seclusion claim." *AFL-CIO*, 2025 WL 1129227, at *8.

69

But, "the intrusions 'nevertheless pose the same *kind* of harm that common law courts recognize—a concrete harm that Congress has chosen to make legally cognizable.'" *Id.* (quoting *Gadelhak*, 950 F.3d at 463) (emphasis in *Gadelhak*).

The court also rejected the defendants' argument that the plaintiffs' alleged harms were not concrete because the plaintiffs alleged "neither that defendants are currently disseminating or using members' information nor that defendants will do so imminently." *AFL-CIO*, 2025 WL 1129227, at *8. Judge Bates explained that intrusion upon seclusion "does not require publication or use to be actionable." *Id.*[33]

In the recent case of *New York OPM Action*, 2025 WL 996542, the plaintiffs, current and former federal government employees and their unions, sued defendants Office of Personnel Management ("OPM"), its Acting Director, and DOGE defendants. *Id.* at *1, *2. The plaintiffs alleged that data contained in OPM databases was improperly disclosed to individuals associated with DOGE, in violation, *inter alia*, of the Privacy Act and the APA. *Id.* at *1, *2. Information contained in those databases included "identifying information such as names, birthdates, social security numbers, demographic information, education and employment histories, personal health records, financial information, and information concerning family members and other third parties." *Id.* at *2.

---

[33] The court "also recognized that the tort of 'breach of confidence' can serve as a common-law analogue for a harm inflicted by a statutory violation." *AFL-CIO*, 2025 WL 1129227, at *9 (quoting *Jefferies v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019)). That tort "'lies where a person offers private information to a third party in confidence and the third party reveals that information to another.'" *AFL-CIO*, 2025 WL 1129227, at *9 (citation omitted). "Nothing beyond the 'plaintiff's trust in the breaching party [being] violated' must occur for the harm to be actionable. The trusted party's disclosure to a third party is sufficient." *Id.* (citation omitted; alteration in *AFL-CIO*). Judge Bates determined that the plaintiffs "allege their members are suffering precisely that harm." *Id.* "This common law analogue," the court said, "is more like a common-law twin." *Id.* But, no such claim has been lodged here.

In particular, the complaint alleged that in January 2025, "OPM gave at least six DOGE agents immediate access to all personnel systems at OPM" and, a week later, "gave more DOGE agents access to OPM systems." *Id*.  According to the complaint, at the time the DOGE agents were provided access, "they had not been properly vetted, had not received customary security clearances, and had not received OPM's security training." *Id.*  Further, the plaintiffs alleged that, "in violation of the Privacy Act, the DOGE Defendants were given access to OPM data without obtaining the consent of affected individuals and with no lawful need for access to the records disclosed to them." *Id.*

The defendants moved to dismiss the complaint pursuant to, *inter alia*, Fed. R. Civ. P. 12(b)(1), based on lack of standing.  *Id.* at 3–4.  The court ruled that the "complaint adequately alleges that the individual plaintiffs and members of the plaintiff unions have experienced a concrete injury in fact that is analogous to the tort of intrusion on seclusion."  *Id.* at *5. Emphasizing that the records "at issue contain information about the deeply private affairs of the plaintiffs," the court reasoned that the "individual plaintiffs had every reason to expect that their OPM records would be carefully guarded and kept private and secure."  *Id.* at *6.  The court added, *id.*: "That is in fact what the Privacy Act requires."  Among other things, the court also found relevant that "these records were disclosed to DOGE agents in a rushed and insecure manner that departed substantially from OPM's normal practices," *i.e.*, "the DOGE agents were not vetted, were not required to obtain security clearances, and were not trained about OPM security protocols and duties before the records were disclosed to them."  *Id.*  Therefore, the court concluded that, based on the allegations of the complaint, "this intrusion upon the individual plaintiffs' private affairs and confidential information was a substantial invasion of their privacy and would be highly offensive to a reasonable person."  *Id.*

In reaching its conclusion, the court rejected the defendants' argument that the plaintiffs' injury could only be considered concrete if the "DOGE agents examined or used the records to which OPM gave them access." *Id.* at *7. Rather, it recognized that standing exists "when an unauthorized third party was granted access to a plaintiff's legally protected data, due to the resulting harm's resemblance to intrusion upon seclusion." *Id.*

In *Alliance for Retired Americans*, 2025 WL 740401, Judge Kollar-Kotelly, of the United States District Court for the District Court of Columbia, found that three plaintiff organizations had standing to sue the Department of Treasury and Treasury Secretary Bessent, among other defendants, on behalf of their members. There, DOGE personnel were provided access to systems of records maintained by the Department of Treasury that contained sensitive and personal information, such as routing and bank account numbers, as well as information about individual credit and debit card numbers. *Id.* at *5–8, *16.[34]

Notably, the court rejected the argument that the plaintiffs lacked standing because the members' information was shared only within the government, and not to the public. The court acknowledged that a "lack of public exposure supports an argument that the harm that Plaintiffs describe is not analogous to the reputational harm caused by defamation." *Id.* at *15. But, the tort of intrusion upon seclusion does not require publication. *Id.* at *16. And, the court concluded that the alleged injury of plaintiffs' members—the same one alleged by plaintiffs here—"bears a close relationship to the harm essential to an intrusion upon seclusion at common law." *Id.*

Of import, the court found that the plaintiffs' members had a reasonable expectation of privacy in the records at issue because, *inter alia*, it is "entirely reasonable for [plaintiffs']

---

[34] Nevertheless, the court declined to issue a preliminary injunction, based on a lack of irreparable harm. *Alliance for Retired Americans*, 2025 WL 740401, at *24.

members to rely on the explicit statutory protections provided by the Privacy Act and the Internal Revenue Code." *Id.* Further, she found that the intrusion at issue would be highly offensive to a reasonable person, pointing, among other things, to "the sensitivity of the information at issue." *Id.* at *17.

The recent case of *New York v. Trump*, 2025 WL 573771, is also informative. There, nineteen states filed suit against President Trump, the U.S. Department of Treasury, and Treasury Secretary Bessent, challenging access to financial and other information provided to members of the DOGE Team by the Department of Treasury. *Id.* at *1. The disbursements included funding to state governments for Medicaid, FEMA, education, and foster care programs. *Id.* at *2. And, payment files contained Social Security and bank account numbers as well as federal tax return information. *Id.* at *7. The court granted a preliminary injunction that, *inter alia*, enjoined the Treasury Department from granting any DOGE affiliates access to any payment record or payment system containing personally identifiable information and/or confidential financial information of the payees. *Id.* at *27.[35]

The court pointed to the Second Circuit's decision in *Bohank v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276 (2d Cir. 2023). There, the Second Circuit concluded that "exposure of [the plaintiff's] private PII to unauthorized third parties" bore "some relationship to a well-established common-law analog: public disclosure of private facts." *Id.* at 285. Relying on *Bohank*, the district court found that the plaintiff-states had standing to sue. Specifically, the court reasoned that the plaintiffs adequately alleged "past harm in the unauthorized disclosure of [their]

---

[35] Recently, Judge Vargas allowed one member of the DOGE Team to access Treasury systems of record, provided that he complies with certain conditions. *New York v. Trump*, JAV-25-1144, 2025 WL 1095147, at *12 (S.D.N.Y. Apr. 11, 2025).

confidential financial information to the DOGE Team . . . ." *New York v. Trump*, 2025 WL 573771, at *12. The court also found that the plaintiffs had "adequately alleged . . . *the risk of future harm*, in the risk of exposure of their confidential information to officials of USDS/DOGE and to the public through potential hacking." *Id.* (emphasis added).

Any claim that plaintiffs' members suffered no injury in fact because the protected information was disclosed only to government employees also carries no water.[36] Intrusion upon seclusion "does not depend upon any publicity given to the person whose interest is invaded or to his affairs." Restatement § 652B cmt. a; *see also Koeppel v. Speirs*, 808 N.W.2d 177, 180 (Iowa 2011) ("[P]roof that information obtained through an intrusion has been distributed to third parties is not required."); *Martin v. Mooney*, 448 F. Supp. 3d 72, 82 (D.N.H. 2020) ("An intrusion upon seclusion claim does not require publicity."); *Hamberger v. Eastman*, 206 A.2d 239, 242 (N.H. 1964) (intrusion upon seclusion "does not require publicity and communication to third persons").

In other words, "[t]he intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the" information obtained. Restatement § 652B cmt. b; *see Nayab*, 942 F.3d at 491 (Intrusion upon seclusion does "'not always require additional consequences to be actionable.'") (citation omitted); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017) ("Further, in the tort of intrusion upon seclusion,[] '[t]he *intrusion itself* makes the defendant subject to liability, even though there is no publication or other use,' *meaning a showing of additional harm is not necessary to create liability*.") (citation omitted; second emphasis added). Moreover, the harm associated with intrusion on seclusion does not dissipate merely because PII is accessed only by government employees, if they were not entitled

---

[36] The government argued in its TRO Opposition that the alleged injuries of plaintiffs' members are not comparable to the harm associated with intrusion upon seclusion because the PII has been shared only with other government employees, and not the public. ECF 36 at 13.

to access the information. *See, e.g.*, *Parks v. U.S. IRS*, 618 F.2d 677, 683 (10th Cir. 1980) (concluding that plaintiffs had standing to sue for a Privacy Act violation, although there was only an intra-agency disclosure, because "plaintiffs are the objects or the subjects of the disclosure and the allegation is that they suffered a personal invasion").[37]

It is also significant that the SSA data systems contain a trove of medical and mental health records. Although *Bessent*, 2025 WL 1023638, involved some health records (*see id.* at *10 (Berner, J., dissenting)), it does not appear that such records were central to the case. Here, the Agency gathers extensive medical records, and the concern among plaintiffs' members regarding access to medical and mental health records is not merely hypothetical.

According to Fiesta, the Executive Director of the Alliance, the Alliance has members who receive Social Security Disability Insurance ("SSDI") benefits. ECF 22-6, ¶ 8. These members "have submitted sensitive medical information to SSA to receive disability benefits, including health records and doctors' evaluations for physical and mental conditions." *Id.* ¶ 18; *see also id.* ¶ 9 (SSA collects and maintains "medical histories" of some ARA members). Widger, the Director of Retirees at AFSCME, avers that SSA "has in its systems the private medical information of AFSCME members who are applying for or have applied for disability insurance benefits . . . ." ECF 22-1, ¶ 10. She states, *id.* ¶ 11: "Required medical information includes all prescription and non-prescription medicines the person is currently taking; all health care providers from whom the individual has sought treatment (doctor, hospital, clinic, psychiatrist, nurse practitioner, therapist,

---

[37] In *TransUnion LLC* the Supreme Court stated, in dicta: "Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation." *TransUnion LLC*, 594 U.S. at 434. But, the Supreme Court was discussing the tort of "defamation," not intrusion upon seclusion. *Id.* at 434. And, as Prosser has observed, defamation and intrusion upon seclusion "have almost nothing in common . . . ." Prosser, *supra*, 48 CAL. L. REV. at 389.

physical therapist or other medical professional) and the medical conditions that were treated and evaluated; all medical tests performed by the listed providers (with the enumerated list including HIV and psychological/IQ tests); and other personal health information." And, for a "mental health disability claim," information "could include notes from psychotherapists and counseling sessions." *Id.* ¶ 12. In addition, Widger asserts, *id.* ¶ 13: "AFSCME members share this information with SSA because they are required to do so to obtain benefits, and they expect the agency to follow the law and keep that data safe and secure." She adds, *id.* ¶ 12: "Information disclosed concerning health conditions like HIV or other STDs can result in stigma, social isolation, job loss, housing loss, and other harms."

Further, Widger avers that she has personally been in contact with multiple retiree-members of AFSCME who are concerned about access to medical records. *Id.* ¶¶ 28, 29, 31. For example, one eighty-year-old retiree told Widger that he was "frightened" about who has access to his medical records. *Id.* ¶ 28. Another retiree participates in the SSDI program and told Widger that she is "frightened about her medical information being accessible by those who are targeting SSDI for cuts." *Id.* ¶ 29. Widger avers that since DOGE was granted access to SSA systems, retiree members have flooded AFSCME with questions, concerns, and fear about the security of their data, their health information, and their benefits. *Id.* ¶¶ 27, 28, 29.

Imperiale, a 60-year-old retiree member of AFSCME, participates in the SSDI program. ECF 22-4, ¶¶ 1, 2, 4. She explains that she was "forced to retire earlier than [she] would have wanted due to an injury [she] sustained while working . . . ." *Id.* ¶ 3. Imperiale avers, *id.* at 4: "I am now anxious and distressed about the access of my private data by DOGE, which the [SSA] stores and which I have submitted to SSA and continue to submit and update to receive SSDI benefits." Further, she asserts, *id.* ¶ 7: "It was my expectation that the personal information I

76

submitted and continue to submit to SSA—including private health information about my disability—would be used only to determine whether I was eligible for benefits, and not disclosed for any other purpose."

"'[A] patient's medical information, as reflected in the records maintained by his or her medical providers, is certainly a matter which a reasonable person would consider to be private.'" *Nayani*, 899 S.E.2d at 488  (alteration in *Nayani*; citation omitted); *see Doe v. Delie*, 257 F.3d 309, 315 (3d Cir. 2001) ("We have long recognized the right to privacy in one's medical information . . . ."). Indeed, as stated earlier, in some jurisdictions "the disclosure of one's private personnel files and medical records amounts to a per se intrusion into seclusion if the records contain sensitive materials[.]" *Sabrowski*, 124 F. App'x at 161; *see Hooper*, 2013 WL 5530603, at *5 ("[A] plaintiff's medical records are considered private, and the unauthorized access or disclosure of the records is an intrusion on seclusion."); *Crosten v. Kamauf*, 932 F. Supp. 676, 685 (D. Md. 1996) (declining to dismiss intrusion upon seclusion claim because "the Court cannot say, as a matter of law, that disclosing the fact that someone is in psychotherapy could not be highly offensive to a reasonable person."); *see also Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009) (stating that "conduct giving rise to unauthorized viewing of personal information such as a plaintiff's Social Security number and other identifying information can constitute an intrusion that is highly offensive to any reasonable person"); *Toomer v. Garrett*, 574 S.E.2d 76, 90 (N.C. App. 2002) ("The unauthorized examination of the contents of one's personnel file, especially where it includes sensitive information such as medical diagnoses and financial information, like the unauthorized opening and perusal of one's mail, would be highly offensive to a reasonable person.").

The enactment of the Health Insurance Portability and Accountability Act ("HIPAA"), 29 U.S.C. § 1181 *et seq.*, is a reflection of societal views as to the sanctity of medical information. HIPAA "is the primary federal law which was passed to ensure an individual's right to privacy over medical records." *United States v. Elliott*, 676 F. Supp. 2d. 431, 436 (D. Md. 2009). For example, under HIPAA, subject to narrow exceptions, a covered entity "must obtain an authorization for any use or disclosure of psychotherapy notes . . . ." 45 C.F.R. § 164.508(a)(2). Although HIPAA does not apply to the government, *see* 45 C.F.R. §§ 160.102, 164.104, the statute suggests the view that there is an expectation of privacy in medical records that is engrained in our culture. *See Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2d 1065, 1090 (D. Or. 2012) ("HIPAA suggests Congress has determined reasonable people want their medical records private and strongly object to those records being inappropriately accessed.").[38]

The evidentiary "psychotherapist-patient privilege" also illustrates the importance of confidentiality that our society attaches to mental health matters. The privilege is "'rooted in the imperative need for confidence and trust'" between a therapist and patient in regard to discussions concerning health issues. *Jaffee v. Redmond*, 518 U.S. 1, 10 (1996) (citation omitted); *see also id.* at 12 (noting that "all 50 States and the District of Columbia have enacted into law some form of psychotherapist privilege"). And, as noted, in certain circumstances, SSA collects the treatment records of mental health care providers. *See* ECF 22-1 (Widger Decl.), ¶ 12.

---

[38] Under 42 U.S.C. § 1320d-6(a), Congress provides for criminal enforcement of HIPAA violations. One who unlawfully "obtains individually identifiable health information relating to an individual" or "discloses individually identifiable health information to another person" is subject to prosecution. 42 U.S.C. § 1320d-6(a). For purposes of the statute, a person is considered to have "obtained or disclosed individually identifiable health information in violation of this part if the information is maintained by a covered entity (as defined in the HIPAA privacy regulation described in section 1320d-9(b)(3) of this title) and the individual obtained or disclosed such information without authorization." *Id.*

"The question of what kinds of conduct will be regarded as a 'highly offensive' intrusion is largely a matter of social conventions and expectations."  J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 5.1(A)(2) (1993).  It is almost self-evident that in our society PII, such as SSNs, medical and mental health information, and certain financial records, are regarded as private, sensitive, and confidential information, found in places equivalent to "private and personal mail," a "wallet," a "safe," or a home.  Restatement § 652B cmt. b.[39]

Members of the plaintiff organizations have expressed their belief of an expectation of privacy as to their PII.  *See* ECF 22-2 (Conard), ¶ 10 ("I always expected that the personal data I have submitted, and continue to submit when required, to SSA would remain private and used only to determine whether I was eligible for benefits, and not to be used for any other purpose."); ECF 22-5 (Williams), ¶ 6 (same); ECF 22-3 (Doe), ¶ 6 (same); ECF 22-9 (Gray), ¶¶ 6, 8 (expectation that data would remain "confidential," and data is "personal and private"); ECF 22-4 (Imperiale), ¶ 5 ("As a retiree with a disability, it is very important to me that my data remain private."); ECF 110-4 (Conard Supplemental Declaration), ¶ 2 ("I have handed over a lot of information to SSA, including my home address, my phone number, and sensitive financial information, on the promise

---

[39] As I was working on the TRO Opinion, the news reported that the SSNs of some 200 people were included in the release of files concerning the death of President John F. Kennedy. *See* William Wan, et al., *Social Security Numbers and Other Private Information Unmasked in JFK Files*, WASH. POST (Mar. 19, 2025), https://perma.cc/C4VG-PY9F.  The reaction to the disclosure is telling, and underscores the expectation of privacy associated with SSNs.  "It's absolutely outrageous," said former Trump campaign lawyer Joseph diGenova, whose information was disclosed. *Id.*  Mary Ellen Callahan, former Chief Privacy Officer at the Department of Homeland Security, aptly stated, *id.*:  "Social Security is literally the keys to the kingdom to everybody. . . .  It's absolutely a Privacy Act violation."

Although access here was provided to the DOGE Team, and records were not disseminated to the public at large, the reaction to the disclosure of SSNs in regard to the Kennedy files is noteworthy.  It supports the conclusion that there is an expectation of privacy with respect to SSNs.  And, the access to private information here includes far more than SSNs.

that [SSA] will keep it confidential and on the understanding, made clear by the [A]gency's own website, that they value privacy and security."); ECF 110-6 (Somo Supplemental Declaration), ¶ 4 ("I have an expectation that the [A]gency will keep my information private because it's what they told me."); *see also* ECF 22-8 (Declaration of Bernadette Aguirre, Director of the Retiree Division of AFT), ¶ 12 (averring that she has "personally heard from retiree members who send data to SSA that they are concerned about DOGE's access to the private personal and financial information they have provided to SSA"). The members' expectation of privacy as to the PII is objectively reasonable.[40]

To be sure, plaintiffs cannot establish a cognizable injury in fact merely by pleading a statutory violation of the Privacy Act.[41] But, the Supreme Court has made clear that the judgment of Congress remains "instructive and important." *Spokeo, Inc.*, 578 U.S. at 341; *see TransUnion LLC*, 594 U.S. at 425 ("Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation."); *Drazen*, 74 F.4th at 1345 ("[T]he Constitution empowers Congress to decide what degree of harm is enough so long as that harm is similar in kind to a traditional harm."). In particular, Congress can "'elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'" *Spokeo, Inc.*, 578 U.S. at 341 (quoting *Lujan*, 504 U.S. at 578) (alteration in *Spokeo, Inc.*). By enacting the Privacy Act, the Social Security Act, FISMA, and the Internal Revenue Code,

---

[40] Defense counsel recognized at the P.I. Motion hearing that the records in issue "are admittedly very private records . . . ." ECF 143 at 69. Nonetheless, he claimed that "there is no reasonable expectation that the agency will not be able to access those records for purposes of antifraud or for technology improvement." *Id.*

[41] The government observes in its Opposition that plaintiffs have not pled an intrusion upon seclusion count in the Amended Complaint. ECF 113 at 13. That is irrelevant. *See TransUnion LLC*, 594 U.S. at 424 (stating that a plaintiff must "identify"—not plead—a common law analog).

Congress recognized, in general, that improper access to or disclosure of personally identifiable information—even to government employees—poses a harm to legitimate privacy interests.

The legislative history of the Privacy Act supports this conclusion. Congress proclaimed: "The right to privacy is a personal and fundamental right protected by the Constitution of the United States[.]" Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(4), 88 Stat. 1896. Congress also found: "The privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by federal agencies[.]" *Id.* § 2(a)(1). Moreover, Congress recognized that "[t]he increasing use of computers and sophisticated information technology, while essential to the efficient operations of the government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information[.]" *Id.* § 2(a)(2); *see Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016) (same). Thus, Congress declared: "In order to protect the privacy of individuals identified in information systems maintained by federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies." Pub. L. No. 93-579, § 2(a)(5).

If receiving a single unwanted text message or phone call is sufficiently offensive to constitute concrete harm for standing purposes, in the context of intrusion upon seclusion, as several Circuits have determined, then providing the DOGE Team with access to the medical records and sensitive financial information of millions of people, if unauthorized, or without adequate need, is surely sufficiently offensive so as to constitute concrete harm. Such unrestricted access to PII that SSA provided to the DOGE Team would be highly offensive to an objectively reasonable person. And, applying the principles gleaned from the cases discussed above to the allegations here, SSA's provision to the DOGE Team of wholesale access to SSA records

81

containing PII, without consent, and allegedly without need and to unqualified personnel, is sufficiently analogous to the tort of intrusion upon seclusion.

Therefore, plaintiffs have satisfied the injury in fact requirement of Article III. Because the remaining elements of associational standing are satisfied, I conclude that plaintiffs have standing to pursue their claims.[42]

## V.    APA Claims

### A.  Judicial Review of APA Claims

As noted, plaintiffs lodge several claims under the APA. Section 702 of the APA provides, in part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see also id.* § 794 (permitting review of "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court").

"The APA establishes a 'basic presumption of judicial review' of agency action.[]" *Lovo v. Miller*, 107 F.4th 199, 205 (4th Cir. 2024) (quoting *Lincoln v. Virgil*, 508 U.S. 182, 190 (1993)); *see Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 16 (2020); *see also Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018) ("The Administrative Procedure Act creates a basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'") (citation and some internal quotations omitted; alteration in *Weyerhaeuser*); *Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697 (4th Cir. 2019); *Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600, 609 (4th Cir. 2018); *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 629 n.3 (4th Cir. 2017); *Friends of Back Bay v.*

---

[42] I express no opinion as to whether plaintiffs have standing to pursue their Appointments Clause claim. That issue has not been raised by either side.

*United States Army Corps. Of Eng'rs*, 681 F.3d 581, 586 (4th Cir. 2012). Of relevance here, even if an agency's actions are based on a President's Executive Order, this does not "insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

The presumption of judicial review "may be rebutted only if the relevant statute precludes review, 5 U.S.C. § 701(a)(1), or if the action is 'committed to agency discretion by law,' § 701(a)(2)." *Weyerhaeuser Co.*, 586 U.S. at 23; *see Gonzalez v. Cuccinelli*, 985 F.3d 357, 366 (4th Cir. 2021). The latter exception is read "quite narrowly." *Weyerhaeuser Co.*, 586 U.S. at 23; *accord Overton Park*, 401 U.S. at 410. This applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Overton Park*, 401 U.S. at 410 (citation omitted); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (judicial review is unavailable if the statute provides "no judicially manageable standards . . . for judging how and when an agency should exercise its discretion"); *see also Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 317 (4th Cir. 2008).

Under the APA, the federal government waives sovereign immunity for a suit brought by "'a person suffering legal wrong because of agency action'" who seeks to obtain relief "'other than money damages.' 5 U.S.C. § 702." *See Medical Imaging & Technology Alliance v. Library of Congress*, 103 F.4th 830, 836 (D.C. Cir. 2024); *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 430 (4th Cir. 2019). "The term 'action' as used in the APA is a term of art that does not include all conduct" of the government. *Vill. Of Bald Head Island v. U.S. Army Corps. Of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(B). The term "'agency action' is a capacious term, 'cover[ing]

comprehensively every manner in which an agency may exercise its power.'" *Maryland, et al. v. United States Dep't of Agriculture, et al.*, JKB-25-0748, 2025 WL 800216, at *11 (D. Md. Mar. 13, 2025) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)) (alteration in *Dep't of Agriculture*).

Of import, the APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see Lovo*, 107 F.4th at 205; *City of New York*, 913 F.3d at 430–31; *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019); *Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438, 445 (4th Cir. 2014); *Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 432–33 (4th Cir. 2010).[43] Indeed, "finality under the APA is a jurisdictional requirement." *Jake's Fireworks Inc. v. Consumer Prod. Safety Comm'n*, 105 F. 4th 627, 631 (4th Cir. 2024); *see also Nat'l Veterans Legal Servs. Program v. United States Dep't of Def.*, 990 F.3d 834, 836 (4th Cir. 2021). Therefore, a court lacks subject matter jurisdiction if the plaintiff challenges an "agency action" that is not "fit for review." *City of New York*, 913 F.3d at 430.

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Court articulated a two-part test to determine finality of agency action. An agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177–78; *see Biden v. Texas*, 597 U.S. 785, 808 (2022). The finality requirement ensures that judicial intervention does not deny an agency the "opportunity to correct its own mistakes and to apply its expertise." *Federal Trade*

---

[43] The requirement of final agency action applies to plaintiffs' APA claims, but not to their *ultra vires* claim or Privacy Act claim in Count II. As Judge Bredar noted in *Dep't of Agriculture,* 2025 WL 800216, at *11 n.4, "the right of action for an *ultra vires* claim flows from the federal courts' equity jurisdiction, not from the APA."

*Comm'n. v. Standard Oil Co. of California*, 449 U.S. 232, 242 (1980); *see also Univ. of Medicine & Dentistry of New Jersey v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003). It also avoids "piecemeal review," which is "inefficient" and might prove to be "unnecessary" upon the agency's completion of its process. *Standard Oil Co. of California*, 449 U.S. at 242.

But, there are limitations on judicial review. The Fourth Circuit has said: "Review is available only when acts are discrete in character, required by law, and bear on a party's rights and obligations. The result is a scheme allowing courts to review only those acts that are specific enough to avoid entangling the judiciary in programmatic oversight, clear enough to avoid substituting judicial judgments for those of the executive branch, and substantial enough to prevent an incursion into internal agency management." *City of New York*, 913 F.3d at 432 (citing *Norton v. Southern Wilderness Alliance ("SUWA")*, 542 U.S. 55, 64–65 (2004)). Thus, the APA does not allow a court to review an agency's "day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).[44]

The scope of judicial review is limited in "two important respects." *City of New York*, 913 F.3d at 431. First, the plaintiff must "identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on the government's operations." *Id.* (quoting *SUWA*, 542 U.S. at 64). The Fourth Circuit has explained, *City of New York*, 913 F.3d at 431: "This distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers. Courts are well-suited to reviewing specific agency decisions, such as rulemakings, orders, or denials. [Courts] are woefully

---

[44] It would be difficult to characterize the arrival of the DOGE Team at SSA, pursuant to an Executive Order, as "day-to-day operations."

ill-suited, however, to adjudicate generalized grievances asking us to improve an agency's performance or operations."

Second, "the definition of 'agency action' is limited to those governmental acts that determin[e] rights and obligations.'" *Id.* (quoting *Clear Sky Car Wash LLC,* 743 F.3d at 445) (alteration in *City of New York*). In *City of New York*, 913 F.3d at 431, the Court said: "This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties." In order to satisfy the requirement, "a party must demonstrate that the challenged act had 'an immediate and practical impact,' *Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010), or 'alter[ed] the legal regime' in which it operates." (Quoting *Bennett*, 520 U.S. at 178) (alteration in *City of New York*).

Courts take a "'pragmatic' approach . . . to finality." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967)); *see Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (noting that the finality requirement is applied in a "'flexible and pragmatic way'"). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (plurality opinion); *see Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019) (stating that the focus of the inquiry is on "'the concrete consequences an agency action has or does not have'") (citation omitted); *Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 858 (4th Cir. 2002) ("[T]he critical issue is whether the [agency's action] gives rise to legal consequences, rights, or obligations.").

86

JA1387

To satisfy the consummation element, the challenged agency action need not be formal action or reduced to writing. *See, e.g.*, *Her Majesty the Queen in Right of Ontario*, 912 F.2d at 1531 (noting that "the absence of a formal statement of the agency's position . . . is not dispositive); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) ("Agency action, however, need not be in writing to be final and judicially reviewable."). Indeed, a "contrary rule would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" *R.I.L-R*, 80 F. Supp. 3d at 184 (citation omitted). And, agency action has legal consequences if it "alters the legal regime[.]" *Bennett*, 520 U.S. at 178; *see Hawkes*, 578 U.S. at 598–99; *Nat'l Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011).

Pursuant to the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B); or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C). The Fourth Circuit has said: "The APA provides that a reviewing court is bound to 'hold unlawful and set aside agency action' for certain specified reasons, including whenever the challenged act is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Back Bay*, 681 F.3d at 586–87 (quoting 5 U.S.C. § 706(2)(A)); *see United States v. Bean*, 537 U.S. 71, 77 (2002); *N. Carolina Growers' Ass'n., Inc. v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012).

Review under the APA is highly deferential, however, and the agency action enjoys a presumption of validity and regularity. *Overton Park*, 401 U.S. at 415; *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). Nevertheless, "the power of . . . agencies is circumscribed by the authority granted," and courts are "entrusted" with "protect[ing] justiciable

individual rights against administrative action fairly beyond the granted powers." *Stark v. Wickard*, 321 U.S. 288, 309–10 (1944). In other words: "Agencies must operate within the legal authority conferred by Congress, and when those limits are transgressed, an individual may seek recourse in the Article III courts." *Medical Imaging & Technoloy Alliance*, 103 F.4th at 838. "In determining whether a 'meaningful standard' for reviewing agency discretion exists, courts consider the particular language and overall structure of the statute in question, as well as 'the nature of the administrative action at issue.'" *Speed Mining, Inc.*, 528 F.3d at 317 (internal citations omitted) (quoting *Heckler*, 470 U.S. at 830, and *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002)).

Notably, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency . . . ." *Motor Vehicle Mfrs. Ass'n of the United States*, 463 U.S. at 43; *see Overton Park*, 401 U.S. at 415; *Ohio Valley Envtl. Coal*, 556 F.3d at 192. A court must perform a "thorough, probing, [and] in-depth" review of an agency action. *Overton Park*, 401 U.S. at 415. In assessing an agency decision, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378 (1989) (quoting *Overton Park,* 401 U.S. at 416).

"'Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made.'" *Ohio Valley Envtl. Coal., Inc. v. United States Army Corps of Engineers*, 828 F.3d 316, 321 (4th Cir. 2016) (citation omitted); *see Trinity Am. Corp. v. U.S. EPA*, 150 F.3d 389, 395 (4th Cir. 1998); *Clevepak Corp. v. U.S. EPA,* 708 F.2d 137, 141 (4th Cir. 1983). However, "[t]he 'arbitrary and capricious' standard is not meant to reduce judicial review to a 'rubber-stamp' of

agency action." *Ohio Valley Envtl. Coal,* 556 F.3d at 192 (citation omitted). In *Judulang v. Holder*, 565 U.S. 42, 53 (2011), the Supreme Court said: "[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking."

In sum, "Congress's 'historic practice' of providing for judicial review of administrative action reflects the importance of an independent check on the exercise of executive power." *Medical Imaging & Technology Alliance*, 103 F.4th at 839 (quoting *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670–73 (1986)). Unless Congress makes a decision to withhold judicial review, "courts have the power and the duty to review agency action for conformity with the law." *Medical Imaging & Technology Alliance*, 103 F.4th at 839.

### B. The Contentions

Plaintiffs maintain, *inter alia*, that the SSA Defendants' "decision to provide the DOGE Team with expansive access to SSA record systems without . . . completed background investigations, . . . need-to-know, and without regard for agency principles including segregation of duties and least-privilege access, constitutes final agency action for purposes of the APA." ECF 110-1 at 21–22. They maintain that SSA's action in providing full access to PII to the DOGE Team is in marked contrast to the Agency's usual procedures. *Id.* at 22. Notably, plaintiffs do not challenge individual decisions of Dudek. In essence, their view is that the decisions, collectively, amount to a change in SSA policy, and the change constitutes a final agency action.

In support of their position, plaintiffs cite Russo's Declaration (ECF 36-1), in which he stated that "'data access to the DOGE team was first approved by SSA's Acting Commissioner [Dudek]'" and that PII "was granted with respect to SSA's MBR, SSR, Numident, and Treasury Payment Files on February 12 and February 20" of 2025. ECF 110-1 at 22 (citing ECF 36-1, ¶¶ 6, 7). Plaintiffs also maintain that this assertion is supported by the Administrative Record. ECF

110-1 at 22 (citing ECF 86-2 at 1–32) (reflecting Dudek's approval of requests for data access for DOGE Team members).  According to plaintiffs, Dudek's decision "gave DOGE Team members access to virtually all data and records systems maintained by SSA, despite longstanding policy and practice at SSA of guarding the confidentiality and privacy of PII."  ECF 110-1 at 22.

Of import, plaintiffs maintain that DOGE Team members received "far broader access than what is automatically afforded" to SSA employees, even when oversight agencies or auditors review SSA records for potential waste, fraud, and abuse.  *Id*.  And, beyond scope of access, plaintiffs insist that "SSA has made a change to what requirements need to be met by employees to obtain such broad access," and that the access decision "is at odds with SSA's earlier policy and practices."  *Id*.

Defendants posit that no final agency action is implicated here.  ECF 113 at 16.  They assert that plaintiffs must demonstrate that the DOGE Team does "not have a right to access" plaintiffs' members' information, and "that steps were taken with the information that had legal consequences . . . ."  *Id.* at 20.

According to defendants, the actions identified by plaintiffs are "both tentative and interlocutory in nature, as the nature of the SSA DOGE Team's composition and projects are in flux."  *Id.* at 18.  In addition, they contend that the declarations accompanying their TRO Opposition demonstrate that no new finalized policy was implemented—or existing policy definitively changed—as SSA continues to onboard employees where needed in a workaday application of previous standards.  *Id.* at 19.

In the view of defendants, the access provided by SSA to the DOGE Team is akin to the garden variety decision of the Agency "to open an e-mail account for an employee, to assign an employee on a particular matter, or to ensure that an employee has the relevant training to access

systems or participate in certain programs." *Id.* at 18.  And, they assert that a "court could not review such decisions without bringing within the scope of the APA virtually every aspect of an agency's relationship with its employees, a result the 'final agency action' limitation of the APA is designed to prevent." *Id.*  Therefore, defendants maintain that plaintiffs have failed to "demonstrate how providing a new employee with system access necessary to his or her function 'consummat[es]' the hiring agency's decisionmaking process in such a way that legal consequences flow to Plaintiffs." *Id.* at 19 (quoting *Hawkes Co.*, 578 U.S. at 597).

### C.  Analysis

In my view, the government misses the mark in claiming that no final agency action is implicated here and, in effect, that it is merely business as usual at SSA.  I rely on my earlier analysis in ECF 49, buttressed by the recent submission of the Administrative Record and additional declarations.

As noted, Russo concedes that on February 12, 2025 and February 20, 2025, Dudek granted the DOGE Team access to personally identifiable information with respect to SSA's MBR, SSR, Numident, and Treasury Payment Files.  ECF 36-1, ¶ 7.  The scope of access concerned virtually all data and records systems maintained by SSA.  ECF 22-10, ¶ 36.  Yet, the Administrative Record reflects an entrenched, longstanding policy and practice at SSA of guarding the confidentiality and privacy of PII, except as needed, and, when needed, allowing only tailored access but not full access.  SSA's decision to provide such broad access to the DOGE Team upended the longstanding policy and practice that has governed SSA with respect to access to PII.

For example, the Administrative Record reflects the policy of "least privilege," by which "a user [is] given no more privileges than those necessary to perform their job."  ECF 86-5 at 18.  According to the A.R., least privilege works as follows:  (1) "Identify the user's current job"; (2)

"Determine the minimum privileges required"; (3) "Restrict the user to those privileges"; (4) "Consider the resource you are trying to protect. What is the *Least Privilege* amount of access you should grant in order to protect the resource and still allow those employees who need access to do their job?" *Id.* (emphasis in ECF 86-5).

SSA's Office of Information Security ("OIS") has explained that the "principle" of least privilege "restricts user access to the minimum amount of systems resources needed to perform assigned job duties or responsibilities." *Id.* And, even when "access is granted, it is always limited to those who have a legitimate need for these resources to perform their assigned position responsibilities." *Id.* Further, the OIS explains that the least privilege principle is important because "[u]nlimited rights and access can equate to unlimited potential for damage. The more privileges an account or user has, the greater potential for abuse or errors." *Id.*

Moreover, the Information Security Policy ("ISP") states that, "[i]n adherence to the security principles of least privilege, separations of duties, and need-to-know, the handling and exchange of data include" certain steps. ECF 86-4 at 53. The ISP instructs managers to "[r]estrict access to information systems to the minimum level required to perform assigned duties." *Id.* at 8.

To access SSA systems of record, the ISP establishes that individuals must complete (1) "Mandatory Information Security Awareness Training during onboarding"; and (2) "Mandatory Information Security Awareness Training within the agency defined timeframe each Fiscal Year." *Id.* at 49.

Section 3.1.3.1 of the ISP provides, in part, ECF 86-4 at 36:

- "Managers authorize access to SSA Information Systems based upon official business 'Need-To-Know,' and limited to the 'Least Privilege' access required for performing job

92

functions. Whenever access is granted, it is limited access to those who have a legitimate need for these resources to perform their assigned position responsibilities."

- "System Managers (SMs) must ensure adequate 'separation of duties' within the roles of Information Systems." *Id.*

- "Upon suitability clearance, users are authorized access to general SSA network resources. Specific access to information systems necessary to perform job duties must be requested via the agency's access management platform." *Id.* at 37.

- "Accounts must be reviewed annually to ensure access is appropriate for each user's assigned duties; frequency of review depends upon account type." *Id.*

In addition, SSA requires its supervisors to conduct "Access Certifications" approximately every thirty days to "ensure adherence to the principles of 'least privilege' and 'need to know.'" ECF 86-2 at 109. Yet, SSA policy provides that "certifiers are not allowed to review and certify their own access. The certification of the certifier's access is the responsibility of the certifier's Supervisors." *Id.* at 110. This limitation supports the separation of duties principle. *Id.*; *see also* ECF 86-4 at 36 ("System Managers (SMs) must ensure adequate 'separation of duties' within the roles of Information Systems.").

The Administrative Record also contains information as to the Privacy Act. ECF 86-2 at 149–71. SSA's policy of respecting privacy is consistent with federal regulations governing the Social Security Administration, which admonish SSA employees to be mindful of their responsibilities under the Privacy Act. The Employee Standards of Conduct for SSA state, 20 C.F.R. Pt. 401, App. A(a):

> All SSA employees are required to be aware of their responsibilities under the Privacy Act of 1974, 5 U.S.C. 552a. . . . Instruction on the requirements of the Act and regulation shall be provided to all new employees of SSA. In addition, supervisors shall be responsible for assuring that employees who are working with

systems of records or who undertake new duties which require the use of systems of records are informed of their responsibilities. Supervisors shall also be responsible for assuring that all employees who work with such systems of records are periodically reminded of the requirements of the Privacy Act and are advised of any new provisions or interpretations of the Act.

SSA's regulations also provide that "Systems Employees shall: (a) Be informed with respect to their responsibilities under the Privacy Act; . . . [and] (c) Disclose records within SSA only to an employee who has a *legitimate need to know* the record in the course of his or her official duties." 20 C.F.R. Pt. 401, App. A(d)(1) (emphasis added).

Marcela Escobar-Alava, the former CIO at SSA, explains Agency policy in her Declaration, which is unrefuted. *See* ECF 110-10. She avers that "SSA's IT and data security practices are driven by a few ideas: (1) use least privilege access; (2) segregation of duties; and (3) incorporate other 'Zero-Trust' principles (including assuming breach and verifying any requests for information as though they originated outside of the system)." *Id.* ¶ 2.

Escobar-Alava explains that least privilege access "is the idea that users should be granted permission to access the smallest amount of and least identifying data possible to complete their jobs." *Id.* ¶ 3. In other words, least privilege access means that "users should be granted the most restrictive type of access—for example, read-only access instead of write access. Data should be sanitized or anonymized wherever possible; users should be required to validate or explain what they are trying to access and why; and they should not be permitted to access production data with 'write' permissions unless absolutely necessary, authorized and documented." *Id.* This is "important because it prevents systems from having over-privileged users that may increase the potential for breach or misuse." *Id.*

"Segregation of duties ('SoD') is the idea that no user should have enough privileges to misuse a system on their own." *Id.* ¶ 4. Escobar Alava explains, for example, that "the person in

94

JA1395

charge of issuing benefits through a system should not be the same person crafting the code that govern[s] that system." *Id.*

When Escobar-Alava worked at SSA, she "saw these principles put into practice." *Id.* ¶ 5. As an example, she states that "anyone seeking access to sensitive data housed in SSA systems was required to provide a justification as to why they needed access to specific systems, information of that kind, of that quantity, or in that way." *Id*.

Notably, the level of access granted is not usually full access. Escobar-Alava explains: "In keeping with the principles outlined above, SSA's Enterprise Data Warehouse, or EDW, includes many sandbox functions." *Id.* ¶ 7. And according to Escobar-Alava, "standard practice would be to (1) grant DOGE Team members access to the data they sought in a 'sandbox' environment with anonymized data, and (2) refuse requests for write-access and access to SSA source code." *Id*.

Flick's Declaration, which is also unrefuted, bolsters the conclusion that the extent of access that SSA provided here constitutes a dramatic change in policy at SSA. She asserts: "The importance of privacy is engrained into every SSA employee from day one." ECF 22-10, ¶ 4. And, "[a]long with accurate and timely payment of benefits, attention to privacy is one of SSA's most fundamental duties." *Id.* To that end, employees are required to sign documents every year acknowledging their duty to protect PII and are also required to attend annual information security training. *Id.* ¶ 6; *see also* ECF 86-3 at 83 (referencing Office of Management and Budget-related requirement of "Annual Reminder on Safeguarding Personally Identifiable Information (PII) for SSA Employees and its accompanying Acknowledgement Statement" that employees must sign annually).

According to Flick, the scope of access requires a "'need to know.'" ECF 110-11, ¶ 43. This requirement is plainly evident from the Administrative Record. For example, the Information

Security Officer manual states: "The principles of 'need-to-know' and 'least privilege' are the basis of the SSA system access policy." ECF 86-3 at 107; *see also* ECF 86-2 at 74 (Employee 8's unsigned Special Government Employee agreement states that employee "will not access, or attempt to access, classified information without the proper security clearance and a need to know"). Flick maintains that the "need to know" reasons for full, non-anonymized access to SSA data systems articulated in this case are "far from sufficiently detailed to justify granting the level of access the DOGE Team now has." ECF 39-1, ¶ 5.

In combination with "need to know," Flick explains that SSA's policy and procedures also follow the "'least privilege' method for granting access, which means that people are permitted to access only the lowest amount of information that will allow them to accomplish their jobs." ECF 110-11, ¶ 4. She contends that "this method of granting access applies to all agency systems and data, including the MBR, Supplemental Security Income Record, Numident, Master Earnings File, and to any mechanism through which one can access data (for example, through both the EDW and via direct access to systems of record like the MBR)." *Id.*

Flick also provided examples of the separation of duties principle from her recent time at SSA. She explains, *id.* ¶¶ 5–8, 10–11:

> For example, the former Office of Analytics, Review, and Oversight included an Office of Program Integrity, which managed SSA's anti-fraud work and contained two components that separated the duties within the anti-fraud work: the fraud analytics team, which examined SSA data for patterns of fraud; and the fraud investigations team, which probed specific instances of fraud referred by the analytics team. Employees in each of these components had access to different levels of data.

> The analytics team (comprised of data scientists, mathematicians, and statisticians) looks for patterns and thus needs access to less granular information. They look for a pattern by using structured query language to determine, for example, a list of Social Security Numbers ("SSNs") associated with dates of birth before 1920.

By contrast, the certified fraud investigators in the investigations component need more specific information. For example, to examine an instance of direct-deposit fraud, they need to review specific data on an individual's MBR (such as the history of changes to routing number or contact information). They access that detailed data through the EDW and search for those details by SSN.

When determining whether an individual employee has a defined business need for accessing PII, SSA considers factors including the type of work that person will do (e.g., fraud analytics versus fraud investigations); the means through which they will access data (i.e., through EDW or via direct access to production data); and the way in which one will interact with that data (i.e., read-only access versus write access).

\* \* \*

Changes to production data are made either through programmatic systems used by the front-line employees who work in local Social Security offices to process benefits or update Social Security records for the public or through "batch jobs," which are programs written by IT programmers (or software engineers) to update production systems or data. Batch jobs are subject to extensive process controls, including multiple layers of testing, integration, and data validation.

Due to SSA's requirement to utilize a separation of duties, generally programmers who write code to update programmatic systems that affect benefit payments or maintenance of Social Security records do not have access to update or "write" to production systems or data. However, if there is an emergency business need that requires an IT programmer (or software engineer) to update a programmatic system or data, they must make a special request with justification, and would have time-limited access, which would only be provided on an "emergency" basis and last for the duration of the specific action but no longer than 24 hours.

Flick's averment suggests that SSA employees writing code for projects such as the Death Data Clean Up Project or the Fraud Detection Project, described *infra*, are not supposed to be the same employees investigating fraud.

Critically, the DOGE Team received far broader access than what is customarily afforded when SSA records are reviewed "for potential fraud, waste, and abuse by oversight agencies . . . or auditors. . . ."  ECF 22-10, ¶ 26.  Flick avers that typically, "when analysts or auditors review agency data for possible payment issues, including for fraud, the review process would start with

access to high-level, anonymized data based on the least amount of data the analyst or auditor would need to know." ECF 39-1, ¶ 4. Then, if a subset of the data are "flagged as suspicious, the analyst or auditor would access more granular, non-anonymized data to just that subset of files." *Id*. She also insists that "the type of full, non-anonymized access of individual data on every person who has a social security number or receives benefit from Social Security is unnecessary at the outset of any anti-fraud or other auditing project." *Id*.

As the government has acknowledged, "SSA's Office of Financial Policy and Program Integrity confirmed that the level of access granted to the SSA DOGE team to perform analysis has likewise been granted to [only] 30 to 40 employees in their component." ECF 113 at 7. And, SSA has well over 50,000 employees. ECF 39-1, ¶ 7. Moreover, there is no indication that new arrivals at the Agency are afforded such access. As Flick puts it, SSA "would not provide full access to all data systems even to our most skilled and highly trained experts." ECF 22-10, ¶ 37.

Clearly, with the arrival of the DOGE Team, SSA has changed the scope of access and the requirements to obtain access. Flick provides several examples of occurrences that reflect that Dudek's decision to authorize the DOGE Team to obtain access to the SSA data systems is at odds with SSA's earlier policy and practices. According to Flick, the onboarding process for one of the DOGE Team employees was "contrary to standard practice," *id.* ¶ 16, and the speed at which access to systems was provided was "unprecedented." *Id.* ¶ 15.

Flick makes clear, and the declarations submitted by defendants confirm, that several employees of the DOGE Team accessed SSA data systems prior to having signed finalized detail agreements from other agencies. ECF 39-2, ¶ 3. According to Flick, this "is not in keeping with agency practice because the agency does not consider a detailee to be an employee of SSA until a detail agreement is signed and finalized." *Id*. Moreover, according to Escobar-Alava, SSA

"conforms with industry-standard IT and data security practices by requiring a completed background check for employees who will be given access to PII. At SSA, no employees are given such access until they have been fully cleared. That often takes months, even when someone already has clearance from the White House or another agency." ECF 110-10, ¶ 6.

Alex Doe is a former Digital Services Expert at USDS. ECF 77-1, ¶ 1.[45] Doe asserts: "USDS employees detailed to SSA received access to data including PII, but only after months of clearance that exceeded the preliminary clearance we had already received from the [EOP]," and these employees could "only access data including PII on SSA devices, which were only issued after the agency confirmed that we had the adjudicated clearance described." *Id.* ¶¶ 5, 6. But, defendants' declarations demonstrate that some of the background investigations for some DOGE Team members were still pending when they were provided access to PII in the SSA data systems. *See* ECF 36-2, ¶ 15. And, proof of completion of the DOGE Team members' background investigations is a troubling omission from the Administrative Record. *See* ECF 86.

I discuss "need," *infra*. But, at this juncture, it is noteworthy that the Administrative Record does not reflect a need for access to PII of the magnitude at issue here. And, need is an inherent component of SSA's policies, practices, and the law. At best, there are vague and conclusory assertions that access to SSA's systems of records is necessary to root out fraud.

For example, on February 19, 2025, Russo, on behalf of the DOGE Team, sought access to EDW copies of the Numident, MBR, and SSR, as well as certain SSA payment files. ECF 86-2 at 5. He stated, in part, *id.*: "SSA has a need to rapidly respond to concerns regarding potentially large-scale fraud and improper payments related to data issues in payment files SSA sends to

---

[45] Doe submitted the Declaration under a pseudonym, for fear of retaliation. ECF 77-1, ¶ 2.

[Bureau of Fiscal Service] and concerns that those potential issues in those payment files may relate, in part, to SSNs without an associated date of death in SSA's Numident master files."

Apart from the issue of need, some of the DOGE Team members clearly were not entitled to access, because they either were not properly detailed to SSA, or had not been vetted or adequately trained, or necessary work documents were not signed. This, too, is contrary to Agency practice. *Compare* ECF 36-2, ¶ 6 (Employee 3's agreement finalizing onboarding on February 22, 2025) *with* ECF 36-1, ¶ 8 (Employee 3 was granted access to PII on February 21, 2025); *compare* ECF 86-2 at 41–47 (Moghaddassi executed Memorandum of Understanding on March 21, 2025) *with* ECF 36-1, ¶ 14 (Moghaddassi was granted access to "SSA Systems" on March 11, 2025); ECF 86-2 at 72–75 (Employee 8's Special Government Employee Agreement dated February 26, 2025, remains unsigned by Employee 8).

In *Bessent*, 2025 WL 1023638, Judge Richardson stated that the "types of agency action that traditionally satisfy" the two-prong test in *Bennett v. Spear*, 520 U.S. 154, "are what one would expect: binding agency opinions, . . . compliance orders . . . and promulgated rules . . . ." *Id.* at *5. The "types of agency action that traditionally fail this two-prong test are also what one would expect: tentative recommendations, . . . intermediate decisions, . . . and the initiation of enforcement proceedings . . . ." *Id*. He suggested that the "agency action" in *Bessent*, "granting IT access to certain employees," "does not fit comfortably into either bucket." *Id*.

Dudek's decision to grant access to DOGE Team members was not tentative, interlocutory, or intermediate. He expressly approved multiple access requests. And, because Dudek is the Acting Commissioner of the Agency, there is no supervisor to override his decision. Moreover, Dudek's repeated and rapid approvals of access requests indicate no further deliberation is contemplated. The record also makes clear that the broad access approved here was hardly

consistent with SSA's ordinary business operations and procedures. The approval decisions are akin to a binding agency opinion—one that established DOGE's entitlement to access PII, notwithstanding the Agency's customs, practices, policies, and procedures.

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925 (D.C. Cir. 2008), is instructive. There, the employer, the operator of a casino, sought an injunction to bar the Equal Employment Opportunity Commission ("EEOC") from releasing, without notice, the confidential documents that the employer provided during various EEOC investigations. The EEOC claimed that the employer's claims were not cognizable under the APA because the EEOC's disclosure policy as to the confidential information was not a final agency action and because the matter of disclosure is committed to the discretion of the agency and thus not reviewable. *Id.* at 931.

As the court explained, the employer was challenging the agency decision to adopt a policy of disclosing confidential information without notice. *Id.* The D.C. Circuit concluded: "Adopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process,' and 'one by which [the submitter's] rights [and the agency's] obligations have been determined.'" *Id.* at 931.[46] Contrary to defendants' assertions, *see* ECF 113 at 20, nothing in *Venetian* was specific to *third-party* access to the information.

The logic of *Venetian* applies here. The evidence is rather overwhelming in establishing that, contrary to SSA's well entrenched policy and practice, Dudek made the unprecedented decision to provide the DOGE Team with non-anonymized access to virtually all SSA records.

---

[46] The court had previously determined that the plaintiff had standing because it had demonstrated "a substantial probability that the alleged disclosure policy will harm its concrete and particularized interest in retaining the confidentiality of protected information." *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 367 (D.C. Cir. 2005).

ECF 86-2 at 1–4.  Moreover, Dudek agreed to do so without signed detail agreements, adequate training, completed background investigations, and/or executed work forms for all DOGE Team members, and without adequately specified "need."  This clearly reflects consequences in terms of statutory violations as well as "a 'consummation of the agency's decisionmaking process,' and 'one by which [the submitter's] rights [and the agency's] obligations have been determined.'" *Venetian Casino Resort, L.L.C.*, 530 F.3d at 931.

In sum, the Agency's decision to allow the DOGE Team access to the PII of millions of Americans, is a sea change that falls within the ambit of a final agency action.  In granting the DOGE Team access to records in the manner alleged, SSA veered far from principles that have been the mainstay of the Agency.  The decision to do so qualifies as a final agency action.

### D.  No Other Adequate Remedy

Plaintiffs assert that "nothing absent an injunction will prevent the SSA Defendants' disclosure of and access to the data in question."  ECF 110-1 at 28.

Defendants argue that the APA provides for judicial review only in circumstances where there is no other adequate remedy.  *See* ECF 113 at 21.  But, defendants contend that "the Privacy Act provides a 'comprehensive remedial scheme' for injuries arising out of the inappropriate dissemination of private information about individuals."  ECF 36 at 22 (quoting *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008)).  Therefore, they contend that plaintiffs "cannot use the APA to circumvent the Privacy Act's carefully drawn limitations on the types of relief they can seek."  ECF 113 at 21.

As discussed, review under the APA is limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  And, the statute "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures

for review of agency action." *Bowen v. Massachusetts,* 487 U.S. 879, 903 (1988). Plaintiffs "may advance an APA claim as well as another type of claim only if the APA claim does not duplicate 'existing procedures for review of an agency action.'" *Cent. Platte Nat. Res. Dist. v. U.S. Dep't of Agric.*, 643 F.3d 1142, 1148 (8th Cir. 2011) (citation omitted).

Courts have stated that an adequate alternative remedy "does not need to provide relief 'identical' to that available to a party under the APA—it must merely be of the 'same genre.'" *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014) (quoting *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)); *see also El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005). Notably, where courts have held that a plaintiff could not also bring an APA claim to obtain relief for an agency's alleged Privacy Act violation, it has been where the Privacy Act provided the kind of relief plaintiff sought. *See, e.g.*, *Poss v. Kern*, No. 23-CV-2199 (DLF), 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024) (no APA claim when seeking "removal and deletion of the allegedly defamatory report from [Department of Defense]'s database"); *Haleem v. U.S. Dep't of Def.*, No. CV 23-1471 (JEB), 2024 WL 230289, at *14 (D.D.C. Jan. 22, 2024) ("The Privacy Act and [the Freedom of Information Act] thus provide adequate remedies to compel responses to his requests and the production of withheld records, meaning Plaintiff cannot premise an APA claim on Defendants' alleged failure to respond to such requests or produce such records."); *Harrison v. BOP*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017) (finding no APA claim because Privacy Act provided relief when agency failed to provide requested records); *Westcott*, 39 F. Supp. 3d 21 (no APA claim because Privacy Act permits removal or revision of memorandum of reprimand contained in official military records); *Wilson v. McHugh*, 842 F. Supp. 2d 310, 320 (D.D.C. 2012) (finding no APA claim because Privacy Act applied when agency refused to withdraw a press release).

The injunctive relief sought by plaintiffs here is not available under the Privacy Act. But, as discussed in the context of standing, and important to repeat here, there have been cases suggesting that injunctive relief may be available through the APA. In 2004, the Supreme Court observed in *Chao I*, 540 U.S. at 619 n.1: "The Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the [APA] . . . ." And, in *Chao II*, the Fourth Circuit suggested that a plaintiff may pursue injunctive relief for a Privacy Act disclosure claim through the APA. 435 F.3d at 504 n.17. The Court said, *id.*: "We note that we do not read these cases to stand for the proposition that the Government may not be enjoined from violating the Privacy Act by disclosing personal records. Instead, we read these cases as stating that such relief is not authorized by the Privacy Act, standing alone. Often, however, and as was the case in the instant action, injunctive relief for a Government's violation of the Act will instead be appropriate and authorized by the APA."

In *Bessent*, 2025 WL 1023638, at *6, Judge Richardson observed that the comments of the Fourth Circuit in *Chao II* and the Supreme Court in *Chao I* are dicta. I, too, made that observation in the TRO opinion. ECF 49 at 90. But, defendants have not identified any case at odds with either *Chao I* or *Chao II*.

Moreover, "not all dicta are created equal." *Farah v. U.S. Att'y Gen.*, 12 F.4th 1312, 1323 (11th Cir. 2021) (citing Bryan A. Garner et al., *The Law of Judicial Precedent* § 4, at 69 (2016)). Indeed, as other courts have noted, "there is dicta and then there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006); *see also Peterson*, 124 F.3d at 1392 n.4 (emphasizing that "dicta from the Supreme Court is not something to be lightly cast aside"). Moreover, the Fourth Circuit has previously said that "carefully considered language

of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Wynne*, 376 F.3d at 298 n.3. And, the fact that dicta is not binding "does not mean that the dicta is incorrect." *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 531 (6th Cir. 2021).

I conclude that plaintiffs are not barred from seeking injunctive relief under the APA.

## VI. Preliminary Injunction

Plaintiffs seek a preliminary injunction to enjoin DOGE's access to SSA's data systems. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Alternatively, plaintiffs seek a stay under 5 U.S.C. § 705. Pursuant to 5 U.S.C. § 705, a reviewing court may stay "agency action" pending judicial review "to prevent irreparable injury." The standards for granting a TRO, a preliminary injunction, and a § 705 stay are essentially the same. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 949–50 (D. Md. 2020) (citing cases); *Maags Auditorium v. Prince George's Cty., Md.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014) ("The standard for a temporary restraining order is the same as a preliminary injunction."), *aff'd*, 681 F. App'x 256 (4th Cir. 2017).

The party seeking a preliminary injunction must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009); *Winter*, 555 U.S. at 20; *see Frazier v. Prince George's Cty., Md.*, 86 F. 4th 537, 543 (4th Cir. 2023) (same). The plaintiff must satisfy each

requirement as articulated. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009).[47]

To meet the first requirement, the plaintiffs must "clearly demonstrate that [they] will likely succeed on the merits," rather than present a mere "grave or serious question for litigation." *Id.* at 346–47. But, plaintiffs "need not establish a 'certainty of success.'" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)).

Of course, it is not enough merely to meet the Fed. R. Civ. P. 12(b)(6) standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *Allstate Ins. Co. v. Warns*, CCB-11-1846, 2012 WL 681792, at *14 (D. Md. Feb. 29, 2012). However, where a plaintiff asserts multiple claims, the court need only find that a plaintiff is likely to succeed on one of his claims in order for this factor to weigh in favor of a preliminary injunction. *PFLAG, Inc. v. Trump*, ___ F. Supp. 3d. ___, BAH-25-337, 2025 WL 510050, at *12 (D. Md. Feb. 14, 2025); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, __ F. Supp. 3d. ___, No. 25-239 (LLA), 2025 WL 368852, at *9 (D.D.C. Feb. 3, 2025); *Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 747 (D. Md. 2020).

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991)). In

---

[47] In *Bessent*, 2025 WL 1023638, Judge Richardson addressed the factors that a court must consider in granting injunctive relief. *Id.* at *4 (citing *Winter*, 555 U.S. at 20). And, he stated that plaintiffs "had to show their likelihood of success was not just high but *extremely high* . . . ." *Id.* at *4 (emphasis in original). But, no authority is cited for that proposition, and this Court is unfamiliar with that burden. In *Winter*, for example, the Supreme Court merely stated that a plaintiff must show "that [they are] *likely* to succeed on the merits" and "*likely* to suffer irreparable harm in the absence of preliminary relief . . . ." *Winter*, 555 U.S. at 20 (emphasis added).

106

other words, the plaintiffs must show that harm is not just a mere possibility, but that harm is truly irreparable and cannot be remedied at a later time with money damages. "[T]he harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Mountain Valley Pipeline, LLC*, 915 F.3d at 216 (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

Irreparable harm "is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (quoting *Danielson v. Loc. 275, Laborers Int'l Union of N. Am., AFL-CIO*, 479 F.2d 1033, 1037 (2d Cir. 1973)). A plaintiff may also establish irreparable harm when its costs are unrecoverable due to the government's sovereign immunity. *See Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *City of New York*, 913 F.3d at 430; *see also Portée v. Morath*, 683 F.Supp.3d 628, 636 (W.D. Tex. 2023) ("[C]laims for money damages against state entities and officials are generally barred by sovereign immunity, which makes Portée's harm irreparable for purposes of seeking preliminary injunctive relief."); *Texas v. U.S. Dep't of Homeland Sec.*, 700 F. Supp. 3d 539, 546 (W.D. Tex. 2023).

"'There is generally no public interest in the perpetuation of unlawful agency action.'" *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (quoting *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)). To the extent an agency's acts facilitate rather than prevent unlawful conduct, such acts implicate the "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). Indeed, "the 'public undoubtedly has an interest in seeing its governmental institutions

follow the law. . . .'" *Roe v. Dep't of Defense*, 947 F.3d 207, 230–31 (4th Cir. 2020) (quoting district court).

When a preliminary injunction will "adversely affect a public interest . . . the court may . . . withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–13 (1982). In fact, "courts . . . should pay particular regard for the public consequences in employing th[is] extraordinary remedy." *Id.* at 312.

In addition to the public interest determination, the balance of equities must tip in favor of the movants in order for a preliminary injunction to be granted. *Winter*, 555 U.S. at 20. Courts must weigh any potential harm to the nonmoving party, and also any potential harm to the public if relief is granted. *Continental Group Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 356–57 (3d Cir. 1980).

These final two factors—balance of the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. But, a court "may not collapse this inquiry with the first *Winter* factor." *Maryland, et al. v. United States Dep't of Agriculture, et al.*, 2025 WL 800216; *see USA Farm Lab, Inc. v. Micone*, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025) (explaining that it is "circular reasoning" to argue that a government "program is against the public interest because it is unlawful" and that such argument "is nothing more than a restatement of their likelihood of success argument").

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017); *see Roe*, 947 F.3d at 231. But, a court should "'mold its decree to meet the exigencies of the particular case.'" *Roe*, 947 F.3d

108

JA1409

at 231 (citation omitted). Moreover, a court must ensure that the preliminary injunction is "'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

### A. Likelihood of Success on the Merits[48]

#### 1. Privacy Act[49]

The Privacy Act of 1974, 5 U.S.C. § 552a, "had its genesis in a growing awareness that governmental agencies were accumulating an ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the perpetuation of inaccuracies that the citizen would never know of, let alone have an opportunity to rebut or correct." *Londrigan v. Fed. Bureau of Investigation*, 670 F.2d 1164, 1169 (D.C. Cir. 1981); *see also Chao I*, 540 U.S. at 618. It "was designed to provide individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves." *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 76 (D.C. Cir. 1982). "The Act gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements." *Chao I*, 540 U.S. at 618.

In passing the Privacy Act, Congress proclaimed: "The right to privacy is a personal and fundamental right protected by the Constitution of the United States[.]" Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(4), 88 Stat. 1896. Congress also recognized: "The privacy of an individual

---

[48] With regard to likelihood of success on the merits, the Court limits its analysis to Count I and Count V of the Amended Complaint (ECF 17).

[49] In the Memorandum Opinion of March 20, 2025 (ECF 49), I noted that defendants suggested that mere access to records does not constitute disclosure under the Privacy Act. *See id.* at 111–12. I also determined that plaintiffs satisfy the zone of interests test. *Id.* at 110–11. The parties do not raise these issues again, so I will not address them again. To the extent relevant, I incorporate these portions of ECF 49.

109

is directly affected by the collection, maintenance, use, and dissemination of personal information by federal agencies[.]" *Id.* § 2(a)(1). And, it said: "The increasing use of computers and sophisticated information technology, while essential to the efficient operations of the government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information[.]" *Id.* § 2(a)(2); *see Tankersley*, 837 F.3d at 395 (same). Therefore, "[i]n order to protect the privacy of individuals identified in information systems maintained by federal agencies," Congress said that "it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies." *Id.* § 2(a)(5).

The identified purposes of the Privacy Act are, *inter alia*, "to provide certain safeguards for an individual against an invasion of personal privacy by requiring federal agencies, except as otherwise provided by law, to— . . . (2) permit an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or made available for another purpose without his consent; . . . (4) collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information[.]" *Id.* §§ 2(b)(2), (b)(4).

To that end, the Privacy Act establishes "certain minimum standards for handling and processing personal information maintained in the data banks and systems of the executive branch, for preserving the security of the computerized or manual system, and for safeguarding the confidentiality of the information." *Id.* In particular, the statute requires "every department and agency to insure, by whatever steps they deem necessary" that, *inter alia*, (1) "they take certain administrative actions to keep account of the employees and people and organizations who have

access to the system or file, and to keep account of the disclosures and uses made of the information"; and (2) "they establish rules of conduct with regard to the ethical and legal obligations in developing and operating a computerized or other data system and in handling personal data, and take action to instruct all employees of such duties[.]" *Id.*

The term "record" is defined as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph[.]" 5 U.S.C. § 552a(a)(4). A "system of record" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5).

The Privacy Act does not define "disclosure." But, the SSA regulations define "disclosure" as "making a record about an individual available to . . . another party." 20 C.F.R. § 401.25. In other words, disclosure of a record includes access to the record.

Under the Privacy Act, to the extent possible, agencies that collect information directly from individuals are to inform individuals of the purpose and authority for that collection. 5 U.S.C. § 552a(e)(2)–(3). The statute contains additional requirements for agencies that maintain a "system of records," or maintain the information they collect such that information can be retrieved "by the name of [an] individual or by some identifying number, symbol, or other identifying particular." *Id.* § 552a(a)(5).

For example, agencies must continuously ensure that their systems of records are accurate and complete to the degree "necessary to assure fairness to the individual[s]" whose information

has been recorded. 5 U.S.C. § 552a(e)(5). Individuals maintain the right to access and review all records "pertaining to" themselves in the agency's system, *id.* § 552a(d)(1), and to request an amendment if they identify an error. *Id.* § 552a(d)(2). If a request to review relevant records or to correct a record is denied, the individual may bring suit in federal district court and obtain an injunction ordering the agency to comply. *Id.* §§ 552a(d)(3), (g)(1)(A)–(B), (g)(2)–(3). And, if the agency makes an adverse determination as to an individual because of an inaccuracy in its records, the Act allows the individual to sue for damages. *Id.* §§ 552a(g)(1)(C), (g)(4).

Relevant here, the Act prohibits federal agencies from sharing records about individuals, except under certain limited circumstances. It states, in part, 5 U.S.C. § 552a (emphasis added):

> **(b) Conditions of disclosure.**--No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be--
> **(1)** to those officers and employees of the agency which maintains the record *who have a need for the record in the performance of their duties*.

The Privacy Act allows disclosure for "a routine use." 5 U.S.C. § 552a(b)(3). A "routine use" is a use of a record "for a purpose which is compatible with the purpose for which it was collected." *Id.* § 552a(a)(7). And, each time an agency "establish[es] or revis[es]" a system of records, it must publish a System of Records Notice ("SORN") in the Federal Register detailing, among other things, "each routine use of the records contained in the system, including the categories of users and the purpose of such use." *Id.* § 552a(e)(4)(D).

The Act also provides for private enforcement of violations of the provisions. *See Univ. of California Student Ass'n v. Carter*, No. CV 25-354 (RDM), __ F. Supp. 3d __, 2025 WL 542586, at *2 (D.D.C. Feb. 17, 2025). In particular, it provides a "comprehensive remedial scheme" for injuries arising from the improper dissemination of private information. *Wilson*, 535 F.3d at 703.

112

But, injunctive relief is reserved for Amendment or Access Actions, not Disclosure Actions.  5 U.S.C. § 552a(g)(2), (3).

Although individual government employees are not subject to civil suit for damages, an individual "may bring a civil action against the agency" for failure "to comply with any . . . provision of" the statute if the individual suffers "an adverse effect" due to that violation.  5 U.S.C. § 552a(g)(1).  Monetary damages are available only to individuals.  *See id.* § 552a(g)(4); *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007).

The Act also establishes criminal penalties for willful violations of its requirements.  *See* 5 U.S.C. § 552a(i).  It is a federal crime for any agency officer or employee willfully to disclose a protected record "in any manner to any person or agency not entitled to receive it," *id.* § 552a(i)(1), or to maintain a system of records "without meeting the notice requirements" provided in the Act, *id.* § 552a(i)(2).  It is also a federal crime for any person to "request[ ] or obtain[ ] any record concerning an individual from an agency under false pretenses."  *Id.* § 552a(i)(3).

### a.  Need

As discussed, the Privacy Act prohibits agencies from disclosing any records contained in a system of records, unless an exception applies.  5 U.S.C. § 552a(b).[50]  The Privacy Act contains

---

[50] At the P.I. Motion hearing, the government argued that, under the Economy Act of 1934, DOGE is not an agency.  ECF 143 at 34.  And, *for the first time*, the government argued that DOGE is an "instrumentality" of the Executive Branch because it is "a component of EOP."  *Id.*  But, the government cited no cases to support the assertion.

The government acknowledged that its claim that DOGE is not an agency has not met with success in any court.  ECF 143 at 35.  Curiously, as recently as yesterday, Judge Bates observed that in his case the government does not contest that DOGE is an agency for purposes of judicial review or APA review.  *AFL-CIO*, 2025 WL 1129227, at *22 n.19.  The position of the government here appears to be inconsistent.

In any event, I addressed the government's agency contention in ECF 49, and rejected the claim.  ECF 49 at 112–14.  I renew that ruling, for the reasons previously stated.

thirteen exceptions to the general rule that disclosure of agency records requires consent. *See* 5 U.S.C. § 522a(b). Of relevance here, disclosure is permitted "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." *Id.* § 552a(b)(1). To fall within this exception, the disclosure must be made within the agency that maintains the record. *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 547 (3rd Cir. 1989). And, the recipient must "examine[] the record in connection with the performance of duties assigned to him . . . in order to perform those duties properly." *Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000).

Defendants assert that 5 U.S.C. § 552a(b)(1) applies here. They claim that the members of the DOGE Team are employees of the SSA and that the plaintiffs' records were not disseminated outside SSA.

The Administrative Record reflects that SSA's policies regarding access decisions appear to be guided by the Agency's understanding of the requirements of the Privacy Act. The A.R. explains the Privacy Act as a "federal law that governs our collection and use of records we maintain about an individual in a system of records. It establishes safeguards against invasions of personal privacy." ECF 86-2 at 150.

Under the Privacy Act, access to the records is permitted to Agency employees only when there is "a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). As discussed earlier, the Agency's ISP provides, ECF 86-4 at 36: "Managers authorize access to SSA Information Systems based upon official business 'Need-To-Know,' and limited to the 'Least Privilege' access required for performing job functions. Whenever access is granted, it is limited access to those who have a legitimate need for these resources to perform their assigned position responsibilities." But, the statute does not define the term "need."

The Executive Order directs the heads of each federal agency to "establish within their respective agencies a DOGE Team of at least four employees" within 30 days. E.O. 14,158 § 3(c).[51] There are now eleven members of the DOGE Team working at SSA. ECF 113 at 5 n.1.[52] Defendants concede that eight of the eleven employees have and have had access to personally identifiable information contained in SSA data systems. *Id.* at 7. The critical question is whether access to records that SSA provided and seeks to provide to the DOGE Team complies with the Privacy Act, which requires a "need" for the data.

Defendants maintain that those employees who have access to virtually all SSA data "need" the information to perform their work. *Id.* at 23. However, the expressed "need" is amorphous, as I discuss, *infra*. And, neither side has provided the Court with any helpful discussion concerning this statutory requirement of the Privacy Act.

"[T]he need to know exception applies only to intra-agency disclosures." *Britt*, 886 F.2d at 547. I shall assume that the DOGE Team members have "intra agency" status at SSA.

The Administrative Record suggests that "need" means "need to know." *See*, *e.g.*, ECF 86-4 at 36. And, cases interpreting the "need" requirement typically consider need as "need to know," asking "whether the official examined the record in connection with the performance of duties assigned to him and whether he had to do so in order to perform those duties properly." *Doe v. U.S. Dep't of Justice,* 660 F. Supp. 2d 31, 44–46 (D.D.C. 2009). These cases typically involve the disclosure of records concerning a single person or a small number of people, and not access

---

[51] Special Government Employees are exempt from some of the ethics rules that apply to most federal employees. *See* 18 U.S.C. §§ 203, 205, 207–209.

[52] The prior Memorandum Opinion (ECF 49) references only ten employees. *Id.* at 115–18. The Court learned of the eleventh member of the DOGE Team after it issued the TRO on March 20, 2025.

to a massive quantity of records for untold millions of people. *See, e.g., deLeon v. Wilkie*, No. CV 19-1250 (JEB), 2020 WL 210089, at *8 (D.D.C. Jan. 14, 2020) (finding "need to know" exception was met in disclosure of single plaintiff's personnel records); *Walia v. Napolitano*, 986 F. Supp. 2d 169, 186–87 (E.D.N.Y. 2013), *on reconsideration in part* (Feb. 4, 2014) (finding "need to know" exception was not met in disclosure of single plaintiff's personnel records); *Middlebrooks v. Mabus*, No. 1:11CV46 LMB/TCB, 2011 WL 4478686, at *5 (E.D. Va. Sept. 23, 2011) (finding that "internal disclosures of plaintiff's record to key senior agency personnel were permissible"); *Viotti v. U.S. Air Force*, 902 F. Supp. 1331, 1337 (D. Colo. 1995) (holding that disclosure of information about acting head of political science department to "political science department staff" not improper "as a matter of law" under need to know exception); *see also Covert v. Harrington*, 876 F.2d 751, 752–54 (9th Cir. 1989) (determining that Inspector General's agents needed employees' personnel files after receiving allegations that employees were falsifying their permanent residences to obtain a per diem); *Howard v. Marsh*, 785 F.2d 645, 648 (8th Cir. 1986) (stating that attorney and personnel specialist gathering information about a discrimination complaint against the agency needed complainant's employment records to respond to the complaint); *Dinh Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 137–39 (D.D.C. 2019) (employees evaluating a detail request needed information about performance appraisal to evaluate skillset and suitability), *aff'd*, 798 F. App'x 649 (D.C. Cir. 2020) (per curiam).

As noted, the term "need" is not defined in the Privacy Act. This implicates principles of statutory construction, which the parties do not address.

Generally, "[w]hen faced with a statutory provision, 'the starting point for any issue of statutory interpretation . . . is the language of the statute itself.'" *Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince George's Cty., Md.*, 17 F.4th 497, 508 (4th Cir.

116

2021) (quoting *D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016)) (alteration in original); *see Groff v. Dejoy*, 600 U.S. 447, 468 (2023) (stating that "statutory interpretation must 'begi[n] with,' and ultimately heed, what a statute actually says") (citation omitted; alteration in *Groff*); *Murphy v. Smith*, 583 U.S. 220, 223 (2018) ("As always, we start with the specific statutory language in dispute."); *Pharmaceutical Coalition for Patient Access v. United States*, 126 F. 4th 947, 953 (4th Cir. 2025) ("Statutory interpretation begins with the text of the statute."); *Williams v. Carvajal*, 63 F.4th 279, 285 (4th Cir. 2023) ("As always, an issue of statutory interpretation begins with the text."); *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020) ("'As in all statutory construction cases,' we start with the plain text of the provision.") (quoting *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013)); *see also McAdams v. Robinson*, 26 F.4th 149, 156 (4th Cir. 2022); *United States v. Bryant*, 949 F.3d 168, 174–75 (4th Cir. 2020); *Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2013); *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012).

A statute "means what it says." *Simmons v. Himmelreich*, 578 U.S. 621 (2016); *see United States v. Cohen*, 63 F.4th 250, 253 (4th Cir. 2023). "'[A]bsent ambiguity or a clearly expressed legislative intent to the contrary,'" courts apply the "plain meaning" of the statute. *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (quoting *United States v. Bell*, 5 F.3d 64, 68 (4th Cir. 1993)); *see United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) ("When interpreting a statute, courts must 'first and foremost strive to implement congressional intent by examining the plain language of the statute.'") (quoting *Abdelshafi*, 592 F.3d at 607). A court determines a statute's plain meaning by referencing the "ordinary meaning [of the words] at the time of the statute's enactment." *United States v. Simmons*, 247 F.3d 118, 122 (4th Cir. 2001); *see also HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021);

*Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018). Courts may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

Moreover, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *see Gundy v. United States*, 588 U.S. 128, 141 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)); *see also United States v. Hansen*, 599 U.S. 762, 775 (2023) ("When words have several plausible definitions, context differentiates among them."); *King v. Burwell*, 576 U.S. 473, 486 (2015); *Pharmaceutical Coalition for Patient Access*, 126 F. 4th at 953. Critically, however, "the text and structure" of the statute is not analyzed in "a vacuum. . . . Rather, [a court] must interpret the statute with reference to its history and purpose as well." *Bryant*, 949 F.3d at 174–75 (4th Cir. 2020) (citing *Abramski v. United States*, 573 U.S. 169, 179 (2014) and *Gundy*, 588 U.S. at 141).

Terms of a statute that are not defined are "'interpreted' in accordance with "their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *see Holly Frontier Cheyenne Refining, LLC*, 594 U.S. at 388; *George*, 946 F.3d at 645; *see also Tankersley*, 837 F.3d at 395 ("Where Congress has not defined a term, we are "bound to give the word its ordinary meaning unless the context suggests otherwise.") (citation omitted).

The word "need" is part of everyday parlance. But, courts may "consult dictionaries" to decipher a term's ordinary or plain meaning. *In re Constr. Supervision Servs., Inc.*, 753 F.3d 124, 128 (4th Cir. 2014); *see also Navy Fed. Credit Union*, 972 F.3d at 356; *Blakely v. Wards,* 738 F.3d

607, 611 (4th Cir. 2013). The word "need" is defined as "a requirement, necessary duty, or obligation, or a lack of something wanted or deemed necessary," an "urgent want, as of something requisite," or "a condition marked by the lack of something requisite." RANDOM HOUSE COLLEGE DICTIONARY at 890 (rev. ed. 1980); *see also Need,* American Heritage Dictionary, https://perma.cc/M32F-ZVM2 (defining "need" as "[s]omething required or wanted; a requisite" and "[n]ecessity; obligation").

In context, and under Social Security Administration regulation 20 C.F.R. Pt. 401, App. A, discussed earlier, the term "need" refers to "need to know." *See Bessent*, 2025 WL 582063, at *10. According to Black's Law Dictionary, at 1194 (12th ed. 2024), "need-to-know basis" is defined as follows: "A justification for restricting access to information to only those with a clear and approved reason for requiring access—used as a means of protecting confidential information that affects a range of interests, from national security to trade secrets to the attorney-client privilege."

Relying on the Privacy Act, defendants assert that the DOGE Team has "a 'need' to access the records contained in the relevant systems to perform their official duties." ECF 113 at 23. They assert: "In creating a framework for agency DOGE Teams and USDS collaboration, Executive Order 14,158 charged both groups with working to modernize technology and coordinating on ways to '[m]aximiz [sic] [e]fficiency and [p]roductivity.'" *Id.* (quoting Exec. Order 14,158 § 4) (alterations in ECF 113). In addition, the Order "instructs agency heads 'to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems,' and in turn requires USDS to 'adhere to rigorous data protection standards.'" ECF 113 at 23 (citing Exec. Order 14,158 § 4(b)). Defendants state, ECF 113 at 24: "The 'need' underlying the employees access here arises directly

119

from the mandates of an Executive Order and the complex functions being performed by agency DOGE Team employees, and it would be impossible to effectively review and modernize a data system without accessing that system, including the records within it, or to investigate improper payments without reviewing payment records."

Further, defendants posit, *id.*: "Nothing in the Privacy Act requires written statements from individual employees establishing their need to access information in order to perform their job duties. Nor does the statute impose the granular explanation of need that the Court suggested is required." This requirement, defendants argue, "would call into doubt SSA's granting of access to other employees with similar access to data—as well as routine grants of access across the Federal government. It would also give litigants a carte blanche to challenge any access decision by an agency whenever the litigant dislikes or distrusts new personnel in any new administration— putting the agencies to the daunting task of papering routine access grants in anticipation of litigation." *Id.*

At the TRO Motion hearing, the Court repeatedly questioned government counsel to explain the "need" for the breadth of access to SSA records that was provided to the DOGE Team. *See, e.g.*, ECF 45 at 23, 24, 38, 84. Besides cursory, circular statements about members of the DOGE Team in need of all SSA data because of their work to identify fraudulent or improper payments, counsel provided no explanation as to why or how the particular records correlated to the performance of job duties. Nor did counsel explain why the DOGE Team was in "need" of unprecedented, unfettered access to virtually SSA's entire data systems in order to accomplish the goals of modernizing technology, maximizing efficiency and productivity, and detecting fraud,

waste, and abuse.  The Court asked similar questions at the P.I. Motion hearing, but obtained no further clarity.  *See* ECF 143 at 49–53, 54–59, 60–66.[53]

The Administrative Record contains requests for access and the reasons for the requests.  I turn to review the requests.

### February 19, 2025

- On February 19, 2025, Russo prepared a "Commissioner Transmittal" for Dudek's review.  ECF 86-2 at 1.  It states, *id*.: "The Office of the Chief Information Officer (OCIO) is requesting approval to grant certain OCIO employees (including detailees from other Federal agencies and Special Government Employees assigned to [SSA]) access to Enterprise Data Warehouse (EDW) copies of SSA's Numident, Master Beneficiary Record (MBR) and Supplemental Security Record (SSR) master records, as well as copies of SSA payment files that SSA transmits to the Department of Treasury, Bureau of the Fiscal Service (BFS) for payment (excluding any matched Treasury data)."  Russo recommended that Dudek approve the access, explaining that this "access allows read-only access to production data and does not in any way allow modification or deletion of the underlying data."  *Id.*

---

[53] As noted, on April 11, 2025, I asked for Acting Commissioner Dudek to attend the P.I. Motion hearing on April 25, 2025.  ECF 127.  I told counsel that his testimony at the hearing "may be helpful as to the various SSA projects that Mr. Dudek has referenced in his declarations, and for which he claims the DOGE Team requires access to PII."  *Id*. at 2.

When Mr. Dudek participated in the telephone hearing on March 27, 2025, there was no time to carefully review the government's submission that prompted the need for the hearing.  In making my request, I was also mindful of Judge Agee's comment regarding "relevant evidence," mentioned earlier.  *See* ECF 83 at 3.  But, as is the government's right, the government chose to "stand on the record in its current form."  ECF 138.  The result, however, is that the clarification has not been provided.  I made that point at the hearing.  *See, e.g.*, ECF 143 at 19.

121

- On the same date, February 19, 2025, Russo emailed Dudek and referenced an attached "decision memorandum," prepared in consultation with the Office of General Counsel. The email states, in part, *id.* at 3: "Given the sensitive nature of our data, I'm seeking your decision on whether it is appropriate for me to grant EDW data to some new members of my team."

- Among other things, the decision memorandum, dated February 19, 2025, states:[54]

  o "SSA has a need to rapidly respond to concerns regarding potentially large-scale fraud and improper payments related to data issues in payment files SSA sends to BFS and concerns that those potential issues in those payment files may relate, in part, to SSNs without an associated date of death in SSA's Numident master files." *Id.* at 5.

  o "Within OCIO, SSA has available personnel with the skills and abilities to conduct the requisite data analysis and review to address these concerns, and this task is within their currently-assigned job duties." *Id.*

  o "To perform this analysis, these personnel require access to EDW copies of the Numident, MBR, SSR, and certain SSA payment files from prior months. These master records and payment files contain [PII] and, in the case of MBR and SSR, information derived from Federal Tax Information (FTI) as well. We investigated options for masked or otherwise protecting PII-containing and [federal tax information]-containing fields within these records but have not identified a solution that enables the necessary analysis to continue at the pace

---

[54] The "Analysis" section of the decision memorandum is redacted and unavailable for my review. ECF 86-2 at 6–8.

122

necessary to respond timely to the fraud and improper-payment-related concerns." *Id.*

- o "The personnel in question are all either SGEs of SSA, or employees detailed to SSA under the Economy Act. They have all received standard SSA training on topics including ethics, the Privacy Act, and information security. They have signed the Systems Sanctions Access Policy and Annual Reminders on Safeguarding PII." *Id.* at 6.

- Dudek responded on February 19, 2025. *Id.* at 3. He stated, *id.*: "Yes, please proceed."

**February 28, 2025**

- On February 28, 2025, Employee 5 sent an email to Dudek, attaching a decision memo for review. The email states, in part: "Most immediate for your attention is the proposed test to mark 100 number holders as deceased this weekend. We believe this would be a conservative test of the system and the proposed process." *Id.* at 11. A "Commissioner Transmittal" was attached, which concerns the "Proposal for Death Data Improvement 100+." *Id.* at 12. The stated "rationale underlying this proposal" is that "accurate death records strengthen nation-wide improper payment and identity theft prevention. It also ensures quality records management standards within SSA." *Id.* at 13. The document also states: "SSA readily has the information, process, and resources on-hand to mark someone as reasonably deceased—we should clean up our records and share this information with other agencies authorized to receive it." *Id.* (boldface omitted). But, this seems to conflict with Russo's previous assertion that DOGE Team members would receive "read-only access to production data [that] does not in any way allow modification or deletion of the underlying data." *Id.* at 1.

- Dudek approved the document via email dated February 28, 2025, and reminded Employee 5 to "provide the requisite justification in accordance with statute." *Id.* at 10. Employee 2 then replied, suggesting that the requisite justification could be that "it is reasonable to assume a person over the age of 119 is dead given (a) the oldest living person in America is 115 years old (cite sources) and (b) the longest documented life of a person in the USA is 117 (citation)." *Id.* at 9. Dudek replied on the same day, instructing the team to proceed. *Id.*

**March 12, 2025**

- On March 12, 2025, Employee 5 emailed Mickie Tyquiengco to request "access to IRON in order to look at microfiche for investigating data integrity. This is for the effort to investigate the number of people beyond a reasonable age who can be marked dead." *Id.* at 23. Tyquiengco sent the request to Dudek. *Id.* He approved the request the same day. *Id.*

**March 14, 2025**

- On March 14, 2025, Tyquiengco forwarded an access request from Employee 9 to Dudek, stating that Employee 9 "is requesting access to PSSNAP data to access identifying information about beneficiaries and their application documents." *Id.* at 19. The request specifies the justification for the request, as follows: "I am investigating fraud, waste, and abuse and improper payments as part of my duties as a senior advisor for the SSA. I require SELECT access to PSSNAP to access identifying information about beneficiaries and their application documents. These are needed within the PADW environment." *Id.* at 20. Dudek approved the request the same day. *Id.* at 19.

**March 14, 2025**

- The Administrative Record includes a "Commissioner Transmittal" dated March 14, 2025, from the "USDS Team (via OCIO)" to Acting Commissioner Dudek. *Id.* at 31. It concerns an "UPDATE – Proposal for Death Data Improvement." *Id.* The document states that it is an update to "the technical approach described in the March 7, 2025 decision memo, *Proposal for Death Data Improvement 120+.*" *Id.* Dudek approved this request on March 14, 2025. *Id.* at 30.

**March 15, 2025**

- On March 15, 2025, Moghaddassi emailed Dudek and others at SSA, asking for "USCIS SAVE access," which he described as "absolutely critical to get detailed immigration status for non-citizen SSNs to detect fraud and improper payments." *Id.* at 29. Dudek approved the request the same day. *Id.* at 28.

**March 15, 2025**

- Also on March 15, 2025, Moghaddassi submitted a request for "SSN application process data (i.e., PSSNAP)" to "audit how fraudulent SSNs are issued." *Id.* Dudek approved the request the same day. *Id.* at 27.

**March 17, 2025**

- On March 17, 2025, Tyquiengco requested access for "[Employee 11], Aram, and [Employee 9]" to "SSI claims data to understand how many people request SSI benefits." *Id.* Dudek approved the request the same day. *Id.*

**March 18, 2025**

- On March 18, 2025, Employee 9 emailed Tyquiengco to request access to a "data schema that the OASI team said [he] needed to get a comprehensive look at the title 2

125

beneficiaries." *Id.* at 26. Tyquiengco forwarded the request to Dudek, along with a justification, stating: "I am leading the Are you Alive campaign and investigating fraud waste and abuse. This schema will provide the information needed to complete the [project]." *Id.* at 25. Dudek approved the request the same day. *Id.*

**March 19, 2025**

- On March 19, 2025, Tyquiengco forwarded an access request from Employee 9 to Dudek, stating that Employee 9 "is requesting access to some schemas that are necessary to determine if a beneficiary is alive or not." *Id.* at 21. The justification for the request is as follows: "I am requesting access to build a system to analyze how often beneficiaries interact with the SSA in order to identify users that may be dead and receiving benefits. These schemas provide insight on when users log into MySSA, Call the 1-800 Number, Call the Field office, and have an appointment in the field offices." *Id.* Dudek approved the request the same day. *Id.*

The justifications for access are thin. Nothing in the specific requests suggests that the DOGE Team members required unlimited access to PII to perform their work.

Defendants point to a memorandum in the Administrative Record stating that SSA "investigated options for masked or otherwise protecting PII-containing and FTI-containing fields within these records but have not identified a solution that enables the necessary analysis to *continue at the pace necessary to respond timely to the fraud and improper-payment-related concerns.*" ECF 113 at 23–24 (citing ECF 86-2 at 5) (emphasis added). However, this does not mean the work cannot be done without PII. Rather, it suggests only that working without PII may cause the work to take longer.

At the P.I. Motion hearing defense counsel conceded that anonymization of the data is possible, but contended that it would be burdensome.  ECF 143 at 66.  However, the Privacy Act does not make an exception to permit employees to access PII so that they can improve their speed when a viable alternative is available to them that does not necessitate access to PII.

If need can be found, it is only in defendants' post hoc explanations for "need," set forth in Dudek's declarations.  Dudek's declarations contain explanations about the projects on which the DOGE Team members are working.  He uses the declarations to amplify the nearly nonexistent explanations in the A.R.  But, even when I consider the declarations, the explanations fail to make clear why members of the DOGE Team need unfettered access to a wide variety of SSA systems of record that contain personal, sensitive, and private information of millions of Americans.

In Dudek's Declaration of March 26, 2025 (ECF 60-1), he identified, for the first time, specific efforts of the DOGE Team concerning the detection of fraud.[55]  Dudek submitted another Declaration on March 27, 2025 (ECF 62-1), in which he provides information on the specific projects on which Employees 1, 5, 8, and 9 are working, and for which SSA contends that access to PII is needed.  One of these is the "Are You Alive Project," which Dudek avers is "aimed at preventing improper payments and fraud, waste, and abuse related to decedent identities."  *Id.* ¶ 9. Dudek states, *id.*:  "Because Employees 1, and 9 are working on individual cases and may be

---

[55] In Dudek's Declaration of March 26, 2025 (ECF 60-1), he states:  "The SSA DOGE team partners with SSA's anti-fraud offices to address fraud costing taxpayers and Social Security beneficiaries up to $521 billion annually," citing the Government Accountability Office ("GAO").  *Id.* ¶ 4; *see also id.* at 2 n.1.  The statement appears to be inaccurate.

Notably, the report from the GAO reflects that *the entire federal government*, not SSA alone, "loses between $233 billion and $521 billion annually to fraud, according to GAO's government-wide estimates based on data from fiscal years 2018 through 2022."  Government Accountability Office, *Fraud & Improper Payments*, https://perma.cc/JN7D-9JK2.  Moreover, SSA does not even appear on the chart illustrating the government programs with the largest percentage of government-wide improper payment estimates for fiscal year 2024.

127

reaching out to individuals in connection with those cases, data anonymization would make it impracticable for these employees to conduct the Are You Alive Project." But, once suspicious, individual cases are identified, that would be the time for access to non-anonymized records, consistent with SSA's practice and policy.

Of note, at the hearing on March 27, 2025, Mr. Dudek stated to the Court that the Are You Alive project is "work [SSA has] never gotten around to as an agency." ECF 73 at 10. This comment suggests that there is no justification for SSA to suddenly abandon longstanding Agency protections of PII.

Dudek refers to another project as the "Death Data Clean Up Project," which is focused "on ensuring death records that can be updated based on information currently available in agency records, for which [SSA has] sufficient confidence that would allow us to conclude a person is deceased." ECF 62-1, ¶ 10. He states, *id.*: "Because the Death Data Clean Up Project involves updates to individual-level records, anonymization is not feasible." But, he provides no rationale for the production of non-anonymized records.

The third project Dudek describes is "direct-deposit change, new claim[s], and wage-reporting fraud detection," or "Fraud Detection." *Id.* ¶ 11. Dudek states, *id.*: "The Fraud Detection Project is aimed at finding new ways to identify fraud in the foregoing areas. The Project involves looking for patterns of fraud in these filings on an individual case level. Anonymization is not feasible because it could obscure information useful for identifying fraud: for instance, name matching would not be possible."

In a Supplemental Declaration on March 28, 2025 (ECF 74-1), Dudek provided additional information about the "Fraud Detection" project, on which Employee 8 is working. He explains, *id.* ¶ 6: "This project is designed to respond to specific instances of known fraud in direct-deposit

128

change (i.e., allowing an individual to change what bank account benefits payments are deposited into), new claims (e.g., claims for Supplemental Security Income (SSI) and Old-Age, Survivors and Disability Insurance (OASDI)) and wage-reporting (i.e., the amount of wages an individual reports to SSA, which directly impacts the amount of benefits the person is entitled to receive). It is also designed to identify whether we can develop new ways to identify fraud. For example, we would like to identify if a higher-than-expected number of wage reports come from extremely young and extremely old individuals, as this would be suspicious and indicative of likely fraud."

Dudek also clarifies the type of access Employee 8 requires. He states, *id.* ¶ 8 (emphasis added): "Employee 8 plans to work with non-DOGE Team SSA employees in order *to retrieve anonymized, aggregated data for the Fraud Detection Project*, in order to look for anomalies that may be indicative of fraud. Employee 8 *needs access to discrete individual data only when anomalies are identified*, in order to detect fraud in specific instances." This assertion appears consistent with SSA's practices and policies, in that there is intended exploration of non-anonymized data only with regard to discrete instances of suspected fraud.

On April 1, 2025, Dudek submitted another Declaration. ECF 80-1. He describes why he believes that anonymization is not feasible. His argument can be summarized in three points: (1) "De-identification of large data sets—such as the data sets contained in the Numident, MBR, and SSR schema—is a highly complex technical and statistical skill that takes large amounts of employee and systems resources to complete"; (2) "anonymization of large data sets would result in the removal of information relevant to the SSA DOGE Team's analysis . . ."; and (3) "Even if SSA attempted to anonymize the individual level data to which the SSA DOGE Team currently needs access, the resulting dataset would almost certainly still contain" PII. *Id.* ¶¶ 5, 6.

Dudek's contentions about the challenges of anonymization are puzzling, given his prior statements about the way Employee 8 will conduct the Fraud Detection Project, and because of Agency practices. He does not shed light on why he changed his position, and now believes the process that he described in ECF 74-1 is no longer feasible. Nor does he explain why the procedures described in ECF 74-1 are not workable for the other projects.

Plaintiffs submitted the Declaration of Ann Lewis (ECF 77-2), who holds a degree in computer science from Carnegie Mellon and is the former Director of the Technology Transformation Services within GSA. *Id.* ¶ 1. She states that she reviewed Dudek's declarations and statements from the hearing of March 27, 2025. *Id.* ¶ 6. She opines that, based on SSA's existing fraud detection processes, the descriptions provided by Dudek "do[] not support the case for Employees 1, 5, 8, and 9 to get access to the high level of non-anonymized data that Mr. Dudek plans to give them, simply because they are 'working on individual cases' or 'the project involves updates to individual-level records.'" *Id.* She also asserts that the SSA projects referenced by Dudek do not warrant the "intended high level of non-anonymized data." *Id.* ¶ 7.

According to Lewis, a new fraud detection model requires an "Authorization to Operate ('ATO') review process" and a "Privacy Impact Assessment." *Id.* She adds that, based on her "professional experience," including her time at GSA, and conversations she has had "with peers familiar with SSA's data systems," SSA's "attempt to give DOGE and its affiliates such a high level of access suggests that they are circumventing existing SSA anti-fraud mitigation, resolution, and auditing processes." *Id.* ¶ 8.

Of concern, there are several access requests in the Administrative Record that do not seem to fit into the three projects identified by Dudek in the Notice. For example, the request from Employee 9 that appears on ECF 86-2 at 19 for "PSSNAP data to access identifying information

about beneficiaries and their application documents" contains only the explanation that Employee 9 is "investigating fraud, waste, and abuse and improper payments as part of [his] duties as a senior advisor for the SSA," for which he needs the information "within the PADW environment." The specific information that Employee 9 seeks is unclear, as is how he plans to use it.

Moghaddassi has requested "USCIS SAVE access" to get "detailed immigration status for non-citizen SSNs to detect fraud and improper payments." *Id.* at 29. He requested "SSN application process data (i.e., PSSNAP)" to "audit how fraudulent SSNs are issued." *Id.* at 28. But, there is no indication by Dudek of a project that is based on a suspicion that immigrants are engaging in fraud or abuse of SSNs.

Tyquiengco has requested access for Employee 9, Employee 11, and Moghaddassi to "SSI claims data to understand how many people request SSI benefits." *Id.* at 27. This appears to require only a numerical computation. It is unclear why the task requires access to PII, or even the projects for which the requests were made.

With respect to the Fraud Detection project, as discussed, Dudek at one point acknowledged that, in general, non-anonymized data is not needed. Rather, access to particular records of specific individuals would be necessary once a discrete issue emerges. *See* ECF 74-1, ¶ 8. But, Dudek later retracted this position. *See* ECF 80-1.

The Administrative Record does not establish "need" in any meaningful way, as contemplated by the Privacy Act and Agency protocols. And, even upon consideration of Dudek's declarations, the explanations are imprecise, contradictory, and insufficient. Defendants have never made clear why, contrary to Agency protocols and the Privacy Act, the DOGE Team requires unbridled access to the PII of countless Americans in order to effectuate their responsibilities.

131

The Privacy Act is not toothless.  Defendants cannot flout the law.  They are not exempt from a statute that Congress enacted to protect American citizens from overbroad and unnecessary access to their PII.

On this record, I conclude that plaintiffs have shown a likelihood of success on the merits as to their claim that the access to records that SSA seeks to provide to the DOGE Team does not fall within the need-to-know exception to the Privacy Act.

### b. Routine Use

Defendants maintain that, to the extent employees of the DOGE Team cannot be considered employees of the SSA, the access they have obtained is not improper under the Privacy Act because it "fits within the routine use exception."  ECF 113 at 25 (citing 5 U.S.C. § 552a(b)(3)).  Defendants' attempt to plug the events here into the routine use exception of the Privacy Act, 5 U.S.C. § 552a(b)(3), is unavailing.  It amounts to the proverbial effort to fit a square peg into a round hole.

Moreover, and of significance, the Administrative Record contains no reference to the reliance on the routine use exception.  Clearly, reliance on routine use constitutes post hoc justification for SSA's access decision.

In 5 U.S.C. § 552a(b)(3), it states:

**(b) Conditions of disclosure.—**No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—

*   *   *

**(3)** for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section; . . . .

In turn, 5 U.S.C. § 552a(a)(7) states:

132

JA1433

**(7)** the term "routine use" means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected; . . . .

Relevant here, the statute also requires the agency to "publish in the Federal Register . . . a notice . . . which notice shall include . . . (D) each routine use of the records contained in the system, including the categories of users and the purpose of such use." 5 U.S.C. § 552a(e)(4)(D). To justify the information shared with the DOGE Team, defendants point to SSA Privacy Act systems of records notices "("SORN")," corresponding to each data system to which access has been granted. ECF 113 at 25.

These SORNs contain the following "routine use," which defendants argue applies to the facts here: "'To student volunteers, individuals working under a personal services contract, and other workers who technically do not have the status of Federal employees, when they are performing work for us, as authorized by law, and they need access to personally identifiable information (PII) in our records in order to perform their assigned agency functions.'" *Id.* (citations omitted). But, defendants do not explain how this routine use applies here.

Members of the DOGE Team with access to these systems are not "student volunteers," nor are they "individuals working under a personal services contract." As employees of DOGE, these individuals would be considered federal employees or contractors, even if they are not employees of SSA. Thus, they are not "other workers who technically do not have the status of Federal employees."

Even assuming these individuals fit into one of the categories outlined in the SORN, and there is no evidence to demonstrate that they do, the SORN still requires that these individuals "*need access* to personally identifiable information (PII) . . . in order to perform their assigned

133

agency functions." (Emphasis added). As discussed earlier, no such need has been proffered to justify the wholesale access of a vast quantity of PII belonging to millions of people.

For these reasons, plaintiffs are likely to succeed on their claim that SSA's provision to the DOGE Team of access to SSA systems is "not in accordance with" the Privacy Act, and therefore in violation of the APA. *See* 5 U.S.C. § 706(2).

## 2. Arbitrary and Capricious

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43.

But, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). Agency action is generally considered arbitrary or capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43.

As discussed, defendants have not provided the Court with a reasonable explanation for why the entire DOGE Team needs full access to the wide swath of data maintained in SSA systems in order to undertake the projects. As detailed by Flick, SSA has practices in place for audits or other searches for alleged fraud or abuse. But, as discussed earlier, defendants ran roughshod over

SSA protocols for proper hiring, onboarding, training, and, most important, access limitations and separation of duties. I need not repeat each instance here, but it is clear from the declarations of Russo (ECF 36-1) and Felix-Lawson (ECF 36-2; ECF 62-1), as well as from the Administrative Record, that the credentialing process of the DOGE Team at SSA was flawed and lackadaisical.

SSA hastily provided access to an enormous quantity of sensitive, confidential data to members of the DOGE Team, without meaningful explanation for why these members needed access to PII to perform their duties. Indeed, the Administrative Record is rife with examples of ambiguous explanations for why DOGE Team members sought access to PII. Not once did Dudek inquire further into why this access is needed. Nor did he ever reject any request for access. The mere utterance of the word "need" is not like the proverbial "get out of jail free card," enabling SSA to avoid or bypass the statutory requirements of the Privacy Act.

Defendants clearly understand why guarding privacy, rather than waiting for harm to occur, is important. After all, that is precisely the reason why they have withheld the names of most of the members of the SSA DOGE Team. But, defendants have not shown the same level of care with the far more sensitive, confidential data of millions of Americans who entrusted their government with their personal and private information. The trust appears to have been violated.

Plaintiffs are likely to succeed on a claim that the conduct at issue was unreasonable and capricious. Plaintiffs have therefore shown a likelihood of success on their arbitrary and capricious claim under the APA.

### B. Irreparable Harm

Plaintiffs contend that "the DOGE Team's access to plaintiffs' members' sensitive, personally identifiable information on a daily basis and with no proper justification constitutes

irreparable injury." ECF 110-1 at 28.[56]  For example, plaintiffs contend that some of their members receive disability benefits. *Id.* (citing ECF 22-1, Widger Declaration, ¶ 10; ECF 22-4, Imperiale Declaration, ¶ 4; ECF 22-6, Fiesta Declaration, ¶ 18).  According to plaintiffs, to receive these benefits, "members must submit extensive medical information, including details about the prescription and non-prescription medicines the applicant takes; lists of their healthcare providers and the medical conditions for which they were evaluated and treated, including mental health conditions; and other sensitive medical information." ECF 110-1 at 29 (citing ECF 22-1, ¶ 11). Plaintiffs argue, ECF 110-1 at 29 (quoting ECF 22-1, ¶ 14): "Some of this information, including concerning 'health conditions like HIV or other STDs, can result in stigma, social isolation, job loss, housing loss, and other harms.'"

Moreover, SSA conducts periodic "Continuing Disability Review." Soc. Sec. Admin., *Your Continuing Eligibility*, https://perma.cc/NN9S-JVVL.  Therefore, the production of health records by beneficiaries of SSA is ongoing.

"Disclosure of this information to DOGE," plaintiffs say, "is an actual harm to Plaintiffs' members, who did not consent to DOGE accessing their sensitive information and who face injury in the form of a privacy violation every day the department accesses their private data." ECF 110-1 at 29.  And, plaintiffs contend that "harm like this cannot be rectified by money damages down the road." *Id.*

Defendants argue that plaintiffs have not established that they will suffer irreparable harm for the same reasons defendants argue that plaintiffs do not have standing—their claimed privacy

---

[56] Plaintiffs also argue that their members are "irreparably harmed by the now-increased risk that their information is more easily accessible by bad actors.[]"  ECF 110-1 at 29–31.  The Court understands plaintiffs' concerns, but that risk is too speculative to constitute irreparable harm.  *See* ECF 49 at 68–70.

136

injury "is not concrete." *See* ECF 113 at 31. Even if plaintiffs have established a concrete injury for standing purposes, defendants posit that plaintiffs "nonetheless fail to make a clear showing of actual and imminent harm from the intra-agency disclosure of information, where employees who view that information are subject to the same confidentiality obligations that apply to other similarly situated agency employees." *Id.* at 31–32. Defendants also contend that plaintiffs' argument fails because they "have an adequate alternative remedy to the emergency relief they seek: a private right of action under the Privacy Act." *Id.* at 32 (citing 5 U.S.C. § 552a(g)(4)).

The government cites two recent cases from the D.C. District Court denying a TRO or a preliminary injunction because the plaintiffs in each case did not establish irreparable harm. ECF 113 at 32 (citing *Carter*, 2025 WL 542586, at *5; *Alliance for Retired Americans*, 2025 WL 740401, at *20–24). But, the D.C. Circuit appears to maintain a higher bar for injunctive relief in these types of cases, as explained by Judge Kollar-Kotelly in *Alliance for Retired Americans*, 2025 WL 740401. There, she stated that in the D.C. Circuit, plaintiffs' asserted injury "'must be both certain and great'" to support a preliminary injunction. *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

And, in the context of disclosure of private information, courts in the D.C. Circuit "have consistently 'declined to find irreparable injury . . . where the challenged disclosure is not public' but instead is to a small number of 'individuals obligated to keep [the information] confidential.'" *Alliance for Retired Americans*, 2025 WL 740401, at *21 (quoting *Carter*, 2025 WL 542586, at *5) (alteration in *Alliance*) (cleaned up). This is because, she noted, the court could order adequate corrective relief after the fact. *See Alliance for Retired Americans*, 2025 WL 74040, at *21. For example, she explained that the court "could order the small number of individuals who received

the information to return or destroy it," and the possibility that adequate relief would later be available weighed against a finding of irreparable harm.  *See id.*

Defendants also cite *Electronic Privacy Information Center v. U.S. Office of Personnel Management.*, RDA-25-255, 2025 WL 580596 (E.D. Va. Feb. 21, 2025), to support their argument.  ECF 113 at 32.  The case involved the accessing of data systems containing "'Social Security numbers, dates of birth, salaries, home addresses, and job descriptions of all civil government workers, along with any disciplinary actions they have faced.'"  *Electronic Privacy Information Center*, 2025 WL 580596, at *2 (citation omitted).  However, the extensive data housed within the SSA's systems does not belong only to government workers.  *See id.*  Moreover, Judge Alston emphasized that the plaintiffs' arguments about "heightened risk of exposure or exfiltration by hostile actors"; future "misuse" of private data "by arbitrarily stopping payments through access to [the Treasury Department's] system"; and risk of "future identity theft because OPM's network is regularly subject to hacking attempts," which plaintiffs claimed were "more likely to be successful as a result of Defendants' actions," were "unpersuasive" and "too speculative."  *Id.* at *6–7.

In *Bessent*, Judge Richardson addressed irreparable injury.  2025 WL 1023638, at *6.  Because Privacy Act violations "are a type of injury at least sometimes redressable through damages," he was "unconvinced by the plaintiffs' assertion that their injury is so irreparable as to merit immediate equitable relief."  *Id.*  Moreover, he noted that the injury complained of "has already occurred," but, "preliminary injunctions typically focus on forestalling impending events that would be difficult to reverse."  *Id.*

I have already addressed the matter of dicta in *Chao I* and *Chao II*; those cases appear to recognize the right to seek injunctive relief under the APA for a Privacy Act violation.  Moreover,

138

the alleged harm here is not a *fait accompli*. And, a second look is not legally insignificant just because there was a previous look. Although the DOGE Team was previously provided with access, the DOGE Team continues to request additional access, and the team itself continues to grow in number. Simply put, the matter is ongoing.

As Judge King recognized in his dissent in *Bessent*, that case involved "some of the most sensitive personal information imaginable." *Id.* at *7. And, in her dissent, Judge Berner said, *id.* at *10: "Permitting DOGE unfettered access to the plaintiffs' personally identifiable information lets the proverbial genie out of the bottle. Even if they ultimately prevail, the plaintiffs will already have suffered irreparable harm." *Id.* at *10. The harm here can only be greater, because the SSA records contain extensive medical and mental health records, as well as records involving children.

Money damages cannot rectify this invasion of privacy of plaintiffs' members. *See, e.g.*, *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1275 (9th Cir. 1998) (finding "the retention of [the plaintiff's] undisputedly intimate medical information [without consent] . . . would constitute a continuing 'irreparable injury' for purposes of equitable relief"); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 802 (N.D. Cal. 2022) ("The invasion of privacy triggered by the Pixel's allegedly ongoing disclosure of plaintiffs' medical information is precisely the kind of intangible injury that cannot be remedied by damages."); *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000) (Disclosure of data including psychiatric and medical treatment and diagnoses "is the quintessential type of irreparable harm that cannot be compensated or undone by money damages."); *Haw. Psychiatric Soc. v. Ariyoshi*, 481 F. Supp. 1028, 1038 (D. Haw. 1979) (finding irreparable injury because "[t]he disclosure of the highly personal information contained in a psychiatrist's files to government personnel is itself a harm that is both substantial and irreversible").

### C.  Balance of the Equities and the Public Interest

As noted, the third and fourth elements, which address whether the balance of the equities tip in the movant's favor and whether the injunction is in the public interest, merge "when the Government is the opposing party." *Nken*, 556 U.S. at 435.

In plaintiffs' view, defendants' conduct "violates the public interest in the protection of personal information." ECF 122 at 14.  Plaintiffs add that there is not a public interest in sustaining unlawful agency action.  ECF 110-1 at 31.  Further, plaintiffs contend that pausing SSA's efforts to "curb fraud . . . will result in only minor harm to the government." ECF 122 at 15.  In particular, plaintiffs observe, *id.*: "In a colloquy with this Court during a telephone conference, Defendant Dudek acknowledged that, far from being time-sensitive, the efforts now underway are 'work [SSA has] never gotten around to as an agency.'" (Quoting ECF 73 (Tr., 3/27/25), at 10).  Thus, in plaintiffs' view, "[a]ny further delay would be incidental, and any further money lost [by the government] would be recoverable through legal action." ECF 122 at 15.

Moreover, according to plaintiffs, an injunction would not "'impinge on the President's broad authority.'" *Id.* (quoting ECF 113 at 30).  Rather, it would "simply ensure[] that the President and his agents abide by the statutory limitations placed upon them by Congress." ECF 122 at 15.

Defendants counter that an injunction is not in the public interest because it "would cause irreparable injuries to the government and the public." ECF 113 at 32.  Specifically, defendants assert that an injunction would harm the Agency's "operations by halting ongoing efforts to detect and eliminate fraud[]" and would "deprive[] the agency of valuable expertise and effectively stop[] work on projects that could otherwise reduce improper payments to the tune of millions of dollars per day that will be difficult, if not impossible, for the government recover." *Id.*

More broadly, the government argues that "a preliminary injunction will impinge on the President's broad authority over and responsibility for directing agency employees" which is "'an improper intrusion by a federal court into the workings of a coordinate branch of the government.'" *Id.* at 33 (quoting *Immigr. & Nat. Serv. v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers)).  Relatedly, defendants contend, ECF 113 at 33: "By instructing the government who can and cannot access the Defendant agency's data systems, Plaintiffs' requested injunction would curtail the Executive Branch's core duty to manage the day-to-day operations of its agencies."  The government also asserts that plaintiffs' "argument for why the equities and the public interest fall in their favor largely collapse into the merits[,]" which is improper.  *Id.*

Logically, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States*, 838 F.3d at 12.  On the other hand, there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *see also HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 686 (D. Md. 2020) (same), *aff'd*, 985 F.3d 309 (4th Cir. 2021); *Roe*, 947 F.3d at 230–31 (citing with approval the district court's statement that "the public 'undoubtedly has an interest in seeing its governmental institutions follow the law . . . .'").  Nonetheless, the Fourth Circuit has recently stated that it is improper to collapse "the first *Winter* factor—likelihood of success on the merits—with the merged balance of equities and public interest factor." *USA Farm Lab., Inc.*, 2025 WL 586339, at *4.  Likelihood of success on the merits alone does not suffice. *Id.*

As addressed earlier, there is a strong public interest in maintaining the confidentiality of PII, such as medical records and financial information.  Indeed, society expects as much.

141

JA1442

Defendants admit that the SSA granted DOGE personnel broad access to the PII of millions of Americans. This intrusion into the personal affairs of millions of Americans—absent an adequate explanation for the need to do so—is not in the public interest. This is especially true because SSA has long communicated to the public its commitment to privacy. *See, e.g.*, *SSA's Commitment to Protecting Privacy through Compliance*, SOC. SEC. ADMIN, https://perma.cc/779M-XJ7H ("The first regulation we published included a commitment to the public to safeguard the personal information you entrust to us. Our commitment is as solid now as it was when Social Security began in 1935, and we include the highest level of privacy protections possible."). And, the public is entitled to rely on the Agency's representations that it will safeguard their private information.

To be sure, rooting out possible fraud, waste, and mismanagement in the SSA is in the public interest. But, that does not mean that the government can flout the law to do so. SSA is not exempt from the statutes Congress enacted to protect American citizens from overbroad and unnecessary access to their PII.

Moreover, the government's claim of irreparable harm is not convincing. ECF 113 at 32 (claiming that an injunction "would cause irreparable injuries to the government and the public."). As the Court pointed out in a Memorandum denying defendants' request for a stay pending appeal (ECF 78 at 5), during an Emergency Telephone Conference held on March 27, 2025, Acting SSA Commissioner Dudek indicated that the anti-fraud related efforts of the SSA DOGE Team include matters that SSA has previously considered but had "never gotten around" to doing. ECF 73 (Tr., 3/27/25), at 10. To claim irreparable harm based, at least in part, on the desire to now perform certain actions that could have been done earlier does not carry the day. Notably, defendants also agreed to extend the TRO to the maximum time permitted by law. ECF 68 at 1. That is not consistent with a claim of irreparable harm.

In sum, the Court is satisfied that the balance of the equities and the public interest favor the issuance of a preliminary injunction.

## VII. Conclusion

In general, defendants tie all three projects identified by Dudek to the mission of DOGE to root out fraud. ECF 143 at 73–74. The objective to address fraud, waste, mismanagement, and bloat is laudable, and one that the American public presumably applauds and supports. Indeed, the taxpayers have every right to expect their government to make sure that their hard earned money is not squandered.

However, the issue here is not the work that DOGE or the Agency want to do. The issue is about how they want to do the work. The DOGE Team seeks access to the PII that millions of Americans entrusted to SSA, and the SSA Defendants have agreed to provide it.

For some 90 years, SSA has been guided by the foundational principle of an expectation of privacy with respect to its records. This case exposes a wide fissure in the foundation.

In my view, plaintiffs have standing, for the reasons stated. They are also likely to succeed on their claim that the Agency's actions are arbitrary and capricious, and in violation of the Privacy Act and the APA. And, plaintiffs have demonstrated that their members will suffer irreparable harm in the absence of a preliminary injunction, the equities tip in their favor, and the preliminary injunction serves the public interest.

For the foregoing reasons, I shall grant plaintiffs' Motion (ECF 110). A Preliminary Injunction shall issue.

## VIII. Bond

Fed. R. Civ. P. 65(c) states, in relevant part: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs

and damages sustained by any party found to have been wrongfully enjoined . . . ." The purpose of this Rule is "to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction . . . ." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). A "district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby*, 709 F.3d at 332, *abrogated on other grounds, as recognized by Stinnie v. Holcomb*, 37 F.4th 977, 981 (4th Cir. 2022); *see Hoechst Diafoil Co.*, 174 F.3d at 421 n.3; *Maryland Dep't of Hum. Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 (4th Cir. 1992); *Maryland, et al. v. United States Dep't of Agriculture, et al.*, 2025 WL 800216, at *26. The amount "ordinarily depends on the gravity of the potential harm to the enjoined party . . . ." *Hoechst Diafoil Co.*, 174 F.3d at 421 n.3.

Plaintiffs ask the Court to "exercise its discretion to waive or set at $0 the security requirement . . . because Defendants will face no monetary injury from any relief ordered by the Court." ECF 110-1 at 33 n.36. Defendants' Opposition is silent on the security requirement. During the P.I. Motion hearing, however, the government requested that the Court "impose a significant bond to take into account the considerable effects that an Injunction would have on the agency's day-to-day operations and the hindrance toward the agency's policy priorities." ECF 143 at 76.

I conclude that a nominal bond is appropriate, and plaintiffs have already paid a bond of $250 each, for a total of $750. ECF 53, ECF 54, ECF 55. No additional bond is required.

## IX. Stay Pending Appeal

In its brief, the government did not request a stay pending appeal in the event of an adverse ruling. But, at the P.I. Motion hearing, it made an oral request for a stay pending appeal, in the

event that they were unsuccessful.  ECF 143 at 76.  I ask defendants to submit a motion for stay, at their convenience.  Plaintiffs may respond within forty-eight (48) hours.

Date:    April 17, 2025                              _____/s/_____
                                                              Ellen Lipton Hollander
                                                              United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.*,

        Plaintiffs,

        v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*,

        Defendants.

Case No. 1:25-cv-00596-ELH

## NOTICE OF APPEAL

Defendants in the above-captioned case hereby give notice that they appeal to the United

States Court of Appeals for the Fourth Circuit from all aspects of this Court's Preliminary

Injunction Order and accompanying Memorandum Opinion entered on April 17, 2025, ECF Nos.

146, 147.

Dated:  April 17, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Senior Trial Counsel
MARIANNE F. KIES
SAMUEL S. HOLT
Trial Attorneys

Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

Kelly O. Hayes
Interim United States Attorney

MICHAEL J. WILSON
USDC Md Bar No. 18970
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4941
Fax: (410) 962-2310
Michael.Wilson4@usdoj.gov

*Attorneys for Defendants*

2

## CERTIFICATE OF SERVICE

I certify that on April 17, 2025, I electronically filed the foregoing and thereby caused a

copy to be served on counsel of record.

_/s/ Bradley P. Humphreys_
BRADLEY P. HUMPHREYS

## CERTIFICATE OF SERVICE

I certify that on June 9, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Jacob Christensen*
Jacob Christensen